IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FEDERAL-MOGUL GLOBAL INC., T&N LIMITED, *et al.*, | Bankruptcy Case No. 01-10578 |
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, *et al.*, | Civil Action Nos. 08-0229 and 08-230 |
| Appellants | Judge Joseph H. Rodriguez |
| v. | |
| FEDERAL-MOGUL GLOBAL INC., *et al.*, | |
| Appellees. | |

## BRIEF OF APPELLANTS, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND CERTAIN LONDON MARKET COMPANIES

Eileen T. McCabe
MENDES & MOUNT LLP
750 Seventh Avenue
New York, New York 10019-6829
Telephone: (212) 261-8000

Russell W. Roten
Jeff D. Kahane
DUANE MORRIS LLP
633 W. 5th Street, Suite 4600
Los Angeles, CA 90071
Telephone: (213) 689-7400

Michael A. Shiner
TUCKER ARENSBERG, P.C.
1500 One PPG Place
Pittsburgh, PA 15222
Telephone: (412) 594-5586

Richard W. Riley (No. 4052)
DUANE MORRIS LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801-1246
Telephone: (302) 657-4928

*Counsel for Certain Underwriters at Lloyd's, London, and Certain London Market Companies*

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

I.  THE PLAN ......................................................................................................5

    A.  Procedural History of the Plan...............................................................5

    B.  The Assignment of Insurance Rights.....................................................7

    C.  Compliance with § 524(g)(2)(B)(i)(II) .................................................8

II.  PROCEDURAL HISTORY OF THE PLAN .................................................12

I.  THE ASSIGNMENT IS DESIGNED TO ALLOW THE DEBTORS TO EVADE THE REQUIREMENTS OF § 524(b)(2)(B)(i).................................................14

II.  THE BANKRUPTCY COURT ERRED IN RULING THAT §§ 541(c) AND 1123(a)(5) PERMIT ASSIGNMENT OF THE INSURANCE RIGHTS..................................................15

    A.  The Bankruptcy Court Erred by Discussing State Law on Assignment.....................16

    B.  The Bankruptcy Court Erred by Finding § 1123(b)(3)(B) Permits the Vesting of Insurance Rights in the Trust.................................................16

    C.  Section 541 Does Not Modify A Debtor's Rights in Property....................................17

    D.  Preemption Occurs Only if There Is an Actual Conflict With State Law .................20

    E.  No Federal Interest Actually Conflicts With the State Law Enforcing Provisions Barring the Assignment of the Insurance Rights........................................20

        1.  Section 363(l) controls the assignment of the Insurance Rights ...................21

        2.  Section 1123(a)(5) does not permit assignment of the Policies absent LMI' consent ....................................................................23

            a.  The burden of establishing preemption is high .........................................23

        3.  Section 1123(a)(5) should be interpreted narrowly.........................................25

            a.  Section 1123(a)(5) does not expand Debtors' limited power to transfer estate property...........................................................25

            b.  Section 1123(a)(5) simply specifies the minimum requirements for what must go into a plan..........................................................25

**TABLE OF CONTENTS (CONT'D)**

Page

    c.   Section 1123(a)(5)'s preemptive effect is constrained by the preemptive effect of §§ 363(l) and 1142(a) ................................................. 27

    d.   Legislative history requires reading § 1123(a)(5)'s preemptive scope to be coextensive with § 1142(a) ................................................................. 32

F.     The Bankruptcy Court Erred in interpreting CE and Kaiser Aluminum ..................... 33

    1.   The Bankruptcy Court erred by misconstruing the holding of CE to involve an assignment to a trust ..................................................... 34

    2.   The Bankruptcy Court erred by misconstruing CE as determining § 1123(a)(5)'s preemptive scope ..................................................... 35

    3.   The Bankruptcy Court erred by relying upon Kaiser Aluminum ................... 36

III.   THE BANKRUPTCY COURT ERRED IN RULING THAT § 1123(A)(5)(B) PREEMPTS CONTRACTUAL PROVISIONS ....................................................................... 37

IV.   SECTION 365 DOES NOT PERMIT MODIFICATION OF THE POLICIES BECAUSE THEY ARE NOT-EXECUTORY CONTRACTS ................................................................. 38

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ........................................................ 39

DM3\726017.1

## TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*AC&S, Inc. v. Aetna Cas. & Sur. Co.*,
  764 F.2d 968 (3d. Cir. 1985) ...................................................................................25

*Amatex Cas. & Sur. Co. v. Aetna Cas. & Sur. Co.*,
  97 B.R. 220 (Bankr. E.D. Pa. 1989) ....................................................................14

*In re American Freight Sys., Inc.*,
  179 B.R. 952 (Bankr. D. Kan. 1995) ..............................................................18, 31

*Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 North LaSalle St. P'ship*,
  526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999)........................................37

*Barber v. Bettendorf Bank, N.A. (In re Pearson Industries, Inc.)*,
  152 B.R. 546 (Bankr. C.D. Ill. 1993) ...................................................................31

*Beck-Brown Realty v. Liberty Bell Ins. Co.*,
  241 N.Y.S. 727 (N.Y. Sup. Ct. 1930).....................................................................22

*In re Beeter*,
  173 B.R. 108 (Bankr. W.D. Tex. 1994).................................................................39

*Beloit Liquidating Trust v. United Ins. Co.*,
  287 B.R. 904 (N.D. Ill. 2002)................................................................................38

*BFP v. Resolution Trust Corp.*,
  511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994)..............................20, 23, 37

*In re Bishop College*,
  151 B.R. 394 (Bankr. N.D.Tex. 1993) ..................................................................18

*Bogus v. American National Bank of Cheyenne, Wyo.*,
  401 F.2d 458 (10th Cir. 1968) ..............................................................................20

*In re Bolin Oil Co.*,
  51 B.R. 936 (Bankr. N.D. Ohio 1985)...................................................................20

*In re Bristol Associates, Inc.*,
  505 F.2d 1056 (3d Cir. 1974) ................................................................................20

*Bunker v. Peyton (in Re Bunker)*,
  312 F.3d 145 (4th Cir. 2002) ................................................................................21

## TABLE OF AUTHORITIES (CONT'D)

**Cases**                                                                   **Page(s)**

*Butner v. United States,*
    440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)....................................................20

*Calvert v. Bongards Creameries (In re Schauer),*
    62 B.R. 526 (Bankr. D. Minn. 1986), *aff'd* Civ. No. 5-86-195 *slip op.* (D. Minn), *aff'd*
    835 F.2d 1222 (8th Cir. 1987)..................................................................................19

*Century Indem. Co. v. Aero-Motive Co.,*
    318 F. Supp. 2d 530 (W.D. Mich. 2003)..................................................................22

*Cipollone v. Liggett Group, Inc.,*
    505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).......................................32, 36

*Cisneros v. Alpine Ridge Group,*
    508 U.S. 10 (1993) ....................................................................................................24

*In re Clarksville Hospitality Corp.,*
    1996 Bankr. LEXIS 340 (Bankr. D. Mass., April 4, 1996).......................................30

*In re Combustion Eng'g, Inc.,*
    391 F.3d 190 (3d Cir. 2004) ..................................3, 9, 12, 14, 17, 19-20, 25, 34-36

*Connecticut Nat'l Bank v. Germain,*
    503 U.S. 249, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).........................................28

*D'Aloia v. Travelers Ins. Co.,*
    85 N.Y.2d 825 (1995).................................................................................................2

*Dawson v. Thomas (In re Dawson),*
    2008 Bankr. LEXIS 1074 (Bankr. D.D.C. Apr. 9, 2008)....................................21-22

*Donaldson v. Bernstein,*
    104 F.3d 547 (3d Cir. 1997) .......................................................................................5

*In re Doty,*
    129 B.R. 571 (Bankr. N.D. Ind. 1991) .....................................................................31

*Duncan v. Walker,*
    533 U.S. 167 (2001) ..................................................................................................29

*Dynamic Changes Hypnosis Center, Inc. v. PCH Holding, LLC,*
    306 B.R. 800 (E.D. Va. 2004) .....................................................................................5

*In re EES Lambert Assocs.,*
    62 B.R. 328 (Bankr. N.D. Ill. 1986) .........................................................................20

iv

## TABLE OF AUTHORITIES (CONT'D)

**Cases**                                                                                    **Page(s)**

*Egelhoff v. Egelhoff,*
    532 U.S. 141 (2001) ........................................................................................................24

*In re Farmers Markets, Inc.,*
    792 F.2d 1400 (9th Cir.1986) ......................................................................................19

*In re FCX, Inc.,*
    853 F.2d 1149 (4th Cir. 1988) .........................................................................18, 27, 30

*First Fidelity Bank v. McAteer,*
    985 F.2d 114 (3d Cir. 1993) ........................................................................................17

*Gans v. MDR Liquidating Corp.,*
    1991 Del. Ch. LEXIS 110 (Del. Ch. 1991) ...................................................................3

*In re Gerwer,*
    898 F.2d 730 (9th Cir. 1990) .......................................................................................21

*In re Global Industrial Technologies, Inc.,*
    Case No. 02-21626, Memorandum Order ...................................................................15

*In re Hanna,*
    912 F.2d 945 (8th Cir. 1990) .......................................................................................22

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    885 F.2d 1149 (3d Cir. 1989) ......................................................................................38

*Integrated Solutions v. Serv. Support Specialties, Inc.,*
    124 F.3d 487 (3d Cir. 1997) ........................................................................................18

*Jones v. Rath Packing Co.,*
    430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)............................................23, 36

*In re Kaiser Aluminum Corp.,*
    343 B.R. 88 (D. Del. 2006)...................................................15, 27, 33, 34, 36-37

*Kane v. Johns-Manville Corp.,*
    843 F.2d 636 (2d Cir. 1988) ........................................................................................14

*Keene Corp. v. United States,*
    508 U.S. 200, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993)............................................37

*In re Kennedy,*
    442 A.2d 79 (Del. 1982)................................................................................................3

## TABLE OF AUTHORITIES (CONT'D)

**Cases**                                                                                   **Page(s)**

*L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*,
    209 F.3d 291 (3d Cir. 2000), *cert denied*, 531 U.S. 873, 121 S.Ct. 175, 148 L.Ed.2d
    120 (2000)................................................................................................................22

*Lamie v. United States Trustee*,
    540 U.S. 526, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004)......................................29

*Massachusetts Ass'n of HMOs v. Ruthardt*,
    194 F.3d 176 (1st Cir. 1999).....................................................................................23

*Matter of Chicago Rock Island & Pacific R. Co.*,
    604 F.2d 1002 (7th Cir. 1979) ..................................................................................38

*Matter of Enjet, Inc.*,
    205 B.R. 803 (Bankr. E.D. La. 1997) .......................................................................39

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).............................24, 28, 36

*Pacific Gas & Elect. Co. v. State of California*,
    350 F.3d 932 (9th Cir. 2003), *cert. denied sub. nom.*, 543 U.S. 956, 125 S.Ct. 454,
    160 L.Ed.2d 318 (2004) ("*PG&E II*").................................................24, 26, 32-33

*Paramount Finance Co. v. U. S.*,
    379 F.2d 543 (6th Cir. 1967) ....................................................................................20

*Public Service Co. v. New Hampshire (In re Public Service Co.)*,
    108 B.R. 854 (Bankr. D.N.H. 1989).........................................................................30

*Ruhlin v. New York Life Ins. Co.*,
    304 U.S. 202 (1938) ..................................................................................................25

*Russello v. U.S.*,
    464 U.S. 16 (1983) ....................................................................................................37

*In re Sanders*,
    969 F.2d 591 (7th Cir. 1992) ....................................................................................18

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props.*,
    394 F. Supp. 2d 585 (S.D.N.Y. 2005) ...............................................................2-3, 22

vi

<u>**TABLE OF AUTHORITIES (CONT'D)**</u>

**Cases**                                                                                   **Page(s)**

*Stan Kock & Sons Trucking, Inc. v. Great W. Cas. Co.,*
517 F.3d 1032 (8th Cir. 2008) ................................................................................25

*In re Stasz,*
2008 Bankr. Lexis 1255 (B.A.P. 9th Cir. April 15, 2008) ........................................5

*In re Stewart Foods, Inc.,*
64 F.3d 141 (4th Cir. 1995) ...................................................................................38

*In re Stone & Webster, Inc.,*
286 B.R. 532 (Bankr. D. Del. 2002) .......................................................................27

*The Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,*
330 F.3d 548 (3d Cir. 2003) ..............................................................................27-28

*Tillison v. Gregoire,*
424 F.3d 1093 (9th Cir. 2005) ...............................................................................24

*Transamerica Ins. Co. v. Duro Bag Mfg. Co.,*
50 F.3d 370 (6th Cir. 1995) ...................................................................................25

*In re Transcon Lines,*
58 F.3d 1432 (9th Cir. 1995), *cert. denied sub nom. Gumport v. Sterling Press, Inc.,*
516 U.S. 1146, 134 L. Ed. 2d 96, 116 S. Ct. 1016 (1996)......................................18

*TRW, Inc. v. Andrews,*
534 U.S. 19 (2001) ................................................................................................29

*U.S. v. Wexler,*
31 F.3d 117 (3rd Cir. 1994).....................................................................................18

*United Sav. Asso. v. Timbers of Inwood Forest Associates, Ltd.,*
484 U.S. 365 (1988) ...............................................................................................28

*United States v. Cooper,*
396 F.3d 308 (3d Cir. 2005) ...................................................................................28

*United States v. Ron Pair Enters.,*
489 U.S. 235 (1989) ...............................................................................................27

*White v. Baltic Conveyor Co.,*
209 F.Supp. 716 (D.N.J. 1962)...............................................................................37

## TABLE OF AUTHORITIES (CONT'D)

**Cases**                                                          **Page(s)**

*In re Western Asbestos Company,*
   313 B.R. 456 (Bankr. N.D. Cal. 2003), *aff'd* 2004 WL 1944792 (N.D.Cal. April 16,
   2004) .................................................................................................................16-17

*Woodson v. Scott Paper Co.,*
   109 F.3d 913 (3d Cir. 1997) ...................................................................................37

*In re Worldcom, Inc.,*
   2003 U.S. Dist. Lexis 11160 (S.D.N.Y. June 30, 2003)............................................5

### Statutes

11 U.S.C. Section 361 .......................................................................................30

11 U.S.C. Section 362 .......................................................................................28

11 U.S.C. Section 363 ...............................................13-14, 21-23, 25-26, 29-32, 37, 39

11 U.S.C. Section 365 ....................................................................................37-38

11 U.S.C. Section 524 ...........................................3, 9, 12-13, 14-16, 34

11 U.S.C. Section 541 ...........................................13, 15-19, 35, 37-39

11 U.S.C. Section 1106 ......................................................................................21

11 U.S.C. Section 1107 ......................................................................................21

11 U.S.C. Section 1123 ...............................................1, 13-17, 21, 23-27, 30-33, 35-38

11 U.S.C. Section 1129 ...............................................................................27, 30

11 U.S.C. Section 1142 ...............................................13, 14, 17, 23, 27, 29-33

15 U.S.C. Section 1012 ......................................................................................25

28 U.S.C. Section 158 ..........................................................................................5

29 U.S.C. Section 1144 ......................................................................................24

DM3\726017.1

## TABLE OF AUTHORITIES (CONT'D)

### Congressional History

140 Cong. Rec. S4521-01, S4523 (Apr. 20, 1994)..................................................................9, 14

140 Cong. Rec. H10,765 (remarks of Rep. Jack Brooks);
   3 Norton Bankruptcy Law & Practice  Section 48:6 (2004) ...................................................14

H.R. Rep. No. 595 95th Cong., 1st Sess. 369 (1977) .....................................................................19

S. Rep. No. 989, 95th Cong, 2d Sess. 83 (1978) ...........................................................................19

### Other

Federal Rule of Bankruptcy Procedure P. 8002(a) ...........................................................................5

Federal Rule of Civil Procedure 58 .................................................................................................5

## INTRODUCTION

Certain Underwriters at Lloyd's, London, and Certain London Market Companies (collectively, "London Market Insurers" or "LMI") bring this appeal to prevent certain of the captioned debtors (the "Putative Insureds")[1] from rewriting their contractual relationship with LMI. On March 20, 2008, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an Order (the "Preemption Order") and Memorandum Opinion Regarding Assignment and Preemption Issue, D.I. 14237 (the "Preemption Opinion"), in which it approved the assignment ("Assignment") of certain Insurance Rights (defined below) to the asbestos personal injury trust created under the Plan of Reorganization pursuant to § 524(g)[2] of the Bankruptcy Code ("Trust"). In doing so, the Bankruptcy Court misapplies §§ 541 and 1123 to purposes for which they were not designed, utilizing a narrow, administrative section of the Bankruptcy Code to supersede substantive state law that should preclude the result the Bankruptcy Court achieved here. The effect of the order is to upset the balance between federal and state law and is a matter of grave concern.

LMI respectfully request that the Court reverse the Preemption Order and find that the Assignment is not permitted under the Bankruptcy Code, as a matter of law.

The Putative Insureds allege that they are covered under insurance policies subscribed by LMI (the "London Policies"). [Trial Exhibit PS-23 (listing policies subscribed by LMI)]. Those policies (if, in fact, they do provide coverage for asbestos claims against the Putative Insureds

---

[1]     The "Putative Insureds" are Federal-Mogul Products Corporation ("FMP"), Federal-Mogul Corporation, and Felt Products Manufacturing Company. Whether FMP is entitled to seek coverage under policies subscribed on behalf of Studebaker-Worthington and McGraw Edison is disputed. This issue would have to be litigated in a coverage case.

[2]     Unless otherwise specified, all section references herein refer to Title 11 of the United States Code (the "Bankruptcy Code").

(which has not been determined) include or incorporate provisions that prevent the insured from assigning the London Policies without the consent of LMI (these clauses are referred to as Consent-to-Assignment Clauses, or, as here, "Anti-Assignment Clauses"). [Stipulation by and Between (I) Plan Proponents[3] and (II) Certain Underwriters at Lloyd's, London and Certain London Market Insurers filed July 24, 2007, at D.I. 13062, Exh. 1 (the "Objection Stipulation")].

The Plan Proponents have stipulated that there is a material dispute about whether the Anti-Assignment Clauses are enforceable under state law. [Objection Stipulation, § 3.b at 2]. For the Court to find that the Bankruptcy Code authorizes the Assignment, the Court must find that the Bankruptcy Code actually conflicts with, and thus preempts, the state law that gives effect to the Anti-Assignment Clauses. Thus, for purposes of this determination, the Court must assume that applicable state law and the London Policies do not permit the Assignment.

LMI based the decision to provide coverage under the London Policies upon factors relating to the insured personally, including the nature of the insured's business and the kinds and extent of risks inherent in that business. *See, e.g., SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props.*, 394 F. Supp. 2d 585, 594 (S.D.N.Y. 2005). Under the London Policies, the insured must cooperate in the defense of meritless claims, resist payment to such claimants, and keep payments of valid claims to reasonable levels. These cooperation obligations are explicit under the terms of the London Policies and are also required by an insured's obligations to act in good faith when seeking coverage under its insurance policies. *See, e.g., D'Aloia v. Travelers Ins. Co.*,

---

[3]    The Plan Proponents are the Debtors, the Official Committee of Unsecured Creditors, the Asbestos Claimants Committee, J.P. Morgan Chase Bank, N.A., as Administrative Agent, the Future Claimants Representative ("FCR"), and the Official Committee of Equity Security Holders.

2

85 N.Y.2d 825, 826 (1995) (evaluating insured's conduct in light of duty of good faith to perform obligations under insurance contract).  Hence, pursuant to the Anti-Assignment Clauses, LMI reserved the right to veto an assignment to another entity, such as the Trust, with a different type of business or different kinds of risks, or that might not comply with the duty of cooperation—in other words, if the proposed assignment would increase LMI' risks under the London Policies. *SR Int'l Bus. Ins.*, 394 F. Supp. at 594.

Through the Fourth Amended Joint Plan of Reorganization (as modified) (the "Plan")[4], the Plan Proponents  seek to substitute the Trust  as the insured in place of the Putative Insureds, with respect to asbestos claims.  Delaware law governs the Trust.  Plan, Exh. 1.1.217, Asbestos Personal Injury Settlement Trust Agreement § 7.11 at 48.  The Trustees, under Delaware law, are fiduciaries to the beneficiaries of the Trust. *See, e.g., Gans v. MDR Liquidating Corp.*, 1991 Del. Ch. LEXIS 110 (Del. Ch. 1991).  The Trust Advisory Committee and FCR oversee the Trustees. [Plan, Exhibit 1.1.217, § 2.2(f) at 17-19].  The members of the Trust Advisory Committee are lawyers for the asbestos claimants.  [Plan, Exhibit 1.1.217, § 5.1 at 31, and p. 50-51].  Their fiduciary duty is to those claimants. *In re Kennedy*, 442 A.2d 79, 89 (Del. 1982) ("It is well settled in Delaware that an attorney is bound by a fiduciary duty in his dealings with his client."). The FCR is a representative of, and fiduciary to, the future asbestos claimants. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 237 (3d Cir. 2004); 11 U.S.C. § 524(g)(4)(B)(i) ("*CE*").  These relationships are different than an insured's obligations to its insurers, *i.e.*, to ensure that only meritorious claims are paid, and those in a reasonable amount.

---

[4]      Unless defined herein, capitalized terms shall take the meanings ascribed to them in the Plan.

3

The Trust operates through Trust Distribution Procedures ("TDP").    [Plan, Exhibit 1.1.217].    The TDP state which claimants get paid; how much; for what diseases; and the quantum of proof needed.    TDP, §§ 2.1(b) at 4, 5.3(a)(1)(C) at 35, 5.3(a)(3) at 42-44, 5.7 at 51-56.    The TDP do not resemble what would happen in a court of law.[5]    The TDP are a way of allowing payment to asbestos claimants (and their lawyers) on the basis of flimsy evidence for medical conditions, which, in some cases, are non-existent.    The intended effect of the Assignment is that the Trust, which is administered and overseen by fiduciaries to the claimants, becomes the insured for asbestos claims.  (Should the court in the coverage case rule, on certain of the policies at issue, that FMP is entitled to seek coverage under the policies as the named assured, or otherwise).  Such a result perverts the insurance relationship and subjects insurers to risks they never contemplated.    It should not be allowed to stand.

## JURISDICTION AND STANDARD OF REVIEW

The issue on appeal is whether the Bankruptcy Court erred in entering the Preemption Order.  The Court has jurisdiction to hear appeals from "final judgments, orders and decrees" of the Bankruptcy Court.  28 U.S.C. § 158(a)(1).  The entry of the Preemption Order resolved the contested matter initiated pursuant to the Stipulation and Order Regarding Remaining London

---

[5] See Report of Edward J. McKinnon dated May 21, 2007 (describing policy rights lost in and inherent legal inequities of TDPs), attached as Exhibit B to Certain Insurers' Additional Objections to the Fourth Amended Joint Plan of Reorganization (the "Additional Objections") filed in De. Bankr. No. 01-10578 on June 4, 2007 at Doc. No. 12585; Report of Mark A. Behrens dated May 21, 2007 (addressing the TPDs contravention of sound legal and medical principals and departure from public policy concerns), attached as Exhibit C to the Additional Objections filed in De. Bankr. No. 01-10578 on June 4, 2007 at Doc. No. 12585; Report of Joseph J. Renn, III (highlighting the  inconsistencies between the TPDs medical criteria and established medical criteria) attached as Exhibit D to the Additional Objections filed in De. Bankr. No. 01-10578 on June 4, 2007 at Doc. No. 12585; Report of Gary S. Stein dated May 22, 2007 (discussing Insurance Neutrality), attached as Exhibit E to the Additional Objections filed in De. Bankr. No. 01-10578 on June 4, 2007 at Doc. No. 12585.

4

Market Objection to the Plan, entered November 8, 2007, D.I. 13670 ("LMI Assignment Stipulation").[6]

An order resolving a contested matter is a final and appealable order.[7]

This appeal is timely.  LMI filed a notice of appeal from the Preemption Order on March 27, 2008, D.I. 582593636, within the required 10-day time period.  Fed. R. Bankr. P. 8002(a). Accordingly, this Court has jurisdiction to entertain this appeal.  28 U.S.C. § 158(a)(1).

This appeal presents issues of law only.  LMI Assignment Stipulation, ¶ 2 at 5.  On appeal, the Bankruptcy Court's conclusions of law are subject to *de novo* review.  *See, e.g.,* *Donaldson v. Bernstein*, 104 F.3d 547, 551 (3d Cir. 1997).

## STATEMENT OF THE CASE

### I.    THE PLAN

#### A.    Procedural History of the Plan

The Plan was filed on June 5, 2007.  LMI and the Plan Proponents agreed to limit LMI' objections to the Plan to one issue.  [Objection Stipulation, Exhibit 1 to Exhibit 1, § 2 at 2].  On June 4, 2007, LMI objected to the Plan on that one issue (the "Preemption Issue"):

> whether under the Bankruptcy Code, as a matter of law, the assignment of any Policies or other rights and obligations with respect to, arising under, or related to the Policies, is valid and enforceable against LMI notwithstanding (i) anti-

---

[6]    The Bankruptcy Court has also ruled that this Order is final and appealable.    Order Confirming Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-In-Possession (As Modified), entered November 8, 2007, D.I. 13674 ("Confirmation Order"), Section VII.A.4 at 32.

[7]    *Dynamic Changes Hypnosis Center, Inc. v. PCH Holding, LLC*, 306 B.R. 800, 807 (E.D. Va. 2004) ("an order ... is a final order because it resolves a contested matter."); *In re Stasz*, 2008 Bankr. Lexis 1255, at *9 (B.A.P. 9th Cir. April 15, 2008) ("The order entered resolving a contested matter has the status of a judgment under Federal Rule of Civil Procedure 58."); *In re Worldcom, Inc.*, 2003 U.S. Dist. Lexis 11160, at *19 (S.D.N.Y. June 30, 2003).

assignment provisions in or incorporated in the Policies and (ii) applicable state law.[8]

((i) and (ii) are collectively referred to herein as the "Assignment Restrictions"). The question of whether the Assignment would be permitted under state law was reserved to the state court. [Transcript of Record, October 1, 2007, at 114:24-115:1, 119:4-9]. On August 21, 2007, LMI filed a post-trial brief. *See* Joint Submission of Plan Objectors' Post-Trial Briefs in Opposition to Confirmation of Fourth Amended Joint Plan Of Reorganization (as Modified), D.I. 13182, Tab 9b.

The Bankruptcy Court conducted the confirmation hearing on June 18-21, July 9-10, 2007, and October 1-2, 2007. During the confirmation hearing the Plan Proponents stated that they needed to obtain a final order confirming the Plan before December 31, 2007. [Transcript of Record, October 2, 2007, at 84:23]. The Bankruptcy Court stated that if the captioned debtors (the "Debtors") failed to resolve LMI' objection on assignment, it would be unlikely that there would be a final order confirming the Plan by December 31. [*Id.* at 117:17-118:2]. Following the confirmation hearing, and after much negotiation, LMI and the Plan Proponents stipulated to, among other things:

1.    The Preemption Issue would be decided in a contested matter separate from confirmation. [LMI Assignment Stipulation, ¶ 1 at 4].

2.    In entering an order on the Preemption Issue, the Bankruptcy Court would rule solely on the Preemption Issue. [*Id.*, ¶ 2 at 5].

3.    The Confirmation Order would state (i) that the Bankruptcy Court is not ruling on the Preemption Issue; (ii) the Preemption Order would be entered separately; and (iii) the Preemption Order would be a final and appealable order. [*Id.*, ¶ 3 at 5].

---

[8]    Objections of Certain Underwriters at Lloyd's, London and Certain London Market Companies to Fourth Amended Joint Plan of Reorganization, D.I. 12576 at 2 ("LMI Plan Objections").

4.      The Plan Proponents may only oppose the appeal on substantive grounds that the Bankruptcy Code preempts or supersedes state law and contractual provisions, consistent with their briefing in the Bankruptcy Court. *Id.*, ¶ 5 at 5].

5.      None of the parties may contend in any appeal of the Preemption Order that (i) the Bankruptcy Court's determination of the Preemption Issue separately from confirmation of the Plan creates a procedural or jurisdictional impediment to appellate review of the merits of the Preemption Order; or (ii) the Bankruptcy Court lacked jurisdiction or statutory authority to enter the Preemption Order. [*Id.*, ¶ 6 at 5-6].

6.      None of the Plan Proponents or the Trust may contend that any appeal by LMI of the Preemption Order is moot or otherwise barred. [*Id.*, ¶ 7 at 6].

7.      In the event that LMI prevail in this appeal, LMI may assert any and all rights under any applicable anti-assignment provisions [the Anti-Assignment Clauses] or state law in any insurance coverage proceeding. [*Id.*, ¶ 8 at 6].

The Bankruptcy Court confirmed the Plan on November 8, 2007, and this Court affirmed the Confirmation Order on November 13, 2007. D.I. 13698. The Effective Date of the Plan occurred on December 27, 2007.[9]

## B.      The Assignment of Insurance Rights

The Plan does not attempt to assign the London Policies, *per se*. The Putative Insureds retain the London Policies, presumably so that the Debtors can attempt to make non-asbestos insurance claims against the London Policies in the future.

The Plan provides for an assignment of Trust Assets to the Trust. [*See* Plan, § 4.3 at 90]. The Trust Assets include, *inter alia*, the following "Insurance Rights" (as defined in the Plan): (i) Asbestos Insurance Actions; (ii) Asbestos Insurance Action Recoveries attributable to any

---

[9]      Notice of (A) Entry of Order Confirming Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-in-Possession (as Modified); (B) Effective Date of the Plan; (C) Substantial Consummation of the Plan; and (D) Bar Dates for Certain Administrative Claims and Professional Claims, D.I. 13940.

7

Asbestos Personal Injury Claims; (iii) certain Asbestos Insurance Settlement Agreements; and

(iv) Asbestos In-Place Insurance Coverage. [Plan, § 1.1.218 at 28].

> Asbestos Insurance Actions are defined as follows:
>
> [A]ny claim, cause of action, or right of the Debtors ..., arising from or related to:
> (a) any such Asbestos Insurance Company's failure to provide or pay under
> Asbestos In-Place Insurance Coverage, (b) the refusal of any Asbestos Insurance
> Company to compromise and settle any Asbestos Personal Injury Claim under or
> pursuant to any Asbestos Insurance Policy, (c) the interpretation or enforcement
> of the terms of any Asbestos Insurance Policy with respect to any Asbestos
> Personal Injury Claim, or (d) any conduct of any Asbestos Insurance Company
> constituting "bad faith" or other wrongful conduct under applicable law.

[Plan, § 1.1.17 at 4].

Asbestos Insurance Action Recoveries include cash from Insurance Settlement

Agreements; the right to receive proceeds of Asbestos In-Place Insurance Coverage; and the

right to receive proceeds or benefits of any Asbestos Insurance Action. [Plan, § 1.1.18 at 4].

> Asbestos In-Place Insurance Coverage is defined as:
>
> Any insurance coverage available for the payment or reimbursement of liability,
> indemnity or defense costs arising from or related to Asbestos Personal Injury
> Claims or Trust Expenses under any Asbestos Insurance Policy or Asbestos
> Insurance Settlement Agreement.

[Plan, § 1.1.16 at 4].

In sum, these provisions purport to give the Trust, a total stranger to the London Policies,

the right to sue for coverage for asbestos claims, under the London Policies.

## C. Compliance with § 524(g)(2)(B)(i)(II)

The Plan should have met the requirements of § 524(g) in order to establish the Trust.

The convoluted machinations of the Plan Proponents set forth in the Plan fail to meet those

requirements. Section 524(g) requires a debtor to put enough equity into a trust to ensure that the

company's future profits will be available to pay future claims. *See CE*, 391 F.3d 190, 248 n. 69

(quoting 140 Cong. Rec. S4521-01, S4523 (Apr. 20, 1994) (statement of Senator Heflin). To

8

provide the assets to pay asbestos claims a trust must be "funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends"). § 524(g)(2)(B)(i)(II). "The implications of this requirement is that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an "evergreen" funding source for future asbestos claimants". *CE*, 391 F.3d at 248. Furthermore, a debtor cannot contribute a *de minimis* amount of securities to a trust. A trust must control the debtor, by owning a majority of its voting shares, or be entitled to control the debtor by such ownership if specified contingencies occur. § 524(g)(2)(B)(i)(III). However, under the Plan, the Trust will not own a majority of voting shares unless a number of extremely remote contingencies occur.

The Plan provides that on the Effective Date, the reorganized Debtors shall issue 49.9 million shares of Reorganized Class A Common Stock and 50.1 million shares of Reorganized Federal-Mogul Class B Common Stock ("Class B"). [Plan, § 8.3.4 at 121]. The Class A and Class B shares have the same rights with respect to voting, however, only the Class B shareholders elect certain of the directors. [Plan, Exhibit 8.3.12(1)]. The Plan specifies that the Class B shares would be distributed to the Trust as part of the consideration for the Trust's assumption of the asbestos claims. [Plan, § 8.3.4 at 121].

Of the 50.1 million shares distributed to the Trust, the Trust will subscribe for 57.5% of such shares for the subscription price of £338,000,000 (approximately $657,209,160). [Plan, § 4.5.5]. The debt for that subscription is then immediately assigned to Reorganized T&N, one of the asbestos tortfeasor debtors. [Plan, § 4.5.5 at 92]. The Class B shares are not traded, but the

Class A common stock trades around $20 per share.[10]  Thus, on the Effective Date, the Trust

received 50.1 million of shares worth approximately $1,002,000,000.  The right to own these

shares is subject to an option by Thornwood Associates Limited Partnership ("Thornwood").

[Plan, § 8.3.6 at 123; Plan, Exhibit 8.3.6(a)].  If Thornwood exercises the option, it will purchase

43,141,667 shares for $775 million (approximately $17.96 per share or slightly more than $2 per

share below market price).  *Id.*  If Thornwood chooses to exercise its call option, the Trust will

have cash worth $775 million plus 6,958,333 shares of Class B shares (which, at the market price

or approximately $20 per share is worth about $139,166,660), for a total net worth of

$914,166,660.

However, of that $914,166,660, the Trust owes the subscription price of $657,209,160

(the "Stock Repayment Obligation") to Reorganized T&N.  *Id.*  Thus, if Thornwood exercises its

option, the Trust is left with net assets worth $256,957,500 on the Effective Date.  If Thornwood

does not exercise its option, then the Trust will have net assets worth $ 344,790,840.  To the

extent that the Trust is able to collect insurance proceeds to pay the asbestos claims against

T&N, it can use such collections to offset the Stock Repayment Obligation.  [Plan, § 4.5.10].  If

the Trust cannot fully offset the Stock Repayment Obligation from insurance proceeds, and if

Thornwood does not exercise its option, the Trust will have to pay the Stock Repayment

Obligation from other assets, *e.g.*, by selling its Class B shares.

In addition, "the Trust shall issue to the reorganized Debtors a note in the face amount of

$125,000,000, which note shall mature ten (10) Business Days after the Effective Date (the

"Maturity Date")".  [Plan, § 8.3.5 at 122].  To secure the note, the Plan specifies that the Trust

"shall grant Reorganized Federal-Mogul a security interest in 13.888888888% of the

---

[10]     *See* http://www.marketwatch.com/quotes/fdml/?dist=DNH_S (last visited May 19, 2008).

Reorganized Federal-Mogul Class B Common Stock" ("Pledged Stock"). *Id.* At the presumed market price, the security interest for the note is worth approximately $139,166,666. There is no evidence to show that the Trust paid the note by the Maturity Date. It seems unlikely, since the Trust did not have any funds to do so. If the Trust defaulted on the Note, and if Thornwood has exercised its option the Trust should be left with assets totaling approximately $117,790,840. If Thornwood has not exercised its option, the Trust's assets would be worth approximately $205,624,175.

The Plan was set forth in two alternate forms, Plan A, and Plan B. Plan A contemplates that the Pneumo Parties[11] will also have asbestos claims against them channeled to the Trust. [Plan, Exhibit 1.1.4, § 2.3.2 at 33-35]. In exchange for obtaining the benefit of the channeling injunction, Cooper LLC will contribute $746 million to the Trust over 20 years, and the parent of Pneumo Abex will contribute Pneumo Abex's stock to the Trust. [Plan, Exhibit 1.1.4, § 2.2 at 17-18]. Plan B contemplates that the claims against the Pneumo Parties will not be channeled to the Trust. Instead, the Trust will pay $138 million to Cooper and $2 million to Pneumo Abex. [Plan, §8.22.4.2 at 138].

If Plan A is approved, then Plan B will not be effective. [Plan, § 8.22 at 135]. Plan B was approved by the Bankruptcy Court as part of the confirmation of the Plan. Plan A is still under consideration by the Bankruptcy Court. In the event that Plan B is the version of the Plan that is ultimately effective, the Trust would have to pay $140,000,000 to Cooper and Pneumo Abex on the 61st day after the Effective Date. [Plan, §8.22.4.2 at 138]. As security for that debt, the Plan specifies that Federal-Mogul would withhold 7,793,333 of the Class B shares. *Id.*

---

[11]    The Pneumo Parties are Cooper LLC, Cooper Industries, Ltd., PCT, and Pneumo Abex. [Plan, § 1.1.169].

There is no evidence to show that the Trust had the funds to pay the $140 million debt, thus, it seems likely that Federal-Mogul will retain that stock. If Thornwood exercises its option the Trust would be left with either a negative net worth of $22,209,160 (if the Trust paid the $140,000,000 in cash) or a negative net worth of $38,075,820 (if Federal Mogul retains the stock). If Thornwood does not exercise its option, then the Trust would not be able to pay the $140 million debt, and Federal-Mogul would retain the stock, leaving the Trust with assets worth approximately $49,757,514.

Any of these results fails to meet the requirement of § 524(g) that a debtor provide assets sufficient to ensure that future asbestos claimants have access to an evergreen fund. *CE*, 391 F.3d at 248 n. 69.

Furthermore, there does not appear to be any realistic chance for the Trust to own a majority of the voting shares of Federal-Mogul. For the Trust to be entitled to own a majority of such shares, Thornwood would have to not exercise its option; the Trust would have to come up with $125,000,000 to pay the note secured by the Pledged Stock; and the Trust would have had to pay the $140,000,000 debt to Cooper. There is no indication anywhere in the record that it has such funds. The chance that all of these contingencies will occur appears exceedingly remote.

## II.    PROCEDURAL HISTORY OF THE PLAN

### SUMMARY OF THE ARGUMENT

The Assignment is a naked attempt by the Debtors and tort claimants for the Debtors to shift their asbestos liabilities to their insurers. The Assignment is not required under § 524(g). The Plan containing the Assignment is not consistent with the terms or purposes of § 524(g). Contrary to the Preemption Opinion, § 1123(b)(3)(B) does not permit the Assignment to the Trust in violation of the Assignment Restrictions. Section 1123(b)(3)(B) does not preempt state law on the Assignment issue.

12

Sections 541(c) and 1123(a)(5) do not permit the Assignment. Section 541(c)(1) permits property to move from a debtor to a bankruptcy estate notwithstanding contrary law or contractual provisions. It does not permit property to move from the bankruptcy estate to another entity. Section 363(l) is the statutory provision that controls whether property may be assigned by the estate, not § 1123(a)(5). The Assignment would not be permitted by § 363(l).

Even if the Bankruptcy Court was correct in applying § 1123(a)(5) (which it was not), the Bankruptcy Court improperly analyzed the scope of § 1123(a)(5). The narrower and more specific preemption provisions in §§ 363(l) and 1142(a) must control over the more general preemption provision in § 1123(a)(5). The Bankruptcy Court's interpretation contravenes well-established canons of statutory interpretation and would lead to ridiculous results. Instead, the Court should look at § 1123(a)(5)'s surrounding statutory framework and legislative history to determine its preemptive scope. The legislative history shows that its preemptive scope should be no broader than the preemptive scope of § 1142(a). The statutory framework surrounding § 1123(a)(5) shows that § 1123(a)(5)'s preemption provision cannot override the preemption provisions in § 363(l) and 1142(a). The Assignment would not be permitted under § 1142(a) or § 363(l) and should not be allowed under § 1123(a)(5).

In addition, § 1123(a)(5) does not preempt contractual provisions. That is, by its own language, § 1123(a)(5) does not attempt to override any contractual rights, let alone a contractual non-assignment provision. Other provisions of the Bankruptcy Code expressly preempt contractual provisions. (See discussion at pp. 36-37.) The Court should determine that Congress acted intentionally in excluding contractual provisions from § 1123(a)(5)'s preemptive scope. Since the Assignment Restrictions are provisions of insurance contracts, and § 1123(a)(5) does

not apply to contractual provisions, the Assignment Restrictions are not preempted by § 1123(a)(5).

## ARGUMENT

## I. THE ASSIGNMENT IS DESIGNED TO ALLOW THE DEBTORS TO EVADE THE REQUIREMENTS OF § 524(b)(2)(B)(i)

Section 524(g) provides for the establishment of a trust to assume and pay the liabilities of a debtor for personal injury, wrongful death and property-damage actions for damages allegedly caused by asbestos. § 524(g). Section 524(g) is modeled on the trust established in the Johns-Manville case. *See* 140 Cong. Rec. H10,765 (remarks of Rep. Jack Brooks); 3 Norton Bankruptcy Law & Practice § 48:6 (2004). In that case, some insurers voluntarily agreed to contribute; they were not compelled to do so against their will. *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 640 (2d Cir. 1988); *Amatex Cas. & Sur. Co. v. Aetna Cas. & Sur. Co.*, 97 B.R. 220, 224 (Bankr. E.D. Pa. 1989).

Section 524(g) requires the Debtors to contribute equity into the Trust to ensure that the debtor's future profits will be available to pay future claims. *See CE*, 391 F.3d 190, 248 n. 69 (quoting 140 Cong. Rec. S4521-01, S4523 (Apr. 20, 1994) (statement of Senator Heflin)). Section 524(g) also requires that the Trust be entitled, or upon the occurrence of certain contingencies be entitled, to control the Debtors by owning a majority of their voting stock. § 524(g)(2)(B)(i)(III). The Plan does not meet those requirements. The Plan does not provide for the Trust to retain a majority of the shares of any Debtor, let alone of all the Debtors whose liability the Trust assumes. Furthermore, after the transactions set forth in the Plan have been completed, there will no "evergreen" fund as contemplated by Congress; the Trust may even have a negative net worth. The Trust will certainly not have any right to control the Debtors.

14

The Plan utilizes the Assignment instead of agreed-upon payments by the Putative Insureds' insurers and stock of the Debtors to fund the Trust. As a consequence, the Plan transfers the Putative Insureds' asbestos liability to their insurers, alleged or otherwise, in violation of the Assignment Restrictions. The Bankruptcy Court has repeatedly and erroneously allowed such assignments.[12]

The Assignment is only necessary to the Plan if the Debtors are allowed to escape their statutory responsibilities. If the Plan complied with § 524(g), then the Trust would retain 50.1% of Federal-Mogul's voting shares. The market value of those shares is slightly over $1 billion. The Trust would not need any insurance assets to pay its asbestos claims.

## II.     THE BANKRUPTCY COURT ERRED IN RULING THAT §§ 541(c) AND 1123(a)(5) PERMIT ASSIGNMENT OF THE INSURANCE RIGHTS

One of the most disturbing aspects of the Bankruptcy Court's ruling to permit the Assignment is how it misuses a minor, administrative Bankruptcy Code section to trample over substantive state law. Section 1123(a)(5) is entitled "Contents of a plan." It is in Chapter 11 of the Code, subchapter II, which is titled simply, "The Plan." It merely specifies the minimum requirements that a plan must satisfy to be confirmed, nothing more. Yet the Bankruptcy Court would imbue this code section with real, substantive power, enough to run roughshod over state law in violation of the basic principles of federalism. This is truly an astonishing result that Congress never intended. The Bankruptcy Court should not have given such short shrift to state law and thereby disturb the balance between the federal government and the states.

---

[12]     *See, e.g., In re Global Industrial Technologies, Inc.*, Case No. 02-21626, Memorandum Order at 2-7, D.I. 7703 (Bankr. W.D. Pa., Sept. 21, modified Sept. 24, 2007)); *In re Kaiser Aluminum Corp.*, Case No. 02-10429, D.I. 8135 (Bankr. Del. Jan. 9, 2006).

The Bankruptcy Court held that §§ 541(c)(1), 1123(b)(3)(B) and 1123(a)(5)(B) permit the Assignment despite the Assignment Restrictions. [Preemption Opinion at 8, 17]. This holding is error.

A.    **The Bankruptcy Court Erred by Discussing State Law on Assignment**

The Bankruptcy Court erred by including a discussion of the effect of state law in the Preemption Opinion. [Preemption Opinion at 10-15]. The Plan Proponents and LMI stipulated that the question of whether state law would permit the Assignment would be not be litigated before the Bankruptcy Court. [D.I. 13062, Exh. 1]. In fact, it was not litigated before the Bankruptcy Court. [Preemption Opinion at 7 ("This court is not addressing whether the provisions of the policies and applicable state law are violated, only whether or not, in this case, they are preempted by the Bankruptcy Code")].

B.    **The Bankruptcy Court Erred by Finding § 1123(b)(3)(B) Permits the Vesting of Insurance Rights in the Trust**

The Bankruptcy Court erred by adopting the holding in *In re Western Asbestos Company,* 313 B.R. 456, 462 (Bankr. N.D. Cal. 2003)*, aff'd* 2004 WL 1944792 (N.D.Cal. April 16, 2004), which found that causes of action could vest in a § 524(g) trust because such trust was a successor to a debtor. *Western Asbestos* was a bankruptcy court decision that was settled while on appeal and hence was never subject to appellate review. It is plainly contrary to the Ninth Circuit's holding in *PG & E II*, because it found that § 1123(a)(5)'s preemptive scope was not limited by the preemptive scope of § 1142. Had it been appealed, it would undoubtedly have been reversed. *See* Section III.E.3.d. It is not persuasive authority.

The Plan specifically provides that the Trust is not a successor to the Debtor.[13]  The Plan itself is contrary to the basis for the *Western Asbestos* holding.

Finally, there is no preemptive language in § 1123(b)(3)(B) whatsoever.  The phrase "notwithstanding any otherwise applicable nonbankruptcy law" is only in §1123(a), not § 1123(b).  Section 1123(b)(3)(B) only provides that "...a plan may (3) provide for—(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."  *Id.*

### C.  Section 541 Does Not Modify A Debtor's Rights in Property

All legal or equitable interests of a debtor in property become property of the bankruptcy estate.  § 541(a).  Section 541 preempts any state law or contractual provision that would prevent the property of the debtor from becoming property of the estate.  *Id.*  Such property interests become property of the estate "notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—(A) that restricts or conditions transfer of such interest by the debtor."  § 541(c)(1)(A); *CE*, 391 F.3d at 218.  These interests include insurance policies.  *First Fidelity Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993).

The Bankruptcy Court did not stop with the proposition that § 541 allows an assignment *to* the estate, however.  Instead, it went too far and erred by holding that § 541(a) *invalidates any* contractual restrictions on assignment, thus modifying the Putative Insureds' rights under the London Policies.[14]

---

[13]    Plan, § 10.2 (stating "Except as provided in Article IV of the Plan, neither the Plan Proponents, Reorganized Federal-Mogul, the other Reorganized Debtors nor the Trust is, or shall be deemed to be, a successor to any of the Debtors").  Article IV of the Plan has no provision designating the Trust as a successor to the Debtors.

[14]    Preemption Opinion at 22 (stating "However, both the express language of §541(c)(1) and courts construing that text have held that §541(c)(1) prohibits a contractual restriction on the
(Continued...)

17

Just because § 541(c) authorizes assignment of a property interest from a debtor to an estate despite an anti-assignment clause, does not mean that the estate can then assign the interest to a third-party free of such restriction.  The Third Circuit has made it absolutely clear that § 541 does not eliminate any restrictions on an interest in property once it has passed to the estate:

> Courts applying the *Butner* analysis have relied on its holding to conclude that *"once a property interest has passed to the estate, it is subject to the same limitations imposed upon the debtor by applicable nonbankruptcy law*."

*Integrated Solutions v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 492 (3d Cir. 1997) (emphasis added).[15]  Despite the impression that the Preemption Opinion conveys by quoting *CE* out of context, *see* Preemption Opinion at 10 "[p]ut simply, § 541 prohibits restrictions on the interests of the debtor...."), *CE* did not overrule *Integrated Solutions*.[16]  Read in context, it is perfectly clear that *CE* was not referring to the transfer of interests from the estate to another entity; it was referring to the transfer of insurance proceeds *to the estate*:

---

(Continued...)

rights of a debtor to transfer or assign its interests in bankruptcy and §1123(a)(5) permits the transfer of the property to a §524(g) trust.").

[15]  *See also In re American Freight Sys., Inc.*, 179 B.R. 952, 960 (Bankr. D. Kan. 1995);  *In re Transcon Lines*, 58 F.3d 1432, 1438 (9th Cir. 1995) (noting that "nonbankruptcy law defines the nature, scope, and extent of the property rights that come into the hands of the bankruptcy estate"), *cert. denied sub nom. Gumport v. Sterling Press, Inc.*, 516 U.S. 1146, 134 L. Ed. 2d 96, 116 S. Ct. 1016 (1996); *In re Sanders*, 969 F.2d 591, 593 (7th Cir. 1992) ("[A] bankruptcy trustee succeeds only to the title and rights in property that the debtor had at the time she filed the bankruptcy petition."); *In re FCX, Inc.*, 853 F.2d 1149, 1153 (4th Cir. 1988) ("The estate under § 541(a) succeeds only to those interests that the debtor had in property prior to commencement of the bankruptcy case."); *In re Bishop College*, 151 B.R. 394, 398 (Bankr. N.D.Tex. 1993) (holding that a bankrupt's estate receives trust assets "subject to any restrictions imposed by state law, pre-petition").

[16]  *U.S. v. Wexler*, 31 F.3d 117, 126 (3rd Cir. 1994) ("We find it difficult to believe that, had the Second Circuit intended anything more... it would have done so without explicitly addressing and overruling its oft-cited Goldstein decision.").

> With respect to the anti-assignment provisions, we agree with the District Court that even if the subject insurance policies purported to prohibit assignment of Combustion Engineering's insurance proceeds, *these provisions would not prevent the assignment of proceeds to the bankruptcy estate.* This is not the case . . . in the Basic and Lummus primary and excess insurance policies.... Put simply, § 541 prohibits restrictions on the interests of the debtor, which includes the insurance policies held by Combustion Engineering. It does not, however, place similar restrictions on the interests of non-debtors.... ("As section 541(a)(1) clearly states, the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. *To the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate* except to the extent that defenses which are personal against the debtor are not effective against the estate.").

*CE*, 391 F.3d at 218-19 (emphasis added). LMI' right to veto the Assignment is not a defense that is personal to the Debtors. The Bankruptcy Court's focus on the more limited quote led it to the wrong conclusion.

Congress intended § 541(c)(1)(A) "to eliminate the barriers to the transfer of property to the estate and nothing more; it *did not intend to vitiate restrictions under prepetition agreements on transfer of that property out of the hands of the trustee standing as the successor to the debtor.*" *Schauer*, 62 B.R at 530 (emphasis added). Citing H.R. Rep. No. 595 95th Cong., 1st Sess. 369 (1977); S. Rep. No. 989, 95th Cong, 2d Sess. 83 (1978)); *see also Calvert v. Bongards Creameries (In re Schauer)*, 62 B.R. 526, 530 (Bankr. D. Minn. 1986), *aff'd* Civ. No. 5-86-195 *slip op.* at 4 (D. Minn), *aff'd* 835 F.2d 1222, 1227 (8th Cir. 1987); *In re Farmers Markets, Inc.*, 792 F.2d 1400, 1402 (9th Cir.1986) (while § 541(c)(1) permitted the transfer of a liquor license to the bankruptcy estate, it did not preempt state law limitations on transfer).

Section 541(c)(1) permitted transfer of the London Polices *to the estate*. It does not, however, permit the Assignment *from the estate* to the Trust in violation of the Assignment Restrictions.

**D.    Preemption Occurs Only if There Is an Actual Conflict With State Law**

State law defines property interests unless there is an actual conflict with the Bankruptcy Code. *Butner v. United States*, 440 U.S. 48, 54, 55 n. 9, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Id.*, 440 U.S. at 54. "[I]t has been settled from an early date that ... state laws are thus suspended only to the extent of actual conflict with the system provided by the Bankruptcy Act of Congress." *Id.* "[T]he federal statutory purpose [to preempt state law] must be clear and manifest . . . ." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544-545, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). "Otherwise, the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law." *Id.* at 545.

Contractual rights are also determined under state law. *See, e.g., In re Bristol Associates, Inc.*, 505 F.2d 1056, 1059 n. 4 (3d Cir. 1974).[17] Such rights must not be modified by a plan. *CE*, 391 F.3d at 209 ("the Plan should not modify the contractual rights of insurers").[18] Unless a federal interest actually conflicts with the state law that allows LMI to enforce their Assignment Restrictions, such rights must be determined under state law.

**E.    No Federal Interest Actually Conflicts With the State Law Enforcing Provisions Barring the Assignment of the Insurance Rights**

The Court should not find that there is an actual conflict between the Bankruptcy Code, properly interpreted, and the applicable state law that allows LMI to enforce their Assignment

---

[17]    *See also Bogus v. American National Bank of Cheyenne, Wyo.*, 401 F.2d 458 (10th Cir. 1968); *Paramount Finance Co. v. U. S.*, 379 F.2d 543 (6th Cir. 1967).

[18]    *See also In re EES Lambert Assocs.*, 62 B.R. 328, 336 (Bankr. N.D. Ill. 1986) ("...bankruptcy court's power ... does not extend to enlarging the rights of a debtor under a contract or rewriting its terms."); *In re Bolin Oil Co.*, 51 B.R. 936, 938 (Bankr. N.D. Ohio 1985) (holding, with respect to a debtor's insurance policy that "[t]he Bankruptcy Code does not enlarge the rights of the debtor under a contract").

Restrictions. Section 363 is the provision that allows a debtor-in-possession or trustee to assign assets of the estate, either through a plan or otherwise. Section 363(l) has a limited preemptive effect that applies only to contractual provisions and nonbankruptcy laws that are premised upon or relate to *the financial condition of a debtor*. Section 1123(a)(5) applies to what a plan may contain. Its limited preemptive effect should apply only to nonbankruptcy laws or rules relating to financial condition, not the Assignment Restrictions, *and not other provisions of the Bankruptcy Code.*

### 1.    Section 363(l) controls the assignment of the Insurance Rights

Section 363 is the statute that applies to the Assignment. It does not conflict with the Assignment Restrictions. It would not permit the Assignment.

In the Preemption Opinion, the Bankruptcy Court states "[s]ection 363 is an administrative provision which gives the trustee authority to deal with property of the estate notwithstanding certain ex post facto clauses based upon the insolvency or financial condition of the debtor." [Preemption Opinion at 19]. On the contrary, § 363 is not merely an administrative provision. It is the substantive statute that allows a debtor-in-possession to alienate property of the estate.

A debtor-in-possession has only those powers specified in the Bankruptcy Code. §§ 1106 (a); 1107(a). Section 363 confers to a debtor-in-possession the power to use, sell or lease property of the estate. *See, e.g., Bunker v. Peyton (In Re Bunker)*, 312 F.3d 145, 152 (4th Cir. 2002); *In re Gerwer*, 898 F.2d 730, 733 (9th Cir. 1990); *Dawson v. Thomas (In re Dawson)*, 2008 Bankr. LEXIS 1074 (Bankr. D.D.C. Apr. 9, 2008). It provides that: "The trustee, after notice and a hearing, may... sell ... other than in the ordinary course of business, property of the estate...." § 363(b)(1). It also provides that a "the trustee may enter into transactions, including

21

the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing...." § 363(c)(1).

> Section 363 contains a preemption provision. It provides that a debtor-in-possession,
>
>> may use, sell or lease property ..., or a plan under chapter 11 ... may provide for the use, sale, or lease of property, notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor ....

§ 363(l).

Section 363(l)'s preemptive language is limited. It only preempts contractual or legal rights that are "conditioned on the insolvency or financial condition of the debtor." *Id.* This preemption provision is "directed solely at making so-called *ipso facto* or bankruptcy-default clauses unenforceable." *In re Hanna*, 912 F.2d 945, 951 n. 8 (8th Cir. 1990). *Ipso facto* clauses are those contractual or statutory provisions that modify a debtor's property rights upon an insolvency or bankruptcy filing. *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000), *cert denied*, 531 U.S. 873, 121 S.Ct. 175, 148 L.Ed.2d 120 (2000). For example, a lien that springs into existence upon bankruptcy is an *ipso facto* clause. *The Railway Reorganization Estate, Inc.*, 133 B.R. 578, 583 (Bankr. D. Del. 1991).

The Assignment Restrictions are not *ipso facto* clauses.[19] The Assignment Restrictions have nothing to do with the Debtors' insolvency or financial condition.

---

[19]    The rationale behind anti-assignment provisions is to protect against unforeseen risk. *See SR Int'l Bus. Ins. Co*, 394 F. Supp.2d at 594 (S.D.N.Y. 2005) (interpreting N.Y. law); *Century Indem. Co. v. Aero-Motive Co.*, 318 F. Supp. 2d 530, 539 (W.D. Mich. 2003) (interpreting Michigan law). When issuing a policy, insurers take account of the nature of the insured. Risk characteristics of the insured determine whether the insurer will provide coverage, and at what rate. A pre-loss assignment could alter drastically the insurer's exposure depending on the nature of the new assured. *Beck-Brown Realty v. Liberty Bell Ins. Co.*, 241 N.Y.S. 727, 728 (N.Y. Sup. Ct. 1930) ("Before loss, the insurer is subjected to risk, and it is this risk which the insurer may exempt from assignability except upon its own consent.").

DM3\726017.1

Section 363(l), the statute governing the Debtors' right to make the Assignment, does not preempt the Anti-Assignment Restrictions, and hence it would not permit the Assignment.

### 2.    Section 1123(a)(5) does not permit assignment of the Policies absent LMI' consent

Section 1123(a)(5), if interpreted consistently with other provisions of the Bankruptcy Code, would not conflict with the Assignment Restrictions. LMI do not contest that § 1123(a)(5) has some limited preemptive effect. However, the interpretation adopted by the Bankruptcy Court conflicts with other provisions of the Bankruptcy Code and would lead to ridiculous results. The preemptive scope of § 1123(a)(5) must not override or read out of existence the more limited preemptive provisions elsewhere in the Bankruptcy Code, *e.g.*, § 363(l), which only preempts provisions in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition, and § 1142(a), which only preempts laws relating to financial condition. Interpreting § 1123(a)(5) to have such limited preemptive effect would not result in an actual conflict with the Assignment Restrictions.

### a.    The burden of establishing preemption is high

The Bankruptcy Court erred in ruling that the plain language of § 1123(a)(5) overcomes the presumption against preemption. *See* Preemption Opinion at 17-18. "[T]hat glib conclusion overlooks that the presumption against preemption applies to the task of defining the scope of an express preemption clause." *Massachusetts Ass'n of HMOs v. Ruthardt*, 194 F.3d 176, 182 (1st Cir. 1999). The presumption against preemption is very strong. The party seeking to establish preemption bears a "considerable burden of overcoming the 'starting presumption that Congress does not intend to supplant state law.'" *DeBuono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1997); *accord, Roach*, 824 F.2d at 1373; *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (stating that

23

the presumption "provides assurance that 'the federal-state balance' will not be disturbed unintentionally by Congress or unnecessarily by the courts.") (citations omitted).

> In all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Medtronic,* 518 U.S. at 484.

The presumption applies in bankruptcy cases. *Pacific Gas & Elect. Co. v. State of California*, 350 F.3d 932, 943 (9th Cir. 2003), *cert. denied sub. nom.*, 543 U.S. 956, 125 S.Ct. 454, 160 L.Ed.2d 318 (2004) ("*PG&E II*"). The "presumption against displacing state law . . . is just as strong in bankruptcy as in other areas of federal legislative power." *Id.* Even if the Court finds that § 1123(a)(5) has some preemptive effect, the presumption against preemption still tempers the scope of the preemption. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *Tillison v. Gregoire*, 424 F.3d 1093, 1098 (9th Cir. 2005).

The cases cited by the Bankruptcy Court as supporting its contrary view either support LMI' analysis or are inapposite:

- In *Egelhoff v. Egelhoff*, 532 U.S. 141 (2001) the Supreme Court looked at the surrounding statutory framework of 29 U.S.C. §§ 1144(a) to find the limits of the phrase "relate to". *Id.* at 147. The Supreme Court held that the term "relate to" "cannot be taken to extend to the furthest stretch of its indeterminacy, or else for all practical purposes pre-emption would never run its course." *Id.* at 146.

- In *Cisneros v. Alpine Ridge Group*, 508 U.S. 10 (1993), the Supreme Court was asked to determine the effect of the clause, "notwithstanding any other provisions of this Contract", on the other terms of that contract. *Id.* at 18. In doing so, it applied rules of contract interpretation. There is no logical connection between the rules of contract interpretation and the scope of preemption of the Bankruptcy Code, and hence *Cisneros* is irrelevant to the analysis in this case. Even if such rules applied in interpreting the Bankruptcy Code, *Cisneros* would still be inapposite. If the rules of contract interpretation were applied to § 1123(a)(5), the analogous language would have to read "notwithstanding any other provisions of

24

the Bankruptcy Code," a reading which turns the phrase "notwithstanding any otherwise applicable nonbankruptcy law," on its head.

The regulation and enforcement of insurance contracts is a field that the states have traditionally occupied.[20]  The presumption against preemption applies to determining whether the Assignment Restrictions are preempted by § 1123(a)(5).  However, the Bankruptcy Court failed to apply the presumption, and as a result, failed to interpret § 1123(a)(5) narrowly.

### 3.    Section 1123(a)(5) should be interpreted narrowly

#### a.    Section 1123(a)(5) does not expand Debtors' limited power to transfer estate property.

Section 363(l) is the specific statute that allows a debtor to use or assign property under a plan of reorganization.  Section 1123(a)(5) is a general statute concerning the contents of a plan of reorganization.  Specific statutory provisions trump general statutory provisions.  *CE,* 391 F.3d at 237 n. 49.

#### b.    Section 1123(a)(5) simply specifies the minimum requirements for what must go into a plan.

As noted above, § 1123(a)(5) is merely an administrative section.  It specifies the minimum requirements that the Plan must satisfy to be confirmed.  It is not a section of substantive law.  Unlike § 363(l), § 1123(a) does not confer any specific powers on debtors.  Section 1123(a)(5) reads, in part: "Notwithstanding any otherwise applicable nonbankruptcy law,

---

[20]    *See* 15 U.S.C. § 1012 (reserving the regulation of the business of insurance "to the laws of the several states" and providing that "[n]o act of Congress shall be construed to invalidate, impair, or supersede" any state law regulating insurance unless such act specifically relates thereto); *Ruhlin v. New York Life Ins. Co.,* 304 U.S. 202, 205 (1938) (state law governs the interpretation of an insurance contract); *Stan Kock & Sons Trucking, Inc. v. Great W. Cas. Co.,* 517 F.3d 1032, 1038 (8th Cir. 2008) (same); *Transamerica Ins. Co. v. Duro Bag Mfg. Co.,* 50 F.3d 370, 372 (6th Cir. 1995) (same); *AC&S, Inc. v. Aetna Cas. & Sur. Co.,* 764 F.2d 968, 973 (3d. Cir. 1985) (finding state law controlling on issue of interpretation of insurance contract).

a plan shall - (5) provide adequate means for its implementation, such as - (B) transfer all or any part of the property of the estate...."

The broad, "empowering"[21] interpretation of § 1123(a)(5) adopted by the Bankruptcy Court is contrary to the actual text of § 1123(a)(5). The Bankruptcy Court's interpretation would make surplusage of the phrase "provide adequate means for its implementation, such as", and interpret § 1123(a)(5) as though it reads as follows: "Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—(5) (B) transfer all or any part of the property of the estate...." The missing language is not surplusage. Instead, it makes clear Congress's intent for § 1123(a)(5) merely to provide a laundry list of possible ways that a plan may provide for its implementation. *In re Pacific Gas & Elect. Co.*, 273 B.R. 795, 806 (Bankr. N.D. Cal. 2002), *aff'd in part & rev'd in part sub nom.*, *Pacific Gas & Elect. Co. v. State of California*, 350 F.3d 932 (9th Cir. 2003), *cert. denied sub. nom.*, 543 U.S. 956, 125 S.Ct. 454, 160 L.Ed.2d 318 (2004) ("PG&E I"). Furthermore, the interpretation adopted by the Bankruptcy Court has the following implication: As long as property of the estate is assigned under a plan of reorganization, it can be assigned regardless of *any* otherwise applicable nonbankruptcy law. That interpretation goes too far. It would completely override the more limited powers of assignment conferred by § 363.

Furthermore, to read § 1123(a)(5) as broadly as the Preemption Opinion does would give rise to results that are not contemplated under the Bankruptcy Code. For example, § 1123(a)(5) plainly does not authorize a debtor, through a plan,

> to sell liquor to minors (notwithstanding state laws to the contrary), or trade with foreign enemies (notwithstanding federal statutes to the contrary), or dump toxic wastes (notwithstanding environmental laws and Supreme Court precedent), or merge with competitors to create a monopoly or gain some other competitive advantage (in violation of state or federal antitrust laws).

---

21    *See* Preemption Opinion at 9.

DM3\726017.1

*PG&E I*, 273 B.R. at 806. The plain meaning rule does not apply when "the literal interpretation of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989).

The cases cited by the Bankruptcy Court are not to the contrary:

- *In re FCX*, 853 F.2d 1149, 1155 (4th Cir. 1988), supports LMI' contention that the Court must look to the statutory framework. In *FCX*, the Fourth Circuit interpreted the scope of § 1123(a)(5)'s preemption in light of the substantive requirements of another Code provision. It looked to § 1129(b)(2)(A)(iii) to determine whether a proposed setoff under § 1123(a)(5)(D) was appropriate.

- In *In re Stone & Webster, Inc.*, 286 B.R. 532, 541, 544 (Bankr. D. Del. 2002) is inapposite. In *Stone & Webster*, the Bankruptcy Court used § 1123(a)(5) to substantively consolidate debtors, and found such use to be consistent with § 1129(a)(7).

The Bankruptcy Court has previously recognized that § 1123(a)(5) could not be given such broad scope. *In re Kaiser Aluminum Corp.*, Case No. 02-10429, Transcript of Record, at 88:18-89:18, D.I. 8135 (Bankr. Del Jan. 9, 2006). Nonetheless, it failed to perform the correct analysis.

### c.    Section 1123(a)(5)'s preemptive effect is constrained by the preemptive effect of §§ 363(l) and 1142(a)

#### i.    The Court must consider the statutory framework

The Bankruptcy Court erred by finding that § 1123(a)(5)'s preemptive effect can override other provisions of the Bankruptcy Code. *See* Preemption Opinion at 17-21. As discussed in Section II.E.3.b., interpreting § 1123(a)(5) broadly would lead to ridiculous results. When reading a statute in isolation would lead "immediately to incoherence", a court must look beyond the statute in question to the "the Chapter 11 framework that is designed to help debtors reorganize while continuing as viable concerns". *The Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 560 (3d Cir. 2003).

The Bankruptcy Court should have considered the surrounding statutory framework.

27

Statutory construction ... is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... *because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.*

*United Sav. Asso. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371-72 (1988) (emphasis added) (internal citations omitted). "The Whole Act Rule instructs that subsections of a statute must be interpreted in the context of the whole enactment." *United States v. Cooper*, 396 F.3d 308, 313 (3d Cir. 2005). *"[T]his is especially true of the Bankruptcy Code."* *Cybergenics*, 330 F.3d at 559 (emphasis added).

In *Timbers*, the Supreme Court examined the scope of relief that § 362 provides to creditors. The petitioner asserted that the phrase "interest in property" in § 362(d)(1) necessarily included a secured creditor's right to take immediate possession of a defaulted security and apply it in payment of the Debtor's debt. The petitioner further argued that because it did not have "adequate protection" for that interest under § 362, it should be reimbursed for the use of the proceeds of which it was deprived during the term of the stay. *Timbers*, 484 U.S. at 370-71.

The Supreme Court noted that "viewed in the isolated context of [§] 362(d)(1), the phrase [interest in property] could reasonably be given the meaning petitioner asserts." *Id.* at 371. However, the Supreme Court found that § 362(d) was "only one of a series of provisions" in the Bankruptcy Code concerning the rights of secured creditors. The Supreme Court then looked to those other provisions to see whether they supported the petitioner's request for compensation for loss of interest. *Id.* at 371-74. The rest of the provisions specifically denied interest to undersecured creditors. Therefore, the Supreme Court found that the petitioner's interpretation of the statute was "structurally inconsistent". *Id.* at 374. The cases cited by the Bankruptcy Court as supporting its plain language reading are either inapposite, or support LMI' analysis:

- *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992), was decided seven years before *Medtronic*. It is inapposite

28

as it not involve a determination of a statute's preemptive scope, and was not related in any way to preemption.

- *Lamie v. United States Trustee*, 540 U.S. 526, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) supports LMI' analysis. It states that the plain language does not control when it would lead to absurd results. *Id.* at 534. As discussed in Section II.E.3.b., it is the Bankruptcy Court's interpretation of § 1123(a)(5) that leads to absurd results.

The Bankruptcy Court stated that to read § 1123(a)(5) narrowly would "modify the meaning of § 1123 in such a way that it becomes superfluous". [Preemption Opinion at 19]. This is error. The Bankruptcy Court did not identify how, exactly, that would occur, nor can LMI understand how it might happen. To the contrary, § 1123(a)(5) should not be read so as to make the terms of other Bankruptcy Code statutes, such as §§363(l) and 1142(a) superfluous. The cases cited by the Bankruptcy Court are, in any case, inapposite. In neither *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001), nor *Duncan v. Walker*, 533 U.S. 167, 174 (2001), was there a question about whether, if read literally, a statute would override the terms of another statute. Instead, in both cases, the Supreme Court was merely giving effect to the words of a single statue. These cases support LMI' analysis with respect to whether § 1123(a)(5) preempts the terms of private contracts in Section III.

Section 1123(a)(5) should be read in the context of other provisions applicable to the assignment of property pursuant to a plan, § 363 (conferring the power to transfer property on a trustee or debtor-in-possession), and § 1142(a) (conferring the power to implement the provisions of a confirmed plan).

### ii.  Section 1123(a)(5) cannot override the narrow preemptive scope afforded by §§ 363(l) and 1142(a)

If § 1123(a)(5) were to be interpreted broadly, it would impermissibly preempt other, more specific provisions of the Bankruptcy Code. For example, § 1123(a)(5)(A) lists "retention by the debtor of all or any part of the property of the estate" as an example of a means to

29

implement a plan. This reference cannot be read to mean that a plan may allow a debtor to retain all its property in contravention of its obligations under § 1129 to holders of security interests in property of the estate, or not to pay creditors whose claims are allowed. Similarly, subparagraph § 1123(a)(5)(E) lists "satisfaction or modification of any lien" as another example of a means to implement a plan. This reference surely cannot authorize a debtor to "satisfy" all liens without regard to the terms of the contracts or the Code's adequate protection requirements. *See* § 361. Similarly, § 1123(a)(5) cannot be read to overrule the limited preemption afforded by §§ 363(l) and 1142(a).

Courts have properly applied § 1123(a)(5) in situations where the contemplated action was consistent with actions authorized elsewhere in the Bankruptcy Code:

- In implementing the "indubitable equivalent" standard of § 1129(b)(2)(A)(iii), *FCX*, 853 F.2d 1149, 1159 (4th Cir. 1988);

- In permitting confirmation upon compliance with § 1129(a)(6), *Public Service Co. v. New Hampshire (In re Public Service Co.)*, 108 B.R. 854, 887-88 (Bankr. D.N.H. 1989); and

- In implementing the "fair and equitable" requirement of § 1129(b)(2)(A), *In re Clarksville Hospitality Corp.*, 1996 Bankr. LEXIS 340 at *12-*14 (Bankr. D. Mass., April 4, 1996).

In none of these cases did the application of § 1123(a)(5) override other provisions of the Bankruptcy Code, as the Preemption Opinion would do here with respect to §§ 363 and 1142(a).

Section 363(l) states:

> a plan under chapter 11... of this title may provide for the use, sale or lease of property, *notwithstanding any provision in a contract, ... that is conditioned on the insolvency or financial condition of the debtor*, on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a case under this title..., *and that effects ... a forfeiture, modification, or termination of the debtor's interest in property*.

*Id.* Section 363(l) does not destroy all limitations on the assignment of property. Rather, it allows a debtor to ignore contractual restrictions on assignment that are conditioned on the

30

debtor's insolvency or financial condition and that work a forfeiture. The Assignment Restrictions meet neither requirement. *If § 1123(a)(5) allows for the assignment of property simply because the assignment is written into a plan of reorganization, then what is the point of § 363(l)? A broad interpretation of § 1123(a)(5) renders § 363(l) superfluous. If Congress intended to allow debtors to assign property without restriction under § 1123(a)(5), why did they write § 363(l)?*

Section 1142(a) states:

*Notwithstanding any otherwise applicable nonbankruptcy law,* rule, or regulation *relating to financial condition,* the debtor and any entity organized or to be organized for the purpose of carrying out the plan *shall carry out the plan....*

It allows a debtor to carry out a plan of reorganization notwithstanding "any otherwise applicable nonbankruptcy law... *relating to financial condition....*"[22] (emphasis added). Thus, it has a narrow preemptive scope. It does not allow a debtor to carry out a plan notwithstanding any otherwise applicable nonbankruptcy law, *whatsoever*.

The Bankruptcy Court's broad interpretation of § 1123(a)(5) would allow for the Assignment contrary to state law; simultaneously, § 1142(a) would not allow the debtor to carry out the plan because § 1142(a) only preempts state law "relating to financial condition". The Assignment Restrictions do not relate to financial condition. *Does it make sense to confirm a plan that cannot be implemented under the Bankruptcy Code?* The Bankruptcy Court has interpreted the Bankruptcy Code to make it internally inconsistent. This is reversible error.

---

[22]    *See American Freight System, Inc. v. I.C.C. (In re American Freight System, Inc.)*, 179 B.R. 952, 961 (Bankr. D. Kan. 1995) (holding that § 1142(a) does not preempt the Negotiated Rates Act because it relates to operating condition rather than financial condition); *In re Doty*, 129 B.R. 571, 577 (Bankr. N.D. Ind. 1991) (stating that § 1142(a) would apply if "the debtor cannot comply with net capital or reserve rules"); *Barber v. Bettendorf Bank, N.A. (In re Pearson Industries, Inc.)*, 152 B.R. 546, 557 (Bankr. C.D. Ill. 1993) (holding 1142(a) applicable to state law requiring a corporation to be solvent to make distributions to shareholders).

The strong presumption against finding preemption should persuade the Court to interpret § 1123(a)(5) consistently with the more limited preemption afforded by § 1142(a). *PG&E II*, 350 F.3d at 943. To interpret § 1123(a)(5) otherwise would make no sense, because it would allow a debtor to include provisions in a plan that it could not then implement.[23]

Section 1123(a)(5) could not reasonably be read to expand the Debtors' authority to use or assign property beyond what is authorized under § 363(l), or to include into a plan provisions that cannot be implemented under § 1142(a). To read it as broadly preempting rights under the Policies would make the more limited preemptive provisions of §§ 363(l) and 1142(a) meaningless or absurd. The Court should avoid an interpretation that would have such an effect.

### d. Legislative history requires reading § 1123(a)(5)'s preemptive scope to be coextensive with § 1142(a)

The legislative history further illustrates the narrow reach of preemption under § 1123(a)(5). "[T]he purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). "To determine congressional purpose, we look to the statute's language, structure, subject matter, context, and history -- factors that typically help courts determine a statute's objectives and thereby illuminate its text.'" *PG&E II,* 350 F.3d at 943. (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998)).

---

[23]    "This construction -- interpreting Paragraph (5) as directive rather than empowering -- does not read the "notwithstanding" clause out of the statute. As several parties suggest, that clause still serves a useful purpose by preempting any state law that, for example, would prohibit a party from even submitting a plan to the bankruptcy court without first obtaining approval from a debtor's shareholders. The court can imagine other examples, such as labor laws that might obligate a plan proponent to negotiate in good faith with unions before submitting a plan or corporate laws that would require "a resolution of the board of directors" before a plan could be proposed. 124 Cong. Rec. H11103 (Sept. 28, 1978); S17419 (Oct. 6, 1978) (statement of Senator DeConcini)." *PG&E I*, 273 B.R. at 806.

32

Because of the absurd results arising from a literal reading of § 1123(a)(5), the Ninth Circuit carefully reviewed § 1123(a)(5)'s legislative history and concluded that it has the same limited preemptive reach as § 1142(a).

The Ninth Circuit reasoned that "[i]t makes perfect sense that the express preemptive scope of what must be included in a confirmable plan, specified in § 1123(a), would be the same as the express preemptive scope of what is actually included in a confirmed plan, specified in § 1142(a)." *PG&E II*, 350 F.3d at 947. The Ninth Circuit found strong support for this in the legislative history, concluding, "a plan proposed in conformity with § 1123(a) could be confirmed, and a confirmed plan would then have the preemptive effect precisely specified in § 1142(a)." *Id.* at 947-48. The Ninth Circuit held that "the 'notwithstanding' clause of § 1123(a) expressly preempts otherwise applicable nonbankruptcy law, and that the scope of that express preemption is the same as under the 'notwithstanding' clause of § 1142(a)." *Id.* at 948.

## F.    The Bankruptcy Court Erred in interpreting *CE* and *Kaiser Aluminum*

Throughout the Preemption Opinion, the Bankruptcy Court improperly analyzed the holdings of *CE* and *Kaiser Aluminum* as supporting its holding that § 1123(a)(5) has a broad preemptive scope. These decisions do not support the Bankruptcy Court's holding that the Insurance Rights are assignable.[24]

---

[24]    The unpublished decision relied upon by the Bankruptcy Court in the Preemption Opinion contains nothing more than the Bankruptcy Court's earlier repetition of the analytical mistakes in the Preemption Opinion. [*See* Preemption Opinion at 8, 16 (citing *In re Global Industrial Technologies, Inc.*, Case No. 02-21626, Memorandum Order at 2-7, Doc No. 7703 (Bankr. W.D. Pas., Sept. 21, modified Sept. 24, 2007))].

1. **The Bankruptcy Court erred by misconstruing the holding of *CE* to involve an assignment to a trust**

In numerous places throughout the Preemption Opinion, the Bankruptcy Court misconstrues *CE* to involve the assignment of proceeds to a trust.[25] Since *CE* does not involve such an assignment, the Bankruptcy Court's analysis is flawed. The only discussion in *CE* regarding assignment was with respect to insurance proceeds, not any other rights arising under insurance policies that are included within the definition of Insurance Rights. Furthermore, *CE* did not discuss whether insurance proceeds *could be assigned to a trust*. There is nothing in *CE* that would stand for the proposition that "the debtor's interests in the policies may be assigned to a trust or other entity". [Preemption Opinion at 10].

> *CE* actually states:
>
> [W]e agree with the District Court that even if the subject insurance policies purported to prohibit assignment of Combustion Engineering's insurance proceeds, these provisions would not prohibit the assignment of proceeds *to the bankruptcy estate*. This is not the case, however, with respect to anti-assignment provision in the Basic and Lummus primary and excess insurance policies....

*CE*, 391 F.3d at 218-19 (emphasis added). The issue in *CE* was whether insurance proceeds could be transferred from a debtor and non-debtors (Basis and Lummus) *to the bankruptcy estate*, *not from the bankruptcy estate to a trust* established pursuant to § 524(g). *CE* did not

---

[25]    "It is established in this circuit that under § 1123(a)(5) assignment of policy proceeds to a § 524(g) trust is not prohibited by anti-assignment provisions in insurance policies. *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004)." [Preemption Opinion at 9]. "[W]ith respect to property of the estate, §1123(a)(5)(B) expressly contemplates that the debtor's interests in the policies may be assigned to a trust or other entity. *Id.* at n.27." [Preemption Opinion at 10]. "*See, e.g., In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004) (finding that assignment of insurance proceeds to §524(g) trust notwithstanding any anti-assignment provisions in subject insurance policies is valid and enforceable pursuant to § 541 and § 1123(a)(5)). *Accord In re Kaiser Aluminum Corp.*, 343 B.R. 88 (D. Del. 2006)." [Preemption Opinion at 20].

34

examine the question of whether § 1123(a)(5) permits the assignment of proceeds, or any right arising under insurance policies, to a trust.

Furthermore, the assignment discussed in *CE* was only of insurance proceeds. The Insurance Rights include interests other than a "right to proceeds". Insurance Rights include, *inter alia*: "(b) the Asbestos Insurance Actions ... [and] (d) the Asbestos In-Place Insurance Coverage...." [Plan, § 1.1.218 at 28]. Asbestos Insurance Actions are defined to include the right to sue insurers. [Plan, § 1.1.17 at 4]. Asbestos In-Place Insurance Coverage is defined as "insurance coverage...." [Plan, § 1.1.16 at 4]. Both the Asbestos Insurance Actions and the Asbestos In-Place Insurance Coverage are defined to include interests that are not proceeds.

The Assignment of the Insurance Rights *to the Trust* is quite different than the assignment of insurance proceeds *to the bankruptcy estate* in *CE*.

### 2. The Bankruptcy Court erred by misconstruing CE as determining § 1123(a)(5)'s preemptive scope

The Bankruptcy Court erred by misconstruing the effect of Note 27 in *CE*. [Preemption Opinion at 18 (stating "[s]ee *Combustion Engineering*, 391 F.3d at 219 n. 27 (interpreting § 1123(a)(5) without limiting applicable nonbankruptcy law to laws relating to financial condition)]. In *CE* the Third Circuit neither analyzed nor decided the breadth of the scope of § 1123(a)(5)'s preemptive effect. Note 27 reads as follows:

> Section 541 effectively preempts any contractual provision that purports to limit or restrict the rights of a debtor to transfer or assign its interests in bankruptcy. 11 U.S.C. § 541(c)(1) ("An interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law - (A) that restricts or conditions transfer of such interest by the debtor"). The Bankruptcy Code expressly contemplates the inclusion of debtor insurance policies in the bankruptcy estate. Section 1123(a)(5) provides:
>
> Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall- . . . (5) provide adequate means for the plan's implementation, such as . . . (B) transfer

35

of all or any part of property of the estate to one or more entities, whether
organized before or after the confirmation of such plan.

*CE*, 391 F.3d at 218 n. 27.

Note 27 contains none of the analysis necessary to a finding of preemption.  It does not

examine Congressional intent, *Cipollone*, 505 U.S. at 516, apply the strong presumption against

preemption, *Medtronic,* 518 U.S. at 485, or attempt to balance competing interests. *Jones*, 430

U.S. at 525.  It was improper for the Bankruptcy Court to read it as deciding the preemptive

scope § 1123(a)(5).

Note 27 of *CE* is appended to the end of the following sentences:

> The London Market Insurers also contend the Plan impairs their rights under the
> anti-assignment provisions of the relevant insurance policies. With respect to the
> anti-assignment provisions, we agree with the District Court that even if the
> subject insurance policies purported to prohibit assignment of Combustion
> Engineering's insurance proceeds, these provisions would not prevent the
> assignment of proceeds to the bankruptcy estate.

*CE*, 390 F.3d at 218.  These sentences do not, in any way, discuss the effect of an assignment to

a trust, let alone whether any assignment to a trust would preempt state law.

### 3.    The Bankruptcy Court erred by relying upon *Kaiser Aluminum*

The Bankruptcy Court also cites *Kaiser Aluminum* for the proposition that § 1123(a)(5)

permits the Assignment.   [Preemption Opinion at 16].   However, the question in *Kaiser*

*Aluminum* was whether *insurance proceeds* could be assigned to a trust.  *Kaiser Aluminum*, 343

B.R. at 94 ("the Court must next determine whether . . . [to] allow the proceeds of those policies

to be assigned to the Funding Vehicle Trust").  As discussed in Section III.F.1, the Assignment

in this case is not merely of proceeds, but the much broader "Insurance Rights".  The question of

whether insurance rights, other than, proceeds could be assigned to a trust was not before the

*Kaiser Aluminum* court. 343 B.R. at 91.  Any statements in *Kaiser Aluminum* that might indicate

an approval of an assignment of anything other than proceeds are *dicta*.

36

The *Kaiser Aluminum* court made the same analytical error as the Bankruptcy Court did in the case at bar by presuming that the brief mention of § 1123(a)(5) at the end of Note 27 constituted a binding preemption analysis.

This Court is not required to follow *Kaiser Aluminum*. *White v. Baltic Conveyor Co.*, 209 F.Supp. 716, 722 (D.N.J. 1962) (stating "if after consideration of the facts and law, our reasoning compels a different conclusion...we must rule accordingly.").

## III. THE BANKRUPTCY COURT ERRED IN RULING THAT § 1123(A)(5)(B) PREEMPTS CONTRACTUAL PROVISIONS

The Bankruptcy Court erred in ruling that § 1123(a)(5) preempts contractual provisions. [Preemption Opinion at 21-22]. Unlike §§ 541(c), 365(f), and 1124(2), § 1123(a)(5) does not preempt contractual rights, and therefore cannot override the Assignment Restrictions. Congress's choice to use different language in different parts of a statute is presumed purposeful. *See Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 450, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). This is particularly true where, as here, Congress includes particular language in one section of a statute but omits it in another.[26] In that case, "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.*; *accord, Woodson v. Scott Paper Co.*, 109 F.3d 913, 934 (3d Cir. 1997).

In the Bankruptcy Code, Congress has specifically preempted contract rights as follows:

- "notwithstanding any *provision in a contract,* a lease, or applicable law ...." § 363(l) (emphasis added);

- "Notwithstanding a *provision in an executory contract* or unexpired lease, or in applicable law ..." § 365(e)(1);

---

[26] *Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994); *Russello v. U.S.*, 464 U.S. 16, 23 (1983), which were relied upon in the Preemption Opinion.

- "notwithstanding any provision in an *agreement*, transfer instrument, or applicable nonbankruptcy law ..." § 541(c)(1);

- "Notwithstanding a *provision in an executory contract* or unexpired lease of the debtor, or in applicable law ..." § 365(f)(1) ("); and,

- "notwithstanding any *contractual provision* or applicable law...." § 1124(2) (emphasis added).

Those provisions contrast sharply with § 1123(a)(5)'s preemption clause, which does not refer to contractual provisions.

Congress, by omitting from § 1123(a)(5) language that specifically preempts private contract rights, but including such specific language elsewhere in the Bankruptcy Code, expressed a clear Congressional intent that § 1123(a)(5) would not preempt private contract rights. Section 1123(a)(5) should not be read to affect the Assignment Restrictions.

## IV.    SECTION 365 DOES NOT PERMIT MODIFICATION OF THE POLICIES BECAUSE THEY ARE NOT-EXECUTORY CONTRACTS

The Bankruptcy Code contains no provision allowing modification or assignment of *non-executory* contracts. Courts generally hold that insurance contracts are non-executory after expiration of the policy period.[27] The policy periods of the London Policies have all expired. The Policies are non-executory and non-assignable.

Section 365 allows a limited modification of contractual rights, but it applies only to executory contracts, not to non-executory contracts.[28] *See Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989); *In re Stewart Foods, Inc.*, 64 F.3d 141, 145 (4th Cir. 1995); *Matter of Chicago Rock Island & Pacific R. Co.*, 604 F.2d 1002 (7th Cir. 1979) (holding that a contract of guaranty was not executory and thus could not be

---

[27]    *See, e.g., Beloit Liquidating Trust v. United Ins. Co.*, 287 B.R. 904, 906 (N.D. Ill. 2002).

[28]    *See* § 365(a), (b), and (f).

disaffirmed by the trustee); *In re Beeter*, 173 B.R. 108, 114 (Bankr. W.D. Tex. 1994) ("[c]onversely, of course, if the Declaration is not an *executory* contract (or is not even a contract at all), the intervention of bankruptcy will not affect the parties' responsibilities thereunder one way or another"); *Matter of Enjet, Inc.*, 205 B.R. 803, 810-812 (Bankr. E.D. La. 1997) (pre-petition contract was non-executory and enforceable).

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The Bankruptcy Court erred in ruling that § 1123(a)(5) preempts the Assignment Restrictions. The Assignment is not authorized by §§ 363(l), 365, 541(c), 1123(a)(5) or any other provision of the Bankruptcy Code. The scope of preemption under § 1123(a)(5) is narrow and cannot reasonably be read to preempt insurers' contractual Assignment Restrictions, which were mutually agreed by the parties to the London Policies. On its face, § 1123(a)(5) says nothing about preempting contracts. To misinterpret its preemptive scope broadly would lead to absurd results, allow the Debtors to do whatever they want without regard to any other federal or state laws, and violate fundamental principles of Federalism. The only logical interpretation of the scope of § 1123(a)(5)'s preemption provision is that it applies only to nonbankruptcy law relating to the financial condition of a debtor, which would not apply to the Assignment Restrictions.

Accordingly, LMI respectfully request that this Court reverse the Preemption Order. The parties will return to state court to litigate whether the Assignment is valid under state law, an issue that was expressly reserved and not litigated during confirmation.


Wilmington, Delaware                           Respectfully submitted,

                                               DUANE MORRIS LLP
                                               Richard W. Riley (No. 4052)
                                               1100 North Market Street, Suite 1200
                                               Wilmington, DE 19801-1246
                                               Telephone: (302) 657-4928
                                               Fax: (302) 657-4901

                                               MENDES & MOUNT LLP
                                               Eileen T. McCabe
                                               750 Seventh Avenue
                                               New York, New York 10019-6829
                                               Telephone: (212) 261-8000
                                               Fax: (212) 261-8750

                                               DUANE MORRIS LLP
                                               Russell W. Roten (CA SBN 170571)
                                               Jeff D. Kahane (CA SBN 223329)
                                               633 W. 5th Street, Suite 4600
                                               Los Angeles, CA 90071
                                               Telephone: (213) 689-7400
                                               Fax:  (213) 689-7401

                                               TUCKER ARENSBERG, P.C.
                                               Michael A. Shiner (PA ID 78088)
                                               1500 One PPG Place
                                               Pittsburgh, PA 15222
                                               Telephone: (412) 594-5586
                                               Fax: (412) 594-5619

                                               *Counsel for Certain Underwriters at Lloyd's,
                                               London, and Certain London Market Companies*

DM3\726017.1

# UNPUBLISHED DECISIONS

LEXSEE 1996 BANKR. LEXIS 340



Analysis
As of: May 21, 2008

### In re CLARKSVILLE HOSPITALITY CORPORATION, Debtor

### Chapter 11, Case No. 93-17668-CJK

### UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MASSA-CHUSETTS

*1996 Bankr. LEXIS 340; 35 Collier Bankr. Cas. 2d (MB) 877; 28 Bankr. Ct. Dec. 1131*

### April 4, 1996, Date

**DISPOSITION:**     [*1]  The objection of the State of Tennessee to confirmation of the Debtor's plan of reorganization is hereby overruled, and it is hereby OR-DERED that postconfirmation interest on the State's al-lowed secured claim shall accrue at the variable rate set forth in the plan as proposed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** After confirmation of the debtor's plan of reorganization, the creditor, the State of Tennessee, (state) argued that the plan was required to pay interest on its fully secured tax claim at a rate provided by state law. The debtor argued that the plan was only required to pay interest at a rate that would give the claim its full present value pursuant to § *1129(b)(2)*9A)(i)(II) of the Bankruptcy Code (Code), *11 U.S.C.S. § 1129(b)(2)(A)(i)(II).*

**OVERVIEW:** The state's pre-petition tax claim against the debtor was impaired under the plan and the interest rate under the plan was calculated to ensure that the claim would have a present value equal to its full al-lowed amount pursuant to § *1129(b)(2)(A)(i)(II)* of the Code. The state argued that the debtor could pay a higher interest rate without compromising distributions to other creditors. The debtor argued that the standard under the Code preempted state law and that there was no risk of nonpayment because the state's claim was fully secured. The court held that in determining whether the interest rate was appropriate, the treatment of the state's claim had to be fair and equitable and not discriminate unfairly in accordance with § *1129(b)(1)* of the Code. The court

held that the effect of the plan was to give the creditor a new claim. State law was inapplicable because the tax claim was thus fully liquidated and discharged. The court held that nothing in the Code required the debtor to pay the state more than the value of its claim. The plan's treatment of the claim was fair and equitable and did not unfairly discriminate.

**OUTCOME:** The court ordered that interest on the state's allowed secured claim would accrue as proposed under the debtor's plan of reorganization.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Subject Matter Juris-diction > Federal Questions > General Overview*
[HN1] The provisions of Chapter 11 of the Bankruptcy Code preempt state laws with respect to the treatment of secured tax claims, including the appropriate interest rate for the payment of such claims over time.

*Bankruptcy Law > Reorganizations > Plans > Confir-mation > Cramdown*
*Bankruptcy Law > Reorganizations > Plans > Confir-mation > Prerequisites > Fairness*
*Bankruptcy Law > Reorganizations > Plans > Confir-mation > Prerequisites > Impaired Class Consent*
[HN2] Under the Bankruptcy Code, a plan of reorganiza-tion must specify a treatment for each class of claims against the debtor, *11 U.S.C.S. §§ 1123(a)(2)* and *(3)*, and the proposed treatment need not leave the claims

Case 1:08-cv-00229-JHR    Document 12-2    Filed 05/21/2008    Page 3 of 35

Page 2
1996 Bankr. LEXIS 340, *; 35 Collier Bankr. Cas. 2d (MB) 877;
28 Bankr. Ct. Dec. 1131

unimpaired. *11 U.S.C.S. §§ 1123(a)(3) and (b)(1).* That is, the plan may alter the legal, equitable, or contractual rights to which a claim entitles its holder. *11 U.S.C.S. § 1124(1).* A class of impaired claims may reject the plan. However, a court shall confirm the plan notwithstanding that class's rejection of it if, in addition to satisfying all the requirements of *§ 1129(a)* other than the requirement that each impaired class have accepted the plan, the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. *11 U.S.C.S. § 1129(b)(1).*

*Bankruptcy Law > Reorganizations > Plans > Confirmation > Cramdown*
*Bankruptcy Law > Reorganizations > Plans > Confirmation > Prerequisites > Fairness*
*Constitutional Law > Supremacy Clause > Federal Preemption*
[HN3] The Bankruptcy Code explicitly permits a plan proponent to alter the legal, equitable, and contractual rights to which a claim entitles its holder, subject only to two requirements: with respect to any impaired class that rejects the plan, the plan must be fair and equitable, and it must not discriminate unfairly. These are requirements of federal law. If they are satisfied, the court shall confirm the plan despite the fact that confirmation impairs the claimants' rights under state law. *11 U.S.C.S. § 1129(b)(1).* The requirements thus clearly conflict with and preempt state laws with respect to the validity, enforceability, and amount of the underlying claims.

*Bankruptcy Law > Discharge & Dischargeability > Reorganizations*
*Contracts Law > Debtor & Creditor Relations*
[HN4] The Bankruptcy Code provides that except as provided in the plan of reorganization, in the order confirming it, and in *11 U.S.C.S. § 1141(d),* confirmation of the plan discharges the debtor from any debt that arose before the confirmation date. In effect, the old claim is exchanged for a new one given in satisfaction of the old. The prior obligation, whether it be under a contract or under a tax statute, is discharged. The basis of the new claim is the plan itself, not the contract or the tax statute.

*Bankruptcy Law > Reorganizations > Plans > Confirmation > Cramdown*
*Bankruptcy Law > Reorganizations > Plans > Confirmation > Prerequisites > Fairness*
[HN5] In relevant part, *§ 1129(b)(2)(A) of the Bankruptcy Code, 11 U.S.C.S. § 1129(b)(2)(A),* states that for the purpose of this subsection, the condition that a plan

be fair and equitable includes the following requirements: with respect to a class of secured claims, the plan provides that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

*Bankruptcy Law > Reorganizations > Plans > Confirmation > Cramdown*
*Bankruptcy Law > Reorganizations > Plans > Confirmation > Prerequisites > Fairness*
*Bankruptcy Law > Reorganizations > Plans > Prerequisites > Impaired Class Consent*
[HN6] *Section 1129(b)(1) of the Bankruptcy Code* (Code), *11 U.S.C.S. § 1129(b)(1)* requires that in order to confirm a plan over the objection of an impaired class, the plan must be fair and equitable, and not discriminate unfairly, with respect to that class. *Section 1129(b)(2)(A)* states that the condition that a plan be fair and equitable with respect to a class includes, with respect to a secured claim, the requirement set forth in *§ 1129(b)(2)(A)(i).* But in the Code, the term "includes" is not limiting. *11 U.S.C.S. § 102(3).* Therefore, *§ 1129(b)(2)(A)(i)* of the Code does not exhaust the requirements and meaning of fair and equitable. Nor does it even purport to define the separate requirement against unfair discrimination.

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > General Overview*
*Bankruptcy Law > Discharge & Dischargeability > Reorganizations*
*Bankruptcy Law > Reorganizations > Plans > Confirmation > Cramdown*
[HN7] A secured creditor's claim is finally quantified as of the effective date of the plan. *11 U.S.C.S. § 1129(b)(2)(A)(i)(II).* On the basis of that quantification, the debtor or a third-party plan proponent devises an appropriate treatment for the claim. The treatment must pay the secured creditor the full value of its claim as of the effective date of the plan. *11 U.S.C.S. § 1129(b)(2)(A)(i), (ii), and (iii).* If this is done over time, as often it must be, the stream of future payments must have a present value, as of the effective date of the plan, of at least the value of the creditor's secured claim. *11 U.S.C.S. § 1129(b)(2)(A)(i)(II).* In effect, the plan gives the secured creditor a new claim in satisfaction of its prepetition claim. Upon confirmation of the plan, the

prepetition claim is discharged and becomes unenforceable. *11 U.S.C.S. §§ 1141(d)(1)(A)* and *524(a)*. From that point forward, the basis of the creditor's claim is the plan itself, not the underlying contract, tax statute, or whatever.

**COUNSEL:** Donald R. Lassman, Esq., for Debtor.

Jeffrey A. Schreiber, Esq., for State of Tennessee.

**JUDGES:** Carol J. Kenner, United States Bankruptcy Judge

**OPINION BY:** Carol J. Kenner

**OPINION**

*MEMORANDUM OF DECISION ON RATE OF POSTCONFIRMATION INTEREST ON SECURED TAX CLAIM*

The issue before the Court is whether the Debtor's Chapter 11 plan of reorganization must pay interest to the State of Tennessee on its fully secured tax claim at the eighteen percent rate provided by Tennessee law, or whether the plan need only pay interest at a rate that gives it, over time, the full present value of its claim, pursuant to *§ 1129(b)(2)(A)(i)(II) of the Bankruptcy Code*. The Debtor's plan provides that the fully secured tax claim of the State of Tennessee, in the amount of $ 187,413.66, shall be paid in full in equal monthly installments of principal and interest over a period of five years, with interest on the deferred payments [*2] to accrue at the prime rate (as defined in the plan). The State of Tennessee objects to this treatment of its claim on the limited basis that the proposed rate of interest on its allowed secured claim should instead be the statutory rate of interest on delinquent tax claims as established by Tennessee law, *T.C.A. § 67-5-2010*. [1] The Court confirmed the plan, subject to later determination of the appropriate rate of interest. [2] The parties have now briefed the issue and submitted it for adjudication.

[1] The State contends that under the statute, it is entitled to *interest* at the rate of 1.5 percent per month. However, the statute does not provide for interest at that rate. It assesses "a penalty of one half of one percent (.5%) and interest of one percent (1%)" per month. *T.C.A. § 67-5-2010*. Therefore, what the State seeks consists of both interest and penalty.

[2] The Court found that the outcome of this dispute would not affect the feasibility of the plan.

*FACTS*

The facts are not [*3] in dispute. The Debtor filed its petition under Chapter 11 of the Bankruptcy Code on August 24, 1993. The State of Tennessee holds a prepetition claim against the Debtor for real estate taxes and other municipal charges in the total amount of $ 187,413.66. The claim was secured by a lien, arising under *T.C.A. § 67-5-2101*, on real estate belonging to the Debtor and located in Clarksville, Tennessee. The State's lien had priority over all other mortgages, liens, and other encumbrances of record. As of the confirmation date, the real estate had a value of $ 1,900,000, such that the State's tax claim was fully secured.

In its First Amended Plan of Reorganization, the Debtor classified the State's tax claim in Class 3, and proposed to pay the Class 3 claims in full in equal monthly installments of principal and interest over a period of five years. [3] The Debtor further proposed that interest on the deferred payments would accrue at the prime rate (defined as the rate published in *The Wall Street Journal* on the last business day of the month), adjusted annually. It is undisputed that under this plan, the State's claim is impaired. It is also undisputed that the rate set forth in the [*4] plan is calculated to ensure that the promised stream of payments on the claim will have a present value ("present" as of the effective date of confirmation) equal to the full allowed amount of the claim, such that it satisfies *11 U.S.C. § 1129(b)(2)(A)(i)(II)*.

[3] The plan does not provide that the State will retain the lien that secures its claim. See *11 U.S.C. § 1141(c)*. However, the Court's order confirming the plan recites that the Court has determined that "the Plan does not discriminate unfairly and is fair and equitable with respect to each class of claims that is impaired and has not accepted the plan because the holders of claims in those classes retain the liens securing such claims." Order Confirming Plan, P 9. In its memorandum on the present issue, the Debtor clearly believes that Tennessee's claim remains fully secured by a first position lien on the property, relying on this fact to establish that the State it at no risk of nonpayment. Debtor's Memorandum. p. 9.

The plan provides that Class [*5] 5, the class of unsecured creditors, will receive a dividend of only ten percent on their claims. And with respect to the class of the Debtor's equity interest holders, consisting solely of the equity interest of the Debtor's president, Ashiya Dudhia Mahdi, the plan provides that her prepetition interest in the Debtor is extinguished. However, it also provides that Ms. Mahdi will make a new capital contribution of $ 300,000 to fund the plan of reorganization, and that she will be given a new equity interest--the sole

equity interest in the Debtor--on account of this contribution.

The State filed a ballot rejecting the plan and also filed a written objection to the plan. Specifically, Tennessee objected to the plan rate of interest and argued that the proper rate of interest was the statutory rate of interest charged on delinquent tax claims, as established by *T.C.A. § 67-5-2010*. Finding that the outcome of this dispute would not affect the feasibility of the plan, the Court confirmed the plan as proposed, subject to later adjudication of the postconfirmation rate of interest on the state's secured tax claim. Resolution of this dispute in favor of the State would increase the monthly [*6] payment to the State (from the present plan rate) by approximately $ 1,100 per month, but it would not affect the amounts of payments due to other classes of creditors under the plan; nor would it impair the Debtor's ability to make such payments. Resolution in favor of the State would affect only the Debtor and its equity holder.

### ARGUMENTS

The State does not deny that, but for the fact that its claim is for taxes and that the Debtor can afford to pay the higher rate, the rate of interest proposed in the plan is such that the stream of payments promised to the State will have a value, as of the effective date of the plan, equal to the full amount of the State's claim, as it must to satisfy *11 U.S.C. § 1129(b)(2)(A)(i)(II)*. However, the State argues that the satisfaction of this requirement is only the minimum that the Bankruptcy Code requires. The State takes the position that where (a) the claim at issue is a tax claim, (b) the state tax statute demands a higher rate of interest than that required by *§ 1129(b)(2)(A)(i)(II)*, and (c) the Debtor can afford to pay the higher rate without jeopardizing the distributions to other creditors, then there is no conflict between [*7] the Bankruptcy Code and the state statute, and the Bankruptcy Code requires that the Debtor pay the amount prescribed by the state statute. In support of this position, the State argues where the Debtor can afford to pay the rate prescribed by the state statute without diminishing the dividend to unsecured creditors or compromising the feasibility of the plan, it is unfair for the Debtor to have the benefit of the lower rate. It is unfair in two respects. First, it violates the principal of equality among taxpayers, giving the Debtor repayment terms that are more lenient than those afforded to other taxpayers. And second, it permits the Debtor and its equity holders to benefit at the expense of the State and its other taxpayers. Moreover, unlike most other creditors, the State is not a consensual creditor--it did not willfully extend credit to the Debtor; therefore, if the Debtor can afford to pay the statutory rate, it should not be permitted to pay less.

The Debtor responds that under the Bankruptcy Code, the rate of interest on an allowed secured claim need only satisfy *§ 1129(b)(2)(A)(i)(II)*, and that this standard preempts state laws as to the proper postconfirmation treatment [*8] of secured tax claims. The standard requires only that the secured creditor receive, over time, the full present value of its secured claim. Accordingly, the interest rate must compensate the creditor for the time value of money and for the risk of nonpayment, nothing more. In this case, where the State's claim is secured many times over by a first position lien on the property, the State bears no risk of nonpayment, so the State need only be compensated for the time value of money. Use of a variable prime rate does just that. The rate prescribed by the Tennessee statute, eighteen percent per annum, far exceeds the rate needed to accomplish this purpose.

### DISCUSSION

[HN1] The provisions of Chapter 11 of the Bankruptcy Code preempt state laws with respect to the treatment of secured tax claims, including the appropriate interest rate for the payment of such claims over time. [HN2] Under the Code, a plan of reorganization must specify a treatment for each class of claims against the Debtor, *11 U.S.C. § 1123(a)(2)* and *(3)*, and the proposed treatment need not leave the claims unimpaired. *11 U.S.C. § 1123(a)(3)* and *(b)(1)*. That is, the plan may alter the legal, equitable, or contractual [*9] rights to which a claim entitles its holder. *11 U.S.C. § 1124(1)*. A class of impaired claims may reject the plan. However, the court "shall confirm the plan notwithstanding" that class's rejection of it if, in addition to satisfying all the requirements of *§ 1129(a)* other than the requirement that each impaired class have accepted the plan, "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *11 U.S.C. § 1129(b)(1)*.

[HN3] By virtue of these provisions, the Bankruptcy Code explicitly permits the plan proponent to alter the legal, equitable, and contractual rights to which a claim entitles its holder, subject only to two requirements: with respect to any impaired class that rejects the plan, the plan must be fair and equitable, and it must not discriminate unfairly. These are requirements of federal law. If they are satisfied, the court "*shall* confirm the plan," *11 U.S.C. § 1129(b)(1)* (emphasis added), despite the fact that confirmation impairs the claimants' rights under state law. The requirements thus clearly conflict with and preempt state laws with respect [*10] to the validity, enforceability, and amount of the underlying claims. [4] *Summit Investment and Development Corp. v. Leroux, 69 F.3d 608, 610 (1st Cir. 1995)* ("Federal preemption under the *Supremacy Clause* . . . will be found only if there

is 'clear' evidence of a congressional intent to preempt state law, or we are persuaded that the federal and state statutes, by their very terms, cannot coexist."). *Matter of Fi-Hi Pizza, Inc., 40 Bankr. 258, 270 (Bankr.D.Mass. 1984)* (The preemption of state provisions "is the very heart of bankruptcy law, whose raison d'etre is the very abrogation of nonbankruptcy obligations.") Therefore, in determining whether the proposed rate of interest is appropriate, the Court must ultimately determine not whether the interest rate conforms to the state statute, but whether it conforms to the requirements of *11 U.S.C. § 1129(b)(1)*: that the treatment of the State's claim be fair and equitable, and that it not discriminate unfairly.

4   [HN4] Accordingly, the Code further provides that except as provided in the plan of reorganization, in the order confirming it, and in *11 U.S.C. § 1141(d)*, confirmation of the plan discharges the debtor from any debt that arose before the confirmation date. *11 U.S.C. § 1141(d)(1)*. In effect, the old claim is exchanged for a new one given in satisfaction of the old. The prior obligation, whether it be under a contract or under a tax statute, is discharged. The basis of the new claim is the plan itself, not the contract or the tax statute.

[*11]   But this conclusion does not fully answer the State's argument. The State concedes that *§ 1129(b)(1)* governs. The State argues that *pursuant to § 1129(b)(1)*, the Debtor should pay interest at the full rate prescribed by state law when circumstances permit: when the Debtor can afford the higher rate without affecting the dividend to other classes of creditors or jeopardizing the feasibility of the plan.

The Debtor responds that *§ 1129(b)(1)* is satisfied because *§ 1129(b)(2)(A)* is satisfied. 5 The State does not deny that *§ 1129(b)(2)(A)* is satisfied: the State has retained its lien to the full extent of the allowed amount of its claim, and the proposed interest rate is calculated such that the deferred payments promised under the plan shall total at least the allowed amount of the claim and have a value, as of the effective date of the plan, of at least the value of the State's lien. But the State contends that *§ 1129(b)(2)(A)(i)* is only a minimum requirement and that, in certain circumstances, *§ 1129(b)(1)* may demand more.

5   [HN5] In relevant part, *§ 1129(b)(2)(A)* states:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable includes the following requirements:

(A) With respect to a class of secured claims, the plan provides--

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

*11 U.S.C. § 1129(b)(2)(A)(i)*.

[*12]   It is true that *§ 1129(b)(2)(A)(i)* is only a minimum requirement and that, in certain respects, *§ 1129(b)(1)* may demand more. *Matter of Sandy Ridge Development Corp., 881 F.2d 1346, 1352 (5th Cir. 1989), reh'g denied 889 F.2d 663 (1989)* (simple technical compliance with *§ 1129(b)(2)* does not assure that plan is fair and equitable; *§ 1129(b)(2)* "sets minimal standards" and "does not require that every plan not prohibited be approved"). [HN6] *Section 1129(b)(1)* requires that in order to confirm a plan over the objection of an impaired class, the plan must be fair and equitable, and not discriminate unfairly, with respect to that class. And *§ 1129(b)(2)(A)* states that the condition that a plan be fair and equitable with respect to a class "includes," with respect to a secured claim, the requirement set forth in *§ 1129(b)(2)(A)(i)*. But in the Bankruptcy Code, "includes" is not limiting. *11 U.S.C. § 102(3)*. Therefore, *§ 1129(b)(2)(A)(i)* does not exhaust the requirements and meaning of "fair and equitable." Nor does it even purport

Case 1:08-cv-00229-JHR    Document 12-2    Filed 05/21/2008    Page 7 of 35

Page 6

1996 Bankr. LEXIS 340, *; 35 Collier Bankr. Cas. 2d (MB) 877;
28 Bankr. Ct. Dec. 1131

to define the separate requirement against unfair discrimination.

Nonetheless, the Court holds that the proposed rate, in satisfying *§ 1129(b)(2)(A)(i)*, **[*13]** should be deemed fair and equitable. This conclusion is based on the structure of the reorganization provisions of Chapter 11, under which the confirmation of a plan of reorganization effectively substitutes a new obligation for each of a debtor's existing obligations (except for nondischargeable obligations, which are not at issue here). [HN7] Under these provisions, a secured creditor's claim is finally quantified as of the effective date of the plan. *11 U.S.C. § 1129(b)(2)(A)(i)(II)*; *In re Brentwood Outpatient Ltd., 134 Bankr. 267, 274 (Bankr.M.D.Tenn. 1991)*, aff'd *152 Bankr. 727 (M.D.Tenn. 1993)*, aff'd in part and rev'd in part on other grounds *43 F.3d 256 (6th Cir. 1994)* (interest on oversecured tax claim accrues through the effective date of the plan, at which time the amount of the claim is fixed). On the basis of that quantification, the debtor (or a third-party plan proponent) devises an appropriate treatment for the claim. The treatment must pay the secured creditor the full value of its claim as of the effective date of the plan. *11 U.S.C. § 1129(b)(2)(A)(i), (ii)*, and *(iii)*. If this is done over time, as often it must be, the stream of future payments must have **[*14]** a present value, as of the effective date of the plan, of at least the value of the creditor's secured claim. *11 U.S.C. § 1129(b)(2)(A)(i)(II)*; *In re Ropt Ltd. Partnership, 152 Bankr. 406, 408 (Bankr.D.Mass. 1993)* (payments over time must have present value at least equal to amount of secured claim). In effect, the plan gives the secured creditor a new claim in satisfaction of its prepetition claim. Upon confirmation of the plan, the prepetition claim is discharged and becomes unenforceable. *11 U.S.C. §§ 1141(d)(1)(A)* and *524(a)*. From that point forward, the basis of the creditor's claim is the plan itself, not the underlying contract, tax statute, or whatever. [6]

6   The State builds its argument on cases that dealt exclusively with *preconfirmation* interest, the rate at which a debtor should pay interest on oversecured tax claims while in Chapter 11 but before its plan is confirmed. See *Wasserman v. City of Cambridge, 151 Bankr. 4 (D.Mass. 1993)*; *In re Kelton, 137 Bankr. 18 (Bankr.W.D. Tex. 1992)*; and *In re Russo, 63 Bankr. 335 (Bankr.D.Mass. 1986)*. But postconfirmation interest is governed by *§ 1129(b)* and related provisions of Chapter 11 that have no bearing on preconfirmation issues. Consequently, these cases offer no guidance on the treatment of oversecured tax claims in Chapter 11 plans of reorganization.

**[*15]** Accordingly, the State's secured tax claim was finally quantified upon confirmation of the plan.

Interest on the claim ran at the rate prescribed by Tennessee law until confirmation. Upon confirmation, the amount of the claim became final, and the State became entitled to payment of its claim in full. The Debtor having proposed to make such payment over time, the State was promised a five-year stream of payments whose value as of the effective date of the plan was the full amount of the State's claim. The function of the postconfirmation rate of interest is only to ensure that this stream of future payments will afford the State the full present value of its claim. [7] The rate prescribed in *T.C.A. § 67-5-2010* does not apply because, upon confirmation, the State's tax claim was liquidated, discharged, and, by substitution of the Debtor's new obligation to the State under the confirmed Chapter 11 plan, satisfied. By virtue of its treatment under the plan, the State will receive payment of its claim in full, with virtually no risk of nonpayment. This is fair and equitable. Nothing in the Code requires the Debtor to pay a creditor, even a tax creditor, more than the value of its claim. **[*16]**

7   *In re Brentwood Outpatient Ltd., 134 Bankr. at 274* (oversecured tax claim accrues interest until effective date of plan; interest thereafter is to insure payment of present value of allowed secured claim); *In re Young, 61 Bankr. 150, 152 (Bankr.S.D.Ind. 1986)* (function of postconfirmation interest is to compensate secured creditor for time value of money and thus to assure its receipt of the present value of its claim; postconfirmation "present value payments" are distinct from the interest component of a secured claim under *11 U.S.C. § 506(b)*); *In re Gincastro, 48 Bankr. 662, 664 n.3 (Bankr.D.R.I. 1985)* (distinguishing interest allowable as part of secured claim under *11 U.S.C. § 506(b)* from interest payments required in Chapter 13 plan by present value provision in *11 U.S.C. § 1325(a)(5)*); *In re Ropt Ltd. Partnership, 152 Bankr. 406, 408 (Bankr.D.Mass. 1993)* (postconfirmation interest rate on secured claim must compensate secured creditor only for the time-value of money and for risk). In this case, the State has virtually no risk of nonpayment, so the interest rate need not compensate for risk.

**[*17]** Moreover, the Court finds no unfair discrimination in the treatment of the State's claim, especially where unsecured creditors are receiving dividends of only ten percent on their claims. The State, by comparison, fares quite enviably. Nor is the State being treated unfairly vis-a-vis the Debtor's equity interest holder. It is true, as the State complains, that the Debtor is, by virtue of Chapter 11, obtaining a better interest rate going forward than is available to other taxpayers, and that this better rate will ultimately accrue to the benefit of the Debtor's sole equity interest holder. However, the

1996 Bankr. LEXIS 340, *; 35 Collier Bankr. Cas. 2d (MB) 877;
28 Bankr. Ct. Dec. 1131

equity holder retains no equity in the Debtor by virtue of her prepetition interest. The plan extinguished her prepetition interest in the Debtor. She holds her present equity interest by virtue of the $ 300,000 contribution to capital she made in order to fund the plan of reorganization. As equity, her contribution is subject to a substantial risk of loss. Where the state is receiving payment in full without risk of loss, the Court finds no unfair discrimination.

For these reasons, the Court concludes that the rate proposed in the plan satisfies the requirements set forth in § [*18] *1129(b)(1)* and, therefore, that the State's objection to confirmation should be overruled. A separate order shall enter accordingly.

Date: April 4, 1996

Carol J. Kenner

United States Bankruptcy Judge

### ORDER ON RATE OF POSTCONFIRMATION INTEREST ON SECURED TAX CLAIM

For the reasons set forth in the separate memorandum of decision issued today, the objection of the State of Tennessee to confirmation of the Debtor's plan of reorganization is hereby overruled, and it is hereby ORDERED that postconfirmation interest on the State's allowed secured claim shall accrue at the variable rate set forth in the plan as proposed.

Date: April 4, 1996

Carol J. Kenner

United States Bankruptcy Judge

LEXSEE 2008 BANKR. LEXIS 1074


**In re ETHEL J. DAWSON, Debtor. ETHEL J. DAWSON, Plaintiff, v. JAMES B. THOMAS, et al., Defendants.**

Case No. 04-00531 (Chapter 13), Adversary Proceeding No. 04-10083

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF COLUMBIA

*2008 Bankr. LEXIS 1074*


**April 9, 2008, Decided**

**CASE SUMMARY:**


**PROCEDURAL POSTURE:** Debtor objected to a proof of claim filed in her Chapter 13 by defendant agent and secured by a residential mortgage. She also sought relief against defendant lender and defendant broker. At issue, inter alia, was whether she was entitled to pursue the claims and whether either or both defendants were liable per the Truth In Lending Act (TILA), *15 U.S.C.S. § 1601 et seq.*, or the D.C. Home Loan Protection Act, *D.C. Code § 26-1151.01 et seq.*

**OVERVIEW:** Defendants structured a loan to defendant as a commercial loan, thereby avoiding TILA or other disclosures, and each received a $5000 fee. Of the $35,000 loan, debtor received about $23,000. Debtor challenged the agent's claim, arguing that the transaction violated, inter alia, TILA and the Home Loan Protection Act (HLPA), *D.C. Code §§ 26-1151.01 et seq.* The court rejected claims that the TILA claim was time-barred and found that even if affirmative claims thereunder were time-barred, recoupment was still available. Moreover, the tolling provisions in *11 U.S.C.S. § 108* was available to debtor per *11 U.S.C.S. § 363* as the claims were estate property. The court concluded that the loan was a consumer credit transaction to which TILA applied, that defendants did not reasonably rely on debtor's claims that the transaction was a commercial one, and that while the broker was not subject to TILA liability, the agent was subject to such liability and in fact liable as the loan included prohibited terms and proper disclosure was not made. Debtor was entitled to rescission on certain terms. Alternatively, debtor was entitled to reformation. Damages and attorneys' fees were also warranted.

**OUTCOME:** The court held that the agent had violated TILA, that plaintiff was entitled to rescission as well as setoff of certain amounts, that the agent was required to deposit, in the court registry, a release of the deed of trust, that plaintiff, as an alternative to rescission, was entitled to reformation of the loan to comply with certain terms detailed by the court, and that plaintiff was entitled to reasonable attorneys fees under TILA and the HLPA.

**LexisNexis(R) Headnotes**


*Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > General Overview*
*Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > Dismissal*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > General Overview*
[HN1] The decision of whether to retain jurisdiction over an adversary proceeding in light of the dismissal of an underlying bankruptcy case should be left to the sound discretion of the bankruptcy court where the adversary proceeding is pending. In making its determination, the court must consider judicial economy, convenience to the parties, fairness, and comity.


*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Bankruptcy Law > Claims > Objections*
*Bankruptcy Law > Claims > Setoffs*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Real Property Law > Financing > Federal Regulations > General Overview*

[HN2] A consumer/debtor is not time-barred from defensively asserting violations of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, in objecting to a proof of claim in the consumer/debtor's bankruptcy. *15 U.S.C.S. § 1640(e)*. That is, actions under the Truth in Lending Act must be brought within one year of the violation, though a consumer/debtor may raise violations of the Act as a defense to a collection action after the expiration of the filing period, and the one-year time limitation does not apply to a violation raised as a recoupment defense to a claim.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Financing > Federal Regulations > General Overview*
[HN3] Affirmative actions under the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, are generally required to be brought within one year of the violation, *15 U.S.C. § 1640(e)*, and actions for rescission must be brought within three days after consummation of the transaction, or in the event the relevant disclosures were never made, within three years after consummation. *15 U.S.C.S. § 1635(a), (f)*.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Purchase & Sale > Closing & Settlement*
[HN4] Violations of the disclosure requirements under the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, accrue no later than the settlement date in the underlying transaction.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Governments > Legislation > Statutes of Limitations > General Overview*

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN5] See *11 U.S.C.S. § 108(a)*.

*Bankruptcy Law > Case Administration > Administrative Powers > Estate Property Lease, Sale & Use > General Overview*
*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN6] On its face, the tolling provision of *11 U.S.C.S. § 108(a)* is available only to the bankruptcy trustee.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview*
*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Estate Property > General Overview*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
[HN7] Under *11 U.S.C.S. § 323(a)*, a trustee in a bankruptcy case is the representative of the estate, and under *11 U.S.C.S. § 323(b)* the trustee has capacity to sue and be sued. The purpose of *§ 323* is to make clear that when the trustee sues, standing in the shoes that the debtor occupied pre-petition as to a claim that has become property of the estate, he has the necessary authority to do so even though the Bankruptcy Code does not make a trustee the owner of the estate but only its representative.

*Bankruptcy Law > Case Administration > Administrative Powers > Estate Property Lease, Sale & Use > General Overview*
*Bankruptcy Law > Case Administration > Administrative Powers > Estate Property Lease, Sale & Use > Ordinary Course of Business*
*Bankruptcy Law > Case Administration > Administrative Powers > Executory Contracts & Unexpired Leases > General Overview*
*Bankruptcy Law > Case Administration > Administrative Powers > Executory Contracts & Unexpired Leases > Powers*
[HN8] *11 U.S.C.S. § 363*, which applies in cases under Chapters 7, 11, 12, and 13 by reason of *11 U.S.C.S. § 103(a)*, confers power on the trustee to pursue a pre-petition cause of action that is property of the estate. *Section 363(c)(1)* generally authorizes the trustee to "use"

the property of the estate in the ordinary course of business if authorized to operate the debtor's business, and *§ 363(b)(1)* generally authorizes a trustee, subject to a requirement of notice and a hearing, to use such property even if such use is not in the ordinary course of business.

*Bankruptcy Law > Case Administration > Administrative Powers > Estate Property Lease, Sale & Use > General Overview*
*Bankruptcy Law > Case Administration > Administrative Powers > Estate Property Lease, Sale & Use > Ordinary Course of Business*
*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
[HN9] The Chapter 13 debtor, to the exclusion of the trustee, is vested with a trustee's powers under *11 U.S.C.S. § 363(b)* and *§ 363(c)* to use property of the estate. That is, subject to any limitations on a trustee thereunder, the debtor has, exclusive of the trustee, the rights and powers of a trustee under *11 U.S.C.S. § 363(b)*, *(d)*, *(e)*, *(f)*, and *(l)*.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Eligibility > Debtors in Business*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
[HN10] *11 U.S.C.S. § 363(b)* addresses a trustee's power to use property of the estate other than in the ordinary course of business, and *§ 363(c)* addresses a trustee's power to use property in the ordinary course of business. Thus, pursuant to *11 U.S.C.S. § 1303* and *11 U.S.C.S. § 1304*, all of the powers of a trustee under *11 U.S.C.S. § 363* to use property of the estate reside in the Chapter 13 debtor, not the Chapter 13 trustee. In other words, although *11 U.S.C.S. § 1306(b)* does not state that a debtor may pursue an estate cause of action that is in his possession, *11 U.S.C.S. § 1303* and *11 U.S.C.S. § 1304*, in bestowing a trustee's powers under *11 U.S.C.S. § 363(b)* and *(c)* on the debtor, authorizes a Chapter 13 debtor, subject to the limitations imposed on a Chapter 13 trustee, to exercise the power of a trustee to "use" such a cause of action, which includes pursuing the same.

*Bankruptcy Law > Estate Property > General Overview*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
*Bankruptcy Law > Individuals With Regular Income > Plans > Contents*
[HN11] *11 U.S.C.S. § 1306(b)* provides that except as provided in a confirmed plan or order confirming a plan, the debtor shall remain in possession of all property of the estate.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview*
*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Estate Property > General Overview*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
[HN12] Based on a Chapter 13 debtor's right pursuant to *11 U.S.C.S. § 1303* to utilize a trustee's power under *11 U.S.C.S. § 363* to "use" the property of the estate in the debtor's possession under *11 U.S.C.S. § 1306*, a Chapter 13 debtor steps into the shoes of a trustee and may sue on a cause of action that is property of the estate.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
[HN13] The effect of *11 U.S.C.S. § 1303* is to endow the Chapter 13 debtor-in-possession with substantially the same powers as the trustee in other chapters of the Bankruptcy Code.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
[HN14] The Bankruptcy Code allows a Chapter 13 debtor to step into the shoes of the trustee with respect to a number of functions. The debtor has the right to bring suit because the debtor has the right to use the property--

the cause of action that came into the bankruptcy estate. With respect to the pursuit of causes of action that are property of the estate, the Chapter 13 trustee is relegated to an advisory role by *11 U.S.C.S. § 1302(b)(4)*, which directs the trustee to advise, other than on legal matters, and assist the debtor in performance under the plan, with the debtor being the entity enjoying the power of a trustee under *11 U.S.C.S. § 363* to pursue such causes of action. That is, a Chapter 13 debtor may sue as representative of the estate on a cause of action that became property of the estate even though *11 U.S.C.S. § 323* does not expressly vest the debtor with a trustee's capacity to sue.

*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
[HN15] The debtor in a Chapter 13 case is entitled to invoke *11 U.S.C.S. § 363* with respect to the "use" of a cause of action that is property of the bankruptcy estate.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview*
*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
[HN16] The power to invoke *11 U.S.C.S. § 323* is available to whichever entity, the Chapter 13 trustee or the Chapter 13 debtor, who is vested with the power to sue, and in that sense *§ 323* confers a concurrently shared power. As to causes of action that became property of the estate, only the debtor enjoys a trustee's powers to possess and use such causes of action, and in exercising such powers only a debtor may invoke a trustee's capacity under *§ 323* to sue on such causes of action. That is, in a Chapter 13 bankruptcy case, it is the debtor, and not the trustee, who has standing to prosecute litigation that is property of the estate.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*

[HN17] Although, because of *11 U.S.C.S. § 1306(b)*, some decisions refer to a debtor in Chapter 13 as a debtor in possession, that term is not used in Chapter 13, and a debtor's *§ 1306(b)* powers should not be treated as clothing a Chapter 13 debtor with all of the rights and powers conferred on a debtor in possession in cases under Chapters 11 and 12. However, a Chapter 13 debtor's possession of the estate's pre-petition causes of action reinforces the debtor's enjoyment under *11 U.S.C.S. § 1303* and *11 U.S.C.S. § 363* of a trustee's power to use such property.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
[HN18] When a Chapter 13 debtor sues on a cause of action that is property of the estate, he exercises the rights of a trustee to sue and does so subject to the same limitations as a trustee. The *11 U.S.C.S. § 363* power to sue, when exercised by a Chapter 13 debtor, is exercised in the words of *11 U.S.C.S. § 1303* as a right and power of a trustee and subject to the limitations on a trustee, meaning the limitations that would apply to a Chapter 13 trustee if the *11 U.S.C.S. § 363* power were vested in the Chapter 13 trustee instead of the debtor.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN19] The provision in *11 U.S.C.S. § 108(a)* addressing limitations on when a trustee may exercise the power under *11 U.S.C.S. § 363* to sue necessarily applies to whomever is exercising the trustee's *§ 363* power to sue.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview*
*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > Court Approval*
*Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > Debtors in Possession & Trustees*

*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
[HN20] The provisions of *11 U.S.C.S. § 327* requiring court approval of a trustee's employment of counsel do not apply to a Chapter 13 debtor's employment of professionals relating to the debtor's exercise of a trustee's powers under *11 U.S.C.S. § 363.*

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN21] *11 U.S.C.S. § 108(a)* specifically addresses a trustee's suing on causes of action that are property of the estate, and can be read as modifying the limitations on a trustee's power to sue under *11 U.S.C.S. § 363* (and thus as modifying a Chapter 13 debtor's power under *11 U.S.C.S. § 1303*, subject to the same limitations as imposed on a trustee, to sue under *11 U.S.C.S. § 363*).

*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
[HN22] The power of a Chapter 13 debtor to sue on estate causes of action that became property of the estate on the petition date is unquestioned.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN23] *11 U.S.C.S. § 108(a)* governs the statute of limitations as to when a trustee may exercise the trustee's powers under *11 U.S.C.S. § 363.*

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN24] *11 U.S.C.S. § 108(a)* modifies the limitations on a trustee's powers under *11 U.S.C.S. § 363* and thus modifies the limitations applicable to the powers of a Chapter 13 debtor (who by reason of *11 U.S.C.S. § 1303* is subject to the same limitations) when suing pursuant to the powers of a trustee under *11 U.S.C.S. § 363.*

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
[HN25] In a Chapter 13 case, only the debtor may sue on causes of action that are property of the estate.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Bankruptcy Law > Individuals With Regular Income > Estate Property*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN26] None of the duties imposed on a trustee under *11 U.S.C.S. § 1302(b)* can be viewed as authorizing pursuit of causes of action of the estate that, pursuant to *11 U.S.C.S. § 1303*, are subject to the debtor's exclusive power to use under *11 U.S.C.S. § 363.* Accordingly, if *11 U.S.C.S. § 108(a)* were unavailable to the Chapter 13 debtor, it would fall into a black hole of being unavailable to anyone to utilize despite *11 U.S.C.S. § 103(a)* making it applicable in Chapter 13.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Disclosure*
*Real Property Law > Financing > Federal Regulations > General Overview*
[HN27] The Truth In Lending Act (TILA), *15 U.S.C.S. § 1601 et seq.*, and its implementing regulation, Regulation Z (*12 C.F.R. §§ 226.1 - 226.36 (2000)*), govern disclosure obligations of creditors when they extend consumer credit. *15 U.S.C.S. § 1638.* The stated purpose for the Act is to assure a meaningful disclosure of credit terms so that consumers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit, and to protect consumers

against inaccurate and unfair credit billing and credit card practices. *15 U.S.C.S. § 1601(a)*.

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
**Banking Law > Consumer Protection > Truth in Lending > Disclosure**
**Real Property Law > Financing > Federal Regulations > General Overview**
**Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act**
[HN28] When *15 U.S.C.S. § 1602(aa)*, added to the Truth In Lending Act (TILA), *15 U.S.C.S. § 1601 et seq.*, by the Home Ownership and Equity Protection Act of 1994, applies, it triggers *15 U.S.C.S. § 1639* which requires that lenders provide borrowers with additional disclosures beyond those that TILA generally requires and bars mortgages from containing certain terms.

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
**Real Property Law > Financing > Federal Regulations > General Overview**
**Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act**
**Real Property Law > Financing > Mortgages & Other Security Instruments > Conventional Loans**
**Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation**
[HN29] The term "residential mortgage transaction" means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest, is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling. *15 U.S.C.S. § 1602(w)*

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
**Real Property Law > Brokers > General Overview**
**Real Property Law > Financing > Federal Regulations > General Overview**
**Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act**
**Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation**
[HN30] Where a consumer credit transaction is covered by *15 U.S.C.S. § 1602(aa)*, it suffices under *§ 1602(aa)(1)(B)(i)* that the total "points and fees" payable by the consumer at or before closing will exceed the greater of 8 percent of the total loan amount or $ 400 as adjusted for annual changes in the Consumer Price In-

dex. Such "fees and points" in *§ 1602(aa)(4)* include a lender's fee per *12 C.F.R. 226.4(b)(3)*; *12 C.F.R. 226.32(b)(i)*, and a broker's fee, *12 C.F.R. § 226.4(a)(3)*; *12 C.F.R. 226.32(b)(1)(ii)*.

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
**Real Property Law > Brokers > General Overview**
**Real Property Law > Financing > Federal Regulations > General Overview**
**Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act**
[HN31] See *12 C.F.R. § 226.4(b)*.

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
**Banking Law > Consumer Protection > Truth in Lending > Disclosure**
**Real Property Law > Brokers > General Overview**
**Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act**
**Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation**
[HN32] The term "points and fees" as used in *12 C.F.R. § 226.32(b)(1)* includes all items required to be disclosed under *§ 226.4(a)* and *(b)* except interest or the time-price differential and all compensation paid to mortgage brokers.

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
**Banking Law > Consumer Protection > Truth in Lending > Disclosure**
**Real Property Law > Financing > Federal Regulations > General Overview**
**Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act**
[HN33] See *12 C.F.R. § 226.4(a)*.

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
**Real Property Law > Financing > Federal Regulations > General Overview**
**Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act**
**Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation**
[HN34] See *15 U.S.C.S. § 1602(h)*.

2008 Bankr. LEXIS 1074, *

*Contracts Law > Defenses > Equitable Estoppel > Elements*
*Governments > Legislation > Statutes of Limitations > Equitable Estoppel*
[HN35] To invoke the equitable doctrine of estoppel, a defendant must establish that a plaintiff made a definite representation upon which the defendant reasonably relied to its detriment.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Disclosure*
*Real Property Law > Financing > Federal Regulations > General Overview*
[HN36] The Official Commentary to Regulation Z, which is the implementing regulation for the Truth In Lending Act (TILA), *15 U.S.C.S. § 1601 et seq.*, provides that lenders must determine in each case if the transaction is primarily for an exempt purpose. *12 C.F.R. pt. 226*, Supp. I, § 226.3(a)(1). The Commentary is dispositive in TILA cases unless the commentary is demonstrably irrational. Although the Commentary does not specify the procedure for determining the primary purpose of a loan and by extension the applicability of the exemption for certain transactions, it does provide that if some question exists as to the primary purpose for a credit extension, the creditor is, of course, free to make the disclosures, and the fact that disclosures are made under such circumstances is not controlling on the question of whether the transaction was exempt. *12 C.F.R. pt. 226*, Supp. I, § 226.3(a)(1). Thus, under the relevant interpretation of the TILA, creditors have an affirmative duty to determine the applicability of the exemption, and in cases of uncertainty, they are expressly invited to make the disclosures.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Disclosure*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Real Property Law > Financing > Federal Regulations > General Overview*
[HN37] When a sophisticated borrower takes deliberate and calculated steps to mislead a lender into believing that a loan is being obtained for commercial purposes, the borrower is not entitled to later invoke the protections of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, based upon an assertion that, notwithstanding what the lender was led to believe, the loan was actually obtained for personal purposes. A borrower's statement of purpose

is relevant to a determination of whether a loan is being obtained for a business or consumer purpose, but the reliability and plausibility of such statements must also be taken into consideration.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Disclosure*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
[HN38] An affidavit stating that a loan is for a business purpose is not legally conclusive as to the purpose of that loan in the context of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.* Indeed, the business or personal nature of a loan is a factual question to be answered after evaluating the circumstances surrounding the transaction.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Real Property Law > Brokers > General Overview*
*Real Property Law > Financing > Federal Regulations > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN39] Only "creditors" are subject to liability under the Truth In Lending Act (TILA), *15 U.S.C.S. § 1601 et seq.* The term "creditor" as used in TILA refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement. Any person who originates two or more mortgages referred to therein in any 12-month period or any person who originates one or more such mortgages through a mortgage broker shall be considered to be a creditor for purposes thereof.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Real Property Law > Brokers > General Overview*
*Real Property Law > Financing > Federal Regulations > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*

[HN40] A person is a "creditor" within the meaning of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, if he originates a mortgage that is referred to in *15 U.S.C.S. § 1602(aa)* through a mortgage broker.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Real Property Law > Brokers > General Overview*
*Real Property Law > Financing > Federal Regulations > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN41] A person "regularly extends consumer credit" within the meaning of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, only if it extends credit (other than credit subject to the requirements of *12 C.F.R. § 226.32*) more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year. If a person did not meet these numerical standards in the preceding calendar year, the numerical standards shall be applied to the current calendar year. A person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension that is subject to the requirements of *§ 226.32* or one or more such credit extensions through a mortgage broker. *12 C.F.R. § 226.2(a)(17)(i)*.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Real Property Law > Brokers > General Overview*
*Real Property Law > Financing > Federal Regulations > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN42] A mortgage broker is not a "creditor" within the meaning of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, if he or she does not regularly extend consumer credit and is not the person to whom such an obligation is initially payable.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Real Property Law > Financing > Federal Regulations > General Overview*
*Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Nonconventional Mortgages*
[HN43] Loans subject to *15 U.S.C.S. § 1602(aa)* are prohibited from including terms that provide for higher interest rates after default or for balloon payments if the term of the loan is less than 5 years. *15 U.S.C.S. § 1639(d), (e)*.

*Real Property Law > Financing > Federal Regulations > General Overview*
*Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act*
[HN44] The Home Ownership and Equity Protection Act of 1994 prohibits lenders from extending loans subject to its requirements without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations, and employment. *15 U.S.C.S. § 1639(h)*.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Disclosure*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Governments > Legislation > Statutory Remedies & Rights*
[HN45] The general provisions of the Truth In Lending Act (TILA), *15 U.S.C.S. § 1601 et seq.*, require lenders to make numerous disclosures. The finding of even one violation of TILA, no matter how technical, gives rise to liability. That is, TILA achieves its remedial goals by a system of strict liability in favor of the consumers when mandated disclosures have not been made. A creditor who fails to comply with TILA in any respect is liable to the consumer under the statute regardless of the nature of the violation or the creditor's intent. Once the court finds a violation, no matter how technical, it has no discretion with respect to liability.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Disclosure*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Real Property Law > Financing > Federal Regulations > General Overview*
*Real Property Law > Purchase & Sale > Remedies > Rescission & Restitution*
[HN46] The Truth In Lending Act (TILA), *15 U.S.C.S. § 1601 et seq.*, requires that a borrower's rescission rights be clearly and conspicuously disclosed by the lender in accordance with regulations promulgated by the Board of Governors of the Federal Reserve System. *15 U.S.C.S. § 1635(a)*. A borrower's right to rescind expires after three days unless the lender failed to provide the requisite no-

tice and disclosures, in which case the borrower has three years to rescind the loan. *15 U.S.C.S. § 1635(a)*, *(f)*.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Contracts Law > Remedies > Rescission & Redhibition > General Overview*
*Real Property Law > Financing > Federal Regulations > General Overview*
[HN47] See *15 U.S.C.S. § 1635(b)*.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Civil Procedure > Equity > Relief*
*Real Property Law > Financing > Federal Regulations > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > General Overview*
*Real Property Law > Purchase & Sale > Remedies > Rescission & Restitution*
[HN48] Notwithstanding *15 U.S.C.S. § 1635(b)*, a debtor's exercise of a right of rescission does not automatically void a creditor's security interest or in any way modify the debt owed by the debtor to the creditor. Where the debtor's right to rescission is subject to legitimate dispute, the creditor is under no obligation to honor the debtor's request until a court determines that the debtor actually possesses a right of rescission. That is, the natural reading of *§ 1635(b)* is that the security interest becomes void when the debtor exercises a right to rescind that is available in the particular case, either because the creditor acknowledges that the right of rescission is available or because the appropriate decision maker has so determined. Until such decision is made, the debtor has only advanced a claim seeking rescission. Moreover, a trial court has the equitable power to condition rescission upon the return of the loan proceeds to the lender.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Civil Procedure > Equity > Relief*
*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Financing > Federal Regulations > General Overview*
*Real Property Law > Purchase & Sale > Remedies > Rescission & Restitution*
[HN49] The rescission remedy provided by the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, despite being

statutorily granted, remains an equitable doctrine subject to equitable considerations.

*Bankruptcy Law > Exemptions > State Law > General Overview*
*Bankruptcy Law > Exemptions > State Law > Specific Exemptions*
*Real Property Law > Homestead Exemptions*
[HN50] In the District of Columbia, an individual may claim a homestead exemption for his or her entire principal residence. *D.C. Code § 15-501(a)(14)* (2001 & Supp. 2005).

*Contracts Law > Remedies > Rescission & Redhibition > General Overview*
*Real Property Law > Purchase & Sale > Remedies > Rescission & Restitution*
[HN51] Once a court determines that rescission of a loan transaction between a lender and a borrower is appropriate, the court may allow the borrower a time certain to tender the net loan proceeds.

*Contracts Law > Defenses > Usury*
*Real Property Law > Financing > Usury*
[HN52] Under *D.C. Code § 28-3302(a)* the rate of interest in the District of Columbia upon the loan or forbearance of money, in the absence of expressed contract, is six percent per annum.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Contracts Law > Remedies > Rescission & Redhibition > General Overview*
*Real Property Law > Purchase & Sale > Remedies > Rescission & Restitution*
[HN53] *15 U.S.C.S. § 1635(b)* permits a court to modify the procedures that relate to the rescission remedy under the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Financing > Federal Regulations > General Overview*

[HN54] *15 U.S.C.S. § 1640* governs civil liability for violations of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Governments > Legislation > Statutory Remedies & Rights*
[HN55] See *15 U.S.C.S. § 1640(a).*

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Financing > Federal Regulations > General Overview*
*Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act*
[HN56] Having established violations of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, a consumer is entitled to (1) actual damages, *15 U.S.C.S. § 1640(a)(1)*; (2) statutory damages of not less than $ 200 and not greater than $ 2,000, *15 U.S.C.S. § 1640(a)(2)(A)(iii)*; (3) costs and reasonable attorney's fees, *15 U.S.C.S. § 1640(a)(3)*; and, unless the creditor shows that a failure to comply with *15 U.S.C.S. § 1639* was not material, (4) an amount equal to the sum of all finance charges and fees paid by the consumer, 11 U.S.C.S. § 1640(a)(4).

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Contracts Law > Remedies > Rescission & Redhibition > General Overview*
*Real Property Law > Purchase & Sale > Remedies > Rescission & Restitution*
[HN57] *15 U.S.C.S. § 1635(b)* expressly provides that in rescinding under *§ 1635(a)*, the obligor is not liable for any finance or other charges and *15 U.S.C.S. § 1640(a)(4)* in turn provides for an affirmative recovery of paid finance charges and fees. But a borrower ought not both collect under *15 U.S.C.S. § 1640(a)(4)* the amount of finance charges and fees paid to a lender and effect a rescission by paying back a loan amount reduced by the amount of finance charges and fees that were paid for out of the borrowed funds. The borrower is required to return whatever amounts were lent to her.

*Civil Procedure > Equity > Relief*
*Contracts Law > Remedies > Rescission & Redhibition > General Overview*
*Real Property Law > Purchase & Sale > Remedies > Rescission & Restitution*
[HN58] Rescission is an equitable remedy of restoring the status quo.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Contracts Law > Remedies > Rescission & Redhibition > General Overview*
*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Financing > Federal Regulations > General Overview*
*Real Property Law > Purchase & Sale > Remedies > Rescission & Restitution*
[HN59] A consumer who establishes violations of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, is entitled to both rescind under 11 U.S.C.S. § 1635 and to recover any double statutory damages imposed by *15 U.S.C.S. § 1640(a)(2)(A)*.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Contracts Law > Remedies > Rescission & Redhibition > General Overview*
*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Purchase & Sale > Remedies > Rescission & Restitution*
[HN60] A court may not require that any recovery by a consumer under *15 U.S.C.S. § 1640(a)(4)*, being part of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, to be set off immediately against the outstanding principal required to be paid to effect a rescission. Unlike *§ 1640(a)(2)(A)(iii)*, *§ 1640(a)(4)* permits a recovery only of finance charges and fees paid by the consumer, and the purposes of *§ 1640(a)(4)* of undoing such a payment are fully effectuated, when rescission is elected, in treating the amount of finance charges and fees recoverable under *§ 1640(a)(4)* as immediately set off against and reducing the borrowed amount required to be repaid by the borrower to effect a rescission.

*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Contracts Law > Remedies > Rescission & Redhibition > General Overview*

*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Financing > Federal Regulations > General Overview*
[HN61] When both rescission and relief under *15 U.S.C.S. § 1640(a)(4)*(being part of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*) are sought, a court may require that the *§ 1640(a)(4)* recovery be set off immediately against the principal of the loan in fixing the amount that must be repaid to effect a rescission. Requiring instead that the lender pay the *§ 1640(a)(4)* damages prior to the receipt of a delayed tender by the borrower of the amount necessary to effect an announced intention to rescind would be unduly harsh, and inconsistent with the equitable goal in rescission of restoring the status quo.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Financing > Federal Regulations > General Overview*
[HN62] *15 U.S.C.S. § 1640(h)* contemplates that a debtor in a bankruptcy may assert a violation of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, in a timely action.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Bankruptcy Law > Claims > Setoffs*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutory Remedies & Rights*
[HN63] *15 U.S.C.S. § 1640(h)* bars a debtor from setting off statutory double damages under *§ 1640(a)(2)* against his mortgage debt unless the amount of the creditor's liability under the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, has been established by a court judgment. Accordingly, a debtor could ordinarily invoke such damages only via an action brought within the one-year statute of limitations of *§ 1640(e)* on pursuing an action for affirmative relief under *§ 1640*.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*

*Contracts Law > Negotiable Instruments > Enforcement > Defenses > Recoupment*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Financing > Federal Regulations > General Overview*
[HN64] 11 U.S.C.S. § 1640(e) clarifies that its one-year statute of limitations does not bar a person from asserting a violation of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or setoff in such action, except as otherwise provided by state law.

*Banking Law > Consumer Protection > Truth in Lending > Liability*
*Bankruptcy Law > Claims > Setoffs*
*Bankruptcy Law > Individuals With Regular Income > Debtor Duties & Powers*
*Governments > Legislation > Statutory Remedies & Rights*
[HN65] By way of recoupment, a debtor in bankruptcy may assert violations of the Truth In Lending Act, *15 U.S.C.S. § 1601 et seq.*, in response to a creditor's proof of claim in order to limit the extent of the creditor's recovery on its claim.

*Real Property Law > Financing > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Conventional Loans*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN66] The D.C. Home Loan Protection Act, *D.C. Code § 26-1151.01 et seq.*, prohibits certain predatory lending practices with respect to residential loans that fall within the statute's definition of "covered loan."

*Real Property Law > Financing > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Conventional Loans*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN67] See *D.C. Code § 26-1151.01(7)(A).*

*Real Property Law > Financing > Mortgages & Other
Security Instruments > General Overview*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Conventional Loans*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Definitions & Interpretation*
[HN68] A "mortgage loan" is defined in *D.C. Code § 26-
1151.01(14)(A)*.

*Real Property Law > Financing > Mortgages & Other
Security Instruments > General Overview*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Conventional Loans*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Definitions & Interpretation*
[HN69] Under *D.C. Code § 26-1151.01(7)(A)*, a "loan"
must be a "mortgage loan" to qualify as a "covered loan."

*Real Property Law > Financing > Mortgages & Other
Security Instruments > General Overview*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Conventional Loans*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Definitions & Interpretation*
[HN70] *D.C. Code § 26-1152.02(c)* permits lenders to
challenge a borrower's claim under the D.C. Home Loan
Protection Act, *D.C. Code § 26-1151.01 et seq.*, in situa-
tions where a lender's violation arose from a borrower
having provided materially false information in connec-
tion with a loan application. To invoke this provision,
lenders are required to show that they made a reasonable
attempt to verify the current and expected income and
debts of the borrower.

*Real Property Law > Financing > Mortgages & Other
Security Instruments > General Overview*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Conventional Loans*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Definitions & Interpretation*
[HN71] *Section 26-1152.02(a)* of the D.C. Home Loan
Protection Act, *D.C. Code § 26-1151.01 et seq.*, prohibits
lenders from making covered loans if the borrower, at
the time that the covered loan is closed, cannot reasona-
bly be expected to make the scheduled payments. It fur-
ther provides that the lender's consideration shall include
the ability to make any payments for mortgage insurance
premiums, escrow deposits, or direct payment of real
estate taxes and property insurance premiums (in addi-
tion to the payments of interest and principal) and the
employment status of the borrower. The lender may con-
sider the current and expected income, current obliga-

tions, and other financial resources of the borrower
(other than the borrower's equity in the dwelling which
secures repayment of the loan). *D.C. Code § 26-
1152.02(a)(1)*. Although the lender may consider the
borrower's equity in the dwelling to evaluate the bor-
rower's likelihood of default, for purposes of evaluating
the borrower's ability to make the scheduled payments
the lender shall not consider the borrowers' equity inter-
est in the residential real property which secures repay-
ment of the covered loan. *D.C. Code § 26-1152.02(a)(2)*.

*Real Property Law > Financing > Mortgages & Other
Security Instruments > General Overview*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Definitions & Interpretation*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Nonconventional Mortgages*
[HN72] Although consideration of a consumer's ex-
pressed intention to sell property as to which a loan is
sought is appropriate in determining whether a borrower
can reasonably be expected to make the required balloon
payment, *D.C. Code § 26-1152.02(a)(3)*, that alone does
not discharge a lender's broader obligation under *D.C.
Code § 26-1152.02(a)* to determine whether a borrower
can be reasonably expected to make all of the scheduled
payments, which includes the monthly payments.

*Real Property Law > Financing > Mortgages & Other
Security Instruments > General Overview*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Definitions & Interpretation*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Nonconventional Mortgages*
*Real Property Law > Financing > Workouts*
[HN73] See *D.C. Code § 26-1152.02(a)(3)*.

*Governments > Legislation > Statutory Remedies &
Rights*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > General Overview*
*Real Property Law > Financing > Mortgages & Other
Security Instruments > Nonconventional Mortgages*
*Real Property Law > Financing > Usury*
[HN74] The D.C. Home Loan Protection Act, *D.C. Code
§ 26-1151.01 et seq.*, prohibits a provision that provides,
in violation of *D.C. Code § 26-1152.09*, for an interest
rate of sixteen percent to be automatically increased to
24 percent should the loan ever be in default.

*Real Property Law > Financing > Mortgages & Other
Security Instruments > Formalities*

*Real Property Law > Financing > Mortgages & Other Security Instruments > Nonconventional Mortgages*
[HN75] The D.C. Home Loan Protection Act, *D.C. Code § 26-1151.01 et seq.*, prohibits balloon payments that come due less than 7 years after the date of the loan closing, with an exception provided for payment schedules that are adjusted to account for the borrower's seasonal or irregular income, or if the loan is a bridge loan connected or related to the acquisition or construction of a dwelling intended to become the borrower's principal dwelling. *D.C. Code § 26-1152.13.*

*Real Property Law > Brokers > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Conventional Loans*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Formalities*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Nonconventional Mortgages*
*Real Property Law > Purchase & Sale > Closing & Settlement*
[HN76] The D.C. Home Loan Protection Act, *D.C. Code § 26-1151.01 et seq.*, provides that lenders shall send to the borrower a Red Flag Warning Disclosure Notice in making a covered loan that shall be received by the borrower at least 3 business days prior to the closing of the loan. If the loan is originated with the assistance of a mortgage broker, the mortgage broker shall provide the Red Flag Warning Disclosure Notice. *D.C. Code § 26-1152.11.*

*Real Property Law > Brokers > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Formalities*
*Real Property Law > Purchase & Sale > Closing & Settlement*
[HN77] The D.C. Home Loan Protection Act, *D.C. Code § 26-1151.01 et seq.*, places the burden of sending the Red Flag Warning Disclosure Notice provided thereby upon the broker and a broker violates *§ 26-1152.11* by failing to send the notice.

*Real Property Law > Financing > Mortgages & Other Security Instruments > Conventional Loans*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Formalities*
[HN78] *D.C. Code § 26-1152.21* requires lenders to submit to the Mayor of the District of Columbia a loan package including the settlement statement, the FP-7 Form filed with the Recorder of Deeds, the final Truth in Lending Act disclosure, and the promissory note.

*Real Property Law > Brokers > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Conventional Loans*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Formalities*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Nonconventional Mortgages*
[HN79] A lender's failure to verify that a mortgage broker was licensed at the time of a transaction that is subject to the D.C. Home Loan Protection Act, *D.C. Code § 26-1151.01 et seq.*, constitutes a violation of *D.C. Code § 26-1152.20.*

*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Conventional Loans*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Nonconventional Mortgages*
[HN80] According to *D.C. Code § 26-1114(a)(6)*, in determining whether a loan was made with intent to foreclose, the court may consider the factors including the lack of the probability of full repayment of the loan by the borrower; and the existence of a significant proportion of similarly foreclosed loans by the lender.

*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Financing > Mortgages & Other Security Instruments > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Conventional Loans*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Nonconventional Mortgages*
[HN81] See *D.C. Code § 26-1153.01(c).*

*Real Property Law > Financing > Mortgages & Other Security Instruments > Conventional Loans*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Formalities*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Nonconventional Mortgages*
[HN82] *D.C. Code § 28-3310(b)(3)* limits late fees charged on mortgage loans that are subject thereto to five percent.

*Antitrust & Trade Law > Consumer Protection > General Overview*
*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*

2008 Bankr. LEXIS 1074, *

*Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview*
*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
[HN83] The D.C. Consumer Protection and Procedures Act, *D.C. Code §§ 28-3901 - 3908* (2001) is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers. A central purpose thereof is to assure that a just mechanism exists to remedy all improper trade practices. *D.C. Code § 28-3901(b)(1)*.

*Antitrust & Trade Law > Consumer Protection > General Overview*
*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
*Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview*
*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
[HN84] *D.C. Code § 28-3904(a)* contemplates a knowing and deliberate misrepresentation of goods and services. However, willful blindness is not the same as actual knowledge.

*Antitrust & Trade Law > Consumer Protection > General Overview*
*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > General Overview*
[HN85] The District of Columbia Court of Appeals has expressly certified that *§ 28-3904(r)* of the D.C. Consumer Protection and Procedures Act, *D.C. Code §§ 28-3901 - 3908* (2001), applies to the extension of credit secured by a consumer's house even where the credit is not extended in the context of a sale of the house. *Section 28-3904(r)* provides a non-exclusive list of factors courts may consider in applying this provision, including whether the party alleged to have violated the Act knew, at the time of the sale, that there was no reasonable probability of payment in full of the obligation by the consumer. *D.C. Code § 28-3904(r)(1)*.

*Antitrust & Trade Law > Consumer Protection > General Overview*
*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Banking Law > Consumer Protection > Unfair & Deceptive Credit Practices*

[HN86] Failure by verify a consumer's payment ability is not the same as actually knowing that there was no reasonable probability of payment in full of the obligation by the consumer within the meaning of *D.C. Code § 28-3904(r)(1)*, which contemplates actual knowledge on the part of the offending party.

*Antitrust & Trade Law > Consumer Protection > General Overview*
*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > General Overview*
*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Banking Law > Consumer Protection > Unfair & Deceptive Credit Practices*
[HN87] *D.C. Code § 28-3904(r)(5)* provides that consideration be given to a person having knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reason of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors.

**COUNSEL:**    [*1] For Ethel J. Dawson (04-00531), Debtor: James Leonardo Neher, Law Office of Jim Neher, College Park, MD.

For Ethel J. Dawson (04-10083), Plaintiff: James Leonardo Neher, LEAD ATTORNEY, Law Office of Jim Neher, College Park, MD.

For James B Thomas, Jack Merwin (04-10083), Defendants: Kenneth S. Kaufman, Garson Claxton LLC, Bethesda, MD.

**JUDGES:** S. Martin Teel, Jr., United States Bankruptcy Judge.

**OPINION BY:** S. Martin Teel, Jr.

**OPINION**

MEMORANDUM DECISION (FINDINGS OF FACT AND CONCLUSIONS OF LAW)

By her amended complaint, the plaintiff, Ethel J. Dawson, objects to the proof of claim filed by James B. Thomas (who made a $ 35,000 loan to Dawson secured by her residence pursuant to a deed of trust, a form of mortgage utilized in the District of Columbia) and seeks affirmative relief against Thomas and Jack Merwin (the broker of the loan from Thomas) under various statutes regulating consumer lending activity. This constitutes the court's findings of fact and conclusions of law. [1]

1   Although the court did not determine whether this matter is a core or non-core proceeding at the initial scheduling conference, see Scheduling Order (DE No. 13, entered December 2, 2004), pursuant to *Fed. R. Bankr. P. 7012(b)*, the defendants Thomas **[*2]** and Merwin have consented to this court's entry of final orders and judgments. See Answers to Amended Complaint (DE Nos. 20 and 21, filed December 14, 2004).

I

BASIC FACTS

Dawson owns real property ("the Property") which is a single family residence located at 500 23rd Place, N.E., Washington, D.C. Dawson has resided there since at least the early 1990s, and has continuously resided there. The tax assessment records reflect that despite the property being her only residence, she has never availed herself of the homestead deduction for real estate tax purposes. She was unaware that she was not taking the deduction, a reflection of her sophistication level. Dawson has never bought or owned rental real estate.

Sometime prior to September 2003, Dawson fell into arrears in paying the holder of a note secured by the first deed of trust on the Property, and the trustees under that deed of trust issued a notice of foreclosure sale to be held on September 18, 2003. By the eve of the foreclosure sale, the reinstatement amount was $ 8,629.77.

Thomas is a real estate agent who has also, for some time, engaged in making real estate loans. By the end of 1999, he decided not to engage in any residential **[*3]** lending due to the laws regulating such lending, and has turned away any borrowers requesting that he make loans secured by owner-occupied property. Thomas engages principally in renovation loans, which he considers to be bridge loans that permit an owner of rental property to renovate the property for sale. The primary reason Thomas extends such loans has been to obtain the listing to sell the property as the borrower's real estate agent.

Starting in approximately 1998, Merwin and Thomas began a business relationship in which Merwin would act as a mortgage broker to originate borrowers for real-estate-secured loans to be extended by Thomas; with Merwin receiving a commission for loans that went to closing. Merwin became aware of the imminent foreclosure sale of Dawson's Property by consulting public notices of such sales. Acting as Thomas's agent, Merwin mailed a flyer to Dawson at the Property address. The flyer offered Thomas's help in avoiding foreclosure. The precise contents of that flyer are unknown, but such flyers generally offered to help avoid foreclosure by way of a loan, meeting Thomas's criteria for commercial non-owner occupied property loans, to bring current the payments **[*4]** on the note secured by the deed of trust which was the subject of the foreclosure. Within three or four days before the scheduled foreclosure sale, Dawson placed a telephone call to the number provided on the flyer and spoke to Merwin.

Merwin stood to earn a handsome commission of $ 5,000 if Dawson borrowed from Thomas, and he was well aware that Thomas's loan terms would be legally impermissible if treated as a consumer rather than as a commercial loan. This may explain why, when speaking with Dawson on the telephone, Merwin did not probe with any depth to verify that Dawson did not occupy the Property and why he never even asked if she intended to occupy the Property in the future. During the telephone conversation, Merwin merely asked Dawson if she lived at the Property and she replied that she did not, after which Merwin turned to such topics as the Property's value and arranging to meet with Dawson. Merwin did not inquire into Dawson's income, including whether she worked, and did not request that she bring any documents with her to their meeting, which was scheduled to take place the following day.

The next day, Merwin met with Dawson at the Property. Present at the Property when **[*5]** Merwin arrived were Dawson, a woman introduced as a neighbor, and a man introduced as a tenant. Merwin cannot recall what words were used to introduce the man as a tenant other than that the word "roomer" was not used. Dawson has, on occasion, rented out a room in the Property, and at the time of the meeting with Merwin she was renting a room to a Mr. Spencer. Dawson has never rented the entire Property. Merwin engaged in no conversation with the tenant separate from Dawson. Merwin did not obtain a copy of the tenant's lease or inquire into the terms of the lease, including whether the tenant was renting the entire house. Nor did he request a copy of the first deed of trust on the Property. [2] Merwin was not concerned regarding whether Dawson had ever occupied the Property as he relied on her statement that she did not live at the Property.

    2   That deed of trust, appended to the holder's proof of claim in Dawson's bankruptcy case, contains a standard covenant wherein Dawson promised to occupy the Property as her primary or secondary residence because the lender makes non-owner residence loans on different terms, but the court need not rely upon it in finding that Dawson occupied the Property **[*6]** as her residence.

Dawson told Merwin that she was living with her daughter, and gave Merwin the daughter's address, which was within walking distance of the Property. Dawson's daughter has from time to time lived with Dawson in the

Property, and was doing so at the time that the foreclosure sale was imminent. Dawson has never lived with her daughter elsewhere, as the daughter has never had a place of her own where Dawson could live with her. Her daughter lives "here and there," as Dawson put it, living for free with various persons. Merwin did not inquire whether Dawson's stated arrangement of living with her daughter was only temporary. Nor did Merwin request any statement from the daughter verifying the arrangement, or verifying that the daughter was rightfully in possession of a residence at which Dawson could live. Nor did Merwin request bank account statements, a driver's license, or other documents showing Dawson as living anywhere other than at the Property.

On the one occasion that Merwin visited the Property, he went into the Property with Dawson, stood in the kitchen and looked in the living room. He outlined to Dawson Thomas's normal lending terms, and asked Dawson if she [*7] thought she would be successful in repaying the loan. Dawson said that she was going to sell the Property and move in with her son, that she regretted having to sell the Property but that she and her son had determined that she should move in with her son. Merwin apparently did not probe Dawson as to why she regretted selling the Property if it was rented out to someone else and she was already living elsewhere with her daughter. In fact, Dawson had no intention of renting the Property, selling the Property, or moving out of the Property. Merwin never explained to Dawson the meaning of the term commercial loan.

Either before or after the visit, Merwin examined the tax assessment record for the Property as posted on the internet by the District of Columbia government. It revealed the Property's assessed value, and also that Dawson was not receiving the homestead deduction. However, it also listed Dawson's mailing address as being the same as the Property's address. Merwin did not inquire of Dawson why she was using the Property as her mailing address if she was renting it out to someone else. Nor did Merwin inquire of Dawson whether she had ever lived at the Property or claimed the homestead [*8] exemption when she was living there. Dawson's failure to take the homestead exemption while living there would have been indicative that the failure presently to claim the homestead exemption ought not be taken as evidence that she was not living there now.

Merwin contacted Thomas to refer Dawson as a borrower, and reported to Thomas what he, Merwin, had learned. Merwin's file contains a note reciting:

Referral from Jack

500 23rd Pl NE

Owner Ethel Dawson

Facing foreclosure

Rental

No Homestead Exemption in the record, son (attorney) says she will sell

Needs: $ 15,000 for repairs

= $ 9,000 to reinstate

Thomas, who is a real estate broker, did a so-called competitive market analysis and satisfied himself that there was sufficient equity in the property to cover the existing secured debt as well as the loan he would make. Accordingly, Thomas approved a loan for $ 35,000 which was to cover reinstatement of the note secured by the first deed of trust, settlement charges, and any cash to be received by Dawson.

Either before or after he called Thomas to refer the requested loan for Thomas's approval, Merwin called Cosmopolitan Real Estate Settlements, Inc. ("Cosmopolitan") to order a title report which [*9] ordinarily is made available within 24 hours. The title was acceptable for loan purposes. Accordingly, Merwin arranged for a paralegal at Cosmopolitan to call Dawson to arrange the settlement at which the loan would be closed.

The closing of the loan occurred on September 17, 2003, at Cosmopolitan's office in Silver Spring, Maryland. Thomas delivered a check for the loan amount to Cosmopolitan's offices on the morning of the day the loan was to close, but he did not stay for the closing. Included in the closing costs were a $ 5,000 "Lender's Fee" to be paid to Thomas and a $ 5,000 "Consulting Fee" to be paid to Merwin.

Dawson's son, who lives in Philadelphia, Pennsylvania, called Merwin the day of the closing and explained that Dawson was still planning to borrow, but wanted to know if additional dollars could be lent to prepare the Property for sale (e.g., for carpet replacement). This is a confusing aspect of the evidence. Thomas testified that when Merwin called him sometime prior to the day of the closing he learned of a statement by Dawson's son that Dawson was going to sell (as reflected by Thomas's file note). However, Merwin never testified to any conversations with Dawson's [*10] son other than on the morning of the day of the closing. It is possible that Thomas is in error in thinking that he had only one conversation with Merwin. In other words, it is possible that Merwin called Thomas the morning of the closing and relayed the son's conversation to Thomas, with the result that Thomas increased what he would otherwise have lent, and delivered the larger loan amount that morning to Cosmopolitan. Thomas's note, however, does not show that a smaller loan had been under consideration in

Merwin's first call to him, and it would be odd for Tho-
mas's note not to include the amount initially under con-
sideration. Fortunately, the court need not resolve this
confusion.

The closing was conducted by an attorney, Ralph A.
Bernardo, acting as Thomas's agent. No one asked Daw-
son to bring any documents to the closing, and she was
not furnished with any of the closing documents until the
closing was held. At the closing, Dawson was accompa-
nied by Samuel S. Logan, a close friend who has known
her since the late 1980s, sometime after Dawson's hus-
band had died. Only Dawson, Logan, and Bernardo were
present at the closing.

Bernardo asked Dawson where she lived and she
told him she **[*11]** resided at 500 23d Place, N.E. (that
is, at the Property). Moreover, the HUD-1 form (Settle-
ment Statement) indicates that Dawson's address is the
same as the Property's. Dawson presented her driver's
license which listed her address as being the same as the
Property's, and Bernardo made a copy for the closing
files, and transmitted a copy with the loan documents to
Thomas on September 28, 2003.

Bernardo had Dawson sign documents at the clos-
ing, including the following which indicated that the loan
was for commercial, investment, or business purposes:

. a Commercial Loan Balloon Deed of
Trust (Second Trust);

. a Ballon Deed of Trust Note (Sec-
ond Trust); and

. a Business and Investment Affida-
vit.

The loan documents also included an Assignment of
Contracts, Income Leases, Rents and Profits. Merwin
and Thomas point to no other loan documents that bear
on the issue of whether this was acknowledged by Daw-
son to be a non-owner-occupied or commercial or busi-
ness or investment purpose loan.

Bernardo briefly described each document to Daw-
son and Logan before Dawson signed the document.
Neither Dawson nor Logan fully understood the docu-
ments.

None of the loan documents indicate that Dawson
resided anywhere **[*12]** other than at the Property. Nor
do they indicate that Dawson did not intend to occupy
the Property after the loan was made. Nor do they indi-
cate that Dawson intended to sell the Property.

The Business and Investment Affidavit indicated
that Dawson "agrees that the . . . loan . . . is for business

and investment purposes only: Stop foreclo-
sure/renovate." Dawson indeed was borrowing for the
stated purpose of stopping the foreclosure sale and reno-
vating the Property. However, that does not necessarily
make the loan one obtained solely for business and in-
vestment purposes. A loan secured by real estate that is
occupied as the owner's principal residence and that is
made for the purpose of stopping foreclosure or renovat-
ing the property is a loan for personal household pur-
poses. [3]

> 3   The court will explore this issue in more detail
> when considering the applicability of consumer
> protection statutes to the instant transaction.

Dawson, who is extremely unsophisticated in finan-
cial affairs, could view saving her house from foreclo-
sure as serving a business and investment purpose in the
sense of saving the house from foreclosure so that she
would not lose the equity in the Property and allowing
her **[*13]** to renovate the Property so as to enhance the
property's value or fitness for sale. The Affidavit did not
extract a sworn statement by her that she was not resid-
ing in the Property and did not intend to reside in the
Property, and her statement that the loan was for only the
stated business and investment purposes of stopping
foreclosure and renovating the Property could be viewed
by her as truthful.

In any event, her signing of the Affidavit did not ne-
gate the personal, household character of the loan.
Bernardo, as an attorney, should have been well aware
that this loan, which was secured by owner-occupied
property, had to be characterized as one for personal,
household purposes. That knowledge must be charged to
Thomas.

Similarly, the Note itself indicates that "THIS
LOAN IS BEING MADE FOR COMMERCIAL OR
INVESTMENT PURPOSES PURSUANT TO *SECTION
28-3301 OF THE DISTRICT OF COLUMBIA CODE*."
Dawson and Logan had no idea what *section 28-3301 of
the D.C. Code* entailed.

Finally, the Commercial Loan Balloon Deed of
Trust (Second Trust) included a similar reference to *sec-
tion 28-3301 of the D.C. Code* but like the Note did not
include any representation that Dawson was not residing
in the Property **[*14]** and did not intend to reside in the
Property. Indeed, the Commercial Loan Balloon Deed of
Trust (Second Trust) included a paragraph 20 entitled
"OCCUPANCY" which contained no text whatsoever
and was followed by a Cross Collateralization provision
of no relevance to the owner-occupancy issue.

Although Dawson signed an Assignment of Con-
tracts, Income Leases, Rents and Profits, she made no
representation in the Assignment or in any other docu-

ment or even orally to Bernardo that she was not occupying the Property, or that she was renting the Property to anyone. [4]

> 4    Although unnecessary to this decision, the court notes that the first deed of trust included an assignment of rents albeit not as lengthy a one as the Assignment Dawson executed in favor of Thomas.

Thomas is charged with Bernardo's knowledge that Dawson resided in the Property. Once Bernardo was told that Dawson occupied the Property, Thomas (acting through Bernardo), ought not have made the loan other than as a loan secured by owner-occupied property.

Moreover, Thomas's other agent, Merwin, failed on behalf of Thomas to observe the standard of care applicable to making commercial loans for non-owner-occupied property. Merwin willfully [*15] and unreasonably failed to make additional inquiries that a lender reasonably ought to make to assure that Dawson's statements to him regarding occupancy were accurate. As Dawson's expert explained, a failure to claim a homestead deduction does not suffice to demonstrate that a property is non-owner-occupied, and the standard of care in the case of loans secured by non-owner-occupied real property requires something more than the oral statements upon which Merwin relied. At a minimum, Merwin should have inquired into the terms of the lease with the tenant, requested a copy of the lease, and probed Dawson more extensively regarding her living arrangement with her daughter and what documentation she could furnish to verify that arrangement. He willfully turned a blind eye to those matters.

Thomas did not follow the standard of care necessary to ascertain that, aside from her equity in the Property, Dawson could reasonably be expected to make the scheduled payments required by the loan. In this regard, Dawson received only $ 14,206.76 in cash from the loan, but Thomas's note indicates that $ 15,000 was needed for repairs. Accordingly, Thomas could not reasonably look to the cash as a source [*16] for interest payments on the note, and he had no other evidence regarding Dawson's income and expenses, and ability to repay the loan.

Dawson received, directly or indirectly, a total of only $ 23,340.50 in property as a result of the transaction: $ 8,629.77 used to reinstate her existing mortgage obligation; $ 14,206.76 in cash; and payment of $ 503.97 in property taxes. In other words, a staggering $ 11,659.50 of the $ 35,000.00 loan proceeds went to fees and finance charges constituting previously non-existent obligations of Dawson. Dawson subsequently made $ 2,841.34 in payments to Thomas on the new debt owed him. Reducing the $ 23,340.50 by the $ 2,841.34 in

payments Dawson made, she has received a net amount of $ 20,499.16 in the transaction.

The promissory note Dawson executed called for interest only payments of $ 466.67 per month, with the entire loan to be paid by March 17, 2004, six months after the closing of the loan. The note bore interest at the rate of 16% per annum, but with the interest rate to be automatically increased to 24% per annum if Dawson should ever be in default.

II

## CONTINUED JURISDICTION OF THE BANKRUPTCY COURT

Although the bankruptcy case in which this adversary [*17] proceeding is being pursued was dismissed on March 15, 2006, the court concludes that it has continued jurisdiction over this matter. See *Swnson v. Coates & Lane, Inc. (In re Swinson), slip copy, 2004 Bankr. LEXIS 2438, 2004 WL 3779953 (Bankr. D.D.C., July 27, 2004)*. As discussed in Swinson, [HN1] the decision of whether to retain jurisdiction over an adversary proceeding in light of the bankruptcy case's dismissal "should be left to the sound discretion of the bankruptcy court . . . where the adversary proceeding is pending." *Id. 2004 Bankr. LEXIS 2438 [WL] at *3* (quoting *In re Porges, 44 F.3d 159, 162-63 (2d Cir. 1995))*. In making its determination, the court must consider judicial economy, convenience to the parties, fairness and comity. Id. The court concludes that all of these factors weigh in favor of this court's continued jurisdiction over this adversary proceeding.

Judicial economy and convenience to the parties are both served by this court's retention of jurisdiction given that the matter has been fully tried and a dismissal without resolution would require the parties to commence a new proceeding in another forum, an undertaking that would be both costly and time-consuming. Furthermore, it would require another court to engage [*18] in the duplicative effort of adjudicating the entire dispute.

Fairness likewise weighs is favor of retained jurisdiction. Not only has neither party sought dismissal of the adversary proceeding based upon dismissal of the bankruptcy case, but a re-adjudication of this dispute in another forum would inevitably result in a further accumulation of legal fees, provide the parties with an unwarranted second bite at the apple, and delay resolution of this adversary proceeding which has been pending in this court for over three years.

Finally, as in Swinson, the court finds that comity weighs in favor of retained jurisdiction given that the difficult issues involved are mostly factual, the legal issues are relatively straightforward, and little purpose

would be served by unloading this litigation on another busy court. *Id. 2004 Bankr. LEXIS 2438 [WL] at * 5.*

Accordingly, the court determines that it would be an abuse of its discretion to dismiss this adversary proceeding based solely upon the prior dismissal of the bankruptcy case.

III

PROPRIETY OF DETERMINING THOMAS'S CLAIM

In her objection to Thomas's proof of claim, Dawson contends that the proof of claim was untimely and failed to attach the necessary support documents. **[*19]** Dawson's objection further disputes the amount of the claim and its secured status. The court need not consider the question of whether Thomas's claim should be disallowed as untimely and lacking the necessary supporting documents. The underlying bankruptcy case was dismissed without the debtor having received a discharge, mooting the legal significance of allowance or disallowance of the claim for purposes of Dawson's Chapter 13 bankruptcy case.

The amount of the claim and its secured status, however, bear on the parties' non-bankruptcy law rights, and are issues that were not mooted by the dismissal of the underlying bankruptcy case. [5] The court will accordingly proceed to determine the validity of the claim and the amount of the claim.

> 5  In contrast, the court does not reach the question of timeliness of Thomas's proof of claim as that no longer matters. Having filed a proof of claim, Thomas necessarily put the validity of that claim into play, and Dawson was entitled to defend against that claim both as untimely and on the alternative basis that the claim is, in part, invalid under nonbankruptcy law and overstated. In any event, Dawson's affirmative claims for relief are obviously **[*20]** not moot.

IV

DAWSON'S TRUTH IN LENDING ACT CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

Some of Dawson's claims in her amended complaint are pursued under the Truth in Lending Act ("TILA"), *15 U.S.C. §§ 1601 - 1667f (2000)* as amended by the Home Ownership and Equity Protection Act of 1994 ("HOEPA"). [6] In their post-trial brief, the defendants assert a statute of limitations defense as to the alleged TILA claims in Count II and the alleged TILA claims (identified as HOEPA claims) in Count III. [7] As will be seen, to the extent that Dawson asserts her TILA claims

defensively by way of recoupment against the debt owed Thomas, the statute of limitations is inapplicable. Moreover, as explained in more detail below, the defendants waived the limitations defense to Dawson's assertion of affirmative claims under TILA by not raising it in their pretrial statement or at trial, and in any event, Dawson's claims are timely under the applicable limitations period in light of *11 U.S.C. § 108(a)*'s tolling provision.

> 6  HOEPA is Title I, subtitle B of the Riegle Community Development and Regulatory Improvement Act of 1994, Pub. L. 103-325, 108 Stat. 2160.
> 7  The defendants have not asserted a limitations **[*21]** defense with respect to Dawson's rescission claim under TILA.

A.

WAIVER

Both defendants raised the limitations defense in their respective answers to the amended complaint. The joint pretrial statement, however, which pursuant to the scheduling order was required to "contain . . . a statement of defenses raised by the parties . . . .", states only as follows:

> Defendants generally deny the factual allegations of the amended complaint. They assert that the Loan was brokered and made to Dawson with the express understanding that Dawson, who was on the verge of foreclosure, was moving out of the House, and sought the Loan in order to (1) avoid a forced sale that would not give fair value, (2) pay off the arrearage on and reinstate the first deed of trust, (3) obtain funds to renovate the House, and (4) offer the House for sale on the market in order to obtain fair value.

> Consequently, Defendants contend that the House was investment property not subject to the statutory provisions and common law with respect to which Dawson complains. If the House is not such investment property, Defendants contend that Dawson intentionally or negligently misrepresented it as such to Defendants, Defendants **[*22]** had no reason to know otherwise, and Dawson cannot therefore be heard to complain.

Following the pretrial conference, the court entered a pretrial order, which provided that:

The Pretrial Statements are hereby incorporated by reference into this Pretrial Order. **This Pretrial Order supersedes the pleadings, governs the future course of proceedings in this adversary proceeding and may not be amended except by Order of this Court to prevent manifest injustice.**

[Emphasis added.] Neither the joint pretrial statement nor the pretrial order addresses the defendants' previously asserted statute of limitations defense, and the defendants never sought to have the pretrial order amended to preserve that defense. The pretrial order having superseded the previously filed pleadings in this adversary proceeding, and the defendants having neglected to take any steps between the entry of the pretrial order and the conclusion of the trial to reassert the defense, it is waived. [8]

> 8    The defendants contend that "[t]he fact that the defense was raised by pleading but is now briefed after hearing does not constitute waiver, as 'the issue raised . . . is primarily legal,' and Dawson may now address it without [*23] any resulting prejudice. See, e.g., *In re 1301 Connecticut Ave. Assoc., 126 B.R. 823 (Bankr. D.D.C. 1991)*." The facts of In re 1301 Conn. Ave. Assocs. are easily distinguishable from the instant dispute, and the court rejects the defendants' argument accordingly. In In re 1301 Conn. Ave. Assocs., the defendant failed to timely assert a federal holder in due course defense in its answer, and did not raise that defense until the hearing on the defendant's motion for summary judgment. The court excused the defendant's failure to timely plead the defense because the case supplying the legal basis for asserting the defense was not decided until after the commencement of the adversary proceeding. The court further determined that because the issue was primarily legal and the plaintiff would have an opportunity to brief the issue, no prejudice to the plaintiff would result. *Id. at 827*. Unlike the defendant in In re 1301 Conn. Ave. Assocs., the defendants in this case have offered no excuse for their failure to preserve the defense and there is no suggestion that recent developments in the law would justify their failure to raise the defense in their pretrial statement. It would be prejudicial to Dawson [*24] if, after presentation of evidence and argument, and after the close of briefing, the court were to consider the defendants' post-trial briefing on a defense that the defendants failed to assert in the joint pretrial statement, that was never made part of the pretrial order, that was not raised at trial, and by all appearances was abandoned by the defendants. See *Murray v. First Nat'l Bank of Chi. (In re Murray), 239 B.R. 728, 734, 2239 B.R. 728 (Bankr. E.D. Pa. 1999)* (failure to prove or argue limitations defense constitutes waiver of defense).

**B.**

**RECOUPMENT**

Moreover, even if Thomas had shown that Dawson is time-barred from seeking affirmative relief under TILA, [HN2] Dawson is not time-barred from defensively asserting TILA violations in objecting to defendant Thomas's proof of claim. See *15 U.S.C. § 1640(e); Horizon Fin., F.A., v. Norris (In re Norris), 138 B.R. 467, 470-71 (E.D. Pa. 1992); Soto v. PNC Bank (In re Soto), 221 B.R. 343, 359 (Bankr. E.D. Pa. 1998)* (citing cases); *Oldroyd v. Assocs. Consumer Disc. Co., 863 F. Supp. 237, 240 (E.D. Pa. 1994)* ("Actions under the Truth in Lending Act must be brought within one year of the violation, though a consumer may raise violations of the Act as a defense [*25] to a collection action after the expiration of the filing period"); *In re United Cos. Fin. Corp., 267 B.R. 524, 529 (Bankr. D. Del. 2000)* (the one-year time limitation set forth in *§ 1640(e)* does not apply to a TILA violation raised as a recoupment defense to a claim); *Coxson v. Commonwealth Mortgage Co. of Am. (In re Coxson), 43 F.3d 189, 193-94 (5th Cir. 1995)* (mere fact that the debtors were the plaintiffs did not preclude finding that their TILA claim was raised defensively). [9]

> 9    Because the statute of limitations does not bar Dawson's claims, the availability of recoupment is an academic issue. Recoupment is defensive in nature. As to those amounts that Thomas asserted in his proof of claim, Dawson would be entitled to assert any time-barred TILA claims defensively as recoupment.

**C.**

**TIMELINESS UNDER THE TOLLING PROVISIONS OF *11 U.S.C. § 108(a)***

The affirmative claims pursued by Dawson include claims under TILA. Even if the defendants had not waived the statute of limitations defense, Dawson's TILA claims were timely filed.

[HN3] Affirmative actions under TILA, are generally required to be brought within one year of the violation, *15 U.S.C. § 1640(e),* [10] and actions for rescission must be brought [*26] within three days after consum-

mation of the transaction, or in the event the relevant disclosures were never made, within three years after consummation. *15 U.S.C. § 1635(a), (f)*. In the instant case, Thomas failed to make the requisite disclosures, rendering the three-year limitation period for rescission applicable. See *In re Cmty. Bank of N. Va., 418 F.3d 277, 304-05 (3d Cir. 2005).*

> 10    A determination that Dawson is permitted to assert her TILA claims affirmatively as well as defensively is required because Dawson may not be entitled to recover attorney's fees if she asserts her TILA claims only defensively and by way of rescission. See, e.g., *Martinez v. Beneficial Texas, Inc. (In re Martinez), 2007 Bankr. LEXIS 1260, 2007 WL 1174186, at *6 n.5 (Bankr. S.D. Tex., April 19, 2007)* (concluding that it was appropriate to treat the debtor's TILA claims as defensive in nature rather than as part of a complaint in an adversary proceeding seeking affirmative relief, but declining to "go so far as to conclude that the request for attorney's fees is part of a defense" and requiring the debtor to amend his complaint and objection to claim to remove demand for attorney's fees). See also *Anderson v. Lester, 382 So. 2d 1019, 1027-28 (La. Ct. App. 1980)* [*27] (one-year limitations period barred fees in timely rescission action). But see *Burley v. Bastrop Loan Co., 407 F.Supp. 773, 779 (W.D. La. 1975)* (one-year limitations period did not apply to attorney's fees claim in timely rescission action).

[HN4] Violations of the disclosure requirements under TILA accrue no later than the settlement date, which in this case was September 17, 2003. See *Lawson v. Nationwide Mortgage Corp., 628 F. Supp. 804, 807 (D.D.C. 1986)* ("In this circuit, violation of TILA occurs no later than the date of settlement of any loan for which required disclosures have not been made."); *Morris v. Lomas & Nettleton Co., 708 F. Supp. 1198, 1203 (D. Kan. 1989).* The complaint in the instant case was filed on September 23, 2004, less than one week after the one-year limitations period would have expired but for the intervention of the bankruptcy petition filing. Accordingly, had bankruptcy not intervened, Dawson's affirmative claims under TILA, other than for rescission, would be time-barred. As explained in more detail below, however, the court finds that *11 U.S.C. § 108(a)'s* tolling provision is applicable not only to trustees and Chapter 11 debtors in possession, but also [*28] to chapter 13 debtors when suing on a cause of action on behalf of the estate. Accordingly, Dawson's TILA claims, which she filed less than two years after the petition date, are timely.

*Section 108(a)* provides:

[HN5] (a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of -

> > (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

> > (2) two years after the order for relief.

[HN6] On its face, the tolling provision of *§ 108(a)* is available only to the bankruptcy trustee. It is well-established, however, that *§ 108(a)'s* two-year tolling provision may be invoked by Chapter 11 debtors in possession pursuant to *§ 1107(a)*, which grants a Chapter 11 debtor in possession all of the rights and powers of a trustee with certain exceptions of no relevance here. [11] It is equally well-established that the extended limitations period of *§ 108(a)* is not available to a chapter 7 debtor, or to a chapter 11 or [*29] chapter 12 debtor when the debtor is no longer a debtor in possession. [12] What is less certain, however, is whether the privileges of *§ 108* can be invoked by a chapter 13 debtor, and there is relatively little case law addressing this specific issue.

> 11    See *Johnson v. First Nat'l Bank of Montevideo, 719 F.2d 270, 278 n.11 (8th Cir. 1983)* ("Although the language of *§ 108* refers only to the trustee, it is generally agreed that the debtor-in-possession is also entitled to the statute's privileges."); *In re Greater Southeast Community Hosp. Corp. I, 333 B.R. 506, 535 (Bankr. D.D.C. 2005)*; *Ranasinghe v. Compton (In re Ranasinghe), 341 B.R. 556, 564 (Bankr. E.D. Va. 2006)*; *TCI Ltd. v. Sears Bank & Trust Co. (In re TCI Ltd.), 21 B.R. 876, 878 (Bankr. N.D. Ill. 1982)*; *Motor Carrier Audit & Collection Co. v. Lighting Prods., Inc., 113 B.R. 424, 426 (N.D. Ill. 1989).*

> 12    See *In re Ranasinghe, 341 B.R. at 564.*

Some courts hold that the provisions of *§ 108* apply to a chapter 13 debtor if the cause of action involved is property of the estate. See *In re Murray, 276 B.R. 869, 874 (Bankr. N.D. Ill. 2002)* (analogizing chapter 13

debtors to chapter 11 and chapter 12 debtors-in-possession and concluding that [*30] "§ 108(b) [which, like § 108(a), applies to "the trustee"] should apply to Chapter 13 debtors who are entitled to remain in possession of all property of the estate and retain the right to any cause of action that would otherwise pass to a trustee."); see also *Thomas v. GMAC Residential Funding Corp.,* 309 B.R. 453 (D. Md. 2004) (permitting chapter 13 debtor to invoke the 60-day extension of *§ 108(b)* to preserve a claim for rescission under TILA). Other courts hold that *§ 108(a)* is unavailable to a chapter 13 debtor. *Estate of Carr ex rel. Carr v. United States,* 482 F. Supp. 2d 842, 850 (W.D. Tex. 2007); *Ranasinghe v. Compton (In re Ranasinghe),* 341 B.R. 556, 564-66 (Bankr. E.D. Va. 2006); *Bowen v. Lee Lewis Const., Inc. (In re Bowen),* 2004 Bankr. LEXIS 356, at *25 (Bankr. N.D. Tex. March 29, 2004); *Craig v. Barclays Am. Fin., Inc. (In re Craig),* 7 B.R. 864 (Bankr. E.D. Tenn. 1980).

The order confirming Dawson's chapter 13 plan specifically provided that the property of the estate would not re-vest in Dawson until payments under the plan were completed and she received a discharge. When Dawson commenced this adversary proceeding, she had not completed plan payments and her claims in [*31] this adversary proceeding remained property of the estate. The critical issue is whether Dawson exercised a trustee's power in pursuing those claims. If she did so act, it stands to reason that she may invoke *§ 108(a)*.

To determine whether *§ 108(a)*'s tolling provision is applicable to a chapter 13 debtor, one must examine the authority under which various entities are authorized to pursue a prepetition cause of action that became property of the estate. [13] As discussed below, the entity empowered to pursue such a cause of action in a chapter 7 case is the trustee; in chapters 11 and 12, it is the debtor in possession (unless and until the debtor in possession is removed as a debtor in possession and the power passes to the trustee); and in chapter 13, it is the debtor.

> 13  There are certain avoidance causes of action under the Bankruptcy Code (see, e.g., *11 U.S.C. § 547*) that the Bankruptcy Code expressly authorizes "the trustee" to pursue, but such avoidance causes of action are not property of the estate (although a recovery pursuant to an avoidance power is property of the estate under *11 U.S.C. § 541(a)(3)*). Dawson's claims were not avoidance causes of action, but instead prepetition [*32] causes of action that became property of the estate.

[HN7] Under *11 U.S.C. § 323(a)*, a trustee in a bankruptcy case is "the representative of the estate," and under *11 U.S.C. § 323(b)* the trustee "has capacity to sue and be sued." The purpose of *§ 323* is to make clear that

when the trustee sues, standing in the shoes that the debtor occupied prepetition as to a claim that has become property of the estate, he has the necessary authority to do so even though the Bankruptcy Code does not make a trustee the owner of the estate but only its representative. See *York v. Bank of America, N.A. (In re York),* 291 B.R. 806, 814 (Bankr. E.D. Tenn. 2003). [14]

> 14  A chapter 7 trustee's power to pursue a debtor's causes of action that became property of the estate flows, as well, from the trustee's obligation under *11 U.S.C. §§ 704(1)* (renumbered *§ 704(a)(1)* by BAPCPA) to "collect and reduce to money the property of the estate. . . ." However, *§ 704(1)* is inapplicable to trustees and debtors in chapters 11, 12, and 13. *11 U.S.C. § 103(a)*. This is understandable. In a chapter 11 case the best interests of creditors in the case may be a reorganization plan instead of a liquidation plan. In chapters 12 and 13, [*33] the debtor generally remains in possession of the property of the estate, *11 U.S.C. §§ 1207(b)* and *1306(b)*, and a plan is generally funded via payments from the debtor. *11 U.S.C. §§ 1222(a)* and *1322(a)*. Nevertheless, pursuit of an estate cause of action may furnish proceeds with which to fund a plan.

Beyond *§ 323*, another provision, [HN8] *11 U.S.C. § 363*, which applies in chapters 7, 11, 12, and 13 by reason of *11 U.S.C. § 103(a)*, confers power on "the trustee" to pursue a prepetition cause of action that is property of the estate. See *Henneghan v. Columbia Gas of Va., Inc. (In re Henneghan),* 2005 Bankr. LEXIS 1770, 2005 WL 2267185, at *6 (Bankr. E.D. Va. June 22, 2005) ("The only way to 'use' a cause of action is to bring suit upon it or settle it."). *Section 363(c)(1)* generally authorizes a trustee to "use" the property of the estate in the ordinary course of business if authorized to operate the debtor's business, and *§ 363(b)(1)* generally authorizes a trustee, subject to a requirement of notice and a hearing, to "use" such property even if such use is not in the ordinary course of business.

Who is the entity empowered to utilize a trustee's powers under *§ 363* in chapters 11, 12, and 13, and to sue pursuant to [*34] that provision on a cause of action that is property of the estate? In chapter 11, a trustee, when one is appointed, is vested with a trustee's powers under *§ 363*. *11 U.S.C. § 103(a)*. In both chapter 11 and 12, however, a debtor in possession [15] has, with exceptions of no relevance here, "all the rights . . . and powers . . . of a trustee serving in a case under [chapter 11]." *11 U.S.C. §§ 1107(a)* and *1203*. It follows that the debtor in possession in chapter 11 or 12, until removed as such, enjoys the powers of a trustee under *§ 363*, including pursuit of causes of action that are property of the estate, and, in

any event, could invoke *§ 323* to pursue such causes of action.

> 15    A debtor in possession in chapter 11 is a debtor in a case in which a trustee is not serving. *11 U.S.C. § 1101(1)*. Although a trustee serves in every chapter 12 case, receiving and disbursing plan payments, the debtor acts as a debtor in possession (an undefined term in chapter 12) until removed as such. *11 U.S.C. § 1204(a)*. In both chapter 11 and 12, a debtor in possession has, with exceptions of no relevance here, "all the rights . . . and powers . . . of a trustee serving in a case under [chapter 11]." *11 U.S.C. §§ 1101(1)* [*35] and *1203*.

Chapter 13 is the odd duck when it comes to pursuit of a prepetition cause of action that is property of the estate. As in chapter 12, a trustee serves in every chapter 13 case, and receives and disposes of the payments the debtor makes under a plan. *11 U.S.C. §§ 1302(a)*, *1322(a)(1)*, and *1326(a)(2)*. As in chapters 11 and 12, the trustee is not directed to liquidate the property of the estate as is a chapter 7 trustee pursuant to *§ 704(1)*. However, unlike debtors in possession in chapters 11 and 12, the chapter 13 debtor is not generally vested with the powers of a chapter 11 trustee.

Instead, a chapter 13 debtor is vested with only some of the powers of a trustee. The debtor remains in possession of the property of the estate, except as provided in a confirmed plan or order confirming a plan. *11 U.S.C. § 1306(b)*. [16] Thus, *§ 363*, if it applied to the trustee, would not authorize the trustee to sue on a cause of action that, as in this proceeding, became property of the estate and remained in the debtor's possession. However, the cause of action does not disappear into a black hole for lack of the chapter 13 trustee's ability to sue on the cause of action. [HN9] The chapter 13 [*36] debtor, to the exclusion of the trustee, is vested with a trustee's powers under *§ 363(b)* and *§ 363(c)* to use property of the estate. First:

> Subject to any limitations on a trustee under this chapter, the debtor shall have, exclusive of the trustee, the rights and powers of a trustee under *sections 363(b)*, *363(d)*, *363(e)*, *363(f)*, and *363(l)*, of this title.

*11 U.S.C. § 1303*. In addition:

> Unless the court orders otherwise, a debtor engaged in business may operate the business of the debtor and, subject to any limitations on a trustee under *sections*

*363(c)* and *364* of this title and to such limitations or conditions as the court prescribes, shall have, exclusive of the trustee, the rights and powers of the trustee under such sections.

*11 U.S.C. § 1304(b)*. [HN10] *Section 363(b)* addresses a trustee's power to use property of the estate other than in the ordinary course of business, and *§ 363(c)* addresses a trustee's power to use property in the ordinary course of business. Thus, pursuant to *§§ 1303* and *1304*, all of the powers of a trustee under *§ 363* to use property of the estate reside in the chapter 13 debtor, not the chapter 13 trustee. To recapitulate, although *§ 1306(b)* does not state that a debtor [*37] may pursue an estate cause of action that is in his possession, *§§ 1303* and *1304*, in bestowing a trustee's powers under *§§ 363(b)* and *363(c)* on the debtor, authorize a chapter 13 debtor, subject to the limitations imposed on a chapter 13 trustee, to exercise the power of a trustee to "use" such a cause of action, which includes pursuing the same.

> 16    [HN11] *Section 1306(b)* provides that "[e]xcept as provided in a confirmed plan or order confirming a plan, the debtor shall remain in possession of all property of the estate." In Dawson's bankruptcy case, the confirmed plan and the confirmation order did not alter the rule that the debtor was to remain in possession of the property of the estate (for example, none of. the property of the estate was conveyed to a creditor in satisfaction of its claim), and the confirmation order provided that the property of the estate would not re-vest in the debtor until after plan payments were completed. Dawson enjoyed, exclusive of the trustee, the rights and powers of a trustee under *§§ 363(b)* and *363(c)* to use that property.

[HN12] Based on a chapter 13 debtor's right pursuant to *§ 1303* to utilize a trustee's power under *§ 363* to "use" the property of the estate [*38] in the debtor's possession under *§ 1306*, a chapter 13 debtor steps into the shoes of a trustee and may sue on a cause of action that is property of the estate. This was the conclusion reached by the first Court of Appeals decision to address the issue, *Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1209 n. 2 (3d Cir. 1991)* (relying on *§§ 1303* and *1306*, the Court of Appeals holds that a chapter 13 debtor "retains possession of and may use all the property of his estate, including his prepetition causes of action, pending confirmation of his plan."). Subsequent decisions have similarly concluded that a chapter 13 debtor may sue on prepetition causes of action that became property of the estate. See *Cable v. Ivy Tech State*

*Coll. (In re Cable), 200 F.3d 467, 472 (7th Cir. 1999)* (describing [HN13] the effect of *§ 1303* as being that "debtor-in-possession has substantially [the] same powers as the trustee in other chapters"); *Autos, Inc. v. Gowin, 244 Fed. Appx. 885, 2007 WL 2269443, at \*3-4 (10th Cir. 2007)* [17] (in concluding that the debtor could sue, the Court of Appeals observed that [HN14] "[t]he Bankruptcy Code allows a Chapter 13 debtor to step into the shoes of the trustee with respect to a [\*39] number of functions," citing *§ 1303* and *Fed. R. Bankr. P. 6009*); *In re York, 291 B.R. at 815* ("[T]he debtor has the right to bring suit because the debtor has the right to use the property--the cause of action that came into the bankruptcy estate." [Citations omitted.]); *In re Bowker, 245 B.R. 192, 195-96 (Bankr. D.N.J. 2000)*. See also *Crosby v. Monroe County, 394 F.3d 1328, 1331 n.2 (11th Cir. 2004)*; *Olick v. Parker & Parsley Petroleum Co., 145 F.3d 513, 516 (2d Cir. 1998)* (pointing to legislative history to *§ 1303* as supporting conclusion that the debtor has standing to sue on causes of action that are property of the estate); 1 Keith M. Lundin, Chapter 13 Bankruptcy § 54.1 (3d ed. 2000 & Supp. 2004). But see *Davis v. Victor Warren Props., Inc. (In re Davis), 216 B.R. 898, 903 (Bankr. N.D. Ga. 1997)* (the *§ 363(b)* power to use property of the estate "[has] nothing to do with the Chapter 13 debtor's prosecution of a state law cause of action."); *Richardson v. United Parcel Serv., 195 B.R. 737, 739 (E.D. Mo. 1996)*. With respect to the pursuit of causes of action that are property of the estate, the chapter 13 trustee is relegated to an advisory role by *11 U.S.C. § 1302(b)(4)* (directing [\*40] the trustee to "advise, other than on legal matters, and assist the debtor in performance under the plan"), with the debtor being the entity enjoying the power of a trustee under *§ 363* to pursue such causes of action. See *Ivy Tech, 200 F.3d at 472 & 475*.

    17  The opinion is unpublished, but may be cited for its persuasive authority under *10th Cir. R. 32.1(A)*.

The chapter 13 debtor may sue as representative of the estate on a cause of action that became property of the estate even though *§ 323* does not expressly vest a debtor with a trustee's capacity to sue. As noted in the legislative history to *§ 323*:

    Subsection (a) of this section makes the trustee the representative of the estate. Subsection (b) grants the trustee the capacity to sue and to be sued. If the debtor remains in possession in a chapter 11 case, *section 1107* gives the debtor in possession these rights of the trustee: the debtor in possession becomes the representative of the estate, and may sue and be

sued. The same applies in a chapter 13 case.

H.R. Rep. No. '95-595, at 326 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6283; S. Rep. No. 95-989, at 37 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5824. Having remained in [\*41] possession of the property of the estate, and being vested by other provisions with a trustee's power to sue on causes of action that are such property, the chapter 13 debtor implicitly is vested with a trustee's capacity to sue on those causes of action. Congress viewed the chapter 13 debtor as exercising a trustee's authority to sue when pursuing such causes of action.

Accordingly, [HN15] a debtor in a chapter 13 case is entitled to invoke *§ 363* with respect to the "use" of a cause of action that is property of the estate. The better reasoned decisions hold that, in contrast to the provisions authorizing a chapter 13 debtor to pursue causes of action that are property of the estate, none of the provisions of chapter 13 authorize a chapter 13 debtor to sue on a trustee's avoidance powers (under, for example, *11 U.S.C. §§ 544* (unperfected liens), *547* (preferences), or *548* (fraudulent conveyances)) other than pursuant to *11 U.S.C. § 522(h)*. [18] Congress thought that it was inappropriate to permit chapter 13 debtors, who are principally consumer debtors, to be armed with avoidance powers, and decided that the avoidance powers should remain vested in the chapter 13 trustee. This explains why Congress [\*42] elected not to follow the approach of chapter 12 of vesting the debtor with all the powers of a chapter 11 trustee until the debtor is displaced as a debtor in possession, and instead resorted to different statutory language for authorizing the debtor to invoke a trustee's power to sue on claims that are property of the estate. That explanation also lends support to viewing the chapter 13 debtor as suing as a trustee for purposes of *§ 108(a)* when the debtor invokes a trustee's powers under *§ 363* to sue on a cause of action that is property of the estate.

    18  See *Knapper v. Bankers Trust Co. (In re Knapper), 407 F.3d 573, 583 (3d Cir. 2005)*; *Estate Constr. Co. v. Miller & Smith Holding Co., 14 F.3d 213, 220 (4th Cir. 1994)*; *Stangel v. United States (In re Stangel), 219 F.3d 498, 501 (5th Cir. 2000)*; *Hansen v. Green Tree Servicing, LLC (In re Hansen), 332 B.R. 8 (B.A.P. 10th Cir. 2005)*; but see *Houston v. Eiler (In re Cohen), 305 B.R. 886, 897 (B.A.P. 9th Cir. 2004)*.

The difference in statutory structure also explains the meaning of the statement in the legislative history to *§ 1303* that the debtor possesses certain powers "concur-

rently with the trustee," and in particular the power to sue [*43] under § 323 despite no mention being made of the debtor in § 323 or in § 1303. [19] [HN16] The power to invoke § 323 is available to whichever entity, the chapter 13 trustee or the chapter 13 debtor, who is vested with the power to sue, and in that sense § 323 is a concurrently shared power. As to causes of action that became property of the estate, only the debtor enjoys a trustee's powers to possess and use such causes of action, and in exercising such powers only a debtor may invoke a trustee's capacity under § 323 to sue on such causes of action. See *In re Bowker, 245 B.R. 192, 193 (Bankr. D.N.J. 2000)* ("[I]n a chapter 13 bankruptcy case, it is the debtor, and not the trustee, who has standing . . . to prosecute litigation that is property of the estate."). See also *Langenfeld v. Bank of America, N.A., 2007 U.S. Dist. LEXIS 49918, 2007 WL 2034366, at *3-4 (N.D. Okla. July 9, 2007)*; *Jackson v. Marlette (In re Jackson), 317 B.R. 573 (Bankr. D. Mass. 2004)*. As to avoidance power causes of action, however, only the chapter 13 trustee enjoys a trustee's power to invoke avoidance powers, and thus enjoy a trustee's capacity to sue on such causes of action under § 323. In other words, in chapter 13, the § 323 capacity [*44] to sue may be invoked by whoever it is, the debtor or the chapter 13 trustee, who possesses a trustee's power under provisions of other chapters of the Bankruptcy Code to sue on the cause of action. It is only in that sense that the chapter 13 trustee and chapter 13 debtor can be said to possess the § 323 capacity to sue concurrently. [20]

19    In the floor statements to § 1303 it was stated:

Section 1303 of the House amendment specifies rights and powers that the debtor has exclusive of the trustees. The section does not imply that the debtor does not also possess other powers concurrently with the trustee. For example, although *section 1323* [sic, presumably 323] is not specified in *section 1303*, certainly it is intended that the debtor has the power to sue and be sued.

124 Cong. Rec. H11106 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards); S17423 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini).
20    As discussed in *In re Bowker, 245 B.R. 192, 198-200 (Bankr. D.N.J. 2000)*, various courts, including the Court of Appeals in *Cable v. Ivy Tech State Coll. (In re Cable), 200 F.3d 467, 475 (7th*

*Cir. 1999)*, have unnecessarily and erroneously suggested that in chapter 13 the debtor and the trustee [*45] concurrently hold the power to sue on a prepetition cause of action that is property of the estate.

It being clear that in chapter 13, a debtor who is in possession of a cause of action that is property of the estate enjoys the powers of a trustee to sue on such a cause of action, the critical issue is whether § 108(a) applies to a debtor's exercise of such trustee powers. [21] *Section 1303* confers on a chapter 13 debtor, to the exclusion of the chapter 13 trustee, the power of a trustee under § 363 to pursue such a cause of action. [22] Such a chapter 13 debtor who is prosecuting an estate cause of action is viewed as exercising the powers of a trustee. In Ivy Tech, the Court of Appeals held that in pursuing estate causes of action, a chapter 13 debtor "steps into the role of trustee" and exercises a trustee's power to represent the estate under § 323. *Ivy Tech, 200 F.3d at 473*. As already discussed, that is the view expressed as well in the House and Senate Reports, and the floor statements addressing §§ 323 and 1303. [23]

21    A chapter 11 or chapter 12 debtor in possession who pursues an estate cause of action is vested (with exceptions of no relevance here) with the powers of a chapter 11 [*46] trustee, and can thus invoke § 108(a) as that provision applies to any trustee under § 103(a).
22    *Section 363(b)* requires notice and a hearing. Although there was no formal notice and a hearing before Dawson commenced this adversary proceeding, the court held a scheduling conference after the proceeding commenced. That resulted in a scheduling order which implicitly authorized the debtor's pursuit of the cause of action. No contention was raised that the debtor lacked authority to pursue the cause of action.

Had the defendants raised a statute of limitations defense in their pretrial statement based on lack of notice and a hearing under § 363(b), Dawson could have taken steps to satisfy the requirement of notice and a hearing, if not already satisfied, because the bankruptcy case was still pending. This illustrates the prejudice that Dawson would suffer were the defendants allowed belatedly to assert the statute of limitations defense.
23    [HN17] Although, because of § 1306(b), some decisions refer to a debtor in chapter 13 as a "debtor in possession," that term is not used in chapter 13, and the debtor's § 1306(b) powers should not be treated as clothing a chapter 13 debtor with all of the rights [*47] and powers conferred on a debtor in possession in cases un-

der chapters 11 and 12. However, a chapter 13 debtor's possession of the estate's prepetition causes of action reinforces the debtor's enjoyment under §§ *1303* and *363* of a trustee's power to use such property.

Even though the term "use" in *§ 363* is construed as including the trustee's power to sue on such a cause of action, some courts have held that *§ 1303* confers on the debtor only the specified powers under *§ 363*, not a trustee's rights under *§ 108(a)* conferring on "the trustee" a lengthier statute of limitations to sue on the cause of action. See, e.g., *Ranasinghe v. Compton (In re Ranasinghe), 341 B.R. 556, 567 (Bankr. E.D. Va. 2006)*. However, [HN18] when a chapter 13 debtor sues on a cause of action that is property of the estate, he exercises the rights of a trustee to sue and does so subject to the same limitations as a trustee.

The *§ 363* power to sue, when exercised by a chapter 13 debtor, is exercised in the words of *§ 1303* as "a right[] and power[] of a trustee" and "subject to the limitations on a trustee under this chapter," meaning the limitations that would apply to a chapter 13 trustee if the *§ 363* power were vested in [*48] the chapter 13 trustee instead of the debtor. That this is the proper interpretation of the "subject to the limitations" language is made clear by the legislative history to *§ 1303*:

> A chapter 13 debtor is vested with the identical rights and powers, and is subject to the same limitations in regard to their exercise, **as those given a liquidation trustee** by virtue of *section 363(b), (d), (e), (f),* and *(h)* of title 11, relating to the . . . use . . . of property.

S. Rep. No. 95-989, at 140 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5926 (1978) (emphasis added). [24]

> 24    A "liquidation trustee" means a trustee in chapter 7 (the chapter entitled "Liquidation"): it is only a chapter 7 trustee that is required by *§ 704(1)* to liquidate the property of the estate.

[HN19] The provision in *§ 108(a)* addressing limitations on when a trustee may exercise the *§ 363* power to sue necessarily applies to whomever is exercising the trustee's *§ 363* power to sue. This is the better view of the statute. When the Bankruptcy Code confers on a party a power of a trustee found in one part of the statute, the power carries with it the provisions of the statute governing when and how the trustee may exercise that power.

If [*49] *§ 108(a)* provided that a trustee must sue on causes of action that are property of the estate only

within 180 days after the commencement of the case, regardless of any longer statute of limitations available under nonbankruptcy law, there could be no doubt that the chapter 13 debtor would be subject to the same restriction, particularly because *§ 1303* provides that the debtor in suing under *§ 363* is "[s]ubject to any limitations on a trustee under . . . chapter [13] . . . ." When the limitations on a trustee are modified by *§ 108(a)* (to enlarge the statute of limitations), the debtor should similarly be subject to the same modified limitations. [25]

> 25    [HN20] The provisions of *11 U.S.C. § 327* requiring court approval of a trustee's employment of counsel do not apply to a chapter 13 debtor's employment of professionals relating to the debtor's exercise of a trustee's *§ 363* powers. *In re Tirado, 329 B.R. 244, 248-50 (Bankr. E.D. Wis. 2005)*; *In re Gutierrez, 309 B.R. 488, 500-01 (Bankr. W.D. Tex. 2004)*. It does not follow that *§ 108(a)* ought not apply either. *Section 327* is not a statute specifically addressing a trustee's suing on causes of action, and deals in general terms regarding a trustee's [*50] employment of professionals. In contrast, [HN21] *§ 108(a)* specifically addresses a trustee's suing on causes of action that are property of the estate, and can be read as modifying the limitations on a trustee's power to sue under *§ 363* (and thus as modifying a chapter 13 debtor's power under *§ 1303*, subject to the same limitations as imposed on a trustee, to sue under *§ 363*).

In *In re Ranasinghe, 341 B.R. at 567*, the court acknowledged that in suing on a cause of action that is property of the estate, the debtor is utilizing a trustee's power of "use" under *§ 363* pursuant to the *§ 363* power conferred on the debtor by *§ 1303*. The court nevertheless held that the *§ 108(a)* power is implicitly negated because it is not one of the powers listed in *§ 1303*. However, the court failed to acknowledge that the chapter 13 debtor's utilization of *§ 363* is "[s]ubject to any limitation on a trustee," and thus includes the provisions of the Bankruptcy Code that govern when a trustee may employ *§ 363*.

This is not a question of conferring on the debtor a trustee's power to sue that the Bankruptcy Code plainly does not confer on the debtor. See *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 13-14, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000)* [*51] (holder of administrative claim may not seek surcharge of a secured creditor's collateral when *§ 506(c)* vests the power to surcharge in only the trustee); *Stangel v. United States (In re Stangel), 219 F.3d 498, 501 (5th Cir. 2000)* (trustee's avoidance power, which is not property of the estate to which §§ *363* and *1303* apply, [26] was not con-

ferred on a chapter 13 debtor except in the limited circumstances specified by *11 U.S.C. § 522(h)*). In *Ranasinghe, 341 B.R. at 567*, the court looked to Hartford Underwriters and Stangel as requiring the conclusion that a trustee's *§ 108(a)* power is not conferred on the debtor because *§ 108(a)* only mentions the trustee as clothed with the rights conferred by that provision. The Supreme Court in Hartford Underwriters stated, with respect to a trustee's exclusive power to surcharge a secured creditor under *§ 506(c)*, that:

> Several contextual features here support the conclusion that exclusivity is intended. First, a situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity. "Where a statute ... names the parties granted [the] right [*52] to invoke its provisions, ... such parties only may act." 2A N. Singer, *Sutherland on Statutory Construction* § 47.23, p. 217 (5th ed. 1992) (internal quotation marks omitted); *see also Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 486, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985)*. Second, the fact that the sole party named--the trustee--has a unique role in bankruptcy proceedings makes it entirely plausible that Congress would provide a power to him and not to others.
>
>     . . . .
>
> Because we believe that by far the most natural reading of *§ 506(c)* is that it extends only to the trustee, petitioner's burden of persuading us that the section must be read to allow its use by other parties is "'exceptionally heavy.'" *Patterson v. Shumate, 504 U.S. 753, 760, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) (quoting Union Bank v. Wolas, 502 U.S. 151, 156, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991))*.

*Hartford Underwriters, 530 U.S. at 6-7, 9.*

> 26    Pursuant to *11 U.S.C. § 541(a)(3)*, property that is the subject of an avoided transfer becomes property of the estate upon the property being recovered under, for example, *11 U.S.C. § 550*. The trustee's avoidance powers, and the trustee's power [*53] to recover property that is the subject of an avoided transfer, are not themselves

property of the estate. Accordingly, *§ 1306(b)* does not place a chapter 13 debtor in the possession of such powers.

However, *Hartford Underwriters* and *Stangel* involved the issue of who had the power to sue (to either surcharge a creditor's collateral or to avoid a transfer). In contrast, [HN22] the power of a chapter 13 debtor to sue on estate causes of action that became property of the estate on the petition date is unquestioned, and the issues are different than in Stangel and Hartford Underwriters.

The first issue is whether the provisions of [HN23] *§ 108(a)* govern the statute of limitations for when a trustee may exercise the trustee's powers under *§ 363*. The answer to that being in the affirmative, the second issue is whether it follows that when exercising a trustee's power to sue under *§ 363*, a chapter 13 debtor may sue within the time that *§ 108(a)* provides for the trustee to sue. The answer to that issue must similarly be in the affirmative. If a statute (here, *§ 1303*) confers on an entity another party's power to sue, expressly subject to the same limitations as apply to that other party, one naturally would [*54] look to the statutory provisions governing that power to sue, including provisions (here, *§ 108(a)*) that alter the statute of limitations for suing. *Section 108(a)* cannot be read in isolation in deciding whether it is available to a chapter 13 debtor exercising a trustee's power to sue on estate causes of action as statutory interpretation is a holistic exercise. [27]

> 27    This court has on previous occasions acknowledged that a plain meaning interpretation of *§ 108(a)* read in isolation could lead to absurd results if it were read as not applying to estate representatives who pursue claims when acting as the functional equivalent of a debtor-in-possession pursuant to the terms of a confirmed Chapter 11 plan. *Alberts v. Tuft (In re Greater Southeast Community Hospital Corp.), 333 B.R. 506, 535-36 (Bankr. D.D.C. 2005)*. In that case, the estate representative was a successor to the debtor in possession's power of a trustee to pursue estate claims. Similarly, here, the chapter 13 debtor's power to pursue estate claims derives from *§ 1303* which cloaks the debtor with the powers of a trustee to use the property of the estate and subject to the same limitations as a trustee.

A similar approach has [*55] been taken permitting a chapter 13 debtor to enforce *11 U.S.C. § 542(a)*, which provides with exceptions of no relevance here:

> [A]n entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease un-

der *section 363* of this title . . . shall de-
liver to the trustee . . . such property or the
value of such property . . . .

Courts have recognized that the chapter 13 debtor, by
virtue of his right to possess and use the property of the
estate, may sue to enforce the turnover obligation under
*§ 542(a)*. See *TranSouth Fin. Corp. v. Sharon (In re
Sharon), 234 B.R. 676, 687 (B.A.P. 6th Cir. 1999)*:

> To the extent a Chapter 13 debtor can . .
> . use property of the estate under *§ 363*,
> the debtor succeeds to the mandate in *§
> 542(a)* that compels delivery of property
> that is usable under *§ 363*. TranSouth's al-
> ternative reading produces an absurd re-
> sult: *§ 542(a)* would mandate delivery of
> a debtor's car to a Chapter 13 trustee who
> is prohibit[ed] by *§ 1306(b)* to possess the
> car and is prohibited by *§ 1303* to use, sell
> or lease the car.

See also *Coleman v. Grand Nat'l Bank (In re Coleman),
229 B.R. 428, 429-30 (Bankr. N.D. Ill. 1999)*.

Similarly, my interpretation [*56] of the statute is
not a case of enlarging *§ 108(a)* to add the missing words
"chapter 13 debtor" to *§ 108(a)*, and this case is thus dis-
tinguishable from *Lamie v. United States Tr., 540 U.S.
526, 538, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004)*.
Instead, my interpretation reads [HN24] *§ 108(a)* as
modifying the limitations on a trustee's powers under *§
363*, and as thus modifying the limitations applicable to
the powers of a chapter 13 debtor (who by reason of *§
1303* is subject to the same limitations) when suing pur-
suant to the powers of a trustee under *§ 363*.

Finally, *§ 108(a)* applies in chapter 13 pursuant to
*11 U.S.C. § 103(a)*, and it would be odd for the power to
apply in chapter 13 and yet, because of an overly narrow
interpretation of the Bankruptcy Code, for the power to
be deprived of any utility in chapter 13.

Although *Estate of Carr ex rel. Carr v. United
States, 482 F. Supp. 2d 842, 850 (W.D. Tex. 2007)*, sug-
gests that a chapter 13 trustee can join in the pursuit of
such a cause of action, this ignores the limited powers of
a chapter 13 trustee which, as already discussed, have led
the better reasoned decisions to conclude that, [HN25] in
a chapter 13 case, only the debtor may sue on causes of
action that are property of the estate. [*57] See, e.g.,
*Jackson v. Marlette (In re Jackson), 317 B.R. 573, 579
(Bankr. D. Mass. 2004); In re Bowker, 245 B.R. 192,
198-200 (Bankr. D.N.J. 2000)*. [HN26] None of the du-
ties imposed on a trustee under *11 U.S.C. § 1302(b)* can
be viewed as authorizing pursuit of causes of action of

the estate that, pursuant to *§ 1303*, are subject to the
debtor's exclusive power to use under *§ 363*. Accord-
ingly, if *§ 108(a)* were unavailable to the chapter 13
debtor, it would fall into a black hole of being unavail-
able to anyone to utilize despite *§ 103(a)* making it ap-
plicable in chapter 13.

In contrast, a trustee's avoidance powers under chap-
ter 5 of the Bankruptcy Code, which similarly are appli-
cable in chapter 13 by virtue of *§ 103(a)*, remain avail-
able (at the very least) to the chapter 13 trustee, [28] thus
not falling into a black hole of being unavailable for
anyone to utilize should the avoidance powers be held
unavailable for the debtor to utilize.

> 28  As noted earlier, the courts are divided over
> whether the chapter 13 debtor may also sue pur-
> suant to a trustee's avoidance powers.

Viewing *§ 108(a)* in the context of other provisions
of chapter 13 of the Bankruptcy Code, and because the
chapter 13 debtor has exclusive [*58] authority to sue on
the causes of action that are property of the estate, there
are additional reasons to think that Congress could not
have intended to bar the applicability of *§ 108(a)* when a
chapter 13 debtor sues on such causes of action. [29]
Among those reasons are these. Congress did not intend
to make creditors worse off in chapter 13 than in chapter
7. See *11 U.S.C. § 1325(a)(4)* (requiring that unsecured
creditors receive in chapter 13 payments of a value equal
to what they would receive in chapter 7). Accordingly,
when a cause of action would be available to a chapter 7
trustee at one point in time only by virtue of *§ 108(a)*, it
is unlikely that Congress meant to treat the same cause of
action as time-barred at the same point in time when the
case has proceeded in chapter 13 instead. [30]

> 29  Courts have rejected somewhat similar ar-
> guments when it comes to the issue of whether
> the debtor may pursue a trustee's avoidance pow-
> ers. But in contrast to claims that are property of
> the estate that the debtor has the exclusive power
> to use, a chapter 13 trustee plainly has the power
> to use the avoidance powers, and the arguments
> for allowing a chapter 13 debtor to utilize avoid-
> ance powers [*59] have been rejected as an at-
> tempt to rewrite the congressional decision to
> place the power to pursue avoidance actions in
> the hands of the chapter 13 trustee. Although a
> chapter 13 trustee may be reluctant to pursue
> avoidance causes of action, that problem is not a
> writ to re-write the statute to permit the debtor to
> pursue such causes of action.
> 30  Chapter 13 cases are available to only "an
> individual with regular income," *11 U.S.C. §
> 109(e)*, which is only "[an] individual whose in-

come is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13" as that term is defined under *11 U.S.C. § 101(30)*. Nevertheless, a chapter 13 debtor's recovery on a cause of action of the estate may serve as an additional source of income to supplement plan payments made by a debtor from regular income in a chapter 13 case, and a recovery on that cause of action may be the only way in which the debtor can propose a plan that complies with *§ 1325(a)(4)*.

Indeed, Congress intended to encourage individuals to utilize chapter 13, devoting future disposable income to paying creditors, instead of utilizing a chapter 7 case in which creditors would often receive much [*60] less, if anything. See, e.g., *In re Lybrook, 951 F.2d 136, 137 (7th Cir. 1991)*; *11 U.S.C. § 707(b)* (enacted after Lybrook, and providing for dismissal of a chapter 7 case that is a substantial abuse of chapter 7, but permitting the debtor to convert his case to chapter 13, in which *§ 707(b)* is inapplicable, in order to avoid dismissal). It is unlikely that Congress intended to reduce the amount that a debtor would be able to pay to creditors under a chapter 13 plan by making *§ 108(a)* unavailable to the chapter 13 debtor. The unavailability of *§ 108(a)*, in certain circumstances, can result in the debtor being forced to convert his case to chapter 7 in order to obtain bankruptcy relief because his inability to pursue an estate cause of action prevents him from proposing a confirmable chapter 13 plan. [31]

> 31    For example, imagine a chapter 13 debtor who, when confirmation of his plan is being considered, is time-barred from pursuing an estate cause of action only because *§ 108(a)* is held to be unavailable to him, and who has insufficient income to propose a plan making payments equal in value to the distribution that would be made to creditors by a chapter 7 trustee pursuant to a recovery [*61] on a pursuit by the chapter 7 trustee of the cause of action (via invoking *§ 108(a)* to make pursuit of the cause of action timely). By reason of *§ 1325(a)(4)*, the debtor's plan could not be confirmed if the debtor could not utilize *§ 108(a)* because creditors would receive more in a chapter 7 case where the chapter 7 trustee could pursue the cause of action by invoking *§ 108(a)*.

Moreover, an anomalous result would flow from depriving a chapter 13 debtor of *§ 108(a)* rights. If the debtor's action were not timely when filed because *§ 108(a)* is unavailable, nevertheless, upon conversion to chapter 7, 11, or 12, the *§ 108(a)* power would be available, even though the action was time-barred while in chapter 13. If the debtor's pursuit of a claim, pursuant to

exercising a trustee's powers under *§ 363*, had already been dismissed as untimely while the bankruptcy case was in chapter 13, that dismissal would raise a vexing issue of whether the chapter 7 trustee is now barred from pursuing the claim even though the claim would be timely under *§ 108(a)* had there not been a prior dismissal. Congress did not likely intend to complicate the pursuit of estate causes of action in that fashion.

V

APPLICABILITY [*62] OF *15 U.S.C. § 1602(aa)* TO DAWSON'S LOAN

[HN27] TILA and its implementing regulation, Regulation Z (*12 C.F.R. §§ 226.1 - 226.36 (2000)*), govern disclosure obligations of creditors when they extend consumer credit. See *Clay v. Johnson, 264 F.3d 744, 747 (7th Cir. 2001)*; *15 U.S.C. § 1638*. The stated purpose for enacting TILA was "to assure a meaningful disclosure of credit terms so that [consumers] will be able to compare more readily the various credit terms available to [them] and avoid the uninformed use of credit, and to protect [consumers] against inaccurate and unfair credit billing and credit card practices." *15 U.S.C. § 1601(a)*. See also *Woolaghan v. United Mortgage Servs., Inc. (In re Woolaghan), 140 B.R. 377, 382 (Bankr. W.D. Pa. 1992)*. HOEPA, in turn, amended TILA in response to increased reports of abusive home mortgage lending practices. *Cooper v. First Gov't Mortgage & Investors Corp., 238 F. Supp. 2d 50, 54 (D.D.C. 2002)*. HOEPA was intended to result in greater disclosure to borrowers in connection with high cost loans and to bring an end to certain loan terms and lending practices. *Id. at 54*. Dawson asserts that *15 U.S.C. § 1602(aa)*, one of the provisions added by HOEPA to TILA, [*63] is applicable here.

[HN28] When *§ 1602(aa)* applies, it triggers *15 U.S.C. § 1639* which both requires that lenders provide borrowers with additional disclosures beyond those that TILA generally requires, and bars mortgages from containing certain terms. Other than defending against Dawson's TILA claims on the basis of the statute of limitations defense already rejected, Thomas and Merwin have defended on the basis that Dawson is estopped from raising her TILA claims, implicitly conceding that except for these defenses, Dawson has shown that the loan was subject to *15 U.S.C. § 1602(aa)*. For the sake of completeness, parts A and B, below, demonstrate, respectively, that the loan was subject to *§ 1602(aa)* if it was a "consumer credit transaction," and that, as implicitly conceded by the defendants, the loan was indeed a "consumer credit transaction" subject to *§ 1602(aa)*. Then, parts C and D, below, reject the defendants' estoppel arguments that are based on, respectively, Dawson's misrepresentations in general, and the documents she signed at closing.

A.

### THE LOAN IS SUBJECT TO *15 U.S.C. § 1602(aa)* IF IT WAS A CONSUMER CREDIT TRANSACTION

*Section 1602(aa)(1) provides:*

> A mortgage referred to in this **[*64]** subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if--
>
> > (A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or
> >
> > (B) the total points and fees payable by the consumer at or before closing will exceed the greater of -
> >
> > > (i) 8 percent of the total loan amount; or
> > >
> > > (ii) $ 400.

*15 U.S.C. § 1602(aa)(1)* (emphasis added). Although *§ 1602(aa)(3)* provides for annually adjusting the $ 400 amount specified in *§ 1602(aa)(1)(B)(ii)* "by the annual percentage change in the Consumer Price Index," the $ 10,000 in fees charged Dawson obviously exceeded the $ 400 amount as thus adjusted. [32]

> 32    Because it is unnecessary to rely on *§ 1602(aa)(1)(A)* to conclude that *§ 1602(aa)* applied to Thomas's loan to Dawson, it is unnecessary to address *§ 1602(aa)(3)* which provides **[*65]** for certain adjustments to the percentage points specified in *§ 1602 (aa)(1)(A)*.

Thomas's loan to Dawson fits within the opening clause of the provision if the transaction was a "consumer credit transaction." The property securing the loan was Dawson's principal dwelling, and the transaction does not fall within any of the categories of transactions expressly excluded under *§ 1602(aa)(1)* because the loan was not a "residential mortgage transaction" as that term is defined in *§ 1602(w)*, [33] and was not an open-end credit plan or a reverse mortgage as defined, respectively, in *§ 1602(i) and § 1602(bb)*.

> 33    [HN29] "The term 'residential mortgage transaction' means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling." *15 U.S.C. § 1602(w)* (emphasis added). The loan at issue was obtained for purposes other than the acquisition or construction of Dawson's dwelling, and therefore does not fall within the statute's definition of residential mortgage transaction.

Then, **[*66]** for Thomas's loan to Dawson, [HN30] if it was a "consumer credit transaction," to be covered by *§ 1602(aa)*, it suffices under *§ 1602(aa)(1)(B)(i)* that the total "points and fees" payable by the consumer at or before closing will exceed the greater of 8 percent of the total loan amount or $ 400.00 as adjusted since HOEPA was enacted in 1994 for annual changes in the Consumer Price Index. Here, the "fees and points" associated with this loan well exceeded the $ 400 amount as annually adjusted, and are a sufficiently high percentage of the loan amount to bring it within the purview of *§ 1602(aa)(1)*. Pursuant to the definition of points and fees in *§ 1602(aa)(4)*, [34] both Thomas's $ 5,000 lender's fee, see *12 C.F.R. 226.4(b)(3)*; [35] *12 C.F.R. 226.32(b)(i)*, [36] and Merwin's $ 5,000 broker fee, see *12 C.F.R. § 226.4(a)(3)*; [37] *12 C.F.R. 226.32(b)(1)(ii)*, [38] are finance charges and thus "fees" to which *§ 1602(aa)(1)(B)* applies. Without even taking into account the various other charges that were imposed incident to this loan and that may also qualify as points and fees, the broker's fee together with Thomas's lender's fee amount to $ 10,000, exceeding, on their face, 28% of the total loan amount.

> 34    Pursuant **[*67]** to *§ 1602(aa)(4)*, the term "points and fees" in *§ 1602(aa)(1)(B)* includes, in addition to certain other charges:
>
> > (A) all items included in the finance charge, except interest or the time-price differential; [and]
> >
> > (B) all compensation paid to mortgage brokers[.]

Although a determination of which items to include in the calculation of points and fees is not always straightforward, see, e.g., *Cooper v. First Gov't Mortgage & Investors Corp., 238 F. Supp. 2d 50 (D.D.C. 2002)*, in the instant case the size of Merwin's broker fee and Thomas's lender's fee obviate the need to determine which of the other fees and expenses charged in connection with this loan qualify as points and fees under *§ 1602(aa)*.
35   *12 C.F.R. § 226.4(b)* provides in pertinent part:

> [HN31] Example of finance charge. The finance charge includes the following types of charges, except for charges specifically excluded by paragraphs (c) through (e) of this section:
>
> . . .
>
> (3) Points, loan fees, assumption fees, finder's fees, and similar charges.
>
> . . .

36   In pertinent part, *12 C.F.R. § 226.32(b)(1)* provides that [HN32] the term "points and fees" includes:

(i) All items required to be disclosed under *§ 226.4(a)* and *226.4(b)*, except interest or the time-price [*68] differential; [and]

(ii) All compensation paid to mortgage brokers[.]
37   *12 C.F.R. § 226.4(a)* provides in pertinent part:

> [HN33] Definition. The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.
>
> . . .

> (3) Special rule; mortgage broker fees. Fees charged by a mortgage broker (including fees paid by the consumer directly to the broker or to the creditor for delivery to the broker) are finance charges even if the creditor does not require the consumer to use a mortgage broker and even if the creditor does not retain any portion of the charge.

38   See supra note 36.

Thus, the applicability of *§ 1602(aa)* to the instant transaction turns on whether Dawson has shown that the transaction was a "consumer credit transaction" within the meaning of *§ 1602(aa)*. As explained in more detail below, the loan was, in fact, a consumer credit transaction, and it was therefore subject to the disclosure requirements of HOEPA absent a valid estoppel [*69] defense.

B.

THE LOAN WAS A "CONSUMER CREDIT TRANSACTION" EVEN IF THE PROCEEDS OF THIS LOAN RELATING TO THE DEBTOR'S PRINCIPAL RESIDENCE WERE USED IN PART TO STOP A FORECLOSURE SALE OF THE PROPERTY AND TO RENOVATE THE PROPERTY TO BE ABLE TO SELL IT

The meaning of "consumer credit transaction" is explained by *15 U.S.C. § 1602(h)*:

> [HN34] The adjective "consumer", used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes.

As found earlier, Dawson borrowed the money primarily for the purpose of saving her home from foreclosure, which would seem to make this a "consumer credit transaction," at least when Dawson's actual reasons for the loan are the focus. However, pointing to representations that Dawson made to them, the defendants contend that the loan is not a consumer credit transaction and is exempt under *15 U.S.C. § 1603(1)* as having been made

"primarily for a business, commercial or agricultural purpose." *15 U.S.C. § 1603(1)*.

Although Dawson and the defendants **[*70]** disagree on whether the loan was obtained primarily for a business or personal purpose, they do agree that of the $ 35,000 loan, $ 8,629.77 was intended and was in fact used to reinstate the first deed of trust and prevent a foreclosure sale of the house, that $ 12,163.47 of the loan amount was attributable to settlement charges and fees, and that the remaining $ 14,206.76 that was disbursed to Dawson was used by her for an unspecified personal purpose. The defendants contend that, notwithstanding how the debtor actually used the $ 14,206.76, Dawson represented that those funds would be used to renovate the property in anticipation of sale, and that the defendants reasonably relied upon that representation in treating the loan as one for commercial and business purposes.

The case law does not support and this court rejects the argument that this loan was obtained for primarily business purposes merely because Dawson sought to halt the foreclosure sale of a property in which she occasionally rented out rooms. The primary motivation and purpose for obtaining the instant loan was the personal purpose of preventing the foreclosure sale of Dawson's primary residence. See *Anderson v. Lester, 382 So. 2d 1019, 1023-25 (La. Ct. App. 1980)* **[*71]** (loan obtained to prevent foreclosure sale of primary residence held to be obtained primarily for personal purposes even though foreclosure was halted by using the loan to pay business debts).

The defendants also contend that the property was rental property, and that a loan obtained to reinstate the first deed of trust as to such investment property constitutes a business purpose. The incidental rental of rooms in Dawson's home does not convert the otherwise personal purpose for obtaining the loan into a commercial purpose. *Gerasta v. Hibernia Nat'l Bank, 411 F. Supp. 176 (E.D. La. 1976)*, aff'd in part, rev'd in part, *575 F.2d 580 (5th Cir. 1978)* (loan obtained for the purpose of making improvements on borrower's property obtained for personal rather than business purposes if borrower intends to live in the property after improvements are complete, even if part of the property is and will continue to be occupied by renters). This was Dawson's primary residence, and not an investment property.

Assuming without deciding that Dawson intended to renovate the property for purposes of sale (or is chargeable with her stated intention to do so), the court is nevertheless faced with the argument **[*72]** that a loan obtained for the purpose of halting a foreclosure sale on a borrower's primary residence with a concomitant purpose of renovating and selling the property converts the would-be personal purpose of preventing the foreclosure sale of one's primary residence into a business and commercial purpose of allowing for the orderly sale of the home such that the borrower can realize the full value of her unencumbered equity in the property. The court rejects this argument. To characterize the loan at issue as having a primarily business or commercial purpose on such basis requires a tortured interpretation of the facts and an equally implausible reading of the statute. Dawson did not convert her primary residence into investment property even if she did intend to use a portion of the loan proceeds for renovations which would in turn facilitate a sale. The court finds that what Dawson intended to do after preventing foreclosure was secondary to her primary motivation of preventing the foreclosure sale of her primary residence. In any event, a homeowner who borrows funds to improve a home that is her principal residence acts as a consumer, and not for commercial or business purposes, **[*73]** even if the funds are to be used to repair the home in order to facilitate a sale of the property.

The court having found that the loan was a consumer credit transaction within the meaning of HOEPA and TILA, and having already found that the loan otherwise qualifies as a loan governed by those statutes, the court holds that the loan is subject to the disclosure requirements of and the restrictions imposed by TILA and HOEPA, unless Dawson is estopped from contending that the transaction was a consumer credit transaction.

C.

THE DEFENDANTS DID NOT REASONABLY RELY UPON ANY OF DAWSON'S STATEMENTS THAT ALLEGEDLY MISLED THE DEFENDANTS INTO BELIEVING THAT THE LOAN WAS A COMMERCIAL RATHER THAN A CONSUMER TRANSACTION

Thomas complains that he and Merwin were misled by Dawson into believing that the loan was being obtained for a commercial purpose, and that Dawson is estopped from now asserting that the loan was a consumer loan obtained for personal purposes. [HN35] To invoke the equitable doctrine of estoppel, the defendants must establish that Dawson made a definite representation upon which they reasonably relied to their detriment. *Graham v. SEC, 343 U.S. App. D.C. 57, 222 F.3d 994, 1007 (D.C. Cir. 2000)*. In the instant case, **[*74]** the defendants have failed to demonstrate that any reliance upon Dawson's alleged misrepresentations was reasonable.

[HN36] The Official Commentary to Regulation Z provides that lenders "must determine in each case if the transaction is primarily for an exempt purpose." *§ 12*

*C.F.R. Pt. 226, Supp. I, 226.3(a)(1)*. The Official Commentary is published by the Board of Governors of the Federal Reserve System and the interpretation of Regulation Z contained therein "is dispositive in TILA cases unless the commentary is demonstrably irrational." *Clay v. Johnson, 264 F.3d 744, 748 (7th Cir. 2001)*; *Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566, 100 S. Ct. 790, 63 L. Ed. 2d 22 (1980)* ("Congress delegated broad administrative lawmaking power to the Federal Reserve Board when it framed TILA [and] [t]he Act is best construed by those who gave it substance in promulgating regulations thereunder."). Although the Commentary does not specify the procedure for determining the primary purpose of a loan and by extension the applicability of the exemption, it does provide that "[i]f some question exists as to the primary purpose for a credit extension, the creditor is, of course, free to make the disclosures, and the fact that disclosures [*75] are made under such circumstances is not controlling on the question of whether the transaction was exempt." *12 C.F.R. Pt. 226, Supp. I, § 226.3(a)(1)*. Thus, under the Board's interpretation, creditors have an affirmative duty to determine the applicability of the exemption, and in cases of uncertainty, they are expressly invited to make the disclosures. [39]

> 39   When cross-examining Dawson's expert with respect to the standard of care applicable to brokers and lenders when processing a loan, counsel for the defendants made much of the fact that the defendants in this case were faced with unique time pressures attributable to the imminent foreclosure sale of Dawson's house. Implicit in this line of inquiry was the notion that a lender's duty to make a reasonable inquiry into the purpose of a loan can be altered by time constraints. The Official Commentary supports the opposite conclusion, to wit, if sufficient time is not available to collect reliable information concerning the purpose of a loan, the lender should err on the side of disclosure rather than rely upon inadequate or incomplete information to erroneously conclude that the disclosure requirements are inapplicable.

[HN37] When a sophisticated [*76] borrower takes deliberate and calculated steps to mislead a lender into believing that a loan is being obtained for commercial purposes, the borrower is not entitled to later invoke the protections of TILA based upon an assertion that, notwithstanding what the lender was led to believe, the loan was actually obtained for personal purposes. See *Conrad v. Smith, 42 Wn. App. 559, 712 P.2d 866 (Wash. Ct. App. 1986)*. Although the court agrees that a borrower's statement of purpose is relevant to a determination of whether a loan is being obtained for a business or consumer purpose, the reliability and plausibility of such statements must also be taken into consideration.

In Conrad, a case addressing the rights of lenders when borrowers misrepresent the purpose of a loan, the borrower made numerous representations to the lender during the loan process regarding the purpose of the loan with the "apparent intention of obfuscating matters." *Id. at 566*. In determining that the loan was for a business rather than a consumer purpose, the Conrad court found it relevant that the borrower, whose representations contributed to the lender's belief that the loan was for a business purpose, had a background that included [*77] "2 years of college and knowledge of the TILA through his occupation as a siding salesman. . . ." *Id. at 868*. Furthermore, the borrower in Conrad testified that he intentionally did not seek to have deleted a provision stating that the loan was for a business purpose "[b]ecause that was the only way I could get the loan, and I was desperate." *Id. at 869*.

The instant case is easily distinguishable from cases such as Conrad. Dawson is far from sophisticated and any effort to mislead the defendants was poorly executed at best. Thomas and Merwin were not entitled to selectively rely upon unconfirmed and unsubstantiated verbal statements regarding the nature of the property securing a loan and the purpose for which the loan was being acquired when such statements did not comport with reality (as would have been revealed by a modicum of due diligence to attempt to verify whether Dawson's representations were accurate) [40] and were expressly contradicted in the instrument consummating the loan. [41] This is especially true when lenders intend to rely upon such statements in asserting that a transaction is exempt from the disclosure requirements of TILA.

> 40   At trial, both defendants demonstrated [*78] a familiarity with predatory lending legislation and acknowledged the importance of verifying that residential property being used to secure a commercial loan is not owner-occupied. Even with the time constraints imposed by the pending foreclosure sale, the defendants should - at a minimum - have obtained some form of written verification that Dawson was not living at the Property or that the Property was non-owner-occupied rental property. There was, after all, sufficient time to run a title check and to confirm that there was enough equity in the property to secure the loan. The court finds that there was likewise sufficient time to request and require to be produced by Dawson at least one document - however simple - confirming Dawson's living arrangement or confirming that the tenant believed to be living at the property was the exclusive oc-

cupant of the premises. The defendants did not even secure a scrap of paper identifying Dawson's supposed alternate address. Even if the defendants satisfied themselves, under their own standards, that the Property was non-owner-occupied rental property, an objective standard of reasonableness called for something more.

41    As stated in the court's [*79] recitation of the basic facts, the settlement agent's knowledge that the property was Dawson's primary residence is imputed to Thomas.

The court need not decide the more difficult question of how it would treat a loan arising from a sophisticated borrower's clever and calculated deception of a lender, or how it would treat a loan arising from a collusive arrangement between equally sophisticated parties who together determine to disregard the true purpose of a loan in favor of calling it a commercial loan, because here Dawson's lack of sophistication should have been evident and should have put both defendants on notice that they would need more than Dawson's unsubstantiated verbal statements to support a determination that the transaction was exempt. It was Thomas's duty to make an inquiry reasonably calculated to lead to an accurate determination of whether the Property was Dawson's primary residence or exclusively a rental property. [42] To the extent Thomas had no actual knowledge that the Property was Dawson's primary residence rather than investment property, he had a duty to make further inquiry, and he cannot assert an estoppel defense based upon his lack of knowledge that resulted [*80] from his and Merwin's failure to make such inquiry.

42    Although the facts reflect that Merwin was equally responsible for the inadequacy of the investigation into the purpose of the loan and contributed to Thomas's stated belief that the Property was not owner-occupied, Thomas, as the lender, had the ultimate duty to ensure that the loan complied with state and federal law.

Accordingly, the court rejects the defendants' estoppel argument because neither defendant could have reasonably relied upon Dawson's allegedly misleading statements to conclude that the transaction was exempt from the disclosure requirements of TILA.

D.

THE AFFIDAVIT OF BUSINESS PURPOSE AND RELATED LOAN DOCUMENTS DO NOT ESTABLISH WHETHER THE LOAN WAS FOR A PERSONAL OR BUSINESS PURPOSE

The court gives little weight to the business purpose affidavit and related documents signed by Dawson at settlement in determining whether Dawson entered into a commercial loan transaction. It is well-established that [HN38] an affidavit stating that a loan is for a business purpose is not legally conclusive as to the purpose of that loan. Indeed, "[t]he business or personal nature of [a] loan is a factual question to be answered after evaluating [*81] the circumstances surrounding the transaction." *McGovern v. Smith, 59 Wn. App. 721, 801 P.2d 250, 256 (Wash. Ct. App. 1991).* The same principle holds true with respect to the other documents purporting to put Dawson on notice that she was engaging in a commercial rather than a consumer transaction. The instrument consummating the loan may have included provisions that gave it the superficial appearance of a commercial loan, yet the court finds that the inclusion of such provisions was insufficient to overcome the true character of the loan as a consumer loan. As in the case of other representations made by Dawson (and when combined with those other representations), the business purpose affidavit and related closing documents do not suffice to establish that equitable estoppel should apply (particularly when other closing documents raised red flags regarding the true character of the loan and, as discussed in part C, above, when the defendants performed an inadequate investigation into the true character of the loan).

VI

MERWIN IS NOT A CREDITOR AND IS THEREFORE NOT SUBJECT TO LIABILITY UNDER TILA

[HN39] Only "creditors" are subject to liability under TILA, *15 U.S.C. §§ 1601 - 1667f (2000).* The term creditor [*82] as used in TILA:

> refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement . . . . Any person who originates 2 or more mortgages referred to in subsection (aa) of this section in any 12-month period or any person who originates 1 or more such mortgages through a mortgage broker shall be considered to be a creditor for purposes of this subchapter.

*15 U.S.C. § 1602(f).* [43] [HN40] Thomas was a creditor if he originated a mortgage that is "referred to in *[§ 1602(aa)]* through a mortgage broker." As earlier concluded, Dawson's loan transaction was a mortgage described in *§ 1602(aa)*. In addition, Merwin acted as Dawson's mortgage broker with respect to the loan. Accordingly, Thomas meets the definition of a "creditor" pursuant to *15 U.S.C. § 1602(f)*, and is subject to liability [*83] as a creditor under TILA.

> 43   Regulation Z also confirms that the last sentence of this provision, which was added as part of the HOEPA amendments, see *60 Fed. Reg. 15463, 15464 (1995)*, was intended to expand what it means to regularly extend credit. Specifically, Regulation Z states:
>
> > [HN41] A person regularly extends consumer credit only if it extended credit (other than credit subject to the requirements of *§ 226.32*) more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year. If a person did not meet these numerical standards in the preceding calendar year, the numerical standards shall be applied to the current calendar year. **A person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension that is subject to the requirements of § 226.32 or one or more such credit extensions through a mortgage broker.** [Emphasis added.]
>
> *12 C.F.R. § 226.2(a)(17)(i)* n.3. See also *Viernes v. Executive Mortgage, Inc., 372 F. Supp. 2d 576, 581 (D. Haw. 2004)* (quoting and discussing *12 C.F.R. § 226.2(a)(17) (i)).*

Dawson has not, however, shown that Merwin is a creditor within the meaning of TILA. She has not [*84] shown that the loan was originally payable to Merwin, that Merwin regularly extends consumer credit, or that Merwin otherwise qualifies as a creditor under TILA. Dawson having failed to show that Merwin is a creditor, Merwin is not subject to liability under TILA in connection with this loan. *Wilson v. Homecomings Fin. Network, Inc., 407 F. Supp. 2d 893, 896 (N.D. Ohio 2005)*; *Viernes v. Executive Mortgage, Inc., 372 F. Supp. 2d 576, 580-82 (D. Haw. 2004)* (discussing TILA's defini-

tion of "creditor" and concluding that [HN42] the defendant mortgage broker was not a creditor within the meaning of TILA because broker did not regularly extend consumer credit and was not the person to whom obligation was initially payable); *Robey-Harcourt v. BenCorp Fin. Co., 326 F.3d 1140, 1142 (10th Cir. 2003)* (broker not creditor within meaning of TILA because it did not regularly extend credit and was not the party to whom obligation was initially payable); *DeLeon v. Beneficial Constr. Co., 55 F. Supp. 2d 819, 828 (N.D. Ill. 1999)* (finding that a construction company that referred its client to a broker to secure financing did not qualify as a creditor under TILA's two-prong test); *Moore v. Flagstar Bank, 6 F. Supp. 2d 496, 501 (E.D. Va. 1997)* [*85] (party that prepared form documents used in transaction did not qualify as a creditor under TILA's two-part test); *Noel v. Fleet Fin., Inc., 971 F. Supp. 1102, 1109 (E.D. Mich. 1997)* (comparing non-creditor brokers and agents with true creditors who are directly involved in financing and to whom the obligation in question is initially payable). [44]

> 44   As explained in *DeLeon v. Beneficial Constr. Co., 55 F. Supp. 2d 819 (N.D. Ill. 1999)*, although TILA's definition of a creditor originally "also included any person who regularly 'arrange[d] for the extension of credit,' see *15 U.S.C. § 1602(f) (1981)*, in 1982 Congress deleted the 'arrange' clause, substituting instead part (2) of the present subsection (f) . . . ." *DeLeon, 55 F. Supp.2d at 828*; Regulation Z, *12 C.F.R. 226*, Supplementary Information to Final Rule and Final Official Staff Interpretation (April 6, 1983) ("*Section 103(f)* of the Truth in Lending Act was amended by deleting "arrangers of credit" from the definition of "creditor," effective October 1, 1982 . . . ."). This explains why cases decided under the pre-1982 statute conclude, contrary to current law, that brokers are creditors within the meaning of TILA. See, e.g., *In re Dukes, 24 B.R. 404, 406 (Bankr. E.D. Mich. 1982)* [*86] ("As a matter of law, [the defendant] is a broker who obtains loans for its clients from lenders, an arranger for the extension of consumer credit, and is therefore a creditor under Regulation Z . . . ."); *McGowan v. Credit Ctr. of N. Jackson, Inc., 546 F.2d 73, 75 (5th Cir. 1977)* (both the broker and the lender are creditors under 1969 version of the Truth-in-Lending Act).

VII

THOMAS IS LIABLE FOR VIOLATING TILA

Having determined that the loan is a consumer credit transaction subject to the requirements of TILA, and that Thomas is a creditor subject to liability under TILA, in-

cluding its HOEPA amendments, the court now considers the question of Thomas's liability under those provisions. The defendants having consistently taken the position that TILA and HOEPA are inapplicable to the transaction rather than alleging compliance, it is no surprise that a finding that the loan was a consumer credit transaction carries with it a corresponding finding that Thomas violated the provisions of TILA and the HOEPA amendments.

A.

THE LOAN INCLUDED TERMS PROHIBITED UNDER TILA AND THOMAS FAILED TO MAKE THE REQUISITE DISCLOSURES UNDER TILA

[HN43] Loans subject to *§ 1602(aa)* are prohibited from including terms [*87] that provide, inter alia, for higher interest rates after default or for balloon payments if the term of the loan is less than 5 years. *15 U.S.C. § 1639(d), (e)*. [45] The defendants concede that the loan contains both of these prohibited provisions.

> 45 The amended complaint further alleges that the loan violated HOEPA because it provided for negative amortization. Although the scheduled payments were interest-only, the evidence suggests that they provide for non-amortization rather than negative amortization.

[HN44] HOEPA also prohibits lenders from extending loans subject to the requirements of HOEPA "without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations, and employment." *15 U.S.C. § 1639 (h)*. The defendants made no attempt to verify the employment status or income level of Dawson and Thomas's failure to do so constitutes a further violation of TILA.

In addition to violating the HOEPA amendments to TILA, Thomas also violated [HN45] the general provisions of TILA, which require lenders to make numerous disclosures, most if not all of which Thomas concedes were not made. The finding of even one violation of TILA, no mater how technical, [*88] gives rise to liability. See *Porter v. Mid-Penn Consumer Disc. Co. (In re Porter), 961 F.2d 1066, 1078 (3d Cir. 1992)* ("TILA achieves its remedial goals by a system of strict liability in favor of the consumers when mandated disclosures have not been made. A creditor who fails to comply with TILA in any respect is liable to the consumer under the statute regardless of the nature of the violation or the creditor's intent. Once the court finds a violation, no matter how technical, it has no discretion with respect to liability." (Internal quotations and citations omitted.)).

B.

RESCISSION

[HN46] TILA requires that a borrower's rescission rights be clearly and conspicuously disclosed by the lender in accordance with regulations promulgated by the Board. *15 U.S.C. § 1635(a)*. A borrower's right to rescind expires after three days unless the lender failed to provide the requisite notice and disclosures, in which case the borrower has three years to rescind the loan. *15 U.S.C. § 1635 (a), (f)*. Thomas does not dispute that he failed to make the requisite disclosures relating to Dawson's right to rescind. Accordingly, Dawson had three years in which to rescind the transaction.

The record reflects that [*89] Dawson's only rescission "demand" was made by way of the complaint. The complaint having clearly expressed Dawson's intent to rescind, the court finds that service of the complaint on Thomas constituted notice of rescission under *§ 1635*. See *Jackson v. U.S. Bank Nat'l Ass'n Tr., 245 B.R. 23, 33 (Bankr. E.D. Pa. 2000)* (awarding damages for creditor's refusal to effect a rescission that was demanded by way of a complaint).

The procedure for undoing a transaction after a borrower exercises her right to rescind is set forth in *15 U.S.C. § 1635(b)*, which provides as follows:

> [HN47] When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to [*90] the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay

for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

As a preliminary matter, the court determines that, [HN48] notwithstanding § 1635(b), Dawson's attempted exercise of her right of rescission did not automatically void Thomas's security interest or in any way modify the debt owed by Dawson to Thomas. Dawson's right to rescission was subject to legitimate dispute in this litigation, and Thomas was under no obligation to honor Dawson's request until this court determined that Dawson actually possessed a right of rescission. See *Am. Mortgage Network, Inc. v. Shelton, 486 F.3d 815 (4th Cir. 2007)* [*91] ("The natural reading of *[§ 1635(b)]* is that the security interest becomes void when the obligor exercises a right to rescind that is available in the particular case, either because the creditor acknowledges that the right of rescission is available, or because the appropriate decision maker has so determined . . . . Until such decision is made, the [borrowers] have only advanced a claim seeking rescission." (quoting *Large v. Conseco Fin. Servicing Corp., 292 F.3d 49, 54-55 (1st Cir. 2002)*, and rejecting the minority position adopted by the Eleventh Circuit in *Williams v. Homestake Mortgage Co., 968 F.2d 1137, 1141-42 (11th Cir. 1992)*, that rescission is automatic). Accordingly, the court finds that Thomas is not subject to liability for failing to rescind the transaction prior to this court's determination that Dawson is entitled to rescission. Accordingly, Dawson's request for attorney's fees and $ 2,000 in statutory damages under *15 U.S.C. § 1640(a)(2)(A)(iii)* based upon Thomas's failure to rescind the transaction in conformity with TILA is denied. [46]

46    As will be seen, however, such damage remedies are available for other violations, and Dawson is entitled to recover her attorney's [*92] fees and the maximum of $ 2,000 in statutory damages.

Second, the court determines that, notwithstanding the court's finding that Dawson is entitled to rescission, to the extent Dawson still wishes to exercise her right of rescission, the court will require Dawson to return to Thomas the proceeds of the loan before requiring that Thomas void his security interest in Dawson's real property.

The court is mindful that the express language of TILA contemplates that, unless the court orders otherwise, after a borrower notifies a creditor of its intent to exercise its right to rescission, the borrower may retain possession of the creditor's property until the lender has taken the necessary steps to void the security interest.

[HN49] The TILA rescission remedy, however, despite being statutorily granted, "remains an equitable doctrine subject to equitable considerations." *Brown v. Nat. Permanent Fed. Sav. & Loan Assoc'n, 221 U.S. App. D.C. 125, 683 F.2d 444, 447 (D.C. Cir. 1982)*. Recognizing that rescission is an equitable remedy, the court of appeals for this circuit has twice concluded that, notwithstanding that TILA does not make the borrower's return of funds a prerequisite to rescission under TILA, the trial court has [*93] the equitable power to condition rescission upon the return of the loan proceeds to the lender. See *id. at 447, 449* (reaching that conclusion even under a prior version of § 1635(b) that did not include the last sentence authorizing the court to alter the procedures of rescission); *Etta v. Seaboard Enters., Inc., 218 U.S. App. D.C. 254, 674 F.2d 913, 919 (D.C. Cir. 1982)* (same). [47]

47  See also *Yamamoto v. Bank of New York, 329 F.3d 1167, 1171 (9th Cir. 2003)* ("A trial judge ha[s] the discretion to condition [TILA] rescission on tender by the borrower of the property he had received by the lender . . . . [W]hether a decree of rescission should be conditional depends upon the equities present in a particular case . . . ." (internal quotations and citations omitted)); *Stanley v. Household Fin. Corp. III (In re Stanley), 315 B.R. 602, 615 (Bankr. D. Kan. 2004)* (voiding of security interest is one of rescission procedures under TILA and can be equitably modified, by requiring payment of loan proceeds as a condition, and Regulation Z § 226.23(d)(4), which provides to the contrary, is an impermissible construction of *TILA § 1635(b)*); *Quenzer v. Advanta Mortgage Corp. USA, 288 B.R. 884, 888 (D. Kan. 2003)*. But see, [*94] e.g., *Williams v. BankOne, N.A. (In re Williams), 291 B.R. 636, 657-58 (Bankr. E.D. Pa. 2003)* ("The language of § 1635(b) and Regulation Z as supported by the legislative history to § 1635(b) informs that, while courts can modify the procedures set forth in § 1635(b), they cannot modify the voiding of a creditor's security interest.").

At the time of trial, Dawson was in bankruptcy and had already exhausted all of the proceeds from the loan. The court is skeptical of Dawson's ability to return the loan proceeds, unless she were to sell her home, and it would be inequitable to require Thomas to terminate his security interest in Dawson's property if Dawson refuses to take that step in order to raise the funds necessary to fulfill her reciprocal duty to return the loan proceeds to Thomas and otherwise has no ability to effect such a return. It is "[t]he equitable goal of rescission under TILA . . . to restore the parties to the 'status quo ante,'" *Shelton, 486 F.3d at 820*, and conditioning Thomas's

duty to terminate his security interest only upon Dawson's return of the loan proceeds is consistent with that goal. To the extent that the court must consider all of the equities in the case [*95] in deciding whether to so condition rescission, the equities weigh in favor of doing so. Dawson's house was already encumbered by a deed of trust that was brought current only by reason of Thomas's advancing funds to reinstate the note secured by that deed of trust, thereby reducing that mortgage obligation on her property in a like amount. In addition, the other funds borrowed by Dawson from Thomas were borrowed for the purpose of improving the home. Although Thomas, through his own actions and through Merwin's actions on his behalf, acted recklessly in not reasonably ascertaining whether the loan was actually being obtained for a commercial purpose, Thomas will be subjected to statutory damages, an elimination of all finance charges, and an award to Dawson of her attorney's fees. That will serve to punish his misconduct. Moreover, Dawson was not blameless in the transaction, having made false representations to Merwin regarding where she resided. [HN50] In the District of Columbia, an individual may exempt her entire principal residence. *D.C. Code § 15-501(a)(14)* (2001 & Supp. 2005). Although *§ 15-501(a)(14)* was enacted in 2001, well before the transaction in the year 2003 at issue here, [*96] the result of that provision would be to strip Thomas of any likelihood of recovery if his security interest is voided without requiring Dawson's repayment of what she received in the transaction as a condition to the voiding of the security interest, a windfall not justified by the equities of this case.

Accordingly, Thomas will be required within 20 days after entry of this decision to deposit in the registry of the court a release of his deed of trust, but that release may recite that it is effective only when the original is recorded with the Recorder of Deeds of the District of Columbia. Once Dawson has performed her reciprocal duty to return the net loan proceeds she received to Thomas, "the court will direct the clerk to deliver the release to Dawson and, because *§ 1635(b)* contemplates that the lender is the party required to take steps "to reflect the termination of [the] security interest," the court will additionally direct that Thomas, upon receiving all of the net loan proceeds from Thomas, shall file a duplicate signed original with the Recorder of Deeds.

[HN51] Once a court determines that rescission is appropriate, the court may allow the borrower a time certain to tender the [*97] net loan proceeds. *American Mortgage Network, Inc. v. Shelton, 486 F.3d at 821.* Bearing in mind that rescission is an equitable remedy, and that Thomas woefully neglected his duties under TILA, it is appropriate to give Dawson a reasonable period of time within which to tender the net loan proceeds.

Some courts permit a borrower to repay the net loan proceeds in installments. See, e.g., *Sterten v. Option One Mortgage Corp. (In re Sterten), 352 B.R. 380, 387-88 (Bankr. E.D. Pa. 2006)*, rev'd on other grounds, *479 F. Supp. 2d 479 (E.D. Pa. 2007)*; *Mayfield v. Vanguard Sav. & Loan Ass'n, 710 F. Supp. 143 (E.D. Pa. 1989)* (borrower given almost eight years to repay the lender). Here, there is no suggestion that Dawson has the financial ability to pay in regular monthly installments the $ 20,499.16 in property she has received, directly or indirectly, and retained as a result of the transaction. [48] However, she should safely and easily be able to sell her home within a period of 18 months after Thomas deposits a release of his deed of trust, if not sooner, and tender the net loan proceeds to Thomas at closing of such a sale. That generous period of time to restore the status quo is, again, [*98] justified by the egregious failure of Thomas to comply with multiple requirements of TILA.

> 48  Dawson received, directly or indirectly, a total of $ 23,340.50 in property as a result of the transaction, but has already paid back $ 2,841.34. It is appropriate that the $ 23,340.50 includes two items even though they were paid to third parties: the $ 8,629.77 reinstatement amount Dawson owed on her existing mortgage and the $ 503.97 in real property taxes paid incident to the transaction as property received by Dawson. See *Mayfield v. Vanguard Sav. & Loan Ass'n, 710 F. Supp. 143, 148 (E.D. Pa. 1989).* The existing mortgage and the real property taxes were existing credit obligations of Dawson and thus not incurred as part of the credit transaction at issue. However, all of the other charges Dawson incurred in the transaction (including interest under the deed of trust note), regardless of whether Thomas profited from them, are not amounts that Dawson is deemed to have received in the transaction and Dawson is not responsible for tendering such amounts to Thomas.

Because I am giving Dawson a generous period of time within which to sell her home, I will, as in Sterten, require that, commencing [*99] on the date that Thomas deposits the release of his security interest with the court, the repayment of the net loan proceeds shall include interest not at the contract rate, but at a rate otherwise provided by law for the use of money, as an equitable requirement for permitting Dawson's delay in making her tender as part of the rescission remedy. Were I not to impose a provision for interest, Dawson would have every incentive to delay tendering repayment until just prior to the end of the 18-month period for making tender. [HN52] Under *D.C. Code § 28-3302(a)* "[t]he rate of interest in the District upon the loan or forbearance of money, . . . in the absence of expressed contract, is 6%

per annum." Accordingly, I will require that the repayment include interest at 6% per annum commencing on the date that Thomas files a notice of his depositing a release of his deed of trust. Interest prior to then is not appropriate as Thomas's violations of TILA were egregious, Thomas insisted on judicial resolution of whether he violated TILA (thereby engendering delay), and TILA contemplates that all finance charges (including interest owed under the parties' contract) are excused in making rescission. [49] [*100] But once rescission is decreed to be appropriate, restoring the parties to the status quo should be measured as though both parties carried out their rescission duties simultaneously, it then being appropriate to charge the borrower with interest at the legal rate in the District of Columbia for the forbearance of money (in the absence of express contract) in order to assure that what Thomas receives is equal in value to what he would receive were he paid upon depositing a release of his deed of trust. In addition, Dawson will be required within 20 days to advise the court whether she still elects to pursue the rescission remedy, and, if she does so elect, then, as a condition to permitting her the option attempting to effect a rescission, any repayment of the loan (even if rescission is not effected) shall include the 6% per annum interest charge commencing on the date that Thomas files notice depositing the release of his deed of trust with the court.

49    *Rachbach v. Cogswell, 547 F.2d 502, 505 (10th Cir. 1976),* found, based upon "an incomplete record," no abuse of discretion in a trial court's having imposed as an equitable condition to rescission an award of interest on the unpaid [*101] principal of the loan from the date of the transaction. I choose to follow instead *Semar v. Platte Valley Fed. Sav. & Loan Ass'n, 791 F.2d 699, 706 (9th Cir. 1986),* (stating that Rachbach v. Cogswell "contravenes *15 U.S.C. § 1635(b),* which states that a borrower is not liable for any finance charge, and *15 U.S.C. § 1605(a),* which lists interest as an example of a finance charge. We defer to Congress' method of enforcing TILA and follow the plain language of the statutes." (footnote omitted)). However, Semar does not preclude the imposition ofstatutory interest for the period after entry of a court's rescission decree. Because [HN53] *§ 1635(b)* permits the court to modify the procedures of rescission, it permits the court to grant Dawson a delay in making her required tender and, correspondingly, to impose interest at the statutory rate during the period of her delayed performance in rescinding the transaction *after* Thomas deposits his release. Dawson can avoid interest altogether by making prompt tender of the net amounts she obtained.

In making a return of the loan proceeds not yet repaid, the amount Dawson must repay may be reduced by the amounts of statutory damages and attorney's fees [*102] that she recovers. See *Mayfield, 710 F. Supp. at 149.* Cf. *Harris v. Tower Loan of Miss., Inc., 609 F.2d 120, 123 (5th Cir.),* cert. denied, *449 U.S. 826, 101 S. Ct. 89, 66 L. Ed. 2d 30 (1980)* (when (unlike here) a lender has received sums from the obligor as part of the transaction, the lender must refund such sums as part of the rescission process, but *§ 1635(b)* does not bar that lender's offsetting the value owed to it by the obligor from the sum it must tender to the obligor). There are, however, decisions which bar a lender's setting off TILA damage and attorney fee awards against obligations owed the lender. *Dias v. Bank of Haw., 732 F.2d 1401, 1402 (9th Cir. 1984); Wright v. Tower Loan of Mississippi, Inc., 679 F.2d 436, 446 (5th Cir. 1982); Plant v. Blazer Financial Services, Inc., 598 F.2d 1357, 1366 (5th Cir. 1979)* ("To allow a setoff would in effect relieve the creditors in violation of the Act of the attorney's fee expense in the case of an insolvent debtor."); *Olevares v. Viking Dodge, Inc., 626 F. Supp. 114 (N.D. Ill. 1985).* When a borrower is rescinding her mortgage transaction, she affirmatively wants to see the lender paid the full tender amount required of her so that she accomplishes the rescission, and  [*103] one might argue that it should not matter to her that the dollars she utilizes to accomplish that are the judgment amounts she recovers against the lender or independent sums. Moreover, a court should arguably structure the rescission remedy in a manner that restores the status quo as promptly as possible, and giving immediate credit for judgment amounts owed by Thomas to Dawson would accomplish that purpose and would be a permissible modification of the rescission remedy under the last sentence of *§ 1635(b).*

However, Dawson may continue to need the services of her attorney in order to bring this proceeding to a successful conclusion, and requiring a setoff of her attorney fee award against her rescission tender obligation might prevent a recovery of moneys she needs to fund continued litigation of this matter (including any appeals). Because TILA should be construed in a manner that advances its enforcement goals, I will not require such a setoff, and I will direct Dawson within 20 days after entry of this decision to advise whether she wishes to exercise such a setoff (in whole or in part). (To the extent that she exercises such setoff, the setoff shall be effective as of the date  [*104] of this decision.) The same will apply to the $ 2,000 statutory damage award that the court will make, below, pursuant to *§ 1640(a)(2)(A)(iii).* But, for reasons explored later, as to any recovery under *§ 1640(a)(4),* the court will require that, if Dawson files notice within the required 20 days that she elects to continue to pursue the rescission remedy, such *§ 1640(a)(4)*

recovery shall be set off against Dawson's obligations under the loan.

C.

### ACTUAL AND STATUTORY DAMAGES

Dawson has shown that Thomas committed multiple violations of TILA in connection with this loan. [HN54] *Section 1640 of 15 U.S.C.*, which governs civil liability for violations of TILA, provides in pertinent part that:

> [HN55] (a) Except as otherwise pro-
> vided in this section, any creditor who
> fails to comply with any requirement im-
> posed under this part, including any re-
> quirement under *section 1635* of this title,
> or part D or E of this subchapter with re-
> spect to any person is liable to such per-
> son in an amount equal to the sum of --
>
> (1) any actual damage sustained by
> such person as a result of the failure;
>
> (2)(A)(i) in the case of an individual
> action twice the amount of any finance
> charge in connection with the transaction,
> (ii) in the [*105] case of an individual ac-
> tion relating to a consumer lease under
> part E of this subchapter, 25 per centum
> of the total amount of monthly payments
> under the lease, except that the liability
> under this subparagraph shall not be less
> than $ 100 nor greater than $ 1,000, or
> (iii) in the case of an individual action re-
> lating to a credit transaction not under an
> open end credit plan that is secured by
> real property or a dwelling, not less than $
> 200 or greater than $ 2,000; . . . .
>
> (3) in the case of any successful ac-
> tion to enforce the foregoing liability or in
> any action which a person is determined
> to have a right of rescission under *section
> 1635* of this title, the costs of the action,
> together with a reasonable attorney's fee
> as determined by the court; and
>
> (4) in the case of a failure to comply
> with any requirement under *section 1639*
> of this title, an amount equal to the sum of
> all finance charges and fees paid by the
> consumer, unless the creditor demon-
> strates that the failure to comply is not
> material.

[HN56] Having established numerous violations of TILA, Dawson is entitled to: (1) actual damages, *15 U.S.C. § 1640(a)(1)*; (2) statutory damages of not less than $ 200 and not greater than $ 2,000, [*106] *§ 1640(a)(2)(A)(iii)*; (3) costs and reasonable attorney's fees, *§ 1640(a)(3)*; and, unless Thomas shows that his failure to comply with *§ 1639* was not material, (4) "an amount equal to the sum of all finance charges and fees paid by the consumer," *§ 1640(a)(4)*.

Dawson has not established actual damages. The court will, however, award Dawson $ 2,000 in statutory damages under *§ 1640(a)(2)(A)(iii)*. The finance charges Dawson paid at closing were $ 11,659.50 (including $ 10,000.00 in lender's and broker fees (Thomas's lender fee of $ 5,000.00 and Merwin's mortgage broker fee of $ 5,000.00)), and twice that amount pursuant to *§ 1640(a)(2)(A)(i)* would be in excess of $ 20,000.00. Al-though the starting point for computing statutory dam-ages for a closed-end mortgage like Dawson's is to calcu-late twice the finance charges under *§ 1640(a)(2)(A)(i)*, the statute caps the amount that may be recovered in the case of a closed-end mortgage on real property at $ 2,000.00 pursuant to *§ 1640(a)(2)(A)(iii)*. *Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 62, 125 S. Ct. 460, 160 L. Ed. 2d 389 (2004)*. Prejudgment interest is not allowed on an award of TILA statutory damages. *Marshall v. Sec. State Bank of Hamilton (In re Mar-shall), 970 F.2d 383 (7th Cir. 1992)*. [*107] Dawson is also entitled to recover attorney's fees and costs.

That leaves the question of whether Dawson is enti-tled to a recovery under *§ 1640(a)(4)*. The failure to comply with *§ 1639* was material, and thus under *§ 1640(a)(4)* Dawson may recover the $ 11,659.50 and $ 2,841.34 in finance charges and fees paid, respectively, at and after closing.

[HN57] *Section 1635(b)* expressly provides that in rescinding under *§ 1635(a)*, the obligor "is not liable for any finance or other charges" and *§ 1640(a)(4)* in turn provides for an affirmative recovery of paid finance charges and fees. But a borrower ought not both collect under *§ 1640(a)(4)* the amount of finance charges and fees paid to a lender and effect a rescission by paying back a loan amount reduced by the amount of finance charges and fees that were paid for out of the borrowed funds. The borrower is required to return whatever amounts were lent to her. Here, Dawson borrowed $ 35,000.00, which included the $ 11,659.50 necessary to pay finance charges at closing. In making rescission, Dawson is obligated to repay that $ 11,659.50. Dawson may not both have her cake and eat it too.

Because [HN58] rescission is an equitable remedy of restoring the status [*108] quo, it makes sense to treat any recovery of the $ 11,659.50 in paid finance charges

pursuant to *§ 1640(a)(4)* as being applied to Dawson's obligation to repay a like amount of $ 11,659.50 of the lent funds. Similarly, the $ 2,841.34 in finance charges (consisting of interest-only charges) paid after closing may be recoverable under *§ 1640(a)(4)*, but in the interest of restoring the status quo promptly as part of the rescission process, that $ 2,841.34 amount should be treated as a credit towards repaying the lent amounts. See *Sparkman v. Parkway Mortgage, Inc. (In re Bell), 314 B.R. 54, 58 (Bankr. E.D. Pa. 2004)* (declining to reconsider judgment dismissing *§ 1640(a)(4)* claims: "the Debtor's damages under *§ 1640(a)(4)* will be recognized because the Loan has been rescinded and the Debtor will receive a credit against her repayment amount for all payments that she previously made to Parkway."). Cf. *Armstrong v. Nationwide Mortgage Plan/Trust (In re Armstrong), 288 B.R. 404, 427 (Bankr. E.D. Pa. 2003)* (no damages were recoverable under state consumer protection statute if the loan was being rescinded); *In re Bell, 314 B.R. at 59* (same). Exercising equitable discretion in fixing the terms **[*109]** of rescission, the court will require that if Dawson files a notice within 20 days that she will proceed with rescission, then, even if she does not later take the steps to effect the rescission, the $ 14,500.84 in paid finance charges recoverable under *§ 1640(a)(4)* will be treated as applied to the $ 35,000.00 principal amount of the loan, reducing the principal amount of the loan to $ 20,499.16.

[HN59] Dawson is entitled to both rescind under *§ 1635* and recover any double statutory damages imposed by *§ 1640(a)(2)(A)*. See *Etta v. Seaboard Enterprises, Inc., 218 U.S. App. D.C. 254, 674 F.2d 913, 919 (D.C. Cir. 1982)* (citing *Eby v. Reb Realty, Inc., 495 F.2d 646 (9th Cir. 1974)*, and other decisions upholding the propriety of allowing both double damages under *§ 1640(a)* and rescission). Logically that holding applies to damages under *§ 1640(a)(4)* as well. Etta recognized that the damages to which the borrower was entitled "may be deductible in their entirety from the payment due on the notes." *Etta, 674 F.2d at 919.* Nothing in Etta suggests that in equitably fixing the terms of rescission, [HN60] the court may not require that the *§ 1640(a)(4)* recovery to be set off immediately against the outstanding principal required to **[*110]** be paid to effect a rescission. Unlike *§ 1640(a)(2)(A)(iii)*, *§ 1640(a)(4)* permits a recovery only of "finance charges and fees *paid* by the consumer" (emphasis added), and the purposes of *§ 1640(a)(4)* of undoing such a payment are fully effectuated, when rescission is elected, in treating the amount of finance charges and fees recoverable under *§ 1640(a)(4)* as immediately set off against and reducing the borrowed amount required to be repaid by the borrower to effect a rescission. [50]

50   Even when double damages under what is now *§ 1640(a)(2)(A)* were at issue, the court in Eby stated:

> [W]hile we hold that *sections 1635* and *1640* do not set forth exclusive remedies, we do not say that a court must always grant both forms of relief when requested. These two separate provisions can result in a sometimes harsh penalty. In the absence of any clear congressional statement, we think a request for both forms of relief is addressed to a court's sense of equity and may properly be denied in appropriate cases.

*Eby, 495 F.2d at 652.* It readily follows that [HN61] when both rescission and *§ 1640(a)(4)* relief are sought, a court may require that the *§ 1640(a)(4)* recovery be set off immediately against the principal **[*111]** of the loan in fixing the amount that must be repaid to effect a rescission. Requiring instead that the lender pay the *§ 1640(a)(4)* damages prior to the receipt of a delayed tender by the borrower of the amount necessary to effect an announced intention to rescind would be unduly harsh, and inconsistent with the equitable goal in rescission of restoring the status quo.

If Dawson fails to file notice that she intends to proceed with rescission, then she will be entitled to either recover finance fees and charges paid incident to the transaction or to set those amounts off against the existing debt. The finance charges paid totaled $ 14,500.84. Dawson is entitled to recover that $ 14,500.84 pursuant to *§ 1640(a)(4)*. She may, however, set off the $ 14,500.84 against her loan obligations, and that would count as part of her repayment of the $ 35,000 loan. [51]

51   The parties have not addressed the impact of such a reduction of the loan obligation via setoff on the repayment terms. If Dawson timely announces that she will pursue rescission and effects the rescission, then the issue will be academic. If she does not, then the obligation is treated as having been $ 35,000, and if the $ 14,500.84 **[*112]** recovery under *§ 1640(a)(4)* is set off against that obligation, it is equitable to treat that $ 14,500.84 as counting towards Dawson's monthly loan payments, with Dawson being in default only if she missed a monthly payment

once the amount of required monthly loan payments exceeded $ 14,500.84.

The loan terms required payments of $ 466.67, and, as explored later, under TILA, Dawson is not liable for interest charges. Consequently, the $ 14,500.84 in monthly payments would be applied to principal as the note provided that "[e]ach installment when so paid [is] to be applied first to the payment of late charges, second to the payment of interest . . ., and the balance thereof . . . to the principal." Monthly payments that Dawson made or makes in addition to that $ 14,500.84 would be applied first to late charges, if any, and then to principal.

Within 20 days after entry of this decision, if Dawson does not file a notice that she intends to proceed with rescission, she shall file a notice stating whether she desires entry of a judgment to recover the $ 14,500.84 or, instead, a judgment decreeing that the $ 14,500.84 is set off against the mortgage debt.

If Dawson does not effect a rescission [*113] (either by electing not to file a notice of her intention to proceed with rescission or by reason of failing timely to pay the amount required to effect a rescission), she nevertheless will have no liability under the note for finance charges and fees financed via the loan. The loan's eye-popping interest rate of 16% (which increased automatically to 24% upon Dawson's default) and fees and charges of $ 11,659.50 paid at closing that constituted new obligations imposed on Dawson (out of a loan for only $ 35,000) are precisely the types of damage that §§ 1639 and 1640(a)(4) are designed to prevent. An affirmative defense to a debtor's invocation of § 1640(a)(4) is that under 15 U.S.C. § 1640(e), an action for affirmative relief under § 1640(a)(4) must be brought within one year, but for reasons already discussed, that affirmative defense does not apply here. Moreover, [HN62] 15 U.S.C. § 1640(h) contemplates that a debtor may assert a violation of TILA in a timely action, and thus, pursuant to her timely action, Dawson is entitled to a declaration that she no longer owes finance charges and fees, not simply to recover finance charges and fees already paid.

Even if Dawson's action had been untimely, [*114] she is entitled to a declaration of whether she no longer owes finance charges and fees. Once Thomas filed a proof of claim, Dawson was entitled to raise the TILA violations as a defense to the proof of claim. [HN63] Section 1640(h) bars a debtor from setting off statutory double damages under § 1640(a)(2) against his mortgage debt unless the amount of the creditor's liability under TILA has been established by a court judgment. Accordingly, a debtor could ordinarily invoke such damages only via an action brought within the one-year statute of

limitations of § 1640(e) on pursuing an action for affirmative relief under § 1640. But [HN64] § 1640(e) clarifies that its one-year statute of limiations:

> does not bar a person from asserting a violation of this subchapter in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law.

See also 15 U.S.C. § 1640(h) (consumer in default on the mortgage obligation may assert a TILA violation "as an original action" (meaning an action not barred by the one-year statute of limitations of § 1640(e)) "or [*115] as a defense or counterclaim to an action to collect amounts owed by the consumer brought by a person liable under [TILA]." [HN65] By way of recoupment, a debtor may assert TILA violations in response to a creditor's proof of claim in order to limit the extent of the creditor's recovery on its claim. See Coxson v. Commonwealth Mortgage Co. of America (In re Coxson), 43 F.3d 189, 194 (5th Cir. 1995); Tarver v. CitiFinancial Auto, Ltd. (In re Tarver), 2007 Bankr. LEXIS 2222, 2007 WL 1876369 (Bankr. M.D. Ala. June 28, 2007); Sinclair v. Wash. Mut. Home Loans, Inc. (In re Sinclair), 2004 Bankr. LEXIS 1415, 2004 WL 2192587 (Bankr. D. Kan. 2004); Woolaghan v. United Mortg. Servs, Inc., 140 B.R. 377 (Bankr. W.D. Pa. 1992). Although the proof of claim is no longer being asserted because the case has been dismissed, the dispute is not moot because it is capable of repetition. Accordingly, the court will declare that even if Dawson does not rescind, she will not be liable for finance charges, including interest.

If Dawson elects to pursue rescission, the court will require that Thomas recover interest at 6% per annum on the $ 20,499.16 from the date on which Thomas deposits his release of his deed of trust. If she does not elect to pursue the rescission [*116] option, the note will not bear any interest, but the deed of trust will be enforceable immediately in the event of a default in monthly payments (after taking into account any setoff amount that Dawson elects to invoke).

VIII

VIOLATION OF THE D.C. HOME LOAN PROTECTION ACT

[HN66] The D.C. Home Loan Protection Act, D.C. Code §§ 26-1151.01-1155.01 (2002) ("HLPA"), prohibits certain predatory lending practices with respect to residential loans that fall within the statute's definition of

"covered loan." Pursuant to *§ 26-1151.01(7)(A)*, [HN67] a covered loan is:

> a mortgage loan, secured by property located in the District (including an open-end line of credit, but not including a mortgage loan insured or guaranteed by a state or local authority, the District of Columbia Housing Finance Agency, the Federal Housing Administration, or the Department of Veteran Affairs, or a reverse mortgage transaction), in which the terms of the mortgage loan exceed one or more of the following thresholds:
>
> (i) The loan is secured by a first mortgage on the borrower's principal dwelling and the annual percentage rate at closing will exceed by more than 6 percentage points the yield on United States Treasury securities having [*117] comparable periods of maturity to the loan maturity measured as of the 15th day of the month immediately preceding the month in which the application for the residential mortgage loan is received by the creditor;
>
> (ii) The loan is secured by a junior mortgage on the borrower's principal dwelling and the annual percentage rate at closing will exceed by more than 7 percentage points the yield on United States Treasury securities having comparable periods of maturity to the loan maturity measured as of the 15th day of the month immediately preceding the month in which the application for the residential mortgage loan is received by the creditor; or
>
> (iii) The origination/discount points and fees payable by the borrower at or before loan closing exceed 5% of the total loan amount.

[HN68] A mortgage loan, in turn, is defined in *§ 26-1151.01(14)(A)* to mean:

> Any loan or other extension of credit:
>
> (i) To a natural person primarily for personal, family, or household purposes;
>
> (ii) That is secured by a lien instrument secured, in whole or in part, by residential real property located within the

District which there is located, or there is to be located, a structure, intended principally for occupancy of from [*118] one to 4 families, and which is, or will be, occupied by the borrower as the borrower's principal dwelling; and

> (iii) For which the principal amount does not exceed the conforming loan size limit for a comparable dwelling as established and revised from time to time by the Federal National Mortgage Association or the Federal Home Loan Corporation.

The defendants concede that if the court determines that the loan was obtained primarily for personal, family or household purposes, the loan falls within the statute's definition of a covered loan. See [HN69] *D.C. Code § 26-1151.01(7)(A)* (loan must be a "mortgage loan" to qualify as a covered loan); *D.C. Code 26-1151.01(14)(A)(i)* (a "mortgage loan" is a loan "[t]o a natural person primarily for personal, family, or household purposes."). There is likewise no dispute that if the court determines that the loan is a covered loan, the defendants' failure to make certain disclosures as well as the inclusion of prohibited provisions in the loan violated the Act. As explained in further detail below, the court determines that the loan was a covered loan within the meaning of the statute and that the defendants violated the D.C. Home Loan Protection Act.

A.

THE [*119] LOAN WAS OBTAINED PRIMARILY FOR PERSONAL, FAMILY, OR HOUSEHOLD PURPOSES AND IS A COVERED LOAN WITHIN THE MEANING OF THE D.C. HOME LOAN PROTECTION ACT

As discussed earlier in this opinion, Dawson obtained the loan for primarily personal rather than business purposes. Having so found, and there being no dispute that the fees associated with the loan exceed 5% of the amount of the loan, the court concludes that the loan is a covered loan within the meaning of the D.C. Home Loan Protection Act, *D.C. Code §§ 26-1151.01-1155.01*.

B.

DAWSON IS NOT EQUITABLY ESTOPPED FROM ASSERTING A CLAIM UNDER THE D.C. HOME LOAN PROTECTION ACT

Although the court rejects the defendants' contention that the loan was obtained primarily for business or commercial purposes, the defendants argue that Dawson

is nevertheless equitably estopped from pursuing her HLPA claim or has waived any such claim because she supplied materially incorrect information in connection with her loan application leading the defendants to believe that the loan was not a covered loan, to wit, Dawson indicated that she did not live at the property and she signed an affidavit stating that the loan was being obtained for the commercial purpose [*120] of renovating the house for sale. [52] The court rejects the defendants' estoppel defense because any reliance upon Dawson's representations as to the property not being her primary residence or her written contention, as memorialized in the commercial purpose affidavit, that the loan was a commercial loan, was unreasonable.

> 52  In making this argument, the defendants are not entitled to rely on [HN70] *D.C. Code § 26-1152.02(c)*, which permits lenders to challenge a borrower's HLPA claim in situations where a lender's violation arose from a borrower having provided materially false information in connection with his or her loan application. To invoke this provision, lenders are required to show that they made a reasonable attempt to verify the current and expected income and debts of the borrower, which the defendants in this case failed to do. Dawson urges that, because *§ 26-1152.02(c)* is an express statutory provision addressing a lender's rights when the borrower has made material misrepresentations, the defendants may only look to this express provision of HLPA and may not instead rely upon equitable defenses.
>
> Although the defendants may, in fact, be required to look to this express provision [*121] if they wish to defend on the basis that Dawson is guilty of misrepresenting the purpose of the loan, the court need not resolve the question of whether an equitable remedy is available notwithstanding *§ 26-1152.02(c)* because, even if the defendants are entitled to assert an estoppel defense, the court finds that the defendants did not reasonably rely upon Dawson's alleged misrepresentations and the defense is rejected accordingly.

## C.

### THE DEFENDANTS VIOLATED THE D.C. HOME LOAN PROTECTION ACT

(1) The defendants failed to make an independent determination of the debtor's ability to repay under *§ 26-1152.02*.

[HN71] *Section 26-1152.02(a)* of the D.C. Home Loan Protection Act prohibits lenders from making covered loans "if the borrower, at the time that the covered

loan is closed, cannot reasonably be expected to make the scheduled payments." The statute further provides that "[t]he lender's consideration shall include the ability to make any payments for mortgage insurance premiums, escrow deposits, or direct payment of real estate taxes and property insurance premiums (in addition to the payments of interest and principal) and the employment status of the borrower. The lender may consider the current [*122] and expected income, current obligations, and other financial resources of the borrower (other than the borrower's equity in the dwelling which secures repayment of the loan)." *§ 26-1152.02(a)(1)* (emphasis added). Although the lender may consider the borrower's equity in the dwelling to evaluate the borrower's likelihood of default, for purposes of evaluating the borrower's ability to make the scheduled payments "[t]he lender shall not consider the borrowers' equity interest in the residential real property which secures repayment of the covered loan." *D.C. Code § 26-1152.02(a)(2)*.

Thus, in assessing Dawson's ability to make the scheduled monthly payments, Thomas was required, at a minimum, to consider the employment status of Dawson. The record reflects that no effort was made by either defendant to determine, inter alia, whether Dawson was employed. Accordingly, Thomas violated *D.C. Code § 26-1152.02* by failing adequately to investigate whether Dawson could reasonably be expected to make the scheduled payments.

At trial, Thomas emphasized his expectation that the Property would be sold and the proceeds thus made available to Dawson to pay the balloon payment called for under the loan. [*123] Thomas took the position that this satisfied his obligation to verify Dawson's ability to repay the loan. [HN72] Although such consideration is appropriate in determining whether a borrower can reasonably be expected to make the required balloon payment, *D.C. Code § 26-1152.02(a)(3)*, [53] that alone does not discharge a lender's broader obligation under *D.C. Code § 26-1152.02(a)* to determine whether a borrower can be reasonably expected to make all of the scheduled payments, which includes the monthly payments. [54]

> 53  [HN73] Where a covered loan "includes payment terms under which the aggregate amount of the scheduled payments will not fully amortize the outstanding principal balance, the lender's determination of the ability of the borrowers to make an expected balloon payment at the scheduled maturity date may include consideration of the borrowers' equity interest in the residential real property and the borrowers' ability, based on current market conditions, to refinance the covered loan without penalty, hardship, or material loss of equity." *D.C. Code § 26-1152.02(a)(3)*.

54   Defendant Merwin testified that borrowers often use disbursed funds to meet their payment obligations. It would have been unreasonable, [*124] however, for the defendants to assume that Dawson would use the disbursed funds to make her monthly payments. There is no evidence that the defendants ever discussed such use of the funds with Dawson and there is likewise no evidence that Dawson ever indicated an intention to use the loan proceeds to meet her payment obligations. Furthermore, if the defendants were expecting Dawson to use the disbursed funds to meet her monthly payment obligations, such a belief directly contradicts the defendants' stated belief that the intended use of those proceeds was the renovation of the Property.

(2) The terms of the loan included several provisions prohibited under the D.C. Home Loan Protection Act, and the defendants failed to take various actions required to be taken with respect to covered loans.

The loan instrument includes various provisions prohibited under HLPA, including, inter alia, [HN74] a provision that provides, in violation of *D.C. Code § 26-1152.09*, for an interest rate of 16%, to be automatically increased to 24% should the loan ever be in default. Likewise, [HN75] HLPA prohibits balloon payments that come due less than 7 years after the date of the loan closing, with an exception provided [*125] for payment schedules that are adjusted to account for the borrower's seasonal or irregular income, or if the loan is a bridge loan connected or related to the acquisition or construction of a dwelling intended to become the borrower's principal dwelling. *D.C. Code § 26-1152.13*. The loan at issue provides for a balloon payment due and payable 6 months after the loan closing and does not fall within any of the aforementioned exceptions. Accordingly, the balloon payment provision of the loan violates *D.C. Code § 26-1152.13*.

[HN76] The statute likewise provides that lenders "shall send to the borrower a Red Flag Warning Disclosure Notice" in making a covered loan that "shall be received by the borrower at least 3 business days prior to the closing of the loan. . . [and] [i]f the loan is originated with the assistance of a mortgage broker, the mortgage broker shall provide the Red Flag Warning Disclosure Notice." *D.C. Code § 26-1152.11* The defendants concede that no red flag warning disclosure notice was sent. Because [HN77] the statute places the burden of sending the notice upon the broker, the court finds that Merwin violated *§ 26-1152.11* by failing to send the requisite notice.

Similarly, Thomas failed [*126] to satisfy the filing requirements of [HN78] *D.C. Code § 26-1152.21*, which requires lenders to submit to the Mayor a loan package including the settlement statement, the FP-7 Form filed with the Recorder of Deeds, the final Truth in Lending Act disclosure, and the note. As there is no dispute that defendant Thomas failed to send a loan package to the Mayor as required, the court finds that defendant Thomas violated *§ 26-1152.21*.

Finally, [HN79] Thomas concedes that he failed to verify that Merwin was licensed at the time of the transaction, and Merwin concedes that he was, in fact, not licensed. This constitutes a violation of *D.C. Code § 26-1152.20*.

Dawson has further alleged that the loan included impermissible charges for services not actually performed or for loan discount points which are not bona fide discount points. See *D.C. Code § 26-1152.10*. Although a "consulting fee" of $ 5,000 and a "lender's fee" of $ 5,000 might be found on a fuller evidentiary record to fall within this category of prohibited charge, Dawson failed to establish by way of evidence or argument the applicability of this provision to the charges present in the instant transaction.

Likewise, Dawson has not demonstrated that [*127] the loan was extended with the intent to foreclose. The court is mindful that, in some instances, loans based solely upon the value of the property securing a loan may be designed to fail, with the lender's anticipated profit arising through loan acquisition of the property on default rather than through loan payments. [55] See *Hargraves v. Capital City Mortgage Corp., 140 F. Supp. 2d 7, 20-21 (D.D.C. 2000)*. [HN80] According to *D.C. Code § 26-1114(a)(6)*, in determining whether the loan was made with intent to foreclose, the court may consider the following factors: "(A) Lack of the probability of full repayment of the loan by the borrower; and (B) A significant proportion of similarly foreclosed loans by the lender." Although the court finds that the defendants failed adequately to verify Dawson's ability to make scheduled payments under the loan, the court credits Thomas's testimony that, in extending loans of this nature, he hoped to obtain the listing to sell the borrower's property. Although Thomas's carelessness in verifying Dawson's repayment ability may be explained by his unwarranted expectation that Dawson would voluntarily and expeditiously sell the Property, that is not the same as engaging [*128] in the transaction with the intent to foreclose. Similarly, Dawson failed to establish the existence of "[a] significant proportion of similarly foreclosed loans by the lender . . . ." *D.C. Code § 26-1114(a)(6)(B)*. Accordingly, the court finds that the defendants did not violate *§ 26-1114(a)(6)*.

55   This practice is commonly referred to as equity-stripping.

(3) Damages

[HN81] HLPA permits borrowers to seek

(1) Reformation of the covered loan to correct or remove an unfair term or a term obtained in violation of *§ 26-1151.02* of subchapter II of this chapter . . . ;

(2) Actual damages;

(3) Injunctive relief;

(4) Reasonable attorneys' fees and costs; or

(5) Statutory damages in an amount to be determined by the finder of fact if the finder of fact determines that the lender has engaged in a systematic pattern of practices and acted in violation of *§ 26-1151.02* or subchapter II of this chapter.

*D.C. Code § 26-1153.01(c).*

The court determines that Dawson is entitled to reformation of the loan on terms consistent with acceptable consumer lending practices, such that the original interest rate of 16% shall be reinstated (with the provision for increasing the interest rate to 24% in the event of a default eliminated),  [*129] [56] the balloon payment shall come due September 13, 2010 (seven years after the September 13, 2003, closing date), and the balance due on the loan shall be reduced by the amount of any penalties or fees that can be traced to the rate increases triggered by the provision of the loan calling for a balloon payment by March 14, 2004. [57] In addition, the note called for a late fee of 10%, but [HN82] *D.C. Code § 28-3310(b)(3)* limits late fees to 5%, and it is appropriate to remove the 10% late fee term as an unfair term and to replace it with a 5% late fee. Finally, the note provided:

[I]n the event of Default and at the sole discretion of the Lender, if said note is modified, extended, default cured, or fully paid and satisfied, there shall be an administrative / reinstatement fee equal to two and one-half percent (2.5%) of the principal balance and all outstanding interest and penalties.

On its face, that provision is unfair in charging a fee on the entire loan balance, not just the amount of the missed payment. In any event, it is a form of a late charge and as another clause of the note (as reformed by this decision) already calls for a late fee of 5% of any missed payment,

the maximum allowable,  [*130] this provision will be stricken as an unfair provision.

56    Under TILA, by reason of *§ 1640(a)(4)*, Thomas is not entitled to retain any finance charges, including interest, that Dawson paid. Accordingly, prior monthly payments by Dawson shall be applied to principal, not interest.

57    The HLPA remedies will be academic if Dawson rescinds the loan transaction. Accordingly, the court will not attempt to fix with exactitude the amounts that Dawson would owe under a note reformed pursuant to HLPA, but will instead simply declare the provisions that are to be reformed, and retain jurisdiction to enforce the court's decree if there is a dispute regarding the proper accounting of amounts that were improperly charged to Dawson as a result of the interest rate increase triggered by the provision calling for an impermissible balloon payment.

As in the case of TILA, Dawson has not shown any actual damages arising from the violations of HLPA. There is no evidence that Thomas has engaged in a systematic pattern of practices, and, accordingly, no statutory damages can be awarded. There being no actual or statutory damages, the only relief being granted (reformation of the terms of the loan) runs against  [*131] Thomas, not Merwin. The court determines that Dawson is entitled to recover reasonable attorney's fees from Thomas based upon his violations of HLPA. [58] As to Merwin, no relief is being granted and, accordingly, it would be inappropriate to award attorney's fees against him.

58    To the extent any damages or attorney's fees awarded under HLPA are duplicative of those already awarded Dawson under TILA, Dawson is only entitled to claim one such recovery or offset.

IX

THE D.C. CONSUMER PROTECTION PROCEDURES ACT

[HN83] The D.C. Consumer Protection and Procedures Act, *D.C. Code §§ 28-3901-3908* (2001) ("CPPA") has been characterized as ambitious legislation, and "is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers." *Atwater v. D.C. Dep't of Consumer & Regulatory Affairs, 566 A.2d 462, 465 (D.C. 1989).* A central purpose of the CPPA is to "assure that a just mechanism exists to remedy all improper trade practices." *D.C. Code § 28-3901(b)(1); Dist. Cablevision Ltd. P'shp v. Bassin, 828 A.2d 714, 723 (D.C. 2003).*

The amended complaint alleges that the defendants violated *D.C. Code § 28-3904(a)* by mischaracterizing the loan as a [*132] commercial loan when it was in fact a consumer loan, and that they further violated *D.C. Code § 28-3904(r)* by entering into such contract where there was no reasonable probability of payment in full, or where the consumer was taken advantage of due to age, physical or mental infirmities, ignorance, illiteracy, or similar factors.

Dawson has not shown that the defendants violated *§ 28-3904(a)* by representing that the transaction had characteristics that it did not have. [HN84] *Section 28-3904(a)* contemplates a knowing and deliberate misrepresentation of goods and services, and although the defendants failed to take reasonable steps to ascertain the true purpose of the loan and to verify the nature of the property securing the loan, willful blindness is not the same as actual knowledge, and it has not been established that the defendants actually knew that the product they were offering was required to be treated as a consumer rather than as a commercial credit transaction. Absent a showing that the defendants actually knew that the loan was required to be processed as a consumer credit transaction, they cannot be held liable under *section 28-3904(a)*.

Dawson has likewise failed to show that the [*133] defendants violated *§ 3904(r)* by making or enforcing unconscionable terms or provisions by soliciting, consummating, and enforcing what was required to be, but was not, treated as a consumer credit transaction. The court is mindful that [HN85] the District of Columbia Court of Appeals has expressly certified that *CPPA § 28-3904(r)* is applicable to the extension of credit secured by the consumer's house even where the credit is not extended in the context of a sale of the house. *DeBerry v. First Gov't Mortgage & Investors Corp., 743 A.2d 699 (D.C. 1999).* Section 28-3904(r), however, provides a non-exclusive list of factors courts may consider in applying this provision, including whether the party alleged to have violated the CPPA knew, at the time of the sale, "that there was no reasonable probability of payment in full of the obligation by the consumer." *D.C. Code § 28-3904(r)(1)*. As discussed earlier in this opinion, the defendants failed to take reasonable steps to determine whether Dawson would be able to meet all of her payment obligations under the loan. [HN86] Failure to verify Dawson's repayment ability, however, is not the same as actually knowing "that there was no reasonable probability [*134] of payment in full of the obligation by the consumer." As with *§ 3904(a)*, section 3904(r)(1) contemplates actual knowledge on the part of the offending party, and while other statutes such as TILA impose liability upon lenders who willfully turn a blind eye to pertinent facts such as a borrower's ability to repay the obligation, a finding of liability under the D.C. Consumer Protection Procedures Act requires something more.

This does not, however, end the court's inquiry. [HN87] *Section 28-3904(r)(5)* further provides that, in applying this subsection, consideration shall also be given to a person having "knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reason of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors." Whether the defendants knowingly took advantage of Dawson's lack of sophistication such that they should be found to have committed a violation of *§ 28-3904(r)(5)* is a close call, as Dawson is unquestionably an unsophisticated borrower and the defendants were undoubtedly on notice of that lack of sophistication. Although Dawson's lack of sophistication [*135] made her less likely to understand the terms of the loan and the consequences of having the loan treated as a commercial rather than as a consumer transaction, when viewing the totality of the circumstances, the court is not persuaded that it was the defendants' intent to exploit the defendants' lack of sophistication in extending this loan. Instead, it appears that the defendants were preying upon Dawson's precarious financial circumstances and the imminent foreclosure sale of her home. Accordingly, the court finds that Dawson failed to demonstrate that the defendants violated *§ 28-3904(r)* by taking advantage of her inability to protect her interests due to her lack of sophistication.

X

CONCLUSION

An order follows.

The Memorandum Decision below is hereby signed.

Dated: April 9, 2008.

/s/ S. Martin Teel Jr.

S. Martin Teel, Jr.

United States Bankruptcy Judge

INTERIM ORDER

In accordance with a memorandum decision of this same date, it is

ORDERED that within 20 days after entry of this order, the defendant James B. Thomas shall deposit in the registry of the court a release of his deed of trust. The release may recite that it is effective only when the original is recorded with the Recorder of Deeds [*136] of the District of Columbia. It is further

ORDERED that within 20 days after entry of this order, the plaintiff, Ethel J. Dawson, shall file a notice advising the court whether she elects to exercise her right to rescission. If she does so elect, and as a condition of rescission and the voiding of Thomas's security interest, Dawson shall be required to first tender to Thomas the amount she received in the transaction, net of finance charges that she has paid (and which are recoverable under *15 U.S.C. § 1640(a)(4)*) and net of any other set-offs Dawson elects. It is further

ORDERED that if Dawson files a timely notice electing to proceed with rescission:

A. The principal amount of the $ 35,000 shall be reduced by way of setoff of the $ 14,500.84 in paid finance charges recoverable under *§ 1640(a)(4)*, resulting in a net amount of principal owed (prior to any additional setoffs that Dawson may elect) of $ 20,499.16.

B. Dawson shall have 18 months from the date of this order to tender to Thomas the amount she received in the transaction, net of setoffs.

C. Dawson's repayment obligation shall also include interest on the net amount she is required to tender at a rate of 6% per annum. Interest **[*137]** will begin to accrue on the date that Thomas files a notice of having deposited a release of his deed of trust in the registry of the court.

D. In the event Dawson does not succeed in effecting a rescission, she shall not be liable to pay the finance charges, including interest, provided for by the note held by Thomas, but she shall be liable for the 6% per annum interest imposed by the preceding paragraph, and for any late charges, and such amounts may be enforced as part of the amounts owed under the note and secured by the deed of trust in Thomas's favor.

It is further

ORDERED that the amount Dawson must repay, whether incident to rescission or otherwise, may be reduced by the $ 2,000 statutory damages award under TILA and any attorney's fees that she is entitled to recover from Thomas. Within 20 days after entry of this order, Dawson shall advise the court whether she wishes to exercise such a setoff, in whole or in part. If Dawson elects to exercise such a setoff, the setoff shall be effective as of the date of entry of this order. To the extent of the amounts that she does not elect to set off, a judgment will be entered in her favor for such amounts. It is further

ORDERED that in **[*138]** the event Dawson does not timely file notice that she intends to proceed with rescission of the entire transaction pursuant to *15 U.S.C. § 1635*, she shall within 20 days after entry of this order file notice whether she elects to obtain a judgment to recover from Thomas the $ 14,500.84 in paid finance charges and fees under *15 U.S.C. § 1640(a)(4)* or, instead, to set off that $ 14,500.84 against the principal amount owed of $ 35,000.00. It is further

ORDERED that in the event that Dawson timely files notice that she intends to proceed with rescission or that Dawson timely files notice that she intends to set off the $ 14,500.84 recoverable under *15 U.S.C. § 1640(a)(4)* against the principal owed on the loan, the $ 14,500.84 shall be treated as counting towards monthly payments Dawson was obligated to make under the note, and she shall be liable for a late fee only if she missed a monthly payment after treating the $ 14,500.84 as applied to required monthly payments. It is further

ORDERED that in the event Dawson elects not to pursue rescission, the note will not bear any interest, but the deed of trust will be enforceable immediately in the event of a default in payment. It is further

ORDERED **[*139]** that under *D.C. Code § 26-1153.01(c)*, Dawson is entitled to reformation of the loan to reflect that:

A. The original interest rate of 16% is reinstated (with the provision for increasing the interest rate to 24% eliminated). [1]

B. The balloon payment is due September 13, 2010.

C. The 10% late fee provision is changed to a 5% late fee provision.

D. The provision for a 2.5% administrative or reinstatement fee is eliminated. [2]

It is further

1  As a remedy under TILA if Dawson elects not to rescind the loan, the court has already decreed that the note will not bear any interest. Thus, reformation of the loan to reinstate the original non-penalty interest rate is purely academic (unless the TILA relief were to be vacated and does not accurately reflect Dawson's obligations under the note.

2  If Dawson effects a rescission, the reformation of the loan to limit late fees to 5% and to strike the 2.5% administrative or reinstatement fee will be academic as such fees are not part of the amount that Dawson must pay to effect a rescission.

ORDERED that Dawson is entitled to recover reasonable attorney's fees from Thomas based upon his violations of the Truth in Lending Act, *15 U.S.C. §§ 1601-1667 (2000)*, **[*140]** and of the D.C. Home Loan Protection Act, *D.C. Code §§ 26-1151.01-1155.01* (2002). It is further

ORDERED that within 20 days after entry of this order, Dawson's attorney shall submit a statement of reasonable attorney's fees, and within 15 days thereafter, the defendant Thomas may file an objection to the attorney's fees. In the event of a dispute, Dawson's attorney shall initiate settlement discussions to attempt to resolve the dispute. It is further

ORDERED that this is not a final judgment as a final judgment will decree the amount required to effect a rescission (if Dawson elects to proceed with rescission) after taking into account any setoffs that Dawson elects to make, and will take into account the amount of attorney's fees awarded.

The order below is hereby signed.

Signed: April 09, 2008.

/s/ S. Martin Teel Jr.

S. Martin Teel, Jr.

    United States Bankruptcy Judge

LEXSEE 1991 DEL CH. LEXIS 110



Caution
As of: May 21, 2008

**LEO GANS and JAMES F. BERNARD, Plaintiffs, v. MDR LIQUIDATING COR-
PORATION, a dissolved Delaware corporation, HERBERT M. LOBSENZ, TER-
RENCE F. COEN, JOHN T. CUNNIFF, TIMOTHY F. HEALY, MARK J.
MEAGHER, directors of MDR Liquidating Corporation, Defendants**

**Civil Action No. 9630**

**Court of Chancery of Delaware, New Castle**

*1991 Del. Ch. LEXIS 110; Fed. Sec. L. Rep. (CCH) P96,122*

**May 16, 1991, Submitted
June 25, 1991, Decided**

**PRIOR HISTORY:**    [*1]  On Plaintiffs' Motion for
Removal of Trustees; On Plaintiffs' Motion for Summary
Judgment.

**DISPOSITION:**    ON PLAINTIFFS' MOTION FOR
REMOVAL OF TRUSTEES: GRANTED. ON PLAIN-
TIFFS' MOTION FOR SUMMARY JUDGMENT: DE-
NIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff trust beneficiar-
ies filed suit against defendants, dissolved corporation
and the trustees of the liquidating trust, to enforce com-
pensation agreements. Plaintiff filed a motion to remove
the trustees and a motion for partial summary judgment
on the issue of assignability of the compensation agree-
ments.

**OVERVIEW:** The trustees did not dispute that the trust
owed benefits to the beneficiaries. The dispute arose over
whether the trust assets were sufficient to fund all future
benefits owed. Considering the beneficiaries' motion to
remove the trustees, the court noted that the trustees were
also beneficiaries of the trust, that there was considerable
friction between the trustees and the beneficiaries, that
the trustees did not willingly provide financial informa-
tion about the trust to the beneficiaries, and that the trus-
tees were not acting as a prudent investor would, al-
though their conduct did not arise to a breach of fiduci-
ary duty. The court held that although none of these fac-

tors in isolation was sufficient to remove the trustees, the
totality of the circumstances compelled their removal.
The court held that a question of material fact remained
regarding whether the compensation agreements were
assignable and whether the beneficiaries consented to the
assignment of their pension and benefit rights.

**OUTCOME:** The court granted the motion to remove
the trustees, but denied the motion for partial summary
judgment.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > State Insolvency Laws*
*Business & Corporate Law > Corporations > Dissolu-*
*tion & Receivership > General Overview*
*Estate, Gift & Trust Law > Trusts > Trustees > Duties*
*& Powers > General Overview*
[HN1] The Delaware court of chancery is statutorily em-
powered to appoint a trustee or receiver for a dissolved
corporation. *Del. Code Ann. tit. 8, § 279.* Upon applica-
tion by a stockholder, creditor or director of the corpora-
tion, the court may, in its discretion, appoint a trustee to
perform the steps necessary to wind-up the affairs of the
corporation. The purpose of tit. 8, § 279, is to provide
protection for creditors and shareholders of the corpora-
tion. The court of chancery also has the power to remove
a trustee. The court's power to remove a trustee is ancil-
lary to the court's duty to ensure that the trust is properly
administered.

*Business & Corporate Law > Corporations > Dissolution & Receivership > Termination & Winding Up > Distribution of Assets > Creditor Rights*
*Business & Corporate Law > Corporations > Dissolution & Receivership > Termination & Winding Up > Distribution of Assets > Shareholder Rights*
*Governments > Fiduciary Responsibilities*
[HN2] Once a corporation dissolves, its assets are held in trust for the benefit of both its creditors and its stockholders. Upon a dissolution, the creditors obtain an equitable interest in the assets of the corporation. At that time, the directors have fiduciary obligations not only to the stockholders but also to the creditors of the corporation. The directors cannot escape their fiduciary duty by transferring all the corporation's assets to a trust which names only the shareholders as beneficiaries.

*Estate, Gift & Trust Law > Trusts > Trustees > Duties & Powers > Standards of Care*
*Estate, Gift & Trust Law > Trusts > Trustees > Removal & Resignation*
*Governments > Fiduciary Responsibilities*
[HN3] A conflict of interest is an appropriate ground for the removal of a trustee. The trustee, as a fiduciary, owes the beneficiaries the duty of loyalty and must exclude all self interests. Trustees are not, however, as a matter of law, incapable of serving as trustees merely because of their status as beneficiaries of the trust.

*Estate, Gift & Trust Law > Trusts > Trustees > Removal & Resignation*
[HN4] Hostility between a trustee and the beneficiaries of a trust is an appropriate ground for the removal of a trustee. Mere friction or discord, however, is not sufficient. The difference is a fine line. For example, hostility of such a magnitude that the trustee refuses to discuss the matters of the trust so as to place the welfare of the trust in jeopardy is sufficient to mandate removal.

*Estate, Gift & Trust Law > Trusts > Trustees > Duties & Powers > Standards of Care*
[HN5] A trustee must invest trust assets as a reasonable prudent investor would. When there are two or more beneficiaries, the trustee must deal with them impartially. As a general rule, a trustee has a duty to diversify trust assets. An exception to this rule occurs when it would be imprudent to diversify, such as when the trust corpus is small.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN6] Summary judgment is employed to avoid a useless trial where there is no issue of material fact. A motion for summary judgment, however, will be granted only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Del. Ch. Ct. R. 56(c).

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
[HN7] Acquiescence requires that after a full knowledge of material facts a claimant remains silent for a considerable time, acts in a matter which amount to recognition of the complained of act, or acts in a manner inconsistent with the subsequent repudiation.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
[HN8] The equitable defense of acquiescence requires full knowledge by the plaintiffs of the material facts and actions which indicate acceptance of those facts.

COUNSEL: William Prickett, Esquire, Elizabeth M. McGeever, Esquire, and April Caso Ishak, Esquire, PRICKETT, JONES, ELLIOTT, KRISTOL & SCHNEE, Wilmington, Delaware, Attorneys for plaintiffs.

Edward B. Maxwell, 2nd, Esquire, William D. Johnston, Esquire, and Bruce L. Silverstein, Esquire, YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware, Attorneys for defendants.

JUDGES: Hartnett, Vice Chancellor.

OPINION BY: HARTNETT

OPINION

Plaintiffs brought this action to enforce Compensation Agreements entered into between them and a now dissolved corporation that entitle them to certain retirement benefits. Two motions are presently before the Court. In the first, plaintiffs seek the removal of the Trustees of the Liquidating Trust that holds the assets of the dissolved corporation that are to be used to fund plaintiffs' retirement benefits. That motion must be granted. The second motion is for partial summary judgment on the issue of assignability of the Compensa-

tion Agreements. That motion must be denied because of the existence [*2] of disputed material facts.

The facts have been fully set out in the earlier opinion in this case, *Gans v. MDR Liquidating Corp., 1990 Del. Ch. LEXIS 3*, Del. Ch., C.A. No. 9630, Hartnett, V.C. (Jan. 10, 1990); therefore only the facts relevant to the pending motions will be restated.

THE FACTS

On June 14, 1984, defendant Market Data Retrieval, Inc. ("MDR") purchased all the outstanding stock of National Business Lists, Inc. ("NBL"). Plaintiff Leo Gans founded NBL in the 1950's and at the time of the stock purchase, he and plaintiff James Bernard were officers, directors and substantial stockholders of NBL. As a part of the agreement for the sale of their stock, Messrs. Gans and Bernard were to receive consulting fees from June 14, 1984 until May 31, 1989, an annual pension to be paid from June 1, 1989 until their deaths, and certain health, life and disability insurance benefits.

In late 1985 MDR began to experience serious financial troubles. Therefore, MDR's Board of Directors (consisting of defendants Lobsenz, Coen, Cunniff, Healy, Meagher and plaintiffs) authorized the sale of substantially all MDR's assets to Dun & Bradstreet, Inc. Dun & Bradstreet did not, however, assume all of MDR's liabilities [*3] and did not assume the obligations due to the plaintiffs.

The sale of the assets to Dun & Bradstreet closed in July 1986. In a tax free exchange, MDR received approximately $ 14 million of Dun & Bradstreet stock and another $ 5 million of Dun & Bradstreet stock was held in escrow by Dun & Bradstreet to be used to satisfy any unknown MDR obligations. An additional $ 10 million in stock was used to pay MDR's outstanding bank loans and other debts.

In connection with the sale of the assets to Dun & Bradstreet, MDR's Board approved a plan of complete dissolution and liquidation pursuant to *8 Del. C. § 275*. The stated purpose of the plan was to provide for the satisfaction of all the liabilities and obligations of the corporation, and then to provide for the distribution of the remaining assets to the shareholders. The Board also adopted a resolution that authorized the creation of a trust, if necessary, to facilitate the dissolution of the corporation.

Following the sale to Dun & Bradstreet in 1986, plaintiffs resigned from MDR's Board. Plaintiffs' attorney then made several requests for information concerning how MDR planned to fulfill its obligations to the plaintiffs under the [*4] Consulting Agreements. Plaintiffs' attorney also requested that no distributions of corporate assets be made until an agreement was reached as to securing MDR's obligations to plaintiffs. Plaintiffs received no response to the requests.

Without notice to plaintiffs, on December 16, 1986, MDR distributed approximately $ 12 million of the $ 14 million Dun & Bradstreet stock to MDR shareholders.

In January 1987, defendants' attorney responded to plaintiffs' request for information. The letter stated that an unspecified amount of cash, Dun & Bradstreet stock and other assets aggregating approximately $ 2 million would be placed in a trust to satisfy MDR's obligations to plaintiffs. The letter, however, contained no information as to the terms of the trust instrument.

According to plaintiffs, this response initially appeared to meet plaintiffs' concerns. A Liquidating Trust was created about March 1, 1987. Defendants then assigned all MDR's liabilities to the Liquidating Trust, despite that the terms of plaintiffs' compensation Agreements prohibited assignment or delegation of any obligations or duties of the parties. Three of the MDR directors (defendants Lobsenz, Healy and Coen) were [*5] appointed as Trustees of the Liquidating Trust. The trust instrument defines the beneficiaries of the Liquidating Trust as being MDR's former stockholders. Plaintiffs are not mentioned as being beneficiaries.

After the Liquidating Trust was formed, plaintiffs, without success, sought information about it. As of December 1989, the Liquidating Trust assets were valued at approximately $ 4.2 million. The increase was due to the release to the Trust of $ 3.1 million of the Dun & Bradstreet stock which had been in escrow. As of the date of defendants' brief on the present motions, the Liquidating Trust assets were valued at $ 3.7 million. Over 85% of the Liquidating Trust assets consist of Dun & Bradstreet stock and the Trustees have repeatedly declined to comply with plaintiffs' request to diversify the Liquidating Trust assets.

There is no dispute that MDR owes plaintiffs pension benefits. The dispute concerns whether the assets of the Liquidating Trust are sufficient to fund the future benefits owed to plaintiffs and a question concerning the amount of health insurance coverage to be provided. The Liquidating Trust has been making payments to plaintiffs and appears to be current in [*6] those payments.

THE MOTION FOR REMOVAL OF TRUSTEES

First to be considered is plaintiffs' motion to remove the trustees of the Liquidating Trust on the grounds that the trustees have a disabling conflict of interest, are hostile towards plaintiffs and have breached their fiduciary duties.

[HN1] The Court of Chancery is statutorily empowered to appoint a trustee or receiver for a dissolved cor-

poration. *8 Del. C. § 279*. Upon application by a stock-holder, creditor or director of the corporation, the Court may, in its discretion, appoint a trustee to perform the steps necessary to wind-up the affairs of the corporation. *Id.; Levin v. Fisk Rubber Corp., Del. Ch., 30 Del. Ch. 31, 52 A.2d 741 (1947)*. The purpose of *8 Del. C. § 279* is to provide protection for creditors and shareholders of the corporation. *Addy v. Short, Del. Super., 46 Del. 178, 81 A.2d 300 (1951), rev'd on other grounds, Del. Supr., 47 Del. 157, 89 A.2d 136 (1952); In re Citadel Indus., Inc., Del. Ch., 423 A.2d 500 (1980)*.

The Court of Chancery also has the power to remove a trustee. *In re Catell's Estate, Del. Ch., 28 Del. Ch. 115, 38 A.2d 466 (1944); In the Matter of Heizer* [*7] *Corp., 1988 Del. Ch. LEXIS 114*, Del. Ch., C.A. No. 7949, Berger, V.C. (June 6, 1988). The Court's power to remove a trustee is ancillary to the Court's duty to ensure that the trust is properly administered. *Catell's Estate, supra.*

*Standing*

Defendants first assert that plaintiffs, as mere credi-tors of the Liquidating Trust, have no standing to seek the removal of the Trustees. They claim that the Court's prior holding in this case that the directors of a dissolved corporation owe a fiduciary duty to its creditors, is ir-relevant as to the Trust, because the holding concerned only MDR.

Defendants are incorrect. This Court held that [HN2] once a corporation dissolves, its assets are held in trust for the benefit of both its creditors and its stockholders. *Gans v. MDR Liquidating Corp.*, C.A. No. 9639-NC, Hartnett, V.C. (Jan. 10, 1990), slip op. at 21, and cases cited therein; *see also Kidde Indus., Inc. v. Weaver Corp., Del. Ch., 593 A.2d 563 (Apr. 16, 1991)*. Upon a dissolution, the creditors obtain an equitable interest in the assets of the corporation. *Kidde Indus., 593 A.2d at 564, n.3*. At that time, the directors have fiduciary obli-gations not only to the stockholders but also [*8] to the creditors of the corporation. *Gans, supra*. As held in that opinion, the directors cannot escape their fiduciary duty by transferring all the corporation's assets to a trust which names only the shareholders as beneficiaries. The Trustees here, therefore, have fiduciary obligations to the corporation's creditors.

The plaintiffs are beneficiaries of the trust because they were creditors of the dissolved corporation, MDR. Plaintiffs are not, as defendants assert, merely creditors of the Liquidating Trust. Therefore, plaintiffs do have standing to seek removal of the Trustees. *Restatement (second) Trusts § 199*.

*Conflict of Interest*

Plaintiffs next claim that the Trustees have a conflict of interest because they are former MDR shareholders and will share in any surplus assets remaining after MDR's liabilities are satisfied. The plaintiffs claim that the Trustees have a direct interest in the assets which they have a duty to hold in trust for the benefit of MDR's creditors, the plaintiffs, and therefore they should be re-moved.

Defendants respond that remaindermen beneficiaries are not disqualified to act as Trustees because of an in-herent conflict of interest. Defendants [*9] suggest that any attempt by the Trustees to distribute the Liquidating Trust assets without payment to plaintiffs would be fruit-less because the plaintiffs would have an equitable lien on the distributed assets.

[HN3] A conflict of interest is an appropriate ground for the removal of a trustee. *Catell's Estate, supra*. The trustee, as a fiduciary, owes the beneficiaries the duty of loyalty and must exclude all self interests. BOGERT, *Trusts and Trustees* § 543 (Rev. 2d Ed. 1978). Trustees are not, however, as a matter of law, incapable of serving as trustees merely because of their status as beneficiaries of the Trust. *Lovett v. Peavy, 253 Ga. 79, 316 S.E.2d 754 (Ga. 1984)*. The Trustees here cannot be disqualified solely for that reason.

*Hostility*

Plaintiffs also assert that the hostility shown by the Trustees to plaintiffs long ago reached a stage where removal is appropriate and necessary to protect the Liq-uidating Trust assets. Plaintiffs base their claim on Trus-tee Coen's statement that he resents the plaintiffs for hav-ing filed this law suit. Plaintiffs also assert that the Trus-tees' hostility is further evidenced by their counterclaim alleging plaintiffs' [*10] bad faith. By filing the coun-terclaim, plaintiffs argue, the Trustees are suing the beneficiaries for their own (the Trustees') benefit.

Defendants counter that the existence of mere fric-tion is not sufficient grounds for removal of Trustees and that the Trustees are empowered by the Liquidating Trust instrument to institute or defend legal actions in the name of the Liquidating Trust. They assert that the counter-claim was filed in the good faith belief that it is meritori-ous.

[HN4] Hostility between a trustee and the benefici-aries of a trust is an appropriate ground for the removal of a trustee. Mere friction or discord, however, is not sufficient. *Smith v. Biggs Boiler Works Co., Del. Ch., 33 Del. Ch. 183, 91 A.2d 193 (1952); Heizer, supra*. The difference is a fine line. For example, hostility of such a magnitude that the trustee refuses to discuss the matters of the trust so as to place the welfare of the trust in jeop-ardy is sufficient to mandate removal. *Smith, supra*.

1991 Del. Ch. LEXIS 110, *; Fed. Sec. L. Rep. (CCH) P96,122

While there does appear to be considerable friction between the plaintiffs and the Trustees, there has been no showing that it has risen to a level that it, standing alone, would warrant the [*11] removal of the Trustees. Although Trustee Coen stated that he resents the plaintiffs for filing this lawsuit, there is no other evidence that the three Trustees are so hostile towards the plaintiffs as to place the Liquidating Trust assets in danger.

The defendants' mere filing of a counterclaim in the name of the Liquidating Trust is not an act of hostility. To the contrary, Trustees are under an obligation to defend actions believed to be without merit.

*Failure to Provide Information*

Plaintiffs next contend that the Trustees have taken the position that they have no obligation to provide plaintiffs with information regarding the Liquidating Trust, in flagrant disregard of their fiduciary duties.

The plaintiffs also claim they did not receive a copy of the trust instrument until the defendants filed their Answer in this law suit. The most current financial statement which plaintiffs have received is dated December, 1989.

It is obvious that the Trustees have not willingly provided financial information about the Liquidating Trust to plaintiffs. Any information plaintiffs have received has been obtained through formal discovery requests n connection with this litigation.

*Violation* [*12] *of Prudent Investor Standard*

Additionally, the plaintiffs claim that the Trustees have not acted in accordance with the prudent investor standard because over 85% of the Liquidating Trust assets are Dun & Bradstreet stock.

Defendants respond that Trustees have not acted imprudently by allowing the Liquidating Trust to continue to hold the Dun & Bradstreet stock because the former MDR stockholders, the named beneficiaries of the Liquidating Trust, would incur a tax liability if the stock was disposed of. In any event, they assert the Trustees did not "invest" in the Dun & Bradstreet stock, but merely permitted the Liquidating Trust assets to remain invested in the stock. The Trustees further claim they are under no obligation to dispose of the stock unless they have reason to fear for the safety of the investment.

Defendants rely heavily on their assertion that the Liquidating Trust assets are presently large enough to satisfy all obligations to plaintiffs, even if all of plaintiffs' claims have merit.

[HN5] A trustee must invest trust assets as a reasonable prudent investor would. *Du Pont v. Delaware Trust Co., Del. Supr., 320 A.2d 694 (1974), reh'g denied.* [*13]

When there are two or more beneficiaries, the trustee must deal with them impartially. *Id.* As a general rule, a trustee has a duty to diversify trust assets. *Pension Benefit Guaranty Corp. v. Greene, 570 F. Supp. 1483, 1493 (W.D. Pa. 1983), aff'd, 727 F.2d 1100 (3rd Cir. 1984), cert. denied, 469 U.S. 820, 83 L. Ed. 2d 38, 105 S. Ct. 92; Hamilton v. Nielsen, 678 F.2d 709, 712* (7th cir. 1982). An exception to this rule occurs when it would be imprudent to diversify, such as when the trust corpus is small. *Restatement (Second) Trusts* §§ 227, 228.

The defendants claim it is imprudent to diversify the Liquidating Trust assets because the named beneficiaries of the Liquidating Trust will suffer a tax liability. This approach, however, only protects the interests of the former MDR stockholders and not the plaintiffs. The Trustees must deal with both classes of beneficiaries impartially, protecting both their interests, if possible.

The Trustees also claim they are under no obligation to dispose of the Dun & Bradstreet stock unless they have reason to fear for the safety of the investment. The Trustees argue that the investment in Dun [*14] & Bradstreet stock is safe because at the present time the assets are large enough to satisfy all plaintiffs' claims. The Liquidating Trust assets have, however, declined from $ 5.1 million in 1988, to $ 4.2 million in 1989, to $ 3.7 million in 19990. While this decline is partially due to the distributions to the beneficiaries of the trust, it is primarily due to the decline of the value of the Dun & Bradstreet stock.

I cannot find, on the present record, that the trustees have, as a matter of law, breached their fiduciary duty to plaintiffs but their conduct leaves much to be desired.

CONCLUSION AS TO THE REMOVAL OF THE TRUSTEES

Although none of the claims of the plaintiffs, standing alone, might be sufficient to compel the removal of the Trustees, the totality of the circumstances clearly compels their removal. Although the Trustees' conflict of interest is not a *per se* disqualification, they obviously have a conflict between their own financial interest as beneficiaries of the trust and the financial interest of the plaintiffs. The Trustees have been less than cooperative in providing plaintiffs with information about the Liquidating Trust and how they plan to fulfill their [*15] obligations to the plaintiffs. They have acted so that they appear to be more concerned with the interests of themselves as the stockholder beneficiaries than with the interest of the plaintiff beneficiaries. The Liquidating Trust assets have been declining and the Trustees have refused to diversity its assets. Also, there is such animosity between the plaintiffs and the Trustees that a great deal of time and money is being wasted in legal manuevering.

Although the present Trustees have expressed a willingness for a successor trustee to be appointed, they have made a succession contingent on the plaintiffs giving up certain of their claims.

In the interests of all concerned, therefore, the Trustees should be replaced by an impartial trustee or trustees.

IT IS SO ORDERED.

SUMMARY JUDGMENT

The plaintiffs also seek partial summary judgment. [HN6] Summary judgment is employed to avoid a useless trial where there is no issue of material fact. *Bershad v. Curtiss-Wright, Del. Supr., 535 A.2d 840 (1987); H.S. Mfg. Co. v. Benjamin F. Rich Co., Del. Ch., 39 Del. Ch. 380, 164 A.2d 447 (1960).* A motion for summary judgment, however, will be granted only where no genuine issue [*16] of material fact exists and the moving party is entitled to judgment as a matter of law. Chancery Court Rule 56(c); *Empire of America Relocation Services, Inc. v. Commercial Credit Co., Del. Supr., 551 A.2d 433, 435 (1988).*

Plaintiffs have moved for partial summary judgment on the issue of the assignability of their Compensation Agreements. According to plaintiffs, the agreements contained a non-assignability clause and defendants breached the agreements by assigning them to the Liquidating Trust. Plaintiffs' 1984 Compensation Agreements contained the following provision:

11. *Binding Effect.* This Agreement shall be binding upon and shall inure to the benefit of the Company and the Consultant and their respective successors and assigns; *provided, however,* that neither this Agreement nor the Consultant's duties hereunder may be assigned or delegated.

Plaintiffs, however, signed a written consent dated June 10, 1986, authorizing the transfer of all MDR's assets to the Liquidating Trust. The consent agreement did not mention MDR's liabilities. Plaintiffs argue that the assignment of the assets was made "subject to any then existing liabilities and obligations [*17] . . ." and therefore the execution of the written consent by the plaintiffs was not a consent to the assignment of their Compensation Agreement to the Liquidating Trust.

Moreover, Mr. Gans added the following reservation when he signed the consent agreement:

By executing this consent no rights are waived by the signatory against MDR or its subsidiary.

Mr. Gans therefore asserts he did not consent or in any way agree that his Compensation Agreement could be assigned to the Liquidating Trust.

Defendants respond that plaintiffs did consent to the assignment but even if they did not, they acquiesced in the establishment of the Liquidating Trust.

[HN7] Acquiescence requires that after a full knowledge of material facts a claimant remains silent for a considerable time, acts in a matter which amount to recognition of the complained of act, or acts in a manner inconsistent with the subsequent repudiation. *The NTC Group, Inc. v. West Point-Pepperell, Inc., 1990 Del. Ch. LEXIS 151,* *12, Del. Ch., C.A. No. 10665-NC, Hartnett, V.C. (Sep. 26, 1990)

Defendants claim that a letter dated February 12, 1987 from plaintiffs' then-counsel to MDR's counsel stating that MDR's program seemed to be in line with [*18] plaintiffs expectations, is evidence of plaintiffs acquiescence. The "program" allegedly was outlined in a letter previously sent to plaintiffs, which included the announcement that approximately $ 2 million in cash and stocks would be placed in a liquidating trust to satisfy MDR's obligations to plaintiffs.

Additionally defendants note that plaintiffs have been receiving checks with the name "MDR LIQUIDATING TRUST" printed on them and plaintiffs received such checks for almost a year before filing this law suit. Therefore, defendants claim plaintiffs are now barred from objecting to the assignment of the Compensation Agreements.

[HN8] The equitable defense of acquiescence requires full knowledge by the plaintiffs of the material facts and actions which indicate acceptance of those facts. The defendants contend the plaintiffs had full knowledge for at least one year prior to the filing of this law suit. Plaintiffs reply that they had been inquiring but received no information from the defendants about the Liquidating Trust prior to this law suit. It therefore seems highly improbable that plaintiffs' claims can be barred by acquiescence.

A genuine issue of material fact clearly exists, however, [*19] as to the intention of the parties on the issue of whether plaintiffs consented to the assignment of their pension and benefit rights. Summary judgment therefore must be denied, although the issue of assignability will now probably be moot.

IT IS SO ORDERED.

LEXSEE 2008 BANKR. LEXIS 1255

In re: SHANEL STASZ, Debtor. SHANEL STASZ, Appellant, v. ROSENDO GON-
ZALEZ, Chapter 7, Trustee, Appellee.

BAP No. CC-07-1367-MoCK, Bk. No. LA 05-43980 AA

UNITED STATES BANKRUPTCY APPELLATE PANEL FOR THE NINTH CIR-
CUIT

*2008 Bankr. LEXIS 1255*

Submitted Without Oral Argument on March 19, 2008
April 15, 2008, Filed

**NOTICE:** ORDERED PUBLISHED

**PRIOR HISTORY: [*1]**
    Appeal from the United States Bankruptcy Court for
the Central District of California. Hon. Alan M. Ahart,
Bankruptcy Judge, Presiding.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant debtor chal-
lenged an order from the United States Bankruptcy Court
for the Central District of California, which granted the
motion of appellee trustee and found the debtor in civil
contempt after she failed to appear and produce docu-
ments at a *Fed. R. Bankr. P. 2004* examination. The
bankruptcy court imposed sanctions against the debtor.

**OVERVIEW:** The trustee argued that the order granting
sanctions for civil contempt was not a final appealable
order. The court disagreed, holding that the order grant-
ing sanctions on a motion for an order of contempt made
under *Fed. R. Bankr. P. 9020* was final and that it had
jurisdiction under *28 U.S.C.S. § 158*. The motion for
contempt was a contested matter under *Fed. R. Bankr. P.
9014*, and the order resolving that contested matter had
the status of a judgment under *Fed. R. Civ. P. 58*. Con-
cluding that the order was appealable, the court could not
find that the bankruptcy court abused its discretion in
holding the debtor in civil contempt. The examination
was reschedule four times at the debtor's request, and the
debtor's conduct during the time when the trustee's coun-
sel was eligible to practice law provided sufficient
grounds for contempt. The trustee's counsel did all he
could to comply with Bankr. C.D. Cal. R. 9013-1(c) per-
taining to discovery disputes despite the debtor's lack of
cooperation. The debtor's attempt to shift blame onto the

trustee's counsel did not excuse her blatant and persistent
evasion of the court-ordered examination.

**OUTCOME:** The court affirmed the bankruptcy court's
order granting the contempt motion and awarding sanc-
tions to the trustee.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals >
Jurisdiction*
*Bankruptcy Law > Practice & Proceedings > Contested
Matters*
*Civil Procedure > Sanctions > Contempt > Civil Con-
tempt*
[HN1] An order of civil contempt issued in a contested
matter within a main bankruptcy case, unlike in an ad-
versary proceeding, is a final, appealable order.

*Bankruptcy Law > Case Administration > Court Pow-
ers*
*Bankruptcy Law > Case Administration > Examina-
tions of Debtors*
[HN2] See *Fed. R. Bankr. P. 2004(a)*.

*Bankruptcy Law > Case Administration > Examina-
tions of Debtors*
[HN3] *Fed. R. Bankr. P. 2004(b)* limits the scope of a
2004 examination to the acts, conduct, or property or to
the liabilities and financial condition of the debtor, or to
any matter which may affect the administration of the
debtor's estate, or to the debtor's right to a discharge.

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Sanctions > Contempt > Civil Contempt*
[HN4] The U.S. Bankruptcy Appellate Panel of the Ninth Circuit reviews a bankruptcy court's award of sanctions for civil contempt under an abuse of discretion standard. A bankruptcy court abuses its discretion if it bases its decision on an erroneous view of the law or clearly erroneous factual findings. Otherwise, to reverse for abuse of discretion the court must have a definite and firm conviction that the bankruptcy court committed a clear error of judgment in the conclusion it reached.

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*
[HN5] If the order is not final, then a bankruptcy appellate panel lacks jurisdiction to hear the appeal absent leave to appeal an interlocutory order. *28 U.S.C.S. 158(a)*.

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*
*Civil Procedure > Sanctions > Contempt > Civil Contempt*
[HN6] An order granting sanctions on a motion for an order of contempt made under *Fed. R. Bankr. P. 9020* is final.

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*
*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
[HN7] A final order ends litigation on the merits and leaves nothing for the court to do but execute the judgment.

*Civil Procedure > Sanctions > Contempt > Civil Contempt*
*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
[HN8] While civil contempt orders entered during the course of a pending civil action are not appealable until final judgment, the U.S. Court of Appeals for the Ninth Circuit has allowed immediate appeals of sanctions orders that dispose of the only issue before the court.

*Bankruptcy Law > Practice & Proceedings > Contested Matters*

*Civil Procedure > Sanctions > Contempt > Civil Contempt*
[HN9] Fed. R. Civ. P. 9020 provides that motions for contempt in bankruptcy cases are contested matters governed by *Fed. R. Bankr. P. 9014*.

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*
*Bankruptcy Law > Practice & Proceedings > Contested Matters*
[HN10] An order entered resolving a contested matter has the status of a judgment under *Fed. R. Civ. P. 58*, incorporated by *Fed. R. Bankr. P. 9021*.

*Bankruptcy Law > Practice & Proceedings > Contested Matters*
*Civil Procedure > Sanctions > Contempt > Civil Contempt*
[HN11] *Fed. R. Bankr. P. 9014* governs a motion for an order of contempt made by the United States trustee or a party in interest.

*Bankruptcy Law > Practice & Proceedings > Contested Matters*
[HN12] A request for civil contempt is a contested matter and, as such, relief should be requested by motion.

*Bankruptcy Law > Practice & Proceedings > Contested Matters*
*Civil Procedure > Sanctions > Contempt > Civil Contempt*
[HN13] Motions for contempt are ordinary contested matters and need not involve an application for an Order to Show Cause.

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*
*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
[HN14] Unlike an adversary proceeding or a civil action outside bankruptcy, the culmination of the bankruptcy case does not result in a final judgment.

*Bankruptcy Law > Case Administration > Court Powers*
*Civil Procedure > Sanctions > Contempt > Civil Contempt*
[HN15] Bankruptcy courts have the power to impose civil contempt. In order to hold a debtor in contempt, the

2008 Bankr. LEXIS 1255, *

bankruptcy court must find that the debtor violated a specific and definite order of the court.

*Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > Discovery*
[HN16] Bankr. C.D. Cal. R. 9013-1(c) provides that in the event of a dispute arising under *Fed. R. Bankr. P. 2004*, counsel for the parties shall meet in person or by telephone in a good faith effort to resolve the discovery dispute and that if counsel are unable to settle their differences, the party seeking discovery shall file and serve a notice of motion together with a written stipulation.

**COUNSEL:** SHANEL ANN STASZ, Appellant, Pro se, Los Angeles, CA.

For ROSENDO GONZALEZ, Chapter 7 Trustee, Appellee: Patrick K. McClellan, Attorney, Irvine, CA.

**JUDGES:** Before: MONTALI, CASE [1] and KLEIN, Bankruptcy Judges.

> 1   Hon. Charles G. Case, II, Bankruptcy Judge for the District of Arizona, sitting by designation.

**OPINION BY:** MONTALI

**OPINION**

MONTALI, Bankruptcy Judge:

In the matter before us we hold that [HN1] an order of civil contempt issued in a contested matter within a main bankruptcy case, unlike in an adversary proceeding, is a final, appealable order. We publish this decision because it requires us to decide an issue of first impression in this circuit regarding the finality of this type of civil contempt order.

A Chapter 7 trustee obtained a bankruptcy court order requiring the debtor to appear at a Rule 2004 [2] examination ("2004 examination"), and produce documents to the trustee. The debtor. repeatedly failed to appear for the 2004 examination and brought two motions before the court alleging that the 2004 examination and discovery requests were improper. Although the court denied the debtor's [*2] motions, she continued to evade the 2004 examination.

> 2   Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1330*, and to the *Federal Rules of Bankruptcy Procedure, Rules 1001-9037*, as enacted and promulgated prior to the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L.

109-8, 119 Stat. 23. All references to Local Rules are to the Local Bankruptcy Rules for the Central District of California.

The trustee filed a motion to find the debtor in civil contempt, to order her to appear for the 2004 examination and produce documents, and to impose monetary sanctions on the debtor. The court granted the trustee's motion and awarded sanctions. The debtor appealed and we AFFIRM.

**I. FACTS**

1. *Order for Debtor to Appear at Rule 2004 Examination and Related Motions*

On February 5, 2007, the bankruptcy court entered an order (the "2004 Order") requiring Chapter 7 Debtor Shanel Stasz ("Debtor") to appear for an examination by Chapter 7 Trustee, Rosendo Gonzalez ("Trustee"), pursuant to *Rule 2004*. [3] Through the 2004 examination, Trustee sought information regarding $ 10,000 that Debtor received post-petition.

> 3   [HN2] *Rule 2004(a)* [*3] provides that "On motion of any party in interest, the court may order the examination of any entity." [HN3] *Rule 2004(b)* limits the scope of the 2004 examination to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge."

Debtor filed a Motion for Protective Order, arguing that she should-not be required to appear for the 2004 examination or to produce documents because she had "submitted to the Trustee the. source of the money as post-petition and received from the largest creditor in this matter, Hugo. Quackenbush." She argued that the 2004 examination was improper because its purpose was1 not limited to the scope of Debtor's estate. Debtor's Motion for Protective Order was denied on March 21, 2007.

On March 22, 2007, Debtor called Trustee's counsel and requested that the 2004 examination scheduled for the next day be postponed because her car was "in the shop." Trustee's counsel agreed to reschedule the 2004 examination for March 28, 2007.

On March 27, 2007, Debtor informed Trustee's counsel that she would not be attending the 2004 examination [*4] because she was ill and her car was still in the shop. She also told Trustee's counsel that she had filed a Motion for Reconsideration of Order Denying Protective Order.

Debtor's Motion for Reconsideration was denied on April 25, 2007. On April 26, 2007, Trustee's counsel noticed a new date for the 2004 examination - May 3, 2007. Debtor did not attend this 2004 examination or produce any documents to Trustee.

### 2. Trustee's Motion to Find Debtor in Contempt

On June 11, 2007, Trustee filed a Motion to Find Debtor in Civil Contempt for Willful Refusal to Comply with Court Order; to Compel Production of Documents and Participation Pursuant to Order for Rule 2004 Examination; Request for Sanctions ("the Motion"). Debtor opposed the Motion.

### 3. Continuance of the Contempt Motion

The Motion was originally set for hearing on July 11, 2007, but was continued to September 12 to allow Debtor an additional opportunity to produce documents by August 16 and to appear for a 2004 examination on August 20. On August 16 Debtor faxed a notice of objections to the document request to Trustee's counsel. [4] In response, Trustee's counsel postponed the upcoming 2004 examination. He requested that Debtor contact [*5] him within ten days to meet and confer regarding her failure to produce documents.

> 4 All objections were identical: "The documents requested are objected to since they are outside of the scope of a 2004 Examination and as such are irrelevant to ascertaining the debtor's estate."

In the Supplemental Declaration of Trustee's Counsel in support of the Motion, Trustee's counsel stated that he had incurred more fees since the filing of the Motion, increasing the total fee request to $ 4,178.00. Debtor objected to Trustee's counsel's declaration on the grounds that he was ineligible to practice law beginning on August 16, 2007. Debtor also asserted that the deadline for preparing a discovery stipulation was September 4, not August 30.

### 4. September 12 Hearing on the Motion

At the hearing, Debtor repeated her argument from the pleadings that Trustee's counsel was ineligible to practice law beginning on August 16, 2007. Trustee's counsel asked the court to "order [Debtor] one more time to produce the documents," to which the Court replied, "But she's already been ordered to do that, hasn't she?" Trustee's counsel responded that the Court had already ordered her to produce the documents.

The bankruptcy [*6] court granted the Motion and awarded sanctions for contempt in the amount of $ 3,278.50 by an order entered on September 24, 2007. Debtor timely appealed.

## II. ISSUE

Did the bankruptcy court err in granting Trustee's contempt motion and ordering Debtor to pay sanctions to Trustee?

## III. STANDARD OF REVIEW

[HN4] We review a bankruptcy court's award of sanctions for civil contempt under an abuse of discretion standard. See S&C Home Loans, Inc. v. Farr (In re Farr), 278 B.R. 171, 175 (9th Cir. BAP 2002); Miller v. Cardinale (In re Deville), 280 B.R. 483, 492 (9th Cir. BAP 2002), aff'd, 361 F.3d 539 (9th Cir. 2004). A bankruptcy court abuses its discretion if it bases its decision on an erroneous view of the law or clearly erroneous factual findings. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990). Otherwise, to reverse for abuse of discretion we must have a definite and firm conviction that the bankruptcy court committed a clear error of judgment in the conclusion it reached. SEC v. Coldicutt, 258 F.3d 939, 941 (9th Cir. 2001).

## IV. JURISDICTION

Trustee argues that the order granting sanctions for civil contempt is not a final order. [HN5] If the order is not final, then the panel lacks jurisdiction [*7] to hear this appeal absent leave to. appeal an interlocutory order. See 28 U.S.C. 158(a). We conclude that [HN6] the order granting sanctions on a motion for an order of contempt made under Rule 9020 is final.

[HN7] A final order "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233, 65 S. Ct. 631, 89 L. Ed. 911 (1945). Trustee bases his argument that the order lacks finality solely on Cunningham v. Hamilton County, Ohio, 527 U.S. 198, 119 S. Ct. 1915, 144 L. Ed. 2d 184 (1999). In Cunningham, the Supreme Court held that an order imposing sanctions against a non-party attorney for discovery violations under Federal Rule of Civil Procedure 37(a) was not a final order because it did not end the litigation. Cunningham, 527 U.S. at 210. In Markus v. Gschwend (In re Markus), 313 F.3d 1146 (9th Cir. 2002), the Ninth Circuit applied Cunningham to an appeal of sanctions awarded by a bankruptcy court within an adversary proceeding. The Markus court found the sanctions order to be interlocutory and not appealable "until final judgment is entered." Markus, 313 F.3d at 1151.

The instant appeal differs significantly from an appeal of discovery sanctions that were awarded in general litigation [*8] or in an adversary proceeding in bankruptcy. The sanctions order here was issued in the main Chapter 7 case, rather than within an adversary proceed-

ing. The order did not award sanctions for a discovery violation under *Federal Rule of Civil Procedure 37*, which is applicable to adversary proceedings in bankruptcy through *Bankruptcy Rule 7037*. Instead, the court awarded sanctions for civil contempt due to Debtor's failure to comply with the court's 2004 Order that Debtor appear at a 2004 examination and produce documents to Trustee's counsel before the 2004 examination. Thus, neither *Cunningham* nor *Markus* directly addresses the procedural context of the case at hand.

[HN8] While civil contempt orders entered "during the course of a pending civil action" are not appealable until final judgment, [5] the Ninth Circuit has allowed immediate appeals of sanctions orders that dispose of the only issue before the court. *See Shuffler v. Heritage Bank, 720 F.2d 1141, 1145 (9th Cir. 1983)* (order finding party in contempt of prior judgment is final); *Hilao v. Estate of Marcos, 103 F.3d 762, 764 (9th Cir. 1996)* (post-judgment orders of contempt are final and appealable).

> 5   *SEC v. Elmas Trading Corp., 824 F.2d 732, 732 (9th Cir. 1987).*

[HN9] *Rule 9020* [*9] provides that motions for contempt in bankruptcy cases are contested matters governed by *Rule 9014.* [6] In this case, the contested matter alleging Debtor's contempt was the only matter before the court. [HN10] The order entered resolving a contested matter has the status of a judgment under *Federal Rule of Civil Procedure 58. Fed. R. Civ. P. 58, incorporated by Fed. R. Banks. P. 9021.* It follows that the court's award of sanctions was a final order that ended the particular contested matter.

> 6   Although some courts continue to require a party seeking an order of contempt to apply to the court for an Order to Show Cause Re Contempt, we note that *Rule 9020* supersedes this procedure and renders it unnecessary. From 1987 until 2001, *Rule 9020(b)* provided in relevant part that "[c]ontempt committed in a case or proceeding pending before a bankruptcy judge ... may be determined by the bankruptcy judge only after a hearing on notice," and that "[t]he notice may be given on the court's own initiative or on application of the United States attorney or by an attorney appointed by the court for that purpose." In 2001, *Rule 9020* was amended to simply state that [HN11] "*Rule 9014* governs a motion for an order of contempt [*10] made by the United States trustee or a party in interest." Hence, [HN12] a request for civil contempt is a contested matter and, as such, "relief should be requested by motion." [HN13] Motions for contempt are

ordinary contested matters and need not involve an application for an Order to Show Cause.

If the award of sanctions were not appealable now, it is unclear when the order would become final and appealable. [HN14] Unlike an adversary proceeding or a civil action outside bankruptcy, the culmination of the bankruptcy case does not result in a final judgment.

Because the sanctions order stands: alone and requires no further action by the bankruptcy court, the order is a final order, and the panel has jurisdiction under *28 U.S.C. § 158.*

## V. DISCUSSION

[HN15] Bankruptcy courts have the power to impose civil contempt. *See Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.), 77 F.3d 278, 284-85 (9th Cir. 1996); see also 11 U.S.C. 105(a).* In order to hold a debtor in contempt, the bankruptcy court must find that the debtor "violated a specific and definite order of the court." *Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1191 (9th Cir. 2003).* Because Debtor's conduct demonstrates her repeated refusal [*11] to comply with the court's clear order to appear for a 2004 examination, we cannot find that the bankruptcy court abused its discretion by holding Debtor in civil contempt and imposing sanctions on her.

The bankruptcy court's 2004 Order was a definite and specific order. It set forth the date, time, and place of the 2004 examination and stated that "IT IS ORDERED that [Debtor] appear for examination." Debtor does not allege that the 2004 Order contained any ambiguity.

More than six months elapsed between the issuance of the 2004 Order and the hearing on Trustee's Motion. The 2004 examination was scheduled and rescheduled for four different dates. Twice, Debtor communicated excuses for her unavailability to Trustee's counsel on the eve of the 2004 examination. Twice, Debtor petitioned the court to excuse her from appearing at the 2004 examination and from producing documents to Trustee's counsel. The court denied Debtor's Motion for Protective Order and Motion for Reconsideration. Debtor claimed that she did not receive notice of Trustee's counsel's third attempt to hold a 2004 examination. Even if this contention were true, it does not excuse Debtor's subsequent noncompliance. Trustee's [*12] Motion was continued from the original July 11 date to allow Debtor the opportunity to produce documents and attend a 2004 examination in August. Debtor refused to provide the required documents and objected to the request on the date the documents were to be produced. Trustee's counsel cancelled the August 2004 examination after Debtor failed to produce documents.

In support of her appeal, Debtor argues that sanctions should riot be awarded because Trustee's counsel was ineligible to practice law beginning on August 16, 2007, and because she allegedly failed to comply with Local Rules regarding discovery disputes. She also complains of alleged deficiencies in Trustee's Motion. We do-not find Debtor's arguments persuasive.

First, Debtor's conduct during the time when Trustee's counsel was eligible to practice law provides sufficient grounds for holding Debtor in civil contempt. The sanctions awarded did not include attorney's fees incurred when Trustee's counsel was ineligible to practice law.[7] The sanctions awarded by the court were limited to attorney's fees for work performed prior to the filing of the Motion on June 11, 2007. Trustee's counsel submitted a supplemental declaration [*13] requesting additional attorney's fees for his continued attempts to conduct a 2004 examination after the filing of the Motion. The court did not include these additional fees in its sanctions award, but only awarded the original amount requested. In addition, the Motion was based on Debtor's conduct prior to June 11, 2007 - all of which occurred when Trustee's counsel was eligible to practice law. The majority of events that transpired between Debtor and Trustee's counsel occurred when Trustee's counsel was eligible to practice law.

> 7 Trustee's counsel was temporarily suspended from practice for non-payment of his bar fees, not for misconduct.

Second, Debtor's contention that Trustee's counsel did not comply with Local Rule 9013-1(c), which pertains to discovery disputes, does not affect the award of sanctions. [HN16] Local Rule 9013-1(c) provides that in the event of a dispute arising under *Rule 2004*, "counsel for the parties shall meet in person or by telephone in a good faith effort to resolve the discovery dispute" and that "[i]f counsel are unable to settle their differences, the party seeking discovery shall file and serve a notice of motion together with a written stipulation." Trustee's [*14] counsel attempted to meet and confer with Debtor, in accordance with Local Rule 9013-1(c)(1). Instead of contacting Trustee's counsel by telephone or arranging to meet him in person, as the rule requires, Debtor faxed Trustee's counsel a letter instructing him to prepare a

stipulation, as described by Local Rule 9013-1(c)(2). Trustee's counsel prepared his portion of the stipulation and gave Debtor an opportunity to contribute to the stipulation. Debtor claimed that she was ill and unable to prepare her portion of the stipulation by August 30, 2007. Instead, she composed a letter objecting to the amount of time she was given to review the stipulation and to the format of the stipulation, and faxed this letter on August 30.

Debtor seems to argue that Trustee's counsel bore the responsibility of complying with Local Rule 9013-1(c); he did not comply with the Local Rule; and therefore sanctions cannot be awarded against Debtor. Debtor's argument is unpersuasive for both factual and logical reasons. First, Trustee's counsel seems to have done all that he could to comply with the rule despite Debtor's lack of cooperation. Debtor did not meet and confer with Trustee's counsel, and she did [*15] not take part in preparing the discovery stipulation. Second, Debtor's attempt to shift blame onto Trustee's counsel does not excuse her blatant and persistent evasion of the court-ordered 2004 examination.

Third, Debtor's argument that the Motion cites inapplicable law and misquotes a Rule of. Bankruptcy Procedure also lacks. merit. The Motion cites the *Rainbow Magazine* decision which, although factually different from the case at hand, stands for the proposition that bankruptcy courts have the power to 'hold parties in civil contempt. Although the Motion quotes an obsolete version of *Rule 9020*, which was amended in 2001, Debtor presents nothing to suggest this inaccuracy affected the court's decision to impose sanctions.

None of the arguments presented by Debtor on appeal establish that the bankruptcy court applied an erroneous view of the law or clearly erroneous factual findings when making its decision to hold Debtor in contempt. We conclude that the court did not abuse its discretion to impose sanctions on Debtor.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM the bankruptcy court's order granting the contempt Motion and awarding sanctions to Trustee.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

Global Industrial Technologies, Inc., *et al.*    Bankruptcy No.  02-21626-JKF

      Debtor(s)    Chapter 11

      **Related to Doc. No. 6375, Debtors' Motion to
Strike Certain Insurers' Objections to GIT Plan
and Witness Designations for Lack of Standing**

**MEMORANDUM ORDER**

**AND NOW**, this **21ˢᵗ** day of **September, 2007**, we address the motion of Global

Industrial Technologies, Inc. ("GIT") and its subsidiaries (collectively "Debtors") to strike

objections and witness designations filed by Hartford Accident and Indemnity Company, First

State Insurance Company, and Twin City Fire Insurance Company (collectively "Hartford") and

California Union Insurance Company, International Insurance Company, and Westchester

Insurance Company (collectively "California Union").  Debtors assert that the Insurers lack

standing inasmuch as they are not creditors of Debtors and that all insurer prepetition rights are

preserved through insurance neutrality provisions in the plan.[1]  We agree.

    With respect to the request to strike the Insurers' witness designations, as to those

witnesses who testified we gave appropriate weight to their testimony in the Memorandum

Opinion and Order addressing confirmation.  We note that some of the witnesses designated by

Insurers did not testify and some were also designated by other parties and did testify.

---

[1]Objections with respect to the propriety of the APG Silica Trust and Silica Channeling
Injunction are addressed in this court's Memorandum Opinion and Order of this date.

1

Therefore, that part of Debtors' motion to strike that addresses Insurers' witness designations is **denied as moot.**

Debtors' motion to strike Insurers' objections based on insurance neutrality and assignment is **granted**. With respect to the insurance neutrality objections, the Debtors included "insurance neutrality" provisions as technical amendments to the Plan.[2] We find that those provisions are adequate to protect insurers' contractual rights.

We also find that, although the Plan assigns to the APG Silica Trust the Debtors' rights to coverage for APG Silica Claims under certain insurance policies, including those issued by Hartford and California Union, the assignment is authorized by law.

It is established in this circuit that assignment of policy proceeds is not prohibited by anti-assignment provisions in insurance policies. *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004). Furthermore, once an event occurs that gives rise to the insurer's liability under the policy, the policy itself can be assigned. *See generally* 3 Couch on Insurance §35.7 (3d ed. 1999). *See also Viola v. Fireman's Fund Insurance Co.*, 965 F.Supp. 654, 658 (E.D. Pa. 1997)("[u]nder Pennsylvania law, an insurer may not limit an insured's ability to assign . . . rights under a policy after the occurrence of the event which gives rise to the insurer's liability"). The court in *Viola* also noted as follows:

---

[2]*See* §§4.4.1, 4.4.2, 4.4.3, Proposed Modifications to the Third Amended Plans of Reorganization Dated December 28, 2005, of North American Refractories Company and its Subsidiaries and Global Industrial Technologies, Inc. and its Subsidiaries, GIT Doc. No. 6244. Debtors assert in their motion that although they sought input from Hartford, California Union, and other insurers regarding insurance neutrality provisions, none provided comment. In the course of issuing our Memorandum Opinion and Order with respect to confirmation of the GIT Plan this court examined various filings of Hartford, California Union, and other insurers but their focus was on the necessity and fairness of the Silica Trust and APG Silica Trust and Silica Channeling Injunction.

2

> [a]fter a loss has occurred, the right of the insured or his successor
> in interest to the indemnity provided in the policy becomes a fixed
> and vested right; it is an obligation or debt due from the insurer to
> the insured, subject only to such claims, demands, or defenses as
> the insurer would have been entitled to make against the original
> insured.

965 F.Supp. at 653 (citation omitted).

See also National Memorial Services v. Metropolitan Life Insurance Co., 49 A.2d 382

(Pa. 1946)(anti-assignment clause does not preclude beneficiaries of life insurance policy from

assigning proceeds of policy after the event giving rise to liability; it applies only to assignments

before liability). See also OneBeacon America Insurance Co. v. A.P.I., Inc. 2006 WL 1473004

at *2-*3 (D.Minn. May 25, 2006)(anti-assignment clauses are to protect insurer from increase in

the risk it agreed to insure but assignment of loss does not expand risk to insurer, simply allows

change in identity to "reconnect the policy's coverage to the insured loss;" most courts follow

the risk/loss distinction to allow insured to assign loss); R.L. Vallee, Inc. v. American Intern.

Specialty Lines Insurance Co., 431 F.Supp.2d 428, 435 (D.Vt. 2006)(assignments after loss are

permitted as there is no additional risk to insurer; anti-assignment clauses operate after loss

occurs to limit the free assignability of claims which is not favored by the law).

       To the extent that in this case the events occurred giving rise to liability there will be no

additional risk to the insurance companies by virtue of the assignments.  Coverage issues,

including, inter alia, proof that an event giving rise to liability occurred within the covered

period before a specific policy can be accessed for coverage, are all preserved.[3]

_____

       [3]GIT's Plan expressly provides that no entity is precluded from asserting any claims,
defenses, etc., with respect to APG Silica Trust Policies except those based on arising out of
anti-assignment provisions.  See § 4.4.1, GIT Doc. No. 6244.  Based on the state of the law, this
                                                                        (continued...)

3

The rule enunciated in *National Memorial Services, supra,* that a non-assignment clause is unenforceable after the loss has occurred, was reiterated in *Egger v. Gulf Insurance Co.*, 903 A.2d 1219 (Pa. 2006).

The Pennsylvania Supreme Court in *Egger* noted that *National Memorial Services* involved a life insurance policy but applied the rule to the facts before it involving personal injury and an excess insurance policy. The court in *Egger* said:

> The logic behind the general rule is that post-loss assignments do not invalidate the policy, thereby changing the risks the insurer undertook to insure; rather, they assign the right to a money claim. See G. Couch, CYCLOPEDIA OF INSURANCE LAW § 35.7 (3d ed. 1995) ("The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise [*16] to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.").

> While *Nat'l Mem'l* involved life insurance policies and the matter concerns an excess insurance policy, this distinction does not warrant a different outcome or analysis. The triggering event for coverage in *Nat'l Mem'l* was the death of the insured. Accordingly, we found that there was no "sound reason for the insurance company to forbid or limit an assignment by a beneficiary of the amount due him or her after the death of the insured." *Id.* at 382-83.

> However, with the Gulf excess insurance policy, there was no death of an insured; rather, Foulke purchased coverage to protect itself against an award of damages exceeding the limits of its

---

[3](...continued)
provision is appropriate. Further, the Plan provides that no insurer's legal, equitable, or contractual rights, except enforcement of anti-assignment provisions, are affected. *Id.* at §4.4.2. The Plan also provides that issue or claim preclusion cannot be asserted against any insurer regarding any APG Silica Claim or Demand based on "submission, valuation, resolution and/or payment of any APG Silica Trust Claim by the APG Silica Trust" and that submission of such a claim and the valuation, resolution or payment of same by the Trust is "wholly without prejudice to any and all rights of the parties in all other contexts or forums [sic], and shall not be deemed (unless otherwise determined by a Court of competent jurisdiction) to be a triggering event for liability under any APG Silica Trust Policy." *Id.* at §4.4.3.

4

primary liability policy with respect to its activities at the PECO plant. Foulke provided plant protection and security services pursuant to its contracts with PECO. Gulf insured these activities of Foulke through its issuance of an excess insurance policy, "which provides coverage for any sum the insured is obligated to pay for bodily injury arising out of an 'occurrence.'" Trial Court Opinion at 2. It is an "Occurrence" that triggers the obligation of Foulke. . . .

Consequently, in parsing the terms of the policy, the triggering event for coverage was bodily injury occasioned by Foulke, which arose out of an Occurrence during the period of the policy. . . .

In attempting to circumvent the principle that we articulated in *Nat'l Mem'l* that a restriction against a post-loss assignment is void, Gulf asserts that its loss did not arise until the jury reached its verdict and awarded damages in an amount exceeding the underlying $ 1,000,000.00 of primary insurance coverage . . .

This argument lacks merit. First, as Appellee correctly notes, the term "by reason of liability imposed by law" could mean, for example: (1) only after a judgment has been entered; (2) only after all appeals are exhausted and the verdict stands; (3) only after efforts to execute judgment have begun; (4) the occurrence upon which the liability is based (i.e., the death of Egger); or (5) only after the tender of primary coverage. . . . This demonstrates the ambiguity of the clause that Gulf cites as support for its argument that this term means the jury verdict.

We have stated that where ambiguity exists in the interpretation of policy language, the ambiguity must be construed in favor of coverage.

*Egger v. Gulf Insurance. Co.*, 903 A.2d at 1224-26 (citations omitted).

In *In re Western Asbestos Company*, 313 B.R 832, 858 (Bankr.N.D.Cal. 2003), *aff'd* 2004 WL 1944792 (N.D.Cal. April 16, 2004), the bankruptcy court concluded that under 11 U.S.C. §1123(a)(5), policies or rights thereunder may be transferred to an asbestos personal injury trust, whether or not state law would permit assignment.

5

In a subsequent opinion in the same case, *In re Western Asbestos Co*., 313 B.R. 456, 459 (Bankr.N.D.Cal. 2004), the court held that, with respect to causes of action that were transferred to the trust pursuant to the plan of reorganization, court orders or a plan confirmation order, the trust was designated as a successor to the debtors and a representative of the chapter 11 estates. Further, the court held that the trust was authorized as a matter of law to appear in and act for debtors in pending actions and to pursue causes of action for the benefit of holders of asbestos related claims.  The court found that under §1123(b)(3)(B), on the effective date of the plan,

> the Trust shall be vested with and have the right to enforce against any Entity any and all such causes of action, with the proceeds of the recovery of any such actions related to insurance for Asbestos Related Claims (including, without limitation, the Coverage Litigation) to be paid to the respective Debtor . . . .

313 B.R. at 459.  The court concluded that insurance rights could be vested in the trust under §1123(a)(5)(B), notwithstanding state law or contractual provisions to the contrary.  *Id.* at 462. The court further ruled that the vesting of insurance rights in the trust "shall neither diminish nor impair the enforceability of any of the Asbestos Insurance Policies against a party that is not a Released Party."  *Id.*  Likewise, it would not expand rights.  We agree with this analysis and adopt it here.

In *Mid-Valley, Inc., et al.*, 305 B.R. 425 (Bank.W.D.Pa. 2004), this court held that objecting insurers had no standing to object to the plan because they were not affected by the filing of the bankruptcy - all their defenses were preserved and they were not creditors of the debtors in that case.  To the extent the Insurers herein are parties in interest because some day they may face liability if the Trust pays a claim, there is no case in controversy at this time.

> One element of the "bedrock" case-or-controversy requirement is that plaintiffs must establish that they have standing to sue. . . .  On

6

> many occasions, we have reiterated the three requirements that
> constitute the "irreducible constitutional minimum" of standing. . .
> . First, a plaintiff must demonstrate an "injury in fact," which is
> "concrete," "distinct and palpable," and "actual or imminent." . . . .
> Second, a plaintiff must establish "a causal connection between the
> injury and the conduct complained of - the injury has to be 'fairly
> trace[able] to the challenged action of the defendant, and not . . .
> th[e] result [of] some third party not before the court'" . . . . Third,
> a plaintiff must show "'the substantial likelihood' that the
> requested relief will remedy the alleged injury in fact."

*McConnell v. Federal Election Commission,* 540 U.S. 93, 225 (2003)(citations omitted).

In *In re Kaiser Aluminum Corp.*, 343 B.R. 88 (D.Del. 2006), in affirming the Bankruptcy Court on the issue of assignment of insurance polices, the District Court for the District of Delaware permitted the debtor in that case to assign insurance proceeds to a non-asbestos personal injury trust pursuant to 11 U.S.C. §1123(a) "which expressly provides for the preemption of nonbankruptcy law." *Id.* at 95. In *Kaiser* the nonbankruptcy law addressed was that purporting to limit or restrict a debtor's rights to assign interests in insurance policies. Further, relying on *Combustion Engineering*, the District Court in *Kaiser* held that §1123(a) preempts the anti-assignment clauses in insurance policies. *Kaiser, supra*, 343 B.R. at 95.

In the case before us, the Insurers have suffered no injury in fact and the injury they assert will occur in the future is not imminent. All coverage defenses and contractual rights of insurers are preserved. They are not required, and have not been asked, to contribute anything to the APG Silica Trust. The anti-assignment clauses in the insurance policies are preempted by the Bankruptcy Code.

It is **FURTHER ORDERED** that counsel for Debtor(s) shall immediately serve a copy of this Memorandum Opinion and Order on the all parties on the current Service List and any other parties in interest and shall file proof of service forthwith.

7

.

*Judith K. Fitzgerald*                                    jmd

Judith K. Fitzgerald
United States Bankruptcy Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| FEDERAL-MOGUL GLOBAL INC., T&N | ) |
| LIMITED, *et al.*, | ) |
| | ) |
| | ) |
| | ) |
| CERTAIN UNDERWRITERS AT LLOYD'S, | ) |
| LONDON, *et al.*, | ) |
| | ) |
| Appellants | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL-MOGUL GLOBAL INC., *et al.*, | ) |
| | ) |
| Appellees. | ) |
| | ) |

Chapter 11

Bankruptcy Case No. 01-10578

Civil Action Nos. 08-0229 and 08-230

Judge Joseph H. Rodriguez

## CERTIFICATE OF SERVICE

I, Richard W. Riley, certify that I am not less than 18 years of are, and that service of a

copy of the Brief of Appellants, Certain Underwriters At Lloyd's, London And Certain London

Market Companies was made on May 21, 2008 upon the individuals identified on the attached

Service List by the manner of delivery indicated on the Service List.

Under penalty of perjury, I declare the foregoing is true and correct.

Dated: May 21, 2008
Wilmington, Delaware

Richard W. Riley (DE 4052)
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Telephone:     (302) 657-4928
Facsimile:     (302) 657-4901
E-mail:     rwriley@duanemorris.com

## SERVICE LIST

| | |
|---|---|
| **VIA FIRST CLASS MAIL**<br>James F. Conlan<br>Larry J. Nyhan<br>Jeffrey C. Steen<br>Kevin T. Lantry<br>Kenneth P. Kansa<br>Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, Illinois 60603 | **VIA HAND DELIVERY**<br>James L. Patton, Jr.<br>Edwin J. Harron<br>Young Conaway Stargatt & Taylor, LLP<br>The Brandywine Building, 17th Floor<br>1000 West Street<br>P.O. Box 391<br>Wilmington, Delaware 19899-0391 |
| **VIA HAND DELIVERY**<br>Laura Davis Jones<br>James E. O'Neill<br>Pachulski Stang Ziehl & Jones LLP<br>919 Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19899-8705 | **VIA FIRST CLASS MAIL**<br>Eileen T. McCabe<br>Mendes & Mount LLP<br>750 Seventh Avenue<br>New York, New York 10019-6829 |
| **VIA HAND DELIVERY**<br>Marla R. Eskin<br>Kathleen Campbell Davis<br>Campbell & Levine, LLC<br>800 N. King Street, Suite 300<br>Wilmington, Delaware 19801 | **VIA FIRST CLASS MAIL**<br>Russell W. Roten<br>Duane Morris LLP<br>633 W. 5th Street, Suite 4600<br>Los Angeles, CA 90071 |
| **VIA FIRST CLASS MAIL**<br>Elihu Inselbuch<br>Caplin & Drysdale Chartered<br>375 Park Avenue, 35th Floor<br>New York, NY 10152-3500 | **VIA FIRST CLASS MAIL**<br>Steven M. Crane<br>Berks Crane Robinson & Seal LLP<br>515 South Figueroa Street, Suite 1500<br>Los Angeles, California 90071 |
| **VIA FIRST CLASS MAIL**<br>Peter Van N. Lockwood<br>Caplin & Drysdale Chartered<br>One Thomas Circle, NW<br>Washington DC 20005 | **VIA FIRST CLASS MAIL**<br>Michael A. Shiner<br>Tucker Arensberg, P.C.<br>1500 One PPG Place<br>Pittsburgh, PA 15222 |
| **VIA HAND DELIVERY**<br>Richard L. Schepacarter<br>Trial Attorney<br>Office of U.S. Trustee<br>J. Caleb Boggs Federal Buiding<br>844 North King Street<br>Room 2207, Lockbox 35<br>Wilmington, Delaware 19801 | **VIA HAND DELIVERY**<br>Sean J. Bellew<br>Cozen O'Connor<br>1201 N. Market Street<br>Suite 1400<br>Wilmington, DE 19801 |
| **VIA HAND DELIVERY**<br>James S. Yoder<br>White and Williams LLP<br>824 N. Market Street, Suite 902<br>P.O. Box 709<br>Wilmington, DE 19899-0709 | **VIA FIRST CLASS MAIL**<br>Michael S. Davis<br>Jantra Van Roy<br>Zeichner Ellman & Krause LLP<br>575 Lexington Avenue<br>New York, New York 10022 |
| | **VIA HAND DELIVERY**<br>Bruce E. Jameson<br>Prickett, Jones & Elliott, P.A.<br>1310 King Street<br>Wilmington, Delaware 19899 |

**VIA FIRST CLASS MAIL**
Elit R. Felix, II
Margolis Edelstein
The Curtis Center, 4th Floor
601 Walnut Street
Philadelphia, PA 19106-3304

**VIA HAND DELIVERY**
John D. Demmy
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801

**VIA FIRST CLASS MAIL**
Leonard P. Goldberger
Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA 19103

**VIA HAND DELIVERY**
Michael W. Yurkewicz
Klehr, Harrison, Harvey Branzburg and Ellers LLP
919 Market Street, Suite 1000
Wilmington, Delaware 19801

**VIA FIRST CLASS MAIL**
David C. Christian II
William J. Factor
Seyfarth Shaw LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603

**VIA FIRST CLASS MAIL**
Craig Goldblatt
Nancy L. Manzer
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., NW
Washington, D.C. 20006

**VIA FIRST CLASS MAIL**
William J. Bowman
James P. Ruggeri
Edward B. Parks, II
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| FEDERAL-MOGUL GLOBAL INC., T&N LIMITED, *et al.*, | ) Chapter 11 |
| | ) Bankruptcy Case No. 01-10578 |
| | ) |
| ———————————— | ) |
| | ) |
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, *et al.*, | ) Civil Action Nos. 08-0229 and 08-230 |
| | ) Judge Joseph H. Rodriguez |
| Appellants | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL-MOGUL GLOBAL INC., *et al.*, | ) |
| | ) |
| Appellees. | ) |
| | ) |

## CERTIFICATE OF SERVICE

I, Richard W. Riley, certify that I am not less than 18 years of are, and that service of a copy of the Brief of Appellants, Certain Underwriters At Lloyd's, London And Certain London Market Companies was made on May 21, 2008 upon the individuals identified on the attached Service List by the manner of delivery indicated on the Service List.

Under penalty of perjury, I declare the foregoing is true and correct.

Dated: May 21, 2008
Wilmington, Delaware

Richard W. Riley (DE 4052)
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Telephone:    (302) 657-4928
Facsimile:    (302) 657-4901
E-mail:    rwriley@duanemorris.com

# SERVICE LIST

| | |
|---|---|
| **VIA FIRST CLASS MAIL**<br>James F. Conlan<br>Larry J. Nyhan<br>Jeffrey C. Steen<br>Kevin T. Lantry<br>Kenneth P. Kansa<br>Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, Illinois 60603 | **VIA HAND DELIVERY**<br>James L. Patton, Jr.<br>Edwin J. Harron<br>Young Conaway Stargatt & Taylor, LLP<br>The Brandywine Building, 17th Floor<br>1000 West Street<br>P.O. Box 391<br>Wilmington, Delaware 19899-0391 |
| **VIA HAND DELIVERY**<br>Laura Davis Jones<br>James E. O'Neill<br>Pachulski Stang Ziehl & Jones LLP<br>919 Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19899-8705 | **VIA FIRST CLASS MAIL**<br>Eileen T. McCabe<br>Mendes & Mount LLP<br>750 Seventh Avenue<br>New York, New York 10019-6829 |
| **VIA HAND DELIVERY**<br>Marla R. Eskin<br>Kathleen Campbell Davis<br>Campbell & Levine, LLC<br>800 N. King Street, Suite 300<br>Wilmington, Delaware 19801 | **VIA FIRST CLASS MAIL**<br>Russell W. Roten<br>Duane Morris LLP<br>633 W. 5th Street, Suite 4600<br>Los Angeles, CA 90071 |
| **VIA FIRST CLASS MAIL**<br>Elihu Inselbuch<br>Caplin & Drysdale Chartered<br>375 Park Avenue, 35th Floor<br>New York, NY 10152-3500 | **VIA FIRST CLASS MAIL**<br>Steven M. Crane<br>Berks Crane Robinson & Seal LLP<br>515 South Figueroa Street, Suite 1500<br>Los Angeles, California 90071 |
| **VIA FIRST CLASS MAIL**<br>Peter Van N. Lockwood<br>Caplin & Drysdale Chartered<br>One Thomas Circle, NW<br>Washington DC 20005 | **VIA FIRST CLASS MAIL**<br>Michael A. Shiner<br>Tucker Arensberg, P.C.<br>1500 One PPG Place<br>Pittsburgh, PA 15222 |
| **VIA HAND DELIVERY**<br>Richard L. Schepacarter<br>Trial Attorney<br>Office of U.S. Trustee<br>J. Caleb Boggs Federal Buiding<br>844 North King Street<br>Room 2207, Lockbox 35<br>Wilmington, Delaware 19801 | **VIA HAND DELIVERY**<br>Sean J. Bellew<br>Cozen O'Connor<br>1201 N. Market Street<br>Suite 1400<br>Wilmington, DE 19801 |
| | **VIA FIRST CLASS MAIL**<br>Michael S. Davis<br>Jantra Van Roy<br>Zeichner Ellman & Krause LLP<br>575 Lexington Avenue<br>New York, New York 10022 |
| **VIA HAND DELIVERY**<br>James S. Yoder<br>White and Williams LLP<br>824 N. Market Street, Suite 902<br>P.O. Box 709<br>Wilmington, DE 19899-0709 | **VIA HAND DELIVERY**<br>Bruce E. Jameson<br>Prickett, Jones & Elliott, P.A.<br>1310 King Street<br>Wilmington, Delaware 19899 |

<u>**VIA FIRST CLASS MAIL**</u>
Elit R. Felix, II
Margolis Edelstein
The Curtis Center, 4th Floor
601 Walnut Street
Philadelphia, PA 19106-3304

<u>**VIA HAND DELIVERY**</u>
John D. Demmy
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801

<u>**VIA FIRST CLASS MAIL**</u>
Leonard P. Goldberger
Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA 19103

<u>**VIA HAND DELIVERY**</u>
Michael W. Yurkewicz
Klehr, Harrison, Harvey Branzburg and Ellers LLP
919 Market Street, Suite 1000
Wilmington, Delaware 19801

<u>**VIA FIRST CLASS MAIL**</u>
David C. Christian II
William J. Factor
Seyfarth Shaw LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603

<u>**VIA FIRST CLASS MAIL**</u>
Craig Goldblatt
Nancy L. Manzer
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., NW
Washington, D.C. 20006

<u>**VIA FIRST CLASS MAIL**</u>
William J. Bowman
James P. Ruggeri
Edward B. Parks, II
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004