**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| FEDERAL-MOGUL GLOBAL INC., T&N LIMITED, *et al.*, <br><br> Reorganized Debtors. | ) ) ) ) ) ) | Chapter 11 <br><br> Bankruptcy Case No. 01-10578 |
| CERTAIN UNDERWRITERS AT LLOYDS, LONDON, *et al.*, <br><br> Appellants, <br><br> v. <br><br> FEDERAL-MOGUL GLOBAL INC., *et al.* <br><br> Appellees. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action Nos. 08-0229 and 08-0230 <br><br> Judge Joseph H. Rodriguez |

## CERTAIN APPELLANTS' BRIEF ON APPEAL

KLEHR, HARRISON, HARVEY
  BRANZBURG AND ELLERS LLP
Michael W. Yurkewicz
919 Market Street, Suite 1000
Wilmington, DE 19801
(302) 426-1189

HOGAN & HARTSON, L.L.P.
William J. Bowman
James P. Ruggeri
Edward B. Parks, II
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Craig Goldblatt
Danielle Spinelli
Nancy L. Manzer
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 663-6000

*Counsel for Appellants Hartford Accident and Indemnity Company, First State Insurance Company, and New England Insurance Company*

WHITE AND WILLIAMS LLP
James S. Yoder
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709
(302) 467-4525

MARGOLIS EDELSTEIN
Elit R. Felix, II
The Curtis Center, 4th Floor
601 Walnut Street
Philadelphia, PA 19106-3304
(215) 931-5870

*Counsel for Appellants Allianz Global Corporate & Specialty AG (as successor-by-partial-merger to Allianz Verischerungs AG as to Policy No. H. 0 001 456); Allianz Global Risks U.S. Insurance Company (f/k/a Allianz Insurance Company); and Allianz Underwriters Insurance Company (f/k/a Allianz Underwriters, Inc.)*

COZEN O'CONNOR
Sean J. Bellew
1201 N. Market Street
Suite 1400
Wilmington, DE 19801
(302) 295-2026

ZEICHNER ELLMAN & KRAUSE LLP
Michael S. Davis
Jantra Van Roy
575 Lexington Avenue
New York, New York 10022
(212) 223-0400

*Counsel for Appellants AIG Casualty Company; AIU Insurance Company; American Home Assurance Company; Granite State Insurance Company; Insurance Company of the State of Pennsylvania; Lexington Insurance Company; National Union Fire Insurance Company of Pittsburgh, Pa; New Hampshire Insurance Company*

PRICKETT, JONES & ELLIOTT, P.A.
Bruce E. Jameson
1310 King Street
Wilmington, DE 19899
(302) 888-6500

BERKES CRANE ROBINSON & SEAL LLP
Steven M. Crane
515 South Figueroa Street, Suite 1500
Los Angeles, CA 90071
(213) 955-1150

SEYFARTH SHAW LLP
David C. Christian III
William J. Factor
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000

*Columbia Casualty Company, Continental Casualty Company, The Continental Insurance Company, Both In Its Individual Capacity and As Successor To Certain Interests Of Harbor Insurance Company*

STEVENS & LEE, P.C.                     STEVENS & LEE, P.C.
John D. Demmy                           Leonard P. Goldberger
1105 North Market Street, 7th Floor     1818 Market Street, 29th Floor
Wilmington, DE  19801                   Philadelphia, PA  19103
(302) 425-3308                          (215) 864-7000

*Fireman's Fund Insurance Company and National Surety Company*

Dated: May 21, 2008

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

BASIS FOR JURISDICTION ....................................................................................... 3

ISSUE PRESENTED ..................................................................................................... 4

STANDARD OF REVIEW ............................................................................................ 4

STATEMENT OF THE FACTS AND OF THE CASE ................................................. 4

ARGUMENT ............................................................................................................... 13

I.  The Court's Ruling That Insurers' Anti-Assignment Provisions Are Preempted Is An Improper Declaratory Judgment ............................................................ 13

II.  The Bankruptcy Code Does Not Preempt The Anti-Assignment Provisions In Appellants' Insurance Contracts ...................................................................... 16

    A.  The Bankruptcy Code Does Not Expressly Preempt The Insurers' Policy Rights ................................................................................................. 18

        1.  Section 1123(a)(5) Does Not Preempt Private Contracts .......................... 19

        2.  Section 1123(a)(5)(B) Preempts Only Laws "Relating To Financial Condition" Of The Debtor ........................................................................ 21

        3.  *Combustion Engineering* Does Not Address The Preemptive Effect Of Section 1123(a)(5) ..................................................................... 26

    B.  The Bankruptcy Code Does Not Impliedly Preempt Appellants' Rights Under The Insurance Contracts ....................................................... 28

        1.  There Is No Conflict Between The Bankruptcy Code And The Anti-Assignment Provisions ...................................................................... 29

        2.  The Anti-Assignment Provisions Pose No Obstacle To The Bankruptcy Code's Objectives .................................................................. 30

CONCLUSION ............................................................................................................ 33

# TABLE OF AUTHORITIES

## CASES

*Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76 (3d Cir. 1999)............4

*American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995).............................................20

*Associates Commercial Corp v. Rash*, 520 U.S. 953 (1997) .......................................19

*Baker & Drake, Inc. v. Pub. Serv. Comm'n*, 35 F.3d 1348 (9th Cir. 1994) ...................31

*Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993).................................................................... 19-20

*Butner v. United States*, 440 U.S. 48 (1979).........................................................18, 30

*Calderon v. Ashmus*, 523 U.S. 740 (1998) ............................................................15

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) ..........................................16, 20

*Coffman v. Breeze Corporations*, 323 U.S. 316 (1945)...............................................15

*Cohen v. De La Cruz*, 523 U.S. 213 (1998).............................................................24

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806 (1997) ...............18

*Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824).....................................................19

*Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985) .........16

*In re Amatex Corp.*, 107 B.R. 856 (E.D. Pa. 1989) .................................................14

*In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004)......................... *passim*

*In re FCX, Inc.*, 853 F.2d 1149 (4th Cir. 1988) ....................................................23, 25

*In re Hanson*, 397 F.3d 482 (7th Cir. 2005) .........................................................14

*In re Kaiser Aluminum Corp.*, 343 B.R. 88 (D. Del. 2006),.......................................25

*In re Stone & Webster, Inc.*, 286 B.R. 532 (Bankr. D. Del. 2002) ...............................25

*In re Western Asbestos Co.*, 313 B.R. 832 (Bankr. N.D. Cal. 2003)...........................25

*In re Western Asbestos Co.*, 313, B.R. 456 (Bankr. N.D. Cal.), *aff'd*, 2004 WL 1944792
(N.D. Cal. Apr. 16, 2004) ................................................................................25

*Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487 (3d Cir.
1997) .................................................................................................... *passim*

*Jones v. GE Capital Mortgage Co.*, 179 B.R. 450 (Bankr. E.D. Pa. 1995)...................................30

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001)............................................................16, 28

*MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007)..................................................15

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) .....................................................................16, 18

*Midlantic Nat'l Bank v. New Jersey Dept. of Envtl Prot.*, 474 U.S. 494 (1986)....................19, 24

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984) ..................................................................27

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S.
645 (1995)...............................................................................................................18

*Pacific Gas & Elec. Co. v. California ex. Rel. Cal. Dep't of Toxic Substances Control*,
350 F.3d 932 (9th Cir. 2003) ........................................................................ *passim*

*SEC v. National Sec., Inc.*, 393 U.S. 453 (1969) ....................................................................17

*Sorenson v. Secretary of Treasury*, 475 U.S. 851 (1986) .........................................................23

*Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002) .........................................................18, 29, 32

*United States Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993) .................................................17

## STATUTES AND RULES

11 U.S.C. § 101(32)(A)..................................................................................................23

11 U.S.C. § 363(*l*).......................................................................................................20, 23

11 U.S.C. § 365(e)(1)...................................................................................................20

11 U.S.C. § 365(f)(1)...................................................................................................21

11 U.S.C. § 541(c)(1)...............................................................................................20, 26

11 U.S.C. § 1123(a) ...................................................................................................22

11 U.S.C. §§ 1123(a)(1)-(5)................................................................................................29

11 U.S.C. § 1123(a)(5)(A)-(D), (J)...................................................................................29

11 U.S.C. § 1123(a)(5)(B)..................................................................................................19

11 U.S.C. § 1124(2)............................................................................................................21

11 U.S.C. § 1129................................................................................................................13

11 U.S.C. § 1129(a)(7), (9)................................................................................................29

11 U.S.C. § 1129(b)............................................................................................................29

11 U.S.C. § 1142(a)............................................................................................................21

15 U.S.C. § 1012.........................................................................................................17, 28

15 U.S.C. § 1012(b)............................................................................................................17

Fed. R. Bankr. P. 3020(b)(1).......................................................................................13, 14

Fed. R. Bankr. P. 7001, Part VII.......................................................................................14

Fed. R. Bankr. P. 7001(1), (9)...........................................................................................13

Fed. R. Bankr. P. 9014.......................................................................................................13

## LEGISLATIVE MATERIAL

124 Cong. Rec. 34,005 (1978)...........................................................................................22

## PRELIMINARY STATEMENT

This appeal presents a straightforward question of federal law: whether anything in the text or the purposes of the Bankruptcy Code *requires* that private insurance contracts be re-written to strip out clauses that prohibit the assignment of the policies without the insurers' consent. The bankruptcy court—in an opinion that confused the merits of the state contract law issue with the question whether federal law preempts the terms of the contract—held that the Bankruptcy Code broadly preempts the terms of private insurance contracts, which are otherwise governed by state law.

The bankruptcy court's decision finds no support in the Bankruptcy Code itself, and cannot be squared with traditional federal preemption analysis—an analysis the bankruptcy court's decision hardly engages at all. Federal preemption turns on whether the application of state law is inconsistent with the language or purposes of a federal statute. Here, there is no such inconsistency. Section 1123(a)(5) of the Code, on which the bankruptcy court relied to find preemption, says nothing whatever about the preemption of private *contracts*, as opposed to "otherwise applicable nonbankruptcy *law.*" Moreover, even as to nonbankruptcy *law*, Section 1123(a)(5) preempts only provisions of state law dealing specifically with the debtor's financial condition. *Pacific Gas & Elec. Co. v. California ex. Rel. Cal. Dep't of Toxic Substances Control*, 350 F.3d 932, 943 (9th Cir. 2003). There is thus no basis in the language of the Code for preemption of anti-assignment clauses of private insurance contracts.

Likewise, anti-assignment provisions pose no obstacle to achievement of the purposes of the Bankruptcy Code. An insured's bankruptcy neither increases nor reduces its rights under its insurance policies. Outside of bankruptcy, if an insured seeks unilaterally to assign its policy rights to another entity, and that entity subsequently submits a claim for coverage under that policy, the insurer is free to argue under applicable state law that the assignment vitiates

coverage—an argument that may succeed, or may not, depending on the facts, the specific terms of the contract, and applicable state law. No purpose of the Bankruptcy Code is frustrated if the same holds true in bankruptcy. Either way, in or outside of bankruptcy, the insured has a choice: it can forego the assignment, it can seek the insurer's consent, or it can act unilaterally—in which case it runs the risk that the court with jurisdiction over a state-law insurance coverage dispute will find that the unilateral assignment vitiates the coverage.

Of course, it might be *easier* for the debtor-insured to reorganize if it did not have to worry about a possible defense to coverage based on an anti-assignment clause, just as it might be easier for an insured to engage in certain transactions outside of bankruptcy if it could ignore such a clause—but mere expedience is not the test for preemption. The debtor-insured *can* reorganize while respecting the policy provisions simply by seeking the insurer's consent to any assignment contemplated by its proposed plan of reorganization, or it can structure its plan without an assignment, or it and the creditors voting on the plan can assume the risk that there will be no coverage. The Bankruptcy Code offers qualified debtors a mechanism to reorganize, but it does not guarantee them the opportunity to do it in the most convenient way at the expense of others' contractual rights.

Indeed, the Plan Proponents' contrary construction of Section 1123(a)(5), under which the Bankruptcy Code would allow a debtor to write its own ticket, exempting itself from any provision of an otherwise binding agreement, or from any state law that it finds inconvenient or disadvantageous to its business, is implausible on its face. The Ninth Circuit carefully considered this very argument, and rejected it for these reasons in *Pacific Gas*, 350 F.3d at 943. There is no reason at all to believe the Third Circuit would reach a different decision. There is certainly nothing in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004)—the case

on which the bankruptcy court relied for this purpose—to suggest that the Third Circuit would reject the preemption analysis set out in *Pacific Gas*. To the contrary, *Combustion Engineering* did not address the preemptive effect of Section 1123(a)(5) at all.

In addition, the bankruptcy court's decision should be reversed because this is an unripe dispute that cannot be decided in the abstract and hypothetical form in which it has been presented. The question of the enforceability of the anti-assignment provision will arise only if and when the trust presents a claim for coverage, and an insurer invokes that provision as a reason to deny coverage on that claim. That has not yet occurred. The ruling at issue here is thus effectively a declaratory judgment as to the validity of a defense to a claim that has not yet been brought. The Supreme Court has made clear that federal courts, which are constitutionally forbidden from issuing advisory opinions, may not issue such a declaratory judgment.

The bankruptcy court's decision is thus infirm both procedurally and on the merits and should be reversed.

## BASIS FOR JURISDICTION

The bankruptcy court issued the Order [D.I. 14237] that is the basis for this appeal on March 19, 2008. Certain Appellants thereafter filed a timely notice of appeal pursuant to Fed. R. Bankr. P. 8001 and 8002. [D.I. 14250 and 582593636][1] This court has jurisdiction under 28 U.S.C. § 158(a).

---

[1]    Certain Appellants submit with this brief Appendix to Certain Appellants' Brief on Appeal which contains (1) the more significant record documents (or relevant portions thereof) to which Appellants refer in this brief, and (2) unpublished decisions or other documents to which the court may not have ready access. References to documents contained in the Appendix shall be cited as "App. ___ at ___." Other documents will be referenced by their bankruptcy court docket number.

**ISSUE PRESENTED**

Whether the Bankruptcy Code preempts otherwise enforceable provisions of private

insurance policies that prohibit an insured from assigning the policies (or rights thereunder) to a

third party without the insurer's consent?

**STANDARD OF REVIEW**

The order being appealed addresses only an issue of law, and thus is subject to *de novo*

review. *See generally Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76,

80 (3d Cir. 1999).

**STATEMENT OF THE FACTS AND OF THE CASE**

1. *Debtors' Bankruptcy Filings and the Insurance Stipulation.* Federal Mogul

Corporation and its affiliated debtors ("Debtors") commenced their chapter 11 proceedings in the

bankruptcy court below on October 1, 2001.[2] The bankruptcy filings were driven in part by a

decline in the automotive sector and in part by an increasing number of claims for personal

injury arising from exposure to products containing asbestos. Discl. Stmt. at 30-47.

Debtors filed their Third Amended Joint Plan of Reorganization (the "Third Amended

Plan") in the bankruptcy court on June 4, 2004. D.I. 5121. The plan was based primarily on an

agreement, referred to as the "Central Deal," between the Unsecured Creditors Committee and

the Asbestos Claimants Committee which, at its core, provided that 49.9 percent of the common

stock of Reorganized Federal Mogul would go to the company's prepetition note holders, while

50.1 percent of the stock would be placed into a trust, established pursuant to Section 524(g) of

---

[2]      Disclosure Statement Describing Third Amended Joint Plan of Reorganization, D.I. 5122
("Discl. Stmt.") at 2.

the Bankruptcy Code, for the benefit of the holders of asbestos-related personal injury claims and demands. Discl. Stmt. at 80.

The Central Deal also provided that the trust would receive whatever insurance assets were held by the Debtors before the bankruptcy that would otherwise be available to respond to their asbestos-related personal injury claims. Specifically, the Disclosure Statement stated that the holders of asbestos-related personal injury claims and demands would "receive the benefit of Asbestos Insurance Policies and Asbestos Insurance Action Recoveries."[3] To accomplish this, the Third Amended Plan provided for the transfer, to the trust, of the Asbestos Insurance Policies and other insurance assets. Significantly, the Plan included proposed findings of fact declaring that this transfer did not "violate any obligation of the Debtors or breach any terms, obligations or duties under any applicable Asbestos Insurance Policies, including . . . any consent to assignment provisions," and did not "materially increase any Asbestos Insurance Company's risk." Third Amended Plan, § 7.1.1(o) and (p).

Certain Appellants and other insurers objected to the Third Amended Plan on the grounds, *inter alia*, that the Plan violated provisions in their policies that prohibited the assignment of the Policies, or interests therein, to the trust without the insurers' consent. Insurers also objected to the Plan on the grounds that it, and other Plan-related documents, would

---

[3]     Discl. Stmt. at 80. Asbestos Insurance Policies were defined to include "any insurance policy . . . in effect at any time on or before the Effective Date naming any of the Debtors . . . as an insured, or otherwise affording the Debtors indemnity or insurance coverage, upon which any claim has been or may be made with respect to any Asbestos Personal Injury Claim." This definition included policies issued by Certain Appellants. Third Amended Plan, § 1.1.18.

prejudice insurers' rights under the policies and in coverage litigation that was the subject of a pending adversary proceeding.[4]

To narrow the scope of insurers' objections and confirmation-related discovery, Debtors, the Future Claimants Representative, and the Asbestos Claimants Committee (collectively, "Plan Proponents") entered into an agreement with certain insurers, including Certain Appellants, in which Plan Proponents agreed to certain modifications to the Plan, in exchange for the stipulating insurers' agreement to limit their objections and plan-related discovery. This agreement was memorialized in a Stipulation and Agreed Order ("the Insurance Stipulation"), dated June 30, 2006, App. A, and was approved by the Court by order dated September 19, 2006.[5]

Pursuant to the Insurance Stipulation, the Stipulating Insurers agreed to limit their objections to the Plan (as then formulated) to two legal issues:

> i. Whether, under the Bankruptcy Code as a matter of law, the Assignment[6] is valid and enforceable against the Insurers notwithstanding anti-assignment provisions in or incorporated in the Policies and applicable state law; and

> ii. Whether the Plan complies with Bankruptcy Code Sections 524(g)(2)(B)(i)(II) and (III).

---

[4]    *See, e.g.,* Certain Insurers' Preliminary Objections to Third Amended Joint Plan of Reorganization, dated Sept. 27, 2004, D.I. 5843; Certain Insurers' Objections to Third Amended Joint Plan of Reorganization, dated Nov. 22, 2004, D.I. 6421.

[5]    App. B (Order (I) Approving Stipulation Regarding Plan Modifications and Potential Confirmation Objections and Plan-Related Discovery By Certain Insurance Companies, (II) Staying Discovery Requests By Certain Insurance Companies, and (III) Granting Related Relief, dated Sept. 19, 2006).

[6]    Defined in the Stipulation, in relevant part, as "any transfer of Asbestos Insurance Assets, Asbestos Insurance Policies or other rights and obligations with respect to Asbestos Insurance Policies to the Trust under the Plan or the Plan Documents." App. A (Insurance Stipulation), at 2.

Insurance Stipulation, § 3.a.[7]

The Insurance Stipulation further provided that to the extent that the stipulating insurers objected to the Plan on these grounds, the parties would request that the bankruptcy court determine such objections only under the Bankruptcy Code as matters of law. *Id.,* § 4.a. With respect to the assignment issue, the parties further agreed that such determination would be made upon the following stipulated facts:

> a. The anti-assignment/consent-to-assignment provisions are among the material provisions of the Policies.
>
> b. There is a material dispute between the Plan Proponents and the Insurers as to whether the Assignment is valid under the anti-assignment provisions of the Policies and applicable law.
>
> c. The Insurers have not given their consent to the Assignment.

*Id.,* § 5. The Parties further agreed that "none of them will seek adjudication of [the assignment issue] under applicable state law as part of or related to any Confirmation Hearing on the Plan," *id.* § 4.a., and that:

> Except to the extent that the permissibility of the Assignment is determined in the Bankruptcy Case by resolution of the issue specified in Section 3(a)(i), the permissibility of the Assignment under the terms of the Asbestos Insurance Policies and applicable non-bankruptcy law, and the effect of the Assignment, if any, on the rights and obligations of the Parties with respect to the Asbestos Insurance Assets, shall be determined in the Coverage Litigation.

*Id.* § 6.

2. *The Fourth Amended Plan.*  Following the execution and approval of the Insurance Stipulation, Debtors filed the Fourth Amended Joint Plan of Reorganization (the "Fourth

---

[7]    The Insurance Stipulation also allowed the stipulating insurers to raise objections if the Plan were amended to add additional "Protected Parties" or "Released Parties" or to channel claims that were not channeled under the Third Amended Plan. *Id.,* § 3.c.

Amended Plan" or "Plan").  App. C.  The Fourth Amended Plan maintained the Central Deal that formed the basis for the Third Amended Plan.  Discl. Stmt. at 80.  It also included the modifications agreed upon in the Insurance Stipulation.[8]  Accordingly, the Plan includes an injunction protecting the Debtors and other protected parties against asbestos-related personal injury claims, Plan § 9.3, and provides for asbestos-related personal injury claims to be liquidated and paid by the trust pursuant to Trust Distribution Procedures negotiated with the Futures Claim Representative and the Asbestos Claimants Committee.  *See, e.g.,* App. C (Plan), §§ 3.1.10; 3.5.9.  In addition to 50.1% of the stock of Reorganized Federal Mogul and certain warrants, the Plan identifies as "Trust Assets" (1) the "Asbestos Insurance Actions"[9] and the "Asbestos Insurance Action Recoveries"[10] attributable to any Asbestos Personal Injury Claims,

---

[8]    The Plan also incorporated an agreement resolving claims against the U.K. Debtors and two alternative settlements of claims asserted against Debtors by Pneumo Abex and Cooper. One of the settlements regarding the Pneumo Abex and Cooper claims, referred to in the Bankruptcy Court as "Plan A," provided for an injunction channeling claims against Pneumo Abex and Cooper to the trust.  Consistent with Section 3.c. of the Insurance Stipulation, Certain Appellants objected to Plan A.  The alternative settlement, referred to in the Bankruptcy Court as "Plan B" did not provide for a channeling injunction in favor of Pneumo Abex and Cooper.  The agreement referred to as Plan B has been approved as part of the confirmation of the Plan. Objections to Plan A are currently pending before the court.  Neither of these two settlements is relevant to the issue currently before this Court.

[9]    Defined in relevant part as "any claim, cause of action, or right of the Debtors or any of them, under the laws of any jurisdiction, against any Asbestos Insurance Company, arising from or related to:  (a) any such Asbestos Insurance Company's failure to provide or pay under Asbestos In-Place Insurance Coverage, (b) the refusal of any Asbestos Insurance Company to compromise and settle any Asbestos Personal Injury Claim under or pursuant to any Asbestos Insurance Policy, (c) the interpretation or enforcement of the terms of any Asbestos Insurance Policy with respect to any Asbestos Personal Injury Claim, or (d) any conduct of any asbestos insurance company constituting "bad faith" or other wrongful conduct under applicable law." App. C (Plan), § 1.17.

[10]    Defined as "(a) Cash derived from and paid pursuant to Asbestos Insurance Settlement Agreements entered into prior to the Effective Date attributable to any Personal Injury Claim other than reimbursement for payments made on account of Asbestos Personal Injury Claims prior to the Petition Date, (b) the right to receive proceeds of Asbestos In-Place Insurance

(2) the Asbestos Insurance Settlement Agreements attributable to any Asbestos Personal Injury Claims, and (3) the Asbestos In-Place Insurance Coverage. [11] *Id.* § 1.1.218.[12]

Although the Plan preserves the right of insurers to assert any "Asbestos Insurer Coverage Defense," *see id.* §§ 10.3 and 10.4.1.1, that term carves out any defense based on the anti-assignment provisions in the insurers' policies:

> In the event that it is finally determined in the Reorganization Cases that the Bankruptcy Code authorizes the Assignment (as defined in the Bankruptcy Insurance Stipulation) by preempting any terms of Asbestos Insurance Policies or provisions of applicable non-bankruptcy law that otherwise might prohibit the Assignment, Asbestos Insurer Coverage Defenses shall not include any defense that the Assignment is prohibited by the Asbestos Insurance Policies or applicable non-bankruptcy law.

*Id.* § 1.1.23.

      3. *Plan Confirmation and the Preemption Appeal Stipulation.* A confirmation hearing on Debtors' Fourth Amended Plan was held in June and July 2007, with closing arguments in October 2007. During closing arguments, the bankruptcy court indicated that, as it had done in prior cases, it would likely overrule insurers' objections based on the anti-assignment provisions in their policies, concluding that any such defenses were preempted by the Bankruptcy Code.

---

Coverage and (c) the right to receive the proceeds or benefits of any Asbestos Insurance Action." *Id.* § 1.1.18.

[11]     Defined as "any insurance coverage to the extent to be utilized for the payment or reimbursement of liability, indemnity or defense costs arising from or related to Asbestos Personal Injury Claims or Trust Expenses under any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement." *Id.* § 1.1.16.

[12]     Section 10.3 provides that the Asbestos In-Place Insurance Coverage and the Asbestos Insurance Actions, "along with the rights and obligations of the Debtors and the Reorganized Debtors with respect to Asbestos Insurance Policies and claims thereunder, to the extent that such Policies, Asbestos In-Place Insurance Coverage, and claims relate to Asbestos Personal Injury Claims . . . subject to the assignability without prejudice of such claims and Policies, shall be assigned to and vested in the Trust as the representative of the Debtors' Estates . . ." *Id.* § 10.3.

Oct. 2, 2002 Tr., D.I. 13480, at 106-07.  The Court further indicated, however, that issues related

to the permissibility of the so-called Plan A Settlement—an aspect of the Plan that provided

third-party injunctive relief to various non-debtor entities, in exchange for payments to the trust

by those entities—required further consideration.

Because of the tightening credit markets, the Debtors were at risk of losing their exit

financing if the Plan did not become effective by December 31, 2007, the expiration of their

commitment period with their exit financing lenders.  Accordingly, in order to avoid the

enormous interest expense the Debtors would face if the Plan could not become effective by

December 31, 2007, the Debtors and those objecting to particular aspects of the Plan sought to

negotiate resolutions of those matters that needed to be resolved in order for a plan to become

effective, while severing ancillary matters that could be adjudicated in separate proceedings.

To that end, Debtors, Certain Appellants, and other insurers entered into a Stipulation to

Preserve Appeals on the Asbestos Insurance Assignment and Preemption Issue, which stipulation

was "so ordered" by the court on November 8, 2007.  App. D ("Preemption Appeal

Stipulation").[13]  The Preemption Appeal Stipulation incorporated the terms of the Insurance

Stipulation with respect to the assignment issue and bifurcated the issue of assignment from the

Confirmation Order.  *Id.*, ¶¶ 2 and 5.

The bankruptcy court entered its Order Confirming Fourth Amended Joint Plan of

Reorganization For Debtors and Debtors-in-Possession (as Modified), App. E, on November 8,

2007.  With respect to the transfer and assignment of the Insurance Assets to the trust the order

provides that:

---

[13]     The only other Appellant, the London Market Insurers, entered into a separate but similar
stipulation.  D.I. 582593612.

> The validity and enforceability of the transfer of the Asbestos
> Insurance Action Recoveries, Asbestos Insurance Actions, and the
> Asbestos In-Place Insurance Coverage by the Debtors to the Trust
> pursuant to Section 4.3 of the Plan with respect to the right and
> obligations of the Asbestos Insurance Companies, the preemption
> of any anti-assignment provisions of the Asbestos Insurance
> Policies pursuant to sections 524(g), 541(c)(1), 1123(a)(5)(B) and
> 1129(a)(1) of the Bankruptcy Code, and the adjudication of the
> objections of certain Asbestos Insurance Companies to such
> assignment and preemption, are and shall be exclusively the
> subject of the Order Granting Joint Motion Seeking Determination
> of Asbestos Insurance Assignment and Preemption Issues Pursuant
> to Plan (the "Preemption Order"), which has been entered by this
> Court or may be entered hereafter. The terms and conditions of
> this Confirmation Order are separate and independent from, and
> are mutually independent of, the terms and conditions of the
> Preemption Order.

App. E (Confirmation Order) ¶ F.2. The Confirmation Order was affirmed by the District Court

on November 13, 2007. D.I. 13698. The Plan became effective and was substantially

consummated on December 27, 2007. D.I. 13940.

  4. *The Bankruptcy Court's Preemption Order and Opinion.* The bankruptcy court issued

its Order regarding the assignment and preemption issue on March 19, 2008 (the "Preemption

Order"), App. F, along with a memorandum opinion constituting the court's findings of fact and

conclusions of law. App. G (Memorandum Opinion Regarding Assignment and Preemption

Issue ("Mem. Op.")).

  Consistent with the bankruptcy court's prior indication, the Preemption Order holds that

"the assignment of rights in certain insurance policies to the asbestos trust, as provided in part by

Section 4.3 of the Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-In-

Possession (As Modified), Doc. No. 13360, is valid and enforceable pursuant to §§ 524(g),

541(c), 1123(a)(5)(B) and 1129(a)(1) of the Bankruptcy Code notwithstanding anti-assignment

provisions in or incorporated in the policies and applicable state law."

Consistent with the agreement of the parties (which had been approved by the bankruptcy court), the Memorandum Opinion states at one point that "this court is not addressing whether the provisions of the policies and applicable state law are violated, only whether or not, in this case, they are preempted by the Bankruptcy Code." App. G (Mem. Op.) at 7. The court nevertheless went on, however, to spend almost five pages of its Memorandum Opinion discussing the enforceability of the anti-assignment provisions under state law. Specifically, the court concluded that under Pennsylvania law—law that no party argued and nothing in the record suggests applies to the policies at issue—"an insurer may not limit an insured's ability to assign . . . rights under a policy after the occurrence of the event which gives rise to the insurer's liability." *Id.* at 10.[14]

When it ultimately turned to the federal preemption analysis, the bankruptcy court relied primarily on the Third Circuit's decision in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), concluding that "[i]t is established in this circuit that under § 1123(a)(5) assignment of policy proceeds to a §524(g) trust is not prohibited by anti-assignment provisions in insurance policies." App. G (Mem. Op.), at 9.[15]

---

[14]    In light of the procedural posture of this matter, these statements of the bankruptcy court—which were by no means necessary to the resolution of the federal preemption issue—should not be construed as formal findings or conclusions with respect to applicability of the anti-assignment provisions under state law.

[15]    The bankruptcy court also addressed and rejected the contention made by one of the insurers before the bankruptcy court that the policies in question are executory contracts, subject to the terms of Section 365 of the Bankruptcy Code. The Certain Appellants who submit this brief did not advance that argument in the bankruptcy court, and are not arguing that point in this appeal.

**ARGUMENT**

## I.    THE COURT'S RULING THAT INSURERS' ANTI-ASSIGNMENT PROVISIONS ARE PREEMPTED IS AN IMPROPER DECLARATORY JUDGMENT

In ruling that the Plan's assignment provisions are "valid and enforceable" notwithstanding the anti-assignment provisions in Appellants' policies, the bankruptcy court has, in effect, entered a declaratory judgment, stating that insofar as any insurer might invoke the anti-assignment provisions of its policies in response to a claim by the trust, that defense is unavailable, on the ground that it has been preempted by the Bankruptcy Code. Granting that relief, however, is procedurally improper, for two separate reasons.

*First*, the affirmative relief of a declaratory judgment can only be granted in the context of a formal adversary proceeding in which Certain Appellants would be afforded procedural and substantive rights consistent with such a request for affirmative relief. *See* Fed. R. Bankr. P. 7001(l), (9). A proponent of a plan of reorganization is not permitted to conduct an end run around these procedural protections by asking a court to make "findings"—findings that are wholly unnecessary to decide whether the plan of reorganization may be confirmed—that simply become part of the confirmation order the proponent asks the court to enter.

A bankruptcy proceeding to confirm a plan of reorganization, like that at issue here, is a limited proceeding known as a "contested matter." It is commenced by the filing of a plan of reorganization and governed by the summary procedures set out in Rule 9014. *See* Fed. R. Bankr. P. 3020(b)(1), 9014. The only question properly at issue in such a contested matter is whether the proposed plan—which addresses the respective claims of the debtor's creditors to its assets—satisfies the statutory requirements for confirmation. *See* 11 U.S.C. § 1129.

If a debtor wishes to obtain any other affirmative relief against a third party—such as money damages or a declaratory judgment—it must seek such relief through a separate

- 13 -

proceeding known as an "adversary proceeding." *See* Fed. R. Bank. P. 7001(1), (9). An adversary proceeding is a separate lawsuit, filed in the bankruptcy case, that is commenced with the traditional protections of a summons and a complaint, and which is generally governed by the Federal Rules of Civil Procedure, much like civil actions in federal district court. *See* Fed. R. Bank. P. 7001, Part VII (incorporating with minor differences the Fed. R. Civ. P.).

Accordingly, if Debtors desired a ruling in the bankruptcy proceedings on whether the assignment provisions in their proposed Plan preempted insurers' defense to coverage based on the failure to satisfy a condition precedent under the anti-assignment provisions in their policies, they were required to file an adversary proceeding against insurers seeking a declaratory judgment on that issue, thus respecting insurers' procedural and substantive rights. Courts have recognized that this is the proper procedure to seek such relief, *see, e.g., In re Amatex Corp.*, 107 B.R. 856, 858, 862-63 (E.D. Pa. 1989) (granting declaratory judgment in insurance coverage dispute, following *de novo* review of bankruptcy judge's proposed findings and conclusions, in adversary proceeding that debtor commenced against its insurers). And courts have likewise made clear that the circumvention of those procedures by the methods employed here is impermissible. As the Seventh Circuit clearly explained, a debtor may not obtain declaratory judgment "without filing an adversary proceeding" simply by "inserting . . . findings . . . in their proposed plans," which would "permit debtors to flout both substantive and procedural provisions of the Bankruptcy Code and Rules through a meaningless incantation . . . in their proposed plans." *In re Hanson*, 397 F.3d 482, 484-86 (7th Cir. 2005). The bankruptcy court therefore erred in effectively granting a declaratory judgment simply by making the "finding" that the Plan Proponents sought.

- 14 -

*Second*, and perhaps more fundamentally, even had the request for declaratory relief been properly before the bankruptcy court in the form of a complaint seeking a declaratory judgment, the ruling that the insurance policies' anti-assignment provisions are preempted would still be procedurally improper.  The Supreme Court has made clear that the Declaratory Judgment Act can only be used to resolve live and ripe disputes—and cannot be invoked as a basis to issue an advisory ruling on a dispute that has not yet ripened.  *Coffman v. Breeze Corporations*, 323 U.S. 316, 324 (1945).

The dispute as to the validity of the anti-assignment clauses would ripen if and when the trust presented a claim to the insurer for coverage, and the insurer denied coverage on that claim, asserting that the assignment of the policies from the debtor to the trust violated the anti-assignment clause, and thus vitiated coverage for that claim.  But it is settled law that a plaintiff cannot use the Declaratory Judgment Act in this context—to obtain a judgment as to the validity of a defense that a plaintiff anticipates a defendant will raise in a separate litigation.  A declaratory judgment as to "the validity of a defense the [defendant] may, or may not, raise in a [subsequent] proceeding," does not satisfy the "actual controversy" requirement of the Declaratory Judgment Act.  *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998).  "Such a suit does not merely allow the resolution of a 'case or controversy' in an alternative format . . . but rather attempts to gain a litigation advantage by obtaining an advance ruling on an affirmative defense."  *Id.  See also MedImmune, Inc.  v. Genentech, Inc.*, 127 S. Ct. 764, 780 (2007) ("the Declaratory Judgment Act does not allow federal courts to give advisory rulings on the potential success of an affirmative defense before a federal cause of action has even accrued").

The bankruptcy court's declaration that the "assignment of rights in certain insurance policies. . . is valid and enforceable. . . notwithstanding anti-assignment provisions in or

incorporated in the policies and applicable state law" runs afoul of this principle. It is a ruling as to the validity of a defense that Debtors anticipate insurers will raise in response to the trust's claims for coverage. Such a ruling would be clearly improper if the Plan Proponents had done what the rules require and initiated an adversary proceeding to obtain such a declaratory judgment. And they surely have no greater entitlement to this ruling by virtue of their disregard for the rules—simply granting themselves an otherwise impermissible declaratory judgment by asking the court to make these "findings" at the time it confirmed the plan of reorganization.

## II.    THE BANKRUPTCY CODE DOES NOT PREEMPT THE ANTI-ASSIGNMENT PROVISIONS IN APPELLANTS' INSURANCE CONTRACTS

In addition to being procedurally improper, the bankruptcy court's ruling also fails on the merits. Insofar as the terms of the insurance policies into which the parties entered contain a clause prohibiting their assignment, and insofar as state law would permit an insurer to invoke this clause in response to a claim by an insured for coverage, nothing in the Bankruptcy Code requires a different outcome.

The Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2, invalidates state laws that "interfere with, or are contrary to" federal law. *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985). A state law may be preempted in one of three ways: "State action may be foreclosed [1] by express language in a congressional enactment, [2] by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or [3] by implication because of a conflict with a congressional enactment." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001). In each case, "the purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).

Courts are reluctant to conclude that Congress intended to preempt state law, particularly in areas that have traditionally been subject to state regulation. "In all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks and citations omitted). The presumption applies not only in determining whether Congress intended any preemption at all, but also to questions concerning the scope of express preemption. *Id.*

The presumption against preemption is heightened in the insurance context by the McCarran-Ferguson Act, in which Congress expressly provided that its enactments should not be construed implicitly to preempt state regulation of insurance. *See* 15 U.S.C. § 1012(b).[16] Moreover, the "presumption against displacing state law . . . is just as strong in bankruptcy as in other areas of federal legislative power." *Pacific Gas*, 350 F.3d at 943. As the Third Circuit has explained:

> Our task is to ascertain and give effect to congressional intent. However, we must approach that task with the realization that the Bankruptcy Code was written with the expectation that it would be applied in the context of state law and that federal

---

[16]    The Act provides:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supercede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance . . . .

15 U.S.C. § 1012. "The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these [a]re the core of the 'business of insurance.'" *SEC v. National Sec., Inc.*, 393 U.S. 453, 460 (1969); *see also, e.g., United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 503 (1993) ("There can be no doubt that the actual performance of an insurance contract falls within the 'business of insurance.'").

> courts are not licensed to disregard interests created by state law when that course
> is not clearly required to effectuate federal interests.

*Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 492 (3d Cir. 1997)

(citation omitted). Rather, as the Supreme Court has made clear, "Congress has generally left the

determination of property rights in the assets of a bankrupt's estate to state law," and therefore,

"[u]nless some federal interest requires a different result, there is no reason why such interests

should be analyzed differently simply because an interested party is involved in a bankruptcy

proceeding." *Butner v. United States*, 440 U.S. 48, 54-55 (1979). Accordingly, the Third Circuit

has "adopted a restrained approach to concluding that Congress has intended to preempt state

law in the bankruptcy context." *Integrated Solutions*, 124 F.3d at 492.

Thus, the "considerable burden of overcoming the starting presumption that Congress

does not intend to supplant state law," *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520

U.S. 806, 814 (1997) (internal quotation marks and citations omitted), is even greater in the

context raised by this case. The bankruptcy court erred in concluding that the Debtors met that

heavy burden.

A.    **The Bankruptcy Code Does Not Expressly Preempt The Insurers' Policy
      Rights**

In determining the scope of an express preemption provision, the court must first

"focus on the plain wording of the clause," *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63

(2002), and then "move on, as need be, to the structure and purpose of the Act." *N.Y. State

Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).

Provisions operating "in a field which the States have traditionally occupied," as here, receive a

"narrow interpretation." *Medtronic*, 518 U.S. at 485 (internal quotation marks and citations

omitted). [17] When construing provisions of the Bankruptcy Code, courts are also constrained by a reluctance to find that Congress has substantively changed the prior practice unless that intent is clearly stated. *Midlantic Nat'l Bank v. New Jersey Dept. of Envtl Prot.*, 474 U.S. 494, 500-01 (1986).

1.    Section 1123(a)(5) Does Not Preempt Private Contracts

Section 1123(a)(5)(B), the provision cited by the bankruptcy court as expressly preempting insurers' policy provisions, provides, in relevant part, that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall provide adequate means for the plan's implementation, such as transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan." 11 U.S.C. § 1123(a)(5)(B). Contrary to the bankruptcy court's reasoning, nothing in this statute preempts the anti-assignment provisions of Appellants' insurance policies and the bankruptcy court offers no explanation as to how this provision may be read to address these private agreements.

Absent clear congressional intent to the contrary, courts presume that Congress does not intend to preempt private contracts and agreements. The Supremacy Clause applies to "any Thing in the *Constitution* or *Laws* of any State," and therefore, by its terms, applies only to state enactments made pursuant to state powers, such as statutes and regulations. *See Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, (1824) ("appropriate application of" the Supremacy Clause is to "acts of the State Legislatures . . . enacted in the exercise of [its] powers"); *Building & Constr.*

---

[17]    In rejecting this otherwise settled principle of law as "not well founded," App. G (Mem. Op.) at 22 n.31, the bankruptcy court relied on the Supreme Court's statement in *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 964 (1997), that the Bankruptcy Code "reshaped debtor and creditor rights" in departure from the otherwise applicable terms of state law. *Id.* But Associates *Commercial* is not a preemption case at all. Rather, the passage on which the bankruptcy court relied simply rejected the proposition that in construing the Bankruptcy Code itself, a court should be guided by the terms of state law. That proposition, however, certainly is not advanced in this appeal, and has nothing at all to do with the issues presented in this case.

- 19 -

*Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227

(1993) ("pre-emption doctrines apply only to state *regulation*").  Thus, for example, the Supreme

Court has held that the National Labor Relations Act did not preempt the provisions of a labor

contract, explaining that "the Supremacy Clause does not require pre-emption of private

conduct."  *Id.* at 229, 232-33; *see also, e.g., American Airlines, Inc. v. Wolens*, 513 U.S. 219,

228-29 (1995) (Airline Deregulation Act did not preempt passengers' contract claims).[18]

     In accord with this basic principle of preemption, Congress plainly did not intend Section

1123(a)(5)(B) of the Bankruptcy Code to preempt the terms of private insurance contracts.

Congress expressly limited the preemptive scope of Section 1123(a)(5)(B) to "applicable

nonbankruptcy *law*."  By its terms, the statute applies only to *laws*, not contracts.  Indeed, there

can be no doubt on this score in light of the fact that Congress *did* expressly preempt the terms of

*both* applicable "law" *and* private "contracts" in several other provisions of the Bankruptcy

Code.  *See, e.g.*, 11 U.S.C. § 541(c)(1) (regarding transfer of property from the debtor to the

bankruptcy estate) ("notwithstanding any provision in an *agreement*, transfer instrument, or

*applicable nonbankruptcy law*" (emphasis added)); 11 U.S.C. § 363(*l*) (governing use, sale, or

lease of property of the estate) ("notwithstanding any provision in a contract, lease, or applicable

law"); § 365(e)(1) (governing assumption, assignment or rejection of executory contracts and

---

[18]    To be sure, contracts may be enforced pursuant to state law.  But that does not transform
a contract's terms into state "law" within the presumed scope of an express preemption clause.
The Supreme Court rejected that very argument in *Cipollone*, explaining:

> That a contract has no legal force apart from the [state] law that acknowledges its
> binding character . . . does not mean that every contractual provision is imposed
> under State law.  To the contrary, common understanding dictates that a
> contractual requirement, although only enforceable under state law, is not
> imposed by the State, but rather is imposed by the contracting party upon itself.

*Id.* at 526 n.24 (first alteration in original; quotation marks and citation omitted); *id.* at 515, 526
(contract claim not preempted by statute preempting "requirement" "imposed under State law").

unexpired leases) ("[n]otwithstanding a provision in an executory contract or unexpired lease, or in applicable law"); § 365(f)(1) ("notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law"); § 1124(2) (governing impairment of claims or interests) ("notwithstanding any contractual provision or applicable law").

In short, when Congress intended to preempt the terms of private agreements in the Bankruptcy Code, it said so *expressly*. The fact that it did not do so here—instead expressly limiting the preemptive scope of Section 1123(a)(5)(B) to "laws"—should be dispositive.

2.    Section 1123(a)(5)(B) Preempts Only Laws "Relating To Financial Condition" Of The Debtor

Even if Congress had intended Section 1123(a)(5)(B) to apply to contracts, rather than simply "laws," that provision still would not preempt the terms of insurance policies. Congress did not intend Section 1123(a)(5) broadly to preempt all state laws, but only a narrow category of laws relating to the debtor's financial condition. As the Ninth Circuit held in *Pacific Gas,* the legislative history and overall structure of the Bankruptcy Code demonstrate that Congress intended Section 1123(a)(5)—which specifies what must be included in a confirmed plan—to have the same preemptive scope as its closely related counterpart, Section 1142(a), which governs the implementation of confirmed plans, and which expressly preempts only state laws "relating to [the] financial condition" of the debtor. *See* 11 U.S.C. § 1142(a); *Pacific Gas*, 350 F.3d at 947-48.

As enacted in 1978, Section 1142(a) contained language expressly preempting certain non-bankruptcy laws that conflicted with the implementation of a confirmed plan. It provided that "[n]otwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation *relating to financial condition*, the debtor . . . shall carry out the plan and shall comply with any orders of the court." 11 U.S.C. § 1142(a) (emphasis added); *see Pacific Gas*, 350 F.3d at 941. Section

- 21 -

1123(a) contained no preemptive language when it was originally enacted in 1978, but the legislative history regarding Section 1123(a) indicates that the provision was intended to have the same preemptive effect as Section 1142. *See* 124 Cong. Rec. 34,005 (1978) (explaining that under §1123(a)(5), "[i]f the plan is confirmed, then any action proposed in the plan may be taken notwithstanding any otherwise applicable nonbankruptcy law in accordance with Section 1142(a) of title 11"); *Pacific Gas,* 350 F.3d at 947-48. Accordingly, prior to 1984, confirmation and implementation of a plan under the Bankruptcy Code could preempt only laws "relating to financial condition" that would otherwise prevent a debtor from carrying out the plan.

In 1984, Section 1123(a) was modified to begin, "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . ." 11 U.S.C. § 1123(a); *see Pacific Gas*, 350 F.3d at 940. As the *Pacific Gas* court noted, there is "absolutely no indication" that the 1984 amendments "were intended by Congress to make any important changes to the 1978 Code." *Id.* at 947. Indeed, the 1984 legislation expressly labeled the amendment to Section 1123(a) as a "technical amendment." *Id.* at 938-40; 947-48 (discussing the legislative history of the 1984 amendment to Section 1123(a)). Nothing in the legislative history suggests that Congress intended to break radically from past practice by permitting debtors broadly to preempt all state laws or private agreements merely by including contrary terms in a plan of reorganization. *See id.* at 947 (noting that the legislative history stated that the 1984 amendments were "consistent with [the] policies" of the 1978 Code). Accordingly, the best reading of the addition of the "notwithstanding" clause to Section 1123(a) in 1984, as the Ninth Circuit held in *Pacific Gas,*

was that Congress intended, merely as a technical clarification, to parallel the pre-existing preemption clause of Section 1142(a). *See id.*[19]

This reading is fully in accord with the overall structure and purpose of the Bankruptcy Code. As the Ninth Circuit observed in *Pacific Gas*:

> It makes perfect sense that the express preemptive scope of what must be included in a confirmable plan, specified in § 1123(a), would be the same as the express preemptive scope of what is actually included in a confirmed plan, specified in § 1142(a). It also makes perfect sense that the express preemptive scope of what must be in a confirmable and confirmed plan would be laws 'relating to financial condition.'

*Id.* at 947-48. Section 1142(a)'s term "financial condition" is used throughout the Bankruptcy Code to refer to the relative solvency or insolvency of the debtor.[20] It "makes perfect sense," as the Ninth Circuit concluded, that the preemptive scope of what must be in a plan under Sections 1123(a) and 1142(a) would be limited to laws "relating to financial condition"—such as state regulatory requirements that are tied to the solvency or capitalization of the reorganized debtor— because such laws relate directly to the solvency or insolvency of the debtor, and thus to the

---

[19]    The only other federal Court of Appeals decision regarding the preemptive effect of Section 1123(a)(5) of which Certain Appellants are aware is the Fourth Circuit's decision in *In re FCX*, 853 F.2d 1149, 1155 (4th Cir. 1988). Although the Fourth Circuit's analysis in *FCX* is much more cursory than the Ninth Circuit's analysis in *Pacific Gas*, the Fourth Circuit also recognizes that the 1984 amendment to section 1123(a) did not effect a substantive change in the prior law. *Id.* at 1154.

[20]    *See, e.g.*, 11 U.S.C. § 101(32)(A) ("'Insolvent' means . . . with reference to an entity other than a partnership and a municipality, *financial condition* such that the sum of such entity's debts is greater than all of such entity's property . . . .") (emphasis added); *id.* § 363(*l*) (permitting trustee to use, sell, or lease property of the estate "notwithstanding any provision in a contract, lease, or applicable law that is conditioned on the insolvency or *financial condition* of the debtor") (emphasis added). Under basic principles of statutory construction, the term "financial condition" as used in Section 1142(a) should be given the same meaning. *See Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860 (1986) ("[I]dentical words used in different parts of the same act are intended to have the same meaning." (internal quotation marks and citation omitted)).

matters with which the Bankruptcy Code itself deals, and with respect to which Congress intended its provisions to be exclusive.

The Ninth Circuit's holding thus makes sense of the relationship between the closely related provisions of Sections 1123(a) and 1142(a). It also interprets Section 1123(a) consistently with the principle—repeatedly reaffirmed by the Supreme Court—that the Bankruptcy Code should not be read to break with prior practice (*i.e.*, the pre-1984 Code) absent a clearly stated intent to do so. *See, e.g.*, *Midlantic Nat'l Bank*, 474 U.S. at 500-01 (holding Section 554(a) of the Bankruptcy Code, which authorizes trustee to abandon property with no express restrictions on such power, did not permit trustee to abandon property in violation of state environmental regulations; "If Congress wishes to grant the trustee an extraordinary exemption from nonbankruptcy law, 'the intention would be clearly expressed . . . .'"); *Cohen v. De La Cruz*, 523 U.S. 213, 221-22 (1998) (refusing to infer congressional intent to "erode past bankruptcy practice" from another 1984 amendment, which, as here, is noted only briefly in the legislative history as a "stylistic change"). And the Ninth Circuit's holding appropriately respects the presumption against preemption, which is particularly strong in the context of insurance, where state regulatory authority is paramount.

Indeed, a contrary reading would be breathtaking in its sweep. Rather than being confined to matters of insolvency—the field Congress regulated in the Bankruptcy Code—a broad reading of Section 1123(a)(5) would permit a reorganized debtor to exempt itself from a broad array of federal and state regulation having nothing to do with its financial condition. Under such a reading, for example, a debtor could transfer contaminated properties in violation of state environmental laws, or merge its business with a rival competitor in violation of state (or federal—the language of Section 1123(a) refers to "nonbankruptcy law") antitrust laws. Given

no evidence that Congress intended such a stark departure from the pre-existing, limited, scope of preemption, Section 1123(a)(5) should be read to preempt only laws relating to the financial condition of the debtor.

Thus, even if Congress had intended Section 1123(a)(5)(B) to apply to private contracts (which it did not), that provision plainly would not preempt the terms of Appellants' insurance policies. Those policies are not contracts "relating to [the] financial condition" of the Debtor.[21] Rather, they insure the Debtor against specified liability risks (not related to the Debtor's solvency), subject to the terms and conditions set forth in the policies. The anti-assignment provisions that the bankruptcy court erroneously held to be "preempted" by Section 1123(a)(5)(B) have nothing to do with the Debtor's financial condition. Section 1123(a)(5)(B) simply does not preempt such provisions.[22]

---

[21]    Section 1142(a)'s term "financial condition" is used throughout the Bankruptcy Code to refer to the relative solvency or insolvency of the debtor. *See supra* note 20.

[22]    The other authorities relied on by the bankruptcy court do not support its conclusion regarding the preemptive effect of Section 1123(a)(5). The courts in *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 95 (D. Del. 2006), and *In re Global Industrial Technologies,* Case No. 02-21626, Memorandum Order (Bankr. W.D. Pa., September 21, 2007, as modified September 24, 2007), like the bankruptcy court here, misconstrued *Combustion Engineering*. The conclusory rulings of the California bankruptcy court in the *Western Asbestos* decisions, to the extent they stand for the proposition that Section 1123(a)(5)(B) preempts anti-assignment provisions in insurance contracts, cannot survive the Ninth Circuit's *Pacific Gas* decision (which post-dated the first decision and was wholly ignored in the second). *See In re Western Asbestos Co.*, 313 B.R. 832, 856 & n.34, 858 (Bankr. N.D. Cal. 2003); *In re Western Asbestos Co.*, 313 B.R. 456, 462 (Bankr. N.D. Cal.), *aff'd*, 2004 WL 1944792 (N.D. Cal. Apr. 16, 2004).

The bankruptcy court also cites to the Fourth Circuit's decision in *In re FCX, Inc.*, 853 F.2d 1149 (4th Cir. 1988), and *In re Stone & Webster, Inc.*, 286 B.R. 532 (Bankr. D. Del. 2002). The Fourth Circuit's decision in *FCX* does not support the Court's conclusions because the result reached by the court there accorded section 1123(a)(5) preemptive scope only with respect to laws concerning the debtor's financial condition and the restructuring of its debt obligations, matters on which the Bankruptcy Code speaks. In *In re Stone v. Webster*, the court did no statutory analysis of its own, but instead relied (erroneously because of the different context) only on the Fourth Circuit's analysis in *FCX* and the district court opinion in *In re Pacific Gas*, which was subsequently overruled by the Ninth Circuit.

3.  *Combustion Engineering* Does Not Address The Preemptive Effect Of Section 1123(a)(5)

In finding that Section 1123(a)(5) of the Bankruptcy Code expressly provides for the preemption of the anti-assignment provisions in insurers' policies, the bankruptcy court erroneously relies on the Third Circuit's decision in *Combustion Engineering*. In *Combustion Engineering*, the Third Circuit observed that Section 541(c) of the Bankruptcy Code—which governs the transfer of the debtor's property to the bankruptcy estate upon the filing of a bankruptcy case—would preempt an insurance policy provision "prevent[ing] the assignment of proceeds to the bankruptcy estate," and further noted in passing that Section 1123(a)(5)(B) "contemplates the inclusion of debtor insurance policies in the bankruptcy estate." *In re Combustion Eng'g*, 391 F.3d at 218-19 & n.27. Critically, Section 541(c), unlike Section 1123(a)(5)(B), expressly preempts not only "applicable nonbankruptcy law," but also "any provision in an *agreement*," 11 U.S.C. § 541(c)(1) (emphasis added), and thus by its terms applies to private contracts as well as state laws.

The Third Circuit's discussion in *Combustion Engineering* is limited to the transfer of property from the pre-petition debtor to the *estate* in bankruptcy not the post-confirmation transfer of policy rights out of the bankruptcy estate to a trust. The Third Circuit's only reference to Section 1123(a)(5) in the *Combustion Engineering* opinion is a passing reference to the statute in a footnote: There is no discussion of the statute's preemptive effect. This is not surprising, as the Court's entire discussion regarding the assignment issue took place in the context of a standing determination and the specific issue addressed by the Court was whether policies issued to non-debtor entities were part of the bankruptcy estate.

Indeed, the Third Circuit's decision in *Integrated Solutions*, 124 F.3d at 494-95, expressly noted the distinction between what *comes into* the bankruptcy estate (which is

governed by Section 541), and what may be *transferred out of* the estate (which is governed by

Section 1123). There, the Third Circuit held that state laws prohibiting the transfer of tort claims

do not preclude the debtor's prepetition tort claims from becoming part of the bankruptcy estate.

"Given § 541's broad scope, its legislative history, and the weight of authority from other

jurisdictions, we conclude that state laws prohibiting the assignment or transfer of property,

including causes of action and tort claims, do not prevent the inclusion of such property in the

bankruptcy estate." *Id.* at 491. But that did not mean that state laws prohibiting the assignment

of those claims would be preempted if the debtor sought to convey those claims *outside* of the

estate. Because the Bankruptcy Code fails "to explicitly express Congress's intent to supersede

state law restrictions on the transfer of estate property, Integrated's preemption claim is rendered

wholly unconvincing, especially in light of our strong presumption against inferring

Congressional preemption in the bankruptcy context." *Id.* at 493.

   In view of this extended discussion of this distinction by the Third Circuit in *Integrated*

*Solutions*, it would be quite odd to conclude, based on nothing more than a passing reference in a

footnote, that the court in *Combustion Engineering* intended to reach exactly the opposite

conclusion. In fact, nothing in *Combustion Engineering* supports the bankruptcy court's holding

that Section 1123(a)(5)(B) preempts the anti-assignment provisions of insurance policies. To the

contrary, as set forth above, that is exactly the opposite of what Congress intended.

   That Congress should have intended (and written) different preemptive effects for

Section 541(c) and Section 1123(a)(5) is not surprising. The Supreme Court, after all, has

explained that the pre-petition debtor and the post-petition "estate" are essentially the same

entity. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) (indicating that the debtor-in-

possession is not a "new entity" distinct from the pre-bankruptcy debtor and noting "[f]or our

purposes, it is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing."). Thus, under *Bildisco*, the transfer of property from the pre-petition debtor to the post-petition debtor-in-possession (as provided for in Section 541) is not even an "assignment" at all. Moreover, under section 541 essentially *all* property of the debtor *automatically* becomes property of the estate, subject to whatever limitations such property had in the hands of the debtor. Conversely, section 1123(a)(5), does not require the transfer of any property, allows the debtor to pick and choose which property it will retain and which property it will transfer, and does not limit the entities who may receive the property. Accordingly, that the Third Circuit has concluded that Section 541(c) preempts the anti-assignment provisions in insurers' policies says nothing at all about that court's view as to the preemptive effect of Section 1123(a)(5).

**B.    The Bankruptcy Code Does Not Impliedly Preempt Appellants' Rights Under The Insurance Contracts**

Having erroneously concluded that *Combustion Engineering* compelled a finding that Section 1123(a)(5) expressly preempted the anti-assignment provisions in insurers' policies, the bankruptcy court does not discuss implied preemption. It is clear, however, that no congressional intent to preempt the terms of insurance policies may be implied from the Bankruptcy Code. Neither "field" nor "conflict" preemption applies here.

There plainly is no field preemption. Far from "occup[ying] the legislative field," Congress has expressly left the field of insurance regulation almost entirely to the states under the McCarran-Ferguson Act. *See* 15 U.S.C. § 1012; *Lorillard Tobacco*, 533 U.S. at 541.

Nor is there any conflict preemption. Conflict preemption applies "where it is impossible for a private party to comply with both state and federal requirements, or where state law stands

as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress." *Sprietsma*, 537 U.S. at 64-65 (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280,

287 (1995)); *see also Integrated Solutions*, 124 F.3d at 492 n.3 ("[S]ince bankruptcy is a field

traditionally occupied by the states, there must be a 'sharp' conflict between state law and federal

policy before we may conclude that federal law preempts state law in the bankruptcy context.").

The anti-assignment provisions in Appellants' policies neither conflict with the requirements of

the Bankruptcy Code nor stand as an obstacle to the accomplishment of its objectives.

   1.    There Is No Conflict Between The Bankruptcy Code And The Anti-
         Assignment Provisions

No actual conflict makes it impossible for the Debtors to both comply with the

Bankruptcy Code and preserve insurers' pre-bankruptcy rights under their policies. The

Bankruptcy Code requires the debtor to provide in a plan of reorganization the terms under

which it will repay its creditors. *See* 11 U.S.C. §§ 1123(a)(1)-(5), 1129(a)(7), (9), 1129(b).

Section 1123(a) requires the debtor to "provide adequate means" by which it will implement that

plan, and provides the debtor with significant flexibility to achieve that end, including through

sales, mergers, securities offerings, distributions to creditors, "the retention by the debtor of all or

any part of the property of the estate" or, conversely, the "transfer of all or any part" of such

property "to one or more entities." *Id.* § 1123(a)(5)(A)-(D), (J). The Bankruptcy Code thus

contemplates that the debtor may transfer property of the estate to another entity, including to a

post-confirmation trust, as the Debtor proposed here. But nothing in the Bankruptcy Code

*requires* a debtor to do so; the debtor could, for example, elect to retain such property itself and

distribute any proceeds to creditors. Nor is there anything in Section 1123(a) or elsewhere in the

Bankruptcy Code providing that the reorganized debtor is to be relieved of its obligations under

- 29 -

its insurance policies, or that any trust to which the debtor might seek to transfer insurance rights must operate contrary to the terms of those policies.

    2.    The Anti-Assignment Provisions Pose No Obstacle to the Bankruptcy Code's Objectives

No one argues that Section 524(g), Section 1123(a)(5), or any other provision of the Bankruptcy Code generally overrides the coverage defenses that insurers may have to claims submitted under their policies, whether those policies are in the hands of the debtors or whether they are in the hands of a trust to which the debtors have purported to assign the policies. To the contrary, the opposite is true: it is a well recognized principle that the filing of a bankruptcy petition does not change the respective rights of an insurer or its insured under their insurance contract. *See Jones v. GE Capital Mortgage Co.*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) ("[T]he owner of an insurance policy cannot obtain greater rights to the proceeds of that policy than he would have under state law by merely filing a bankruptcy petition."); *cf. Butner*, 440 U.S. at 55 (state-law entitlements generally enforced in bankruptcy "to prevent a party from receiving a 'windfall merely by reason of the happenstance of bankruptcy'"). And, regardless of the validity of the assignment, Debtors clearly cannot assign greater rights than they have.

Accordingly, if and when the trust seeks coverage from insurers, insurers may assert whatever coverage defenses they believe they have and the court presiding over the action will determine whether or not those defenses are valid with respect to the claims asserted based on applicable state law. To the extent that the court determines they are valid, the coverage available to the trust may be limited or eliminated altogether. Respecting the parties' state law

rights in this way does not hinder any objective of Congress in enacting Section 1123(a)(5), Section 524(g) or any other provision of the Bankruptcy Code.[23]

An insurer's defense based on a failure to satisfy a condition precedent to coverage under the anti-assignment provisions under its policies is, from a bankruptcy perspective, no different in kind or effect from any other coverage defense. Like other coverage defenses, the success of a defense based on an anti-assignment provision may vary depending on the applicable state law, the claims at issue, and the facts regarding the assignment. As with other coverage defenses, insurers may or may not prevail, but if they prevail, in whole or in part, the coverage available to the trust may be limited. But just as with other defenses, this result is not an impediment to any bankruptcy objective, but rather is consistent with the principle that rights under insurance policies are not enhanced by a bankruptcy filing.

Outside of bankruptcy, the Debtors could certainly have purported to transfer and assign their rights to insurance coverage to a trust, against which the claimants agreed to assert claims, and the trust could in turn seek coverage under the policies. Under those circumstances, however, there can be no doubt that insurers would be permitted to challenge any request for coverage from the trust based on any defenses available to it under its policies, which may well include the defense that a condition precedent under the anti-assignment provisions in its policies has not been satisfied. And while that defense may or may not prevail, the determination regarding its validity will be based on the facts under applicable state law.

---

[23] That it may in some cases make reorganization more difficult is not an obstacle to Congress's purpose. "Congress's purpose in enacting the Bankruptcy Code was not to mandate that every company be reorganized at all costs, but rather to establish a preference for reorganizations, where they are legally feasible and economically practical." *Baker & Drake, Inc. v. Pub. Serv. Comm'n*, 35 F.3d 1348, 1354 (9th Cir. 1994) (emphasis omitted). "Simply making a reorganization more difficult for a particular debtor . . . does not rise to the level of stand[ing] as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* (second alteration in original; internal quotation marks and citation omitted).

There is absolutely no reason why a bankruptcy trust should have any greater rights to access insurance coverage than that.[24] It could seek coverage under the terms of the policies, and remain bound (just as the debtor was) by the terms of those policies. If debtors or the asbestos claimants feared that the assignment would serve as a basis for insurers to challenge coverage, it is completely in their power to address that concern by seeking the insurers' consent. But inside of bankruptcy, no differently from outside of it, an insured that chooses to act unilaterally thereby assumes the risk that its actions will limit or preclude its ability to recover insurance if and when it presents a claim.

Nothing in the Bankruptcy Code suggests that Congress intended to alter the relationship of insurer and insured, or to impose any conflicting requirement in bankruptcy that would make it "impossible" for a debtor to comply with its obligations under the policies. *Sprietsma*, 537 U.S. at 64-65. Permitting Appellants to raise insurance coverage defenses they possess under state law—just as they would if the very same arrangement were negotiated and implemented outside of bankruptcy—would by no means frustrate Congress's purpose in enacting the Bankruptcy Code.

---

[24]    The bankruptcy court suggests that the trust created by the Plan is different because "Section 524(g) of the Bankruptcy Code creates a new form of entity." App. G (Mem. Op.) at 20). Contrary to the bankruptcy court' assertion, however, the trust established under the Plan is a trust created by private agreement under state law, App. H (Plan, Ex.1.1.217 (Asbestos Personal Injury Trust Agreement), no different than any other such trust. Section 524(g) of the Bankruptcy Code merely authorizes the issuance of an injunction in connection with a trust that satisfies the requirements set forth in that section, it does not create the trust. Nor does the fact that the trust is to assume the asbestos liabilities of the Debtor somehow distinguish it from other private trusts; it is not at all unusual for private trusts to assume liabilities in exchange for the receipt of assets, the use of which is specifically limited to the payment of those liabilities.

**CONCLUSION**

For the reasons stated above, the Court should reverse the decision of the bankruptcy

court and find that there is no preemption with respect to the anti-assignment provisions in

Appellants' policies.

Respectfully submitted,

/s/ Michael W. Yurkewicz
**KLEHR, HARRISON, HARVEY
  BRANZBURG AND ELLERS LLP**
919 Market St., Suite 1000
Wilmington, DE 19801
Telephone: 302-426-1189
Facsimile: 302-426-9193

- and –

Craig Goldblatt
Danielle Spinelli
Nancy L. Manzer
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: 202-663-6000
Facsimile: 202-663-6363

- and –

William J. Bowman
James P. Ruggeri
Edward B. Parks, II
**HOGAN & HARTSON, L.L.P.**
555 Thirteenth Street, N.W.
Washington, DC 20004
Telephone: 202-637-5600
Facsimile: 202-637-5910

*Attorneys for Hartford Accident and Indemnity
Company, First State Insurance Company, and
New England Insurance Company*

- 33 -

/s/ James S. Yoder
James S. Yoder
**WHITE AND WILLIAMS LLP**
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE  19899-0709
Telephone:  302-467-4524

-and-

Elit R. Felix, II
**MARGOLIS EDELSTEIN**
The Curtis Center, 4th Floor
601 Walnut Street
Philadelphia, PA  19106-3304
Telephone:  215-931-5870

*Attorneys for Allianz Global Corporate &*
*Specialty AG (as successor-by-partial-merger to*
*Allianz Verischerungs AG as to Policy No. H. 0*
*001 456); Allianz Global Risks U.S. Insurance*
*Company (f/k/a Allianz Insurance Company); and*
*Allianz Underwriters Insurance Company (f/k/a*
*Allianz Underwriters, Inc.)*

/s/ Sean J. Bellew
Sean J. Bellew
**COZEN O'CONNOR**
1201 N. Market Street
Suite 1400
Wilmington, DE  19801
Telephone:  302-295-2026

-and-

Michael S. Davis
Jantra Van Roy
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, New York  10022
Telephone:  212-223-0400

*Attorneys for AIG Casualty Company; AIU*

- 34 -

*Insurance Company; American Home Assurance Company; Granite State Insurance Company; Insurance Company of the State of Pennsylvania; Lexington Insurance Company; National Union Fire Insurance Company of Pittsburgh, Pa; New Hampshire Insurance Company*

/s/ Bruce E. Jameson
Bruce E. Jameson
**PRICKETT, JONES & ELLIOTT, P.A.**
1310 King Street
Wilmington, DE 19899
Telephone: (302) 888-6500

-and-

David C. Christian, III
William J. Factor
**SEYFARTH SHAW LLP**
131 S. Dearborn Street, Suite 2400
Chicago, IL 60603
Telephone: 312-460-5000

-and-

Steven M. Crane
**BERKES CRANE ROBINSON & SEAL LLP**
515 South Figueroa Street, Suite 1500
Los Angeles, CA 90071
Telephone: 213-955-1150

*Columbia Casualty Company, Continental Casualty Company, The Continental Insurance Company, Both In Its Individual Capacity and As Successor To Certain Interests Of Harbor Insurance Company*

/s/ John D. Demmy
John D. Demmy
**STEVENS & LEE, P.C.**
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: 302-425-3308

- 35 -

-and-

Leonard P. Goldberger
**STEVENS & LEE, P.C.**
1818 Market Street, 29th Floor
Philadelphia, PA 19103
Telephone: 215-864-7000

***Fireman's Fund Insurance Company and***
***National Surety Company***

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FEDERAL-MOGUL GLOBAL INC., T&N LIMITED, *et al.,* <br><br> Reorganized Debtors. | ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| CERTAIN UNDERWRITERS AT LLOYDS, LONDON, *et al.,* <br><br> Appellants, <br><br> v. <br><br> FEDERAL-MOGUL GLOBAL INC., *et al.* <br><br> Appellees. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

| Chapter 11 |
|---|
| Bankruptcy Case No. 01-10578 |
| Civil Action Nos. 08-0229 and 08-0230 |
| Judge Joseph H. Rodriguez |

**APPENDIX TO CERTAIN APPELLANTS' BRIEF ON APPEAL**

| Tab | Description |
|---|---|
| A | Stipulation and Agreed Order, dated June 30, 2006 and filed July 24, 2006 as Exhibit A to Motion thereto [D.I. 10113] |
| B | Order (I) Approving Stipulation Regarding Plan Modifications and Potential Confirmation Objections and Plan-Related Discovery By Certain Insurance Companies (II) Staying Discovery Requests By Certain Insurance Companies, and (III) Granting Related Relief, dated September 19, 2006 [D.I. 10606] |
| C | Fourth Amended Joint Plan of Reorganization (As Modified), filed November 7, 2007 [D.I. 13660] |
| D | Order and Stipulation to Preserve Appeals on the Asbestos Insurance Assignment and Preemption Issue, dated November 8, 2007 [D.I. 13671] |

| E | Order Confirming Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-In-Possession (As Modified), dated November 8, 2007 [D.I. 13674] |
|---|---|
| F | Order Regarding Assignment and Preemption Issue, dated March 19, 2008 and attached to Mem. Op. [D.I. 14237] |
| G | Memorandum Opinion Regarding Assignment and Preemption Issue, dated March 19, 2008 [D.I. 14237] |
| H | Plan, Ex. 1.1.217 (Asbestos Personal Injury Trust Agreement), filed June 5, 2007 [D.I. 12621] |

# Tab A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| FEDERAL-MOGUL GLOBAL INC., | ) | |
| T&N LIMITED, et. al., | ) | Jointly Administered Under |
| | ) | Case No. 01-10578 (JKF) |
| Debtors. | ) | |
| | ) | |
| DII INDUSTRIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 01-09018 |
| | ) | |
| FEDERAL-MOGUL PRODUCTS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## STIPULATION AND AGREED ORDER

IT IS HEREBY STIPULATED AND AGREED, by and between, on the one hand, each of the above-captioned debtors (collectively, the "Debtors"), the Future Claimants' Representative (the "Futures Representative"), and the Asbestos Claimants' Committee (the "Committee") (the Debtors, the Committee and the Futures Representative collectively are referred to as the "Plan Proponents") and, on the other hand, the Insurers (as defined below) (the Plan Proponents and the Insurers are referred to collectively as the "Parties"), as follows:

WHEREAS, certain of the Debtors or their alleged predecessors in interest purchased insurance policies (collectively, the "Policies") from, among others, those insurers that have executed this Stipulation and Agreed Order ("Stipulation") (such signatory insurers are referred to collectively as "the Insurers");

WHEREAS, in the above-captioned adversary proceeding (the "Adversary Proceeding") the Debtors have asserted cross-claims against one or more Insurers relating to insurance coverage for Asbestos Personal Injury Claims (the Adversary Proceeding, and each

other proceeding in which the rights and obligations of any of the Parties with respect to the Policies may be adjudicated, are referred to collectively as the "Coverage Litigation");[1/]

WHEREAS, on October 1, 2001, the Debtors commenced their respective reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Debtors' chapter 11 cases (collectively, the "Bankruptcy Case") have been consolidated for procedural purposes only and are being administered jointly;

WHEREAS, on June 4, 2004, the Debtors filed their Third Amended Joint Plan of Reorganization (the "Third Amended Plan") in the Bankruptcy Court. For purposes of this Stipulation, the term "Plan" shall be defined as the Third Amended Plan and any subsequent joint plan of reorganization for the Debtors that incorporates the modifications set forth in Exhibit A and contains no other changes from the Third Amended Plan that would adversely affect the rights of the Insurers;

WHEREAS, under the Plan, the Debtors seek to transfer to the Trust, among other things, (i) the Asbestos Insurance Actions and the Asbestos Insurance Action Recoveries attributable to any Asbestos Personal Injury Claims, (ii) the Asbestos Insurance Settlement Agreements attributable to any Asbestos Personal Injury Claims, other than such agreements attributable to the Hercules Policy, and (iii) the Asbestos In-Place Insurance Coverage (collectively, the "Asbestos Insurance Assets"). For purposes of this Stipulation, the term "Assignment" shall be defined as (i) any transfer of Asbestos Insurance Assets, Asbestos Insurance Policies or other rights and obligations with respect to Asbestos Insurance Policies to the Trust under the Plan or the Plan Documents, and, (ii) with respect only to Fel-Pro Claims and Vellumoid Claims, any other provisions contained in the Plan or the Plan Documents addressing the handling of Asbestos Personal Injury Claims by the Trust that have the effect of permitting the Trust to assert the rights of an insured under the Asbestos Insurance Policies;

WHEREAS, certain of the Insurers propounded discovery requests on one or more of the Plan Proponents in the Bankruptcy Case;

WHEREAS, the Insurers have objected to, inter alia, (a) the terms of the Plan, including the Assignment and the Plan's compliance with Bankruptcy Code Section 524(g); (b) the effect of the Plan, the Plan Documents, and any order confirming the Plan as to the rights and obligations of the Debtors, the Trust, and the Insurers, respectively, under the Insurers' Policies, and (c) the effect of the Plan, the Plan Documents, and any order confirming the Plan as to the issues currently being, or expected to be, adjudicated in the Coverage Litigation; and

WHEREAS, the Parties, without admission, have reached agreement, as set forth below, to, inter alia, make certain modifications to the Plan and narrow the scope of the Insurers' objections and discovery related to confirmation of the Plan.

---

[1/]   Capitalized terms used but not defined in this Stipulation have the meanings assigned to them in the Third Amended Plan (defined below). For purposes of construction of this Stipulation, (i) "includes" and "including" are not limiting, and (ii) "or" is not exclusive.

USIDOCS 5491605v17

THEREFORE, the Parties hereby stipulate and agree as follows:

1.      Plan Amendments.  The Plan shall be amended to include the Plan modifications set forth in Exhibit A attached hereto, which modifications are incorporated herein by reference.  The parties are discussing further Plan modifications to address issues concerning Asbestos Personal Injury Claims arising or alleged to arise under the Fel-Pro and Vellumoid streams of liability ("Fel-Pro Claims" and "Vellumoid Claims," as defined in the Asbestos Personal Injury Trust Distribution Procedures), which Claims are treated differently from other Asbestos Personal Injury Claims under the Plan and the Plan Documents, and which are not at issue in the Adversary Proceeding.

2.      Certain Discovery.  Except as provided in Section 4 below, the Parties agree to limit discovery in the Bankruptcy Case concerning the Plan and the Confirmation Hearing as follows:

a.      No written discovery shall be taken between the Insurers and the Plan Proponents; and

b.      No depositions (i) of any Insurer by any of the Plan Proponents or (ii) of any of the Plan Proponents by any Insurer shall be taken or continued.

3.      Insurer Plan Objections.

a.      The Insurers' objections, if any, to Confirmation of the Plan shall be limited to the following legal issues:

i.      Whether, under the Bankruptcy Code as a matter of law, the Assignment is valid and enforceable against the Insurers notwithstanding anti-assignment provisions in or incorporated in the Policies and applicable state law; and

ii.     Whether the Plan complies with Bankruptcy Code Sections 524(g)(2)(B)(i)(II) and (III).

b.      Without limiting Section 3(a) of this Stipulation, and subject to Section 3(c) of this Stipulation, the Insurers agree that they shall not object to confirmation of the Plan based on "good faith" arguments pursuant to Bankruptcy Code Section 1129(a)(3).

c.      Notwithstanding Sections 3(a) and 3(b) of this Stipulation, the Parties agree as follows:

i.      The Insurers retain all rights, if any, including the rights to conduct discovery and to object to Confirmation of the Plan, (x) as to any amendment of the Plan or the Plan Documents or proposed provision of a Confirmation Order that would allow an entity that is not a Protected Party or a Released Party under the Third Amended Plan to be treated as a Protected Party or a Released Party under the Plan or the Plan Documents; and (y) with respect to any entity treated as a Protected Party pursuant to section 1.1.122.5 of the Third Amended Plan (other

3

than those parties identified in sections 1.1.122.1, 1.1.122.2, 1.1.122.3 and 1.1.122.4 and any Settling Asbestos Insurance Company), or any provision to the same effect in any subsequent Plan, that may assert rights to coverage for asbestos related claims or liabilities under policies of insurance issued or subscribed by any Insurer.

ii.    The Insurers retain all rights, including the rights to conduct discovery and to object to Confirmation of the Plan, related to any amendment of the Plan that provides for Claims that were not channeled to or assumed by the Trust under the Third Amended Plan to be channeled to and/or assumed by the Trust under the Plan as so amended.

4.    <u>Litigation of Insurer Plan Confirmation Objections</u>. With respect to the issues identified in Section 3(a) of this Stipulation, and subject to Section 3(c) of this Stipulation,

a.    To the extent that the Insurers object to confirmation of the Plan for any of the reasons identified in Section 3(a) of this Stipulation, then the Parties shall request that the Bankruptcy Court determine such objections only under the Bankruptcy Code as matters of law (i) with respect to the issue identified in Section 3(a)(i) of this Stipulation, based upon the facts set forth in Section 5 of this Stipulation; and (ii) with respect to the issue identified in Section 3(a)(ii) of this Stipulation, based upon the terms of the Plan and the facts set forth in the Disclosure Statement. The Parties agree that none of them will seek adjudication of the issue identified in Section 3(a)(i) of this Stipulation under applicable state law as part of or related to any Confirmation Hearing on the Plan.

b.    No Party shall present or elicit any witness testimony or demonstrative evidence (other than exhibits to briefs) at the Confirmation Hearing with respect to the issues identified in Section 3(a) of this Stipulation;

c.    No Insurer shall cross-examine any witness presented by any of the Plan Proponents at the Confirmation Hearing. To the extent that a witness testifies with respect to the issues identified in Section 3(a) of this Stipulation or with respect to issues that are reserved for the Coverage Litigation under the terms of this Stipulation, such testimony shall be inadmissible and shall not be relied upon by any party in the Confirmation Hearing for purposes of the resolution of the issues set out in Section 3(a)(i) of this Stipulation or for any purpose in the Coverage Litigation;

d.    Documentary evidence with respect to the issues outlined in Section 3(a) of this Stipulation shall be limited to the Plan, the Plan Documents, the Disclosure Statement, and the Asbestos Insurance Policies, all of which shall be treated as admissible evidence (subject to any applicable hearsay objections) for such purpose;

e.    Any Party shall be entitled to present legal arguments at the Confirmation Hearing with respect to the issues identified in Section 3(a) of this Stipulation.

f.    Each Party retains all appellate rights with respect to any adjudication by the Bankruptcy Court or any higher court of the issues identified in Section 3(a) above, and may appeal any such adjudication.

USIDOCS 5491605v17

g.      Notwithstanding anything to the contrary in this Section 4, in the event the Bankruptcy Court or a higher court concludes that any evidence is lacking or additional evidence is necessary in connection with the adjudication of any issue identified in Section 3 of this Stipulation, then, with respect to each such issue as to which evidence is lacking or additional evidence is necessary (an "Evidentiary Issue"):

i.      Any Party shall have the right to present all relevant evidence with respect to any Evidentiary Issue, and each other Party shall have the right to assert any applicable objections to the admission of such evidence.

ii.      The Parties shall meet and confer for the purpose of agreeing on a schedule for discovery and presentation of evidence with respect to the Evidentiary Issues. The Parties agree jointly to propose a Scheduling Order that provides for, inter alia, (i) written discovery, (ii) the designation of primary fact witnesses, (iii) the designation of rebuttal witnesses, (iv) a reasonable period of time to depose any such primary or rebuttal witnesses, and (v) a hearing at which documentary and testimonial evidence can be presented.

iii.      Discovery and evidentiary presentations shall be limited to matters relating to the Evidentiary Issues.

5.      Stipulated Facts. Solely for purposes of any adjudication of the issues outlined in Section 3(a)(i) above at any Confirmation Hearing on the Plan, the Parties hereby stipulate as follows:

a.      The anti-assignment / consent-to-assignment provisions are among the material provisions of the Policies.

b.      There is a material dispute between the Plan Proponents and the Insurers as to whether the Assignment is valid under the anti-assignment provisions of the Policies and applicable law.

c.      The Insurers have not given their consent to the Assignment.

6.      Assignment. Except as provided in Section 3(a)(i), the Parties shall not litigate or otherwise seek any ruling in the Bankruptcy Case regarding the permissibility of the Assignment or the legal effect of the Assignment as between the Insurers and any other Entity. Except to the extent that the permissibility of the Assignment is determined in the Bankruptcy Case by resolution of the issue specified in Section 3(a)(i), the permissibility of the Assignment under the terms of the Asbestos Insurance Policies and applicable non-bankruptcy law, and the effect of the Assignment, if any, on the rights and obligations of the Parties with respect to the Asbestos Insurance Assets, shall be determined in the Coverage Litigation.

7.      Coverage Litigation. The Parties agree as follows:

a.      By entering into and acting pursuant to this Stipulation, the Insurers are not waiving any rights, claims, defenses or arguments they otherwise would be entitled to assert in the Coverage Litigation. Without limiting the generality of the foregoing, the

USIDOCS 5491605v17

Insurers retain the right to assert in the Coverage Litigation all Asbestos Insurer Coverage Defenses, including (i) all defenses previously asserted in the Coverage Litigation; and (ii) that, as to the Insurers, the Plan is unfair, unreasonable or the product of fraud or collusion.

b.    Neither the Confirmation Order nor any finding of fact or conclusion of law made in connection with confirmation of the Plan shall be binding on any Party for purposes of the Coverage Litigation, whether under principles of res judicata or collateral estoppel or otherwise, except to the extent that (i) the party sought to be bound actually litigated such issue in connection with confirmation of the Plan, or (ii) the issue is specified in Section 3(a)(i) hereof.

c.    For purposes of determining any rights or obligations of the Parties with respect to the Asbestos Insurance Policies issued by the Insurers, neither (i) Confirmation of the Plan by the Bankruptcy Court and/or the District Court, nor approval of the Plan Documents by such court in connection with Confirmation of the Plan, nor any finding of fact and/or conclusion of law made by such court with respect to Confirmation of the Plan; nor (ii) any order entered by an appellate court on appeal of any of the orders, findings or conclusions specified in subsection (i) of this Section 7(c), shall constitute or operate as a judgment or settlement of any Asbestos Personal Injury Claim or Demand.

d.    Except to the extent that the permissibility of the Assignment is determined in the Bankruptcy Case by resolution of the issue specified in Section 3(a)(i), and subject to Section 7(b), neither Confirmation of the Plan nor issuance of any finding of fact or conclusion of law in connection with Confirmation shall make either the Plan or any of the Plan Documents binding on or enforceable against the Insurers with respect to matters relating to Asbestos Insurer Coverage Defenses or the Asbestos Insurance Policies, including whether and, if so, how much the Insurers are obligated, under their Asbestos Insurance Policies and applicable law, to pay with respect to Asbestos Personal Injury Claims resolved by the Trust pursuant to the Plan and the Plan Documents. Instead, all such matters shall be determined in the Coverage Litigation. For purposes of that determination, (i) Asbestos Personal Injury Claims resolved by the Trust (other than through contested litigation to judgment by a court) shall be treated as having been settled by the Trust; (ii) the Plan Proponents shall be free to argue that such settlements are reasonable and binding on the Insurers; (iii) the Insurers shall be free to argue that any settlement with respect to Asbestos Personal Injury Claims that is embodied in the Plan or the Plan Documents or that results from the resolution of Asbestos Personal Injury Claims by the Trust is not reasonable and not binding on the Insurers, and to assert any other Asbestos Insurer Coverage Defenses; and (iv) neither the fact that the Plan was confirmed by the Bankruptcy Court nor the terms of the Confirmation Order nor any finding of fact or conclusion of law in connection with the Confirmation shall create a presumption or be used as evidence to prove that any settlement was reasonable or that any Insurer is obligated to pay any Asbestos Personal Injury Claim.

e.    Except to the extent that the permissibility of the Assignment is determined in the Bankruptcy Case by resolution of the issue specified in Section 3(a)(i), the validity and enforceability of any sale, transfer, assignment, or release, of claims,

6

rights, duties, or assets by or between any of the Debtors and any third party, with respect to any policy of insurance issued or subscribed by any Insurer, or the rights or obligations under such policy, shall be determined in the Coverage Litigation.

      f.     The Insurers have not consented to the Plan, the Plan Documents, or the Assignment, and have not consented to the settlement, resolution or payment of any Asbestos Personal Injury Claims or Demands thereunder.

      g.     The Parties, including the Insurers, and the Trust may offer in the Coverage Litigation any relevant portion of the Plan, the Plan Documents or the Stipulation for any purpose other than as specified in Article 10.3A of the Plan (as set forth in the Plan Modifications), provided however, such offer shall be subject to the rights, defenses (including Asbestos Insurer Coverage Defenses), and objections, if any, of each of the Parties and the Trust.

      h.     Litigation of the Confirmation Objections specified in Section 3 of this Stipulation shall not be deemed to constitute litigation of any Asbestos Insurer Coverage Defense and shall not have any res judicata or collateral estoppel effect with respect to any Asbestos Insurer Coverage Defense.

      8.     It is the intent of all Parties that this Stipulation shall be binding in any and all Coverage Litigation involving the Policies, and shall bind all Parties now or hereafter participating in any such Coverage Litigation, including without limitation the Trust. Toward that end, the Parties hereby agree (i) to file this Stipulation in the Bankruptcy Case and the Adversary Proceeding within five (5) days after it has been executed by all Parties, (ii) to use their reasonable best efforts to obtain approval of the Stipulation by the Bankruptcy Court in the Bankruptcy Case and by the District Court in the Coverage Litigation as soon thereafter as is reasonably practicable and prior to Confirmation of the Plan; and (iii) in the event any Coverage Litigation takes place, before or after the Effective Date of the Plan, in any proceeding other than the Bankruptcy Case or the Adversary Proceeding, or in a court other than the Bankruptcy Court or the District Court, the Parties shall jointly request such court to enter this Stipulation as an order governing such Coverage Litigation.

      9.     Nothing in this Stipulation, the Plan, or the Plan Documents shall be construed as precluding any Party from filing a motion in the Adversary Proceeding asking the Bankruptcy Court or the District Court to abstain from hearing the Adversary Proceeding pursuant to 28 U.S.C. § 1334(c).

      10.     This Stipulation shall become effective and binding upon execution by all Parties and approval by the Bankruptcy Court.

      11.     This Stipulation shall be binding upon the Parties and their respective successors and assigns, upon any Trust that is established pursuant to the Plan, and upon any trustee appointed in the Bankruptcy Case, and the Plan and any Confirmation Order shall so provide.

US1DOCS 5491605v17

12.    No change or modification of the Plan shall alter the rights of the Insurers under this Stipulation unless agreed to in writing by all Parties hereto.

13.    The Bankruptcy Court shall retain jurisdiction to interpret and enforce the provisions of this Stipulation in all respects.  The provisions of this Stipulation are non-severable and mutually dependent.

AGREED as of this 30ᵗʰ day of June, 2006:

PLAN PROPONENTS:

James F. Conlan
Larry J. Nyhan
Kenneth P. Kansa
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL  60603
Tel.: 312-853-7000
Fax: 312-853-7036

Richard T. Peters
Kevin T. Lantry
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013
Tel.: 213-896-6000
Fax: 213-896-6600

Laura Davis Jones
James E. O'Neill
PACHULSKI, STANG, ZIEHL, YOUNG
  JONES & WEINTRAUB P.C.
919 North Market Street, 16ᵗʰ Floor
Wilmington, DE  19801
Tel.: 302-652-4100
Fax: 302-652-4400

*Counsel for the Debtors*

Peter Van N. Lockwood
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W.
Washington, D.C.  20005-5802
Tel.: 202-862-5065

12.    No change or modification of the Plan shall alter the rights of the Insurers under this Stipulation unless agreed to in writing by all Parties hereto.

13.    The Bankruptcy Court shall retain jurisdiction to interpret and enforce the provisions of this Stipulation in all respects. The provisions of this Stipulation are non-severable and mutually dependent.

AGREED as of this ___ day of June, 2006:

PLAN PROPONENTS:

_____
James F. Conlan
Larry J. Nyhan
Kenneth P. Kansa
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603
Tel.: 312-853-7000
Fax: 312-853-7036

Richard T. Peters
Kevin T. Lantry
SIDLEY AUSTIN BROWN & WOOD LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Tel.: 213-896-6000
Fax: 213-896-6600

Laura Davis Jones
James E. O'Neill
PACHULSKI, STANG, ZIEHL, YOUNG
  JONES & WEINTRAUB P.C.
919 North Market Street, 16th Floor
Wilmington, DE 19801
Tel.: 302-652-4100
Fax: 302-652-4400

*Counsel for the Debtors*

_____
Peter Van N. Lockwood
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W.
Washington, D.C. 20005-5802

8

Tel.: 202-862-5065
Fax: 202-429-3301

Elihu Inselbuch
CAPLAN & DRYSDALE, CHARTERED
375 Park Avenue
New York, NY 10152
Tel.: 212-319-7125
Fax: 212-644-6755

Marla R. Eskin
Kathleen Campbell Davis
CAMPBELL & LEVINE, LLC
800 King Street, Suite 300
Wilmington, DE 19801
Tel.: 302-426-1900
Fax: 302-426-9947

*Counsel for the Asbestos Claimants' Committee*

James L. Patton, Jr. (No. 2202)
Edward J. Harron (No. 3396)
Sharon M. Zieg (No. 4196)
Maribeth L. Minella (No. 4185)
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Tel.: 302-571-6600

*Counsel for Eric D. Green, the Legal
Representative for Future Asbestos Claimants*

9

App. 010

INSURERS:

_Duane D. Morse_ (signature)

Duane D. Morse
Craig Goldblatt
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Joanne Wills
Jennifer L. Scoliard
Klehr, Harrison, Harvey, Branzburg & Ellers LLP
919 Market Street, Suite 1000
Wilmington, DE 19801
Tel: (302) 426-1189
Fax: (302) 426-9193

*Counsel for Hartford Accident and Indemnity
Company, First State Insurance Company and New
England Insurance Company*

Neal Levitsky, Esquire
L. Jason Cornell, Esquire
FOX ROTHSCHILD LLP
Citizen's Bank Center
919 North Market Street, Suite 1300
Wilmington, DE 19899
Telephone: (302) 654-7444
Fax: (302) 656-8920
nlevitsky@foxrothschild.com
jcornell@foxrothschild.com

Stuart D. Rosen
G. Eric Brunstad, Jr.
Kate K. Simon
BINGHAM McCUTCHEN LLP
One State Street
Hartford, Connecticut 06103-3178
Telephone: (860) 240-2700
Facsimile: (860) 240-2800

10

Rheba Rutkowski
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA 02110
Telephone: (617) 951-8000
Fax: (617) 951-8736

*Attorneys for The Travelers Indemnity Company
and certain affiliates and Travelers Casualty and
Surety Company f/k/a The Aetna Casualty and
Surety Company*

Sean J. Bellew (No. 4072)
COZEN O'CONNOR
Chase Manhattan Centre
1201 N. Market Street, Ste. 1400
Wilmington, DE 19801
Telephone: (302) 295-2026
Facsimile: (302) 295-2013

Thomas G. Wilkinson, Jr.
James B. Dolan, Jr.
David J. Liebman
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Telephone: (215) 665-3737
Facsimile: (215) 701-2437

*Counsel for American International Underwriters
Insurance Company; American Home Assurance
Company; Birmingham Fire Insurance Company of
Pennsylvania; Granite State Insurance Company;
Insurance Company of the State of Pennsylvania;
Lexington Insurance Company; and National Union
Fire Insurance Company of Pittsburgh, PA.*

Brian L. Kasprzak (No. 3846)
MARKS, O'NEILL, O'BRIEN AND COURTNEY

11

Rheba Rutkowski
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA 02110
Telephone: (617) 951-8000
Fax: (617) 951-8736

*Attorneys for The Travelers Indemnity Company
and certain affiliates and Travelers Casualty and
Surety Company f/k/a The Aetna Casualty and
Surety Company*

---

Jeffrey R. Waxman (No. 4159)
COZEN O'CONNOR
Chase Manhattan Centre
1201 N. Market Street, Ste. 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013

Thomas G. Wilkinson, Jr.
James B. Dolan, Jr.
David J. Liebman
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Telephone: (215) 665-3737
Facsimile: (215) 701-2437

*Counsel for American International Underwriters
Insurance Company; American Home Assurance
Company; Birmingham Fire Insurance Company of
Pennsylvania; Granite State Insurance Company;
Insurance Company of the State of Pennsylvania;
Lexington Insurance Company; and National Union
Fire Insurance Company of Pittsburgh, PA.*

Brian L. Kasprzak (No. 3846)
MARKS, O'NEILL, O'BRIEN AND COURTNEY

11

913 North Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 658-6538
Facsimile: (302) 658-6537

Mark D. Plevin
Joseph L. Meadows
Leslie A. Epley
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

*Attorneys for Century Indemnity Company, ACE
Property & Casualty Insurance Company, Central
National Insurance Company of Omaha, Insurance
Company of North America, Pacific Employers
Insurance Company, St. Paul Mercury Insurance
Company, U.S. Fire Insurance Company, and TIG
Insurance Company (solely as successor by merger
to International Insurance Company)*

_____

Andrew K. Craig, Esq.
CUYLER BURK, LLP
Parsippany Corporate Center
Four Century Drive
Parsippany, NJ 07054

Robert J. Katzenstein
SMITH KATZENSTEIN FURLOW
The Corporate Plaza
800 Delaware Avenue, 7th Floor

12

App. 014

913 North Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:  (302) 658-6538
Facsimile:  (302) 658-6537

Mark D. Plevin
Joseph L. Meadows
Leslie A. Epley
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

Andrew K. Craig, Esq.
CUYLER BURK, LLP
Parsippany Corporate Center
Four Century Drive
Parsippany, NJ 07054

Robert J. Katzenstein
SMITH KATZENSTEIN FURLOW
The Corporate Plaza
800 Delaware Avenue, 7th Floor

12

Wilmington, DE 19801

*Attorneys for Allstate Insurance
Company, solely as successor-in-interest
to Northbrook Excess and Surplus
Insurance Company, formerly
Northbrook Insurance Company*

Karen V. Sullivan (No. 3872)
OBERLY, JENNINGS & RHODUNDA, P.A.
800 Delaware Avenue, Suite 901
PO Box 2054
Wilmington DE 19899
Telephone: 302-576-2000
Facsimile: 302-576-2004

Carl J. Pernicone
WILSON, ELSER, MOSKOWITZ,
  EDELMAN & DICKER, LLP
150 East 42nd Street
New York NY 10017-5639
Telephone: 212-490-3000
Facsimile : 212-490-3038

*Attorneys for Globe Indemnity Company and Royal
Indemnity Company*

Gerald F. Ellersdorfer
Paul A. Peters
KAUFMAN & LOGAN LLP
100 Spear Street, 12th Floor
San Francisco, Ca: 94105
Telephone: (415) 247-8300
Facsimile: (415) 247-8310

*Attorneys for Fireman's Fund Insurance Company
and National Surety Corporation*

App. 016

Wilmington, DE 19801

*Attorneys for Allstate Insurance*
*Company, solely as successor-in-interest*
*to Northbrook Excess and Surplus*
*Insurance Company, formerly*
*Northbrook Insurance Company*

_____

Karen V. Sullivan (No. 3872)
OBERLY, JENNINGS & RHODUNDA, P.A.
800 Delaware Avenue, Suite 901
PO Box 2054
Wilmington DE 19899
Telephone: 302-576-2000
Facsimile: 302-576-2004

Carl J. Pernicone
WILSON, ELSER, MOSKOWITZ,
   EDELMAN & DICKER, LLP
150 East 42nd Street
New York NY 10017-5639
Telephone: 212-490-3000
Facsimile : 212-490-3038

*Attorneys for Globe Indemnity Company and Royal*
*Indemnity Company*

_____

Gerald F. Ellersdorfer
Paul A. Peters
KAUFMAN & LOGAN LLP
100 Spear Street, 12th Floor
San Francisco, Ca. 94105
Telephone: (415) 247-8300
Facsimile: (415) 247-8310

*Attorneys for Fireman's Fund Insurance Company*
*and National Surety Corporation*

13

Arthur A. Povelones, Jr.          6 - 28 - 06
HARDIN, KUNDLA, MCKEON
  & POLETTO, P.A.
673 Morris Avenue
Springfield, NJ 07081
(973) 912-5222 x2220

*Counsel for Lumbermens Mutual Casualty
Company*

David C. Christian II
William J. Factor
SEYFARTH SHAW LLP
55 East Monroe Street, Suite 4200
Chicago, Illinois 60603
Telephone: 312-346-8000
Facsimile: 312-269-8869

*Attorneys For Columbia Casualty Company,
Continental Casualty Company, And
The Continental Insurance Company,
For Itself And As Successor In Interest
To Certain Policies Issued By
Harbor Insurance Company*

Elit R. Felix, II
MARGOLIS EDELSTEIN
The Curtis Center, 4th Floor
601 Walnut Street
Philadelphia, PA 19106-3304
Tel: (215) 931-5870
Fax: (215) 922-1772
E-mail: EFelix@MargolisEdelstein.com

James S. Yoder
WHITE AND WILLIAMS LLP
824 Market Street, Suite 902
Wilmington, DE 19899-0709
Tel: (302) 467-4524
Fax: (302) 467-4554
E-mail: YoderJ@WhiteandWilliams.com

14

Arthur A. Povelones, Jr.
HARDIN, KUNDLA, MCKEON
   & POLETTO, P.A.
673 Morris Avenue
Springfield, NJ 07081
(973) 912-5222 x2220

*Counsel for Lumbermans Mutual Casualty
Company*

David C. Christian II
William J. Factor
SEYFARTH SHAW LLP
55 East Monroe Street, Suite 4200
Chicago, Illinois 60603
Telephone: 312-346-8000
Facsimile: 312-269-8869

*Attorneys For Columbia Casualty Company,
Continental Casualty Company, And
The Continental Insurance Company,
For Itself And As Successor In Interest
To Certain Policies Issued By
Harbor Insurance Company*

Elit R. Felix, II
MARGOLIS EDELSTEIN
The Curtis Center, 4th Floor
601 Walnut Street
Philadelphia, PA 19106-3304
Tel: (215) 931-5870
Fax: (215) 922-1772
E-mail: EFelix@MargolisEdelstein.com

James S. Yoder
WHITE AND WILLIAMS LLP
824 Market Street, Suite 902
Wilmington, DE 19899-0709
Tel: (302) 467-4524
Fax: (302) 467-4554
E-mail: YoderJ@WhiteandWilliams.com

14

Arthur A. Povelones, Jr.
HARDIN, KUNDLA, MCKEON
   & POLETTO, P.A.
673 Morris Avenue
Springfield, NJ 07081
(973) 912-5222 x2220

*Counsel for Lumbermans Mutual Casualty Company*

David C. Christian II
William J. Factor
SEYFARTH SHAW LLP
55 East Monroe Street, Suite 4200
Chicago, Illinois 60603
Telephone: 312-346-8000
Facsimile: 312-269-8869

*Attorneys For Columbia Casualty Company,
Continental Casualty Company, And
The Continental Insurance Company,
For Itself And As Successor In Interest
To Certain Policies Issued By
Harbor Insurance Company*

Elit R. Felix, II
MARGOLIS EDELSTEIN
The Curtis Center, 4th Floor
601 Walnut Street
Philadelphia, PA 19106-3304
Tel: (215) 931-5870
Fax: (215) 922-1772
E-mail: EFelix@MargolisEdelstein.com

James S. Yoder
WHITE AND WILLIAMS LLP
824 Market Street, Suite 902
Wilmington, DE 19899-0709
Tel: (302) 467-4524
Fax: (302) 467-4554
E-mail: YoderJ@WhiteandWilliams.com

14

*Counsel for ALLIANZ VERSICHERUNGS AG;
ALLIANZ GLOBAL RISKS U.S. INSURANCE
COMPANY, formerly known as
Allianz Insurance Company; and
ALLIANZ UNDERWRITERS INSURANCE
COMPANY, formerly known as Allianz
Underwriters, Inc.*

Sean J. Bellew, Esq. (DE No. 4072)
COZEN O'CONNOR
Chase Manhattan Centre
1201 North Market Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 295-2026
Facsimile: (302) 295-2013

William P. Shelley, Esq.
John J. Dwyer, Esq.
COZEN O'CONNOR
1900 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 665-2000
Facsimile: (215) 665-2013

*Counsel for Federal Insurance Company*


Stanley J. Samorajczyk
Scott L. Alberino
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave., NW
Washington, DC 20036
Tel 202 887-4000
Fax 202 887-4288

*Counsel For Liberty Mutual Insurance Company*

USJDOCS 5491605v17

*ALLIANZ VERSICHERUNGS AG;*
*ALLIANZ GLOBAL RISKS U.S. INSURANCE*
*COMPANY, formerly known as*
*Allianz Insurance Company; and*
*ALLIANZ UNDERWRITERS INSURANCE*
*COMPANY, formerly known as Allianz*
*Underwriters, Inc.*

_____

Sean J. Bellew, Esq. (DE No. 4072)
COZEN O'CONNOR
Chase Manhattan Centre
1201 North Market Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 295-2026
Facsimile: (302) 295-2013

William P. Shelley, Esq.
John J. Dwyer, Esq.
COZEN O'CONNOR
1900 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 665-2000
Facsimile: (215) 665-2013

*Counsel for Federal Insurance Company*

Stanley J. Samorajczyk
Scott L. Alberino
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave., NW
Washington, DC 20036
Tel 202 887-4000
Fax 202 887-4288

*Counsel For Liberty Mutual Insurance Company*

15

_[signature]_

Robert P. Siegel
TRAUB EGLIN LIEBERMAN STRAUS LLP
Seven Skyline Drive
Hawthorne, NY 10532
Tel. (914) 347-2600
Fax (914) 347-8898

*Attorneys for Evanston Insurance Company,*
*Associated International Insurance Company,*
*and Northwestern National Insurance Company*

SO ORDERED this ____ day of _____, 2006:

_____
Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

16

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FEDERAL-MOGUL GLOBAL INC., | ) | Case No. 01-10578 (RTL) |
| T&N LIMITED, et al.,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## NON-MATERIAL MODIFICATIONS TO THIRD AMENDED JOINT PLAN OF REORGANIZATION

The Plan Proponents (as defined in § 1.1.116 of the Third Amended Joint Plan of Reorganization (the "Plan") hereby propose the following non-material modifications to the Plan:

---

[1]    The U.S. Debtors (collectively, the "U.S. Debtors") are Carter Automotive Company, Inc., Federal-Mogul Corporation, Federal-Mogul Dutch Holdings Inc., Federal-Mogul FX, Inc., Federal-Mogul Global Inc., Federal-Mogul Global Properties, Inc., Federal-Mogul Ignition Company, Federal-Mogul Machine Tool, Inc., Federal-Mogul Mystic, Inc., Federal-Mogul Piston Rings, Inc., Federal-Mogul Powertrain, Inc., Federal-Mogul Products, Inc., Federal-Mogul Puerto Rico, Inc., Federal-Mogul U.K. Holdings, Inc., Federal-Mogul Venture Corporation, Federal-Mogul World Wide, Inc., Felt Products Manufacturing Co., FM International LLC, Ferodo America, Inc., Gasket Holdings Inc., J.W.J. Holdings, Inc., McCord Sealing, Inc., and T&N Industries Inc.

The U.K. Debtors (collectively, the "U.K. Debtors") are AE Dayton Services Limited, AB Group Machines Limited, AE Holdings Limited, AE International Limited, AE Limited, AE Piston Products Limited, AE Sales (Africa) Limited, Aeroplane & Motor Aluminium Castings Limited, Amber Supervision Limited, Ashburton Road Services Limited, Associated Engineering Group Limited, Awncast Limited, Bearings (North-Western) Limited, Brake Linings Limited, Colvan Rubber Co. Limited, Contact 100 Limited, Cosmid Limited, Cranhold Limited, Dealings Limited, Dumplington Services Limited, Duron Limited, E W Engineering Limited, Edmunds, Walker & Co. Limited, Engineering Components Limited, Federal-Mogul Acquisition Company Limited, Federal-Mogul Aftermarket UK Limited, Federal-Mogul Bradford Limited, Federal-Mogul Brake Systems Limited, Federal-Mogul Bridgwater Limited, Federal-Mogul Camshaft Castings Limited, Federal-Mogul Camshafts Limited, Federal-Mogul Engineering Limited, Federal-Mogul Eurofriction Limited, Federal-Mogul Export Services Limited, Federal-Mogul Friction Products Limited, Federal-Mogul Global Growth Limited, Federal-Mogul Ignition (U.K.) Limited, Federal-Mogul Powertrain Systems International Limited, Federal-Mogul Sealing Systems (Cardiff) Limited, Federal-Mogul Sealing Systems (Rochdale) Limited, Federal-Mogul Sealing Systems (Slough) Limited, Federal-Mogul Sealing Systems Limited, Federal-Mogul Shoreham Limited, Federal-Mogul Sintered Products Limited, Federal-Mogul Systems Protection Group Limited, Federal-Mogul Technology Limited, Federal-Mogul U.K. Limited, Ferodo Caernarfon Limited, Ferodo Limited, FHE Technology Limited, Fleetside Investments Limited, F-M UK Holding Limited, FP Diesel Limited, Friction Materials Limited, G.B. Tools & Components Exports Limited, Genthope Limited, Greet Limited, Halls Gaskets Limited, Hepworth & Grandage Limited, High Precision Equipment Limited, Inblot Limited, Instantwonder Limited, J.W. Roberts Limited, Kings Park Housing Limited, Lalton Limited, Lanoth Limited, Lanoth Precision Equipment Limited, Leeds Piston Ring & Engineering Co. Limited, M.T.A. (Kettering) Limited, Mantro Engineering Co. Limited, Mobile Distributing (Spares) Limited, Moores Plastic Units Limited, Newalls Insulation Company Limited, Ontall Limited, Payen (Europe) Limited, Pecal Limited, Presswork-Components Limited, Sintration Limited, Sourcelook Limited, Specialloid, Limited, STS (1996) Limited, TAF International Limited, T&N Holdings Limited, T&N International Limited, T&N Investments Limited, T&N Limited, T&N Materials Research Limited, T&N Piston Products Group Limited, T&N Properties Limited, T&N Shelf Eight Limited, T&N Shelf Eighteen Limited, T&N Shelf Fifteen Limited, T&N Shelf Five Limited, T&N Shelf Four Limited, T&N Shelf Fourteen Limited, T&N Shelf Nine Limited, T&N Shelf Nineteen Limited, T&N Shelf One Limited, T&N Shelf Seven Limited, T&N Shelf Six Limited, T&N Shelf Sixteen Limited, T&N Shelf Ten Limited, T&N Shelf Thirteen Limited, T&N Shelf Thirty Limited, T&N Shelf Thirty-One Limited, T&N Shelf Thirty-Three Limited, T&N Shelf Three Limited, T&N Shelf Twenty Limited, T&N Shelf Twenty-Eight Limited, T&N Shelf Twenty-Five Limited, T&N Shelf Twenty-Four Limited, T&N Shelf Twenty-Nine Limited, T&N Shelf Twenty-One Limited, T&N Shelf Twenty-Six Limited, T&N Shelf Twenty-Two Limited, T&N Shelf Two Limited, T&N Trade Marks Limited, T&N Welfare Trust Limited, TBA Belting Limited, TBA Belting (Residual) Limited, TBA Industrial Products Limited, Telford Rubber Processors Limited, Telford Technology Supplies Limited, The British Piston Ring Company Limited, The Washington Chemical Company Limited, Tinblo Limited, Touchdown Adhesive Products Limited, Turner & Newall Limited, Turner Brothers Asbestos Company Limited, Tynoda Limited, Vanwall Cars Limited, Wellworthy Limited, Wellworthy Property Developments Limited, and William C. Jones (Polymers) Limited. Unlike all the other U.K. Debtors, T&N Investments Limited is a Scottish rather than English company and commenced administration in Scotland in April 2002.

1029/006/88786.1
US1DOCS 4786011v18

- § 1.1.10.2 shall be amended as follows:

  With respect to an Asbestos Personal Injury Claim other than a Bonded Claim, the term "Allowed" shall not apply. the amount of any such Claim that is determined pursuant to the procedures set forth in the Asbestos Personal Injury Trust Distribution Procedures or, if applicable, pursuant to a Final Order of the Bankruptcy Court or the U.K. Court. An Asbestos Personal Injury Claim that is Allowed in accordance with the foregoing, shall be, and be deemed to be, a judgment determining the legal liability against the Trust in the Allowed Amount of such Asbestos Personal Injury Claim.

- Current § 1.1.16 shall be amended and restated in its entirety as follows:

  "Asbestos Insurance Company" means any insurance company, insurance broker or syndicate insurance broker, guaranty association or any other entity that may have liability under an Asbestos Insurance Policy.

- Current § 1.1.18 shall be amended as follows:

  "Asbestos Insurance Policy" means (a) any insurance policy (other than the Hercules Policy and the EL Policy) in effect at any time on or before the Effective Date naming the Debtors (or any predecessor, subsidiary, or past or present Affiliate of the Debtors) as an insured, or otherwise affording the Debtors indemnity or insurance coverage, upon which any claim has been or may be made with respect to any Asbestos Personal Injury Claim or (b) any reinsurance agreement relating to an Asbestos Insurance Policy as defined in (a) above to which an Asbestos Insurance Company is a party.

- The following shall be added between § 1.1.19 and § 1.1.20:

  "Asbestos Insurer Coverage Defenses" means all rights and defenses at law or in equity that any Asbestos Insurance Company may have under any Asbestos Insurance Policy or applicable law to a claim seeking insurance coverage, provided, however, that the pursuit of such defenses shall be subject to the terms of the Bankruptcy Insurance Stipulation (if applicable). Asbestos Insurer Coverage Defenses includes, without limitation, any defense based on the terms of the Plan or the Plan Documents or the manner in which the Plan or Plan Documents were negotiated, including but not limited to (i) the defense that Asbestos Personal Injury Claims asserted against one Debtor cannot be tendered to nor paid by insurers issuing or subscribing Asbestos Insurance Policies to a different Debtor and/or with respect to risks that are not insured under those policies, (ii) defenses based on the provisions in the Plan, Plan Documents, and any Order confirming the Plan relating to the treatment or handling of Vellumoid and Fel-Pro Claims, and (iii) the defenses that excess insurers have no duty to

2

undertake the defense of any claim and have no duty to pay defense costs with respect to claims that are not covered by any Asbestos Insurance Policy issued or subscribed by them; but Asbestos Insurer Coverage Defenses does not include any defense that the Plan or any of the Plan Documents does not comply with the Bankruptcy Code. In the event that it is finally determined in the Bankruptcy Case that the Bankruptcy Code authorizes the Assignment (as defined in the Bankruptcy Stipulation) by preempting any terms of the Asbestos Insurance Policies or provisions of applicable non-bankruptcy law that otherwise might prohibit the Assignment, Asbestos Insurer Coverage Defenses shall not include any defense that the Assignment is prohibited by the Asbestos Insurance Policies or applicable non-bankruptcy law.

- The following shall be added between § 1.1.__ and § 1.1.__:

  "Bankruptcy Insurance Stipulation" means that certain Stipulation and Agreed Order, entered by the Bankruptcy Court in the Bankruptcy Cases on _____, 2006 as docket no.____ and in the Coverage Litigation on _____, 2006 as docket no.____, by and between the Debtors, certain Asbestos Insurance Companies, the Asbestos Claimants' Committee and the Future Claimants Representative, as such Stipulation and Agreed Order may subsequently be amended and modified by agreement of the parties thereto.

- The following shall be added between § 1.1.__ and § 1.1.__:

  § 1.1.____ "Debtor Insurance Claim" means a Claim (other than an Asbestos Personal Injury Claim) that is alleged to be covered by an insurance policy issued or allegedly issued by an Asbestos Insurance Company.

- § 1.1.122.5 shall be amended as follows:

  1.1.122.5   each Settling Asbestos Insurance Company ~~named in the Confirmation Order~~ and, to the extent specified in the Confirmation Order, each contributor of funds, proceeds or other consideration to the Trust ~~but only to the extent specified in the Confirmation Order~~; and

- § 1.1.137 shall be amended as follows:

  1.1.137. **Settling Asbestos Insurance Company** means each Asbestos Insurance Company listed on Exhibit 1.1.137 (as the same may be amended from time to time, including following entry of the Confirmation Order) and any other Asbestos Insurance Company that enters into an Asbestos Insurance Settlement Agreement that is determined by the District Court to justify treating such Asbestos Insurance Company as a Protected Party.

3

- § 3.1.10(b) shall be amended to read as follows:

    Treatment: As of the Effective Date, liability for all Class 1J Asbestos Personal
    Injury Claims shall be automatically and without further act, deed or Court order,
    transferred to, vested in and assumed by the Trust. Each Asbestos Personal Injury
    Claim in Class 1J shall be addressed ~~(i.e. Allowed or disallowed, and if Allowed,
    then paid)~~ solely by the Trust pursuant to and in accordance with the Asbestos
    Personal Injury Trust Distribution Procedures. If Classes 1D and 1J vote to
    accept the Plan, and at least one of Classes 1M, 1N or 1O votes to accept the Plan,
    then Class 1J shall also receive 50% of the Warrants to be issued and distributed
    under the Plan; provided, however, Class 1J has agreed to distribute any and all
    such Warrants to the holders of Class 1M, 1N and/or 1O Claims and/or interests
    in accordance with Sections 3.1.13 , 3.1.14 and 3.1.15 of the Plan; provided,
    further, however, the distribution of the Warrants shall be subject to the
    requirements of Section 8.3.5 of the Plan.

- § 3.5.9(b) shall be amended as follows:

    Treatment: As of the Effective Date, liability for all Class 5J Asbestos Personal
    Injury Claims shall be automatically and without further act, deed or Court order,
    transferred to, vested in and assumed by the Trust. Each Asbestos Personal Injury
    Claim in Class 5J shall be addressed ~~(i.e. Allowed or disallowed, and if Allowed,
    then paid)~~ solely by the Trust pursuant to and in accordance with the Asbestos
    Personal Injury Trust Distribution Procedures.

- The fourth, fifth and sixth sentences of § 4.2 shall be amended and restated in
  their entirety as follows:

    The Asbestos Personal Injury Trust Distribution Procedures provide, among other
    things, for the resolution of Asbestos Personal Injury Claims pursuant to the terms
    of the Trust Documents, and that resolution of an Asbestos Personal Injury Claim
    by the Trust will result in a full release of such Claim against the Trust. The Trust
    shall pay Asbestos Personal Injury Claims in accordance with the Trust
    Documents. In the event that an Indirect Asbestos Personal Injury Claim against
    the Debtors is disallowed pursuant to Section 502(e)(1)(B) of the Bankruptcy
    Code, the right of a holder of such disallowed Claim under applicable non-
    bankruptcy law, to setoff payments by the Trust against such holder's liability to
    an asbestos personal injury claimant, shall be preserved.

- § 4.8 shall be amended as follows:

    4.8.    **Trust Expenses.** The Trust shall pay all Trust Expenses from the
    Trust Assets, including proceeds of applicable Asbestos Insurance Policies,
    except to the extent such assets are precluded by agreement with an Asbestos
    Insurance Company from being used for payment of Trust Expenses. Neither the
    Debtors' Estates nor the Reorganized Debtors shall have any obligation to pay any
    Trust Expenses. Additionally, the Trust shall promptly pay all Trust Expenses of

4

Reorganized Debtors for any and all liabilities, costs or expenses incurred in taking any action on behalf of or at the direction of the Trustees.

- § 4.11.5 shall be amended as follows:

Notwithstanding anything in the Trust Agreement, including, without limitation, Section 3.1 of the Trust Agreement, the Trust shall (i) be obligated to pay the indemnification as required under the Plan without regard to which stream of asbestos liability the indemnification relates to and (ii) pay such indemnification from any and all available assets in any of the funds (as such term is defined in the Trust Agreement) without regard to which Fund or stream of asbestos liability such indemnification relates to; provided, however, that (x) funds paid to the Trust by an Asbestos Insurance Company with respect to an Asbestos Insurance Policy that are reserved, by express agreement with such Asbestos Insurance Company (other than the terms of the Asbestos Insurance Policy itself), for payment of covered Asbestos Personal Injury Claims and related expenses shall not be used to pay indemnification of liabilities that were not covered by such Asbestos Insurance Policy; and (y) nothing in this Section 4.11.5 is intended or shall be construed to limit the assertion, applicability, or effect of any Asbestos Insurance Coverage Defenses.

- A new § 4.12 shall be added, as follows:

**Retrospective Insurance Premiums and Related Matters.** Notwithstanding anything to the contrary in the Plan or the Plan Documents, (i) any entity (including the Trust, any Reorganized Debtor and any non-Debtor Affiliate) that tenders a Claim to an Asbestos Insurance Company shall be responsible, for purposes of such Claim, for any retrospective insurance premium, self-insured retention, deductible, or similar obligation of the insured under the Asbestos Insurance Policies to which such Claim is tendered; (ii) with respect to any self-insured retention, deductible or similar obligation, any Asbestos Insurance Company to which such Claim is tendered may seek to establish, as one of its Asbestos Insurance Coverage Defenses, that such entity has not, in fact, fulfilled the obligations of the insured under the Asbestos Insurance Policies to which such Claim was tendered; and (iii) with respect to any retrospective insurance premium or similar obligation, any Asbestos Insurance Company to which such Claim is tendered may offset the amount of such retrospective insurance premium or similar obligation against any amount otherwise payable by such Asbestos Insurance Company on account of such claim under its Asbestos Insurance Policies.

- § 5.1.4 shall be added and shall read as follows:

**Pre-Petition Settlement Agreements Relating To Asbestos Insurance Policies.** Notwithstanding §§ 5.1.1 – 5.1.3 above, all settlement agreements affecting Asbestos Insurance Policies entered into prior to the Petition Date shall be considered non-executory contracts and shall neither be assumed nor rejected by

5

the Debtors. Except to the extent that the permissibility of the Assignment (as defined in the Bankruptcy Insurance Stipulation) is determined in the Bankruptcy Case by resolution of the issue specified in Section 3(a) of the Bankruptcy Insurance Stipulation, the rights and obligations of the parties under such settlement agreements, including the question whether any breach has occurred, shall be determined under applicable non-bankruptcy law.

- § 7.1.1(o) shall be deleted in its entirety.

- § 7.1.1(p) shall be deleted in its entirety.

- § 7.1.1(q) shall be deleted in its entirety.

- § 8.19 shall be amended as follows:

**Objections to Claims Other Than Asbestos Personal Injury Claims.** Subject to the provisions of Section 8.19A, after the Effective Date, only the applicable Reorganized Debtor against whose Estate a Claim was filed or deemed filed ~~or the Trust in the case of Asbestos Personal Injury Claims~~ may object to the allowance of any Claim, except that (i) the Unsecured Creditors Committee, the Asbestos Claimants Committee and the Future Claimants Representative shall also have standing and capacity to object to ~~(i)~~ (A) the Administrative Expense Claims of professionals employed or retained in these Reorganization Cases and ~~(ii)~~ (B) the Secured or unsecured Surety Claims; and (ii) all rights of any Asbestos Insurance Company with respect to the defense and settlement of Debtor Insurance Claims, or claims asserted by any non-debtor party against any Debtor or Asbestos Insurance Company for coverage under any Asbestos Insurance Policy, are preserved. After the Effective Date, the applicable Reorganized Debtor against whose Estate a Claim was filed or deemed filed, ~~filed or the Trust in the case of Asbestos Personal Injury Claims~~ shall be accorded the power and authority to allow or settle and compromise any Claim, except for the Administrative Expense Claims of professionals employed by or on behalf of the Estates and Debtor Insurance Claims, without notice to any other party or approval of or notice to the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court, and except as to any (a) late-filed Claims, or (b) Asbestos Personal Injury Claims, all objections to Claims against the U.S. Debtors shall be filed with the Bankruptcy Court on or before six months following the Effective Date. Objections to late-filed Claims against the U.S. Debtors shall be filed not later than the later of (a) six months following the Effective Date or (b) sixty (60) days after the Reorganized Debtor receives actual notice of the filing of such Claim.

- A new § 8.19A shall be added, as follows:

**Resolution of Asbestos Personal Injury Claims.** Asbestos Personal Injury Claims shall be resolved in accordance with the Asbestos Personal Injury Trust

6

Distribution Procedures, subject to the right of any Asbestos Insurance Company to raise any Asbestos Insurance Coverage Defense in response to a demand by the Trust that such insurer handle, defend, or pay any such claim.

- A new § 8.21 shall be added, as follows:

  Settling Asbestos Insurance Companies.  After the Confirmation Hearing and prior to the Effective Date, the Debtors, and, from and after the Effective Date, the Trust, may, at any time, in its or their sole and absolute discretion, move the District Court to extend the Supplemental Injunction to any Asbestos Insurance Company, for good cause shown.  Such motion shall be served upon the parties entitled to notice pursuant to the Court's [insert title of administrative order regarding notice] and shall disclose, to the extent necessary, the terms of any Asbestos Insurance Settlement Agreement with such Asbestos Insurance Company.

- § 9.3.2(d) shall be added and shall read as follows:

  If a non-Settling Asbestos Insurance Company asserts that it has rights of contribution, indemnity, reimbursement, subrogation or other similar claims (collectively, "Contribution Claims") against a Settling Asbestos Insurance Company, (i) such Contribution Claims may be asserted as a defense or counterclaim against the Trust or the Reorganized Debtors (as applicable) in any Asbestos Insurance Action involving such non-Settling Asbestos Insurance Company, and the Trust or the Reorganized Debtors (as applicable) may assert the legal or equitable rights, if any of the Settling Asbestos Insurance Company, and (ii) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such non-Settling Asbestos Insurance Company to the Trust or the Reorganized Debtors (as applicable) shall be reduced by the amount of such Contribution Claims.

- § 9.3.3(a)(i) shall be amended as follows:

  (i) the Trust shall have the sole and exclusive authority at any time to file a motion, upon express notice to each affected Asbestos Insurance Company, asking the District Court to terminate, or reduce or limit the scope of, the Asbestos Insurance Entity Injunction with respect to such Asbestos Insurance Company; provided, however, that each affected Asbestos Insurance Company shall retain all rights and defenses with respect to Claims asserted against it as a result of any such termination, reduction or limitation of the Asbestos Insurance Entity Injunction ; and

- § 9.3.3(c)(v) shall be added and shall read as follows:

  The rights of any Asbestos Insurance Company to assert any claim, debt,

7

obligation, cause of action or liability for payment against any other Asbestos
Insurance Company that is not a Settling Asbestos Insurance Company.

- § 9.4 shall be amended by adding the following new language at the end of the
existing provision:

    Nothing in this Section 9.4 is intended or shall be construed to limit the assertion,
    applicability, or effect of any Asbestos Insurance Coverage Defense.

- § 9.6 shall be amended as follows:

    None of the Debtors, the Reorganized Debtors, the members of the Unsecured
    Creditors Committee, the members of the Asbestos Claimants Committee, the
    Future Claimants Representative, the members of the Equity Committee, the
    Collateral Trustee, the holders of Noteholder Claims, the holders of Bank Claims,
    the Administrative Agent nor any of their respective successors, officers,
    directors, employees, members, agents, attorneys, accountants, investment
    bankers, financial advisors or restructuring professionals, nor any other
    professional Person employed by any of them, shall have or incur any liability to
    any Person or Entity for any act or omission in connection with, relating to, or
    arising out of the Reorganization Cases, the administration proceedings of the
    U.K. Debtors, the negotiation of the Plan, the Schemes of Arrangement or the
    Voluntary Arrangements, pursuit of confirmation of the Plan, sanction of the
    Schemes of Arrangement and/or approval of the Voluntary Arrangements, the
    administration, consummation and implementation of the Plan or Schemes of
    Arrangement and/or the Voluntary Arrangements or the property to be distributed
    under the Plan or the Schemes and/or the Voluntary Arrangements, the Disclosure
    Statement, the Plan Documents, the releases and Injunctions, or the management
    or operation of the Debtors (except for any liability that results primarily from
    such Person's or Entity's bad faith or willful misconduct); provided, however, that
    (i) with respect to officers and directors of the Debtors, this exculpation provision
    shall apply only to officers or directors who were serving in such capacity on or
    after the Petition Date; (ii) this exculpation provision shall not apply to Rothschild
    Inc; and (iii) this exculpation provision shall not apply to Asbestos Insurer
    Coverage Defenses. In all respects each and all of such Persons, firms and
    Entities shall be entitled to rely upon the advice of counsel with respect to their
    duties and responsibilities under, or in connection with, the Reorganization Cases,
    the Plan, the Schemes of Arrangement, the Voluntary Arrangements, the
    administration proceedings of the U.K. Debtors, and the administration of each of
    them.

- § 10.3 shall be amended as follows:

    Any Asbestos Insurance Action, or the claims and causes of action asserted or to
    be asserted therein, shall be preserved for the benefit of the Trust, for prosecution
    either by Reorganized Federal-Mogul, the other applicable Reorganized Debtors,
    or the Trustees (as mutually agreed by such parties) subsequent to Confirmation

USIDOCS 4786011v18

of the Plan and in accordance with the Trust Agreement. As of the date subsequent to the Effective Date on which the Trustees confirm in writing to the Reorganized Debtors that the Trust is in a position to assume such responsibility, such actions, along with the rights and obligations of the Debtors and the Reorganized Debtors with respect to Asbestos Insurance Policies and claims thereunder, to the extent that such Policies and claims relate to Asbestos Personal Injury Claims but not as to any other claims covered thereby and subject to the assignability without prejudice of such claims and Policies, shall be assigned to and vested in the Trust as the representative of the Debtors' Estates, each being appointed by the Bankruptcy Court in accordance with Section 1123(b)(3) of the Bankruptcy Code without any further action by the Debtors or Reorganized Debtors, the Trust or the Bankruptcy Court. Such Asbestos Insurance Actions shall be so vested free and clear of all Liens, security interests and other Claims or causes of action, except for Asbestos Insurer Coverage Defenses as otherwise provided in the Plan. Until such time as the Asbestos Insurance Actions have become vested in the Trust, Reorganized Federal-Mogul and the other Reorganized Debtors, as the case may be, shall be entitled to compromise or settle any Asbestos Insurance Action; provided, however, that any such compromise or settlement shall require the consent of the Future Claimants Representative and the Asbestos Claimants Committee or the Trust Advisory Committee, as applicable, and the approval of the Bankruptcy Court. Upon vesting in the Trust, the prosecution of the Asbestos Insurance Actions shall be governed by the Trust Documents. Notwithstanding anything to the contrary contained herein, the Trust shall not compromise or resolve insurance coverage under any Asbestos Insurance Policy except with respect to Asbestos Personal Injury Claims and Trust Expenses. From the time that the Asbestos Insurance Actions are vested in the Trust, the Trust shall be entitled, in its sole and complete discretion, to extend the Supplemental Injunction, the Third Party Injunction, and/or the Asbestos Insurance Entity Injunction to any Asbestos Insurance Company that becomes a party to an Asbestos Insurance Settlement Agreement. Extension of the Supplemental Injunction, the Third Party Injunction, and/or the Asbestos Insurance Entity Injunction shall be accomplished by amending and/or supplementing Exhibit 1.1.137 hereto to add the name of the Settling Asbestos Insurance Company and, if requested by the Settling Asbestos Insurance Company, by obtaining an order of the District Court.

• § 10.3A shall be added and shall read as follows:

**10.3A. Insurance Neutrality**

a. Nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan, shall limit the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defense.

9

US1DOCS 4786011v18

b. The Plan, the Plan Documents, the Confirmation Order, and the Bankruptcy Insurance Stipulation shall be binding on the Debtors, the Reorganized Debtors, the Trust and the beneficiaries of the Trust. The obligations, if any, of the Trust to pay holders of Asbestos Personal Injury Claims and Demands shall be determined pursuant to the Plan and the Plan Documents. None of (I) the Court's approval of the Plan or the Plan Documents, (II) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (III) any estimation or valuation of Asbestos Personal Injury Claims, either individually or in the aggregate (including, without limitation, any agreement as to the valuation of Asbestos Personal Injury Claims) in the Bankruptcy Case shall, with respect to any Asbestos Insurance Company, constitute a trial or hearing on the merits or an adjudication or judgment; or accelerate the obligations, if any, of any Asbestos Insurance Company under its Asbestos Insurance Policies; or be used as evidence in any forum to prove:

(i) that any of the Debtors, the Trust, or any Asbestos Insurance Company is liable for, or otherwise obligated to pay with respect to, any individual Asbestos Personal Injury Claim or Demand;

(ii) that the procedures established by the Plan, including the Asbestos Personal Injury Trust Distribution Procedures, for evaluating and paying Asbestos Personal Injury Claims and Demands are reasonable;

(iii) that the procedures established by the Plan, including the Asbestos Personal Injury Trust Distribution Procedures, for evaluating and paying Asbestos Personal Injury Claims and Demands are consistent with any procedures that were used to evaluate or settle Asbestos Personal Injury Claims against the Debtors before the Petition Date;

(iv) that the settlement of, or the value assigned to, any individual Asbestos Personal Injury Claim pursuant to the Asbestos Personal Injury Trust Distribution Procedures was reasonable and/or otherwise appropriate;

(v) that any of the Asbestos Insurance Companies participated in and/ or consented to the negotiation of the Plan or any of the Plan Documents;

(vi) that any of the Debtors or the Trust has suffered an insured loss with respect to any Asbestos Personal Injury Claim or Demand; or

(vii) as to (A) the liability of the Debtors or the Trust for Asbestos Personal Injury Claims or Demands, whether such Claims or Demands are considered individually or on an aggregate basis; or (B) the value of such Asbestos Personal Injury Claims or Demands, individually or in the aggregate.

c. Nothing in the Plan or the Plan Documents shall affect or limit, or be construed as affecting or limiting, the protection afforded to any Settling Asbestos

10

Insurance Company by the Supplemental Injunction, the Third Party Injunction, and/or the Asbestos Insurance Entity Injunction.

d. Nothing in this Section 10.3A is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Asbestos Insurance Company with respect to any issue that is actually litigated by such Asbestos Insurance Company as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by such Asbestos Insurance Company in conjunction with or related to Confirmation of the Plan. Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated.

e. Nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the Confirmation or consummation of the Plan shall limit the right, if any, of (i) any Asbestos Insurance Company, in any Asbestos Insurance Action, to assert any Asbestos Insurance Coverage Defense, including by presenting evidence and/or argument with respect to any of the matters specified in clauses (i) though (vii) of this Section 10.3A or (ii) any other party in any such Asbestos Insurance Action to assert any appropriate position. Except as provided in Section 10.3A(d) above, none of the matters specified in clauses (i) through (vii) of this Section 10.3A shall have any *res judicata* or collateral estoppel effect against any Asbestos Insurance Company.

- § 10.7 shall be deleted in its entirety.

- § 11.1 shall be amended as follows:

Until the Reorganization Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out. Except as otherwise provided in the Plan or the Trust Documents, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Equity Interests in the Debtors, and to adjudicate and enforce the Asbestos Insurance Actions, the Supersedeas Bond Actions, and all other causes of action which may exist on behalf of the Debtors. Nothing contained herein shall prevent the Reorganized Debtors or the Trust from taking such action as may be necessary in the enforcement of any Asbestos Insurance Action, Supersedeas Bond Action or other cause of action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which actions or other causes of action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein. Nothing contained herein shall prejudice or affect the sole and exclusive jurisdiction and power of the U.K. Court in relation to the conduct of the administration of any U.K. Debtor under the laws of the relevant part of the United Kingdom and in relation to any Scheme of Arrangement or Voluntary Arrangement affecting any of the U.K.

11

Debtors.  Nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (i) the Bankruptcy Court in fact has jurisdiction with respect to any Asbestos Insurance Action, (ii) that any such jurisdiction is exclusive with respect to any Asbestos Insurance Action, or (iii) that abstention or dismissal of any Asbestos Insurance Action pending in the Bankruptcy Court or the District Court as an adversary proceeding, so that another court can hear and determine such Asbestos Insurance Action (s), is or is not advisable or warranted.  Any court other than the Bankruptcy Court that has jurisdiction over an Asbestos Insurance Action shall have the right to exercise such jurisdiction.

- § 11.3.13 shall be amended as follows:

to hear and determine the Asbestos Insurance Actions, any similar claims, causes of action or rights of Reorganized T&N against the Hercules Insurers or rights of the Trust against the EL Insurers and the Supersedeas Bond Actions, to construe and take any action to enforce any Asbestos Insurance Settlement Agreement or any settlement with the Hercules Insurers or the EL Insurers or of any Supersedeas Bond Action and the releases executed and exchanged in connection therewith, and to issue such orders as may be necessary for the execution, consummation and implementation of any Asbestos Insurance Settlement Agreement or settlement of any Supersedeas Bond Action, and to determine all questions and issues arising thereunder.  Notwithstanding anything herein to the contrary, however, such retention of jurisdiction by the Bankruptcy Court in this section 11.3.13 shall not be deemed to be a retention of exclusive jurisdiction with respect to any matter described in this section 11.3.13; rather, any court other than the Bankruptcy Court which has jurisdiction over any matter described in this section 11.3.13 shall have the right to exercise such jurisdiction.

- § 11.3.17 shall be added and shall read as follows:

to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Trust or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, violative of, or insufficient to satisfy any of the terms, conditions, or other duties associated with any Asbestos Insurance Policies, provided however, (i) such orders shall not impair the Asbestos Insurer Coverage Defenses or the rights, claims, or defenses, if any, of any Asbestos Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, the Bankruptcy Insurance Stipulation, or any other Orders entered in the Debtors' bankruptcy cases, (ii) this provision does not, in and of itself, grant this Court jurisdiction to hear and decide disputes arising out of or relating to the Asbestos Insurance Policies, and (iii) all interested parties, including any Asbestos Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

- A new § 11.3A shall be added and shall read as follows:

12

**District Court Jurisdiction.** The District Court shall, without regard to the amount in controversy, retain exclusive jurisdiction after Confirmation to hear and determine any motion pursuant to Section 8.21 of the Plan to extend the Supplemental Injunction to an Asbestos Insurance Company, and shall be deemed to have withdrawn the reference to the Bankruptcy Court for such purpose.

- A new § 11.3B shall be added and shall read as follows:

**Reservation of Rights.** Except as otherwise agreed in the Bankruptcy Insurance Stipulation or the modifications of the Plan set forth in Exhibit A thereto, nothing contained in the Plan will (i) constitute a waiver of any claim, right or cause of action that a Debtor, a Reorganized Debtor, or the Trust, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement, except to the extent the insurer is a Settling Insurance Company; or (ii) limit the assertion, applicability or effect of any Asbestos Insurer Coverage Defense.

- § 11.21 shall be added and shall read as follows:

**Duty to Cooperate.** Nothing in the Plan, the Plan Documents or the Confirmation Order shall relieve (by way of injunction or otherwise) any entity (including the Trust, any Reorganized Debtor and any non-Debtor Affiliate) that is or claims to be entitled to indemnity under an Asbestos Insurance Policy from any duty to cooperate that may be required by any such insurance policy or under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Asbestos Insurance Policy. To the extent that any entity incurs costs in satisfying such duty to cooperate with respect to Asbestos Personal Injury Claims, the Trust shall reimburse such entity for all such reasonable out-of-pocket expenses.

- Section references and cross-references contained in the Plan shall be deemed renumbered to conform to the modifications outlined above.

13

# Tab B

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| FEDERAL-MOGUL GLOBAL INC., T&N LIMITED, et al.,[1] | Case No. 01-10578 (JKF) Agenda Nos. 19, 21, 22, 25, & 27 Hearing Date: August 28, 2006 |
| Debtors. | Jointly Administered |

Related Docket Nos. 9524, 9531, 9543, 9529, 9745, 9833, 9895, 10113, 10124, 10204, 10206, 10207, 10212, 10270, 10271 → 10581

## ORDER (I) APPROVING STIPULATION REGARDING PLAN MODIFICATIONS AND POTENTIAL CONFIRMATION OBJECTIONS AND PLAN-RELATED DISCOVERY BY CERTAIN INSURANCE COMPANIES, (II) STAYING DISCOVERY REQUESTS BY CERTAIN INSURANCE COMPANIES, AND (III) GRANTING RELATED RELIEF

---

[1] The U.S. Debtors are Carter Automotive Company, Inc., Federal-Mogul Corporation, Federal-Mogul Dutch Holdings Inc., Federal-Mogul FX, Inc., Federal-Mogul Global Inc., Federal-Mogul Global Properties, Inc., Federal-Mogul Ignition Company, Federal-Mogul Machine Tool, Inc., Federal-Mogul Mystic, Inc., Federal-Mogul Piston Rings, Inc., Federal-Mogul Powertrain, Inc., Federal-Mogul Products, Inc., Federal-Mogul Puerto Rico, Inc., Federal-Mogul U.K. Holdings, Inc., Federal-Mogul Venture Corporation, Federal-Mogul World Wide, Inc., Felt Products Manufacturing Co., FM International LLC, Ferodo America, Inc., Gasket Holdings Inc., J.W.J. Holdings, Inc., McCord Sealing, Inc., and T&N Industries Inc.

The U.K. Debtors are AB Dayton Services Limited, AE Group Machines Limited, AE Holdings Limited, AE International Limited, AE Limited, AB Piston Products Limited, AB Sales (Africa) Limited, Aeroplane & Motor Aluminium Castings Limited, Amber Supervision Limited, Ashburton Road Services Limited, Associated Engineering Group Limited, Awncast Limited, Bearings (North-Western) Limited, Brake Linings Limited, Calvan Rubber Co. Limited, Contact 100 Limited, Cranold Limited, Cranhold Limited, Dealings Limited, Dumplington Services Limited, Duron Limited, E W Engineering Limited, Edmunds, Walker & Co. Limited, Engineering Components Limited, Federal-Mogul Acquisition Company Limited, Federal-Mogul Aftermarket UK Limited, Federal-Mogul Bradford Limited, Federal-Mogul Brake Systems Limited, Federal-Mogul Bridgwater Limited, Federal-Mogul Camshaft Castings Limited, Federal-Mogul Camshafts Limited, Federal-Mogul Engineering Limited, Federal-Mogul Eurofriction Limited, Federal-Mogul Export Services Limited, Federal-Mogul Friction Products Limited, Federal-Mogul Global Growth Limited, Federal-Mogul Ignition (U.K.) Limited, Federal-Mogul Powertrain Systems International Limited, Federal-Mogul Sealing Systems (Cardiff) Limited, Federal-Mogul Sealing Systems (Rochdale) Limited, Federal-Mogul Sealing Systems (Slough) Limited, Federal-Mogul Sealing Systems Limited, Federal-Mogul Shoreham Limited, Federal-Mogul Sintered Products Limited, Federal-Mogul Systems Protection Group Limited, Federal-Mogul Technology Limited, Federal-Mogul U.K. Limited, Ferodo Caernarfon Limited, Ferodo Limited, FHE Technology Limited, Fleetside Investments Limited, F-M UK Holding Limited, FP Diesel Limited, Friction Materials Limited, G.B. Tools & Components Exports Limited, Genthope Limited, Greet Limited, Halls Gaskets Limited, Hepworth & Grandage Limited, High Precision Equipment Limited, Inblot Limited, Instantwander Limited, J.W. Roberts Limited, Kings Park Housing Limited, Lahon Limited, Lanoth Limited, Lanoth Precision Equipment Limited, Leeds Piston Ring & Engineering Co. Limited, M.T.A. (Kettering) Limited, Manro Engineering Co. Limited, Mobile Distributing (Spares) Limited, Moores Plastic Units Limited, Newalls Insulation Company Limited, Ontall Limited, Payen (Europe) Limited, Payen Limited, Presswork-Components Limited, Simnation Limited, Sourcelook Limited, Specialfold, Limited, STS (1996) Limited, TAF International Limited, T&N Holdings Limited, T&N International Limited, T&N Investments Limited, T&N Limited, T&N Materials Research Limited, T&N Piston Products Group Limited, T&N Properties Limited, T&N Shelf Eight Limited, T&N Shelf Eighteen Limited, T&N Shelf Fifteen Limited, T&N Shelf Five Limited, T&N Shelf Four Limited, T&N Shelf Fourteen Limited, T&N Shelf Nine Limited, T&N Shelf Nineteen Limited, T&N Shelf One Limited, T&N Shelf Seven Limited, T&N Shelf Six Limited, T&N Shelf Sixteen Limited, T&N Shelf Ten Limited, T&N Shelf Thirteen Limited, T&N Shelf Thirty Limited, T&N Shelf Thirty-One Limited, T&N Shelf Thirty-Three Limited, T&N Shelf Three Limited, T&N Shelf Twenty Limited, T&N Shelf Twenty-Eight Limited, T&N Shelf Twenty-Five Limited, T&N Shelf Twenty-Four Limited, T&N Shelf Twenty-Nine Limited, T&N Shelf Twenty-One Limited, T&N Shelf Twenty-Six Limited, T&N Shelf Twenty-Two Limited, T&N Shelf Two Limited, T&N Trade Marks Limited, T&N Welfare Trust Limited, TBA Belting Limited, TBA Belting (Residual) Limited, TBA Industrial Products Limited, Telford Rubber Processors Limited, Telford Technology Supplies Limited, The British Piston Ring Company Limited, The Washington Chemical Company Limited, Tinblo Limited, Touchdown Adhesive Products Limited, Turner & Newall Limited, Turner Brothers Asbestos Company Limited, Tynoda Limited, Vanwall Cars Limited, Wellworthy Limited, Wellworthy Property Developments Limited, and William C. Jones (Polymers) Limited.  Unlike all the other U.K. Debtors, T&N Investments Limited is a Scottish rather than English company and commenced administration proceedings in Scotland in April 2002.

App. 037

Upon the Motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (the "Debtors"), the Official Committee of Asbestos Claimants (the "ACC") and the Legal Representative for Future Asbestos Claimants (the "Futures Representative" and, collectively with the Debtors and the ACC, the "Plan Proponents") for entry of an order, pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure and section 105(a) of title 11 of the United States Code, approving that certain Stipulation attached to the Motion as Exhibit A (the "Stipulation"); and the Bankruptcy Court having held a hearing on August 28, 2006 to consider the Motion and all objections thereto; and the Bankruptcy Court having determined that the relief requested in the motion is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest; and it appearing that notice of the Motion was good and sufficient under the circumstances and that no other or further notice need be given; and the Bankruptcy Court having considered the evidence presented and the arguments of counsel made at the hearing; and in light of the statements made by the Bankruptcy Court on the record at the hearing, it is hereby

ORDERED, that the Motion is granted and the Stipulation is approved; and it is further

ORDERED, that the Stipulation shall be binding on all parties to the Stipulation, but shall not bind entities that are not parties to the Stipulation; and it is further

ORDERED, that the rights of all non-parties to the Stipulation are unaffected by the Stipulation and preserved for determination as part of the plan confirmation process; and it is further

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

2

ORDERED, that all discovery propounded by Mt. McKinley Insurance Company and/or Everest Reinsurance Company (collectively, "MMIC") in the Debtors' chapter 11 cases, save for discovery propounded in connection with ongoing proceedings concerning that certain Motion to Disqualify Gilbert, Heintz & Randolph as Special Insurance Counsel to the Debtors (docket no. 10123), shall be stayed, subject to further order of the Court, until a date to be set by the Court after the filing of an amended plan of reorganization for the Debtors; and it is further

ORDERED, that the Joint Motion of the Plan Proponents for a Protective Order Extending Time to Respond or Object to Discovery Propounded by Mt. McKinley Insurance Company and Everest Reinsurance Company (docket no. 9524) is GRANTED; provided, however, that the granting of such Motion is without prejudice to MMIC's ability to make discovery requests concerning the Debtors' plan of reorganization following the filing of the amended joint plan of reorganization for the Debtors; and it is further

ORDERED, that that certain Brief in Support of Standing to Take Discovery submitted by MMIC (docket no. 10124) and the Joint Reply Brief of the Plan Proponents submitted in response thereto (docket no. 10200), together with all related pleadings, are adjourned from the Court's consideration at present without prejudice to the parties' ability to raise the issues addressed by such Briefs in connection with confirmation of the plan of reorganization for the Debtors; and it is further

ORDERED, that this Court retains jurisdiction to construe and enforce this Order.

Dated: Sept 19    , 2006

_Judith K. Fitzgerald_

The Honorable Judith K. Fitzgerald

CH1 3690484v.3

3

# Tab C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FEDERAL-MOGUL GLOBAL INC., | ) | Case No. 01-10578 (JKF) |
| T&N LIMITED, et al.,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## FOURTH AMENDED JOINT PLAN OF REORGANIZATION (AS MODIFIED)

**ARTICLE IX OF THIS PLAN AND THE ADDENDUM TO THE PLAN PROVIDE FOR THE ISSUANCE OF A CHANNELING INJUNCTION UNDER SECTION 524(g) OF THE BANKRUPTCY CODE THAT PERMANENTLY ENJOINS ALL PERSONS HOLDING ASBESTOS PERSONAL INJURY CLAIMS FROM PURSUING A REMEDY AGAINST THE PROTECTED PARTIES (AND, IN THE CASE OF THE ADDENDUM, THE PNEUMO PROTECTED PARTIES) AND CHANNELS THEM TO THE TRUST FOR RESOLUTION AND PAYMENT**

---

[1]    The U.S. Debtors (collectively, the "U.S. Debtors") are Carter Automotive Company, Inc., Federal-Mogul Corporation, Federal-Mogul Dutch Holdings Inc., Federal-Mogul FX, Inc., Federal-Mogul Global Inc., Federal-Mogul Global Properties, Inc., Federal-Mogul Ignition Company, Federal-Mogul Machine Tool, Inc., Federal-Mogul Mystic, Inc., Federal-Mogul Piston Rings, Inc., Federal-Mogul Powertrain, Inc., Federal-Mogul Products, Inc., Federal-Mogul Puerto Rico, Inc., Federal-Mogul U.K. Holdings, Inc., Federal-Mogul Venture Corporation, Federal-Mogul World Wide, Inc., Felt Products Manufacturing Co., FM International LLC, Ferodo America, Inc., Gasket Holdings Inc., J.W.J. Holdings, Inc., McCord Sealing, Inc., and T&N Industries Inc.

The United Kingdom Entities to which this Plan applies (collectively, the "U.K. Debtors") are AE Piston Products Limited, Aeroplane & Motor Aluminium Castings Limited, Ashburton Road Services Limited, Brake Linings Limited, Duron Limited, Edmunds, Walker & Co. Limited, Federal-Mogul Aftermarket UK Limited, Federal-Mogul Bradford Limited, Federal-Mogul Bridgwater Limited, Federal-Mogul Camshaft Castings Limited, Federal-Mogul Camshafts Limited, Federal-Mogul Engineering Limited, Federal-Mogul Eurofriction Limited, Federal-Mogul Friction Products Limited, Federal-Mogul Global Growth Limited, Federal-Mogul Ignition (U.K.) Limited, Federal-Mogul Powertrain Systems International Limited, Federal-Mogul Sealing Systems (Cardiff) Limited, Federal-Mogul Sealing Systems (Rochdale) Limited, Federal-Mogul Sealing Systems (Slough) Limited, Federal-Mogul Sealing Systems Limited, Federal-Mogul Shoreham Limited, Federal Mogul Sintered Products Limited, Federal-Mogul Systems Protection Group Limited, Federal-Mogul Technology Limited, Ferodo Caernarfon Limited, Ferodo Limited, Fleetside Investments Limited, F-M UK Holding Limited, Friction Materials Limited, Greet Limited, Halls Gaskets Limited, Hepworth & Grandage Limited, J.W. Roberts Limited, Lanoth Limited, Newalls Insulation Company Limited, TAF International Limited, T&N Holdings Limited, T&N International Limited, T&N Investments Limited, T&N Limited, T&N Materials Research Limited, T&N Piston Products Group Limited, T&N Properties Limited, T&N Shelf Eighteen Limited, T&N Shelf Nineteen Limited, T&N Shelf One Limited, T&N Shelf Seven Limited, T&N Shelf Three Limited, T&N Shelf Twenty Limited, T&N Shelf Twenty-One Limited, T&N Shelf Twenty-Six Limited, TBA Belting Limited, TBA Industrial Products Limited, Telford Technology Supplies Limited, The Washington Chemical Company Limited, Turner & Newall Limited, Turner Brothers Asbestos Company Limited, and Wellworthy Limited.  Unlike all the other U.K. Debtors, T&N Investments Limited is a Scottish rather than English company and commenced administration in Scotland in April 2002.  Certain additional U.K. Affiliates of the U.S. Debtors and U.K. Debtors have commenced chapter 11 cases but are not subjects of this Plan.

**TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS, CONSTRUCTION OF TERMS, AND EXHIBITS ........................1

    1.1.    Definitions................................................................................................1
    1.2.    Other Terms ...........................................................................................32
    1.3.    Deemed Acts ..........................................................................................32
    1.4.    Exhibits .................................................................................................32

ARTICLE II TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX
    CLAIMS ..........................................................................................................32

    2.1.    Allowed Administrative Claims ............................................................32
    2.2.    No Double Payment of Administrative Claims ......................................33
    2.3.    Special Provisions Relating to United States Customs and Border
           Protection ..............................................................................................33
    2.4.    Priority Tax Claims................................................................................33
    2.5.    Treatment of Claims for Payment or Reimbursement of Professional Fees
           and Expenses.........................................................................................33

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND
    INTERESTS ....................................................................................................34

    3.1.    Federal-Mogul Corporation (Classes 1A through 1O) ...........................35
    3.2.    Federal-Mogul Piston Rings, Inc. ("FMPRI") (Classes 2A through 2P)..............44
    3.3.    Federal-Mogul Powertrain, Inc. ("FMPI") (Classes 3A through 3P) ...................48
    3.4.    Federal-Mogul Ignition Company ("FMIC") (Classes 4A through 4P) ...............51
    3.5.    Federal-Mogul Products, Inc. ("FMP") (Classes 5A through 5P) ........................55
    3.6.    T&N Limited ("T&N") (Classes 6A – 6P).............................................59
    3.7.    Federal-Mogul Ignition (U.K.) Limited ("FM Ignition")(Classes 7A – 7P) .........63
    3.8.    Federal-Mogul Systems Protection Group Limited ("FMSPG") (Classes
           8A 8P) ..................................................................................................65
    3.9.    Federal-Mogul Aftermarket UK Limited ("FMAUK") (Classes 9A – 9P) ..........67
    3.10.  Federal-Mogul Sintered Products Limited ("FMSP") (Classes 10A – 10P) .........68
    3.11.  Federal-Mogul Sealing Systems (Slough) Limited ("FMSS-Slough")
           (Classes 11A – 11P)..............................................................................70
    3.12.  Federal-Mogul Friction Products Limited ("FMFP") (Classes 12A – 12P)..........72
    3.13.  Federal-Mogul Sealing Systems (Rochdale) Limited ("FMSS-Rochdale")
           (Classes 13A – 13P)..............................................................................75
    3.14.  Federal-Mogul Camshaft Castings Limited ("FMCC") (Classes 14A –
           14P)......................................................................................................77
    3.15.  Federal-Mogul Bradford Limited ("Bradford") (Classes 15A – 15P)..................79
    3.16.  Federal-Mogul Camshafts Limited ("FM Camshafts") (Classes 16A –
           16P)......................................................................................................81
    3.17.  Federal-Mogul Eurofriction Limited ("FMEL") (Classes 17A – 17P)................83

i

3.18.  Federal-Mogul Powertrain Systems International Limited ("Powertrain")
       (Classes 18A – 18P) .................................................................85
3.19.  TBA Industrial Products Limited ("TBA-IP") (Classes 19A – 19P).....................87
3.20.  Remaining Debtors .................................................................89

ARTICLE IV THE TRUST ...................................................................89

4.1.   Establishment Of Trust ...........................................................89
4.2.   Purpose of Trust..................................................................89
4.3.   Receipt Of Trust Assets ..........................................................90
4.4.   Discharge Of Liabilities To Holders Of Asbestos Personal Injury Claims ...........90
4.5.   Special Provisions Applicable to the Reorganized Hercules-Protected
       Entities .........................................................................91
4.6.   Special Provisions Relating to CVA Asbestos Claims ...............................105
4.7.   The Swiss Re Settlement ..........................................................106
4.8.   Extension of Injunctions to Curzon and/or Its Reinsurers .........................106
4.9.   Investment Guidelines ............................................................106
4.10.  Excess Trust Assets...............................................................106
4.11.  Trust Expenses ...................................................................106
4.12.  Selection Of The Initial Trustees ................................................106
4.13.  Advising The Trust. ..............................................................107
4.14.  Trust Indemnity Obligations ......................................................107
4.15.  Retrospective Insurance Premiums and Related Matters..............................110

ARTICLE V EXECUTORY CONTRACTS AND UNEXPIRED LEASES.......................................110

5.1.   Assumption And Rejection Of Unexpired Leases And Executory
       Contracts ........................................................................110
5.2.   Rejected Unexpired Leases And Executory Contracts ................................111
5.3.   Continuation Of Product Warranties ...............................................112
5.4.   Collective Bargaining Agreements and Retiree Benefit Plans. ......................112
5.5.   Damages Upon Rejection ...........................................................113
5.6.   Corporate Indemnities.............................................................113

ARTICLE VI ACCEPTANCE OR REJECTION OF THE PLAN .........................................114

6.1.   Each Impaired Class Entitled To Vote Separately...................................114
6.2.   Acceptance By Impaired Classes Of Claims .........................................114
6.3.   Acceptance Pursuant To Section 524 Of The Bankruptcy Code.........................114
6.4.   Presumed Acceptance Of Plan.......................................................115
6.5.   Presumed Rejection Of Plan .......................................................115
6.6.   Votes With Respect to U.K. Debtors ...............................................115
6.7.   Confirmability And Severability Of The Plan. .....................................115

ARTICLE VII CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ................................116

7.1.   Conditions To Confirmation .......................................................116
7.2.   Conditions To Effectiveness ......................................................118

App. 042

ARTICLE VIII IMPLEMENTATION OF THE PLAN................................................................119

    8.1.   Matters Involving the U.K. Debtors ...............................................119
    8.2.   Continued Corporate Existence .....................................................120
    8.3.   Federal-Mogul Corporation Securities and Corporate Governance ...................120
    8.4.   Ownership and Management of Reorganized Debtors other than
           Reorganized Federal-Mogul .........................................................126
    8.5.   Dissolution Of Inactive Debtor Subsidiaries ...............................127
    8.6.   Corporate Action..........................................................................127
    8.7.   Vesting of Assets ..........................................................................127
    8.8.   Preservation of Rights Of Action..................................................127
    8.9.   Setoffs .........................................................................................128
    8.10.  Reorganized Federal-Mogul Secured Term Loan Agreement...............128
    8.11.  Issuance of Reorganized Federal-Mogul Junior Secured PIK Notes...................128
    8.12.  Exit Facilities ..............................................................................129
    8.13.  Effectuating Documents And Further Transactions .....................129
    8.14.  Distributions Under the Plan........................................................129
    8.15.  Distributions to Holders of Unsecured Claims Against U.S. Debtors................132
    8.16.  Implementation of Plans for Federal-Mogul Bradford Limited and
           Federal-Mogul Sealing Systems (Rochdale) Limited..........................................134
    8.17.  Objections to Claims Other than Asbestos Personal Injury Claims ...................134
    8.18.  Resolution of Asbestos Personal Injury Claims.............................................135
    8.19.  Settling Asbestos Insurance Companies .......................................135
    8.20.  Release by Dan=Loc Group............................................................135
    8.21.  Implementation of Environmental Settlements .................................................136
    8.22.  Implementation of Plan B Settlement With Pneumo Parties..............................136
    8.23.  Effectiveness of Addendum...........................................................140
    8.24.  Plan Support Agreement...............................................................141
    8.25.  Implementation of Owens-Illinois Settlement .............................141
    8.26.  Implementation of Settlement Agreement with Certain Asbestos Property
           Damage Claimants ......................................................................141
    8.27.  Implementation of MagneTek Settlement Agreement......................................141
    8.28.  Dismissal of CNA Adversary Proceeding ...................................141
    8.29.  Implementation of CIP Agreement and Controlling Effect Thereof..................141

ARTICLE IX INJUNCTIONS, RELEASES AND DISCHARGE ...........................................142

    9.1.   Discharge ....................................................................................142
    9.2.   Releases.......................................................................................144
    9.3.   The Supplemental Injunction, The Third Party Injunction and The
           Asbestos Insurance Entity Injunction ..........................................145
    9.4.   Reservation Of Rights..................................................................149
    9.5.   Disallowed Claims And Disallowed Equity Interests....................................150
    9.6.   Exculpation .................................................................................150

ARTICLE X MATTERS INCIDENT TO PLAN CONFIRMATION.........................................151

iii

10.1.   No Liability For Tax Claims ...................................................................151
10.2.   No Successor Liability .........................................................................151
10.3.   Asbestos Insurance Actions and Asbestos In-Place Insurance Coverage...........151
10.4.   Insurance Neutrality. ...........................................................................152
10.5.   Supersedeas Bond Actions. ...................................................................155
10.6.   Institution And Maintenance Of Legal And Other Proceedings..........................155
10.7.   Retention And Enforcement Of Trust Causes Of Action ................................156
10.8.   Sherrill Litigation. ..............................................................................156

ARTICLE XI MISCELLANEOUS .........................................................................156

11.1.   Jurisdiction.......................................................................................156
11.2.   General Retention ..............................................................................157
11.3.   Specific Purposes ...............................................................................157
11.4.   District Court Jurisdiction ....................................................................159
11.5.   Reservation of Rights...........................................................................159
11.6.   Interpretation of Certain Terms ..............................................................159
11.7.   The Official Committees and The Future Claimants Representative .................159
11.8.   Revocation Of Plan .............................................................................160
11.9.   Modification Of Plan. ..........................................................................160
11.10.  Certain Provisions Regarding Thornwood....................................................161
11.11.  Modification Of Payment Terms ..............................................................161
11.12.  Entire Agreement ...............................................................................161
11.13.  Headings .........................................................................................161
11.14.  Administrative Claims Bar Date ..............................................................161
11.15.  Governing Law .................................................................................162
11.16.  No Interest. ......................................................................................162
11.17.  Limitation On Allowance .....................................................................162
11.18.  Estimated Claims ..............................................................................162
11.19.  Consent To Jurisdiction .......................................................................162
11.20.  Successors And Assigns .......................................................................162
11.21.  Non-Debtor Waiver of Rights.................................................................162
11.22.  Consistent United States Federal Tax Reporting ..........................................162
11.23.  Duty to Cooperate .............................................................................163
11.24.  Notices ...........................................................................................163

iv

Pursuant to 11 U.S.C. § 1121, the Debtors, the Unsecured Creditors Committee, the Asbestos Claimants Committee, the Future Claimants Representative, the Administrative Agent and the Equity Committee hereby jointly propose the following Fourth Amended Joint Plan of Reorganization (As Modified) in accordance with the provisions of Chapter 11, Title 11 of the United States Code:

## ARTICLE I
## DEFINITIONS, CONSTRUCTION OF TERMS, AND EXHIBITS

**1.1.**    **Definitions**.  As used herein, the following terms shall have the respective meanings specified below, unless the context otherwise requires:

**1.1.1.**    *1930 Act* means the Third Parties (Rights Against Insurers) Act 1930 of the United Kingdom.

**1.1.2.**    *1930 Act Rights* means rights (whether vested, future, contingent or inchoate), (a) which have been or will be transferred to the holder of an Asbestos Personal Injury Claim in respect of that Asbestos Personal Injury Claim by operation of law under the 1930 Act, or any replacement thereof; and/or (b) which are conferred by any law (whether of the United Kingdom or any other jurisdiction), and which entitle the holder of an Asbestos Personal Injury Claim to recover any sum in respect of that claim from any insurer of a Debtor whether directly or by transfer or assignment of any rights under an insurance policy under which a Debtor is insured; and/or (c) which are conferred by any law (whether of the United Kingdom or any other jurisdiction), and which give the holder of an Asbestos Personal Injury Claim any rights in relation to sums recovered in respect of that Asbestos Personal Injury Claim by a Debtor under an insurance policy under which that Debtor is insured.

**1.1.3.**    *1997 Flexitallic Asset Purchase Agreement* means that certain Asset Purchase Agreement, dated as of April 11, 1997, by and among T&N plc, Flexitallic Limited, Flexitallic Sealing Materials Ltd., Flexitallic, Inc., Goetze Vermogenswerwaltungs, GmbH, Flexitallic Canada Ltd., Ferodo a.s., Dan=Loc Corporation, Dan=Loc Limited, Delta 72 Unternehmenswerwaltungs GmbH, Frederique s.r.o., Dan=Loc (Canada) Ltd. and Dan=Loc Transitional, L.P.

**1.1.4.**    *Addendum* means the Addendum of Additional Provisions Incorporated Into Joint Plan of Reorganization (Pneumo Abex "Plan A" Settlement), together with the exhibits thereto, filed with the Bankruptcy Court by the Plan Proponents as Exhibit 1.1.4 to the Plan.

**1.1.5.**    *Administrative Agent* means JPMorgan Chase Bank, N.A. (formerly The Chase Manhattan Bank), as administrative agent under the Bank Credit Agreement.

**1.1.6.**    *Administrative Claim* means any Claim for the payment of an Administrative Expense.

**1.1.7.**    *Administrative Expense* means (a) any cost or expense of administration of the Reorganization Cases under Section 503(b) of the Bankruptcy Code including, but not limited to (1) any actual and necessary postpetition cost or expense of

preserving the Estates or operating the businesses of the Debtors, (2) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (3) any postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of business, (4) any valid and allowed reclamation claims in accordance with Section 546(c) of the Bankruptcy Code, (5) compensation or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court under Sections 328, 330(a) or 331 of the Bankruptcy Code, (6) the Indenture Trustee fees and expenses under the terms of the respective Indentures and pursuant to Section 8.14.6 of the Plan; (7) all Claims arising under the DIP Facility; and (8) all Claims for adequate protection authorized and entitled to administrative expense status pursuant to the DIP Facility (and/or Final Orders approving prior debtor-in-possession financing facilities for Federal-Mogul and its subsidiaries); and (b) any fee or charge assessed against the Estates under 28 U.S.C. § 1930. Administrative Expenses shall not include the fees or expenses of the Administrators and/or any of their professionals or advisors, which shall be paid under the CVAs in accordance with the U.K. Global Settlement Agreement.

     **1.1.8.** *Administrators* means, in relation to a U.K. Debtor, the administrators appointed by the U.K. Court from time to time in respect of that U.K. Debtor.

     **1.1.9.** *Affiliate* shall have the meaning ascribed to such term in Section 101(2) of the Bankruptcy Code, and when used with reference to any Debtor, shall include, but not be limited to, each of the entities listed in Exhibit 1.1.9 to the Plan.

     **1.1.10.** *Affiliate Claims* means all prepetition Claims against any of the Debtors held by a Debtor or non-Debtor Affiliate, or any interest held by such entities in any property of the Debtors, but excluding Secured Claims, Equity Interests and the Convertible Subordinated Debentures.

     **1.1.11.** *Affiliated Subsidiaries* means the subsidiaries of the Debtors or their Affiliates in which the Debtors or their Affiliates own greater than 5% but less than 20% of the outstanding voting securities of such entity, each of which is listed in Exhibit 1.1.11 of the Plan.

     **1.1.12.** *Allowed* means:

     **1.1.12.1.** With respect to any Claim other than an Administrative Claim, an Asbestos Personal Injury Claim, a Bonded Claim or an Other U.K. Claim, any Claim (a) that is specifically designated as Allowed under this Plan, (b) that has been, or hereafter is, listed in the Schedules as liquidated in amount and not disputed or contingent or (c) proof of which was timely filed in a liquidated non-contingent amount with the Bankruptcy Court or its duly appointed claims agent, or, in compliance with any order of the Bankruptcy Court regarding the filing of a Proof of Claim and with respect to which either (i) no objection to the allowance thereof has been filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or (ii) the Claim has been allowed by a Final Order (but only to the extent so allowed).

     **1.1.12.2.** With respect to an Asbestos Personal Injury Claim other than a Bonded Claim, the term "Allowed" shall not apply.

**1.1.12.3.**    With respect to any Bonded Claim, any Claim that qualifies as a Bonded Claim under the applicable definitions of the Plan, with respect to which the Bankruptcy Court or other court of competent jurisdiction determines by Final Order, or the applicable Debtor or Reorganized Debtor and the holder of such Claim agree, that such holder is entitled to some or all of the proceeds of the applicable supersedeas bond or other payment assurance (but only to the extent so ordered or agreed). An Allowed Bonded Claim shall constitute a final, non-appealable judgment determining the legal liability of the Debtors or their Estates, as applicable.

**1.1.12.4.**    With respect to any Claim that is asserted to constitute an Administrative Expense (a) a Claim that represents an actual and necessary expense of preserving the estate or operating the business of the Debtors, to the extent such Claim is determined by the Plan Proponents to constitute an Administrative Expense; (b) other than with respect to a Claim of a professional person employed under Sections 327, 328 or 1103 of the Bankruptcy Code that is required to apply to the Bankruptcy Court for the allowance of compensation and reimbursement of expenses pursuant to Section 330 of the Bankruptcy Code, a Claim that the Plan Proponents do not believe constitutes an Administrative Expense, and such Claim is allowed in whole or in part by a Final Order of the Bankruptcy Court and only to the extent that such allowed portion is determined pursuant to a Final Order to constitute a cost or expense of administration under Sections 503(b) and 507(a)(1) of the Bankruptcy Code; or (c) that represents a Claim of a professional person employed under Sections 327, 328 or 1103 of the Bankruptcy Code that is required to apply to the Bankruptcy Court for the allowance of compensation or reimbursement of expenses pursuant to Section 330 of the Bankruptcy Code, to the extent such Claim is allowed by a Final Order of the Bankruptcy Court under Section 330 of the Bankruptcy Code.

**1.1.12.5.**    With respect to any Other U.K. Claim, (i) in the case of T&N Limited, J.W. Roberts Limited and TAF International Limited, a Claim that is non-contingent and is either (a) allowed in accordance with the provisions of the CVA for the applicable U.K. Debtor or (b) is allowed by a Final Order of the Bankruptcy Court; (ii) in the case of any U.K. Debtor other than T&N Limited, J.W. Roberts Limited and TAF International Limited for which a CVA becomes effective, a Claim that is non-contingent and is allowed in accordance with the provisions of the CVA for such U.K. Debtor, and (iii) in the case of any U.K. Debtor for which a CVA is not proposed or does not become effective, a Claim that is non-contingent and that is allowed by a Final Order of the Bankruptcy Court.

**1.1.12.6.**    With respect to any Equity Interest, an Equity Interest held by any Person as of the Record Date.

3

**1.1.13.** *Allowed Amount* means, with respect to any Claim, the amount in which that Claim is Allowed, denominated in dollars (in the case of a U.S. Debtor) or pounds sterling (in the case of a U.K. Debtor).

**1.1.14.** *Ancillary CVAs* means the company voluntary arrangements under Part I IA 1986 which have been proposed by the Administrators of F-M UK Holding Limited and Federal-Mogul Global Growth Limited in respect of those companies, and which are attached to the Plan as Exhibit 1.1.14, as may be varied from time to time.

**1.1.15.** *Asbestos Claimants Committee* means the Official Committee of Asbestos Claimants appointed in the Reorganization Cases by the United States Trustee.

**1.1.16.** *Asbestos In-Place Insurance Coverage* means any insurance coverage to the extent to be utilized for the payment or reimbursement of liability, indemnity or defense costs arising from or related to Asbestos Personal Injury Claims or Trust Expenses under any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement.

**1.1.17.** *Asbestos Insurance Action* means any claim, cause of action, or right of the Debtors or any of them, under the laws of any jurisdiction, against any Asbestos Insurance Company, arising from or related to: (a) any such Asbestos Insurance Company's failure to provide or pay under Asbestos In-Place Insurance Coverage, (b) the refusal of any Asbestos Insurance Company to compromise and settle any Asbestos Personal Injury Claim under or pursuant to any Asbestos Insurance Policy, (c) the interpretation or enforcement of the terms of any Asbestos Insurance Policy with respect to any Asbestos Personal Injury Claim, or (d) any conduct of any Asbestos Insurance Company constituting "bad faith" or other wrongful conduct under applicable law. Asbestos Insurance Actions shall not include any disputes relating to the CIP Agreement, unless otherwise provided in the CIP Agreement.

**1.1.18.** *Asbestos Insurance Action Recoveries* means (a) Cash derived from and paid pursuant to Asbestos Insurance Settlement Agreements entered into prior to the Effective Date attributable to any Asbestos Personal Injury Claim other than reimbursement for payments made on account of Asbestos Personal Injury Claims prior to the Petition Date, (b) the right to receive proceeds of Asbestos In-Place Insurance Coverage and (c) the right to receive the proceeds or benefits of any Asbestos Insurance Action.

**1.1.19.** *Asbestos Insurance Company* means any insurance company, insurance broker or syndicate insurance broker, guaranty association or any other entity that may have liability under an Asbestos Insurance Policy.

**1.1.20.** *Asbestos Insurance Entity Injunction* means the injunction described in Section 9.3.3 of the Plan.

**1.1.21.** *Asbestos Insurance Policy* means any insurance policy (other than the Hercules Policy and the EL Policies) in effect at any time on or before the Effective Date naming any of the Debtors (or any predecessor, subsidiary, or past or present Affiliate of any of the Debtors) as an insured, or otherwise affording the Debtors indemnity or insurance coverage, upon which any claim has been or may be made with respect to any Asbestos Personal Injury

4

Claim. For the avoidance of doubt, Asbestos Insurance Policy shall not include any Pneumo Asbestos Insurance Policy (as defined in the Addendum).

   **1.1.22.**  *Asbestos Insurance Settlement Agreement* means any settlement agreement with a Settling Asbestos Insurance Company relating to any Asbestos Personal Injury Claim. For the avoidance of doubt, Asbestos Insurance Settlement Agreement shall not include any settlement agreement related to or under any of the Pneumo Asbestos Insurance Policies. For the further avoidance of doubt, the CIP Agreement shall be an Asbestos Insurance Settlement Agreement.

   **1.1.23.**  *Asbestos Insurer Coverage Defenses* means all rights and defenses at law or in equity that any Asbestos Insurance Company may have under any Asbestos Insurance Policy or applicable law to a claim seeking insurance coverage; provided, however, that the pursuit of such defenses shall be subject to the terms of the Bankruptcy Insurance Stipulation (if applicable). Asbestos Insurer Coverage Defenses include, without limitation, any defense based on the terms of the Plan or the Plan Documents or the manner in which the Plan or Plan Documents were negotiated, including but not limited to (i) the defense that Asbestos Personal Injury Claims asserted against one Debtor cannot be tendered to nor paid by insurers that have issued or subscribed Asbestos Insurance Policies to a different Debtor and/or with respect to risks that are not insured under those policies, (ii) defenses based on the provisions in the Plan, Plan Documents, and any Order confirming the Plan relating to the treatment or handling of Vellumoid and Fel-Pro Claims, and (iii) the defenses that excess insurers have no duty to undertake the defense of any claim and have no duty to pay defense costs with respect to claims that are not covered by any Asbestos Insurance Policy issued or subscribed by them; but Asbestos Insurer Coverage Defenses do not include any defense that the Plan or any of the Plan Documents do not comply with the Bankruptcy Code. In the event that it is finally determined in the Reorganization Cases that the Bankruptcy Code authorizes the Assignment (as defined in the Bankruptcy Insurance Stipulation) by preempting any terms of Asbestos Insurance Policies or provisions of applicable non-bankruptcy law that otherwise might prohibit the Assignment, Asbestos Insurer Coverage Defenses shall not include any defense that the Assignment is prohibited by the Asbestos Insurance Policies or applicable non-bankruptcy law.

   **1.1.24.**  *Asbestos Personal Injury Claim* means a liquidated or unliquidated claim against one or more of the Debtors, their non-Debtor Affiliates, or the present or former officers, directors or employees of any of them, whether asserted by agents or employees of the Debtors or their non-Debtor Affiliates or any other Person or Entity, whether in the nature of or sounding in tort, contract, warranty, employer liability or any other theory of law, equity or admiralty, whatsoever, for, attributable to or arising under the laws of any jurisdiction, by reason of, directly or indirectly, physical, emotional or other personal injuries or other damages (including, without limitation, death) caused, or allegedly caused, in whole or in part, directly or indirectly, by the presence of, or exposure to, asbestos – including, but not limited to, asbestos-containing products, automotive or industrial parts and components, equipment, manufacturing processes, improvements to real property or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors, their non-Debtor Affiliates or the predecessors of any of them – and arising or allegedly arising, directly or indirectly, from acts, omissions, business or operations of one or more of the Debtors, their non-Debtor Affiliates or the predecessors of any of them, or any other Entity for whose acts,

5

omissions, business or operations any of the Debtors have liability (to the extent of such Debtor's or Debtors' liability for such acts, omissions, business or operations), including, but not limited to, all claims, debts, obligations or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general and special damages) and punitive damages. Asbestos Personal Injury Claims shall include, without limitation, (i) Indirect Asbestos Personal Injury Claims, (ii) Demands, and (iii) any Claim or Demand based upon, arising under or attributable to an asbestos personal injury settlement agreement or protocol entered into by CCR on behalf of one or more of the Debtors. Notwithstanding the foregoing, Asbestos Personal Injury Claims shall not include (i) Bonded Asbestos Personal Injury Claims (but shall include the unsecured deficiency, if any, of any Bonded Asbestos Personal Injury Claim), (ii) Asbestos Property Damage Claims, (iii) any workers' compensation claim brought directly against a Debtor or a non-Debtor Affiliate by a past or present employee of any U.S. Debtor under an applicable workers' compensation statute, (iv) Hercules Claims, and (v) EL Claims Handling Costs Claims.

　　　　　**1.1.25.** *Asbestos Personal Injury Expenses* means all costs, taxes and expenses of or imposed on the Trust attributable or allocable to Asbestos Personal Injury Claims, including, but not limited to, trustee compensation, employee compensation, insurance premiums, legal, accounting and other professional fees and expenses, overhead, disbursements, and expenses relating to the implementation of the Asbestos Personal Injury Trust Distribution Procedures, but excluding payments to holders of Asbestos Personal Injury Claims on account of such Claims or Demands, or reimbursements of such payments.

　　　　　**1.1.26.** *Asbestos Personal Injury Trust Distribution Procedures* means the Asbestos Personal Injury Trust Distribution Procedures substantially in the form attached to the Trust Agreement, or as subsequently modified or amended.

　　　　　**1.1.27.** *Asbestos Property Damage Claim* means a liquidated or unliquidated Claim against, or any debt, obligation or liability of one or more of the Debtors, arising under the laws of any jurisdiction, whether in the nature of or sounding in tort, contract, warranty or any other theory of law, equity or admiralty, for, attributable to or arising by reason of, directly or indirectly, property damages (whenever suffered), including, but not limited to, diminution in the value thereof, or environmental damage or economic loss caused or allegedly caused, directly or indirectly, by asbestos - including, but not limited to, asbestos-containing products, automotive or industrial parts and components, equipment, manufacturing processes, improvements to real property or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors or their predecessors – and arising or allegedly arising, directly or indirectly, from acts or omissions of one or more of the Debtors, or their predecessors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages, and also including, without limitation, any claim for contribution, reimbursement, subrogation or indemnity, whether contractual or implied by law, attributable to Asbestos Property Damage Claims. Asbestos Property Damage Claims shall exclude all Asbestos Personal Injury Claims.

6

**1.1.28.** ***Asbestos Property Damage Claimants Committee*** means the Official Committee of Asbestos Property Damage Claimants appointed in the Reorganization Cases by the United States Trustee.

**1.1.29.** ***Bank Claims*** means any and all obligations, rights, claims or interests, whether secured or unsecured, matured or unmatured, fixed or contingent, including, but not limited to, principal, accrued and unpaid interest, charges, costs, breakage fees, counsel fees, contingent reimbursement obligations under unfunded or partially drawn letters of credit, and any and all other rights to payment of money arising under, based upon or related to the Bank Credit Agreement.

**1.1.30.** ***Bank Credit Agreement*** means that certain Fourth Amended and Restated Credit Agreement and related Loan Documents as therein defined, dated as of December 29, 2000, as such Agreement has been amended, supplemented or otherwise modified from time to time thereafter among Federal Mogul, certain Affiliate Debtors and non-Debtor Affiliates, a syndicate of lenders and the Administrative Agent.

**1.1.31.** ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

**1.1.32.** ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware.

**1.1.33.** ***Bankruptcy Insurance Stipulation*** means that certain Stipulation and Agreed Order approved by the Bankruptcy Court in the Reorganization Cases by an order entered on September 19, 2006 as docket no. 10606, by and between the Debtors, certain Asbestos Insurance Companies, the Asbestos Claimants Committee and the Future Claimants Representative, as such Stipulation and Agreed Order may subsequently be amended and modified by agreement of the parties thereto.

**1.1.34.** ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

**1.1.35.** ***Bonded Asbestos Personal Injury Claim*** means an Asbestos Personal Injury Claim evidenced by a judgment as to which, but only to the extent that, a supersedeas bond or equivalent form of payment assurance was posted by a Debtor as security for such Claim, and only to the extent that the Bankruptcy Court or other court of competent jurisdiction determines by Final Order, or the applicable Reorganized Debtor and the holder of such Bonded Asbestos Personal Injury Claim agree, that such holder is entitled to some or all of the proceeds of the supersedeas bond or other payment assurance.

**1.1.36.** ***Bonded Claim*** means any Bonded Asbestos Personal Injury Claim or Bonded Non-Asbestos Claim, but shall not include the unsecured deficiency, if any, of any such Claims.

7

**1.1.37.**    ***Bonded Non-Asbestos Claim*** means any Claim, other than an Asbestos Personal Injury Claim, evidenced by a judgment as to which, but only to the extent that, a supersedeas bond or equivalent form of payment assurance was posted by a Debtor as security for such Claim, and only to the extent that the Bankruptcy Court or other court of competent jurisdiction determines by Final Order, or the applicable Reorganized Debtor and the holder of such Bonded Non-Asbestos Claim agree, that such holder is entitled to some or all of the proceeds of the supersedeas bond or other payment assurance.

**1.1.38.**    ***Business Day*** means any day other than a Saturday, Sunday or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

**1.1.39.**    ***Cash*** means lawful currency of the United States of America and its equivalents as to the U.S. Debtors, and pounds sterling and its equivalents as to the U.K. Debtors.

**1.1.40.**    ***CCR*** means the Center for Claims Resolution, a Delaware non-profit corporation.

**1.1.41.**    ***CCR Surety Bonds*** means Performance Bond No. 6066092 issued by Safeco in favor of CCR, Performance Bond Nos. 103529126 and 103529229 REL issued by Travelers in favor of CCR, and Performance Bond No. 929182983 issued by CNA in favor of CCR.

**1.1.42.**    ***Chester Street Claims*** has the same meaning as in the Principal CVAs.

**1.1.43.**    ***Chester Street Fund*** has the same meaning as in the Principal CVAs.

**1.1.44.**    ***Chester Street Hercules Fund*** means those Hercules Recoveries referred to in Section 4.5.12(c) *Seventhly* (ii)(3), the assets or investments derived from those recoveries from time to time, and all accumulations of income on or arising from those assets.

**1.1.45.**    ***Chester Street Hercules Fund Costs*** has the same meaning as in the Principal CVAs.

**1.1.46.**    ***Chester Street Percentage*** means 4.76% or such other percentage as may be agreed from time to time under Section 4.5.14.

**1.1.46A.**    ***CIP Agreement*** means that certain Asbestos Bodily Injury Coverage in Place Agreement dated October 30, 2007 by and among Felt Products Manufacturing Co., Federal-Mogul Corporation, and certain insurers. As used herein, the term CIP Agreement shall include all exhibits and documents attached to the CIP Agreement. The CIP Agreement is an Asbestos Insurance Settlement Agreement as defined in the Plan.

**1.1.47.**    ***Claim*** shall have the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code, and shall include, but not be limited to, Asbestos Personal Injury Claims and interests other than Equity Interests.

8

**1.1.48.** *Class* means a category of Claims or Equity Interests pursuant to the Plan, as such term is used and described in Section 1122 of the Bankruptcy Code.

**1.1.49.** *Collateral Trustee* means the Persons serving as trustees of collateral pledged as security for the Bank Claims, Noteholder Claims and Surety Claims, as applicable, pursuant to, among other things, the Bank Credit Agreement and related documents.

**1.1.49A.** *Commutation Agreement* means that certain Settlement Agreement and Release attached to the CIP Agreement as Exhibit I thereto.

**1.1.50.** *Company Specific Distribution Ratio* means a ratio, the numerator of which shall be the value of the referenced U.K. Debtor's assets as estimated on Exhibit 1.1.50 to the Plan and the denominator of which shall be the Allowed Amount of all Claims against the referenced U.K. Debtor other than U.S. Asbestos Personal Injury Claims.

**1.1.51.** *Confirmation* or *Confirmation of the Plan* means the entry of an order approving the Plan in accordance with Section 1129 of the Bankruptcy Code.

**1.1.52.** *Confirmation Date* means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

**1.1.53.** *Confirmation Hearing* means the hearing(s) which will be held before the Bankruptcy Court and/or District Court, as applicable, in which the Plan Proponents will seek Confirmation of the Plan.

**1.1.54.** *Confirmation Order* means the order confirming the Plan pursuant to Section 1129 and other applicable sections of the Bankruptcy Code.

**1.1.55.** *Convertible Subordinated Debentures* means the 7% Convertible Junior Subordinated Debentures due 2027 in the original aggregate principal amount of $575,000,000 issued by Federal-Mogul on December 1, 1997, and sold to Federal-Mogul Financing Trust, the indenture trustee for which is currently The Bank of New York.

**1.1.56.** *Cooper* means Cooper Industries, Ltd., a Bermuda company, and Cooper LLC, together with any Affiliates thereof that asserted Claims against any of the Debtors.

**1.1.57.** *Cooper/Pneumo Escrow Account* shall have the meaning set forth in the Plan B Settlement Agreement.

**1.1.58.** *Cooper/Pneumo Escrow Agreement* shall have the meaning set forth in Section 8.22.4.1(b) of the Plan.

**1.1.59.** *Intentionally Omitted.*

**1.1.60.** *Cooper Claims* shall mean any Claims asserted or that could be asserted by Cooper in the Reorganization Cases against any of (a) Federal-Mogul, (b) FMP, (c) F-M UK Holding Limited, (d) FM International LLC, and/or (e) Federal-Mogul Global Growth Limited, including but not limited to those Claims set forth in the proofs of claim filed by

9

Cooper, on behalf of itself and its Affiliates, dated (i) March 1, 2003 in the total liquidated claim amount of $17,786,050.88, including alleged asbestos liabilities and defense costs liquidated since October 1, 2001, (ii) July 12, 2004 (amending the proof of claim dated March 1, 2003) in the total liquidated claim amount of $104,382,778.41, including alleged asbestos liabilities and defense costs liquidated as of May 31, 2004, (iii) November 2, 2004 (amending the proof of claim dated July 12, 2004) in the total liquidated claim amount of $135,075,462.42, including alleged asbestos liabilities and defense costs liquidated as of November 1, 2004, and (iv) May 8, 2006 (amending the proof of claim dated November 2, 2004) in the total amount of $479,542,188.86, including alleged asbestos liabilities and defense costs liquidated as of March 31, 2006 and the alleged net present value of future claims.

    **1.1.61.** *Cooper LLC* has the meaning set forth in Section 8.22.1 of the Plan.

    **1.1.62.** *CRU* means the Compensation Recovery Unit established in the United Kingdom under the U.K. Social Security (Recovery of Benefits) Act 1997.

    **1.1.63.** *Curzon* means Curzon Insurance Limited, a company incorporated in Guernsey whose principal place of business is St Julian's Court, St Peter's Port, Guernsey GY1 4AT, in its capacity as insurer under the Hercules Policy.

    **1.1.64.** *CVA Asbestos Claim* has the same meaning as in the Principal CVAs.

    **1.1.65.** *CVAs* means the Principal CVAs and the Ancillary CVAs when referred to together, and "*CVA*" means the company voluntary arrangement applicable to the relevant U.K. Debtor under Part I of the IA 1986 and Part I of the IR 1986.

    **1.1.66.** *CVA Supervisors* means, in relation to each of the CVAs, the supervisors thereof or their duly appointed successors.

    **1.1.67.** *Dan=Loc Deed of Guarantee* means that certain Deed of Guarantee, dated as of April 11, 1997, by and among T&N plc, and Dan=Loc Corporation, Dan=Loc, Inc., Dan=Loc Limited, Delta 72 Unternehmenswerwaltungs GmbH, Frederique s.r.o., Dan=Loc (Canada) Ltd., Dan=Loc Investments, Inc. and Dan=Loc Transitional, L.P.

    **1.1.68.** *Dan=Loc Deed of Special Indemnity* means that certain Deed of Special Indemnity, dated as of April 11, 1997, by and among T&N plc, Flexitallic Limited, Flexitallic Sealing Materials Ltd., Flexitallic, Inc., Goetze Vermogenswerwaltungs, GmbH, Flexitallic Canada Ltd., Ferodo a.s., Dan=Loc Corporation, Dan=Loc Limited, Delta 72 Unternehmenswerwaltungs GmbH, Frederique s.r.o., Dan=Loc (Canada) Ltd. and Dan=Loc Transitional, L.P.

    **1.1.69.** *Dan=Loc Group* means Dan=Loc Corporation and its subsidiaries or affiliates and their respective successors, including but not limited to, The Flexitallic Group, Inc. and its subsidiaries and affiliates.

    **1.1.70.** *Dan=Loc Indemnified Indirect Asbestos Personal Injury Claims and Demands* means any Asbestos Personal Injury Claim or Demand that is <u>both</u>: (A)(i) based upon exposure, occurring at any time, to an asbestos containing product which was manufactured,

10

distributed, or sold prior to April 11, 1997 by GHI or any other Debtor, that has been, is or could be asserted against the Dan=Loc Group or (ii) based upon exposure, prior to April 11, 1997, to asbestos present in the internal or external fabric of any building owned or leased by GHI or any other Debtor and which was acquired or leased by the Dan=Loc Group from GHI or any other Debtor under the terms of the 1997 Flexitallic Asset Purchase Agreement, that has been, is or could be asserted against the Dan=Loc Group; and (B) is an "Asbestos Related Claim" (as such term is defined in the Dan=Loc Deed of Special Indemnity) subject to indemnification by GHI under Section 2.2 of the Dan=Loc Deed of Special Indemnity and Section 2.2 of the Dan=Loc Deed of Guarantee (copies of which are attached hereto as Exhibit 1.1.70). Dan=Loc/GHI Indemnified Asbestos Personal Injury Claims and Demands shall also include any Asbestos Personal Injury Claims and Demands asserted in connection with any asbestos containing product manufactured, distributed or sold by GHI or any other Debtor prior to April 11, 1997, which Asbestos Personal Injury Claim also alleges exposure to any asbestos containing product manufactured, distributed or sold by the Dan=Loc Group on or after April 11, 1997, and which Asbestos Personal Injury Claim is based upon exposure to asbestos from such product during a period of time both prior to and after April 11, 1997, but only to the extent of the percentage allocable to GHI or any other Debtor pursuant to and in accordance with the sharing provisions set forth in Section 2.5 of the Dan=Loc Deed of Special Indemnity; provided, however, that in no event shall Dan=Loc Indemnified Indirect Asbestos Personal Injury Claims and Demands include any Claims or Demands made against the Dan=Loc Group at any time after April 11, 2024.

**1.1.71.**    *Date of Finality* has the meaning set forth in the Addendum.

**1.1.72.**    *Debtor HPE Asbestos Claim* means, in respect of each Reorganized Hercules-Protected Entity, an Asbestos Personal Injury Claim against the relevant Reorganized Hercules-Protected Entity other than a CVA Asbestos Claim.

**1.1.73.**    *Debtor Insurance Claim* means a Claim (other than an Asbestos Personal Injury Claim) that is alleged to be covered by an insurance policy issued or allegedly issued by an Asbestos Insurance Company.

**1.1.74.**    *Debtors* means Federal-Mogul and its affiliated U.S. Debtors and U.K. Debtors (or any of them as the context may require).

**1.1.75.**    *Debtors in Possession* means the Debtors (or any of them as the context may require) in their capacities as debtors in possession in the Reorganization Cases.

**1.1.76.**    *Demand* means a demand as such term is used and defined in Section 524(g)(5) of the Bankruptcy Code, including a demand for payment, present or future, that (i) was not a Claim prior to the Effective Date; (ii) arises out of the same or similar conduct or events that gave rise to an Asbestos Personal Injury Claim or the Claims addressed by the Third Party Injunction or the Asbestos Insurance Entity Injunction; and (iii) pursuant to the Plan, is to be satisfied exclusively by the Trust.

**1.1.77.**    *DIP Facility* means that certain Credit and Guaranty Agreement, as amended from time to time, by, between and among certain of the U.S. Debtors and a syndicate

App. 055

of lenders, with Citicorp USA, Inc. as administrative agent, and those certain Tranche C Loans (as defined in the Final Order approving the DIP Facility), which the Bankruptcy Court authorized through a Final Order entered on May 24, 2007.

      **1.1.78.**    *Disbursing Agent* means Reorganized Federal-Mogul or any Person selected by Reorganized Federal-Mogul (with approval of the Bankruptcy Court) to hold and distribute the consideration to be distributed to the holders of Allowed Claims (other than Allowed Asbestos Personal Injury Claims) or Allowed Equity Interests under the Plan. Disbursing Agent does not include any Indenture Trustee relating to the Notes or the Indentures.

      **1.1.79.**    *Discharge Injunction* means the injunction described in Section 1141 of the Bankruptcy Code and contained in Section 9.1.2 of the Plan.

      **1.1.80.**    *Disclosure Statement* means the Disclosure Statement Describing Third Amended Joint Plan Of Reorganization, dated June 4, 2004, including all exhibits, appendices, schedules and annexes attached thereto, as submitted by the Plan Proponents pursuant to Section 1125 of the Bankruptcy Code and approved by the Bankruptcy Court, as such Disclosure Statement may be further amended, supplemented or modified from time to time (including the Supplemental Disclosure Statement dated as of January 30, 2007).

      **1.1.81.**    *Distribution Date* means, when used with respect to an Allowed Claim (other than an Asbestos Personal Injury Claim that is not a Bonded Asbestos Personal Injury Claim), the date which is as soon as reasonably practicable after the later of: (a) the Effective Date, and (b) the first Business Day of the next calendar quarter after the date upon which the Claim becomes Allowed, unless the Claim becomes Allowed within fifteen Business Days before the first Business Day of the next calendar quarter, in which case the Distribution Date shall be the first Business Day of the next succeeding calendar quarter.

      **1.1.82.**    *District Court* means the United States District Court for the District of Delaware, or the unit thereof having jurisdiction over the matter in question.

      **1.1.83.**    *Effective Date* means, and shall occur on, the date on which the Debtors file notice with the Bankruptcy Court of the Effective Date, which notice shall state that the conditions contained in Section 7.2 of the Plan have been satisfied or waived, and on which date all acts, events, terms and conditions contemplated under the Plan to occur on the Effective Date or as soon as practicable thereafter shall be deemed to have occurred simultaneously.

      **1.1.84.**    *EL Asbestos Insurance* means employer's liability policies (other than (i) (if the EL Scheme becomes effective before the EL Scheme Long Stop Date) those that are the subject of the EL Settlement and (ii) the Hercules Policy) that afford any of the U.K. Debtors rights of indemnity or insurance coverage with respect to any Asbestos Personal Injury Claim asserted by an employee or former employee relating to exposure to asbestos in the course of such individual's employment.

      **1.1.85.**    *EL Asbestos Insurance Expiry Date* means the date upon which all of the obligations of all the EL Insurers under all the EL Asbestos Insurance cease to have effect, whether by commutation or otherwise.

**1.1.86.**    *EL Claims Handling Costs Claims* has the same meaning as in the Principal CVAs.

**1.1.87.**    *EL Insurer* means any insurer (except, for the avoidance of doubt, Curzon) providing employer's liability insurance cover (except, for the avoidance of doubt, the Hercules Policy) to any of the U.K. Debtors.

**1.1.88.**    *EL Recoveries* means all amounts received or recoverable in respect of EL Asbestos Insurance.

**1.1.89.**    *EL Scheme* means the scheme of arrangement proposed in the United Kingdom by the Administrators of T&N Limited and certain other U.K. Debtors to facilitate the distribution of the amounts to be received under the EL Settlement to such persons who are scheme creditors under the terms of the EL Scheme.

**1.1.90.**    *EL Scheme Long Stop Date* means 31 May 2007 or such later date as may be agreed in writing between the Administrators of T&N or, if T&N has ceased to be in administration, the CVA Supervisors with respect to T&N and the U.K. Asbestos Trustee.

**1.1.91.**    *EL Settlement* means the settlement of the proceedings HC02C01451 which were commenced against Royal & Sun Alliance Insurance Plc and the Brian Smith Syndicate at Lloyd's (Syndicate Number 45/177) (and, insofar as it is the successor thereto, Equitas Limited) by T&N and certain other U.K. Debtors.

**1.1.92.**    *Employee Benefit Plan* means any employment, compensation, pension, healthcare (including, but not limited to, medical, surgical, hospital, dental and counseling), bonus, incentive compensation, sick leave and other leaves (including, but not limited to, jury duty, child-bearing and military service), vacation pay, expense reimbursement, dependent care, retirement, savings, workers compensation, life insurance, disability, dependent care, dependent healthcare, education, car allowance, miscellaneous executive benefits, severance or other benefit plan or arrangement for the benefit of the directors, officers or employees (whether salaried or hourly, active or retired) of the applicable Debtor, but excluding (i) any new agreements provided for in Section 8.3.14 of this Plan and (ii) that portion of the Debtors' non-tax qualified pension plans giving rise to Excluded Non-Qualified Pension Claims.

**1.1.93.**    *English Court* means the High Court of Justice of England and Wales.

**1.1.94.**    *Entity* means any Person, estate, trust, Governmental Unit, or the United States Trustee.

**1.1.95.**    *Environmental Claim* means any Claim, other than an Asbestos Personal Injury Claim, asserted by any Governmental Unit or Person, arising out of, related to, or based upon any Environmental Law, including, but not limited to, any Claim (a) to restrict or enjoin, or recover damages, costs or expenses to remedy any release or threatened release of any environmental pollution, contamination or nuisance or to require the Debtors or their non-debtor Affiliates to remedy or to reimburse, pay or incur costs to remedy any release or threatened release of any environmental pollution, contamination or any nuisance; (b) to remedy, reimburse, compensate or pay any damage, penalty, fine or forfeiture for, or to restrict or enjoin any

13

violation of, or alleged violation of, any Environmental Law; (c) to pay any contractual claim with respect to any Environmental Law; or (d) to pay or reimburse any such Entity for personal injury (including workers compensation, sickness, disease or death), tangible or intangible property damage or natural resource damage arising out of, relating to, or based upon any release or threatened release of any environmental pollution, contamination or nuisance, whether or not contemplated in subsections (a) through (d) above, including, but not limited to, any related Asbestos Property Damage Claim. For purposes of the Plan, prepetition Environmental Claims fall into one of two categories – (x) Claims arising from or related to property either never owned or occupied, or formerly but no longer owned or occupied by the Debtors (*"Off-Site Environmental Claims"*), and (y) Claims arising from or related to property currently owned or occupied, and that will continue to be owned or occupied by the Debtors after Confirmation of the Plan, excluding, however, any Claims arising from or relating to wastes or other materials which were shipped or were arranged to be shipped for disposal to a site that was never owned or occupied, or was formerly owned or occupied but is no longer owned or occupied by the Debtors (*"On-Site Environmental Claims"*). A schedule of all known On-Site Environmental Claims is set forth in Exhibit 1.1.95 to the Plan.

      **1.1.96.** *Environmental Laws* means (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C., §§ 9601, et seq., (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendment of 1984, 42 U.S.C. §§ 6901, et seq., (c) the Clean Air Act, 42 U.S.C. §§ 7401, et seq., (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, et seq., (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq., (f) the Environmental Protection Act 1990, the Environment Act 1995, the Control of Pollution Act 1974, the Planning (Hazardous Substances) Act 1990, the Radioactive Substances Act 1993, the Clean Air Act 1993, the Water Resources Act 1991, the Water Industry Act 1991, the Health and Safety at Work, etc. Act 1974 and the Public Health Act 1936 (all of the United Kingdom) as the same may from time to time be amended or reenacted, and all orders and regulations from time to time made thereunder, (g) all statutes, laws, rules or regulations issued or promulgated by any Governmental Unit or court (including, without limitation, the common law), as they may be amended from time to time, relating to the protection and/or prevention of harm, contamination or pollution of or to the environment (including, without limitation, ecological systems and living organisms including humans and the following media whether alone or in combination: air (including air within buildings), water (including water under or within land or in pipe or sewage systems), land, buildings and soil) and (h) the ordinances, rules, regulations, orders, notices of violation, requests, demands and requirements issued or promulgated by any Governmental Unit in connection with such statutes or laws.

      **1.1.97.** *Environmental Settlement Agreements* shall have the meaning ascribed to such term in Section 8.21 hereof.

      **1.1.98.** *Equity Committee* means the Official Committee of Equity Security Holders of Federal-Mogul Corporation appointed in the Reorganization Cases by the United States Trustee.

14

**1.1.99.** *Equity Interest* means any equity interest in the Debtors represented by (a) existing Federal-Mogul common or preferred stock as classified in Classes 1M and 1O below or (b) shares of capital stock in the remaining Debtors, whether or not issued.

**1.1.100.** *Estate* means, as to each Debtor, the estate created for that Debtor under Section 541 of the Bankruptcy Code upon the commencement of its Reorganization Case.

**1.1.101.** *Excluded Non-Qualified Pension Claims* means any Claims based upon or arising out of the Debtors' non-tax qualified pension plans in which the existing or prior employee was entitled to receive more than $3,500 per month, but for which such employee has received or will receive only $3,500 per month pursuant to the Bankruptcy Court's order entered on April 30, 2002 (Docket No. 1655), all of which Claims shall be classified and treated as Unsecured Claims; provided, however, that the claims of James Zamoyski, Wilhelm Schmelzer and Richard Randazzo, respectively, based upon the Supplemental Key Executive Pension Plan of Federal-Mogul shall not be subject to the aforementioned $3,500 per month limitation as provided in the Bankruptcy Court's order entered on August 9, 2002 (Docket No. 582591721).

**1.1.102.** *Exit Facilities* means the agreements described in Section 8.12 below providing for one or more credit facilities which shall be used to repay obligations under the DIP Facility on the Effective Date, make cash payments required under the Plan and/or provide working capital for the business operations of the Reorganized Debtors.

**1.1.103.** *Federal-Mogul* means Federal-Mogul Corporation, a corporation incorporated in Michigan and one of the U.S. Debtors.

**1.1.103A.** *Fel-Pro Claim* means any Fel-Pro Asbestos Claim, as that term is defined in the CIP Agreement.

**1.1.104.** *Ferodo* means Ferodo America, Inc., a corporation incorporated in Delaware and one of the U.S. Debtors.

**1.1.105.** *Final Order* means an order or judgment of any court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which order (or any revision, modification or amendment thereof) the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari has been taken and is pending.

**1.1.106.** *FMP* means Federal-Mogul Products, Inc., a Missouri corporation and one of the Debtors.

**1.1.107.** *FM Ignition Pension Plan* means the pension scheme known as the Champion Pension Scheme, a defined benefit plan operated by Federal-Mogul Ignition (U.K.) Limited for eligible employees.

**1.1.108.** *Future Claimants Representative* means Eric D. Green (or any court-appointed successor) who was appointed by the Bankruptcy Court in the Reorganization Cases pursuant to an Order dated February 11, 2002 as the legal representative of any and all persons described in Section 524(g)(4)(B)(i) of the Bankruptcy Code who may assert demands for

15

asbestos-related personal injuries, as that term is defined in Section 524(g)(5) of the Bankruptcy Code.

      **1.1.109.**   *GHI* means Gasket Holdings Inc. (f/k/a Flexitallic, Inc.), a corporation incorporated in Delaware and one of the U.S. Debtors.

      **1.1.110.**   *Governmental Unit* means any domestic, foreign, provincial, federal, state, local or municipal (a) government, or (b) governmental agency, commission, department, bureau, ministry or other governmental entity.

      **1.1.111.**   *Hercules Claims* has the same meaning as in the Principal CVAs.

      **1.1.112.**   *Hercules Claims Handling Costs* means all amounts now or at any time in the future incurred or paid by T&N or any Hercules-Protected Entity to Curzon or the Reinsurers in accordance with and under the Hercules Policy for costs, fees and expenses that are attributable to the administration, defense or disposition (including but not limited to settlement) of one or more Asbestos Personal Injury Claims against any of the Hercules-Protected Entities, or the pursuit of subrogation rights, all in accordance with and under the terms of the Hercules Policy. "Hercules Claims Handling Costs" shall exclude (a) Hercules Recovery Costs, and (b) the costs, fees and expenses of T&N or any other Hercules-Protected Entity seeking coverage under Section 4.5.19(a).

      **1.1.113.**   *Hercules Coverage* means the £500,000,000 insurance coverage provided by Curzon under the Hercules Policy.

      **1.1.114.**   *Hercules Payment Agency Agreement* means the agreement to be entered into between T&N, the Administrators of T&N, the U.K. Asbestos Trustee, the Asbestos Claimants Committee, the Future Claimants Representative, GHI, Ferodo and Phillip Rodney Sykes and Jeremy Mark Willmont as the initial Hercules Payment Agents in the form set out in Annex 19 to the Principal CVAs, with such variations thereto as the parties thereto may agree (to which it is intended that the U.S. Asbestos Trust should accede once it has been established).

      **1.1.115.**   *Hercules Payment Agents* means the Hercules Payment Agents as defined in the Hercules Payment Agency Agreement.

      **1.1.116.**   *Hercules Policy* means the asbestos liability policy number CZ 7/96 ASB/096 dated December 30, 1996 and made among T&N (then known as "T&N plc") and Curzon, as varied from time to time.

      **1.1.117.**   *Hercules Policy Expiry Date* means the date that is the later of (a) the earlier of (i) the date that (aa) the Hercules Retention has been satisfied; and (bb) the Hercules Coverage has been exhausted or is otherwise determined by agreement, judicial proceedings or otherwise, to be unavailable; and (cc) all other amounts under or in connection with the Hercules Policy including, without limitation, sums payable by Marsh USA Inc, Sedgwick Limited and Sedgwick U.K. Risk Services Limited under the collateral settlement agreement dated 16 January 2004 and amounts payable by the Reinsurers under the Reinsurance Agreement (including any amounts recoverable as a result of any breach by the Reinsurers of their obligations under the Reinsurance Agreement) and amounts recoverable as a result of any breach

16

by Curzon of its obligations under or with respect to the Hercules Policy, to the extent they exceed the Hercules Coverage, are recovered or are otherwise determined by agreement, judicial proceedings or otherwise to be unavailable; or (ii) the date that the Hercules Policy ceases to have effect, whether by commutation or settlement pursuant to Section 4.5.21 or otherwise; and (b) the date that both (i) all Hercules Recoveries paid to the credit of the Hercules Receipt Account have been applied in accordance with Section 4.5.12(a) and (ii) there can be no further Hercules Recoveries that are required to be credited to the Hercules Receipt Account to be applied in accordance with Section 4.5.12(a).

1.1.118.    *Hercules-Protected Entities* means (a) T&N, (b) Reorganized T&N, (c) the Debtors listed as subsidiaries or subsidiary undertakings of T&N in Schedule B to the Hercules Policy, (d) those Debtors identified in (c) as reorganized under and pursuant to the Plan and (e) the non Debtor companies listed as subsidiaries or subsidiary undertakings of T&N Limited in Schedule B to the Hercules Policy. *Reorganized Hercules-Protected Entities* means the companies identified in (b) and (d) above and *Non-Debtor Hercules-Protected Entities* means the companies identified in (e) above.

1.1.119.    *Hercules Receipt Account* means a bank account (not attracting interest or other income) in the name of T&N and designated as the "T&N Hercules Trust Account" and in respect of which the Hercules Payment Agents are or will be the sole authorized signatories as more particularly described in the Hercules Payment Agency Agreement.

1.1.120.    *Hercules Recoveries* means all amounts received or recoverable in respect of the Hercules Coverage (including, for the avoidance of doubt, any sum paid in respect of any commutation of or settlement of claim under the Hercules Policy) and all such amounts as are referred to in paragraph (a)(i)(cc) of the definition of Hercules Policy Expiry Date except (in each case) for any proceeds of the Hercules Policy which Reorganized T&N is entitled to retain pursuant to Section 4.5.21(a).

1.1.121.    *Hercules Recovery Costs* means (a) all reasonable amounts properly incurred after the U.K. Effective Date by Reorganized T&N for costs, fees and expenses (other than salaries, management time and overhead costs of Reorganized T&N incurred by Reorganized T&N in maintaining the books, records, document and control systems of Reorganized T&N) in connection with the preservation, recovery or attempted recovery of any Hercules Recoveries (net of the amount of any monetary collateral benefit actually received by Reorganized T&N in connection with such recovery or attempted recovery (which for the avoidance of doubt includes any VAT charged to Reorganized T&N on such costs, fees and expenses recoverable and actually recovered by Reorganized T&N (or where Reorganized T&N is a member of a VAT group, by such representative member) but does not include any relief from or other benefit in relation to tax)) or in connection with the exercise of Reorganized T&N's rights or the performance of Reorganized T&N's obligations under the Hercules Policy, provided that the costs, fees and expenses referred to above (other than those which are excluded in this paragraph (a)) are incurred at the request of the U.K. Asbestos Trustee or the Trust or in response to the assertion of an Asbestos Personal Injury Claim by the U.K. Asbestos Trustee or the Trust as agent of the holder of such claim; (b) all reasonable amounts properly incurred after the U.K. Effective Date by the U.K. Asbestos Trustee or the Trust for costs, fees and expenses (other than salaries and other overhead costs of the U.K. Asbestos Trustee or the Trust) in

17

connection with the preservation, recovery or attempted recovery of any Hercules Recoveries; (c) any costs, fees and expenses (or other liabilities) incurred by Reorganized T&N by reason of the exercise of any power of attorney granted by Reorganized T&N to the U.K. Asbestos Trustee under the terms of paragraph 19.7.1 of Principal CVAs or to the Trust under the terms of Section 4.5.11, provided that to the extent that such costs, fees and expenses (or other liabilities) are incurred in litigation and Reorganized T&N (and not the U.K. Asbestos Trustee or the Trust as donee of any power of attorney given by Reorganized T&N) has the conduct of the case, any such costs, fees and expenses (or other liabilities) shall be limited to the reasonable costs, fees and expenses (or other liabilities) properly incurred by Reorganized T&N; and (d) any reasonable costs or expenses (other than the cost or expense of salaries, management time and overhead costs of Reorganized T&N which would be borne by Reorganized T&N in any case) which Reorganized T&N may properly incur in connection with any application referred to in paragraph 19.19.13(b) of the Principal CVAs. Hercules Recovery Costs shall not include (i) Hercules Claims Handling Costs, (ii) the T&N Hercules Fund Costs and the Chester Street Hercules Fund Costs, except to the extent set out in sub-paragraph (b) above, and (iii) any costs, fees and expenses incurred in seeking coverage under Section 4.5.19(a).

**1.1.122.** *Hercules Retention* means the remaining amount of the "Retained Limit" of £690,000,000 as defined by the Hercules Policy.

**1.1.123.** *Hercules U.S. Holding Account* means a bank account in the name of the Hercules Payment Agents and designated as the "The Hercules Payment Agents' U.S. Holding Trust Account" and in respect of which the Hercules Payment Agents are the sole authorized signatories as more particularly described in the Hercules Payment Agency Agreement.

**1.1.124.** *Hercules Waterfall Account* means a bank account in the name of the U.K. Asbestos Trustee (and, when the Trust has come into existence and has become an account-holder of the account) the Trust and designated as the "Hercules Waterfall Trust Account" and in respect of which the Hercules Payment Agents are the sole authorized signatories as more particularly described in the Hercules Payment Agency Agreement.

**1.1.125.** *[Intentionally Omitted.]*.

**1.1.126.** *IA 1986* means the Insolvency Act 1986 of the United Kingdom, as amended from time to time.

**1.1.127.** *Inactive Debtor Subsidiaries* means the affiliated Debtors which may, at the discretion of their respective boards of directors and corporate parent companies, be liquidated, dissolved, wound-up, struck off, merged into another entity, and/or left in existence after Confirmation.

**1.1.128.** *Indenture Trustees* means the Persons serving as trustees under the Indentures for the Notes and for the Convertible Subordinated Debentures.

**1.1.129.** *Indentures* means the indenture agreements entered into between and among Federal-Mogul, the Indenture Trustees and certain other parties relating to each series of

18

Notes and to the Convertible Subordinated Debentures, as amended, modified or supplemented from time to time.

**1.1.130.** *Indirect Asbestos Personal Injury Claim* means any Asbestos Personal Injury Claim for contribution, reimbursement, subrogation or indemnity, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative or indirect Asbestos Personal Injury Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law, equity or admiralty, whatsoever. Without limitation, Indirect Asbestos Personal Injury Claims include (i) Dan=Loc Indemnified Indirect Asbestos Personal Injury Claims and Demands; (ii) any Claim or Demand by an EL Insurer for premium, indemnity, reimbursement, contribution, fees, expenses or otherwise in connection with any EL Asbestos Insurance made available by any EL Insurer or Asbestos Personal Injury Claims held or asserted by any EL Insurer in respect of EL Asbestos Insurance; and (iii) Claims or Demands held or asserted by the CRU based on Asbestos Personal Injury Claims. Indirect Asbestos Personal Injury Claims shall not include (i) Hercules Claims, (ii) EL Claims Handling Costs Claims, (iii) Pneumo Parties Claims, and (iv) Other Cooper Claims.

**1.1.131.** *Injunctions* means the Discharge Injunction, the Supplemental Injunction, the Third Party Injunction, the Asbestos Insurance Entity Injunction and any other injunctions entered by Order of the Bankruptcy Court in the Reorganization Cases.

**1.1.132.** *IR 1986* means the Insolvency Rules 1986 of the United Kingdom, as amended from time to time.

**1.1.133.** *IRC* means the Internal Revenue Code of 1986, as amended.

**1.1.134.** *Lien* means, with respect to any asset or property, any mortgage, lien, pledge, charge, security interest, encumbrance or other security device of any kind pertaining to or affecting such asset or property.

**1.1.135.** *Loan Notes* has the same meaning as in the Principal CVAs.

**1.1.136.** *Non-CVA Asbestos Claim* has the same meaning as in the Principal CVAs.

**1.1.137.** *Non-Priority Employee Benefit Claim* means any Claim that (i) arises from or relates to an Employee Benefit Plan or otherwise to the performance of service by an employee to the Debtors and (ii) is neither secured nor entitled to priority or preference to other Claims under the Bankruptcy Code or U.K. insolvency laws. For the avoidance of doubt, Non Priority Employee Benefit Claims include claims described in Section 1114 of the Bankruptcy Code, except to the extent such retiree benefit claims (a) are entitled to priority under Section 503 of the Bankruptcy Code or (b) arise in connection with the termination or modification of any retiree benefit plan in accordance with Section 1114 of the Bankruptcy Code. Non-Priority Employee Benefit Claims shall not include: (w) Excluded Non-Qualified Pension Claims, (x) Non-Priority T&N Pension Plan Employee Benefit Claims, (y) Non-Priority FM Ignition Pension Plan Employee Benefit Claims or (z) any Claims arising out of the rejection of a collective bargaining agreement in accordance with Section 1113 of the Bankruptcy Code.

**1.1.138.** ***Non-Priority FM Ignition Pension Plan Employee Benefit Claim*** means any Claim that arises from or relates to the FM Ignition Pension Plan.

**1.1.139.** ***Non-Priority T&N Pension Plan Employee Benefit Claim*** means any Claim that arises from or relates to the T&N Pension Plan.

**1.1.140.** ***Noteholder*** means each Person holding or having a beneficial interest in any of the Notes as of the Record Date.

**1.1.141.** ***Noteholder Claims*** means all Claims of the Noteholders against Federal Mogul and/or any Debtor that guaranteed the Notes arising under or evidenced by the Notes or the Indentures for the Notes and related documents. Notwithstanding the foregoing, Noteholder Claims shall not include any Convertible Subordinated Debenture Claims or Subordinated Securities Claims.

**1.1.142.** ***Notes*** means Federal-Mogul's 7.5% Notes due 2009, 7.375% Notes due 2006, 7.75% Notes due 2006, 7.875% Notes due 2010, 7.5% Notes due 2004, 8.8% Senior Notes due 2007, 8.37% Medium Term Notes due 2001, 8.25% Medium Term Notes due 2005, 8.33% Medium Term Notes due 2001, 8.12% Medium Term Notes due 2003, 8.16% Medium Term Notes due 2003 and 8.46% Medium Term Notes due 2002.

**1.1.143.** ***Official Committees*** means the Asbestos Claimants Committee, the Unsecured Creditors Committee, the Asbestos Property Damage Claimants Committee and the Equity Committee (or, in the singular, any of them).

**1.1.144.** ***Other Cooper Claims*** shall mean any Claims asserted by Cooper in the Reorganization Cases other than the Cooper Claims.

**1.1.145.** ***Other U.K. Claim*** means Unsecured Claims against any of the U.K. Debtors (including, but not limited to, Asbestos Property Damage Claims) and any other Claims asserted against a U.K. Debtor other than Administrative Claims, Priority Claims, Bank Claims, Surety Claims, Noteholder Claims, Other Secured Claims, Non-Priority T&N Pension Plan Employee Benefit Claims, Non-Priority FM Ignition Pension Plan Employee Benefit Claims, Asbestos Personal Injury Claims, and Affiliate Claims.

**1.1.146.** ***Owens-Illinois Settlement Agreement*** shall mean that certain Stipulation and Settlement Agreement By and Between the Plan Proponents and Owens-Illinois, Inc. Resolving Certain Claims and Objections, as approved by the Bankruptcy Court by a Final Order entered on November 15, 2005.

**1.1.147.** ***Owens-Illinois Settlement Amount*** shall mean $4.8 million in Cash, as payable by Federal-Mogul to Owens-Illinois pursuant to the Owens-Illinois Settlement Agreement.

**1.1.148.** ***PCT*** means PCT International Holdings Inc., a Delaware corporation.

**1.1.149.** ***Person*** means any person, individual, partnership, corporation, limited liability company, joint venture company, association or other entity or being of whatever kind,

whether or not operating or existing for profit, including, but not limited to, any "person" as such term is defined in Section 101(41) of the Bankruptcy Code, but excluding any Governmental Unit.

   **1.1.150.**  *Petition Date* means October 1, 2001.

   **1.1.151.**  *PIK Notes Trustee* means, as the context requires, the trustee or trustees under those certain Indentures of Trust pursuant to which the Reorganized Federal Mogul Junior Secured PIK Notes are to be issued.

   **1.1.152.**  *Plan* means this Fourth Amended Joint Plan of Reorganization filed by the Plan Proponents, as the same may be amended or modified from time to time pursuant to Section 1127 of the Bankruptcy Code. To the extent the Addendum is implemented pursuant to Section 8.23 of the Plan, the Addendum shall also constitute part of the Plan; provided, however, that if Articles II and III of the Plan B Settlement Agreement become effective in accordance with Section 5.01 of the Plan B Settlement Agreement, except (i) as otherwise provided in Section 8.23.1.2 of the Plan and (ii) for capitalized terms set forth in this Article I that have the meaning set forth in the Addendum (for which purposes such defined terms contained in the Addendum shall survive), the Addendum shall cease to have force and effect and shall not constitute part of the Plan.

   **1.1.153.**  *Plan A Date* shall have the meaning set forth in the Addendum.

   **1.1.154.**  *Plan A Settlement* shall have the meaning set forth in the Addendum.

   **1.1.155.**  *Plan B Date* has the meaning set forth in the Plan B Settlement Agreement.

   **1.1.156.**  *Plan B Effective Date* has the meaning set forth in the Plan B Settlement Agreement.

   **1.1.157.**  *Plan B Settlement* means the settlement embodied in the Plan B Settlement Agreement, as implemented pursuant to the Plan.

   **1.1.158.**  *Plan B Settlement Agreement* means that certain Amended and Restated Plan B Settlement Agreement dated as of November 20, 2006 by and among Cooper Industries, Ltd., a Bermuda company, Cooper Industries, LLC, a Delaware limited liability company, PCT International Holdings Inc., a Delaware corporation, Pneumo Abex LLC, a Delaware limited liability company, Federal-Mogul Corporation, a Michigan corporation, Federal-Mogul Products, Inc., a Missouri corporation, the Future Claimants Representative for Federal-Mogul Corporation and Federal-Mogul Products, Inc. appointed in the Reorganization Cases, and the Official Committee of Asbestos Claimants for Federal-Mogul Corporation and Federal-Mogul Products, Inc. appointed in the Reorganization Cases (as amended by the First Amendment thereto dated as of September 26, 2007), a copy of which is attached to the Plan as Exhibit 8.22.

   **1.1.159.**  *Plan B Settlement Amount* shall have the meaning set forth in Section 8.22.1 of the Plan.

**1.1.160.** *Plan Documents* means all documents, attachments and exhibits related to the Plan, including, but not limited to, the Trust Documents and the Cooper/Pneumo Escrow Agreement, that aid in effectuating the Plan, which documents, attachments and exhibits shall be filed by the Plan Proponents with the Bankruptcy Court on or before a date established by the Bankruptcy Court. To the extent the Addendum is implemented pursuant to Section 8.23 of the Plan, the Addendum and the exhibits thereto shall also be Plan Documents; provided, however, that if Articles II and III of the Plan B Settlement Agreement become effective in accordance with Section 5.01 of the Plan B Settlement Agreement, except as otherwise provided in Section 8.23.1.2 of the Plan, the Addendum shall cease to have force and effect and the Addendum and the exhibits thereto shall not be Plan Documents.

**1.1.161.** *Plan Documents Repository* means the offices of Sidley Austin LLP, counsel to the Debtors, at the address set forth in Section 1.4 of the Plan, at which any party-in-interest may review all of the Plan Documents after such Plan Documents have been filed with the Bankruptcy Court.

**1.1.162.** *Plan Proponents* means, collectively, the Debtors, the Unsecured Creditors Committee, the Asbestos Claimants Committee, the Future Claimants Representative, the Administrative Agent and the Equity Committee.

**1.1.163.** *Plan Support Agreement* means that certain Plan Support Agreement among the Debtors, the Asbestos Claimants Committee, the Future Claimants Representative and each of the Pneumo Parties dated as of November 20, 2006, as approved by the Bankruptcy Court by an order dated as of February 7, 2007, which is attached as Exhibit 8.24 to the Plan.

**1.1.164.** *Pneumo Abex* means Pneumo Abex LLC, a Delaware limited liability company.

**1.1.165.** *Pneumo Abex Claims* means any Claims or that could be asserted by Pneumo Abex and/or PCT against FMP in the Reorganization Cases, including but not limited to those Claims set forth on that certain proof of claim filed by Pneumo Abex against FMP dated February 28, 2003, in the total liquidated amount of $2,190,615.39, together with any and all contingent Claims.

**1.1.166.** *Pneumo Asbestos Claims* shall have the meaning set forth in the Addendum and in the Plan B Settlement Agreement.

**1.1.167.** *Pneumo Asbestos Insurance Policies* shall have the meaning set forth in the Addendum.

**1.1.168.** *Pneumo Excluded Claims* has the meaning set forth in Section 8.22.3.2 of the Plan.

**1.1.169.** *Pneumo Parties* means, collectively, Cooper LLC, Cooper Industries, Ltd., PCT, and Pneumo Abex.

**1.1.170.** *Pneumo Parties Claims* means, collectively, the Cooper Claims and the Pneumo Abex Claims.

**1.1.171.** *Pneumo Protected Party Injunction* shall have the meaning set forth in the Addendum.

**1.1.172.** *PPF* means the Board of the Pension Protection Fund, established under Part 2 of the Pensions Act 2004 of the United Kingdom.

**1.1.173.** *Principal CVAs* means the company voluntary arrangements under Part I IA 1986 which have been proposed by the Administrators of T&N and certain other U.K. Debtors in respect of those companies, and which are attached to the Plan as Exhibit 1.1.173, as may be varied from time to time.

**1.1.174.** *Priority Claim* means any Claim (other than an Administrative Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under Section 507(a) of the Bankruptcy Code.

**1.1.175.** *Priority Tax Claim* means any Claim to the extent that such Claim is entitled to a priority in payment under Section 507(a)(8) of the Bankruptcy Code.

**1.1.176.** *Pro Rata* means the proportion that a Claim in a particular Class bears to the aggregate amount of all Claims in such Class except in cases where Pro Rata is used in reference to multiple classes, in which case Pro Rata means the proportion that a Claim in a particular Class bears to the aggregate amount of all Claims in such multiple Classes.

**1.1.177.** *Proof of Claim* means any proof of claim filed with the Bankruptcy Court or its duly appointed claims agent with respect to the Debtors pursuant to Bankruptcy Rules 3001 or 3002, unless and to the extent that the Bankruptcy Court has ordered the use of a special or customized form for the particular type of claim at issue, and in such case, the special or customized form proof of claim.

**1.1.178.** *Protected Party* means any and all of the following parties:

**1.1.178.1.** the Debtors, their non-Debtor Affiliates (excluding, however, any person or Entity that may qualify as an Affiliate, but that is not commonly owned or controlled by the Debtors), the Affiliated Subsidiaries, Reorganized Federal-Mogul and the other Reorganized Debtors and all of their respective past and present officers, directors and employees;

**1.1.178.2.** the Noteholders, the holders of Bank Claims, and the Sureties, together with their respective successors, past and present officers, directors and employees, in each case limited to such party's capacity set forth in this Subsection 1.1.178.2;

**1.1.178.3.** any Entity which, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of the Debtors, Reorganized Federal-Mogul or the Trust, but only to the extent that a claim or liability is asserted against such Entity on account of its status as such transferee or successor;

**1.1.178.4.** any Entity that, pursuant to the Plan or after the Effective Date, makes a loan to the Debtors, Reorganized Federal-Mogul, or the Trust, or to a successor to,

23

or transferee of, any assets of the Debtors, Reorganized Federal-Mogul, or the Trust, but only to the extent that liability is asserted to exist by reason of such lending relationship or to the extent any Lien created in connection with such a loan is sought to be challenged or impaired;

**1.1.178.5.**     each Settling Asbestos Insurance Company and, to the extent specified in the Confirmation Order, each contributor of funds, proceeds or other consideration to the Trust; provided, however, that in the event a Settling Asbestos Insurance Company enters into any Asbestos Insurance Settlement Agreement(s) that cover less than all Asbestos Insurance Policies applicable to such Settling Asbestos Insurance Company, such Settling Asbestos Insurance Company shall be a Protected Party only with respect to those Asbestos Insurance Policies as to which it has entered into an Asbestos Insurance Settlement Agreement or Agreements; and

**1.1.178.6.**     the Dan=Loc Group, but only to the extent specified in the Confirmation Order.

**1.1.179.**     ***Record Date*** means the Confirmation Date.

**1.1.180.**     ***Reinsurance Agreement*** means the Reinsurance Agreement dated 30 December 1996 entered into between Curzon and the Reinsurers whereby Curzon re-insured all its liability under the Hercules Policy, as varied from time to time.

**1.1.181.**     ***Reinsurers*** means Centre Reinsurance International Company, European International Reinsurance Company Limited and Münchener Rückversicherangs-Gesellschaft AG.

**1.1.182.**     ***Released Claims Against FMC Group*** has the meaning set forth in the Plan B Settlement Agreement.

**1.1.183.**     ***Released Party*** means each of (a) the Debtors, their non-Debtor Affiliates (excluding, however, any person or Entity that may qualify as an Affiliate, but that is not commonly owned or controlled by the Debtors), the Affiliated Subsidiaries, the Reorganized Debtors, and their respective present and former agents, attorneys, accountants, financial advisors, restructuring consultants and investment bankers, including Rothschild Inc. (together with its officers, directors and employees who served in such capacity during the term of its engagement by the Debtors) (but specifically excluding Gilbert Randolph LLP; provided, however, that Gilbert Randolph LLP shall not be excluded as a Released Party to the extent that any and all issues related to the contested matter involving that certain Motion to Disqualify Gilbert, Heintz & Randolph as Special Insurance Counsel to the Debtors (Docket No. 10123, filed July 24, 2006) are resolved in favor of Gilbert Randolph LLP pursuant to a Final Order) and their respective successors or assigns, (b) the officers and directors of the Debtors, their non-Debtor Affiliates, Rothschild Inc. (together with its officers, directors and employees who served in such capacity during the term of its engagement by the Debtors) (excluding, however, any person or Entity that may qualify as an Affiliate, but that is not commonly owned or controlled by the Debtors), and the Affiliated Subsidiaries, who were serving as officers or directors on or after the Petition Date, (c) the Official Committees and their respective members, agents, attorneys, accountants, financial advisors, restructuring consultants and investment bankers (but

24

specifically excluding L. Tersigni Consulting, Inc. (*"Tersigni Consulting"*), pending the outcome of the review of Tersigni Consulting's professional fees and expenses in the Reorganization Cases by the United States Trustee and the Office of the United States Attorney for the District of Delaware), (d) the Future Claimants Representative and his agents, attorneys, accountants, financial advisors, restructuring consultants and investment bankers, and (e) the holders of Noteholder Claims, holders of Bank Claims, the Administrative Agent and the Sureties, together in each case with all of their respective successors, officers, directors, employees, agents, attorneys, accountants, financial advisors, restructuring consultants and investment bankers.

      **1.1.184.** *Remuneration Fund* has the meaning given to it in paragraph 32.3 of the Principal CVAs.

      **1.1.185.** *Remuneration Reserve* has the same meaning as in the Principal CVAs.

      **1.1.186.** *Reorganization Cases* means the cases currently pending under Chapter 11 of the Bankruptcy Code of Federal-Mogul and its affiliated Debtors before the Bankruptcy Court.

      **1.1.187.** *Reorganized Federal-Mogul* means Federal-Mogul on and after the Effective Date, as reorganized pursuant to the Plan. *Reorganized Debtor* or *Reorganized [name of Debtor]* shall have the same meaning with reference to the particular Debtor identified. In each instance, and unless a successor entity is specified, the Reorganized Debtor shall consist of the same legal entity as the corresponding Debtor, but subject to the terms and conditions of the Plan, including, without limitation, the discharge, release and Injunctions under Article IX of the Plan, and, except as provided in Article IV of the Plan, each Reorganized Debtor shall have and incur no successor liability with respect to Claims or Demands that may have existed prior to Confirmation of the Plan.

      **1.1.188.** *Reorganized Federal-Mogul Class A Common Stock* shall have the meaning set forth in the Amended and Restated Certificate of Incorporation of Federal-Mogul Corporation which is attached as Exhibit 8.3.12(1) to the Plan.

      **1.1.189.** *Reorganized Federal-Mogul Class B Common Stock* shall have the meaning set forth in the Amended and Restated Certificate of Incorporation of Federal-Mogul Corporation which is attached as Exhibit 8.3.12(1) to the Plan.

      **1.1.190.** *Reorganized Federal-Mogul Common Stock* means the shares of Reorganized Federal-Mogul Class A Common Stock and Reorganized Federal-Mogul Class B Common Stock to be distributed pursuant to the Plan.

      **1.1.191.** *Reorganized Federal-Mogul Junior Secured PIK Notes* means the junior secured PIK Notes to be issued by Reorganized Federal-Mogul pursuant to the Plan on account of the Allowed Class B Bank Claims and the Allowed Class C Surety Claims, in the original principal amount of $305,236,000.00. The principal terms and conditions of the Reorganized Federal-Mogul Junior Secured PIK Notes are set forth in Exhibit 1.1.191 to the Plan.

**1.1.192.**    ***Reorganized Federal-Mogul Secured Term Loan Agreement*** means the loan agreement among Reorganized Federal-Mogul, the holders of Allowed Class 1B Bank Claims and the Administrative Agent, and the Sureties, in the principal amount of $1,326,661,117.90 (as adjusted as of the Effective Date to convert any foreign currencies to U.S. dollars) plus the amount of any draws prior to the Effective Date on letters of credit outstanding under the Bank Credit Agreement. The principal terms and conditions of the Reorganized Federal-Mogul Secured Term Loan Agreement are set forth in Exhibit 1.1.192 to the Plan. The then-current form of the Reorganized Federal-Mogul Secured Term Loan Agreement shall be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing as a supplement to Exhibit to 1.1.192 to the Plan.

**1.1.193.**    ***Reorganized T&N*** means T&N on and after the Effective Date, as reorganized pursuant to the Plan.

**1.1.194.**    ***Repayment Percentage*** means (a) unless and until the Swiss Re Settlement becomes effective in accordance with its terms, the percentage of the amount actually recoverable under the Hercules Policy within the Hercules Coverage in respect of CVA Asbestos Claims that are established pursuant to paragraph 19.5 of the Principal CVAs and/or Debtor HPE Asbestos Claims that are established pursuant to Section 4.5.9; and (b) after the Swiss Re Settlement becomes effective in accordance with its terms, 94.25%.

**1.1.195.**    ***Review Date*** has the same meaning as in the Hercules Payment Agency Agreement.

**1.1.196.**    ***Schedules*** means the Schedules, Statements and Lists filed by the Debtors with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been and may be amended or supplemented from time to time.

**1.1.197.**    ***Secured*** means, with respect to any Claim, including, without limitation, Bank Claims, Surety Claims (other than the unsecured Surety Claims against T&N and GHI), and any Claim on the part of Federal-Mogul against T&N which was secured on the Loan Notes immediately before they were sold by T&N to Federal-Mogul and Federal Mogul (Continental European Operations) Limited pursuant to an Agreement dated December 9, 2005 made between T&N, the Administrators of T&N, Federal-Mogul (Continental European Operations) Limited and Federal-Mogul, a Claim that is (a) secured in whole or in part as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or other applicable law, or (b) subject to setoff under Section 553 of the Bankruptcy Code or other applicable law, but, with respect to both (a) and (b) above, only to the extent of the value of the holder of such Claim's interest in the particular Estate's interest in the property securing any such Claim or the amount subject to setoff, as the case may be.

**1.1.198.**    ***Settling Asbestos Insurance Company*** means each Asbestos Insurance Company listed on Exhibit 1.1.198 (as the same may be amended from time to time, including following entry of the Confirmation Order) and any other Asbestos Insurance Company that enters into an Asbestos Insurance Settlement Agreement that is determined by the District Court to justify treating such Asbestos Insurance Company as a Protected Party.

26

**1.1.199.    *Stock Repayment Obligation*** shall have the meaning set forth in Section 4.5.5(b).

**1.1.200.    *Subordinated Securities Claim*** means a Claim subject to subordination under Section 510(b) of the Bankruptcy Code, including, without limitation, any Claim that arises from the rescission of a purchase or sale of a security of any of the Debtors (including, without limitation, the Notes and the existing Federal-Mogul common and preferred stock classified below in Classes 1M and 1O), or for damages arising from the purchase or sale of such a security, or for reimbursement, indemnification, or contribution allowed under Section 502 of the Bankruptcy Code on account of such Claim.

**1.1.201.    *Subsidiary*** has the meaning given to that term by Section 736 of the Companies Act 1985 of the United Kingdom, as amended from time to time.

**1.1.202.    *Supersedeas Bond Action*** means any rights, defenses, counterclaims or affirmative causes of action of the Debtors, Reorganized Federal-Mogul, or the other Reorganized Debtors with respect to a Bonded Claim, or with respect to any supersedeas bond or other form of security or payment assurance issued in connection with a Bonded Claim, or against the issuer or insurer of any payment assurance issued in connection with a Bonded Claim.

**1.1.203.    *Supplemental Injunction*** means the injunction described in Section 9.3.1 of the Plan.

**1.1.204.    *Sureties*** means Travelers Casualty and Surety Company of America (**"*Travelers*"**), SAFECO Insurance Company of America (**"*Safeco*"**), and National Fire Insurance Company of Hartford and Continental Casualty Company (collectively, **"*CNA*"**), as issuers of the CCR Surety Bonds. Any reference to the "Sureties" in the Plan shall be strictly limited to Travelers, Safeco, and CNA in their capacity as issuers of the CCR Surety Bonds, and shall not refer to any or all of Travelers, Safeco, and/or CNA in any other capacity.

**1.1.205.    *Surety Claims*** means the Allowed Secured (and, in the case of T&N and GHI, unsecured) Claims of the Sureties in the aggregate amount of $28.0 million, as compromised and settled under the terms set forth in the Surety Claims Settlement Agreement. The Surety Claims and all consideration to be distributed under the Plan on account of the Surety Claims shall be allocated as follows:  Safeco: $8.7 million; CNA: $8.7 million; Travelers in its capacity as successor in interest to Reliance Insurance Company: $5.3 million; and Travelers: $5.3 million.

**1.1.206.    *Surety Claims Settlement Agreement*** means that certain Stipulation and Agreement for Compromise and Settlement of Secured Surety Claims, for Treatment Thereof Under Third Amended Joint Plan of Reorganization, and Related Matters as approved by a Final Order of the Bankruptcy Court entered on March 16, 2005.

**1.1.207.    *Swiss Re Settlement*** means the terms of the settlement of the proceedings brought by European International Reinsurance Company Limited in the English Court against Curzon and the settlement agreement between Curzon and T&N dated 16 January 2004.

**1.1.208.**    *T&N* means T&N Limited, a company incorporated in England and Wales.

**1.1.209.**    *T&N Fund* has the same meaning as in the Principal CVAs.

**1.1.210.**    *T&N Hercules Fund* means the fund established under the U.K. Asbestos Trust to hold those Hercules Recoveries referred to in Section 4.5.12(c) *Seventhly* (ii)(2), the assets or investments derived from those recoveries from time to time, and all accumulations of income on or arising from those assets.

**1.1.211.**    *T&N Hercules Fund Costs* has the same meaning as in the Principal CVAs.

**1.1.212.**    *T&N Pension Plan* means the T&N Retirement Benefits Scheme (1989), a defined benefit plan operated by certain of the U.K. Debtors for eligible employees, and the trustees thereof from time to time.

**1.1.213.**    *Third Party Injunction* means the injunction described in Section 9.3.2 of the Plan.

**1.1.214.**    *Thornwood* means Thornwood Associates Limited Partnership, a Delaware limited partnership.

**1.1.215.**    *Trust* means the trust established pursuant to the Trust Agreement and in accordance with Section 524(g) of the Bankruptcy Code, which is a "qualified settlement fund" pursuant to Section 468B of the IRC and the regulations issued pursuant thereto.

**1.1.216.**    *Trust Advisory Committee* or *TAC* means that committee appointed and serving in accordance with Section 4.13.1 of the Plan and having the powers, duties and obligations set forth in the Trust Agreement.

**1.1.217.**    *Trust Agreement* means that certain Asbestos Personal Injury Trust Agreement, effective as of the Confirmation of the Plan, substantially in the form of Exhibit 1.1.217 to the Plan.

**1.1.218.**    *Trust Assets* means the following assets and any income, profits and proceeds derived from such assets subsequent to the transfer of such assets to the Trust: (a) the Reorganized Federal-Mogul Class B Common Stock to be distributed to the Trust pursuant to the Plan, (b) the Asbestos Insurance Actions and the Asbestos Insurance Action Recoveries attributable to any Asbestos Personal Injury Claims, (c) the Asbestos Insurance Settlement Agreements attributable to any Asbestos Personal Injury Claims, other than such agreements attributable to the Hercules Policy, (d) the Asbestos In-Place Insurance Coverage, (e) the Trust Causes of Action and (f) any and all other funds, proceeds or other consideration otherwise contributed to the Trust pursuant to the Plan and/or the Confirmation Order. For the avoidance of doubt, Trust Assets do not include FMP's rights relating to benefits and proceeds of insurance with respect to amounts paid and costs incurred by FMP prior to October 1, 2001 in connection with Pneumo Asbestos Claims under (x) Section 5.1 of the Pneumo Settlement Agreement (as defined in the Plan B Settlement Agreement), (y) Section 11.6 of the 1994 APA (including the

28

insurance Agreement, as defined therein), and (z) Section 5.25 of the 1998 PSA to the extent such benefits and proceeds of insurance exceed $3,200,000 in the aggregate, and Trust Assets shall include any such benefits and proceeds of insurance that aggregate $3,200,000 or less.

       **1.1.219.**    *Trust Causes of Action* means any and all of the actions, claims, rights, defenses, counterclaims, suits and causes of action of the Debtors (other than, prior to the Hercules Policy Expiry Date, the Hercules-Protected Entities and other than any such actions, claims, rights, defenses, counterclaims, suits and causes of action with respect to the EL Coverage), whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction attributable to: (a) all defenses to any Asbestos Personal Injury Claim, including, but not limited to, all defenses under Section 502 of the Bankruptcy Code, (b) with respect to any Asbestos Personal Injury Claim, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted, and (c) subject to the provisions of the Plan, any other claims or rights with respect to Asbestos Personal Injury Claims that the Debtors (other than, prior to the Hercules Policy Expiry Date, the Hercules-Protected Entities and other than any such claims or rights with respect to the EL Coverage) would have had under applicable law if the Reorganization Cases had not occurred and the holder of such Asbestos Personal Injury Claim had asserted it by initiating civil litigation against any such Debtor. Notwithstanding the foregoing, Trust Assets and Trust Causes of Action shall not include (x) any of the Debtors' rights arising under or attributable to the Supersedeas Bond Actions, (y) the property, rights or assets, if any, of the Debtors which were previously used to secure or obtain a supersedeas bond with respect to any Allowed Bonded Claim and which are recoverable or recovered by the Debtors after the full satisfaction of such claim or (z) any claim, cause of action, or right of the Debtors or any of them, under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract or otherwise arising from or relating to any payments made by the Debtors on account of Asbestos Personal Injury Claims prior to the Petition Date.

       **1.1.220.**    *Trust Claim* shall have the meaning set forth in Section 4.5.2 of the Plan.

       **1.1.221.**    *Trust Documents* means the Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures and all other agreements, instruments and documents governing the establishment, administration and operation of the Trust, which shall be substantially in the form set forth in the Plan, as they may be amended or modified from time to time in accordance with the Plan and the Trust Agreement.

       **1.1.222.**    *Trust Expenses* means any Asbestos Personal Injury Expenses and any other liabilities, costs or expenses of, or imposed upon, or in respect of, the Trust (except for payments to holders of Asbestos Personal Injury Claims on account of such Claims). Trust Expenses shall also expressly include, without limitation, (a) any and all liabilities, costs and expenses incurred subsequent to the Confirmation of the Plan in connection with any and all Asbestos Insurance Actions, or any similar claim, cause of action or right of Reorganized T&N against Curzon and/or the Reinsurers, in each case whether or not any such action results in a recovery for the Trust, (b) the Trust's proportionate share of all liabilities, costs and expenses

29

incurred by the Reorganized Debtors in taking any action on behalf of or at the direction of the Trustees, if any, including, without limitation, any costs and expenses incurred by the Reorganized Debtors in connection with any action involving an Asbestos Insurance Policy or the Hercules Policy, and (c) to the extent as may be required by Section 4.5.13 of the Plan, the fees and costs incurred by GHI or Ferodo incurred after the Effective Date and any award of costs against either GHI or Ferodo entered after the Effective Date in connection with any litigation concerning GHI's or Ferodo's interest in or right to any Hercules Policy proceeds. Notwithstanding anything to the contrary, Trust Expenses shall include any and all amounts due under any indemnity provided by the Trust pursuant to the Plan.

    **1.1.223.**   *Trustees* means the Persons appointed pursuant to Section 4.12 of the Plan for the purpose of acting as trustees of the Trust in accordance with the terms and conditions contained in the Trust Documents, the Plan and the Confirmation Order.

    **1.1.224.**   *U.K. Asbestos Trust* means the trust established or to be established pursuant to the Principal CVAs for the benefit of holders of CVA Asbestos Claims against certain of the U.K. Debtors.

    **1.1.225.**   *U.K. Asbestos Trust Documents* has the same meaning as in the Principal CVAs.

    **1.1.226.**   *U.K. Asbestos Trust Percentage* means 7.14% or such other percentage as may be agreed from time to time under Section 4.5.14.

    **1.1.227.**   *U.K. Asbestos Trustee* means The T&N Asbestos Trustee Company Limited, which is or shall be the trustee of the U.K. Asbestos Trust and whose board of directors as at the U.K. Effective Date shall be made up of James Gleave, Anne O'Keefe and one independent director, or such other person who may be appointed as the trustee of the U.K. Asbestos Trust from time to time.

    **1.1.228.**   *U.K. Court* means any court of competent jurisdiction in any part of the United Kingdom.

    **1.1.229.**   *U.K. Debtors* means, for purposes of this Plan, those Debtors so listed in footnote 1 of the Plan for which a plan of reorganization is proposed as part of this Plan.

    **1.1.230.**   *U.K. Effective Date* means "Effective Date" as defined by the Principal CVAs.

    **1.1.231.**   *U.K. Global Settlement Agreement* means that certain Agreement between Federal-Mogul, T&N Limited, the other Plan Proponents, High River Limited Partnership, the Administrators, and the PPF filed with the Bankruptcy Court on September 26, 2005, as approved by the Bankruptcy Court by a Final Order entered on November 15, 2005.

    **1.1.232.**   *United Kingdom Tax* means United Kingdom corporation tax or other tax chargeable in the United Kingdom.

**1.1.233.** *United Kingdom Taxpayer* means any member of the Federal-Mogul Group (as defined in the Principal CVAs) which is subject to United Kingdom Tax.

**1.1.234.** *United States Trustee* means the Office of the United States Trustee for the District of Delaware.

**1.1.235.** *Unsecured Claim* means any Claim against one or more of the Debtors (regardless of whether such Claim is covered by insurance), not specifically included in a separately identified Class of Claims or Equity Interests, and to the extent that such Claim is neither secured nor entitled to priority under applicable law. Unsecured Claims shall expressly include, without limitation, (a) any claim arising from the rejection of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code, (b) any portion of a Claim to the extent the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to Section 506(a) of the Bankruptcy Code, (c) Other U.K. Claims (including, specifically, Off-Site Environmental Claims against any U.K. Debtors), (d) any unsecured deficiency claims held by the holders of Bonded Non-Asbestos Claims, (e) Asbestos Property Damage Claims against any U.S. Debtors to the extent that such Claims are not Bonded Claims, (f) Excluded Non-Qualified Pension Claims, (g) Off-Site Environmental Claims, (h) Other Cooper Claims, and (i) Claims arising from the provision of goods or services to the Debtors prior to the Petition Date, including the Claims of commercial trade creditors. Unless otherwise specifically provided in an applicable provision of the Plan, Unsecured Claims shall not include (i) Administrative Claims, (ii) Priority Claims, (iii) Bank Claims, (iv) Surety Claims, (v) Noteholder Claims, (vi) Other Secured Claims, (vii) On-Site Environmental Claims, (viii) Non-Priority Employee Benefit Claims, (ix) Asbestos Personal Injury Claims, (x) Bonded Claims, (xi) Affiliate Claims, (xii) Pneumo Parties Claims, and (xiii) Equity Interests.

**1.1.236.** *Unsecured Creditors Committee* means the Official Committee of Unsecured Creditors of the Debtors appointed in the Reorganization Cases by the United States Trustee.

**1.1.237.** *U.S. Asbestos Trust Percentage* means 88.10% or such other percentage as may be agreed from time to time under Section 4.5.14.

**1.1.238.** *U.S. Debtors* means those Debtors so listed in footnote 1 of the Plan.

**1.1.239.** *VAT* means value added tax chargeable in accordance with the Value Added Tax Act 1994 of the United Kingdom and any substantially similar tax that may replace it.

**1.1.239A.** *Vellumoid Claim* means any Federal-Mogul Vellumoid Asbestos Claim, as that term is defined in the CIP Agreement.

**1.1.240.** *Warrants* means the warrants for the purchase of Reorganized Federal Mogul Common Stock which are to be issued by Reorganized Federal Mogul pursuant to the Plan and the warrant agreement attached hereto as Exhibit 1.1.240 to the Plan.

31

**1.2.** **Other Terms**. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular or the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine and neuter. The word "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and are not limited to any particular article, section, subsection, or clause contained in the Plan. Any capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require. Whenever used in the Plan, the terms "officer," "director," or "agent" shall not include the Administrators. The rules of construction set forth in Section 102 of the Bankruptcy Code shall also apply in construing and interpreting the provisions of the Plan.

**1.3.** **Deemed Acts**. Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

**1.4.** **Exhibits**. All Plan Documents, to the extent not annexed hereto, shall be contained in a separate Appendix of Plan Documents, which shall be filed with the Clerk of the Bankruptcy Court not later than a date to be established by the Bankruptcy Court. The Plan Documents shall be made available for review, inspection, and copying at the expense of the party in interest, either (a) through posting on the Internet at http://www.fmoplan.com or (b) during normal business hours at the office of Debtors' counsel, as follows:

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000

**ARTICLE II**
**TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS**

**2.1.** **Allowed Administrative Claims**. Except (i) to the extent that any holder agrees to different treatment and (ii) with respect to compensation or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court under Sections 328, 330(a) or 331 of the Bankruptcy Code (which shall be addressed in accordance with Section 2.5 of the Plan), on the Distribution Date, each holder of an Allowed Administrative Claim against any of the Debtors shall receive Cash equal to the Allowed Amount of its Administrative Claim in full satisfaction, settlement, release, extinguishment and discharge of such Claim; provided, however, that Allowed Administrative Claims representing (a) liabilities incurred on or after the Petition Date in the ordinary course of business by the Debtors and (b) postpetition contractual liabilities arising under loans or advances to the Debtors, including, but not limited to the DIP Facility, whether or not incurred in the ordinary course of business, shall be paid by Reorganized Federal-Mogul or the applicable Reorganized Debtor, in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto, subject to the provisions set forth in Section 2.2 of the Plan. Each Allowed Administrative Claim shall be paid from, and to the extent of available assets of, the respective Debtor's Estate to which such Claim applies or has been allocated, and thereafter to the extent of any insufficiency, from funds advanced to the relevant Debtor by the Estate of Federal-Mogul.

32

**2.2.**   **No Double Payment of Administrative Claims**.  To the extent that an Administrative Claim is Allowed against the Estate of more than one Debtor, there shall be only a single recovery on account of such Allowed Claim.  In addition, to the extent any amount that would otherwise constitute an Administrative Claim is paid under the CVA of any U.K. Debtor (other than an Administrative Claim for the professional fees, costs and expenses in the Reorganization Cases of any of the U.K. Debtors), the payment under the CVA shall be the only payment on account of such Claim.

**2.3.**   **Special Provisions Relating to United States Customs and Border Protection**. Notwithstanding any provision in the Plan or Confirmation Order to the contrary; (1) the Allowed Administrative Claim of the United States Customs and Border Protection ( *"Customs"*) shall be paid in full in Cash on the Effective Date to the extent the Administrative Claim of Customs is Allowed on the Effective Date, provided, however, that to the extent that the Administrative Claim of Customs becomes Allowed after the Effective Date, it shall be paid in full in Cash as soon as practicable after it is Allowed; (2) interest shall accrue on the Allowed Administrative, Allowed Priority Tax and Allowed Secured Claims of Customs to the extent required by applicable law at a rate and method which is either mutually agreed in writing by Customs and the Debtors, or in the case of disagreement, to the extent adjudicated by the Bankruptcy Court; (3) Confirmation of the Plan shall not affect any rights of Customs against the sureties, or the rights of the sureties against Customs, with respect to any Customs bonds that secure payment of any of Customs' claims; and (4) to the extent permitted by applicable bankruptcy and nonbankruptcy law, Confirmation of the Plan shall not extinguish any rights of Customs to assert setoff or recoupment with respect to any of its Allowed prepetition and post-petition claims against any amounts owed to the Debtors by the United States.  Notwithstanding anything to the contrary in this provision or elsewhere in the Plan or Confirmation Order, the Debtors reserve the right to object to and defend against any and all Claims asserted by Customs.

**2.4.**   **Priority Tax Claims**.  Except to the extent that any holder agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive on account of such Claim deferred cash payments, over a period not exceeding six years after the date of assessment of each such Claim, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Priority Tax Claim.  Each Allowed Priority Tax Claim shall be paid from, and to the extent of available assets of, the respective Debtor's Estate against which such Claim is asserted, and thereafter to the extent of any insufficiency, from funds advanced to the relevant Debtor by the Estate of Federal-Mogul; provided, however, that Federal-Mogul's Estate shall not be obligated to advance funds for the payment of Priority Tax Claims, if any, against any Debtor for which a Plan is not confirmed.

**2.5.**   **Treatment of Claims for Payment or Reimbursement of Professional Fees and Expenses.**  All final requests for compensation or reimbursement of the fees of any professional employed in the Reorganization Cases pursuant to Section 327 or 1103 of the Bankruptcy Code or otherwise, including any Claims for making a substantial contribution under Section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtors and their counsel, together with the Bankruptcy Court-appointed fee auditor, the Office of the United States Trustee, counsel to each of the other Plan Proponents, and counsel to the administrative agent under the Exit Facilities, not later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such

professionals or other entities for compensation or reimbursement of expenses must be filed and served on the parties specified above in this Section 2.5 and the requesting professional or other entity not later than twenty (20) days after the date on which the applicable application for compensation or reimbursement was served; provided, however, that, in lieu of such twenty (20) day objection deadline, the following protocol shall apply to the fee auditor previously appointed by the Bankruptcy Court in the Reorganization Cases:

(i)      if the fee auditor has any questions for any applicant, the fee auditor may communicate such questions in writing to the applicant in an initial report (an *"Initial Report"*) within forty-five (45) days after the date on which the applicable application for compensation or reimbursement was served on the fee auditor;

(ii)     any applicant who receives such an Initial Report and wishes to respond thereto shall respond within thirty (30) days after the date of the Initial Report and shall serve upon the fee auditor via e-mail a response in an electronic format such as Microsoft Word, WordPerfect, or Excel, but not Adobe Acrobat;

(iii)    within thirty (30) days after the date on which any response to an Initial Report is served on the fee auditor (or, if no such response is served, within thirty (30) days after the deadline for serving such Initial Report has passed), the fee auditor shall file with the Court a final report with respect to each such application for compensation or reimbursement; and

(iv)     within twenty (20) days after the date of the final report, the subject applicant may file with the Court a response to such final report.

Notwithstanding the foregoing, the fee auditor and a professional may agree to extend any of the time periods set forth in items (i) through (iv) above with respect to any application filed by such professional.

### ARTICLE III
### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**Summary**.  Pursuant to Sections 1122 and 1123 of the Bankruptcy Code, Claims and Equity Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to the Plan, as set forth herein.  A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  Other than Asbestos Personal Injury Claims, a Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

**ALLOWED CLAIMS HELD AGAINST ONE DEBTOR WILL BE SATISFIED SOLELY FROM THE CASH AND ASSETS OF SUCH DEBTOR AND ITS ESTATE, PROVIDED THAT, TO THE EXTENT OF ANY INSUFFICIENCY, FUNDS MAY BE ADVANCED TO THE RELEVANT DEBTORS BY THE ESTATE OF FEDERAL-MOGUL.  EXCEPT AS SPECIFICALLY SET FORTH HEREIN, NOTHING IN THE**

PLAN OR THE DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE DEEMED TO CONSTITUTE AN ADMISSION THAT ANY ONE OF THE DEBTORS IS SUBJECT TO OR LIABLE FOR ANY CLAIM AGAINST ANY OTHER DEBTOR. A CLAIM AGAINST MULTIPLE DEBTORS, TO THE EXTENT ALLOWED IN EACH DEBTOR'S CASE, WILL BE TREATED AS A SEPARATE CLAIM AGAINST EACH DEBTOR'S ESTATE FOR ALL PURPOSES (INCLUDING, BUT NOT LIMITED TO, VOTING AND DISTRIBUTION, **PROVIDED, HOWEVER,** THAT THERE SHALL BE ONLY A SINGLE RECOVERY ON ACCOUNT OF SUCH CLAIMS AND ANY DISTRIBUTION FROM A DEBTOR ON ACCOUNT OF SUCH CLAIMS SHALL TAKE INTO ACCOUNT THE DISTRIBUTIONS TO BE MADE BY OTHER DEBTORS ON ACCOUNT OF SUCH CLAIMS PURSUANT TO THE PLAN), AND SUCH CLAIMS WILL BE ADMINISTERED AND TREATED IN THE MANNER PROVIDED IN THE PLAN.

The classification and treatment of Claims against and Equity Interests in the primary five (5) U.S. Debtors and twelve (12) U.K. Debtors that are contemplated to have material ongoing business operations after Confirmation of the Plan, as well as two (2) U.K. Debtors (Federal-Mogul Eurofriction Limited and TBA Industrial Products Limited) that had business operations as of the Petition Date but have subsequently sold substantially all of their assets and no longer have active business operations, are set forth in detail in the text of the Plan which follows. For purposes of brevity and convenience, but with the same legal force and effect as if set forth at length herein, the classification and treatment of Claims against and Equity Interests in all remaining U.S. Debtors and U.K. Debtors is set forth in Exhibit 3.20 to the Plan and the explanatory notes accompanying Exhibit 3.20.

### 3.1.    Federal-Mogul Corporation (Classes 1A through 1O)

#### 3.1.1.    Class 1A – Priority Claims.

(a)    Classification:  Class 1A consists of all Priority Claims against Federal-Mogul.

(b)    Treatment:  On the Distribution Date, each holder of a Class 1A Allowed Priority Claim shall receive either (I) Cash equal to the Allowed Amount of such Priority Claim or (II) such other treatment as may be agreed upon in writing by such holder and Reorganized Federal-Mogul.

(c)    Voting:  Class 1A is impaired and each holder of an Allowed Class 1A Claim is entitled to vote to accept or reject the Plan.

#### 3.1.2.    Class 1B – Bank Claims.

(a)    Classification:  Class 1B consists of all Bank Claims against Federal-Mogul.

(b)    In full and complete satisfaction of the Allowed Class 1B Claims, including, without limitation, any subordination or turnover rights relating to the Convertible Subordinated Debentures, the holders of such Claims shall receive the following treatment:

35

(i)      Claims arising under the Bank Credit Agreement (including certain letter of credit obligations) shall be deemed fully Secured and Allowed in the amount of $1,646,681,464.00 (as adjusted as of the Effective Date to convert any foreign currencies to U.S. dollars);

(ii)      Reorganized Federal-Mogul shall (y) enter into, execute and deliver the Reorganized Federal-Mogul Secured Term Loan Agreement which shall provide for, among other things, the issuance to the holders of Allowed Class 1B Claims, in accordance with each such holder's rights under the Bank Credit Agreement, of term loans in the aggregate principal amount of $1,303,897,117.90 (as adjusted as of the Effective Date to convert any foreign currencies to U.S. dollars) plus the amount of any draws prior to the Effective Date on letters of credit outstanding under the Bank Credit Agreement and (z) replace with the Exit Facilities any letters of credit not drawn as of the Effective Date;

(iii)      Reorganized Federal-Mogul shall issue and deliver to the PIK Notes Trustee, for ultimate distribution to the holders of Allowed Class 1B Claims in accordance with each such holder's rights under the Bank Credit Agreement, the Reorganized Federal-Mogul Junior Secured PIK Notes in the amount of $300,000,000.00; and

(iv)      All adequate protection payments to the holders of Bank Claims authorized under the Final Order approving the DIP Facility (and/or Final Orders approving prior debtor-in-possession financing facilities for Federal-Mogul and its subsidiaries) shall continue until and cease on the Effective Date and all accrued and unpaid adequate protection payments as of the Effective Date will be paid in Cash on the Effective Date.  The holders of Bank Claims shall retain all adequate protection payments made during these Reorganization Cases without any diminution of the treatment set forth above.

All Claims arising under the Bank Credit Agreement are deemed fully Secured.  As a result, there are no unsecured Bank Claims and the holders of Bank Claims do not have or hold any Class H Unsecured Claims against any of the Debtors.

(c)      Voting:  Class 1B is impaired and each holder of an Allowed Class 1B Claim is entitled to vote to accept or reject the Plan.

### 3.1.3.    Class 1C – Surety Claims

(a)      Classification:  Class 1C consists of all Surety Claims against Federal-Mogul.

(b)      Treatment:  In full and complete satisfaction of the Allowed Class 1C Surety Claims, the holders of such Claims shall receive the following treatment:

(i)      Reorganized Federal-Mogul shall issue and deliver to the holders of the Class 1C Surety Claims senior secured term loans in the aggregate principal amount of $22,764,000, to be repaid under and evidenced by the Reorganized Federal-

Mogul Secured Term Loan Agreement as particularly set forth in Exhibit 1.1.192 to the Plan, and related documents, but in any event upon the same terms, conditions, interest rate, maturity, collateral and lien priority as the holders of Bank Claims shall receive under the Plan with respect to senior secured term loans;

       (ii)     Reorganized Federal-Mogul shall issue and deliver to the PIK Notes Trustee, for ultimate distribution to the holders of Class 1C Surety Claims, Reorganized Federal-Mogul Junior Secured PIK Notes in the aggregate principal amount of $5,236,000, to be repaid under and evidenced by the Reorganized Federal-Mogul Junior Secured PIK Notes as particularly set forth in Exhibit 1.1.191 to the Plan, and related documents, but in any event upon the same terms, conditions, interest rate, maturity, collateral and lien priority as the holders of Bank Claims shall receive under the Plan with respect to Junior Secured PIK Notes; and

       (iii)     All payments of fees and costs to the Sureties as authorized under the Final Order approving the DIP Facility (as modified by the Surety Claims Settlement Agreement), and adequate protection payments also authorized under the Surety Claims Settlement Agreement, shall continue until and cease on the Effective Date; all accrued and unpaid adequate protection payments or fee and cost reimbursement payments will be paid in Cash on the Effective Date. The holders of the Class 1C Surety Claims shall retain all adequate protection payments and all fee and cost reimbursement payments made during the Reorganization Cases without any diminution of the treatment set forth above.

       (c)     Voting: Class 1C is impaired and, subject to the terms of the Surety Claims Settlement Agreement, each holder of an Allowed Class 1C Claim is entitled to vote to accept or reject the Plan.

### 3.1.4.     Class 1D – Noteholder Claims.

       (a)     Classification: Class 1D consists of all secured and unsecured Noteholder Claims against Federal-Mogul, which shall be deemed Allowed as follows:

       (1)     Claims arising under Federal-Mogul's 7.5% Notes due 2009 shall be deemed Allowed in the aggregate amount of $572,812,500.00;

       (2)     Claims arising under Federal-Mogul's 7.375% Notes due 2006 shall be deemed Allowed in the aggregate amount of $401,069,010.50;

       (3)     Claims arising under Federal-Mogul's 7.75% Notes due 2006 shall be deemed Allowed in the aggregate amount of $399,595,000.10;

       (4)     Claims arising under Federal-Mogul's 7.875% Notes due 2010 shall be deemed Allowed in the aggregate amount of $347,713,437.50;

       (5)     Claims arising under Federal-Mogul's 7.5% Notes due 2004 shall be deemed Allowed in the aggregate amount of $244,500,000.00;

App. 081

(6)    Claims arising under Federal-Mogul's 8.8% Senior Notes due 2007 shall be deemed Allowed in the aggregate amount of $107,663,379.80;

(7)    Claims arising under Federal-Mogul's 8.37% Medium Term Notes due 2001 shall be deemed Allowed in the aggregate amount of $32,788,640.00;

(8)    Claims arising under Federal-Mogul's 8.25% Medium Term Notes due 2005 shall be deemed Allowed in the aggregate amount of $15,364,375.00;

(9)    Claims arising under Federal-Mogul's 8.33% Medium Term Notes due 2001 shall be deemed Allowed in the aggregate amount of $12,294,326.67;

(10)    Claims arising under Federal-Mogul's 8.12% Medium Term Notes due 2003 shall be deemed Allowed in the aggregate amount of $10,239,088.89;

(11)    Claims arising under Federal-Mogul's 8.16% Medium Term Notes due 2003 shall be deemed Allowed in the aggregate amount of $10,240,266.67;

(12)    Claims arising under Federal-Mogul's 8.46% Medium Term Notes due 2002 shall be deemed Allowed in the aggregate amount of $5,124,550.00.

**(b)**    .Treatment: On the Distribution Date, the Disbursing Agent shall issue and deliver to the indenture trustees for the Notes, to be allocated Pro Rata among those indenture trustees based upon the deemed Allowed Amounts of the Claims in Class 1D as set forth above, and for ultimate distribution to or for the account of each Person holding an Allowed Class 1D Claim in accordance with such holder's rights and interests under the applicable Notes and their respective indentures, a Pro Rata portion of the Reorganized Federal-Mogul Class A Common Stock. Such Pro Rata portion to be distributed to each particular indenture trustee shall be determined by multiplying the total number of shares representing such Class A Common Stock times a fraction, the numerator of which equals the Allowed Amount of all Class 1D Claims represented by a particular indenture pertaining to the Notes, and the denominator of which equals the Allowed Amount of all Class 1D, Class 1F Claims, and Class H Claims held by Electing Holders (as defined in Section 8.15.2 of the Plan). If Classes 1D and 1J vote to accept the Plan, and at least one of Classes 1M, 1N or 1O votes to accept the Plan, then Class 1D shall also receive 50% of the Warrants to be issued and distributed under the Plan; provided, however, Class 1D has agreed to distribute any and all such Warrants to the holders of Class 1M, 1N and/or 1O Claims and/or interests in accordance with Sections 3.1.13, 3.1.14 and 3.1.15 of the Plan; provided, further, however, the distribution of the Warrants shall be subject to the requirements of Section 8.3.7 of the Plan.

**(c)**    Adequate Protection Payments: All adequate protection payments to the holders of Class 1D Noteholder Claims authorized under the Final Order approving the DIP Facility shall continue until and cease on the Effective Date and any such adequate protection payments that are unpaid as of the Effective Date will be paid in Cash on the Effective Date. The holders of Class 1D Noteholder Claims shall retain any and all such adequate protection payments made and/or authorized in connection with the DIP Facility without any diminution of the treatment set forth above.

38

(d)    Voting:  Class 1D is impaired and each holder of an Allowed Class 1D Claim is entitled to vote to accept or reject the Plan.

### 3.1.5.    Class 1E – Other Secured Claims

(a)    Classification:  Class 1E consists of all Secured Claims against Federal-Mogul other than Bank Claims, Surety Claims, Noteholder Claims or Bonded Claims.  Each Secured Claim against Federal-Mogul shall constitute a separate sub-class (designated, for example, as Class 1E-1) for purposes of voting and distribution.

(b)    Treatment:  At the option of the Debtor or the Reorganized Debtor and in accordance with Section 1124 of the Bankruptcy Code, all Allowed Secured Claims in Class 1E, and each sub-class thereof, will be treated pursuant to one of the following alternatives: (I) the Plan will leave unaltered the legal, equitable and contractual rights to which each Secured Claim in Class 1E entitles the holder; (II) the Debtor shall cure any default that occurred before or after the Petition Date; the maturity of such Secured Claim shall be reinstated as such maturity existed prior to any such default; the holder of such Secured Claim shall be compensated for any damages incurred as a result of any reasonable reliance by the holder on any right to accelerate its claim; and the legal, equitable and contractual rights of such holder will not otherwise be altered; (III) an Allowed Secured Claim shall receive such other treatment as the Debtor and the holder shall agree; or (IV) all of the collateral for such Secured Claim will be surrendered by the Debtor to the holder of such Claim on the Effective Date or as soon as practicable thereafter.

(c)    Voting:  To the extent any Allowed Secured Claims are treated in the manner set forth in clauses (I), (II), (III) or (IV) of the immediately preceding subsection, Class 1E or the particular sub-class is unimpaired and such holders are not entitled to vote to accept or reject the Plan.

### 3.1.6.    Class 1F – Convertible Subordinated Debenture Claims

(a)    Classification:  Class 1F consists of all Allowed Claims arising under, evidenced by, or based upon the Convertible Subordinated Debentures, which shall be deemed Allowed in the amount that have not been converted prior to the Effective Date or deemed to be converted pursuant to Section 8.3.2 of the Plan; provided, however, to the extent that the beneficiaries of Convertible Subordinated Debentures convert their securities to Federal-Mogul common stock on or before the Record Date or are deemed to have so converted such securities pursuant to Section 8.3.2 of the Plan, then such holders will be treated as holders of Class 1O Federal-Mogul common stock and receive the distribution, if any, to be made on account of such Class 1O Equity Interests under the Plan.

(b)    Treatment:  On the Distribution Date, in full and complete satisfaction of the Allowed Class 1F Claims (including, without limitation, any guarantees related to or arising from the Convertible Subordinated Debentures) the Disbursing Agent shall issue and deliver to the indenture trustee for the Convertible Subordinated Debentures a Pro Rata portion of the Reorganized Federal-Mogul Class A Common Stock, which portion shall be determined by multiplying the total number of shares representing such Class A Common Stock times a fraction, the numerator of which equals the Allowed Amount of all Class 1F Claims, and the

denominator of which equals the Allowed Amount of all Class 1D, Class 1F Claims, and Class H Claims held by Electing Holders (as defined in Section 8.15.2 of the Plan), provided, however, to the extent necessary to comply with the contractual subordination provisions in the indentures for the Convertible Subordinated Debentures, the Disbursing Agent shall hold in trust and cause all distributions allocable to the Allowed Convertible Subordinated Debenture Claims to be paid directly to the applicable Indenture Trustees on behalf of the Allowed Class 1D Noteholder Claims in accordance with the formula set forth in Section 3.1.4(b) of the Plan. Solely for purposes of the Declaration of Trust of Federal-Mogul Financing Trust regarding the Convertible Subordinated Debentures, the bankruptcy of Federal-Mogul shall be deemed to have occurred on the Effective Date, and the Federal-Mogul Financing Trust shall thereupon be deemed dissolved as provided in such Declaration of Trust.

(c)     Voting. Class 1F is impaired and each holder of an Allowed Class 1F Claim is entitled to vote to accept or reject the Plan.

### 3.1.7.     Class 1G – On-Site Environmental Claims

(a)     Classification: Class 1G consists of all On-Site Environmental Claims against Federal-Mogul.

(b)     Treatment: Each holder of an Allowed On-Site Environmental Claim in Class 1G shall retain unaltered the legal, equitable and contractual rights to which such Allowed On-Site Environmental Claim entitles the holder.

(c)     Voting: Class 1G is unimpaired and holders of Class 1G Claims are thus not entitled to vote to accept or reject the Plan.

### 3.1.8.     Class 1H – Unsecured Claims

(a)     Classification: Class 1H consists of all Unsecured Claims against Federal-Mogul, other than any unsecured portion of Noteholder Claims, any unsecured portion of Bonded Asbestos Personal Injury Claims, the Convertible Subordinated Debenture Claims or other Claims specifically included in any other Class.

(b)     Treatment: Subject to Sections 8.15 and 8.24 of the Plan, each holder of an Allowed Class 1H Unsecured Claim shall receive either (i) a total Cash payment equal to 35% of such holder's Allowed Unsecured Claim, with such total amount to be paid in three equal, annual installments, the first of which shall be paid on the Distribution Date and the second and third on the first and second anniversaries of the Distribution Date, respectively, or (ii) based on such holder's election under Section 8.15.2 of the Plan, a Pro Rata share of Reorganized Federal-Mogul Class A Common Stock to be issued and distributed on the Distribution Date.

(c)     Voting: Class 1H is impaired and each holder of an Allowed Class 1H Claim is entitled to vote to accept or reject the Plan.

40

### 3.1.9.    Class 1I – Non-Priority Employee Benefit Claims

(a)    Classification:  Class 1I consists of all Non-Priority Employee Benefit Claims against Federal-Mogul.

(b)    Treatment:  On the Effective Date, Reorganized Federal-Mogul shall continue, automatically and without further act, deed or court order, the Employee Benefit Plans maintained by Federal-Mogul, and each holder of an Allowed Non-Priority Employee Benefit Claim shall retain unaltered the legal, equitable and contractual rights to which such Allowed Non-Priority Employee Benefit Claim entitles such holder.

(c)    Voting:  Class 1I is unimpaired and holders of Class 1I Claims are thus not entitled to vote to accept or reject the Plan.

### 3.1.10.    Class 1J – Asbestos Personal Injury Claims

(a)    Classification:  Class 1J consists of all Asbestos Personal Injury Claims against Federal-Mogul.

(b)    Treatment:  As of the Effective Date, liability for all Class 1J Asbestos Personal Injury Claims shall be automatically and without further act, deed or court order, transferred to, vested in and assumed by the Trust. Each Asbestos Personal Injury Claim in Class 1J shall be addressed solely by the Trust pursuant to and in accordance with the Asbestos Personal Injury Trust Distribution Procedures. If Classes 1D and 1J vote to accept the Plan, and at least one of Classes 1M, 1N or 1O votes to accept the Plan, then Class 1J shall also receive 50% of the Warrants to be issued and distributed under the Plan; provided, however, Class 1J has agreed to distribute any and all such Warrants to the holders of Class 1M, 1N and/or 1O Claims and/or interests in accordance with Sections 3.1.13, 3.1.14 and 3.1.15 of the Plan; provided, further, however, the distribution of the Warrants shall be subject to the requirements of Section 8.3.7 of the Plan.

(c)    Voting:  Class 1J is impaired and each holder of a Class 1J Claim is entitled to vote to accept or reject the Plan.

### 3.1.11.    Class 1K – Bonded Claims

(a)    Classification:  Class 1K consists of all Bonded Claims against Federal-Mogul.

(b)    Treatment:  Each holder of an Allowed Bonded Claim in Class 1K shall retain unaltered the legal, equitable and contractual rights to which such Allowed Bonded Claim entitles the holder.

(c)    Voting:  Class 1K is unimpaired and holders of Class 1K Claims are thus not entitled to vote to accept or reject the Plan.

### 3.1.12.    Class 1L – Affiliate Claims

**(a)**    Classification:  Class 1L consists of all Affiliate Claims against Federal-Mogul Corporation.

**(b)**    Treatment:  On the Effective Date, at the option of the Plan Proponents, all Affiliate Claims in Class 1L shall either be (a) reinstated, in full or in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 1L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against Federal-Mogul.  Any and all Class 1L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non-Affiliate Claims, are set forth in Exhibit 3.1.12 of the Plan.

**(c)**    Voting:  Class 1L is impaired and each holder of an Allowed Class 1L Claim is entitled to vote to accept or reject the Plan.

### 3.1.13.    Class 1M – Federal-Mogul Corporation Preferred Stock

**(a)**    Classification:  Class 1M consists of all shares of the Series C ESOP Convertible Preferred Stock of Federal-Mogul, having a liquidation preference of $63.75 per share, of which there are 439,937 shares outstanding.

**(b)**    Treatment:  All existing shares of outstanding Federal-Mogul preferred stock and all rights related to such stock shall be cancelled, annulled and extinguished on the Effective Date. If Classes 1D, 1J and 1M all vote to accept the Plan, then each holder of Class 1M Equity Interest shall receive, in exchange for and in full satisfaction of its Class 1M Equity Interest, Warrants calculated as follows:  for each outstanding share of Federal-Mogul preferred stock held as of the Record Date, the holder shall receive Warrants in an amount equal to (A)(i) two, divided by (ii) the sum of (a) two times the total number of outstanding shares of Federal-Mogul preferred stock plus (b) the total number of shares of Federal Mogul common stock deemed held by holders of Allowed Class 1N Claims (but only if Class 1N accepts the Plan) plus (c) the total number of outstanding shares of Federal-Mogul common stock, including any shares deemed issued pursuant to Section 8.3.2 of the Plan (but only if Class 1O accepts the Plan), times (B) the total number of Warrants.  If Class 1M rejects the Plan, then no distributions shall be made on account of Class 1M Equity Interests.  Notwithstanding the foregoing or anything to the contrary in the Plan, the distribution of the Warrants shall be subject to the requirements of Section 8.3.7 of the Plan.

**(c)**    Voting: Class 1M is impaired and each holder of an Allowed Class 1M Equity Interest is entitled to vote to accept or reject the Plan.

### 3.1.14.    Class 1N – Subordinated Securities Claims

(a)    Classification:  Class 1N consists of all Subordinated Securities Claims, if any, against Federal-Mogul.

(b)    Treatment:  If Classes 1D, 1J and 1N all vote to accept the Plan, each holder of a Subordinated Securities Claim shall receive, in exchange for and in full satisfaction of its Class 1N Subordinated Securities Claim, its Pro Rata share of any applicable insurance and, with respect to any deficiency, the holder shall receive Warrants calculated as follows: for each share of Federal-Mogul common stock deemed held, the holder shall receive Warrants in an amount equal to (A)(i) one, divided by (ii) the sum of (a) two times the total number of outstanding shares of Federal-Mogul preferred stock (but only if Class 1M accepts the Plan) plus (b) the total number of shares of Federal-Mogul common stock deemed held by holders of Allowed Class 1N Claims plus (c) the total number of outstanding shares of Federal-Mogul common stock, including any shares deemed issued pursuant to Section 8.3.2 of the Plan (but only if Class 1O accepts the Plan), times (B) the total number of Warrants.  For purposes of calculating such distributions of Warrants, the holder of a Subordinated Securities Claim shall be deemed to hold one share of Federal Mogul Corporation common stock for each $28.00 of (i) its Subordinated Securities Claim minus (ii) any insurance proceeds actually received in respect of such Subordinated Securities Claim. If, however, Class 1N rejects the Plan, then no distributions of Warrants shall be made on account of such Class 1N Claims.  Notwithstanding the foregoing or anything to the contrary in the Plan, the distribution of the Warrants shall be subject to the requirements of Section 8.3.7 of the Plan.

(c)    Voting:  Class 1N is impaired and each holder of an Allowed Class 1N Subordinated Securities Claim is entitled to vote to accept or reject the Plan.

### 3.1.15.    Class 1O – Federal-Mogul Corporation Common Stock

(a)    Classification:  Class 1O consists of all outstanding shares of Federal-Mogul common stock, of which there were 89,861,480 shares outstanding as of July 25, 2007, and shall also include up to 1,482,716 additional shares which may be deemed to be issued pursuant to Section 8.3.2 of the Plan.

(b)    Treatment: All existing shares of outstanding Federal-Mogul common stock and all rights related to such stock shall be cancelled, annulled and extinguished on the Effective Date. If Classes 1D, 1J, and 1O all vote to accept the Plan, then each holder of a Class 1O interest shall receive, in exchange for and in full satisfaction of its Class 1O interest, Warrants calculated as follows: for each outstanding share of Federal-Mogul common stock held as of the Record Date, the holder shall receive Warrants in an amount equal to (A)(i) one, divided by (ii) the sum of (a) two times the total number of outstanding shares of Federal-Mogul preferred stock (but only if Class 1M accepts the Plan) plus (b) the total number of shares of Federal-Mogul common stock deemed held by holders of Allowed Class 1N Claims (but only if Class 1N accepts the Plan) plus (c) the total number of outstanding shares of Federal-Mogul Corporation common stock, including shares deemed issued pursuant to Section 8.3.2 of the Plan, times (B) the total number of Warrants.  If Class 1O rejects the Plan, then no distribution shall be made on account of Class 1O interests.  Notwithstanding the foregoing or anything to

43

the contrary in the Plan, the distribution of the Warrants shall be subject to the requirements of Section 8.3.7 of the Plan.

        **(c)**     Voting: Class 1O is impaired and each holder of an Allowed Class 1O Equity Interest is entitled to vote to accept or reject the Plan.

### 3.1.16.    Class 1Q – Cooper Claims

        **(a)**     Classification: Class 1Q consists of all Cooper Claims against Federal-Mogul.

        **(b)**     Treatment: The Class 1Q Cooper Claims shall be treated pursuant to one of the following alternatives: (i) subject to the condition precedent that the Plan A Date and the Date of Finality occur, the Class 1Q Cooper Claims shall be treated as provided in the Plan A Settlement set forth in the Addendum as implemented by Section 8.23 of the Plan, or (ii) if Articles II and III of the Plan B Settlement Agreement become effective pursuant to Section 5.01 of the Plan B Settlement Agreement prior to the Date of Finality, the Class 1Q Cooper Claims shall be treated as provided in the Plan B Settlement Agreement, as implemented by Section 8.22 of the Plan.

        **(c)**     Voting: Class 1Q is impaired. Subject to the terms of the Plan Support Agreement, each holder of a Class 1Q Cooper Claim is entitled to vote to accept or reject the Plan.

### 3.2.    **Federal-Mogul Piston Rings, Inc.** ("FMPRI") (Classes 2A through 2P)

### 3.2.1.    Class 2A – Priority Claims

        **(a)**     Classification: Class 2A consists of all Priority Claims against FMPRI.

        **(b)**     Treatment: On the Distribution Date, each holder of a Class 2A Allowed Priority Claim shall receive either (I) Cash equal to the Allowed Amount of such Priority Claim or (II) such other treatment as may be agreed upon in writing by such holder and Reorganized FMPRI.

        **(c)**     Voting: Class 2A is impaired and the each holder of an Allowed Class 2A Claim is entitled to vote to accept or reject the Plan.

### 3.2.2.    Class 2B – Bank Claims

        **(a)**     Classification: Class 2B consists of all Bank Claims against FMPRI.

        **(b)**     Treatment: On the Effective Date, all Claims and interests arising under or related to any obligation of FMPRI to holders of Bank Claims shall be released, extinguished and discharged. In full and complete satisfaction of all Allowed Class 2B Claims, Claims arising under the Bank Credit Agreement (including certain letter of credit obligations) shall be deemed Allowed in the amount of $1,646,681,464.00 (as adjusted as of the Effective Date to convert any foreign currencies to U.S. dollars) and Reorganized FMPRI shall guarantee on a secured basis

Reorganized Federal-Mogul's obligations under (y) the Reorganized Federal Mogul Secured Term Loan Agreement and (z) the Reorganized Federal Mogul Junior Secured PIK Notes.

(c)     Voting:  Class 2B is impaired and each holder of an Allowed Class 2B Claim is entitled to vote to accept or reject the Plan.

### 3.2.3.    Class 2C – Surety Claims

(a)     Classification:  Class 2C consists of all Surety Claims against FMPRI.

(b)     Treatment:  On the Effective Date, all Claims and interests arising under or related to any indemnity contract or guarantee between FMPRI and any of the Sureties relating to the CCR Surety Bonds, if any, and all Liens on any property of FMPRI in favor of the Sureties, shall be released, extinguished and discharged.  In full and complete satisfaction of all Allowed Class 2C Surety Claims, Claims of any of the Sureties relating to the CCR Surety Bonds shall be deemed Allowed in the amount of $28,000,000 and FMPRI shall guarantee on a secured basis Reorganized Federal-Mogul's obligations under (y) the Reorganized Federal Mogul Secured Term Loan Agreement and (z) the Reorganized Federal Mogul Junior Secured PIK Notes.

(c)     Voting:  Class 2C is impaired and, subject to the terms of the Surety Claims Settlement Agreement, each holder of an Allowed Class 2C Claim is entitled to vote to accept or reject the Plan.

### 3.2.4.    Class 2D – Noteholder Claims

(a)     Classification:  Class 2D consists of all Secured and unsecured Noteholder Claims against FMPRI.

(b)     Treatment:  On the Effective Date, all Claims arising under FMPRI's guaranty of the Noteholder Claims shall be released, extinguished and discharged.  In consideration of the treatment accorded Class 1D, holders of Class 2D Noteholder Claims shall receive no additional distribution under the Plan on account of such Class 2D Noteholder Claims.

(c)     Voting:  Class 2D is impaired and each holder of an Allowed Class 2D Claim is entitled to vote to accept or reject the Plan.

### 3.2.5.    Class 2E – Other Secured Claims

(a)     Classification:  Class 2E consists of all Secured Claims against FMPRI other than Bank Claims, Surety Claims, Noteholder Claims or Bonded Claims.  Each Secured Claim against FMPRI shall constitute a separate sub-class (designated, for example, as Class 2E-1) for purposes of voting and distribution.

(b)     Treatment:  At the option of the Debtor or the Reorganized Debtor and in accordance with Section 1124 of the Bankruptcy Code, all Allowed Secured Claims in Class 2E, and each sub-class thereof, will be treated pursuant to one of the following alternatives: (I) the

45

Plan will leave unaltered the legal, equitable and contractual rights to which each Secured Claim in Class 2E entitles the holder; (II) the Debtor shall cure any default that occurred before or after the Petition Date; the maturity of such Secured Claim shall be reinstated as such maturity existed prior to any such default; the holder of such Secured Claim shall be compensated for any damages incurred as a result of any reasonable reliance by the holder on any right to accelerate its claim; and the legal, equitable and contractual rights of such holder will not otherwise be altered; (III) an Allowed Secured Claim shall receive such other treatment as the Debtor and the holder shall agree; or (IV) all of the collateral for such Secured Claim will be surrendered by the Debtor to the holder of such Claim on the Effective Date or as soon as practicable thereafter.

     **(c)**     Voting:  To the extent any Allowed Secured Claims are treated in the manner set forth in clauses (I), (II), (III) or (IV) of the immediately preceding subsection, Class 2E or the particular sub-class is unimpaired and such holders are not entitled to vote to accept or reject the Plan.

### 3.2.6.     Class 2G – On-Site Environmental Claims

     **(a)**     Classification:  Class 2G consists of all On-Site Environmental Claims against FMPRI.

     **(b)**     Treatment:  Each holder of an Allowed On-Site Environmental Claim in Class 2G shall retain unaltered the legal, equitable and contractual rights to which such Allowed On-Site Environmental Claim entitles the holder.

     **(c)**     Voting:  Class 2G is unimpaired and holders of Allowed Class 2G Claims are thus not entitled to vote to accept or reject the Plan.

### 3.2.7.     Class 2H – Unsecured Claims

     **(a)**     Classification:  Class 2H consists of all Unsecured Claims against FMPRI other than any unsecured portion of Noteholder Claims, any unsecured portion of Bonded Asbestos Personal Injury Claims or other Claims specifically included in any other Class.

     **(b)**     Treatment: Subject to Sections 8.15 and 8.24 of the Plan, each holder of an Allowed Class 2H Unsecured Claim shall receive either (i) a total Cash payment equal to 35% of such holder's Allowed Unsecured Claim, with such total amount to be paid in three equal, annual installments, the first of which shall be paid on the Distribution Date and the second and third on the first and second anniversaries of the Distribution Date, respectively, or (ii) based on such holder's election under Section 8.15.2 of the Plan, a Pro Rata share of Reorganized Federal-Mogul Class A Common Stock to be issued and distributed on the Distribution Date.

     **(c)**     Voting:  Class 2H is impaired and each holder of an Allowed Class 2H Claim is entitled to vote to accept or reject the Plan.

### 3.2.8.     Class 2I – Non-Priority Employee Benefit Claims

     **(a)**     Classification:  Class 2I consists of all Non-Priority Employee Benefit Claims against FMPRI.

**(b)**    Treatment: On the Effective Date, Reorganized FMPRI shall continue, automatically and without further act, deed or court order, the Employee Benefit Plans maintained by FMPRI, and each holder of an Allowed Class 2I Non-Priority Employee Benefit Claim shall retain unaltered the legal, equitable and contractual rights to which such Allowed Non-Priority Employee Benefit Claim entitles such holder.

**(c)**    Voting: Class 2I is unimpaired and holders of Allowed Class 2I Claims are thus not entitled to vote to accept or reject the Plan.

### 3.2.9.    Class 2K – Bonded Claims

**(a)**    Classification: Class 2K consists of all Bonded Claims against FMPRI.

**(b)**    Treatment: Each holder of an Allowed Bonded Claim in Class 2K shall retain unaltered the legal, equitable and contractual rights to which such Allowed Bonded Claim entitles the holder.

**(c)**    Voting: Class 2K is unimpaired and holders of Allowed Class 2K Claims are thus not entitled to vote to accept or reject the Plan.

### 3.2.10.    Class 2L – Affiliate Claims

**(a)**    Classification: Class 2L consists of all Affiliate Claims against FMPRI.

**(b)**    Treatment: On the Effective Date, at the option of the Plan Proponents, all Affiliate Claims in Class 2L shall either be (a) reinstated, in full or in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any such Class 2L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMPRI. Any and all Class 2L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non-Affiliate Claims, are set forth in Exhibit 3.1.12.

**(c)**    Voting: Class 2L is impaired and each holder of an Allowed Class 2L Claim is entitled to vote to accept or reject the Plan.

### 3.2.11.    Class 2N – Subordinated Securities Claims

**(a)**    Classification: Class 2N consists of all Subordinated Securities Claims against FMPRI.

**(b)**    Treatment: No distributions shall be made on account of Subordinated Securities Claims against FMPRI. All such Claims against FMPRI shall be discharged and extinguished on the Effective Date.

(c)     Voting: Class 2N is impaired and does not receive or retain any property under the Plan. Accordingly, the holders of Class 2N Claims are conclusively presumed to reject the Plan and the votes of such holders will not be solicited.

### 3.2.12.    Class 2P – Equity Interests

(a)     Classification: Class 2P consists of all Equity Interests in FMPRI.

(b)     Treatment: Each holder of an Allowed Equity Interest in Class 2P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)     Voting: Class 2P is unimpaired and holders of Class 2P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.3.    Federal-Mogul Powertrain, Inc. ("FMPI") (Classes 3A through 3P)

### 3.3.1.    Class 3A – Priority Claims

(a)     Classification: Class 3A consists of all Priority Claims against FMPI.

(b)     Treatment: On the Distribution Date, each holder of a Class 3A Allowed Priority Claim shall receive either (I) Cash equal to the Allowed Amount of such Priority Claim or (II) such other treatment as may be agreed upon in writing by such holder and Reorganized FMPI.

(c)     Voting: Class 3A is impaired and each holder of an Allowed Class 3A Claim is entitled to vote to accept or reject the Plan.

### 3.3.2.    Class 3B – Bank Claims

(a)     Classification: Class 3B consists of all Bank Claims against FMPI.

(b)     Treatment: On the Effective Date, all Claims and interests arising under or related to any obligation of FMPI to holders of Bank Claims shall be released, extinguished and discharged. In full and complete satisfaction of the Allowed Class 3B Claims, Claims arising under the Bank Credit Agreement (including certain letter of credit obligations) shall be deemed Allowed in the amount of $1,646,681,464.00 (as adjusted as of the Effective Date to convert any foreign currencies to U.S. dollars) and FMPI shall guarantee on a secured basis Reorganized Federal-Mogul's obligations under (y) the Reorganized Federal Mogul Secured Term Loan Agreement and (z) the Reorganized Federal Mogul Junior Secured PIK Notes.

(c)     Voting: Class 3B is impaired and each holder of an Allowed Class 3B Claim is entitled to vote to accept or reject the Plan.

### 3.3.3.    Class 3C – Surety Claims

(a)     Classification: Class 3C consists of all Surety Claims against FMPI.

48

(b)    Treatment: On the Effective Date, all Claims and interests arising under or related to any indemnity contract or guarantee between FMPI and any of the Sureties relating to the CCR Surety Bonds, if any, and all Liens on any property of FMPI in favor of the Sureties, shall be released, extinguished and discharged. In full and complete satisfaction of all Allowed Class 3C Surety Claims, Claims of any of the Sureties relating to the CCR Surety Bonds shall be deemed Allowed in the amount of $28,000,000 and FMPI shall guarantee on a secured basis Reorganized Federal-Mogul's obligations under (y) the Reorganized Federal Mogul Secured Term Loan Agreement and (z) the Reorganized Federal Mogul Junior Secured PIK Notes.

(c)    Voting: Class 3C is impaired and, subject to the terms of the Surety Claims Settlement Agreement, each holder of an Allowed Class 3C Claim is entitled to vote to accept or reject the Plan.

### 3.3.4.    Class 3D – Noteholder Claims

(a)    Classification: Class 3D consists of all Secured and unsecured Noteholder Claims against FMPI.

(b)    Treatment: On the Effective Date, all Claims arising under FMPI's guaranty of the Noteholder Claims shall be released, extinguished and discharged. In consideration of the treatment accorded Class 1D, holders of Class 3D Noteholder Claims shall receive no additional distribution under the Plan on account of such Class 3D Noteholder Claims.

(c)    Voting: Class 3D is impaired and each holder of an Allowed Class 3D Claim is entitled to vote to accept or reject the Plan.

### 3.3.5.    Class 3E – Other Secured Claims

(a)    Classification: Class 3E consists of all Secured Claims against FMPI other than Bank Claims, Surety Claims, Noteholder Claims or Bonded Claims. Each Secured Claim against FMPI shall constitute a separate sub-class (designated, for example, as Class 3E-1) for purposes of voting and distribution.

(b)    Treatment: At the option of the Debtor or the Reorganized Debtor and in accordance with Section 1124 of the Bankruptcy Code, all Allowed Secured Claims in Class 3E, and each sub-class thereof, will be treated pursuant to one of the following alternatives: (I) the Plan will leave unaltered the legal, equitable and contractual rights to which each Secured Claim in Class 3E entitles the holder; (II) the Debtor shall cure any default that occurred before or after the Petition Date; the maturity of such Secured Claim shall be reinstated as such maturity existed prior to any such default; the holder of such Secured Claim shall be compensated for any damages incurred as a result of any reasonable reliance by the holder on any right to accelerate its claim; and the legal, equitable and contractual rights of such holder will not otherwise be altered; (III) an Allowed Secured Claim shall receive such other treatment as the Debtor and the holder shall agree; or (IV) all of the collateral for such Secured Claim will be surrendered by the Debtor to the holder of such Claim on the Effective Date or as soon as practicable thereafter.

(c)    Voting:  To the extent any Allowed Secured Claims are treated in the manner set forth in clauses (I), (II), (III) or (IV) of the immediately preceding subsection, Class 3E or the particular sub-class is unimpaired and such holders are not entitled to vote to accept or reject the Plan.

### 3.3.6.    Class 3G – On-Site Environmental Claims

(a)    Classification:  Class 3G consists of all On-Site Environmental Claims against FMPI.

(b)    Treatment:  Each holder of an Allowed On-Site Environmental Claim in Class 3G shall retain unaltered the legal, equitable and contractual rights to which such Allowed On-Site Environmental Claim entitles the holder.

(c)    Voting:  Class 3G is unimpaired and holders of Allowed Class 3G Claims are thus not entitled to vote to accept or reject the Plan.

### 3.3.7.    Class 3H – Unsecured Claims

(a)    Classification:  Class 3H consists of all Unsecured Claims against FMPI other than any unsecured portion of Noteholder Claims, any unsecured portion of Bonded Asbestos Personal Injury Claims, or other Claims specifically included in any other Class.

(b)    Treatment: Subject to Sections 8.15 and 8.24 of the Plan, each holder of an Allowed Class 3H Unsecured Claim shall receive either (i) a total Cash payment equal to 35% of such holder's Allowed Unsecured Claim, with such total amount to be paid in three equal, annual installments, the first of which shall be paid on the Distribution Date and the second and third on the first and second anniversaries of the Distribution Date, respectively, or (ii) based on such holder's election under Section 8.15.2 of the Plan, a Pro Rata share of Reorganized Federal-Mogul Class A Common Stock to be issued and distributed on the Distribution Date.

(c)    Voting:  Class 3H is impaired and each holder of an Allowed Class 3H Claim is entitled to vote to accept or reject the Plan.

### 3.3.8.    Class 3I – Non-Priority Employee Benefit Claims

(a)    Classification:  Class 3I consists of all Non-Priority Employee Benefit Claims against FMPI.

(b)    Treatment:  On the Effective Date, Reorganized FMPI shall continue, automatically and without further act, deed or court order, the Employee Benefit Plans maintained by FMPI, and each holder of an Allowed Class 3I Non-Priority Employee Benefit Claim shall retain unaltered the legal, equitable and contractual rights to which such Allowed Non-Priority Employee Benefit Claim entitles such holder.

(c)    Voting:  Class 3I is unimpaired and holders of Class 3I Claims are thus not entitled to vote to accept or reject the Plan.

### 3.3.9.    Class 3K – Bonded Claims

(a)    Classification:  Class 3K consists of all Bonded Claims against FMPI.

(b)    Treatment:  Each holder of an Allowed Bonded Claim in Class 3K shall retain unaltered the legal, equitable and contractual rights to which such Allowed Bonded Claim entitles the holder.

(c)    Voting:  Class 3K is unimpaired and holders of Class 3K Claims are thus not entitled to vote to accept or reject the Plan.

### 3.3.10.    Class 3L – Affiliate Claims

(a)    Classification:  Class 3L consists of all Affiliate Claims against FMPI.

(b)    Treatment: On the Effective Date, at the option of the Plan Proponents, all Affiliate Claims in Class 3L shall either be (a) reinstated, in full or in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 3L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMPI.  Any and all Class 3L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non-Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)    Voting:  Class 3L is impaired and each holder of an Allowed Class 3L Claim is entitled to vote to accept or reject the Plan.

### 3.3.11.    Class 3P – Equity Interests

(a)    Classification:  Class 3P consists of all Equity Interests in FMPI.

(b)    Treatment:  Each holder of an Allowed Equity Interest in Class 3P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting:  Class 3P is unimpaired and holders of Class 3P Equity Interests are thus not entitled to vote to accept or reject the Plan.

## 3.4.    Federal-Mogul Ignition Company ("FMIC") (Classes 4A through 4P)

### 3.4.1.    Class 4A – Priority Claims

(a)    Classification:  Class 4A consists of all Priority Claims against FMIC.

51

**(b)**     Treatment:  On the Distribution Date, each holder of a Class 4A Allowed Priority Claim shall receive either (I) Cash equal to the Allowed Amount of such Priority Claim or (II) such other treatment as may be agreed upon in writing by such holder and Reorganized FMIC.

**(c)**     Voting:  Class 4A is impaired and each holder of an Allowed Class 4A Claim is entitled to vote to accept or reject the Plan.

### 3.4.2.     Class 4B – Bank Claims

**(a)**     Classification:  Class 4B consists of all Bank Claims against FMIC.

**(b)**     Treatment:  On the Effective Date, all Claims and interests arising under or related to any obligation of FMIC to holders of Bank Claims shall be released, extinguished and discharged.  In full and complete satisfaction of all Allowed Class 4B Claims, Claims arising under the Bank Credit Agreement (including certain letter of credit obligations) shall be deemed Allowed in the amount of $1,646,681,464.00 (as adjusted as of the Effective Date to convert any foreign currencies to U.S. dollars) and FMIC shall guarantee on a secured basis Reorganized Federal-Mogul's obligations under (y) the Reorganized Federal Mogul Secured Term Loan Agreement and (z) the Reorganized Federal Mogul Junior Secured PIK Notes.

**(c)**     Voting:  Class 4B is impaired and each holder of an Allowed Class 4B Claim is entitled to vote to accept or reject the Plan.

### 3.4.3.     Class 4C – Surety Claims

**(a)**     Classification:  Class 4C consists of all Surety Claims against FMIC.

**(b)**     Treatment:  On the Effective Date, all Claims and interests arising under or related to any indemnity contract or guarantee between FMIC and any of the Sureties relating to the CCR Surety Bonds, if any, and all Liens on any property of FMIC in favor of the Sureties, shall be released, extinguished and discharged.  In full and complete satisfaction of all Allowed Class 4C Surety Claims, Claims of any of the Sureties relating to the CCR Surety Bonds shall be deemed Allowed in the amount of $28,000,000 and FMIC shall guarantee on a secured basis Reorganized Federal-Mogul's obligations under (y) the Reorganized Federal Mogul Secured Term Loan Agreement and (z) the Reorganized Federal Mogul Junior Secured PIK Notes.

**(c)**     Voting:  Class 4C is impaired and, subject to the terms of the Surety Claims Settlement Agreement, each holder of an Allowed Class 4C Claim is entitled to accept or reject the Plan.

### 3.4.4.     Class 4D – Noteholder Claims

**(a)**     Classification:  Class 4D consists of all Secured and unsecured Noteholder Claims against FMIC.

**(b)**     Treatment:  On the Effective Date, all Claims arising under FMIC's guaranty of the Noteholder Claims shall be released, extinguished and discharged.  In

52

consideration of the treatment accorded Class 1D, holders of Class 4D Noteholder Claims shall receive no additional distribution under the Plan on account of such Class 4D Noteholder Claims.

     **(c)**     Voting:  Class 4D is impaired and each holder of an Allowed Class 4D Claim is entitled to vote to accept or reject the Plan.

### 3.4.5.     Class 4E – Other Secured Claims

     **(a)**     Classification:  Class 4E consists of all Secured Claims against FMIC other than Bank Claims, Surety Claims, Noteholder Claims or Bonded Claims.  Each Secured Claim against FMIC shall constitute a separate sub-class (designated, for example, as Class 4E-1) for purposes of voting and distribution.

     **(b)**     Treatment:  At the option of the Debtor or the Reorganized Debtor and in accordance with Section 1124 of the Bankruptcy Code, all Allowed Secured Claims in Class 4E, and each sub-class thereof, will be treated pursuant to one of the following alternatives: (I) the Plan will leave unaltered the legal, equitable and contractual rights to which each Secured Claim in Class 4E entitles the holder; (II) the Debtor shall cure any default that occurred before or after the Petition Date; the maturity of such Secured Claim shall be reinstated as such maturity existed prior to any such default; the holder of such Secured Claim shall be compensated for any damages incurred as a result of any reasonable reliance by the holder on any right to accelerate its claim; and the legal, equitable and contractual rights of such holder will not otherwise be altered; (III) an Allowed Secured Claim shall receive such other treatment as the Debtor and the holder shall agree; or (IV) all of the collateral for such Secured Claim will be surrendered by the Debtor to the holder of such Claim on the Effective Date or as soon as practicable thereafter.

     **(c)**     Voting:  To the extent any Allowed Secured Claims are treated in the manner set forth in clauses (I), (II), (III) or (IV) of the immediately preceding subsection, Class 4E or the particular sub-class is unimpaired and such holders are not entitled to vote to accept or reject the Plan.

### 3.4.6.     Class 4G – On-Site Environmental Claims

     **(a)**     Classification:  Class 4G consists of all On-Site Environmental Claims against FMIC.

     **(b)**     Treatment:  Each holder of an Allowed On-Site Environmental Claim in Class 4G shall retain unaltered the legal, equitable and contractual rights to which such Allowed On-Site Environmental Claim entitles the holder.

     **(c)**     Voting:  Class 4G is unimpaired and holders of Class 4G Claims are thus not entitled to vote to accept or reject the Plan.

### 3.4.7.    Class 4H – Unsecured Claims

**(a)**    Classification:  Class 4H consists of all Unsecured Claims against FMIC other than any unsecured portion of Noteholder Claims, any unsecured portion of Bonded Asbestos Personal Injury Claims, or other Claims specifically included in any other Class.

**(b)**    Treatment: Subject to Sections 8.15 and 8.24 of the Plan, each holder of an Allowed Class 4H Unsecured Claim shall receive either (i) a total Cash payment equal to 35% of such holder's Allowed Unsecured Claim, with such total amount to be paid in three equal, annual installments, the first of which shall be paid on the Distribution Date and the second and third on the first and second anniversaries of the Distribution Date, respectively, or (ii) based on such holder's election under Section 8.15.2 of the Plan, a Pro Rata share of Reorganized Federal-Mogul Class A Common Stock to be issued and distributed on the Distribution Date.

**(c)**    Voting:  Class 4H is impaired and each holder of an Allowed Class 4H Claim is entitled to vote to accept or reject the Plan.

### 3.4.8.    Class 4I – Non-Priority Employee Benefit Claims

**(a)**    Classification:  Class 4I consists of all Non-Priority Employee Benefit Claims against FMIC.

**(b)**    Treatment:  On the Effective Date, Reorganized FMIC shall continue, automatically and without further act, deed or court order, the Employee Benefit Plans maintained by FMIC, and each holder of an Allowed Class 4I Non-Priority Employee Benefit Claim shall retain unaltered the legal, equitable and contractual rights to which such Allowed Non-Priority Employee Benefit Claim entitles such holder.

**(c)**    Voting:  Class 4I is unimpaired and holders of Class 4I Claims are thus not entitled to vote to accept or reject the Plan.

### 3.4.9.    Class 4K – Bonded Claims

**(a)**    Classification:  Class 4K consists of all Bonded Claims against FMIC.

**(b)**    Treatment:  Each holder of an Allowed Bonded Claim in Class 4K shall retain unaltered the legal, equitable and contractual rights to which such Allowed Bonded Claim entitles the holder.

**(c)**    Voting:  Class 4K is unimpaired and holders of Class 4K Claims are thus not entitled to vote to accept or reject the Plan.

### 3.4.10.    Class 4L – Affiliate Claims

**(a)**    Classification:  Class 4L consists of all Affiliate Claims against FMIC.

**(b)**    Treatment:  On the Effective Date, at the option of the Plan Proponents, all Affiliate Claims in Class 4L shall either be (a) reinstated, in full or in part, or (b) discharged and

extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any such Class 4L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMIC. Any and all Class 4L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non-Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)     Voting: Class 4L is impaired and each holder of an Allowed Class 4L Claim is entitled to vote to accept or reject the Plan.

### 3.4.11.    Class 4P – Equity Interests

(a)     Classification: Class 4P consists of all Equity Interests in FMIC.

(b)     Treatment: Each holder of an Allowed Equity Interest in Class 4P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)     Voting: Class 4P is unimpaired and holders of Class 4P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.5.    Federal-Mogul Products, Inc. ("FMP") (Classes 5A through 5P)

### 3.5.1.    Class 5A – Priority Claims

(a)     Classification: Class 5A consists of all Priority Claims against FMP.

(b)     Treatment: On the Distribution Date, each holder of a Class 5A Allowed Priority Claim shall receive either (I) Cash equal to the Allowed Amount of such Priority Claim or (II) such other treatment as may be agreed upon in writing by such holder and Reorganized FMP.

(c)     Voting: Class 5A is impaired and each holder of an Allowed Class 5A Claim is entitled to vote to accept or reject the Plan.

### 3.5.2.    Class 5B –Bank Claims

(a)     Classification: Class 5B consists of all Bank Claims against FMP.

(b)     Treatment: On the Effective Date, all Claims and interests arising under or related to any obligation of FMP to holders of Bank Claims shall be released, extinguished and discharged. In full and complete satisfaction of all Allowed Class 5B Bank Claims, Claims arising under the Bank Credit Agreement (including certain letter of credit obligations) shall be deemed Allowed in the amount of $1,646,681,464.00 (as adjusted as of the Effective Date to

convert any foreign currencies to U.S. dollars) and FMP shall guarantee on a secured basis Reorganized Federal-Mogul's obligations under (y) the Reorganized Federal Mogul Secured Term Loan Agreement and (z) the Reorganized Federal Mogul Junior Secured PIK Notes.

(c)    Voting:  Class 5B is impaired and each holder of an Allowed Class 5B Claim is entitled to vote to accept or reject the Plan.

### 3.5.3.    Class 5C – Surety Claims

(a)    Classification:  Class 5C consists of all Surety Claims against FMP.

(b)    Treatment:  On the Effective Date, all Claims and interests arising under or related to any indemnity contract or guarantee between FMP and any of the Sureties relating to the CCR Surety Bonds, if any, and all Liens on any property of FMP in favor of the Sureties, shall be released, extinguished and discharged.  In full and complete satisfaction of all Allowed Class 5C Surety Claims, Claims of any of the Sureties relating to the CCR Surety Bonds shall be deemed Allowed in the amount of $28,000,000 and FMP shall guarantee on a secured basis Reorganized Federal-Mogul's obligations under (y) the Reorganized Federal Mogul Secured Term Loan Agreement and (z) the Reorganized Federal Mogul Junior Secured PIK Notes.

(c)    Voting:  Class 5C is impaired and, subject to the terms of the Surety Claims Settlement Agreement, each holder of an Allowed Class 5C Claim is entitled to vote to accept or reject the Plan.

### 3.5.4.    Class 5D – Noteholder Claims

(a)    Classification:  Class 5D consists of all Secured and unsecured Noteholder Claims against FMP.

(b)    Treatment:  On the Effective Date, all Claims arising under FMP's guaranty of the Noteholder Claims shall be released, extinguished and discharged.  In consideration of the treatment accorded Class 1D, holders of Class 5D Noteholder Claims shall receive no additional distribution under the Plan on account of such Class 5D Noteholder Claims.

(c)    Voting:  Class 5D is impaired and each holder of an Allowed Class 5D Claim is entitled to vote to accept or reject the Plan.

### 3.5.5.    Class 5E – Other Secured Claims

(a)    Classification:  Class 5E consists of all Secured Claims against FMP other than Bank Claims, Surety Claims, Noteholder Claims or Bonded Claims.  Each Secured Claim against FMP shall constitute a separate sub-class (designated, for example, as Class 5E-1) for purposes of voting and distribution.

(b)    Treatment:  At the option of the Debtor or the Reorganized Debtor and in accordance with Section 1124 of the Bankruptcy Code, all Allowed Secured Claims in Class 5E, and each sub-class thereof, will be treated pursuant to one of the following alternatives: (I) the

Plan will leave unaltered the legal, equitable and contractual rights to which each Secured Claim in Class 5E entitles the holder; (II) the Debtor shall cure any default that occurred before or after the Petition Date; the maturity of such Secured Claim shall be reinstated as such maturity existed prior to any such default; the holder of such Secured Claim shall be compensated for any damages incurred as a result of any reasonable reliance by the holder on any right to accelerate its claim; and the legal, equitable and contractual rights of such holder will not otherwise be altered; (III) an Allowed Secured Claim shall receive such other treatment as the Debtor and the holder shall agree; or (IV) all of the collateral for such Secured Claim will be surrendered by the Debtor to the holder of such Claim on the Effective Date or as soon as practicable thereafter.

(c)    Voting:  To the extent any Allowed Secured Claims are treated in the manner set forth in clauses (I), (II), (III) or (IV) of the immediately preceding subsection, Class 5E or the particular sub-class is unimpaired and such holders are not entitled to vote to accept or reject the Plan.

### 3.5.6.    Class 5G – On-Site Environmental Claims

(a)    Classification:  Class 5G consists of all On-Site Environmental Claims against FMP.

(b)    Treatment:  Each holder of an Allowed On-Site Environmental Claim in Class 5G shall retain unaltered the legal, equitable and contractual rights to which such Allowed On-Site Environmental Claim entitles the holder.

(c)    Voting:  Class 5G is unimpaired and holders of Class 5G Claims are thus not entitled to vote to accept or reject the Plan.

### 3.5.7.    Class 5H – Unsecured Claims

(a)    Classification:  Class 5H consists of all Unsecured Claims against FMP other than any unsecured portion of Noteholder Claims, any unsecured portion of Bonded Asbestos Personal Injury Claims or other Claims specifically included in any other Class.

(b)    Treatment: Subject to Sections 8.15 and 8.24 of the Plan, each holder of an Allowed Class 5H Unsecured Claim shall receive either (i) a total Cash payment equal to 35% of such holder's Allowed Unsecured Claim, with such total amount to be paid in three equal, annual installments, the first of which shall be paid on the Distribution Date and the second and third on the first and second anniversaries of the Distribution Date, respectively, or (ii) based on such holder's election under Section 8.15.2 of the Plan, a Pro Rata share of Reorganized Federal-Mogul Class A Common Stock to be issued and distributed on the Distribution Date.

(c)    Voting:  Class 5H is impaired and each holder of an Allowed Class 5H Claim is entitled to vote to accept or reject the Plan.

### 3.5.8.    Class 5I – Non-Priority Employee Benefit Claims

(a)    Classification:  Class 5I consists of all Non-Priority Employee Benefit Claims against FMP.

57

**(b)**    Treatment:  On the Effective Date, Reorganized FMP shall continue, automatically and without further act, deed or court order, the Employee Benefit Plans maintained by FMP, and each holder of an Allowed Class 5I Non-Priority Employee Benefit Claim shall retain unaltered the legal, equitable and contractual rights to which such Allowed Non-Priority Employee Benefit Claim entitles such holder.

**(c)**    Voting:  Class 5I is unimpaired and holders of Class 5I Claims are thus not entitled to vote to accept or reject the Plan.

### 3.5.9.    Class 5J – Asbestos Personal Injury Claims

**(a)**    Classification:  Class 5J consists of all Asbestos Personal Injury Claims against FMP.

**(b)**    Treatment:  As of the Effective Date, liability for all Class 5J Asbestos Personal Injury Claims shall be automatically and without further act, deed or court order, transferred to, vested in and assumed by the Trust.  Each Asbestos Personal Injury Claim in Class 5J shall be addressed solely by the Trust pursuant to and in accordance with the Asbestos Personal Injury Trust Distribution Procedures.

**(c)**    Voting:  Class 5J is impaired and each holder of a Class 5J Claim is entitled to vote to accept or reject the Plan.

### 3.5.10.    Class 5K – Bonded Claims

**(a)**    Classification:  Class 5K consists of all Bonded Claims against FMP.

**(b)**    Treatment:  Each holder of an Allowed Bonded Claim in Class 5K shall retain unaltered the legal, equitable and contractual rights to which such Allowed Bonded Claim entitles the holder.

**(c)**    Voting:  Class 5K is unimpaired and holders of Class 5K Claims are thus not entitled to vote to accept or reject the Plan.

### 3.5.11.    Class 5L - Affiliate Claims

**(a)**    Classification:  Class 5L consists of all Affiliate Claims against FMP.

**(b)**    Treatment: On the Effective Date, at the option of the Plan Proponents, all Affiliate Claims in Class 5L shall either be (a) reinstated, in full or in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 5L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMP.  Any and all Class 5L Claims, or portions thereof, being reinstated and, to

the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)    Voting:  Class 5L is impaired and each holder of an Allowed Class 5L Claim is entitled to vote to accept or reject the Plan.

### 3.5.12.    Class 5P – Equity Interests

(a)    Classification:  Class 5P consists of all Equity Interests in FMP.

(b)    Treatment:  Each holder of an Allowed Equity Interest in Class 5P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting:  Class 5P is unimpaired and holders of Class 5P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.5.13.    Class 5Q – Pneumo Parties Claims

(a)    Classification:  Class 5Q consists of all Pneumo Parties Claims against FMP.

(b)    Treatment:  The Class 5Q Pneumo Parties Claims shall be treated pursuant to one of the following alternatives:  (i) subject to the condition precedent that the Plan A Date and the Date of Finality occur, the Class 5Q Pneumo Parties Claims shall be treated as provided in the Plan A Settlement set forth in the Addendum as implemented by Section 8.23 of the Plan, or (ii) if Articles II and III of the Plan B Settlement Agreement become effective pursuant to Section 5.01 of the Plan B Settlement Agreement prior to the Date of Finality, the Class 5Q Pneumo Parties Claims shall be treated as provided in the Plan B Settlement Agreement, as implemented by Section 8.22 of the Plan.

(c)    Voting:  Class 5Q is impaired.  Subject to the terms of the Plan Support Agreement, each holder of a Class 5Q Pneumo Parties Claim is entitled to vote to accept or reject the Plan.

### 3.6.    T&N Limited ("T&N") (Classes 6A – 6P)

### 3.6.1.    Class 6A – Priority Claims

(a)    Classification:  Class 6A consists of all Priority Claims against T&N. Class 6A Priority Claims shall include, without limitation, all Priority Claims against other U.K. Debtors for which T&N is liable under applicable non-bankruptcy law as a result of agency agreements entered into with such Affiliate prior to the Petition Date; provided, however, to ensure that there shall be no double recovery to any holder on account of the inclusion in Class 6A of any Priority Claim against T&N as a result of such agency agreements, such holder shall be required to make an election as to whether such Priority Claim shall be asserted against T&N as principal, or against the relevant Affiliate of T&N which was acting as the agent of T&N.

59

**(b)** Treatment: Each holder of an Allowed Class 6A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

**(c)** Voting: Class 6A is unimpaired and holders of Class 6A Claims are thus not entitled to vote to accept or reject the Plan.

### 3.6.2. Class 6C – Surety Claims

**(a)** Classification: Class 6C consists of all Surety Claims against T&N.

**(b)** Treatment: On the Effective Date, all Claims and interests arising under or related to any indemnity contract or guarantee between T&N and any of the Sureties relating to the CCR Surety Bonds, if any, shall be released, extinguished and discharged. In full and complete satisfaction of all Allowed Class 6C Surety Claims, Claims of any of the Sureties relating to the CCR Surety Bonds shall be deemed Allowed in the amount of $28,000,000 and T&N shall guarantee on an unsecured basis Reorganized Federal-Mogul's obligations under (y) the Reorganized Federal Mogul Secured Term Loan Agreement and (z) the Reorganized Federal Mogul Junior Secured PIK Notes.

**(c)** Voting: Class 6C is impaired and, subject to the terms of the Surety Claims Settlement Agreement, each holder of an Allowed Class 6C Claim is entitled to vote to accept or reject the Plan.

### 3.6.3. Class 6E – Other Secured Claims

**(a)** Classification: Class 6E consists of all Secured Claims against T&N other than Bonded Claims. Each Secured Claim against T&N shall constitute a separate sub-class (designated, for example, as Class 6E-1) for purposes of voting and distribution.

**(b)** Treatment: In accordance with Section 1124 of the Bankruptcy Code, the Plan will leave unaltered the legal, equitable and contractual rights to which each Allowed Secured Claim in Class 6E entitles the holder.

**(c)** Voting: Class 6E or the particular sub-class is unimpaired, and holders of Claims in such Class or sub-class are thus not entitled to vote to accept or reject the Plan.

### 3.6.4. Class 6H – Unsecured Claims

**(a)** Classification: Class 6H consists of all Unsecured Claims against T&N other than any Claims that are specifically included in any other Class. Class 6H shall also expressly include, without limitation, all Unsecured Claims against other U.K. Debtors or non-Debtor Affiliates of T&N for which T&N is liable under applicable non-bankruptcy law as a result of agency agreements entered into with such Affiliate prior to the Petition Date; provided, however, that to ensure that there shall be no double recovery to any holder on account of the inclusion in Class 6H of any Claim against T&N as a result of any such agency agreements, such holder shall be required to make an election as to whether such Claim shall be asserted against T&N as principal, or against the relevant Affiliate of T&N which was acting as the agent of T&N.

60

(b)    Treatment:  Each holder of an Allowed Class 6H Claim shall receive the treatment afforded to such Claim under the CVA proposed for T&N in the U.K. administration proceedings of T&N in full satisfaction of such Allowed Class 6H Claim.

(c)    Voting: Class 6H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 6H Claim is entitled to vote to accept or reject the Plan.

### 3.6.5.    Class 6H.PD – Asbestos Property Damage Claims

(a)    Classification: Class 6H.PD consists of all Asbestos Property Damage Claims against T&N.

(b)    Treatment:

(i)    If a holder of a Class 6H.PD Claim submits (or is deemed to submit) a Notice of Claim on account of such Claim in the CVA for T&N, then the holder of such Class 6H.PD Claim shall receive the treatment afforded to such Claim under the CVA proposed for T&N in the U.K. administration proceedings of T&N in full satisfaction of such Claim.

(ii)    If a holder of a Class 6H.PD Claim does not submit (or is not deemed to submit) a Notice of Claim on account of such Claim in the CVA for T&N, then each holder of an Allowed Class 6H.PD Claim shall receive, in full and complete satisfaction of such Claim, a Cash payment equal to the Allowed Amount of such Claim multiplied by 0.08, unless such Claim is subject to the Settlement Agreement to be implemented pursuant to Section 8.26 of the Plan.

(c)    Voting: Class 6H.PD is impaired and each holder of an Allowed Class 6H.PD Claim is entitled to vote to accept or reject the Plan.

### 3.6.6.    Class 6I – Non-Priority T&N Pension Plan Employee Benefit Claims

(a)    Classification: Class 6I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against T&N.

(b)    Treatment:  Each holder of an Allowed Class 6I Claim shall receive the treatment afforded to such Claim under the CVA proposed for T&N in the U.K. administration proceedings of T&N.

(c)    Voting:  Class 6I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 6I Claim is entitled to vote to accept or reject the Plan.

### 3.6.7.    Class 6J – Asbestos Personal Injury Claims

(a)    Classification:  Class 6J consists of all Asbestos Personal Injury Claims against T&N, and shall also include, without limitation, all Asbestos Personal Injury Claims against other U.K. Debtors or non-Debtor Affiliates of T&N for which T&N is liable under

61

applicable non-bankruptcy law as a result of agency agreements entered into with such Affiliates before the Petition Date, to the extent that the holders of such Claims against the Affiliates of T&N so elect. To ensure that there shall be no double recovery to any holder on account of the inclusion in Class 6J of any Asbestos Personal Injury Claim (other than a CVA Asbestos Claim) against T&N as a result of such agency agreements, each holder of such Claim against a T&N Affiliate shall be required to make an election as to whether such Asbestos Personal Injury Claim shall be asserted against T&N as principal, or against the relevant Affiliate of T&N which was acting as the agent of T&N.

      **(b)**    Treatment: As of the Effective Date, liability for all Class 6J Asbestos Personal Injury Claims shall automatically and without further act, deed or court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance. Additionally, on the Effective Date, the liability of Reorganized T&N for each Class 6J Claim shall continue but recourse to the assets of Reorganized T&N in respect of such liability shall, by operation of the Plan, the CVA for T&N, and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance. Upon the Hercules Policy Expiry Date and/or the EL Asbestos Insurance Expiry Date, Reorganized T&N shall be, without further order of court, released and discharged from Class 6J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

      **(c)**    Voting: Class 6J is impaired and each holder of a Class 6J Claim is entitled to vote to accept or reject the Plan.

### 3.6.8.    Class 6L – Affiliate Claims

      **(a)**    Classification: Class 6L consists of all Affiliate Claims against T&N. Class 6L Affiliate Claims shall include, without limitation, all Affiliate Claims against other U.K. Debtors or non-Debtor Affiliates of T&N for which T&N is liable under applicable non bankruptcy law as a result of agency agreements entered into with such Affiliate prior to the Petition Date; provided that, to ensure that there shall be no double recovery to any holder on account of the inclusion in Class 6L of any Affiliate Claim against T&N as a result of such agency agreements, such holder shall be required to make an election as to whether such Affiliate Claim shall be asserted against T&N as principal, or against the relevant Affiliate of T&N which was acting as the agent of T&N.

      **(b)**    Treatment: All Affiliate Claims in Class 6L shall receive the treatment afforded to such Claims under the CVA proposed for T&N in the U.K. administration proceedings of T&N. If such Affiliate Claims are not compromised under the CVA proposed for T&N, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and

extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any such Class 6L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against T&N. Any and all Class 6L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)    Voting:  Class 6L is unimpaired and holders of Class 6L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.6.9.    Class 6P – Equity Interests

(a)    Classification:  Class 6P consists of all Equity Interests in T&N.

(b)    Treatment:  Each holder of an Allowed Equity Interest in Class 6P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting:  Class 6P is unimpaired and holders of Class 6P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.7.    Federal-Mogul Ignition (U.K.) Limited ("FM Ignition")(Classes 7A – 7P)

### 3.7.1.    Class 7A - Priority Claims

(a)    Classification:  Class 7A consists of all Priority Claims against FM Ignition.

(b)    Treatment:  Each holder of an Allowed Class 7A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)    Voting:  Class 7A is unimpaired and holders of Class 7A Claims are thus not entitled to vote to accept or reject the Plan.

### 3.7.2.    Class 7H – Unsecured Claims

(a)    Classification: Class 7H consists of all Unsecured Claims against FM Ignition other than any Claims that are specifically included in any other Class.

(b)    Treatment:  Each holder of an Allowed Class 7H Claim shall receive the treatment afforded to such Claim under the CVA proposed for FM Ignition in the U.K. administration proceedings of FM Ignition in full satisfaction of such Allowed Class 7H Claim.

(c)    Voting: Class 7H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 7H Claim is entitled to vote to accept or reject the Plan.

### 3.7.3.    Class 7I – Non-Priority FM Ignition Pension Plan Employee Benefit Claims

(a)    Classification: Class 7I consists of all Non-Priority FM Ignition Pension Plan Employee Benefit Claims against FM Ignition.

(b)    Treatment:  Each holder of an Allowed Class 7I Claim shall receive the treatment afforded to such Claim under the CVA proposed for FM Ignition in the U.K. administration proceedings of FM Ignition.

(c)    Voting:  Class 7I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 7I Claim is entitled to vote to accept or reject the Plan.

### 3.7.4.    Class 7J – Asbestos Personal Injury Claims

(a)    Classification:  Class 7J consists of all Asbestos Personal Injury Claims against FM Ignition.

(b)    Treatment:  As of the Effective Date, liability for all Class 7J Asbestos Personal Injury Claims shall automatically and without further act, deed or court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Additionally, on the Effective Date, the liability of Reorganized FM Ignition for each Class 7J Claim shall continue but recourse to the assets of Reorganized FM Ignition in respect of such liability shall, by operation of the Plan, the CVA for FM Ignition, and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance. Upon the Hercules Policy Expiry Date and/or the EL Asbestos Insurance Expiry Date, Reorganized FM Ignition shall be, without further order of court, released and discharged from Class 7J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

(c)    Voting:  Class 7J is impaired and each holder of a Class 7J Claim is entitled to vote to accept or reject the Plan.

### 3.7.5.    Class 7L - Affiliate Claims

(a)    Classification:  Class 7L consists of all Affiliate Claims against FM Ignition.

(b)    Treatment:  All Affiliate Claims in Class 7L shall receive the treatment afforded to such Claims under the CVA proposed for FM Ignition in the U.K. administration proceedings of FM Ignition.  If such Affiliate Claims are not compromised under the CVA proposed for FM Ignition, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest

64

on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any such Class 7L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FM Ignition. Any and all Class 7L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)     Voting: Class 7L is unimpaired and holders of Class 7L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.7.6.     Class 7P – Equity Interests

(a)     Classification: Class 7P consists of all Equity Interests in FM Ignition.

(b)     Treatment: Each holder of an Allowed Equity Interest in Class 7P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)     Voting: Class 7P is unimpaired and holders of Class 7P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.8.     Federal-Mogul Systems Protection Group Limited ("FMSPG") (Classes 8A 8P)

#### 3.8.1.     Class 8A - Priority Claims

(a)     Classification: Class 8A consists of all Priority Claims against FMSPG other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)     Treatment: Each holder of an Allowed Class 8A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)     Voting: Class 8A is unimpaired and holders of Class 8A Claims are thus not entitled to vote to accept or reject the Plan.

#### 3.8.2.     Class 8H – Unsecured Claims

(a)     Classification: Class 8H consists of all Unsecured Claims against FMSPG other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

(b)     Treatment: Each holder of an Allowed Class 8H Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMSPG in the U.K. administration proceedings of FMSPG in full satisfaction of such Allowed Class 8H Claim.

65

(c)    Voting:  Class 8H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 8H Claim is entitled to vote to accept or reject the Plan.

### 3.8.3.    Class 8I – Non-Priority T&N Pension Plan Employee Benefit Claims

(a)    Classification: Class 8I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against FMSPG.

(b)    Treatment:  Each holder of an Allowed Class 8I Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMSPG in the U.K. administration proceedings of FMSPG.

(c)    Voting:  Class 8I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 8I Claim is entitled to vote to accept or reject the Plan.

### 3.8.4.    Class 8L - Affiliate Claims

(a)    Classification:  Class 8L consists of all Affiliate Claims against FMSPG, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

(b)    Treatment:  All Affiliate Claims in Class 8L shall receive the treatment afforded to such Claims under the CVA proposed for FMSPG in the U.K. administration proceedings of FMSPG.  If such Affiliate Claims are not compromised under the CVA proposed for FMSPG, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 8L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMSPG.  Any and all Class 8L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non-Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)    Voting:  Class 8L is unimpaired and holders of Class 8L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.8.5.    Class 8P – Equity Interests

(a)    Classification:  Class 8P consists of all Equity Interests in FMSPG.

(b)    Treatment:  Each holder of an Allowed Equity Interest in Class 8P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

66

(c)     Voting:  Class 8P is unimpaired and holders of Class 8P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.9.    Federal-Mogul Aftermarket UK Limited ("FMAUK") (Classes 9A – 9P)

#### 3.9.1.    Class 9A - Priority Claims

(a)     Classification: Class 9A consists of all Priority Claims against FMAUK other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)     Treatment:  Each holder of an Allowed Class 9A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)     Voting:  Class 9A is unimpaired and holders of Class 9A Claims are thus not entitled to vote to accept or reject the Plan.

#### 3.9.2.    Class 9H – Unsecured Claims

(a)     Classification: Class 9H consists of all Unsecured Claims against FMAUK other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

(b)     Treatment:  Each holder of an Allowed Class 9H Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMAUK in the U.K. administration proceedings of FMAUK in full satisfaction of such Allowed Class 9H Claim.

(c)     Voting:  Class 9H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 9H Claim is entitled to vote to accept or reject the Plan.

#### 3.9.3.    Class 9I – Non-Priority T&N Pension Plan Employee Benefit Claims

(a)     Classification:  Class 9I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against FMAUK.

(b)     Treatment:  Each holder of an Allowed Class 9I Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMAUK in the U.K. administration proceedings of FMAUK.

(c)     Voting:  Class 9I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 9I Claim is entitled to vote to accept or reject the Plan.

### 3.9.4.    Class 9L - Affiliate Claims

**(a)**    Classification:  Class 9L consists of all Affiliate Claims against FMAUK, other than any such Affiliate Claims in respect of which the holder has elected to assert the Claim against T&N, as principal, under Class 6L.

**(b)**    Treatment:  All Affiliate Claims in Class 9L shall receive the treatment afforded to such Claims under the CVA proposed for FMAUK in the U.K. administration proceedings of FMAUK.  If such Affiliate Claims are not compromised under the CVA proposed for FMAUK, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 9L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMAUK.  Any and all Class 9L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

**(c)**    Voting:  Class 9L is unimpaired and holders of Class 9L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.9.5.    Class 9P – Equity Interests

**(a)**    Classification:  Class 9P consists of all Equity Interests in FMAUK.

**(b)**    Treatment:  Each holder of an Allowed Equity Interest in Class 9P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

**(c)**    Voting:  Class 9P is unimpaired and holders of Class 9P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.10.    Federal-Mogul Sintered Products Limited ("FMSP") (Classes 10A – 10P)

### 3.10.1.    Class 10A - Priority Claims

**(a)**    Classification:  Class 10A consists of all Priority Claims against FMSP, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

**(b)**    Treatment:  Each holder of an Allowed Class 10A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

**(c)**    Voting:  Class 10A is unimpaired and holders of Class 10A Claims are thus not entitled to vote to accept or reject the Plan.

### 3.10.2.    Class 10H – Unsecured Claims

**(a)**    Classification: Class 10H consists of all Unsecured Claims against FMSP other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

**(b)**    Treatment: Each holder of an Allowed Class 10H Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMSP in the U.K. administration proceedings of FMSP in full satisfaction of such Allowed Class 10H Claim.

**(c)**    Voting: Class 10H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 10H Claim is entitled to vote to accept or reject the Plan.

### 3.10.3.    Class 10I – Non-Priority T&N Pension Plan Employee Benefit Claims

**(a)**    Classification: Class 10I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against FMSP.

**(b)**    Treatment: Each holder of an Allowed Class 10I Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMSP in the U.K. administration proceedings of FMSP.

**(c)**    Voting: Class 10I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 10I Claim is entitled to vote to accept or reject the Plan.

### 3.10.4.    Class 10L - Affiliate Claims

**(a)**    Classification: Class 10L consists of all Affiliate Claims against FMSP, other than any such Affiliate Claims in respect of which the holder has made an election to assert the Claim against T&N, as principal, under Class 6L.

**(b)**    Treatment: All Affiliate Claims in Class 10L shall receive the treatment afforded to such Claims under the CVA proposed for FMSP in the U.K. administration proceedings of FMSP. If such Affiliate Claims are not compromised under the CVA proposed for FMSP, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any such Class 10L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMSP. Any and all Class 10L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

69

(c)    Voting:  Class 10L is unimpaired and holders of Class 10L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.10.5.    Class 10P – Equity Interests

(a)    Classification:  Class 10P consists of all Equity Interests in FMSP.

(b)    Treatment:  Each holder of an Allowed Equity Interest in Class 10P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting:  Class 10P is unimpaired and holders of Class 10P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.11.    Federal-Mogul Sealing Systems (Slough) Limited ("FMSS-Slough") (Classes 11A – 11P)

#### 3.11.1.    Class 11A - Priority Claims

(a)    Classification:  Class 11A consists of all Priority Claims against FMSS-Slough, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)    Treatment:  Each holder of an Allowed Class 11A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)    Voting:  Class 11A is unimpaired and holders of Class 11A Claims are thus not entitled to vote to accept or reject the Plan.

#### 3.11.2.    Class 11G -- On-Site Environmental Claims

(a)    Classification:  Class 11G consists of all On-Site Environmental Claims against FMSS-Slough.

(b)    Treatment:  Each holder of an Allowed On-Site Environmental Claim in Class 11G shall retain unaltered the legal, equitable and contractual rights to which such Allowed On-Site Environmental Claim entitles the holder.

(c)    Voting:  Class 11G is unimpaired and holders of Class 11G Claims are thus not entitled to vote to accept or reject the Plan.

#### 3.11.3.    Class 11H – Unsecured Claims

(a)    Classification:  Class 11H consists of all Unsecured Claims against FMSS Slough other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

**(b)**    Treatment:  Each holder of an Allowed Class 11H Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMSS-Slough in the U.K. administration proceedings of FMSS-Slough in full satisfaction of such Allowed Class H Claim.

**(c)**    Voting:  Class 11H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 11H Claim is entitled to vote to accept or reject the Plan.

**3.11.4.    Class 11I – Non-Priority T&N Pension Plan Employee Benefit Claims**

**(a)**    Classification:  Class 11I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against FMSS-Slough.

**(b)**    Treatment:  Each holder of an Allowed Class 11I Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMSS-Slough in the U.K. administration proceedings of FMSS-Slough.

**(c)**    Voting:  Class 11I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 11I Claim is entitled to vote to accept or reject the Plan.

**3.11.5.    Class 11J - Asbestos Personal Injury Claims**

**(a)**    Classification:  Class 11J consists of all Asbestos Personal Injury Claims against FMSS-Slough as to which the holder has not made an election to assert such Claim against T&N as principal and to have such Claim included in Class 6J.

**(b)**    Treatment:  As of the Effective Date, liability for all Class 11J Asbestos Personal Injury Claims shall automatically and without further act, deed or court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Additionally, on the Effective Date, the liability of Reorganized FMSS-Slough for each Class 11J Claim shall continue but recourse to the assets of Reorganized FMSS Slough in respect of such liability shall, by operation of the Plan, the CVA for FMSS-Slough,  and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Upon the Hercules Policy Expiry Date and/or the EL Asbestos Insurance Expiry Date, Reorganized FMSS-Slough shall be, without further order of court, released and discharged from Class 11J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

**(c)**    Voting:  Class 11J is impaired and each holder of a Class 11J Claim is entitled to vote to accept or reject the Plan.

### 3.11.6.   Class 11L - Affiliate Claims.

**(a)**   Classification:  Class 11L consists of all Affiliate Claims against FMSS-Slough, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

**(b)**   Treatment:  All Affiliate Claims in Class 11L shall receive the treatment afforded to such Claims under the CVA proposed for FMSS-Slough in the U.K. administration proceedings of FMSS-Slough.  If such Affiliate Claims are not compromised under the CVA proposed for FMSS-Slough, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 11L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMSS-Slough.  Any and all Class 11L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

**(c)**   Voting:  Class 11L is unimpaired and holders of Class 11L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.11.7.   Class 11P – Equity Interests

**(a)**   Classification:  Class 11P consists of all Equity Interests in FMSS-Slough.

**(b)**   Treatment:  Each holder of an Allowed Equity Interest in Class 11P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

**(c)**   Voting:  Class 11P is unimpaired and holders of Class 11P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.12.   <u>Federal-Mogul Friction Products Limited ("FMFP")</u> (Classes 12A – 12P)

### 3.12.1.   Class 12A - Priority Claims

**(a)**   Classification:  Class 12A consists of all Priority Claims against FMFP, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

**(b)**   Treatment:  Each holder of an Allowed Class 12A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

72

      (c)     Voting: Class 12A is unimpaired and holders of Class 12A Claims are thus not entitled to vote to accept or reject the Plan.

### 3.12.2.    Class 12G -- On-Site Environmental Claims

      (a)     Classification: Class 12G consists of all On-Site Environmental Claims against FMFP.

      (b)     Treatment: Each holder of an Allowed On-Site Environmental Claim in Class 12G shall retain unaltered the legal, equitable and contractual rights to which such Allowed On-Site Environmental Claim entitles the holder.

      (c)     Voting: Class 12G is unimpaired and holders of Class 12G Claims are thus not entitled to vote to accept or reject the Plan.

### 3.12.3.    Class 12H – Unsecured Claims

      (a)     Classification: Class 12H consists of all Unsecured Claims against FMFP other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

      (b)     Treatment: Each holder of an Allowed Class 12H Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMFP in the U.K. administration proceedings of FMFP in full satisfaction of such Allowed Class 12H Claim.

      (c)     Voting: Class 12H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 12H Claim is entitled to vote to accept or reject the Plan.

### 3.12.4.    Class 12I – Non-Priority T&N Pension Plan Employee Benefit Claims

      (a)     Classification: Class 12I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against FMFP.

      (b)     Treatment: Each holder of an Allowed Class 12I Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMFP in the U.K. administration proceedings of FMFP.

      (c)     Voting: Class 12I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 12I Claim is entitled to vote to accept or reject the Plan.

### 3.12.5.    Class 12J – Asbestos Personal Injury Claims

      (a)     Classification: Class 12J consists of all Asbestos Personal Injury Claims against FMFP as to which the holder has not made an election to assert such Claim against T&N as principal and to have such Claim included in Class 6J.

**(b)**      Treatment:  As of the Effective Date, liability for all Class 12J Asbestos Personal Injury Claims shall automatically and without further act, deed or court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Additionally, on the Effective Date, the liability of Reorganized FMFP for each Class 12J Claim shall continue but recourse to the assets of Reorganized FMFP in respect of such liability shall, by operation of the Plan, the CVA for FMFP, and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Upon the Hercules Policy Expiry Date and/or the EL Asbestos Insurance Expiry Date, Reorganized FMFP shall be, without further order of court, released and discharged from Class 12J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

**(c)**      Voting:  Class 12J is impaired and each holder of a Class 12J Claim is entitled to vote to accept or reject the Plan.

### 3.12.6.     Class 12L - Affiliate Claims

**(a)**      Classification:  Class 12L consists of all Affiliate Claims against FMFP, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

**(b)**      Treatment:  All Affiliate Claims in Class 12L shall receive the treatment afforded to such Claims under the CVA proposed for FMFP in the U.K. administration proceedings of FMFP.  If such Affiliate Claims are not compromised under the CVA proposed for FMFP, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 12L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMFP. Any and all Class 12L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

**(c)**      Voting:  Class 12L is unimpaired and holders of Class 12L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.12.7.     Class 12P – Equity Interests

**(a)**      Classification:  Class 12P consists of all Equity Interests in FMFP.

74

(b)    Treatment:  Each holder of an Allowed Equity Interest in Class 12P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting:  Class 12P is unimpaired and holders of Class 12P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.13.    Federal-Mogul Sealing Systems (Rochdale) Limited ("FMSS-Rochdale") (Classes 13A – 13P)

#### 3.13.1.    Class 13A - Priority Claims

(a)    Classification:  Class 13A consists of all Priority Claims against FMSS-Rochdale, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)    Treatment:  Each holder of an Allowed Class 13A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)    Voting:  Class 13A is unimpaired and holders of Class 13A Claims are thus not entitled to vote to accept or reject the Plan.

#### 3.13.2.    Class 13H – Unsecured Claims

(a)    Classification:  Class 13H consists of all Unsecured Claims against FMSS Rochdale other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

(b)    Treatment:  Each holder of an Allowed Class 13H Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMSS-Rochdale in the U.K. administration proceedings of FMSS-Rochdale in full satisfaction of such Allowed Class 13H Claim.

(c)    Voting:  Class 13H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 13H Claim is entitled to vote to accept or reject the Plan.

#### 3.13.3.    Class 13I – Non-Priority T&N Pension Plan Employee Benefit Claims

(a)    Classification:  Class 13I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against FMSS-Rochdale.

(b)    Treatment:  Each holder of an Allowed Class 13I Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMSS-Rochdale in the U.K. administration proceedings of FMSS-Rochdale.

75

(c)    Voting: Class 13I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 13I Claim is entitled to vote to accept or reject the Plan.

### 3.13.4.    Class 13J - Asbestos Personal Injury Claims

(a)    Classification: Class 13J consists of all Asbestos Personal Injury Claims against FMSS-Rochdale as to which the holder has not made an election to assert such Claim against T&N as principal and to have such Claim included in Class 6J.

(b)    Treatment: As of the Effective Date, liability for all Class 13J Asbestos Personal Injury Claims shall automatically and without further act, deed or court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance. Additionally, on the Effective Date, the liability of Reorganized FMSS-Rochdale for each Class 13J Claim shall continue but recourse to the assets of Reorganized FMSS-Rochdale in respect of such liability shall, by operation of the Plan, the CVA for FMSS-Rochdale, and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance. Upon the Hercules Policy Expiry Date and/or the EL Asbestos Insurance Expiry Date, Reorganized FMSS-Rochdale shall be, without further order of court, released and discharged from Class 13J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

(c)    Voting: Class 13J is impaired and each holder of a Class 13J Claim is entitled to vote to accept or reject the Plan.

### 3.13.5.    Class 13L - Affiliate Claims

(a)    Classification: Class 13L consists of all Affiliate Claims against FMSS Rochdale, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

(b)    Treatment: All Affiliate Claims in Class 13L shall receive the treatment afforded to such Claims under the CVA proposed for FMSS-Rochdale in the U.K. administration proceedings of FMSS-Rochdale. If such Affiliate Claims are not compromised under the CVA proposed for FMSS-Rochdale, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any such Class 13L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMSS-Rochdale. Any and all Class 13L Claims, or portions thereof, being reinstated and, to the extent,

76

if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)    Voting:  Class 13L is unimpaired and holders of Class 13L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.13.6.    Class 13P – Equity Interests

(a)    Classification:  Class 13P consists of all Equity Interests in FMSS Rochdale.

(b)    Treatment:  Each holder of an Allowed Equity Interest in Class 13P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting:  Class 13P is unimpaired and holders of Class 13P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.14.    Federal-Mogul Camshaft Castings Limited ("FMCC") (Classes 14A – 14P)

### 3.14.1.    Class 14A - Priority Claims

(a)    Classification:  Class 14A consists of all Priority Claims against FMCC, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)    Treatment:  Each holder of a Class 14A Allowed Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)    Voting:  Class 14A is unimpaired and holders of Class 14A Claims are thus not entitled to vote to accept or reject the Plan.

### 3.14.2.    Class 14H – Unsecured Claims

(a)    Classification:  Class 14H consists of all Unsecured Claims against FMCC other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

(b)    Treatment:  Each holder of an Allowed Class 14H Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMCC in the U.K. administration proceedings of FMCC in full satisfaction of such Allowed Class 14H Claim.

(c)    Voting:  Class 14H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 14H Claim is entitled to vote to accept or reject the Plan.

### 3.14.3.    Class 14I – Non-Priority T&N Pension Plan Employee Benefit Claims

(a)    Classification:  Class 14I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against FMCC.

(b)    Treatment:  Each holder of an Allowed Class 14I Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMCC in the U.K. administration proceedings of FMCC.

(c)    Voting:  Class 14I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 14I Claim is entitled to vote to accept or reject the Plan.

### 3.14.4.    Class 14J - Asbestos Personal Injury Claims

(a)    Classification:  Class 14J consists of all Asbestos Personal Injury Claims against FMCC as to which the holder has not made an election to assert such Claim against T&N as principal and to have such Claim included in Class 6J.

(b)    Treatment:  As of the Effective Date, liability for all Class 14J Asbestos Personal Injury Claims shall automatically and without further act, deed or court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Additionally, on the Effective Date, the liability of Reorganized FMCC for each Class 14J Claim shall continue but recourse to the assets of Reorganized FMCC in respect of such liability shall, by operation of the Plan, the CVA for FMCC, and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Upon the Hercules Policy Expiry Date and/or the EL Asbestos Insurance Expiry Date, Reorganized FMCC shall be, without further order of court, released and discharged from Class 14J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

(c)    Voting:  Class 14J is impaired and each holder of a Class 14J Claim is entitled to vote to accept or reject the Plan.

### 3.14.5.    Class 14L - Affiliate Claims

(a)    Classification:  Class 14L consists of all Affiliate Claims against FMCC, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

(b)    Treatment:  All Affiliate Claims in Class 14L shall receive the treatment afforded to such Claims under the CVA proposed for FMCC in the U.K. administration proceedings of FMCC.  If such Affiliate Claims are not compromised under the CVA proposed for FMCC, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part,

in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any such Class 14L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMCC. Any and all Class 14L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

       **(c)**    Voting:  Class 14L is unimpaired and holders of Class 14L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.14.6.    Class 14P – Equity Interests

       **(a)**    Classification:  Class 14P consists of all Equity Interests in FMCC.

       **(b)**    Treatment:  Each holder of an Allowed Equity Interest in Class 14P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

       **(c)**    Voting:  Class 14P is unimpaired and holders of Class 14P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.15.    Federal-Mogul Bradford Limited ("Bradford") (Classes 15A – 15P)

### 3.15.1.    Class 15A - Priority Claims

       **(a)**    Classification:  Class 15A consists of all Priority Claims against Bradford, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

       **(b)**    Treatment:  Each holder of an Allowed Class 15A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

       **(c)**    Voting:  Class 15A is unimpaired and holders of Class 15A Claims are thus not entitled to vote to accept or reject the Plan.

### 3.15.2.    Class 15H – Unsecured Claims

       **(a)**    Classification:  Class 15H consists of all Unsecured Claims against Bradford other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

       **(b)**    Treatment:  Each holder of an Allowed Class 15H Claim shall receive the treatment afforded to such Claim under the CVA proposed for Bradford in the U.K. administration proceedings of Bradford in full satisfaction of such Allowed Class 15H Claim.

(c)    Voting:  Class 15H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 15H Claim is entitled to vote to accept or reject the Plan.

### 3.15.3.    Class 15I – Non-Priority T&N Pension Plan Employee Benefit Claims

(a)    Classification:  Class 15I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against Bradford.

(b)    Treatment:  Each holder of an Allowed Class 15I Claim shall receive the treatment afforded to such Claim under the CVA proposed for Bradford by the Administrators in the U.K. administration proceedings of Bradford.

(c)    Voting:  Class 15I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 15I Claim is entitled to vote to accept or reject the Plan.

### 3.15.4.    Class 15J - Asbestos Personal Injury Claims

(a)    Classification:  Class 15J consists of all Asbestos Personal Injury Claims against Bradford as to which the holder has not made an election to assert such Claim against T&N as principal and to have such Claim included in Class 6J.

(b)    Treatment:  As of the Effective Date, liability for all Class 15J Asbestos Personal Injury Claims shall automatically and without further act, deed or court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Additionally, on the Effective Date, the liability of Reorganized Bradford for each Class 15J Claim shall continue but recourse to the assets of Reorganized Bradford in respect of such liability shall, by operation of the Plan, the CVA for Bradford, and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Upon the Hercules Policy Expiry Date and/or the EL Asbestos Insurance Expiry Date, Reorganized Bradford shall be, without further order of court, released and discharged from Class 15J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

(c)    Voting:  Class 15J is impaired and each holder of a Class 15J Claim is entitled to vote to accept or reject the Plan.

### 3.15.5.    Class 15L - Affiliate Claims

(a)    Classification:  Class 15L consists of all Affiliate Claims against Bradford, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

(b)    Treatment:  All Affiliate Claims in Class 15L shall receive the treatment afforded to such Claims under the CVA proposed for Bradford in the U.K. administration

80

proceedings of Bradford. If such Affiliate Claims are not compromised under the CVA proposed for Bradford, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any such Class 15L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against Bradford. Any and all Class 15L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)    Voting: Class 15L is unimpaired and holders of Class 15L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.15.6.    Class 15P – Equity Interests

(a)    Classification: Class 15P consists of all Equity Interests in Bradford.

(b)    Treatment: Each holder of an Allowed Equity Interest in Class 15P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting: Class 15P is unimpaired and holders of Class 15P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.16.    Federal-Mogul Camshafts Limited ("FM Camshafts") (Classes 16A – 16P)

### 3.16.1.    Class 16A - Priority Claims

(a)    Classification: Class 16A consists of all Priority Claims against FM Camshafts, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)    Treatment: Each holder of an Allowed Class 16A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)    Voting: Class 16A is unimpaired and holders of Class 16A Claims are thus not entitled to vote to accept or reject the Plan.

### 3.16.2.    Class 16H – Unsecured Claims

(a)    Classification: Class 16H consists of all Unsecured Claims against FM Camshafts other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

**(b)** Treatment: Each holder of an Allowed Class 16H Claim shall receive the treatment afforded to such Claim under the CVA proposed for FM Camshafts in the U.K. administration proceedings of FM Camshafts in full satisfaction of such Allowed Class 16H Claim.

**(c)** Voting: Class 16H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 16H Claim is entitled to vote to accept or reject the Plan.

**3.16.3.    Class 16I – Non-Priority T&N Pension Plan Employee Benefit Claims**

**(a)** Classification: Class 16I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against FM Camshafts.

**(b)** Treatment: Each holder of an Allowed Class 16I Claim shall receive the treatment afforded to such Claim under the CVA proposed for FM Camshafts in the U.K. administration proceedings of FM Camshafts.

**(c)** Voting: Class 16I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 16I Claim is entitled to vote to accept or reject the Plan.

**3.16.4.    Class 16L - Affiliate Claims**

**(a)** Classification: Class 16L consists of all Affiliate Claims against FM Camshafts, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

**(b)** Treatment: All Affiliate Claims in Class 16L shall receive the treatment afforded to such Claims under the CVA proposed for FM Camshafts in the U.K. administration proceedings of FM Camshafts. If such Affiliate Claims are not compromised under the CVA proposed for FM Camshafts, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any such Class 16L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FM Camshafts. Any and all Class 16L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

**(c)** Voting: Class 16L is unimpaired and holders of Class 16L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.16.5.    Class 16P – Equity Interests

(a)    Classification:  Class 16P consists of all Equity Interests in FM Camshafts.

(b)    Treatment:  Each holder of an Allowed Equity Interest in Class 16P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting:  Class 16P is unimpaired and holders of Class 16P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.17.    Federal-Mogul Eurofriction Limited ("FMEL") (Classes 17A – 17P)

### 3.17.1.    Class 17A - Priority Claims

(a)    Classification:  Class 17A consists of all Priority Claims against FMEL, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)    Treatment:  Each holder of an Allowed Class 17A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)    Voting:  Class 17A is unimpaired and holders of Class 17A Claims are thus not entitled to vote to accept or reject the Plan.

### 3.17.2.    Class 17G -- On-Site Environmental Claims

(a)    Classification:  Class 17G consists of all On-Site Environmental Claims against FMEL.

(b)    Treatment:  Each holder of an Allowed On-Site Environmental Claim in Class 17G shall retain unaltered the legal, equitable and contractual rights to which such Allowed On-Site Environmental Claim entitles the holder.

(c)    Voting:  Class 17G is unimpaired and holders of Class 17G Claims are thus not entitled to vote to accept or reject the Plan.

### 3.17.3.    Class 17H – Unsecured Claims

(a)    Classification:  Class 17H consists of all Unsecured Claims against FMEL other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

(b)    Treatment:  Each holder of an Allowed Class 17H Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMEL in the U.K. administration proceedings of FMEL in full satisfaction of such Allowed Class 17H Claim.

83

(c)    Voting:  Class 17H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 17H Claim is entitled to vote to accept or reject the Plan.

### 3.17.4.    Class 17I – Non-Priority T&N Pension Plan Employee Benefit Claims

(a)    Classification:  Class 17I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against FMEL.

(b)    Treatment:  Each holder of an Allowed Class 17I Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMEL in the U.K. administration proceedings of FMEL.

(c)    Voting:  Class 17I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 17I Claim is entitled to vote to accept or reject the Plan.

### 3.17.5.    Class 17J– Asbestos Personal Injury Claims

(a)    Classification:  Class 17J consists of all Asbestos Personal Injury Claims against FMEL as to which the holder has not made an election to assert such Claim against T&N as principal and to have such Claim included in Class 6J.

(b)    Treatment:  As of the Effective Date, liability for all Class 17J Asbestos Personal Injury Claims shall automatically and without further act, deed or court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Additionally, on the Effective Date, the liability of Reorganized FMEL for each Class 17J Claim shall continue but recourse to the assets of Reorganized FMEL in respect of such liability shall, by operation of the Plan, the CVA for FMEL, and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Upon the Hercules Policy Expiry Date and/or the EL Asbestos Insurance Expiry Date, Reorganized FMEL shall be, without further order of court, released and discharged from Class 17J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

(c)    Voting:  Class 17J is impaired and each holder of a Class 17J Claim is entitled to vote to accept or reject the Plan.

### 3.17.6.    Class 17L - Affiliate Claims

(a)    Classification:  Class 17L consists of all Affiliate Claims against FMEL, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

(b)    Treatment:  All Affiliate Claims in Class 17L shall receive the treatment afforded to such Claims under the CVA proposed for FMEL in the U.K. administration

84

proceedings of FMEL. If such Affiliate Claims are not compromised under the CVA proposed for FMEL, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any such Class 17L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMEL. Any and all Class 17L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)    Voting: Class 17L is unimpaired and holders of Class 17L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.17.7.    Class 17P – Equity Interests

(a)    Classification: Class 17P consists of all Equity Interests in FMEL.

(b)    Treatment: Each holder of an Allowed Equity Interest in Class 17P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting: Class 17P is unimpaired and holders of Class 17P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.18.    Federal-Mogul Powertrain Systems International Limited ("Powertrain") (Classes 18A – 18P)

### 3.18.1.    Class 18A - Priority Claims

(a)    Classification: Class 18A consists of all Priority Claims against Powertrain, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)    Treatment: Each holder of an Allowed Class 18A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)    Voting: Class 18A is unimpaired and holders of Class 18A Claims are thus not entitled to vote to accept or reject the Plan.

### 3.18.2.    Class 18H – Unsecured Claims

(a)    Classification: Class 18H consists of all Unsecured Claims against Powertrain other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

85

(b)     Treatment:  Each holder of an Allowed Class 18H Claim shall receive the treatment afforded to such Claim under the CVA proposed for Powertrain in the U.K. administration proceedings of Powertrain in full satisfaction of such Allowed Class 18H Claim.

(c)     Voting:  Class 18H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 18H Claim is entitled to vote to accept or reject the Plan.

### 3.18.3.     Class 18I – Non-Priority T&N Pension Plan Employee Benefit Claims

(a)     Classification:  Class 18I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against Powertrain.

(b)     Treatment:  Each holder of an Allowed Class 18I Claim shall receive the treatment afforded to such Claim under the CVA proposed for Powertrain in the U.K. administration proceedings of Powertrain.

(c)     Voting:  Class 18I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 18I Claim is entitled to vote to accept or reject the Plan.

### 3.18.4.     Class 18L - Affiliate Claims

(a)     Classification:  Class 18L consists of all Affiliate Claims against Powertrain, other than such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

(b)     Treatment:  All Affiliate Claims in Class 18L shall receive the treatment afforded to such Claims under the CVA proposed for Powertrain in the U.K. administration proceedings of Powertrain.  If such Affiliate Claims are not compromised under the CVA proposed for Powertrain, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 18L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against Powertrain.  Any and all Class 18L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)     Voting:  Class 18L is unimpaired and holders of Class 18L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.18.5.     Class 18P – Equity Interests

(a)     Classification:  Class 18P consists of all Equity Interests in Powertrain.

**(b)**    Treatment:  Each holder of an Allowed Equity Interest in Class 18P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

**(c)**    Voting:  Class 18P is unimpaired and holders of Class 18P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.19.    TBA Industrial Products Limited ("TBA-IP") (Classes 19A – 19P)

#### 3.19.1.    Class 19A - Priority Claims

**(a)**    Classification:  Class 19A consists of all Priority Claims against TBA-IP, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

**(b)**    Treatment:  Each holder of an Allowed Class 19A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

**(c)**    Voting:  Class 19A is unimpaired and holders of Class 19A Claims are thus not entitled to vote to accept or reject the Plan.

#### 3.19.2.    Class 19H – Unsecured Claims

**(a)**    Classification: Class 19H consists of all Unsecured Claims against TBA IP other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

**(b)**    Treatment:  Each holder of an Allowed Class 19H Claim shall receive the treatment afforded to such Claim under the CVA proposed for TBA-IP in the U.K. administration proceedings of TBA-IP in full satisfaction of such Allowed Class 19H Claim.

**(c)**    Voting:  Class 19H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 19H Claim is entitled to vote to accept or reject the Plan.

#### 3.19.3.    Class 19I – Non-Priority T&N Pension Plan Employee Benefit Claims

**(a)**    Classification: Class 19I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against TBA-IP.

**(b)**    Treatment:  Each holder of an Allowed Class 19I Claim shall receive the treatment afforded to such Claim under the CVA proposed for TBA-IP in the U.K. administration proceedings of TBA-IP.

**(c)**    Voting:  Class 19I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 19I Claim is entitled to vote to accept or reject the Plan.

### 3.19.4.    Class 19J – Asbestos Personal Injury Claims

**(a)**    Classification:  Class 19J consists of all Asbestos Personal Injury Claims against TBA-IP as to which the holder has not made an election to assert such Claim against T&N as principal and to have such Claim included in Class 6J.

**(b)**    Treatment:  As of the Effective Date, liability for all Class 19J Asbestos Personal Injury Claims shall automatically and without further act, deed or court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Additionally, on the Effective Date, the liability of Reorganized TBA-IP for each Class 19J Claim shall continue but recourse to the assets of Reorganized TBA IP in respect of such liability shall, by operation of the Plan, the CVA for TBA-IP, and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Upon the Hercules Policy Expiry Date and/or the EL Asbestos Insurance Expiry Date, Reorganized TBA-IP shall be, without further order of court, released and discharged from Class 19J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

**(c)**    Voting:  Class 19J is impaired and each holder of a Class 19J Claim is entitled to vote to accept or reject the Plan.

### 3.19.5.    Class 19L - Affiliate Claims

**(a)**    Classification:  Class 19L consists of all Affiliate Claims against TBA-IP, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

**(b)**    Treatment:  All Affiliate Claims in Class 19L shall receive the treatment afforded to such Claims under the CVA proposed for TBA-IP in the U.K. administration proceedings of TBA-IP.  If such Affiliate Claims are not compromised under the CVA proposed for TBA-IP, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 19L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against TBA-IP.  Any and all Class 19L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

**(c)**    Voting:  Class 19L is unimpaired and holders of Class 19L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.19.6.    Class 19P – Equity Interests

(a)    Classification: Class 19P consists of all Equity Interests in TBA-IP.

(b)    Treatment: Each holder of an Allowed Equity Interest in Class 19P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting: Class 19P is unimpaired and holders of Class 19P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.20.   Remaining Debtors

The remaining U.S. Debtors and U.K. Debtors not listed above in Sections 3.1 through 3.19, inclusive, of the Plan, are either holding companies or have comparatively minimal business operations (and some or all of such Debtors may be designated as Inactive Debtor Subsidiaries). Accordingly, in the interest of brevity and convenience, the classification of Claims against and Equity Interests in such remaining Debtors, as well as the treatment of such Claims and Equity Interests, are set forth in summary fashion in Exhibit 3.20 to the Plan with the same legal force and effect as if such classification and treatment terms and provisions were set forth at length herein.

### ARTICLE IV
### THE TRUST

**4.1.    Establishment Of Trust.** On the Effective Date, the Trust shall be established pursuant to Section 524(g) of the Bankruptcy Code. The provisions of Sections 4.2, 4.3 and 4.4 hereof which follow shall take effect subject to, and only to the extent not inconsistent with, the provisions of Section 4.5 hereof.

### 4.2.    Purpose of Trust.

**4.2.1.**    The Trust shall on the Effective Date assume liability for all Asbestos Personal Injury Claims in accordance with the provisions of Section 4.4 hereof. The Trust shall, in accordance with the Trust Documents, hold and administer the Trust Assets (including, without limitation, Asbestos In-Place Insurance Coverage), liquidate such Claims, and make distributions to holders of Asbestos Personal Injury Claims from the Trust Assets. The Trust is a "qualified settlement fund" within the meaning of Section 468B of the IRC and the regulations promulgated thereunder. The Asbestos Personal Injury Trust Distribution Procedures provide, among other things, for the resolution of Asbestos Personal Injury Claims pursuant to the terms of the Trust Documents, and that resolution of an Asbestos Personal Injury Claim by the Trust will result in a full or partial release of such Claim against the Trust as set forth in the Asbestos Personal Injury Trust Distribution Procedures. The Trust shall pay Asbestos Personal Injury Claims in accordance with the Trust Documents. In the event that an Indirect Asbestos Personal Injury Claim against the Debtors is disallowed pursuant to Section 502(e)(1)(B) of the Bankruptcy Code, the right of a holder of such disallowed Claim under applicable non-bankruptcy law to setoff payments by the Trust against such holder's liability to an asbestos personal injury claimant shall be preserved. Additionally, the Trust shall advocate in any and all

89

actions and proceedings brought against the Debtors and/or Reorganized Debtors which involve Debtor HPE Asbestos Claims that Debtor HPE Asbestos Claims shall be dealt with only in accordance with the terms of the Plan, and the Trust Documents shall provide that the Trust shall cooperate with the Debtors and/or Reorganized Debtors in any and all such actions and proceedings.

      **4.2.2.**    For the avoidance of doubt, the Trust's assumption of liabilities to the extent and as set forth in the Plan, including the assumption of any Asbestos Personal Injury Claims against the Debtors, shall not be conditional on the occurrence of the Plan A Date or otherwise limited by anything in the Addendum.

    **4.3.**    <u>Receipt Of Trust Assets</u>. On the Effective Date, all Trust Assets shall be automatically and without further act or deed, transferred to, vested in and assumed by the Trust, subject to the notification requirements contained in Sections 10.3 and 10.5 of the Plan; provided, however, that to the extent that certain Trust Assets, because of their nature or because such assets will accrue or become transferable subsequent to the Effective Date, cannot be transferred to, vested in and assumed by the Trust on the Effective Date, such Trust Assets shall be automatically, and without further act or deed, transferred to, vested in and assumed by the Trust as soon as practicable after the Effective Date.

    **4.4.**    <u>Discharge Of Liabilities To Holders Of Asbestos Personal Injury Claims</u>. Except as provided in the Plan (including, without limitation, the exceptions provided in Section 4.5 hereof and Section 9.3.2(b)(v) of the Plan concerning non-Debtor Affiliates), the transfer to, vesting in and assumption by the Trust of the Trust Assets as contemplated by the Plan shall, as of the Effective Date, discharge all obligations and liabilities of and bar recovery or any action against the Released Parties and their respective estates, Affiliates and subsidiaries, for or in respect of all Asbestos Personal Injury Claims and Demands, including, but not limited to, all Indirect Asbestos Personal Injury Claims and Demands against the Debtors, the Reorganized Debtors, and their respective Estates, Affiliates and subsidiaries (and the Confirmation Order shall so provide for such discharge). Except as provided in Sections 8.22.3.2 and 4.5 hereof, the Trust shall as of the Effective Date assume sole and exclusive responsibility and liability for all Asbestos Personal Injury Claims, including, but not limited to, Indirect Asbestos Personal Injury Claims, against the Debtors, the Reorganized Debtors, and their respective Estates, Affiliates and subsidiaries, and also except as provided in Section 4.5 hereof, such Claims shall be paid by the Trust from the Trust Assets or as otherwise directed in the Trust Documents. The Trust shall indemnify and hold the Reorganized Debtors and their non-Debtor Affiliates harmless from and against any and all Asbestos Personal Injury Claims, as well as all associated costs and expenses, to the extent set forth in Section 4.14 below. Additionally, notwithstanding the foregoing and anything to the contrary in the Plan or the Trust Documents, each Reorganized Hercules-Protected Entity shall also be conclusively deemed to have suffered a loss (y) in the amount of any and all unreimbursed fees, costs and expenses incurred by such Reorganized Hercules-Protected Entity on and after the Effective Date in defending against Asbestos Personal Injury Claims and (z) in the amount of any unreimbursed fees, costs, expenses, indemnity payments, reimbursement amounts, additional premiums or other amounts paid by such Hercules-Protected Entity on and after the Effective Date related to the Hercules Policy or the EL Asbestos Insurance. The Trust shall indemnify the applicable indemnitee(s) in respect of any such losses in full (without regard to any limitation in Section 4.14 below).

**4.5.    Special Provisions Applicable to the Reorganized Hercules-Protected Entities**. Notwithstanding any other provisions of the Plan to the contrary, the following provisions regarding the Trust and certain Asbestos Personal Injury Claims shall apply to the Reorganized Hercules-Protected Entities:

**4.5.1.**    On the Effective Date, the Trust will assume all liability for Asbestos Personal Injury Claims against the Reorganized Hercules-Protected Entities in excess of both (i) the Hercules Retention and the Hercules Coverage and (ii) all other sums as are attributable to or otherwise represent the Hercules Recoveries to the extent such amounts exceed the Hercules Coverage; provided, however, the Trust shall not assume liability for Asbestos Personal Injury Claims to the extent such Claims are covered by the indemnity provisions of the EL Asbestos Insurance (but shall assume such Claims to the extent they are in excess of the sums referred to in (i) and (ii) above and are not covered by the indemnity provisions of the EL Asbestos Insurance).

**4.5.2.    Rights granted with the Trust Claim**

**(a)**    Each holder of a Debtor HPE Asbestos Claim shall be entitled to a claim (a *"Trust Claim"*) against the Trust which shall be separate and distinct from the Debtor HPE Asbestos Claim.

**(b)**    A Trust Claim shall confer, and be limited to conferring, on the holder thereof (y) the right to receive such payment, if any, as is offered or payable by the Trust in accordance with and subject to the terms of the Trust Documents, and (z) the right to pursue any remedies that the holder may have under the Trust Documents against the Trust in respect of the Trust Claim.

**(c)**    For the avoidance of doubt, in the event that, for any reason, the Trust (y) has no funds enabling it to make any or any further payment(s) to the holder of any Trust Claim or (z) fails to make any or any further payment(s) to the holder of any Trust Claim which should have been made in accordance with the terms of the Trust Documents:

(i)    the right of the holder of the Trust Claim remains strictly limited to asserting the Trust Claim, and any claim arising for failure to make payments in accordance with the terms of the Trust Documents may be asserted solely against the Trust; and

(ii)    the terms and provisions of the Plan do not oblige, require or render liable the Debtors in any circumstances to make any payment to the holder of any Trust Claim or the Trust in respect of any sum due to the holder of a Trust Claim from the Trust.

**4.5.3.    Responsibility for seeking recovery under Hercules Policy**.  The Trust and the U.K. Asbestos Trustee shall be jointly responsible for seeking recovery under the Hercules Policy (in the case of the Trust, in accordance with and subject to the provisions of the power of attorney granted by Reorganized T&N pursuant to Section 4.5.11(a)) in a manner which does not contravene the terms of the Hercules Policy.  In the event that the Trust and the U.K. Asbestos Trustee, acting reasonably, are nevertheless unable to agree on a particular matter

91

relating to the Hercules Policy, the English Court shall by Final Order resolve the dispute between them. In the event that the English Court declines for whatever reason to resolve the dispute between the Trust and the U.K. Asbestos Trustee or in the event that the Trust and the U.K. Asbestos Trustee agree that the matter should not be referred to the English Court, then the Trust acting reasonably shall have the exclusive right to determine the matter in question.

### 4.5.4. General provisions applicable to the Hercules Policy and the EL Asbestos Insurance

(a)    Nothing in the Plan or the Trust Documents shall require either expressly or implicitly the Hercules-Protected Entities or their appointed agents or representatives to act other than in accordance with and subject to the terms of the Hercules Policy or the EL Asbestos Insurance.

(b)    Nothing in the Plan or the Trust Documents is intended to affect the validity, effectiveness or terms of the Hercules Policy or the EL Asbestos Insurance, which shall continue to bind the Debtors that are parties thereto immediately after the Effective Date to the same extent as they did immediately before it.

### 4.5.5. Stock Repayment Obligation

(a)    On the Effective Date, the Trust will subscribe for 57.5% of the Reorganized Federal-Mogul Class B Common Stock for the subscription price of £338,000,000.00, such sum being left outstanding as a debt owing by the Trust to Reorganized Federal-Mogul.

(b)    Immediately following such subscription and the issue to the Trust (specifically, the T&N Worldwide Fund within the Trust), Reorganized Federal-Mogul hereby assigns and transfers and agrees to assign and transfer to Reorganized T&N by way of capital contribution all of its right, title and interest in and to such debt (the *"Stock Repayment Obligation"*).

(c)    The Stock Repayment Obligation shall be payable by offset, in whole or in part, upon notice by either Reorganized T&N to the Trust or by the Trust to Reorganized T&N in exercise of the option provided for by Section 4.5.10(a)(i), or shall be payable, in whole or in part, upon notice by the Trust to Reorganized T&N in exercise of the option provided for by Section 4.5.10(a)(ii). The Stock Repayment Obligation shall also be payable by offset as set forth in Section 4.5.21(b). To the extent not payable at any earlier date pursuant to Section 4.5.5, the Stock Repayment Obligation shall be payable 20 years after the Effective Date.

### 4.5.6. Limited Recourse to assets of Reorganized Hercules-Protected Entities. On and from the Effective Date until discharge and release under Section 4.5.20 of the Plan, any liability of the Reorganized Hercules-Protected Entities for Asbestos Personal Injury Claims (including for the avoidance of doubt CVA Asbestos Claims) and any costs and interest due or which may become due in relation thereto shall continue in full, but recourse to the assets of the Reorganized Hercules-Protected Entities in respect of such liabilities shall, by operation of the Plan, be limited in and to the assets of the relevant Reorganized Hercules-Protected Entity as

92

specifically referred to in Section 4.5.10(b) and shall otherwise be without recourse as to the relevant Reorganized Hercules-Protected Entities or any of their assets.

### 4.5.7.    Assignment of rights

(a)    With effect from the Effective Date, and pursuant to the Plan, each holder of a Debtor HPE Asbestos Claim hereby assigns and agrees to assign to the Trust his rights to the proceeds of his Debtor HPE Asbestos Claim (whenever such rights may arise).

(b)    With effect from the Effective Date, each holder of a Debtor HPE Asbestos Claim hereby assigns and agrees to assign to Reorganized T&N, all 1930 Act Rights (whenever arising) in respect of or in connection with the Hercules Policy or to the extent that such holder has already assigned or agreed to assign the same under the Principal CVAs, such holder hereby confirms and ratifies such assignment or agreement to assign).

(c)    Each holder of a Debtor HPE Asbestos Claim against a Reorganized Hercules-Protected Entity undertakes with Reorganized T&N that he will not commence or continue any proceedings against Curzon in exercise or purported exercise of his 1930 Act Rights in respect of the Hercules Policy or otherwise.

(d)    Reorganized T&N shall hold the benefit of the undertaking given in Section 4.5.7(c) on trust for itself and Curzon such that Curzon shall be entitled to enforce the provisions of Section 4.5.7(c) directly against each such holder of a Debtor HPE Asbestos Claim.

(e)    Reorganized T&N shall not, after the assignment of 1930 Act Rights or the agreement to assign 1930 Act Rights has taken effect pursuant to Section 4.5.7(b) or the Principal CVAs, assign or otherwise encumber or transfer those 1930 Act Rights or the entitlement to receive the proceeds of those 1930 Act Rights, including, without limitation, its entitlement to receive Hercules Recoveries (other than its entitlement to receive Hercules Recoveries from the Trust and/or the U.K. Asbestos Trustee pursuant to Section 4.5.12(c)).

### 4.5.8.    Appointment of the Trust as agent to assert Claims

(a)    From and after the Effective Date, each holder of a Debtor HPE Asbestos Claim irrevocably appoints the Trust as his agent, in the name of such holder or otherwise, to assert such Debtor HPE Asbestos Claim against the Reorganized Hercules-Protected Entity in any appropriate forum, and such holder shall not be entitled to assert such holder's Debtor HPE Asbestos Claim except through the agency of the Trust. To the extent permitted by law, this appointment shall remain in full force and effect notwithstanding the death, bankruptcy or insolvency of such holder. This appointment shall be in addition and without prejudice to the authority conferred by any power of attorney given by the holder of a Debtor HPE Asbestos Claim to the Trust pursuant to the Trust Documents.

(b)    Each holder of a Debtor HPE Asbestos Claim shall do such acts and things and execute such deeds and documents and in particular such forms of assignment, transfer or assurance as the relevant assignee in Sections 4.5.7(a) or 4.5.7(b) may from time to time require to vest in such assignee fully and effectively all the rights assigned or to perfect or evidence the vesting in such assignee of the same. Holders of Trust Claims shall cooperate with the Trust in

93

the assertion of Debtor HPE Asbestos Claims against Reorganized T&N or any of the other Reorganized Hercules-Protected Entities. Each such holder hereby unconditionally appoints the Trust to be his agent and on his behalf to do such acts and things and execute such documents as may be required to give effect to this Section 4.5.8(b). Without prejudice to the above assignments, if and to the extent that any interest in any such right as is hereby assigned does not for any reason immediately vest fully and effectively in the assignee, the same shall be held by the said holder absolutely on trust for the Trust or Reorganized T&N (as the case may be) until it does so vest.

(c)    The Trust shall indemnify each holder of a Debtor HPE Asbestos Claim against any costs that may be awarded against such holder in any legal proceedings brought by the Trust on behalf of such holder.

(d)    Without prejudice to the Trust's assertion on behalf of the holder of a Debtor HPE Asbestos Claim of his rights against the applicable Reorganized Hercules-Protected Entity in respect of that holder's particular Debtor HPE Asbestos Claim, no sum received in respect of a Trust Claim shall reduce or extinguish the liability of the applicable Reorganized Hercules-Protected Entity in respect of the Debtor HPE Asbestos Claim.

(e)    The Reorganized Hercules-Protected Entities shall, subject to and in accordance with the provisions of the Hercules Policy including, without limitation, the claims handling rights of Curzon and/or the Reinsurers (whatever they may be), retain the right to assert any defenses, counterclaims, offsets, rights of contribution or any other rights and remedies for the purpose of reducing or defeating their liability for any Debtor HPE Asbestos Claim.

(f)    Without prejudice to the foregoing and in recognition of Curzon and/or the Reinsurers' asserted claims handling rights:

(i)    the Reorganized Hercules-Protected Entities will, to the extent required by the Hercules Policy, refer Debtor HPE Asbestos Claims to Curzon and/or the Reinsurers or its or their appointed claims handling designee for the further administration, defense and disposition of the Debtor HPE Asbestos Claims and Curzon and/or the Reinsurers will be entitled to exercise all claims handling rights under the Hercules Policy in relation to such proceedings, including defense or settlement of the Debtor HPE Asbestos Claim; and

(ii)    the claim of the holder of a Debtor HPE Asbestos Claim against the Reorganized Hercules-Protected Entities (acting by his agent the Trust) shall be allowed to proceed in the ordinary course to judgment or settlement, but the holder of a Debtor HPE Asbestos Claim (acting by his agent the Trust) shall not be permitted to enforce any judgment or settlement except in accordance with the provisions of Sections 4.5.6 and 4.5.10(b).

(g)    Any rights of the holder of a Debtor HPE Asbestos Claim to payment from the Trust in respect of a Trust Claim shall be determined solely under and in accordance with the Trust Documents.

94

**4.5.9.    Establishment of Asbestos Personal Injury Claims.** A Debtor HPE Asbestos Claim is established for the purpose of this Section 4.5.9 when it is established as owing by a Reorganized Hercules-Protected Entity by final judgment or award of a court or arbitrator of competent jurisdiction or when (to the extent required by the Hercules Policy, with the consent of Curzon and/or the Reinsurers, as applicable) an agreement is entered into between the holder of a Debtor HPE Asbestos Claim (acting by his agent the Trust) and the applicable Reorganized Hercules-Protected Entity under which the Debtor HPE Asbestos Claim is so established. CVA Asbestos Claims shall be established pursuant to the Principal CVAs.

**4.5.10.    Satisfaction of or non-enforcement of established Asbestos Personal Injury Claims**

(a)    Once a Debtor HPE Asbestos Claim has been established pursuant to Section 4.5.9, or a CVA Asbestos Claim has been established pursuant to the Principal CVAs, the liability of any Reorganized Hercules-Protected Entity concerned in respect of that Claim, and in respect of any costs and interest due or which may become due in relation thereto, may only be satisfied and discharged by payment or deemed payment to the Trust or the U.K. Asbestos Trustee, as applicable, as agent of the holder of the Claim, as follows:

(i)    (at the option of either the Trust or Reorganized T&N, and notwithstanding that the obligation to the Trust is in its capacity as agent of the holder of that Claim against the Reorganized Hercules-Protected Entity) by setting off against the liability in respect of an established Debtor HPE Asbestos Claim an equivalent amount of the Stock Repayment Obligation (provided that, if the Reorganized Hercules-Protected Entity is not Reorganized T&N, such set off shall not be effected without the prior written consent of Reorganized Federal-Mogul) and in order to effect such set-off, where such consent is given, Reorganized T&N hereby agrees to assign and transfer, for no consideration and at the time that the option is exercised (or, if later, at the time that such consent is given), to the applicable Reorganized Hercules-Protected Entity such part of the Stock Repayment Obligation as is equal to the Debtor HPE Asbestos Claim that has been so established;

(ii)    (at the option of the Trust) by the Trust paying the whole or part of the Stock Repayment Obligation to Reorganized T&N for the purpose of enabling Reorganized T&N to satisfy, or (with the prior written consent of Reorganized Federal-Mogul) to arrange for the relevant Reorganized Hercules-Protected Entity to satisfy, the liability (any such sum to be received and held by Reorganized T&N in trust for that purpose);

(iii)    by payment by the relevant Reorganized Hercules-Protected Entity out of funds made available (whether by loan or in any other manner agreed between Reorganized Federal-Mogul and the Trust and/or the U.K. Asbestos Trustee) to:

(1)    Reorganized T&N, or

95

(2)    (with the prior written consent of Reorganized Federal-Mogul) any other Reorganized Hercules-Protected Entity other than Reorganized T&N,

by the Trust and/or U.K. Asbestos Trustee and/or any other person for the purpose of satisfying any Debtor HPE Asbestos Claims that have been established pursuant to Section 4.5.10 and/or any CVA Asbestos Claims that have been established pursuant to the Principal CVAs; or

(iv)    by payment out of any Hercules Recoveries payable and to be applied under Section 4.5.12(a) *Secondly* or *Thirdly*.

(b)    There shall be no recourse to the assets of any Reorganized Hercules-Protected Entity in respect of any Asbestos Personal Injury Claim that may be established against it except (i) to the whole or any part of the Stock Repayment Obligation by way of set-off in accordance with Section 4.5.10(a)(i), (ii) to the proceeds of the repayment of the whole or any part of the Stock Repayment Obligation in accordance with Section 4.5.10(a)(ii), (iii) to the funds made available to the relevant other Reorganized Hercules-Protected Entity in accordance with Section 4.5.10(a)(iii), or (iv) by payment out of the Hercules Recoveries in accordance with Section 4.5.10(a)(iv).

(c)    Any loan made by the Trust and/or the U.K. Asbestos Trustee for the purpose mentioned in Section 4.5.10(a)(iii) shall:

(i)    be made to Reorganized T&N or any other Reorganized Hercules-Protected Entity provided that, if the Reorganized Hercules-Protected Entity is not Reorganized T&N, the loan shall not be made except with the prior written consent of Reorganized Federal-Mogul;

(ii)    be made free of interest;

(iii)    be repayable only to the extent of the Repayment Percentage of the principal amount advanced in respect of the relevant Debtor HPE Asbestos Claim or CVA Asbestos Claim; and

(iv)    be repayable only from Hercules Recoveries actually recovered and that are to be applied in accordance with the provisions of Section 4.5.12(a) First, but shall otherwise be without recourse to the assets of the Reorganized Hercules-Protected Entity in question.

(d)    It is acknowledged that any benefit derived by a Reorganized Hercules-Protected Entity from the limited recourse provisions in this Section 4.5.10 and in Section 4.5.6 and the indemnities in favor of any Reorganized Hercules-Protected Entity contained in Sections 4.4 and 4.14 are conferred voluntarily upon the relevant Reorganized Hercules-Protected Entity and that it is for the exclusive benefit of that Reorganized Hercules-Protected Entity and not in any respect for the benefit of any insurer.

(e)     To the extent that any Debtor HPE Asbestos Claim has been established and is payable to the Trust in a currency other than British Pounds Sterling, and the liability is to be satisfied by setting off the sum due against the Stock Repayment Obligation, such Debtor HPE Asbestos Claim shall be converted at the London Spot Mid-Point Rate prevailing on the date when the set-off is made or, if such date is not a Business Day, on the previous Business Day, as published in the Financial Times of London.

### 4.5.11.    Process of making Hercules Recoveries

(a)     Reorganized T&N shall, by the Effective Date, provide the Trust with a power of attorney in the form of Exhibit 4.5.11 to enable the Trust to take all necessary and/or appropriate steps (subject to the indemnity contained in Section 4.14.5) to pursue Hercules Recoveries in respect of Debtor HPE Asbestos Claims (but not to receive any payments thereof, except as may be permitted by Section 4.5.12) including the giving of any instructions to the Hercules Payment Agents (being instructions which are not inconsistent with the terms of the Plan). For the avoidance of doubt, Reorganized T&N shall not be obliged to incur any Hercules Recovery Costs in pursuing any claim against Curzon under the Hercules Policy other than those incurred on its behalf through the use of the power of attorney referred to above and for which it is indemnified under the indemnity contained in Section 4.14.5.

(b)     The Trust and the U.K. Asbestos Trustee shall cooperate with one another in order to give effect to the split of Hercules Recoveries as is provided for in Section 4.5.12.

(c)     If the holder of a Debtor HPE Asbestos Claim receives any Hercules Recoveries in respect of such Claim, he shall hold such Hercules Recoveries in trust for the purposes set out in Section 4.5.12(a) and shall pay such Hercules Recoveries to the credit of the Hercules Receipt Account on demand.

(d)     As soon as practicable after the Effective Date, the Trust shall (i) accede to the Hercules Payment Agency Agreement by executing an accession deed substantially in the form set out in Schedule 1 to the Hercules Payment Agency Agreement (ii) use all reasonable endeavors to procure that the Trust shall become an account holder of the Hercules Waterfall Account jointly with the U.K. Asbestos Trust.

(e)     In addition to the foregoing, paragraphs 19.7.4 through 19.7.7 of the Principal CVAs are hereby incorporated by reference as if fully set forth herein, but with any necessary changes and as if each reference to a CVA Asbestos Claim were a reference to a Debtor HPE Asbestos Claim.

### 4.5.12.    Division of Hercules Recoveries – Hercules waterfall

(a)     All Hercules Recoveries shall be paid to the credit of the Hercules Receipt Account and shall be held by Reorganized T&N in trust to be applied:

*First*: in reduction or discharge of any indebtedness (i) of Reorganized T&N under any loans made to Reorganized T&N, or (ii) of any Reorganized Hercules-Protected Entity (other than Reorganized T&N) under any loans made, with the prior written consent of Reorganized Federal-Mogul, to such Reorganized

97

Hercules-Protected Entity, in each case by the Trust and/or U.K. Asbestos Trustee for the purpose of satisfying Debtor HPE Asbestos Claims that have been established pursuant to Section 4.5.9 and/or for the purpose of satisfying CVA Asbestos Claims that have been established pursuant to the provisions of the Principal CVAs;

*Secondly*: in or towards satisfaction of any liability of Reorganized T&N or, with the prior written consent of Reorganized Federal-Mogul, of any Reorganized Hercules-Protected Entity other than Reorganized T&N, for Debtor HPE Asbestos Claims that have been established pursuant to Section 4.5.9 and/or for CVA Asbestos Claims that have been established pursuant to the provisions of the Principal CVAs and (in each case) for any costs and interest due in relation thereto; and

*Thirdly*: in payment to:

(i)    the Trust on account of and in reduction or discharge of any Debtor HPE Asbestos Claims:

(1)    that may be established in the future against Reorganized T&N or, with the prior written consent of Reorganized Federal-Mogul, of any Debtor HPE Asbestos Claims that may be established in the future against any Reorganized Hercules-Protected Entity other than Reorganized T&N, in each case pursuant to Section 4.5.9, or

(2)    for which Reorganized T&N or any other Hercules Protected Entity could but for such payment otherwise have become liable; and/or

(ii)    the U.K. Asbestos Trustee on account of and in reduction or discharge of any CVA Asbestos Claims:

(1)    that may be established in the future against Reorganized T&N or, with the prior written consent of Reorganized Federal-Mogul, of any CVA Asbestos Claims that may be established in the future against any Reorganized Hercules-Protected Entity other than Reorganized T&N, in each case pursuant to the provisions of the Principal CVAs, or

(2)    for which Reorganized T&N or any other Hercules-Protected Entity could but for such payment otherwise have become liable;

such payments to be dealt with in accordance with Section 4.5.12(c).

(b)    The application of Hercules Recoveries provided for by Section 4.5.12(a) shall be effected by the transfer of the Hercules Recoveries from the Hercules Receipt Account to the Hercules Waterfall Account by the end of the Business Day upon which they are received in cleared funds to the credit of the Hercules Receipt Account (or as soon thereafter as is practicable) and such transfer shall upon being made (automatically and without any further action on the part of Reorganized T&N) repay the indebtedness or satisfy the liabilities or be paid on account of Debtor HPE Asbestos Claims or CVA Asbestos Claims as provided for by

98

Section 4.5.12(a) in the order of application set out therein to the extent of the Hercules Recoveries so transferred.

    **(c)**    The Trust (when it has become into existence and has become an account-holder of the Hercules Waterfall Account) and the U.K. Asbestos Trustee shall hold the Hercules Recoveries standing to the credit of the Hercules Waterfall Account, including any interest and other income accruing thereon from time to time, in trust to be applied on each Review Date (or, if there has been a commutation or settlement of the Hercules Policy, as soon as practicable after transfer of the Hercules Recoveries to the Hercules Waterfall Account representing the proceeds of commutation or settlement), as follows:

    *First*: (subject to Section 4.5.18) in or towards satisfaction of those sums due to the Hercules Payment Agents representing remuneration or expenses from time to time due to or payable by the Hercules Payment Agents pursuant to the provisions of the Hercules Payment Agency Agreement;

    *Secondly*: in or towards reimbursement on a pari passu basis to (i) Reorganized T&N or any other Hercules-Protected Entity of any sum actually paid by it that remains outstanding representing Hercules Claims Handling Costs (save that Reorganized T&N or the relevant Hercules-Protected Entity shall not seek reimbursement of, or, as the case may be, shall give credit for, any VAT charged to it on such sum to the extent recoverable and actually recovered by it) and (ii) Reorganized T&N of any sum actually paid by Reorganized T&N representing Hercules Recovery Costs that remains outstanding;

    *Thirdly*: in or towards reimbursement on a pari passu basis (a) to the Trust of any sum actually paid by it to Reorganized T&N or any other Hercules-Protected Entity that remains outstanding in respect of those liabilities referred to in Section 4.5.12(c) *Secondly* pursuant to any indemnity or similar obligation of the Trust (whether pursuant to Section 4.14.6 or otherwise) and (b) to the U.K. Asbestos Trustee of any sum actually paid by it to Reorganized T&N or any other Hercules-Protected Entity that remains outstanding in respect of the liabilities referred to in Section 4.5.12(c) *Secondly* pursuant to any indemnity or similar obligation of the U.K. Asbestos Trustee (whether pursuant to paragraphs 16.2(e) or 28 of the Principal CVAs or otherwise);

    *Fourthly*: in or towards reimbursement on a pari passu basis (i) to the Trust of (aa) any sum actually paid by it that remains outstanding representing Hercules Claims Handling Costs not included in Section 4.5.12(c) *Thirdly*, (save that the Trust shall not seek reimbursement of, or, as the case may be, shall give credit for, any VAT on such sum to the extent recoverable and actually recovered by it) and (bb) any sum actually paid by it that remains outstanding representing Hercules Recovery Costs not included in Section 4.5.12(c) *Thirdly*, and (ii) to the U.K. Asbestos Trustee of (aa) any sum actually paid by it that remains outstanding representing Hercules Claims Handling Costs not included in Section 4.5.12(c) *Thirdly*, (save that the U.K. Asbestos Trustee shall not seek reimbursement of, or, as the case may be, shall give credit for, any VAT on such sum to the extent

99

recoverable and actually recovered by it) and (bb) any sum actually incurred by it that remains outstanding representing Hercules Recovery Costs not included in Section 4.5.12(c) *Thirdly*. To the extent that either the Trust or the U.K. Asbestos Trustee pay Hercules Claims Handling Costs or Hercules Recovery Costs out of their own assets (or, in the case of the U.K. Asbestos Trustee, such sums are paid out of the Remuneration Reserve or the Remuneration Fund), they shall be entitled to recover an amount equal to such Hercules Claims Handling Costs or Hercules Recovery Costs pursuant to this Section 4.5.12(c) *Fourthly* as if such amount were Hercules Claims Handling Costs or Hercules Recovery Costs which remained outstanding;

*Fifthly*: in or towards establishing a reasonable reserve to meet remuneration which will fall due, and expenses which the Hercules Payment Agents have forecast are likely to be incurred by the Hercules Payment Agents, pursuant to the provisions of the Hercules Payment Agency Agreement in the period of 6 months following the relevant or (as the case may be) the last Review Date, to the extent not already reserved by a previous determination;

*Sixthly*: in or towards establishing a reasonable reserve to meet Hercules Claims Handling Costs and Hercules Recovery Costs which the Hercules Payment Agents, in consultation with Reorganized T&N, the Trust and the U.K. Asbestos Trustee have forecast are likely to be incurred by any of Reorganized T&N, any other Hercules-Protected Entity, the Trust or the U.K. Asbestos Trustee in the period of 6 months following the relevant or (as the case may be) the last Review Date to the extent not already reserved by a previous determination; and

*Seventhly*, as to the balance of Hercules Recoveries available on the date of application under this Section 4.5.12(c):

      (i)     if it is determined pursuant to Section 4.5.13 that either or both of GHI or Ferodo are entitled to Hercules Recoveries, in payment to the Trust of an amount equal to:

      (1)     21% of the balance if both GHI and Ferodo are determined to be so entitled,

      (2)     17% of the balance if only GHI is determined to be so entitled, or

      (3)     4% of the balance if only Ferodo is determined to be so entitled,

or, in each case, such other percentage as may be agreed between the Trust and the U.K. Asbestos Trustee; and

      (ii)     as to the remaining balance, in payment of:

      (1)     the U.S. Asbestos Trust Percentage of such balance, first, to Reorganized Federal-Mogul in payment of any amounts owing to it under any indemnity

contained in the Plan given by the Trust to Reorganized Federal-Mogul and, secondly, to the Trust;

(2)    the U.K. Asbestos Trust Percentage of such balance to the U.K. Asbestos Trustee (with any sums so paid forming part of the assets of the T&N Hercules Fund); and

(3)    the Chester Street Percentage of such balance to the U.K. Asbestos Trustee, with any sums so paid forming part of the assets of the Chester Street Hercules Fund.

**4.5.13.    Possible entitlement of GHI and Ferodo to Hercules Recoveries.** The amount of the Hercules Recoveries to which:

(a)    T&N (or the holders of 1930 Act Rights in respect of T&N), and

(b)    either or both of GHI and Ferodo,

are entitled between and among them shall be determined by the English Court by Final Order or agreed by the relevant parties and any application for directions commenced by the Administrators of T&N to seek such determination may be continued by the Supervisors following the discharge of the Administration Order in respect of T&N. Hercules Recoveries to which either or both of GHI and Ferodo and/or the holders of Asbestos Personal Injury Claims against GHI or Ferodo are determined to be entitled (not being payments made under Section 4.5.12(c) *Seventhly* (i)) shall be paid to the Hercules Receipt Account to be applied in accordance with Section 4.5.12(a).

App. 145

**4.5.14.    Alteration of the Chester Street Percentage.** Paragraph 19.10 of the Principal CVAs is hereby incorporated by reference as if fully set forth herein (but with any necessary changes).

**4.5.15.    Loans to Reorganized Hercules-Protected Entities.** Paragraph 19.11 of the Principal CVAs is hereby incorporated by reference as if fully set forth herein (but with any necessary changes).

**4.5.16.    Hercules U.S. Holding Account.** Paragraph 19.12 of the Principal CVAs is hereby incorporated by reference as if fully set forth herein (but with any necessary changes).

**4.5.17.    Investment of Hercules Recoveries.** Paragraph 19.13 of the Principal CVAs is hereby incorporated by reference as if fully set forth herein (but with any necessary changes).

**4.5.18.    Payment of tax on interest.** Paragraph 19.14 of the Principal CVAs is hereby incorporated by reference as if fully set forth herein, except that the reference to CVAs in paragraph 19.14.3 of the Principal CVAs shall be deemed to be a reference to the Plan (but with any necessary changes).

**4.5.19.    Certain Recoveries under the Hercules Policy**

(a)    To the extent that:

(i)    any Hercules-Protected Entity (other than a U.K. Debtor party to the Principal CVAs or Ferodo or GHI) is sued or otherwise pursued on a liability or alleged liability (other than with respect to a Non-CVA Asbestos Claim) for which coverage is provided under the Hercules Policy, or

(ii)    any Hercules-Protected Entity is sued or otherwise pursued in respect of a Non-CVA Asbestos Claim for which coverage is provided under the Hercules Policy (unless the holder of such claim has made an election under paragraph 19.17 of the Principal CVAs for his Non-CVA Asbestos Claim to be treated as if it were a CVA Asbestos Claim), subject to Section 4.5.19(c)), Reorganized T&N shall be entitled (but not required), at Reorganized T&N's own cost (which cost shall not be liable to be reimbursed whether under Section 4.5.12(c) or otherwise), to seek and obtain coverage for such liability under or with respect to the Hercules Policy and retain the proceeds thereof. This is subject to the proviso, however, that Reorganized T&N shall pay to the Hercules Payment Agents (and the Hercules Payment Agents shall pay to the U.K. Asbestos Trustee) any and all proceeds paid on account of such liability by Curzon less the following amounts that may be retained by Reorganized T&N, namely:

(iii)    the amount (if any) to which GHI and Ferodo would have been entitled had Section 4.5.12(c) *Seventhly* applied to such proceeds, and

(iv)    an amount equal to the U.S. Asbestos Trust Percentage of the balance of such proceeds.

102

Reorganized T&N's rights under this Section 4.5.19(a) shall not prevent a commutation or settlement of the Hercules Policy (subject to and in accordance with Section 4.5.21) if the Trust and the U.K. Asbestos Trustee agree to a commutation or settlement with Curzon and the Reinsurers. Reorganized T&N's rights under this Section 4.5.19(a) shall be extinguished on such commutation or settlement and the Trust and the U.K. Asbestos Trustee shall have no obligation to consult Reorganized T&N in relation to any such commutation or settlement.

**(b)**    The proceeds received by the U.K. Asbestos Trustee pursuant to Section 4.5.19(a) shall be divided between the T&N Hercules Fund and the Chester Street Hercules Fund in the ratio that the U.K. Asbestos Trust Percentage bears to the Chester Street Percentage respectively.

**(c)**    In exercising its rights under Section 4.5.19(a), Reorganized T&N shall in good faith (a) consult with the Trust and the U.K. Asbestos Trustee and give consideration to their views and (b) give the Trust and the U.K. Asbestos Trustee reasonable notice of its intention to commence any legal proceedings against either or both of Curzon or the Reinsurers (or of any legal proceedings which either or both of Curzon or the Reinsurers take against Reorganized T&N in consequence of its exercise of its rights under Section 4.5.19(a)) and shall provide the Trust and the U.K. Asbestos Trustee with copies of such documents as they may reasonably require in relation to any such proceedings. Nothing in this Section 4.5.19(c) shall oblige Reorganized T&N to provide the Trust or the U.K. Asbestos Trustee with documents that are privileged or documents the provision of which might reasonably be expected to prejudice its case in any proceedings.

**4.5.20.    Discharge of liability for Debtor HPE Asbestos Claims and CVA Asbestos Claims**

**(a)**    From and after the Hercules Policy Expiry Date,

(i)    the Trust will assume sole and exclusive liability for all remaining Asbestos Personal Injury Claims (whether then existing or at any time in the future coming into existence) against the Reorganized Hercules-Protected Entities (other than Claims covered by the indemnity provisions of the EL Asbestos Insurance, to the extent so covered);

(ii)    the Reorganized Hercules-Protected Entities shall automatically and without further order of court be discharged and released from any and all liability with respect to Asbestos Personal Injury Claims (whether then existing or at any time in the future coming into existence and other than Claims covered by the indemnity provisions of the EL Asbestos Insurance, to the extent so covered); and

(iii)    all rights of the Reorganized Hercules-Protected Entities to assert any defenses, counterclaims, offsets, rights of contribution or similar rights and remedies for the purpose of reducing or defeating any Asbestos Personal Injury Claim (whether then existing or at any time in the future coming into existence and other than Claims covered by the indemnity provisions of the EL Asbestos Insurance, to the extent so

covered) shall be transferred from the Reorganized Hercules-Protected Entities to the Trust.

    **(b)**    With effect from the later of the Hercules Policy Expiry Date and the EL Asbestos Insurance Expiry Date:

    (i)    the Trust will assume sole and exclusive liability for all remaining Asbestos Personal Injury Claims (whether then existing or at any time in the future coming into existence) against the Reorganized Hercules-Protected Entities;

    (ii)    the Reorganized Hercules-Protected Entities shall be automatically and without further order of court-discharged and released from any and all liability with respect to such remaining Asbestos Personal Injury Claims (whether then existing or at any time in the future coming into existence);

    (iii)    all rights of the Reorganized Hercules-Protected Entities to assert any defenses, counterclaims, offsets, rights of contribution, or similar rights and remedies for the purpose of reducing or defeating any such remaining Asbestos Personal Injury Claim (whether then existing or at any time in the future coming into existence) shall be transferred from the Reorganized Hercules-Protected Entities to the Trust; and

    (iv)    Reorganized T&N agrees to assign to the Trust and to the U.K. Asbestos Trustee any interest that it may have in the Hercules Recoveries transferred to the Hercules Waterfall Account pursuant to Section 4.5.12 (but without prejudice to its right to receive any sums due to it under the applications set out in Section 4.5.12).

    **4.5.21.**    **Commutation**

    **(a)**    The Trust and the U.K. Asbestos Trustee may jointly negotiate with Curzon and/or the Reinsurers for the commutation of the Hercules Policy or settlement of claims thereunder. If requested to do so by the Trust and the U.K. Asbestos Trustee, Reorganized T&N will enter into any agreement with Curzon and/or the Reinsurers reasonably required to give effect to such commutation or settlement. Any such agreement may extinguish Reorganized T&N's rights to receive recoveries under the Hercules Policy under Section 4.5.19. This Section 4.5.21(a) is subject to the provisos:

    (i)    that Reorganized T&N shall not be required to enter into any such agreement unless the effect of the commutation or settlement is in the reasonable opinion of Reorganized Federal-Mogul Tax Neutral in the United Kingdom to Reorganized T&N and to each of the Hercules-Protected Entities, and

    (ii)    that the Trust shall not agree to any such commutation or settlement unless

    (1)    in the reasonable opinion of Reorganized Federal-Mogul the effect of the commutation or settlement is Globally Tax Neutral to Reorganized Federal-Mogul, each Subsidiary of Reorganized Federal-Mogul and any other Hercules-Protected Entity (an "*FMC Entity*");

(2)    if any portion of the Stock Repayment Obligation is then outstanding, then the commutation or settlement operates in satisfaction of all rights and obligations of both Curzon and T&N under the Hercules Policy and, prior to or contemporaneously with such commutation or settlement, the Stock Repayment Obligation then outstanding is fully extinguished; and

(3)    any portion of the Stock Repayment Obligation that is so extinguished is, in the reasonable opinion of Reorganized Federal-Mogul, extinguished in a manner such that no liability for tax (including, without limitation, any liability for tax arising in connection with any absolute or timing mismatch for any tax purpose) would arise for any FMC Entity in connection with the Stock Repayment Obligation (including, without limitation, the operation of Sections 4.5.5, 4.5.10, and 4.5.21 of the Plan).

**(b)**    If any portion of the Stock Repayment Obligation is outstanding at the time of any commutation or settlement, the Trust and Reorganized T&N may agree upon a final accounting of all remaining HPE Asbestos Claims (whether established through settlements, or otherwise pursuant to Section 4.5.9, but in each case excluding Claims covered by the indemnity provisions of the EL Asbestos Insurance, to the extent so covered) against Reorganized T&N or, with the prior consent of Reorganized Federal-Mogul against any Reorganized Hercules Protected Entity other than T&N, and, subject to Section 4.5.21(a), any agreement for the commutation of the Hercules Policy or settlement of claims thereunder may provide for the reduction by offset of the Stock Repayment Obligation against the amounts that were so agreed, such reduction to take effect contemporaneously with any such commutation or settlement and immediately prior to the discharge set forth in Section 4.5.20 of the Plan.

**(c)**    In addition to the foregoing, paragraphs 19.19.2 through 19.19.16 (with the exception of paragraph 19.19.16(c)) of the Principal CVAs are hereby incorporated by reference as if those paragraphs were fully set forth herein (save to the extent that any provision in those paragraphs imposes any obligation on Federal-Mogul that as at the Effective Date has already been performed), and as if terms used therein which are defined in the Principal CVAs had the meanings ascribed to them in the Principal CVAs, but with the following changes:

(i)    the reference to paragraph 19.7.1 in paragraph 19.19.9(c) of the Principal CVAs shall be substituted by a reference to Section 4.5.11 of the Plan; and

(ii)    the references to paragraphs 19.15.1 and 19.15.2 in paragraph 19.19.10 of the Principal CVAs shall be substituted by references to Sections 4.5.19(a) and 4.5.19(b) of the Plan respectively.

**4.6.    Special Provisions Relating to CVA Asbestos Claims**. As set forth in Sections 4.2 and 4.5 of the Plan, the Trust shall assume liability for all Asbestos Personal Injury Claims, including, without limitation, CVA Asbestos Claims. The Trust, however, shall direct all CVA Asbestos Claims to the U.K. Asbestos Trust for resolution in accordance with the Principal CVAs. The treatment of and payments to the holders of CVA Asbestos Claims by the U.K. Asbestos Trust in accordance with the Principal CVAs shall be the sole treatment and payments available to the holders of CVA Asbestos Claims. Such treatment and payments shall be deemed

105

to be treatment and payments by the Trust, and the holders of CVA Asbestos Claims shall have no other rights against the Trust or entitlement to any payments from the Trust.

**4.7.**    **The Swiss Re Settlement**.  All holders of Asbestos Personal Injury Claims against Reorganized T&N shall be deemed to approve and be bound by the Swiss Re Settlement and (notwithstanding Section 4.5.9) agree that any 1930 Act Rights respecting the Hercules Policy or otherwise shall be limited in the same way and to the same extent as Reorganized T&N's rights under the Hercules Policy are limited by the Swiss Re Settlement as if each and every holder of an Asbestos Personal Injury Claim against Reorganized T&N had entered into the Swiss Re Settlement on the same terms mutatis mutandis as Reorganized T&N.  This approval shall constitute formal approval to the entry by T&N into the settlement agreement between Curzon and T&N dated 16 January 2004 for the purpose of clause 2.1(iii) of that agreement.  Confirmation of the Plan shall constitute approval of the Swiss Re Settlement pursuant to section 1123(b) of the Bankruptcy Code.

**4.8.**    **Extension of Injunctions to Curzon and/or Its Reinsurers**.  After Confirmation of the Plan through and including the Effective Date, in the event that any commutation of or settlement of claims under the Hercules Policy is reached, the Debtors shall have the ability, with the consent of the Asbestos Claimants Committee and the Future Claimants Representative, to extend the provisions of the Supplemental Injunction and the Asbestos Insurance Entity Injunction so that those injunctions cover Curzon and/or its Reinsurers.

**4.9.**    **Investment Guidelines**.  Pursuant to Section 3.2 of the Trust Agreement, all monies held in the Trust shall be invested, subject to the investment limitations and provisions enumerated in the Trust Agreement, and shall not be limited to the types of investments described in Section 345 of the Bankruptcy Code.

**4.10.**    **Excess Trust Assets**.  To the extent there are any Trust Assets remaining at such time as the Trust is terminated, such excess Trust Assets shall be transferred to such charitable purposes as the Trustees, in their reasonable discretion, shall determine, provided that, if practicable, the charity or charities to which such excess Trust Assets are transferred shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos-related lung disorders.

**4.11.**    **Trust Expenses**. The Trust shall pay all Trust Expenses from the Trust Assets as provided in the Trust Documents, including proceeds of applicable Asbestos Insurance Policies, except to the extent such assets are precluded by agreement with an Asbestos Insurance Company from being used for payment of Trust Expenses.  Neither the Debtors' Estates nor the Reorganized Debtors shall have any obligation to pay any Trust Expenses.  Additionally, the Trust shall promptly pay all Trust Expenses of Reorganized Debtors for any and all liabilities, costs or expenses incurred in taking any action on behalf of or at the direction of the Trustees.

**4.12.**    **Selection Of The Initial Trustees**.  The three initial Trustees of the Trust shall be the persons identified in the Trust Agreement.  All successor Trustees shall be appointed in accordance with the terms of the Trust Agreement. For purposes of performing their duties and fulfilling their obligations under the Trust Agreement and the Plan, each Trustee shall be deemed

App. 150

to be (and the Confirmation Order shall so provide) a "party in interest" within the meaning of Section 1109(b) of the Bankruptcy Code.

### 4.13.  Advising The Trust.

**4.13.1.  The Trust Advisory Committee.**  The Trust Advisory Committee shall be established pursuant to the Trust Agreement.  The TAC shall have four members and shall have the functions, duties and rights provided in the Trust Agreement.  On or before the Confirmation Date, the four initial members of the TAC shall be selected by the Asbestos Claimants Committee.

**4.13.2.  Successor Committee Members.**  Each member of the Trust Advisory Committee shall serve in accordance with the terms and conditions contained in the Trust Agreement.

**4.13.3.  Future Claimants Representative.**  From and after the Effective Date, the Future Claimants Representative shall continue to serve in that capacity as an advisor to the Trust.

### 4.14.  Trust Indemnity Obligations.  Notwithstanding anything to the contrary in the Trust Documents, the Trust shall have the indemnification obligations set forth in Article IV of the Plan, including, without limitation, the indemnification obligations set forth below.

**4.14.1.**

(a)  Except as provided in section 4.14.2 below with respect to Non-Debtor Asbestos Claims against any non-Debtor Affiliates, if, on or after the Effective Date, the Reorganized Debtors and/or any of their non-Debtor Affiliates are held liable for any Asbestos Personal Injury Claim that is not for any reason successfully dealt with in accordance with the terms of the Plan and the Trust Documents or the CVAs (as the case may be), and if such Asbestos Personal Injury Claim is asserted in the United States, then the Trust shall indemnify the Reorganized Debtors and/or any of their non-Debtor Affiliates, as applicable, in full for any loss, cost, fees or expenses incurred in connection with such Asbestos Personal Injury Claim.

(b)  Except as provided in 4.14.2 below with respect to Non-Debtor Asbestos Claims, if, on or after the Effective Date, the Reorganized Debtors and/or any of their non-Debtor Affiliates are held liable for any Asbestos Personal Injury Claim that is not for any reason successfully dealt with in accordance with the terms of the Plan and the Trust Documents or the CVAs (as the case may be), and if such Asbestos Personal Injury Claim is asserted outside of the United States, then the Trust shall indemnify the Reorganized Debtors and/or any of their non-Debtor Affiliates, as applicable, in an amount equal to (i) the value of such Asbestos Personal Injury Claim as determined by settlement or judgment times (ii) the applicable payment percentage under the Asbestos Personal Injury Trust Distribution Procedures.  For purposes of determining the amount of indemnification due under this Section 4.14 and only for such purpose, the value of such Asbestos Personal Injury Claim as set forth in (i) shall be the amount of any settlement or judgment plus all costs of defenses and expenses related to such Asbestos Personal Injury Claim.  Notwithstanding anything to the contrary, if the Asbestos Personal Injury Claim for which indemnity is due under this Section 4.14 is an Other Asbestos Disease (Disease

Level I – Cash Discount Payment) as defined in the Asbestos Personal Injury Trust Distribution Procedures, then the Trust shall indemnify the Reorganized Debtors and/or any of their non-Debtor Affiliates, as applicable, in an amount equal to the Scheduled Value for such Asbestos Personal Injury Claim.

4.14.2.    If, on or after the Effective Date, the Reorganized Debtors and/or any of their non-Debtor Affiliates are held liable for any claim attributable to, directly or indirectly, injuries or other damages caused or allegedly caused by the presence of, or exposure to, asbestos and arising or allegedly arising, in whole or in part, directly or indirectly, from acts or omissions of one or more of the non-Debtor Affiliates (a *"Non-Debtor Asbestos Claim"*), and if such claim is asserted outside of the United States (or, with respect to any such claim asserted against a non-Debtor Affiliate, if such claim is asserted anywhere in the world), the Trust shall indemnify the Reorganized Debtors and/or any of their non-Debtor Affiliates in an amount equal to the lesser of (i) the amount actually paid on such Non-Debtor Asbestos Claim by the Reorganized Debtors and/or the non-Debtor Affiliates, as applicable, plus fees and costs related to such Non-Debtor Asbestos Claim, times the applicable payment percentage under the Asbestos Personal Injury Trust Distribution Procedures and (ii) what the holder of such Non-Debtor Asbestos Claim would have received from the applicable sub-fund if the Non-Debtor Asbestos Claim had been dealt with in accordance with the terms of the Plan and the Trust Documents and did not proceed to judgment. In the event the Asbestos Personal Injury Trust Distribution Procedures do not contain a matrix for any such Non-Debtor Asbestos Claim, the amount of indemnity due under this Section 4.14.2 shall be determined by using the Average Value set forth in the matrix applicable to T&N and as defined in the Asbestos Personal Injury Trust Distribution Procedures.

4.14.3.    Notwithstanding Sections 4.14.1 and 4.14.2 above, if, on or after the Effective Date, the Reorganized Debtors and/or any of their non-Debtor Affiliates are sued on account of an Asbestos Personal Injury Claim or a Non-Debtor Asbestos Claim that relates to a stream of liability for which there is no applicable payment percentage and such Asbestos Personal Injury Claims and/or Non-Debtor Asbestos Claims may be tendered to an insurance company for handling and payment, the applicable Reorganized Debtor and/or non Debtor Affiliate shall tender such Asbestos Personal Injury Claim or Non-Debtor Asbestos Claim, as applicable, to the Trust so the Trust can properly access any available insurance. The Trust shall use its best efforts to have such Asbestos Personal Injury Claim and/or Non-Debtor Asbestos Claim paid by any applicable insurance and, if the Trust obtains any insurance proceeds on account of such claims, the Trust shall remit such proceeds to the applicable Reorganized Debtor and/or non-Debtor Affiliate to the extent necessary to fully reimburse all such entities, in the aggregate, for amounts they paid with respect to all such Asbestos Personal Injury Claims and Non-Debtor Asbestos Claims.

4.14.4.    The Trust shall indemnify each Reorganized Debtor on an after-tax basis for all and any adverse tax consequences suffered by any of the Reorganized Debtors arising (either directly or indirectly) as a result of or attributable to the implementation of Article IV of the Plan.

4.14.5.    The Trust shall indemnify Reorganized T&N in relation to all liabilities, costs, charges and expenses at any time incurred or suffered by Reorganized T&N by

reason of the exercise by the Trust of the power granted under the power of attorney referred to in Section 4.5.11(a).

**4.14.6.** The Trust, the T&N Fund and the Chester Street Fund shall severally indemnify Reorganized T&N in respect of Hercules Claims Handling Costs incurred by it or by any other Hercules-Protected Entity before the effective date of the Principal CVAs in the proportions equivalent to those in which the proceeds of the Hercules Policy are split pursuant to Section 4.5.12(c) *Seventhly* (b) or such other proportions as may be agreed in accordance with the provisions of Section 4.5.14. The Trust, the T&N Fund and the Chester Street Fund shall not be required to pay any sum under these indemnities until the relevant Hercules Claims Handling Costs have actually been paid. Reorganized T&N shall not agree with Curzon or the Reinsurers the quantum of such Hercules Claims Handling Costs without obtaining the prior written consent of the Trust and the U.K. Asbestos Trustee (such consent not be unreasonably withheld).

**4.14.7.** Except as otherwise provided in the Addendum, and notwithstanding anything in the Trust Agreement, including, without limitation, Section 3.1 of the Trust Agreement, the Trust shall (i) be obligated to pay the indemnification as required under the Plan without regard to which stream of asbestos liability the indemnification relates to and (ii) pay such indemnification from any and all available assets in any of the Funds (as such term is defined in the Trust Agreement) without regard to which Fund or stream of asbestos liability such indemnification relates to; provided, however, that (x) funds paid to the Trust by an Asbestos Insurance Company with respect to an Asbestos Insurance Policy that are reserved, by express agreement with such Asbestos Insurance Company (other than the terms of the Asbestos Insurance Policy itself), for payment of covered Asbestos Personal Injury Claims and related expenses shall not be used to pay indemnification of liabilities that were not covered by such Asbestos Insurance Policy; and (y) nothing in this Section 4.14.7 is intended or shall be construed to limit the assertion, applicability, or effect of any Asbestos Insurer Coverage Defenses.

**4.14.8.** If the EL Insurers and/or Curzon or its Reinsurers assert any Asbestos Personal Injury Claim, EL Claims Handling Costs Claim or Hercules Claim against the Reorganized Debtors and such Claim is not for any reason dealt with in accordance with the terms of the Plan and the Trust Documents or the CVAs (as the case may be), then the Trust shall indemnify the Reorganized Debtors against the full amount of any and all damages, losses, fees and expenses incurred with respect to such Claim.

**4.14.9.** For the avoidance of doubt, any indemnity due to the Hercules-Protected Entities under this Section 4.14 shall be subject to the limitations set forth in Section 4.4 above.

**4.14.10.** Subject to Section 4.14.11 below, if the U.K. Asbestos Trustee does not pay any of its indemnity obligations with respect to a loss pursuant to the Principal CVAs within 45 days of a demand for payment of such indemnity, the Trust shall be required to pay any such indemnity obligation; provided, however, that (a) if the loss to be indemnified relates to the exercise by the Trust and the U.K. Asbestos Trustee of their joint responsibility to seek Hercules Recoveries, the Reorganized Debtors can seek payment under any applicable indemnity, without limitation, from either or both the Trust and/or the U.K. Asbestos Trustee, (b)

if the loss to be indemnified related to the Hercules Claims Handling Costs referred to in Section 4.14.6, the Reorganized Debtors can seek payment under the applicable indemnity from each of the Trust, the T&N Fund and the Chester Street Fund in their several proportions, in either case whether or not the U.K. Asbestos Trustee is able to pay its indemnity obligations with respect to such loss, (c) in the event the Trust actually pays any indemnity obligation of the U.K. Asbestos Trustee, the Trust shall be subrogated to the rights of the indemnitee against the U.K. Asbestos Trustee with respect to such payment, and (d) in the event the U.K. Asbestos Trustee makes a payment on any of its indemnity obligations to Reorganized Federal-Mogul after the Trust has already paid such amount, Reorganized Federal-Mogul shall reimburse such amount to the Trust. Nothing herein shall limit the Trust's indemnity obligations for Asbestos Personal Injury Claims asserted in the U.S. under the Plan. For the avoidance of doubt, the application of funds through the Hercules Policy waterfall under the Principal CVAs and the Plan is not an indemnity, but is in addition to the indemnities granted in the Principal CVAs and the Plan.

**4.14.11. Timing of Indemnity Payments.** The Trust shall pay its indemnity obligations under this Article IV on a semi-annual basis starting on the six-month anniversary of the Effective Date and every six months thereafter. Notwithstanding this semi-annual schedule, if, at any time, the Trust's unpaid indemnity obligations under this Plan equal or exceed $2.5 million, the Trust shall indemnify the applicable indemnitee(s) in full within 15 Business Days of receiving notice from Reorganized Federal-Mogul that the unpaid indemnity obligations exceed $2.5 million (*"Indemnity Obligation Reduction Notice"*). The Trust shall continue to pay its indemnity obligations under this Article IV to the applicable indemnitee(s) in full on a semi-annual basis starting on the date on which payment is remitted or earlier in the event the Trust receives an Indemnity Obligation Reduction Notice before the end of the applicable semi-annual period.

**4.15. Retrospective Insurance Premiums and Related Matters.** Notwithstanding anything to the contrary in the Plan or the Plan Documents, (i) any entity (including the Trust, any Reorganized Debtor and any non-Debtor Affiliate) that tenders a Claim to an Asbestos Insurance Company shall be responsible, for purposes of such Claim, for any retrospective insurance premium, self-insured retention, deductible, or similar obligation of the insured under the Asbestos Insurance Policies to which such Claim is tendered; (ii) with respect to any self-insured retention, deductible or similar obligation, any Asbestos Insurance Company to which such Claim is tendered may seek to establish, as one of its Asbestos Insurer Coverage Defenses, that such entity has not, in fact, fulfilled the obligations of the insured under the Asbestos Insurance Policies to which such Claim was tendered; and (iii) with respect to any retrospective insurance premium or similar obligation, any Asbestos Insurance Company to which such Claim is tendered may offset the amount of such retrospective insurance premium or similar obligation against any amount otherwise payable by such Asbestos Insurance Company on account of such claim under its Asbestos Insurance Policies.

## ARTICLE V
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**5.1. Assumption And Rejection Of Unexpired Leases And Executory Contracts**

**5.1.1.    Assumption.** All unexpired leases and executory contracts that (a) have not been expressly rejected by the U.S. Debtors with approval of the Bankruptcy Court on or prior to the Effective Date or (b) are not rejected pursuant to Section 5.1.2 or Section 5.2 below shall, as of the Effective Date (and subject to the occurrence of the Effective Date), be assumed by the Debtors. Not later than sixty (60) days prior to the scheduled date for the Confirmation Hearing, the Debtors will file with the Bankruptcy Court an exhibit (the "*Cure Exhibit*") setting forth those unexpired leases and executory contracts which are being assumed by the U.S. Debtors and as to which the U.S. Debtors believe that cure amounts are owing, together with the respective cure amounts due for each such assumed lease or executory contract. With respect to any unexpired leases or executory contracts which are being assumed by the U.S. Debtors but as to which the U.S. Debtors contend that no cure amounts are due, such unexpired leases and executory contracts will not be included on the Cure Exhibit. The U.S. Debtors may modify, supplement or amend the Cure Exhibit up to and including the Confirmation Date. Not later than the earlier of (i) thirty (30) days prior to the scheduled Confirmation Hearing or (ii) if the proposed cure amount for any particular unexpired lease or executory contract is amended by any U.S. Debtor following the filing of the initial Cure Exhibit, thirty (30) days after such amendment is filed by the U.S. Debtors with the Bankruptcy Court, the non-Debtor party to any such unexpired lease or executory contract which the U.S. Debtors propose to assume may dispute the cure amount, if any, set forth by the U.S. Debtors with respect to the assumption of such unexpired lease or executory contract by filing an appropriate objection with the Bankruptcy Court.

**5.1.2.    Rejection.** Notwithstanding Section 5.1.1 above, the U.S. Debtors shall reject each and all of the executory contracts and unexpired leases designated in the list of rejected contracts (as such list may be amended or supplemented up to and including the Confirmation Date) that will be included in Exhibit 5.1.2 of the Plan filed with the Bankruptcy Court prior to the Confirmation Hearing.

**5.1.3.    Reservation.** Notwithstanding Sections 5.1.1 and 5.1.2 above, Section 5.2 shall not apply to any unexpired lease or executory contract that is specifically identified and dealt with otherwise under the Plan.

**5.1.4.    Prepetition Settlement Agreements Relating to Asbestos Insurance Policies.** Notwithstanding Sections 5.1.1 – 5.1.3 above, all settlement agreements affecting Asbestos Insurance Policies entered into prior to the Petition Date shall be considered non-executory contracts and shall neither be assumed nor rejected by the Debtors. Except to the extent that the permissibility of the Assignment (as defined in the Bankruptcy Insurance Stipulation) is determined in the Reorganization Cases by resolution of the issue specified in Section 3(a) of the Bankruptcy Insurance Stipulation, the rights and obligations of the parties under such settlement agreements, including the question of whether any breach has occurred, shall be determined under applicable non-bankruptcy law.

**5.2.    Rejected Unexpired Leases And Executory Contracts.** Notwithstanding anything to the contrary set forth in Section 5.1 hereof, the U.S. Debtors hereby expressly reject, pursuant to Section 365 of the Bankruptcy Code, the following executory contracts and unexpired leases: (a) all product warranties, indemnity agreements and similar agreements of the U.S. Debtors (including any obligation of the U.S. Debtors to pay any costs or expenses related

111

to such product warranties) which relate to asbestos or asbestos-related products that were made, mined, manufactured, produced, distributed, sold, marketed or supplied by the U.S. Debtors, whether or not the liabilities or obligations resulting thereunder constitute or will be treated as Asbestos Personal Injury Claims pursuant to the Plan; (b) all product warranties of the U.S. Debtors (including any obligation to pay any costs or expenses related to such warranties), which relate to products no longer made, manufactured, produced, distributed, sold, marketed or supplied by the U.S. Debtors; provided, however, that any such warranties comprising a portion of otherwise-executory contracts of the Debtors that are assumed pursuant to the Plan shall not be rejected pursuant to this Section 5.2; and (c) the Dan=Loc Deed of Special Indemnity and the Dan=Loc Deed of Guarantee, except as set forth in Section 8.20 of the Plan.

    **5.3.**    **Continuation Of Product Warranties**. The Reorganized U.S. Debtors may elect to honor any product warranty as to non-asbestos products rejected pursuant to Section 5.2 of the Plan if honoring such product warranty would, in the judgment of the Reorganized U.S. Debtors, confer a reasonably comparable benefit upon the Reorganized U.S. Debtors.

    **5.4.**    **Collective Bargaining Agreements and Retiree Benefit Plans**.

**5.4.1.    General.**  Notwithstanding any other provisions of the Plan or of this Article V, the Plan Proponents reserve the right to seek to reject, modify and/or terminate any collective bargaining agreements with respect to which any of the Debtors is a party in accordance with Section 1113 of the Bankruptcy Code, any retiree benefit plans of any or all of the Debtors in accordance with Section 1114 of the Bankruptcy Code and any other employee benefit programs in accordance with applicable law; provided, however, that absent the termination of any retiree benefit plans to which Section 1114 of the Bankruptcy Code is applicable in accordance with Section 1114 of the Bankruptcy Code, and subject to the provisions of Section 5.4.2 of the Plan, payment of all retiree benefits under retiree benefit plans to which Section 1114 of the Bankruptcy Code is applicable shall be continued after the Effective Date in accordance with Section 1129(a)(13) of the Bankruptcy Code.

**5.4.2.    Special Provisions Relating to U.K. Debtors' Pension Plans and Excluded Non-Qualified Pension Claims.**  Nothing in Section 5.4.1 of the Plan shall alter or modify (i) the treatment of Excluded Non-Qualified Pension Claims as Unsecured Claims under the Plan, or (ii) the treatment of any claims relating to the FM Ignition Pension Plan and/or the T&N Pension Plan under the CVAs (as such treatment is incorporated into the Plan).

**5.4.3.    Special Provisions Relating to Federal-Mogul Corporation Pension Plan.**  Unless and until the Federal-Mogul Corporation Pension Plan is terminated pursuant to applicable law, Reorganized Federal-Mogul and each of the other Reorganized U.S. Debtors, as a successor to its respective Debtor, shall comply with any and all of its obligations under the Federal-Mogul Corporation Pension Plan pursuant to applicable law.  Notwithstanding anything to the contrary in this section or elsewhere in the Plan, including but not limited to Article IX, there shall be no discharge, exculpation or release of any claims with respect to the Federal-Mogul Corporation Pension Plan, including any claims asserted by the Pension Benefit Guaranty Corporation with respect to the Federal-Mogul Corporation Pension Plan, whether against the Debtors, the Reorganized U.S. Debtors or any other persons or entities liable under applicable law.

**5.5.    Damages Upon Rejection**.  The Bankruptcy Court shall determine the dollar amount, if any, of the Claim of the non Debtor party for damages resulting from the rejection of any executory contract or unexpired lease; provided, however, that any such Entity that holds or asserts a Claim against a U.S. Debtor or its Estate must file a Proof of Claim with the Bankruptcy Court within thirty (30) calendar days following the Confirmation Date, or as otherwise ordered by the Bankruptcy Court.  To the extent any such Claim is Allowed by the Bankruptcy Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan as an Unsecured Claim, or, as applicable, an Asbestos Personal Injury Claim, in the Reorganization Case of the particular U.S. Debtor which is a party to such contract or lease, and the holder thereof shall receive distributions under the Plan as a holder of an Allowed Unsecured Claim or Asbestos Personal Injury Claim.  The Plan shall constitute notice to Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the bar date for filing a Proof of Claim in connection therewith; provided, however, that the U.S. Debtors shall have no obligation to notify such Entities that Confirmation has occurred.

**5.6.    Corporate Indemnities**

**5.6.1.    Prepetition Indemnification and Reimbursement Obligations.** For purposes of the Plan, the respective obligations of Federal-Mogul and its Affiliated Debtors to indemnify and reimburse Persons who are or were directors, officers or employees of the Debtors on the Petition Date or at any time thereafter, against and for any obligations pursuant to the articles of incorporation, codes of regulation, bylaws (including, without limitation, the obligations of Federal-Mogul pursuant to Article IV of the By-Laws of Federal-Mogul), applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, shall survive Confirmation of the Plan, remain unaffected thereby, and not be discharged under Section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date.

**5.6.2.    Plan Indemnity.** In addition to the matters set forth in Section 5.6.1 and not by way of limitation thereof, the Reorganized Debtors shall indemnify and hold harmless all Persons who are or were officers or directors of the Debtors on the Petition Date or thereafter on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including attorney's fees) on account of claims or causes of action threatened or asserted by any third party against such officers or directors that seek contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of the assertion of primary claims against such third party by any representative of the Debtors' Estates.

**5.6.3.    Limitation on Indemnification.** Notwithstanding anything to the contrary set forth in this Plan or elsewhere, the Reorganized Debtors shall not be obligated to indemnify and hold harmless any Person or Entity for any claim, cause of action, liability, judgment, settlement, cost or expense that results primarily from such Person's or Entity's bad faith, gross negligence or willful misconduct.

## ARTICLE VI
## ACCEPTANCE OR REJECTION OF THE PLAN

**6.1.    Each Impaired Class Entitled To Vote Separately.** Subject to Section 6.3 below, the holders of Claims or Equity Interests in each impaired Class of Claims or Equity Interests that receive or retain property pursuant to the Plan shall be entitled to vote separately to accept or reject the Plan.

**6.2.    Acceptance By Impaired Classes Of Claims.** Pursuant to Section 1126(c) of the Bankruptcy Code, but subject to Section 6.3 below, an impaired Class of Claims shall have accepted the Plan if, after excluding any Claims held by any holder designated pursuant to Section 1126(e) of the Bankruptcy Code, (a) the holders of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) more than one half in number of such Allowed Claims actually voting in such Class have voted to accept the Plan.

**6.3.    Acceptance Pursuant To Section 524 Of The Bankruptcy Code.** Pursuant to Section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, the respective Classes of Asbestos Personal Injury Claims shall have accepted the Plan only if the holders of at least 75 percent of the Claims who voted in such Classes have voted to accept the Plan.

**6.4.    Presumed Acceptance Of Plan**.  Classes of Claims or Equity Interests designated as unimpaired are conclusively presumed to have voted to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  In addition, by virtue of the Surety Claims Settlement Agreement and the U.K. Global Settlement Agreement, and the Plan's implementation of the relevant provisions of such agreements, the holders of Surety Claims, Non-Priority FM Ignition Pension Plan Employee Benefit Claims and Non-Priority T&N Pension Plan Employee Benefit Claims are presumed to have voted to accept the Plan.

**6.5.    Presumed Rejection Of Plan**.  Impaired Classes of Claims or Equity Interests that do not receive or retain any property under the Plan are conclusively presumed to have voted to reject the Plan pursuant to Section 1126(g) of the Bankruptcy Code.

**6.6.    Votes With Respect to U.K. Debtors**.  The CVA Supervisors for each of the U.K. Debtors that are covered by the Principal CVAs shall be entitled to exercise the right, if any, to vote on the Plan in respect of any Unsecured Claims (other than Asbestos Property Damage Claims and any other Unsecured Claims referred to in paragraph 41.2 of the Principal CVAs), Non-Priority T&N Pension Plan Employee Benefit Claims, and Non-Priority FM Ignition Pension Plan Claims against any or all of such U.K. Debtors.

**6.7.    Confirmability And Severability Of The Plan**.

**6.7.1.    Consensual Confirmation**. The Confirmation requirements of Section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the combination of the separate plans of reorganization of all U.S. Debtors and U.K. Debtors in this Plan for purposes of, among other things, economy and efficiency, the Plan shall be deemed a separate Chapter 11 plan for each such Debtor.

**6.7.2.    Cramdown**. With respect to any impaired Class of Claims or Equity Interests that fails to accept the Plan in accordance with Section 1129(a) of the Bankruptcy Code, including such Classes as may be created pursuant to amendments to the Plan, the Plan Proponents request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code with respect to such non-accepting Classes, in which case or cases the Plan shall constitute a motion for such relief.

**6.7.3.    Reservation of Rights**. The Plan Proponents reserve the right to modify or withdraw the Plan, any other plan, or the Plan in its entirety, for any reason, including, without limitation, in the event that any separate plan for a particular Debtor is not confirmed. In addition, should the Plan, or any individual Debtor's plan, fail to be accepted by the requisite number and amount of Claims and Equity Interests voting, as required to satisfy Sections 524(g) (in the case of any Debtor subject to Asbestos Personal Injury Claims) and 1129 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Plan Proponents reserve the right to amend, modify or withdraw such plan or the Plan in its entirety. Notwithstanding the foregoing, in the case of any modifications to the Plan relating to the Plan A Settlement or the Plan B Settlement, the Plan Proponents' ability to modify the Plan shall be subject to the terms of the Plan Support Agreement.

### ARTICLE VII
### CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

**7.1.    Conditions To Confirmation**. Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived by the Plan Proponents and, with respect to any waiver of the condition set forth in Section 7.1.4, the written consent of Cooper LLC, Cooper Industries, Ltd. or Pneumo Abex, as applicable; provided, however, that in the case of Pneumo Abex, such consent shall not be unreasonably withheld. These conditions to Confirmation, which are designed, among other things, to ensure that the Injunctions, releases and discharges set forth in Article IX shall be effective, binding and enforceable, are as follows:

**7.1.1.    Findings of Fact**. The Bankruptcy Court and/or the District Court, as applicable, shall have made the following findings in substantially the following form:

**(a)**    The Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction are to be implemented in connection with the Trust;

**(b)**    As of the Petition Date, certain of the Debtors had been named as defendants in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos containing products;

116

     **(c)**    Subject to Article IV of the Plan, upon Confirmation, the Trust shall assume the liabilities of the Debtors with respect to Asbestos Personal Injury Claims;

     **(d)**    The Trust will be funded in part by the Reorganized Federal Mogul Class B Common Stock, and all rights to receive dividends or other distributions on account of such Class B Common Stock;

     **(e)**    On the Effective Date, the Trust will own a majority of the voting shares of Reorganized Federal-Mogul;

     **(f)**    The Trust will use its assets or income to pay Asbestos Personal Injury Claims;

     **(g)**    The Debtors are likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims that are addressed by the Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction;

     **(h)**    The actual amounts, numbers and timing of future Demands cannot be determined;

     **(i)**    Pursuit of Asbestos Personal Injury Claims, including Demands, outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands;

     **(j)**    The terms of the Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement;

     **(k)**    Pursuant to court orders or otherwise, the Trust shall operate through mechanisms, such as structured, periodic or supplemental payments, Pro Rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Trust will value, and be in a financial position to pay, present Asbestos Personal Injury Claims and future Asbestos Personal Injury Claims and Demands that involve similar Claims in substantially the same manner;

     **(l)**    The Future Claimants Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in the Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction, and transferred to and assumed by the Trust;

     **(m)**    The inclusion of each Debtor or beneficiary within the protection afforded by the Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction, as applicable, is fair and equitable with respect to the persons that might subsequently

117

assert Demands against each such Debtor or beneficiary in light of the benefits provided, or to be provided, to the Trust on behalf of such Debtor or such beneficiary;

(n)    The Plan complies with Section 524(g) of the Bankruptcy Code in all respects; and

(o)    The Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction are essential to the Plan and the Debtors' reorganization efforts.

**7.1.2.    Confirmation Order.** The Bankruptcy Court and/or District Court, as applicable, shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order entered in conjunction therewith in form and substance acceptable to the Plan Proponents.

**7.1.3.    Exit Facilities.** The Debtors shall have obtained a binding commitment(s) for the Exit Facilities on terms reasonably acceptable to the Plan Proponents.

**7.1.4.    Pneumo Abex Settlement.** Either (a) the Confirmation Order (and any order of the District Court affirming the Confirmation Order) shall approve the Plan B Settlement or (b) the Confirmation Order shall approve the Plan B Settlement and the Confirmation Order, together with such other order of the Bankruptcy Court and/or the District Court that may be proposed by the Debtors and the other Plan Proponents approving the Plan A Settlement (the *"Plan A Approval Order"*) shall approve the Plan A Settlement; provided, however, that the affirmation of the Confirmation Order (or any other order that approves the Plan B Settlement) by the District Court shall only be required with respect to the Plan B Settlement if the District Court rules on the Plan B Settlement. The Confirmation Order (or any portion thereof) shall be in form and substance reasonably acceptable to Cooper LLC and Cooper Industries, Ltd. with respect to matters related to or contemplated by the Plan B Settlement. Provisions of the Confirmation Order that approve the Plan B Settlement, to the extent directly related to Pneumo Abex's or PCT's rights under the Plan B Settlement Agreement and directly related to Pneumo Abex or PCT, shall also be subject to the consent of Pneumo Abex, which consent shall not be unreasonably withheld. Any provisions of the Confirmation Order pertaining to the Plan A Settlement, or the Plan A Approval Order, if applicable, (i) shall be in form and substance reasonably acceptable to Cooper LLC and Cooper Industries, Ltd., and (ii) to the extent the provisions thereof are directly related to Pneumo Abex or PCT, shall be subject to the consent of Pneumo Abex, which consent shall not be unreasonably withheld.

**7.2.    Conditions To Effectiveness.** Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless and until each of the following conditions has been satisfied or waived by the Plan Proponents and, with respect to any waiver of Section 7.2.5, the written consent of Cooper LLC and Cooper Industries, Ltd., and the Debtors have filed a notice with the Bankruptcy Court stating that all such conditions have been satisfied or waived:

**7.2.1.    Confirmation Order.** The Confirmation Order shall have been issued by the Bankruptcy Court and affirmed by the District Court, and the Confirmation Order shall have become a Final Order; provided, however, that once the Confirmation Order has been

affirmed by the District Court, the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order at the sole option of the Plan Proponents unless the effectiveness of the Confirmation Order has been stayed or vacated, in which case the Effective Date may be, again at the sole option of the Plan Proponents, the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

**7.2.2.    Trust.** The Trust Assets shall have been transferred to, vested in and assumed by the Trust in accordance with Section 4.3 of the Plan, other than any Trust Assets to be transferred to, vested in and assumed by the Trust after the Effective Date, and the Trust is capable of complying with its obligations under Section 8.3.6 of the Plan.

**7.2.3.    Corporate Documents.** The Trust Documents and the other applicable corporate documents necessary or appropriate to implement the Plan shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities.

**7.2.4.    United States Trustee's Fees.** The fees of the United States Trustee then owing by the Debtors shall have been paid in full.

**7.2.5.    Pneumo Abex Settlement.** Either (a) the Confirmation Order and, if applicable, any affirmance thereof by the District Court, shall approve the Plan B Settlement or (b) the Confirmation Order shall approve the Plan B Settlement and the Confirmation Order, together with the Plan A Approval Order (if applicable), shall approve the Plan A Settlement; provided, however, that the affirmation of the Confirmation Order by the District Court shall only be required with respect to the Plan B Settlement if the District Court rules on the Plan B Settlement. Neither the Confirmation Order (or any order of the District Court affirming the Confirmation Order) nor the Plan A Approval Order need to be a Final Order for this condition to be satisfied.

**7.2.6.    Other Assurances.** The Plan Proponents shall have obtained tax rulings, decisions, opinions or other assurances regarding certain tax consequences of the Plan, as they deem satisfactory.

**7.2.7.    Exit Facilities.** The Reorganized Debtors shall have entered into agreements with respect to the Exit Facilities and the Closing Date, as to be defined in the Exit Facilities, shall have occurred.

**7.2.8.    Notice of Effective Date.** The Debtors shall have filed with the Bankruptcy Court a notice of the occurrence of the Effective Date, which notice shall confirm that the foregoing conditions have been satisfied or waived.

## ARTICLE VIII
## IMPLEMENTATION OF THE PLAN

### 8.1.    Matters Involving the U.K. Debtors

**8.1.1.    CVAs for the U.K. Debtors.** The Plan recognizes and incorporates the treatment provided by the CVAs for those categories of Claims that are treated by the CVAs.

When the Plan provides that a Claim shall receive the treatment afforded to such Claim under the applicable CVA, the Plan means that such Claim will receive a distribution in respect of such Claim from the CVA Supervisors in accordance with the provisions of the applicable CVA. Claims against the U.K. Debtors that are not treated by the CVAs and Claims against those of the U.K. Debtors for which CVAs have not been proposed shall be Allowed or not Allowed and, if Allowed, receive a distribution, solely in accordance with the terms of the Plan.

**8.1.2.    Treatment of Asbestos Property Damage Claims Against the U.K. Debtors Under the Plan and CVAs.** Holders of Asbestos Property Damage Claims against the U.K. Debtors have the option of foregoing the treatment of such Claims specified in the CVAs. In the event that a holder of an Asbestos Property Damage Claim against a U.K. Debtor elects to forego the treatment of such Asbestos Property Damage Claim under the CVAs by not submitting notice of such Asbestos Property Damage Claim to the CVA Supervisors in accordance with the terms of the CVAs, such Asbestos Property Damage Claim may be pursued in the Bankruptcy Court under and pursuant to the Bankruptcy Code, in which case any Allowed Asbestos Property Damage Claims against a U.K. Debtor proven pursuant to such process shall receive the treatment specified in this Plan for Asbestos Property Damage Claims against the relevant U.K. Debtor.

**8.1.3.    Reservation of Rights.** The Plan Proponents reserve the right to seek to have the Bankruptcy Court enforce the CVAs, including, but not limited to, the treatment of Claims against the U.K. Debtors under the CVAs as a matter of comity or otherwise.

**8.2.    Continued Corporate Existence.** Each of the Reorganized Debtors, other than such Inactive Debtor Subsidiaries as may be dissolved, liquidated, wound-up, struck off and/or merged into another entity, shall continue to exist immediately after the Effective Date as a separate corporate entity in accordance with the applicable law in the jurisdiction in which it is incorporated, under its respective certificate of incorporation and bylaws or other organizational documents in effect before the Effective Date, except as its certificate of incorporation, bylaws or other organizational documents are amended by the Plan.

**8.3.    Federal-Mogul Corporation Securities and Corporate Governance**

**8.3.1.    Cancellation Of Existing Stock In Federal-Mogul.** On the Effective Date, the Federal-Mogul common and preferred stock classified in Classes 1M and 1O, and all unexercised rights, warrants and options relating to such stock and any other rights attached to the ownership of any equity securities of Federal-Mogul, shall be deemed cancelled and of no further force and effect. The holders of such cancelled instruments, securities and other documentation shall have no rights arising from or relating to such instruments, securities or other documentation or the cancellation thereof, except the rights provided pursuant to the Plan.

**8.3.2.    Conversion of Convertible Subordinated Debentures.** On the Effective Date, all beneficiaries of Convertible Subordinated Debentures, except those who have affirmatively elected not to do so in connection with their vote on the Plan, will be deemed to have exercised their rights to convert their securities into Federal-Mogul common stock on the terms provided for in the indenture governing those securities and debentures. For purposes of the classification and treatment of Claims and Equity Interests under the Plan, such conversion

120

shall be deemed to have occurred on the Record Date, and the resulting common stock interests arising from such conversion shall be included in and treated as Equity Interests under Class 1O.

**8.3.3.    Cancellation of Notes, Other Debt Securities and Indentures**. On the Effective Date, (i) the Notes, the Convertible Subordinated Debentures and any other debt securities issued by the Debtors shall be deemed cancelled and of no further force and effect and (ii) the obligations of the Debtors under any agreements governing such Notes, the Convertible Subordinated Debentures or other debt securities, including, without limitation, the Indentures, shall be cancelled and discharged. Except as provided in this section and the Plan, the holders of any such cancelled instruments, debt securities and related documentation shall have no rights arising from or relating to such instruments, securities or other documentation or the cancellation thereof. Notwithstanding the foregoing, each Indenture, Note and Convertible Subordinated Debenture shall continue in effect solely for the purposes of (a) allowing the Indenture Trustees to make distributions on account of Noteholder Claims and Convertible Subordinated Debenture Claims under the Plan and (b) permitting the Indenture Trustees to maintain any rights or Liens they may have for unpaid fees, costs and expenses under such Indentures; provided, however, that such rights and Liens are limited to the distributions, if any, to Noteholders. Notwithstanding the preceding sentence, clauses (a) and (b) of this section shall not represent exceptions to the discharge of the Debtors' liabilities under the Bankruptcy Code and the Confirmation Order. Additionally, upon payment in full of the fees and expenses of the Indenture Trustees pursuant to Section 8.14.6 of the Plan, any such rights or Liens of the Indenture Trustees shall terminate.

**8.3.4.    Issuance Of Reorganized Federal-Mogul Common Stock**. On the Effective Date, Reorganized Federal-Mogul shall issue 49.9 million shares of Reorganized Federal-Mogul Class A Common Stock and 50.1 million shares of Reorganized Federal-Mogul Class B Common Stock. Concurrently with such issuance, Reorganized Federal-Mogul shall distribute (i) all of the shares of the Class B Common Stock (less the shares of Class B Common Stock issued pursuant to Section 4.5.5 hereof) to the Trustees of the Trust as part of the consideration to be paid for the Trust's assumption of all Asbestos Personal Injury Claims (which shall then be allocated to the sub-Trusts created under the Trust Documents as provided therein), (ii) the Class B Common Stock issued under Section 4.5.5 of the Plan to the Trustees of the Trust and (iii) all of the shares of the Class A Common Stock to the Disbursing Agent for further distribution Pro Rata to the holders of Allowed Noteholder Claims, Allowed Convertible Subordinated Debenture Claims, and Allowed Class H Unsecured Claims that make the Stock Election described in Section 8.15.2 of the Plan. For the purpose of distributions to the holders of Allowed Noteholder Claims, the Indenture Trustee under each series of Notes shall be deemed to be the sole holder of the Allowed Noteholder Claim for all Allowed Noteholder Claims for such series of Notes. Accordingly, all distributions of Reorganized Federal-Mogul Class A Common Stock on account of Allowed Noteholder Claims shall be distributed to the Indenture Trustees for further distribution to the Noteholders pursuant to the terms of the respective Indentures. Distribution of such Reorganized Federal-Mogul Class A Common Stock shall be deemed complete upon delivery of one or more share certificates representing such shares to the Indenture Trustees, on behalf of the Noteholders. The Disbursing Agent shall not be entitled to vote any shares of Reorganized Federal-Mogul Class A Common Stock.

121

**8.3.5.     Specific Provisions Relating to Reorganized Federal-Mogul Class B Common Stock.**  Upon formation of the Trust on the Effective Date in accordance with Section 4.1 of the Plan, the Trust shall issue Reorganized Federal-Mogul a note in the face amount of $125 million (the *"$125 Million Note"*), which note shall mature ten (10) Business Days after the Effective Date (the *"Maturity Date"*).  In addition, also on the Effective Date, to secure repayment of the $125 Million Note, the Trust shall grant Reorganized Federal-Mogul a security interest in 13.888888888% of the Reorganized Federal-Mogul Class B Common Stock to be distributed to the Trust pursuant to the Plan (the *"Pledged Stock"*).  On the Maturity Date, in exchange for and in complete satisfaction of the $125 Million Note, the Trust shall either (i) pay the entire $125 million principal amount in Cash to Reorganized Federal-Mogul or (ii) if the Trust does not make the foregoing payment on the Maturity Date, then Reorganized Federal-Mogul shall automatically and without any further notice or action have full and complete ownership of the Pledged Stock; provided, however, that 32% of the 13.888888888% of Reorganized Federal-Mogul Class B Common Stock so paid to Reorganized Federal-Mogul shall be held in escrow by Reorganized Federal-Mogul (the *"Escrowed Shares"*) or, if the $125 million principal amount is paid in Cash, 32% of such Cash shall be held in escrow by Reorganized Federal-Mogul (the *"Escrowed Cash"*).  If, after the Relevant Claims have been satisfied or provided for in full, any portion of the Chester Street Fund Assets is released to Reorganized T&N or such other member or members of the UK Group as Reorganized FMUK may direct pursuant to the Release Provisions, a number of the Escrowed Shares equivalent in value at the time of release to the portion of the Chester Street Fund Assets released pursuant to the Release Provisions shall be returned to the Trust; provided, however, that if an amount in excess of £22 million is released pursuant to the Release Provisions, then a number of shares valued at $17.9640719 per share shall be returned to the Trust (any and all shares returned to the Trust pursuant to this sentence, the *"Returned Shares"*) with respect to any amount released pursuant to the Release Provisions in excess of £22 million.  If, however, the $125 million principal amount is paid in Cash, a percentage of the Escrowed Cash equivalent in value to the portion of the Chester Street Fund Assets released pursuant to the Release Provisions shall be returned to the Trust.  Any Escrowed Shares or Escrowed Cash that are not returned to the Trust, after the Relevant Claims have been satisfied or provided for in full, shall be transferred to Reorganized Federal-Mogul.  In this Section 8.3.5:

(a)     *"UK Trust Deed"* means the Trust Deed dated October 10, 2006 made between (i) T&N acting by its administrators, (ii) the companies listed in Schedule A thereto acting by their respective administrators, and (iii) The T&N Asbestos Trustee Company Limited;

(b)     the *"Release Provisions"* means paragraph 15.1.3 of the Principal CVAs, Clause 2.4.3(b) of the UK Trust Deed, and/or Clause 4.1.2 of the UK Trust Deed;

(c)     the *"Relevant Claims"* means (i) the Chester Street Fund Costs, (ii) the remuneration, costs and expenses to be met out of the Chester Street Fund Assets pursuant to paragraph 18.1.3(f)(ii) of the Principal CVAs, and (iii) the Chester Street Trust Claims;

(d)     the expressions *"Chester Street Fund Assets"*, *"Chester Street Fund Costs"*, *"Chester Street Trust Claims"*, *"UK Group"* and *"FMUK"* have the same respective meanings as in the UK Trust Deed and the expression *"Tax"* has the same meaning as in the Principal CVAs; and

122

(e)     any reference in this Section 8.3.5 to the "amount released pursuant to the Release Provisions" shall be construed as such amount net of any deduction or withholding from such amount that has been made on account of Tax.

### 8.3.6.     Thornwood Call Option.

(a)     **Grant and Exercise of Call.**  Thornwood (or its designee) is hereby granted by the Trust on the Effective Date a call (the *"Call"*) on all of the Reorganized Federal-Mogul Class B Common Stock other than the Pledged Stock (the *"Call Stock"*).  The Call shall be governed by the terms and conditions specified in the Stock Option Agreement attached hereto as Exhibit 8.3.6(a).

(b)     **Additional Provisions Applicable If Call Is Exercised.**  In the event that Thornwood or its designee exercises the Call and the Trust repays the $125 Million Note in Cash as provided in Section 8.3.5 of the Plan, then Thornwood or its designee shall be granted an additional call on the Pledged Stock (the *"Pledged Stock Option"*), which shall expire sixty (60) days after Thornwood (or its designee) is first permitted to exercise the Pledged Stock Option and shall be exercisable for additional Cash consideration on the same terms as the Reorganized Federal-Mogul Class B Common Stock covered by the Call.  In the event that Thornwood or its designee exercises the Call and the Trust does not repay the $125 Million Note in Cash as provided in Section 8.3.5, and Federal-Mogul takes the Pledged Stock in full and complete satisfaction of the $125 Million Note, then upon return to the Trust, any Returned Shares (as described in Section 8.3.5 above) shall be offered to Thornwood or its designee for additional Cash consideration on the same terms as the Reorganized Federal-Mogul Class B Common Stock covered by the Call.  If Thornwood and/or its designee declines to purchase such stock, the Trust shall have the ability to sell the stock on the open market, subject to regulatory and contractual compliance.  In addition, if the Call is exercised, Thornwood (or its designee) (as applicable) shall comply with the terms of the Letter Agreement attached to the Plan as Exhibit 8.3.6(b).

(c)     **Provisions Applicable If Call Is Not Exercised.**  In the event that Thornwood (or its designee) does not exercise the Call on or prior to the expiration date of the Call as set forth in the Stock Option Agreement, Thornwood will provide the Trust with a term loan facility in the amount of $100 million, which term loan facility shall be secured by the Reorganized Federal-Mogul Class B Common Stock held by the Trust.  The terms and conditions of the term loan facility provided for by this Section 8.3.6(c) shall be as set forth in the Loan Agreement attached hereto as Exhibit 8.3.6(c).

### 8.3.7.     Issuance of Warrants

(a)     Subject to Section 8.3.7(b) below, on the Effective Date, if Classes 1D and 1J have both voted to accept the Plan, and if at least one of Classes 1M, 1N or 1O has also voted to accept the Plan, Reorganized Federal-Mogul shall issue Warrants for the purchase of shares of Reorganized Federal-Mogul Class A Common Stock in an amount calculated in accordance with Sections 3.1.13, 3.1.14 and/or 3.1.15, as applicable.  Concurrently with such issuance, Reorganized Federal-Mogul shall distribute such Warrants to the Disbursing Agent for further

distribution consistent with the terms and provisions of the Plan. The Disbursing Agent shall not be entitled to exercise any of the Warrants.

**(b)**    If the Bankruptcy Court and/or District Court, as applicable, holds, determines or rules that the Plan is not confirmable due to the gifting, issuance or distribution of the Warrants, then (a) no Warrants shall be issued or distributed pursuant to the Plan and (b) Classes 1M, 1N and 1O shall receive no distributions under the Plan.

**8.3.8.    Surrender of Securities or Instruments**. On or before the Effective Date, or as soon as practicable thereafter, each holder of an instrument (a *"Certificate"*) evidencing the Notes, the Convertible Subordinated Debentures or any other debt securities (but excluding securities representing Bank Claims) shall surrender such Certificate to the Disbursing Agent, or, with respect to indebtedness that is governed by an Indenture, to the Indenture Trustee. The surrender of any global certificate held by an Indenture Trustee shall constitute surrender of the Notes or other debt securities pertaining to such global certificate for purposes of this provision. No distribution of property hereunder shall be made to or on behalf of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective Indenture Trustee, or evidence of the loss, theft, mutilation or destruction of such Certificate is established to the reasonable satisfaction of the Disbursing Agent or the respective Indenture Trustee. Any such holder who fails to (a) surrender or cause to be surrendered such Certificate, or (b) execute and deliver an affidavit of loss, theft, mutilation or destruction and indemnity to the reasonable satisfaction of the Disbursing Agent or the respective Indenture Trustee prior to the second anniversary of the Effective Date, (i) shall be deemed to have forfeited all rights and Claims or interests in respect of such Certificate, (ii) shall not participate in any distribution hereunder, and (iii) all property in respect of such forfeited distribution, including interest accrued thereon, shall be distributed Pro Rata to and among holders of the same securities, and in accordance with legal rights and priorities of those holders who properly surrendered such Certificates pursuant to the Plan.

**8.3.9.    Registration of Certain Reorganized Federal-Mogul Securities**. On the Effective Date, Reorganized Federal-Mogul shall execute and deliver a registration rights agreement substantially in the form set forth in Exhibit 8.3.9 hereto obligating Reorganized Federal-Mogul to register for resale, to the extent required by federal and state securities laws, the Reorganized Federal-Mogul Common Stock, the Reorganized Federal-Mogul Junior Secured PIK Notes and the Warrants under the Securities Act of 1933 in accordance with the terms set forth in such registration rights agreement. The holders of Reorganized Federal-Mogul Common Stock, Reorganized Federal-Mogul Junior Secured PIK Notes and Warrants entitled to enter into such registration rights agreement are those that (i) are issued 10% or more of the Reorganized Federal-Mogul Common Stock, (ii) would otherwise qualify as an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code or (iii) reasonably request to do so.

**8.3.10.    Reporting Requirements Under Securities Exchange Act of 1934 and Listing on Securities Exchange or Quotation System**. Reorganized Federal-Mogul shall be a mandatory reporting company under Section 12 of the Securities Exchange Act of 1934, as amended. In addition, Reorganized Federal-Mogul will use its best efforts to list, as promptly as practicable after the Effective Date, the Reorganized Federal-Mogul Class A Common Stock on a national securities exchange or for quotation on a national automated interdealer quotation

124

system but will have no liability if it is unable to do so. Persons receiving distributions of Reorganized Federal-Mogul Class A Common Stock, by accepting such distributions, will have agreed to cooperate with Reorganized Federal-Mogul's reasonable requests to assist Reorganized Federal-Mogul in its efforts to list the Reorganized Federal-Mogul Class A Common Stock on a national securities exchange or quotation system, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the Board of Directors of Reorganized Federal-Mogul who satisfy the independence and other requirements of any such national securities exchange or quotation system.

        **8.3.11.    Transfer Restrictions.** On the Effective Date, Reorganized Federal-Mogul, the Trust and certain Noteholders shall enter into a Lockup Agreement substantially in the form set forth in Exhibit 8.3.11 hereto. The Trust and such Noteholders shall be bound by certain restrictions on transfer of their shares of Reorganized Federal-Mogul Common Stock as set forth in such Lockup Agreement.

        **8.3.12.    Certificate Of Incorporation and Bylaws.**

        **8.3.12.1.** The Certificate of Incorporation of Reorganized Federal-Mogul shall, as of the Effective Date, be amended in its entirety substantially in the form set forth in Exhibit 8.3.12(1) hereto, and the Bylaws of Reorganized Federal-Mogul shall be amended in their entirety substantially in the form set forth in Exhibit 8.3.12(2) hereto. Consistent with, but only to the extent required by, Section 1123(a)(6) of the Bankruptcy Code, the amended Certificate of Incorporation of Reorganized Federal-Mogul shall, among other things, prohibit the issuance of non-voting equity securities.

        **8.3.12.2.** The amended Certificate of Incorporation of Reorganized Federal-Mogul shall provide that the initial board of directors of Reorganized Federal-Mogul shall consist of nine members (as determined in accordance with the amended Certificate of Incorporation), and that the holders of Reorganized Federal-Mogul Class A Common Stock shall initially be entitled to nominate six (6) directors and the holders of Reorganized Federal-Mogul Class B Common Stock shall initially be entitled to nominate three (3) directors. Additionally, the amended Certificate of Incorporation shall provide that certain major transactions by Reorganized Federal-Mogul shall require the approval of a majority of both the directors elected by the holders of Reorganized Federal-Mogul Class A Common Stock and the directors elected by the holders of Reorganized Federal-Mogul Class B Common Stock. Notwithstanding the foregoing, of the six (6) directors that the holders of the Reorganized Federal-Mogul Class A Common Stock shall initially be entitled to nominate, one of such directors shall be the Chief Executive Officer of Reorganized Federal-Mogul, and one other of such directors shall be Neil Subin, presently chairman of the Unsecured Creditors Committee.

**8.3.13.    Initial Board of Directors of Reorganized Federal-Mogul.** On and after the Effective Date, the business and affairs of Reorganized Federal-Mogul shall become the general responsibility of its board of directors, subject to, and in accordance with, the Certificate of Incorporation and the Bylaws of Reorganized Federal-Mogul. The initial board of directors shall consist of the nine individuals identified in Exhibit 8.3.13 hereto.

**8.3.14.    New Employment Agreements.** On the Effective Date, Reorganized Federal-Mogul may implement new employment agreements and/or equity-based compensation and pension plans, which shall become binding, effective and operative as of the Effective Date.

**8.3.15.    Grant of Non-Qualified Stock Options.** As soon as practicable after the Effective Date, Reorganized Federal-Mogul shall grant José Maria Alapont, the President, Chairman of the Board of Directors, and Chief Executive Officer of Federal-Mogul, non-qualified stock options to purchase the number of shares of Reorganized Federal-Mogul Class A Common Stock equivalent to four percent (4%) of the number of shares of the Reorganized Federal-Mogul Class A Common Stock and the Reorganized Federal-Mogul Class B Common Stock issued on the Effective Date. The grant of such non-qualified stock options shall be subject to the terms and conditions in the Stock Option Agreement attached to the Plan as Exhibit 8.3.15 (the *"Stock Option Agreement"*). The Certificate of Incorporation of Reorganized Federal-Mogul shall authorize the issuance of the number of shares of Reorganized Federal-Mogul Class A Common Stock necessary to fulfill the provisions of this Section 8.3.15 and the Stock Option Agreement.

**8.3.16.    Reincorporation of Reorganized Federal-Mogul.**

**8.3.16.1.    General.** Prior to the Effective Date, a new corporate entity, known as "New Federal-Mogul Corporation" shall be incorporated as a Delaware corporation (*"New Federal-Mogul"*), and New Federal-Mogul shall be a wholly-owned subsidiary of Federal-Mogul. On the Effective Date, Federal-Mogul shall merge with and into New Federal-Mogul (the *"Merger"*), with New Federal-Mogul surviving the merger and becoming Reorganized Federal-Mogul, with the surviving corporation to be renamed "Federal-Mogul Corporation". Immediately after the consummation of the Merger, New Federal-Mogul shall issue the Reorganized Federal-Mogul Common Stock, the Warrants and the Reorganized Federal-Mogul Junior Secured PIK Notes, as provided in Sections 8.3.4, 8.3.7 and 8.11 of the Plan. All references herein to Reorganized Federal-Mogul shall refer to New Federal-Mogul from and after the Merger.

**8.3.16.2.    Reservation of Rights.** Notwithstanding the provisions of Section 8.3.16.1 of the Plan, the Plan Proponents reserve the right to maintain Reorganized Federal-Mogul Corporation as a Michigan corporation and adopt an amended and restated certificate of incorporation in Michigan. In such event, the Plan Proponents shall file such amended and restated certificate of incorporation prior to the Confirmation Hearing.

**8.4.    Ownership and Management of Reorganized Debtors other than Reorganized Federal-Mogul.** From and after the Effective Date, each Debtor shall retain its Equity Interest in any other Debtor. The initial boards of directors for the Reorganized Debtors other than Reorganized Federal-Mogul are set forth in Exhibit 8.4 hereto.

**8.5.** **Dissolution Of Inactive Debtor Subsidiaries**. On or subsequent to the Effective Date, in the discretion of the new board of directors, Reorganized Federal-Mogul, or the applicable parent company, may take such actions as may be necessary or appropriate to effect the liquidation, dissolution, winding-up, striking off, or other disposition, if any, of some or all of the Inactive Debtor Subsidiaries.

**8.6.** **Corporate Action**. All matters provided for under the Plan involving the corporate structure of the Debtors, or any corporate action to be taken by, or required of the Debtors, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action or vote by the stockholders or directors of any of such entities.

**8.7.** **Vesting of Assets**. On the Effective Date, all property of the Estate of each Debtor (including, but not limited to, any tax credits or other tax-related benefits that are property of the Estate of any Debtor) shall revest in the applicable Reorganized Debtor free and clear of all Claims, Liens, encumbrances and other interests, except as provided in the Plan and the Confirmation Order. As of the Effective Date, each Reorganized Debtor may operate its business, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

**8.8.** **Preservation of Rights Of Action**.

**8.8.1.** **Rights of Action.** Except for the Trust Causes of Action and except as provided in Section 11.5 of the Plan or as otherwise provided in the Plan or the Confirmation Order, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all rights, claims, causes of action, suits and proceedings accruing to or for the benefit of the Debtors or the Estates pursuant to the Bankruptcy Code, or pursuant to any other statute or legal theory, and which shall include, but are not limited to, all causes of action arising under Sections 542, 543, 544, 547 through 551 and 553 of the Bankruptcy Code and which, for the avoidance of doubt, shall specifically include any action for recovery of "preferential transfers" described in Section 11 of the Disclosure Statement.

**8.8.2.** **Designation of Estates' Representative.** The Unsecured Creditors Committee shall be deemed the appointed representative of the Estates to pursue, litigate, compromise and settle any action to avoid and recover transfers made to or for the benefit of former Federal-Mogul officers Richard Snell and Alan Johnson. The Reorganized Debtors shall be deemed the appointed representatives to pursue, litigate, compromise and settle any other rights, remedies, claims, causes of action, suits or proceedings.

**8.8.3.** **Asbestos Insurance Actions.** Notwithstanding any other provision of the Plan to the contrary and without limiting the foregoing, the Reorganized Debtors, with the consent of the Trustees, may retain, prosecute and enforce any Asbestos Insurance Action in their own name, for the benefit of the Trust and the holders of Asbestos Personal Injury Claims, provided that any costs and expenses to be incurred by the Reorganized Debtors in any such

Asbestos Insurance Action shall be reimbursed to the Reorganized Debtors by the Trust as Trust Expenses as soon as practically possible.

    **8.9.**   **Setoffs**. Except as otherwise provided in the Addendum and the Plan B Settlement Agreement with respect to the Plan B Settlement, each Reorganized Debtor (or the Trust to the extent it pertains to an Asbestos Personal Injury Claim) may, pursuant to the applicable provisions of the Bankruptcy Code or applicable non-bankruptcy law, setoff against any applicable Allowed Claim (before any distribution is made on account of such Claim) any and all claims, rights, causes of action, debts or liabilities of any nature that the applicable Reorganized Debtor (or the Trust to the extent it pertains to an Asbestos Personal Injury Claim) may hold against the holder of such Allowed Claim; provided, however, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, causes of action, debts or liabilities.

    **8.10.**  **Reorganized Federal-Mogul Secured Term Loan Agreement**. On the Effective Date, (i) Reorganized Federal-Mogul, as borrower, (ii) the other Reorganized U.S. Debtors and F-M UK Holding Limited, as guarantors, (iii) the holders of Class 1B Bank Claims, as lenders, (iv) JPMorgan Chase Bank, N.A., as Administrative Agent for the lenders, and (v) the holders of Class 1C Surety Claims, shall become parties to the Reorganized Federal-Mogul Secured Term Loan Agreement regardless of whether any such party actually executes the Reorganized Federal Mogul Secured Term Loan Agreement. The Reorganized Federal-Mogul Secured Term Loan Agreement shall provide for, among other things, (a) the issuance to the holders of Allowed Class 1B Bank Claims, in accordance with each such holder's previously existing rights under the Bank Credit Agreement, of term loans in the principal amount of $1,303,897,117.90 (as adjusted as of the Effective Date to convert any foreign currencies to U.S. dollars) plus the amount of any draws prior to the Effective Date on letters of credit outstanding under the Bank Credit Agreement (but excluding draws prior to the Effective Date on letters of credit outstanding under the Tranche C Loans portion of the DIP Facility) and (b) the issuance to the holders of Class 1C Surety Claims of term loans in the principal amount of $22,764,000.00. Unless repaid earlier, the term loans issued to the holders of Class 1B Bank Claims and Class 1C Surety Claims shall be repayable in periodic installments maturing six and a half years after the Effective Date, at a rate of interest based on rates in the London interbank market or, at Reorganized Federal-Mogul's option, an alternate base rate. The obligations of the Reorganized U.S. Debtors with respect to the Reorganized Federal-Mogul Secured Term Loan Agreement shall be secured by Liens on substantially all domestic assets of the Reorganized U.S. Debtors and on 65% of the equity in the first-tier foreign subsidiaries owned by the Reorganized U.S. Debtors and Reorganized F-M UK Holding Limited. Except as otherwise provided in the Reorganized Federal-Mogul Secured Term Loan Agreement, such Liens shall be junior only to the Liens securing the Exit Facilities.

    **8.11.**  **Issuance of Reorganized Federal-Mogul Junior Secured PIK Notes**. On the Effective Date, Reorganized Federal Mogul shall issue and distribute to the PIK Notes Trustee, on behalf of all holders of Class 1B Bank Claims and all holders of Class 1C Surety Claims, and for ultimate distribution to each such holder in accordance with such holder's previously existing rights under the Bank Credit Agreement and the Surety Claims Settlement Agreement, respectively, the Reorganized Federal-Mogul Junior Secured PIK Notes. The Federal-Mogul Junior Secured PIK Notes shall have an aggregate original principal amount of $305,236,000.00,

shall mature on the eleventh anniversary of the Effective Date and shall bear interest at a fixed rate, initially payable partially in cash and partially in kind.  The obligations of Reorganized Federal-Mogul with respect to the Reorganized Federal-Mogul Junior Secured PIK Notes shall be secured by Liens on substantially all domestic assets of the Reorganized U.S. Debtors and on 65% of the equity in the first-tier foreign subsidiaries owned by the Reorganized U.S. Debtors and Reorganized F-M UK Holding Limited.  Except as otherwise provided in the indenture for the Reorganized Federal-Mogul Junior Secured PIK Notes, such Liens shall be junior only to the Liens securing (i) the Exit Facilities and (ii) the Reorganized Federal-Mogul Secured Term Loan Agreement.

     **8.12.**  <u>**Exit Facilities**</u>.  On the Effective Date, Reorganized Federal-Mogul shall enter into the Exit Facilities.  The proceeds of the Exit Facilities shall be used to (a) repay obligations under the DIP Facility on the Effective Date, (b) make cash payments required under the Plan and/or (c) provide working capital for the business operations and general corporate purposes of the Reorganized Debtors.

     **8.13.**  <u>**Effectuating Documents And Further Transactions**</u>.  The Chief Executive Officer, President, or any Vice President of each Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

     **8.14.**  <u>**Distributions Under the Plan**</u>

     **8.14.1.**  **General Matters**.  The Disbursing Agent shall make all distributions required under the Plan (other than distributions to holders of Asbestos Personal Injury Claims).  Distributions shall be made on the Distribution Date (unless otherwise provided herein or ordered by the Bankruptcy Court) with respect to all Claims except Asbestos Personal Injury Claims.  Distributions with respect to Asbestos Personal Injury Claims shall be made in accordance with the Asbestos Personal Injury Trust Distribution Procedures.  Distributions to be made on the Distribution Date shall be deemed actually made on the Distribution Date if made either (a) on the Distribution Date or (b) as soon as practicable thereafter, but in no event later than ten Business Days after the Distribution Date, except as otherwise provided for herein, or except as may be ordered by the Bankruptcy Court.  Except where the Plan contemplates deferred payment or delivery of property or securities, payments to be made by the Disbursing Agent pursuant to the Plan shall be made in Cash or by check drawn on a domestic bank or by wire transfer from a domestic bank.

     **8.14.2.**  **Withholding Of Taxes**.  The Disbursing Agent or the Trust, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

     **8.14.3.**  **Allocation of Consideration**.  To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for tax purposes, be allocated to the principal amount of

129

the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

      **8.14.4.**    **Unclaimed Property.**  Except as provided in Section 8.3.4 of the Plan with respect to distributions of Reorganized Federal-Mogul Class A Common Stock to or for the benefit of Noteholders, and Section 8.10 of the Plan with respect to distributions on account of Bank Claims and Surety Claims, any Cash, assets, and other property to be distributed under the Plan, but excluding any distributions from the Trust, that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (a) one year after the Distribution Date, or (b) six months after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and shall be transferred to, the applicable Reorganized Debtor whose Estate owed or paid the Claim, notwithstanding state or other escheat or similar laws to the contrary.  In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall be deemed to have waived its rights to such payments or distributions under the Plan pursuant to Section 1143 of the Bankruptcy Code, and such Entity shall have no further Claim in respect of such distribution and shall not participate in any further distributions under the Plan with respect to such Claim.

      **8.14.5.**    **Transfer Taxes.**  Pursuant to Section 1146 of the Bankruptcy Code, and to the fullest extent permitted by law, no stamp tax, transfer tax or other similar tax shall be imposed or assessed by any taxing authority on account of (i) the issuance, transfer or exchange of any securities issued under the Plan; (ii) the transfer of any assets or property pursuant to the Plan (including as collateral for any indebtedness contemplated by the Plan) or (iii) the making or delivery of an instrument of transfer under the Plan.

      **8.14.6.**    **Indenture Trustee Compensation.**  The Indenture Trustees shall receive reasonable compensation and reimbursement of actual and necessary expenses pursuant to the Indentures and pursuant to the procedures set forth herein.

      **(a)**    Not later than five (5) days after the Confirmation Date, the Indenture Trustees shall submit to Reorganized Federal-Mogul reasonably detailed statements of the fees and expenses incurred by the Indenture Trustees through such date along with any estimated fees and expenses for services to be rendered after such date in effectuating the distribution of Reorganized Federal-Mogul Class A Common Stock to the Noteholders and the surrender and cancellation of the Notes as contemplated by the Plan (the "*Statements*").

      **(b)**    Reorganized Federal-Mogul shall pay all undisputed Statements submitted by the Indenture Trustees in Cash on the Effective Date.  If Reorganized Federal Mogul disputes any Statement, Reorganized Federal-Mogul shall notify the applicable Indenture Trustee of the basis for the dispute in writing on or prior to ten (10) days after the Effective Date.  Such notice shall also set forth the amount Reorganized Federal-Mogul believes is due and owing, if any, to the applicable Indenture Trustee.  If the applicable Indenture Trustee and Reorganized Federal-Mogul thereafter reach an agreement with regard to the disputed Statement, Reorganized Federal-Mogul shall promptly pay the agreed-upon amount to the applicable Indenture Trustee. If the parties are unable to reach an agreement as to any disputed Statement, the applicable Indenture Trustee shall file a request for allowance and payment of an Administrative Expense with the Bankruptcy Court on or before thirty (30) days after the Effective Date (the "*Request*").

If no Request is filed by such date, the applicable Indenture Trustee shall be deemed to have consented to the amount of fees and expenses agreed to by Reorganized Federal-Mogul. Reorganized Federal-Mogul shall be given notice and an opportunity to respond to any and all Requests. Upon the entry of a Final Order with respect to any Request, Reorganized Federal-Mogul shall pay the applicable Indenture Trustee the amount allowed in such Final Order in Cash.

(c)     Upon payment of the Indenture Trustees' fees and expenses in accordance with the foregoing paragraphs, the charging liens of the Indenture Trustees upon distributions to the Noteholders, if any, will be discharged.

**8.14.7.     Record Ownership Date.** Only Persons who hold Notes, are beneficiaries of Convertible Subordinated Debentures or hold Equity Interests of record as of the Record Date will be entitled to receive distributions payable on account of such Claims or Equity Interests under the Plan. The Disbursing Agent and any transfer or distribution agent shall be entitled to treat the record holder of a registered security as the sole holder of any Equity Interest evidenced thereby for purposes of all notices, payments or distributions under the Plan. No notice of any transfer of any such security shall be binding on the Disbursing Agent or any transfer or distribution agent unless such transfer has been properly registered in accordance with the provisions of the governing indenture or agreement at least ten Business Days prior to any Distribution Date. If there is any dispute regarding the identity of the Entity entitled to receive a distribution in respect of a Claim or Equity Interest under the Plan, no distribution need be made in respect of such Claim or Equity Interest until such dispute has been resolved.

**8.14.8.     Transfer of Claim.** In the event that the holder of any Claim shall transfer such Claim on or after the Effective Date, it shall immediately advise the Disbursing Agent or the Trust, as the case may be, in writing of such transfer. The Disbursing Agent or the Trust, as the case may be, shall be entitled to assume that no transfer of any Claim has been made by any holder unless and until written notice of a transfer has been actually received by the Disbursing Agent or the Trust. Each transferee of any Claim shall take such Claim subject to the provisions of the Plan, and except as provided in a notice of transfer, the Disbursing Agent or the Trust, as the case may be, shall be entitled to assume conclusively that the transferee named in any notice of transfer shall thereafter be vested with all rights and powers of the transferor of such Claim. The provisions of this Section 8.14.8 shall not apply to holders or transferees of Bank Claims or Noteholder Claims.

**8.14.9.     Cash Payments.** Cash payments on account of Allowed Claims of creditors of the U.S. Debtors located in the United States of America shall be paid in U.S. dollars. Cash payments on account of Allowed Claims of creditors of the U.S. Debtors located outside the United States of America, and cash payments on account of Allowed Claims against the U.K. Debtors to be paid under the Plan, shall be paid under the currency in which the Claim is denominated in the invoice or under the currency in which the Claim is otherwise payable under applicable non-bankruptcy law.

**8.14.10.     Distributions to Holders of Claims to be Treated Under CVAs.** In the event that a Claim is Allowed under the Plan by virtue of its allowance under the CVA applicable to a particular U.K. Debtor or is to be satisfied out of the assets of the U.K. Asbestos

131

Trust, the payments made on account of such Claim shall be the only amounts payable on account of such Claim, and no further payment on account of such Claim shall be made under the Plan.

8.14.11.    **Payment of Plan B Settlement Amount.**  Payment of the Plan B Settlement Amount shall not be subject to the provisions of this Section 8.14 of the Plan, but shall instead be governed by the provisions of Section 8.22 of the Plan and the Plan B Settlement Agreement.

8.14.12.    **Payment of Owens-Illinois Settlement Amount.**  Payment of the Owens-Illinois Settlement Amount shall not be subject to the provisions of Section 8.14 or 8.15 of the Plan, but shall instead be governed by the provisions of Section 8.25 of the Plan and the Owens-Illinois Settlement Agreement.

8.14.13.    **Payment of Statutory Fees.**  All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  After the Effective Date, the Reorganized Debtors shall pay all required fees pursuant to 28 U.S.C. § 1930 or any other statutory requirement and comply with all statutory reporting requirements related to the foregoing.

8.14.14.    **Payment of Amounts to The Travelers Indemnity Company & Affiliates.**  Payments to The Travelers Indemnity Company & Affiliates on account of the proofs of claim filed thereby with respect to the Deductible Amount (as defined in the Commutation Agreement) shall not be subject to the provisions of Section 8.14 or 8.15 of the Plan, but shall instead be governed by the terms of the Commutation Agreement.

**8.15.    Distributions to Holders of Unsecured Claims Against U.S. Debtors.**  The following provisions shall apply to distributions to the holders of Class H Unsecured Claims against the U.S. Debtors.

8.15.1.    **Cash Distribution.**  In the event that the total amount of Allowed Unsecured Claims against the U.S. Debtors (including the total amount of Allowed Unsecured Claims of any holders making the stock election set forth below in Section 8.15.2) is determined by the Plan Proponents or by the Reorganized Debtors, as applicable, to be in excess of $258.0 million, then the amount of the Cash distributions to holders of Allowed Unsecured Claims against such Debtors will be adjusted so that each such holder will receive, on account of its Allowed Unsecured Claim, total Cash payments equal to such holder's Pro Rata portion of $90.3 million (and the calculation of such Pro Rata portion shall take into account all Allowed Class H Unsecured Claims against the U.S. Debtors including the Allowed Unsecured Claims of any holders making the stock election set forth below in Section 8.15.2).   In the event the Claims allowance and reconciliation process for Unsecured Claims against the U.S. Debtors is not completed on or prior to the second anniversary of the Distribution Date, then Reorganized Federal Mogul shall make a determination as to whether it is likely that such Claims will exceed $258.0 million.  If it is determined that such Claims will exceed $258.0 million, then Reorganized Federal-Mogul shall adjust all remaining payments to be made on account of such Claims so that the holders of such Claims will receive a Pro Rata portion of $90.3 million and Reorganized Federal-Mogul shall take any and all necessary steps to facilitate the distributions in

132

accordance with this Section 8.15.1 including, without limitation, setting reasonable reserves, if necessary, and withholding portions of any distributions pending the completion of the Claims allowance and reconciliation process for the applicable Debtors.

       **8.15.2.    Class H Stock Election.** The holders of Allowed Class H Unsecured Claims against the U.S. Debtors shall be entitled to elect to receive a Pro Rata share of Reorganized Federal-Mogul Class A Common Stock instead of the Cash distribution provided for Allowed Class H Unsecured Claims in Article III of the Plan. For purposes of this Section 8.15.2, a holder making such an election is referred to as an *"Electing Holder."* An Electing Holder must represent that it has not, at the time of making its election, agreed to sell its claims to a third party. Any Cash that would have been distributed to an Electing Holder had they not made the election will remain with Reorganized Federal-Mogul.

       **8.15.2.1.    Calculation of Pro Rata Share of Stock.** The Pro Rata portion of Reorganized Federal-Mogul Class A Common Stock to be distributed to each Electing Holder shall be determined by the proportion that such Electing Holder's Allowed Class H Unsecured Claim against a U.S. Debtor bears to the aggregate amount of all Allowed Class 1D Noteholder Claims, Allowed Class 1F Subordinated Debenture Claims and Allowed Class H Unsecured Claims against the U.S. Debtors held by all other Electing Holders; provided, however, Allowed Class 1F Subordinated Debenture Claims shall not include any holders of Convertible Subordinated Debenture Claims that have converted or deemed to have converted their respective Convertible Subordinated Debentures to Federal-Mogul common stock pursuant to Section 8.3.2 of the Plan; provided further, however, if the aggregate amount of Allowed Class H Unsecured Claims exceeds $258.0 million, then each Electing Holder's Pro Rata share of the stock shall be reduced to reflect the reduced Cash distribution such Electing Holder would have received had such Electing Holder not made the stock election provided herein. If, at or prior to the Confirmation Hearing, the Plan Proponents believe that the aggregate amount of Allowed Class H Unsecured Claims against the U.S. Debtors is likely to exceed $258.0 million, then the Plan Proponents shall seek Bankruptcy Court approval of an appropriate withholding and reserve mechanism for the stock to be distributed to all Electing Holders pending the completion of the Claims allowance and reconciliation process for the applicable Debtors.

       **8.15.2.2.    Election Form.** The Debtors shall send an election form substantially in the form set forth in Exhibit 8.15.2.2 along with the notice of the Confirmation Hearing to all holders of Allowed Class H Unsecured Claims against the U.S. Debtors. The election forms shall be mailed to, and only be exercisable by, the owner of such Allowed Class H Unsecured Claims as of January 22, 2007. The entities listed on Exhibit 8.15.2.2A shall be deemed to be the record owners of the Class H Unsecured Claims set forth on Exhibit 8.15.2.2A (and they shall be the record owner for only such Claims) as of January 22, 2007. Any subsequent owner, assignee, or transferee shall not be entitled to make the election set forth in Section 8.15.2. Any election form must be received by the Debtors on or before 45 days after the Bankruptcy Court enters an order approving the Supplemental Disclosure Statement. If the holder of any disputed Class H Unsecured Claim against a U.S. Debtor wishes to make the stock election, such holder must file a motion, prior the deadline to object to the Plan, seeking temporary allowance and an estimation of such disputed Class H Unsecured Claim for election purposes. If, at or prior to the Confirmation Hearing, the holder of a disputed Class H Unsecured Claim wishes to make the stock election, the Plan Proponents shall seek Bankruptcy Court

approval of an appropriate withholding and reserve mechanism for the stock to be distributed to all Electing Holders pending the completion of the Claims allowance and reconciliation process for the applicable Debtors.

        **8.15.3.**    **Ad Hoc Committee of Unsecured Creditors.** The Plan Proponents support the granting of, and shall not object to, any application by the Ad Hoc Committee of Certain Unsecured Creditors (or its counsel) pursuant to Section 503(b) of the Bankruptcy Code seeking compensation and reimbursement of actual and reasonable legal fees and expenses incurred in these Reorganization Cases in an amount up to but not exceeding $150,000.00.

      **8.16.**    <u>Implementation of Plans for Federal-Mogul Bradford Limited and Federal-Mogul Sealing Systems (Rochdale) Limited</u>.

        **8.16.1.**    The Plan, as it relates to Federal-Mogul Bradford Limited (***"Bradford"***), will be implemented in part pursuant to an agreement dated as of December 17, 2003, by and among T&N, Bradford, the T&N Administrators, the Bradford Administrators, Federal Mogul Gorzyce, S.A. (***"F-M Gorzyce"***) and Federal Mogul Holding Deutschland GmbH, which agreement provides for (i) the lease of certain of Bradford's plant, tooling and machinery and (ii) the license of certain of Bradford's know-how utilized in its piston-manufacturing operations to F-M Gorzyce, a non-Debtor Affiliate of the Debtors located in Poland. That agreement further provides for the sale of such leased and licensed assets, together with Bradford's customer goodwill, to F-M Gorzyce pursuant to a purchase option to be exercised by F-M Gorzyce through the Plan, pursuant to Section 524(g)(3)(A)(ii) of the Bankruptcy Code. Accordingly, the Confirmation Order shall provide that F-M Gorzyce shall exercise the purchase option described in this paragraph as part of the implementation of the Plan and that pursuant to Section 524(g)(3)(A)(ii) of the Bankruptcy Code F-M Gorzyce shall have no liability with respect to any Asbestos Personal Injury Claim or Demand that may be made against it by reason of its status as the transferee of and/or successor to the assets of Bradford.

        **8.16.2.**    The Plan, as it relates to Federal-Mogul Sealing Systems (Rochdale) Limited (***"FMSS-Rochdale"***), will be implemented in part pursuant to an agreement dated as of August 4, 2006, by and among T&N, FMSS-Rochdale, the T&N Administrators, the FMSS-Rochdale Administrators, and Federal-Mogul Sealing Systems (Pty) Limited (***"FMSS-South Africa"***), which agreement provides for the lease of certain of FMSS-Rochdale's plant, machinery and tooling to FMSS-South Africa, a non-Debtor Affiliate of the Debtors. That agreement further provides for the sale of such plant, machinery and tooling to FMSS-South Africa pursuant to a purchase option to be exercised by FMSS-South Africa through the Plan, pursuant to Section 524(g)(3)(A)(ii) of the Bankruptcy Code. Accordingly, the Confirmation Order shall provide that FMSS-South Africa shall exercise the purchase option described in this paragraph as part of the implementation of the Plan and that pursuant to Section 524(g)(3)(A)(ii) of the Bankruptcy Code FMSS-South Africa shall have no liability with respect to any Asbestos Personal Injury Claim or Demand that may be made against it by reason of its status as the transferee of and/or successor to the assets of FMSS-Rochdale.

      **8.17.**    <u>Objections to Claims Other than Asbestos Personal Injury Claims</u>. Subject to the provisions of Article IV and Section 8.18, after the Effective Date, only the applicable Reorganized Debtor against whose Estate a Claim was filed or deemed filed may object to the

allowance of any Claim, except that (i) the Unsecured Creditors Committee, the Asbestos Claimants Committee and the Future Claimants Representative shall also have standing and capacity to object to the Administrative Expense Claims of professionals employed or retained in these Reorganization Cases; (ii) all rights of any Asbestos Insurance Company with respect to the defense and settlement of Debtor Insurance Claims, or claims asserted by any non-Debtor party against any Debtor or any Asbestos Insurance Company for coverage under any Asbestos Insurance Policy, are preserved; (iii) insurers that have issued or subscribed policies that provide or may be alleged to provide coverage for Debtor Insurance Claims shall retain any rights they may have to object to the allowance of such Debtor Insurance Claims; and (iv) the Unsecured Creditors Committee shall also have standing and capacity to object to the Claims of Richard Snell and Alan Johnson. Subject to the provisions of Article IV and Section 8.18, after the Effective Date, the applicable Reorganized Debtor against whose Estate a Claim was filed or deemed filed shall be accorded the power and authority to allow or settle and compromise any Claim, except for the Administrative Expense Claims of professionals employed by or on behalf of the Estates and Debtor Insurance Claims, without notice to any other party or approval of or notice to the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court, and except as to any (a) late-filed Claims, (b) Asbestos Personal Injury Claims, (c) Claims granted to Dana Corporation and/or any of its affiliates pursuant to that certain settlement agreement between Dana Corporation, certain of its affiliates, and certain of the Debtors, which settlement agreement was approved by the Bankruptcy Court on August 21, 2003, and (d) Claims asserted by the United States of America or any of the States party to the Environmental Settlement Agreements relating to the Additional Sites (as defined in the Environmental Settlement Agreements), all objections to Claims against the U.S. Debtors shall be filed with the Bankruptcy Court on or before six months following the Effective Date. Objections to late-filed Claims against the U.S. Debtors shall be filed not later than the later of (a) six months following the Effective Date or (b) sixty (60) days after the Reorganized Debtor receives actual notice of the filing of such Claim. Nothing in this Section 8.17 or any other provision of the Plan shall be deemed to limit or impair the ability of the United States Trustee to object to Administrative Expense Claims of professionals employed during these Reorganization Cases.

**8.18.  Resolution of Asbestos Personal Injury Claims.**  Asbestos Personal Injury Claims (other than CVA Asbestos Claims) shall be resolved in accordance with the Trust Documents, subject to the provisions of Article IV of the Plan and subject to the right of any Asbestos Insurance Company to raise any Asbestos Insurer Coverage Defense in response to a demand by the Trust that such insurer handle, defend, or pay any such claim.

**8.19.  Settling Asbestos Insurance Companies.**  After the Confirmation Hearing and prior to the Effective Date, the Debtors, and, from and after the Effective Date, the Trust, may, at any time, in its or their sole and absolute discretion, move the District Court to extend the Third Party Injunction to any Asbestos Insurance Company, for good cause shown. Such motion shall be served upon the parties entitled to notice pursuant to the Bankruptcy Court's Order Establishing Case Management Procedures and Hearing Schedule, and shall disclose, to the extent necessary, the terms of any Asbestos Insurance Settlement Agreement with any Asbestos Insurance Company.

**8.20.  Release by Dan=Loc Group.**  On the Effective Date, each of the Dan=Loc Deed of Special Indemnity and the Dan=Loc Deed of Guarantee shall be deemed terminated by

135

agreement and the Dan=Loc Group shall release any and all Claims, obligations and liabilities (including, but not limited to, Environmental Claims) whatsoever against any and all of the Debtors, their non-Debtor Affiliates and the Released Parties (i) under the Deed of Special Indemnity, (ii) under the Deed of Guarantee (iii) or otherwise, except that Asbestos Property Damage Claims against the Debtors that the Dan=Loc Group had under the Dan=Loc Deed of Special Indemnity and Dan=Loc Deed of Guarantee as of the Petition Date shall, to the extent that any such Claims are Allowed, be treated as Unsecured Claims under the Plan. In addition to releasing any Environmental Claims against the Debtors, Dan=Loc is also waiving and releasing any and all claims against four non-Debtor Affiliates that are parties to the 1997 Dan=Loc Asset Purchase Agreement.

    **8.21.    Implementation of Environmental Settlements.** The Plan will implement those certain settlement agreements by and among the Debtors and (i) the United States of America, the State of Georgia, the State of Indiana, the Commonwealth of Kentucky, the Commonwealth of Pennsylvania, the City of Battle Creek, Michigan, the Board of County Commissioners, Lucas County, Ohio, and certain PRP Groups dated as of December 1, 2004 (and approved by the Bankruptcy Court by a Final Order dated December 1, 2004), (ii) the State of Michigan, dated as of November 7, 2005 (and approved by the Bankruptcy Court by a Final Order dated November 7, 2005, and (iii) the State of Ohio, dated as of October 27, 2006 (and approved by the Bankruptcy Court by a Final Order dated as of October 27, 2006 (collectively, the *"Environmental Settlement Agreements"*) wherein, among other things, all Environmental Claims against the U.S. Debtors with respect to Additional Sites (as defined in each of the Environmental Settlement Agreements) shall be discharged under Section 1141 of the Bankruptcy Code in exchange for giving the holders of such Claims (i) the distributions and rights afforded under the Plan to the holders of Allowed Unsecured Claims in Class H against the relevant Debtor once such Claims have been liquidated in accordance with the terms of the Environmental Settlement Agreements and (ii) the other rights provided under the Environmental Settlement Agreements, including but not limited to the right to liquidate Environmental Claims involving the Additional Sites after the Effective Date, notwithstanding their having been discharged under 11 U.S.C. § 1141. Accordingly, the provisions of this Plan shall not alter or prejudice the specific rights provided to the parties under the Environmental Settlement Agreements pertaining to Environmental Claims arising or relating to the Additional Sites, and in the event of any inconsistencies between the Plan and the Environmental Settlement Agreements pertaining to Environmental Claims arising or relating to the Additional Sites, the terms of the Environmental Settlement Agreements shall govern. In addition, any other Environmental Claims by parties which are not settling pursuant to the Environmental Settlement Agreements, and which are not liquidated prior to the Effective Date, may be settled by the applicable Reorganized U.S. Debtors to the extent such settlements are substantially similar to the provisions of the Environmental Settlement Agreements relating to Environmental Claims with respect to Additional Sites.

    **8.22.    Implementation of Plan B Settlement With Pneumo Parties.** The Plan will implement the Plan B Settlement in the event Articles II and III of the Plan B Settlement Agreement become effective pursuant to Section 5.01 of the Plan B Settlement Agreement prior to the Date of Finality. The Plan B Settlement Agreement is attached to the Plan as Exhibit 8.22. The Plan B Settlement shall not become effective if the Date of Finality occurs and the Plan A Settlement becomes fully and finally effective.

**8.22.1.    Plan B Settlement Amount.**  In full, final and complete satisfaction of any Released Claims Against FMC Group, on or as soon as reasonably practicable following the Plan B Date (but in no event later than 10 days after the Plan B Date), (a) $138,000,000 shall be paid to Cooper Industries, LLC (*"Cooper LLC"*) by wire transfer of immediately available funds from assets available for distribution under the Plan and (b) $2,000,000 shall be paid to Pneumo Abex by wire transfer of immediately available funds from assets available for distribution under the Plan (the $138,000,000 payment and the $2,000,000 payment referred to in this Section 8.22.1 being collectively referred to as the *"Plan B Settlement Amount"*).  Cooper LLC's and Pneumo Abex's entitlement to receive payments of their respective portions of the Plan B Settlement Amount shall not be subject to any defense, counterclaim, offset, subordination, reduction, disallowance, or modification under the Plan or otherwise, including, but not limited to, under Section 502(d) of the Bankruptcy Code.

**8.22.2.    Restriction on Payments.**  If the Plan B Effective Date occurs, none of the Debtors, their non-Debtor Affiliates, nor the Disbursing Agent shall make any payment, distribution or contribution under the Plan (other than a payment, distribution or contribution to the Trust or other Entity necessary to pay the Plan B Settlement Amount and which payment, distribution or contribution (or the Cash proceeds thereof) is actually used by the Trust or such other Entity to pay the Plan B Settlement Amount to Cooper LLC and Pneumo Abex (as applicable) prior to the time the Plan B Settlement Amount is paid in full in accordance with Section 8.22.1 of the Plan and Section 2.01 of the Plan B Settlement Agreement.

**8.22.3.    Plan B Settlement Mutual Releases; Limited Exceptions to Discharge**

**8.22.3.1.**    Except as otherwise provided in the Plan B Settlement Agreement, the Plan B Settlement is a complete, final and comprehensive settlement and resolution of any and all Claims between the Pneumo Parties, or any of them, and the Debtors and their non-Debtor Affiliates, or any of them.

**8.22.3.2.**    On the terms and subject to the conditions set forth in the Plan B Settlement Agreement, the various releases set forth in Article III of the Plan B Settlement Agreement shall become effective as of the Effective Date.  Notwithstanding any other provision of the Plan, the Claims set forth in Section 3.03 of the Plan B Settlement Agreement that are not released (the *"Pneumo Excluded Claims"*) shall remain unaltered, shall continue in full force and effect and shall not be subject to any treatment or discharge under the Plan, regardless of the classes into which any such preserved Claims would otherwise be categorized and the treatment otherwise afforded to the Pneumo Excluded Claims in such classes under any other provision of the Plan.

**8.22.4.    Funding of Plan B Settlement Amount.**

**8.22.4.1.    If Call is Exercised on Effective Date.**

(a)    If the Call (as defined in Section 8.3.6 of the Plan) in favor of Thornwood or its designee is exercised on the Effective Date and the Plan B Date occurs on the Effective Date, then the Trust shall pay the Plan B Settlement Amount pursuant to Section 8.22.1 of the

137

Plan and Section 2.01 of the Plan B Settlement Agreement from the funds received as a result of the exercise of the Call.

      **(b)**    If the Call is exercised on the Effective Date and any of the situations described in Section 4.09(a), (b), or (c) of the Plan B Settlement Agreement are in occurrence as of the Effective Date, then the Trust shall fund the Cooper/Pneumo Escrow Account pursuant to Section 4.09 of the Plan B Settlement Agreement from the funds received as a result of the exercise of the Call on or as soon as reasonably practicable following (but in no event later than ten (10) days after) the Effective Date. The Cooper/Pneumo Escrow Account shall be maintained pursuant to an escrow agreement that gives effect to the provisions of Section 4.09 of the Plan B Settlement Agreement and is otherwise in form and substance reasonably satisfactory to Cooper, FMP, and, to the extent directly related to Pneumo Abex or PCT, Pneumo Abex and/or PCT (as the case may be) (the *"Cooper/Pneumo Escrow Agreement"*). Unless and until the Date of Finality occurs, the Cooper/Pneumo Escrow Account shall be maintained and the assets therein used only to pay the Plan B Settlement Amount pursuant to Section 8.22.1 of the Plan and Section 2.01 of the Plan B Settlement Agreement upon the occurrence of the Plan B Date. Interest accrued on amounts in the Cooper/Pneumo Escrow Account shall be paid as provided in Section 4.09 of the Plan B Settlement Agreement.

      **8.22.4.2.**    **If Call is Exercised Subsequent to Effective Date.**

      **(a)**    If the Call is not exercised on the Effective Date but the Plan B Date occurs on the Effective Date, then Reorganized Federal-Mogul shall pay the Plan B Settlement Amount on behalf of the Trust pursuant to Section 8.22.1 of the Plan and Section 2.01 of the Plan B Settlement Agreement.

      **(b)**    If the Call is not exercised on the Effective Date and any of the situations described in Section 4.09(a), (b), or (c) of the Plan B Settlement Agreement are in occurrence as of the Effective Date, then Reorganized Federal-Mogul shall fund the Cooper/Pneumo Escrow Account on behalf of the Trust pursuant to Section 4.09 of the Plan B Settlement Agreement on or as soon as reasonably practicable following (but in no event later than ten (10) days after) the Effective Date. The Cooper/Pneumo Escrow Account shall be maintained pursuant to the Cooper/Pneumo Escrow Agreement. Unless and until the Date of Finality occurs, the Cooper/Pneumo Escrow Account shall be maintained and the assets therein used only to pay the Plan B Settlement Amount pursuant to Section 8.22.1 of the Plan and Section 2.01 of the Plan B Settlement Agreement upon the occurrence of the Plan B Date. Interest accrued on amounts in the Cooper/Pneumo Escrow Account shall be paid as provided in Section 4.09 of the Plan B Settlement Agreement.

      **(c)**    If the Call is not exercised on the Effective Date, the Trust shall issue and deliver a promissory note in the principal amount of $140,000,000 (the *"Trust Note"*) to Reorganized Federal-Mogul on the Effective Date. The entirety of the obligations under the Trust Note shall become due and payable on the sixty-first (61st) day after the Effective Date. As security for the Trust's obligations to Reorganized Federal-Mogul under the Trust Note, Reorganized Federal-Mogul shall withhold from distribution to the Trust, and shall be granted a possessory security interest in, 7,793,333 shares of the Reorganized Federal-Mogul Class B Common Stock otherwise to be distributed to the Trust pursuant to Section 4.3 of the Plan (the

*"Retained Stock"*). Reorganized Federal-Mogul shall not have recourse to any assets of the Trust other than the Retained Stock to satisfy the Trust's obligations under the Trust Note. On the Effective Date, the Trust shall also deliver to Reorganized Federal-Mogul (i) a stock pledge agreement in form and substance satisfactory to Reorganized Federal-Mogul evidencing the Trust's pledge of the Retained Stock to secure repayment of the Trust Note and (ii) stock powers duly executed in blank or other instruments of transfer necessary for Reorganized Federal-Mogul to sell the Retained Stock in the event that the obligations under the Trust Note are being satisfied by Reorganized Federal-Mogul retaining the Retained Stock as contemplated in Section 8.22.4.3(b) of the Plan.

(d)    If the Call is exercised subsequent to the Effective Date, Thornwood shall pay the entire $140,000,000 amount of the Trust Note to Reorganized Federal-Mogul on behalf of the Trust, from the $375,000,000 cash payment contemplated by section 8.3.6 of the Plan to be paid to the Trust as a result of the exercise of the Call. Payment of the $140,000,000 by Thornwood directly to Reorganized Federal-Mogul shall be in full and complete satisfaction of the Trust's obligations under the Trust Note, and shall reduce dollar-for-dollar the amount that Thornwood shall pay to the Trust as a result of the exercise of the Call. Upon payment of the $140,000,000 by Thornwood to Reorganized Federal-Mogul, Reorganized Federal-Mogul shall deliver the Retained Stock to Thornwood.

**8.22.4.3.    If Call Expires.** If the Call expires without being exercised, then, on the first day following the expiry of the Call (i.e., the sixty-first (61st) day after the Effective Date):

(a)    Thornwood shall make a loan of $100,000,000 to the Trust as set forth in Section 8.3.6(c) of the Plan, which loan shall be secured by a first lien upon all the Reorganized Federal-Mogul Class B Common Stock held by the Trust at that time (which shall not include the Retained Stock); and

(b)    the Trust shall either repay the entire $140,000,000 principal amount in Cash to Reorganized Federal-Mogul, or, if the Trust does not make the foregoing payment on the sixty-first (61st) day after the Effective Date, then Reorganized Federal-Mogul shall automatically, and without any further notice or action, have full and complete ownership of the Retained Stock, and any right, title and interest of the Trust in the Retained Stock shall be deemed completely cancelled and all of the Trust's obligations under the Trust Note shall be deemed satisfied in full. In the event that Reorganized Federal-Mogul has full and complete ownership of all or part of the Retained Stock, Reorganized Federal-Mogul shall immediately be entitled to sell such Retained Stock.

**8.22.4.4.    If Dates do not Occur on a Business Day.** If any of the dates set forth in Section 8.22.4 of the Plan fall on a day that is not a Business Day, the obligations that are due on such day shall be extended until the next Business Day thereafter.

**8.22.5.     Trust Bound by Plan B Settlement Agreement.** On the Effective Date, provided that the Plan B Settlement Agreement has not been earlier terminated in accordance with its terms, the Trust will be bound by the Plan B Settlement Agreement without any need for any further action by the Trust.

**8.22.6.     Modifications to Plan B Settlement Agreement.** No provision of the Plan B Settlement Agreement may be modified, supplemented, changed or amended (including, without limitation, by amendment of the Plan) except as provided in the Plan B Settlement Agreement.

**8.22.7.     Insurance Matters Relating to Implementation of Plan B Settlement.**

**8.22.7.1.     <u>Non-Recovery of Plan B Settlement Amount from Insurers.</u>** None of the Debtors, the Trust, the Asbestos Claimants Committee, and/or the Future Claimants Representative shall seek in any forum or proceeding to recover the Plan B Settlement Amount, or any portion thereof, from any issuer(s) of any Pneumo Asbestos Insurance Policies (including, without limitation, any of Columbia Casualty Company, Continental Casualty Company and The Continental Insurance Company, both in its individual capacity as well as the successor to certain interests of Harbor Insurance Company).

**8.22.7.2.     <u>Pneumo Asbestos Insurance Policies Under Plan B Settlement.</u>** In the event Articles II and III of the Plan B Settlement Agreement become effective pursuant to Section 5.01 of the Plan B Settlement Agreement, none of the Debtors shall assert any rights to recover any amounts under any Pneumo Asbestos Insurance Policies.

**8.23.     Effectiveness of Addendum.**

**8.23.1.     Implementation of Addendum and Plan A Settlement.**

**8.23.1.1.**     The Addendum and the Plan A Settlement contained therein will be implemented unless Articles II and III of the Plan B Settlement Agreement become effective pursuant to Section 5.01 of the Plan B Settlement Agreement prior to the Date of Finality. If the Addendum and the Plan A Settlement are implemented, the Addendum and the exhibits thereto shall be part of the Plan and the Addendum and the exhibits thereto shall be Plan Documents.

**8.23.1.2.**     If Articles II and III of the Plan B Settlement Agreement become effective pursuant to Section 5.01 of the Plan B Settlement Agreement prior to the Date of Finality, the Addendum shall have no further force and effect <u>except</u> that the provisions of Section 2.4.2 of the Addendum (and all definitions used therein) and any agreements entered into to give effect thereto or in connection therewith, shall continue to have full force and effect and shall be enforceable in accordance with their terms. In such event, except for the provisions and agreements described in the first sentence of this Section 8.23.1.2, the Addendum and the exhibits thereto shall not constitute a part of the Plan and the Addendum and the exhibits thereto shall not be Plan Documents.

**8.23.2.    Addendum Controls with Respect to Plan A Settlement.**  In the event the Addendum is implemented as described in Section 8.23.1 of the Plan, to the extent there is a conflict between the Addendum and any provision of the Plan with respect to the Plan A Settlement, the Addendum shall control.

**8.24.    Plan Support Agreement.**  The Other Cooper Claims shall be subject to the terms of the Plan Support Agreement.  In particular, pursuant to the Plan Support Agreement, Cooper LLC and Cooper Industries, Ltd. have waived any rights to any Distributions on account of any of the Other Cooper Claims and any right to vote with respect thereto.

**8.25.    Implementation of Owens-Illinois Settlement.**  The Plan incorporates by reference the terms of the Owens-Illinois Settlement Agreement, including, without limitation, (i) the obligation of Federal-Mogul to pay the Owens-Illinois Settlement Amount to Owens-Illinois, Inc. on the Effective Date and (ii) the release on the Effective Date by Owens-Illinois of any and all claims against all of the Debtors and their non-Debtor Affiliates, save those proofs of claim reflecting contribution and indemnity claims arising from asbestos liabilities that are specifically set forth in the Owens-Illinois Settlement Agreement, which, for the avoidance of doubt, are classified as Indirect Asbestos Personal Injury Claims and the liability for which shall be transferred to the Trust on the Effective Date in accordance with Section 4.2.1 of the Plan.

**8.26.    Implementation of Settlement Agreement with Certain Asbestos Property Damage Claimants.**  Pursuant to Section 1123(b) of the Bankruptcy Code, that certain Settlement Agreement with the holders of Asbestos Property Damage Claims attached to the Plan as Exhibit 8.26 shall be implemented according to its terms pursuant to the Plan.

**8.27.    Implementation of MagneTek Settlement Agreement.**  The Plan will implement that certain Settlement Agreement among (i) Federal-Mogul and FMP, (ii) MagneTek, Inc., MagneTek Controls, Inc., and MagneTek National Electric Coil, Inc., (iii) the Asbestos Claimants Committee, and (iv) the Future Claimants Representative dated as of May 24, 2007.

**8.28.    Dismissal of CNA Adversary Proceeding.**  That certain adversary proceeding captioned Columbia Casualty Company, Continental Casualty Company and The Continental Insurance Company v. Federal-Mogul Corporation, Federal-Mogul Products, Inc., The Official Committee of Asbestos Claimants, Eric D. Green, Future Claimants' Representative, Pneumo Abex, LLC, PepsiAmericas, Inc., and Cooper Industries, LLC, Adv. Pro. No. 06-50609 (the *"CNA Adversary Proceeding"*), shall be deemed dismissed without prejudice as of the Effective Date.  Neither the CNA Adversary Proceeding nor any of the arguments made or actions taken by any of the parties to the CNA Adversary Proceeding in the CNA Adversary Proceeding shall in any way operate to, or have the effect of, impairing any of the parties' legal, equitable or contractual rights, if any, in any respect.

**8.29.    Implementation of CIP Agreement and Controlling Effect Thereof.**  The CIP Agreement shall be implemented as part of the Plan, and the CIP Agreement shall govern the obligations of the Reorganized Debtors, the Trust, and the Insurers and Excess Insurers (as the terms Insurers and Excess Insurers are defined in the CIP Agreement) with respect to the matters covered by the CIP Agreement.  Notwithstanding anything to the contrary in the Plan, any of the

Plan Documents (including the Trust Documents), or the Confirmation Order (including any provisions that purport to be preemptory or supervening and specifically including, without limitation, sections 4.3, 4.11, 4.14, 4.15, 8.7, 8.8.3, 8.9, 8.19, 9.6 (only as section 9.6 applies to the Reorganized Debtors), 10.6, 11.5, 11.9.1, and 11.23 of the Plan):

      (a)    The Reorganized Debtors and the Trust shall be bound by the CIP Agreement and their obligations thereunder.

      (b)    Fel-Pro Claims and Vellumoid Claims shall be handled under the CIP Agreement and Section 5.3 of the Asbestos Personal Injury Trust Distribution Procedures. In the event of any conflict or discrepancy between, on the one hand, the CIP Agreement and, on the other hand, the Plan, the Confirmation Order, or any of the Plan Documents (including, without limitation, the Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures, or any provisions that purport to be preemptory or supervening) concerning the handling and disposition of Fel-Pro Claims and Vellumoid Claims, the CIP Agreement shall govern.

      (c)    Nothing in the Plan, any of the Plan Documents (including, without limitation, the Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures, or any provisions that purport to be preemptory or supervening), or the Confirmation Order shall in any way operate to, or have the effect of, impairing, limiting, diminishing, or otherwise materially and adversely affecting the rights and obligations of the Insurers and the Excess Insurers under the CIP Agreement.

      (d)    Any future modifications to the Plan or Plan Documents (including without limitation any modifications to the Trust Agreement or the Asbestos Personal Injury Trust Distribution Procedures) shall not contain provisions that materially and adversely affect the Insurers' or Excess Insurers' rights under the CIP Agreement and Sections 5.3(b) or 8.1 of the Asbestos Personal Injury Trust Distribution Procedures shall not be amended without the prior express written consent of the Lead Insurer (as that term is defined in the CIP Agreement).

      (e)    Nothing in Section 1.1.178.5 of the Plan shall limit the effect or scope of Section 2.1(b) of the CIP Agreement.

      (f)    Nothing in this Section 8.29 shall affect, supersede or amend Section 10.4.2 of the Plan, which shall remain in full force and effect.

## ARTICLE IX
## INJUNCTIONS, RELEASES AND DISCHARGE

### 9.1.    Discharge

#### 9.1.1.    Discharge of Claims and Termination of Interests

      (a)    As of the Effective Date, except as provided in the Plan or the Confirmation Order, the distributions and rights afforded under this Plan and the treatment of Claims and Equity Interests under this Plan shall be in exchange for, and in complete discharge of, all Claims and satisfaction and termination of all Equity Interests, including any interest accrued on Claims from and after the Petition Date. Accordingly, except as otherwise provided

in the Plan or the Confirmation Order, Confirmation of the Plan shall, as of the Effective Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in Sections 502(g) or 502(i) of the Bankruptcy Code, whether or not (x) a proof of claim based on such debt is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code, (y) a Claim based on such debt is Allowed pursuant to Section 502 of the Bankruptcy Code (or is otherwise resolved), or (z) the holder of a Claim based on such debt has accepted the Plan; and (ii) satisfy, terminate or cancel all Equity Interests and other rights of equity security holders in the Debtors except as otherwise provided in the Plan.

**(b)**    As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, Demands, debts, rights, causes of action, liabilities or Equity Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims and other debts and liabilities of the Debtors, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent such judgment is related to a discharged Claim.

### 9.1.2.    Discharge Injunction

**(a)**    Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim, Demand or other debt or liability that is discharged, or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Equity Interests or rights: (i) commencing or continuing any action or other proceeding against the Debtors, the Reorganized Debtors, the Trust or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Debtors, the Reorganized Debtors, the Trust or their respective property; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtors, the Reorganized Debtors, the Trust or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Debtors, the Reorganized Debtors, the Trust or their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Plan.

**(b)**    Except as provided in the Plan or the Confirmation Order, as of the Effective Date all Persons that hold, have held, or may hold a Claim, Demand, or other debt, right, cause of action or liability that is released pursuant to the provisions of the Plan are permanently enjoined from taking any of the following actions on account of or based upon such released Claims, Demands, debts, rights, causes of action or liabilities: (i) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (iii) creating, perfecting or enforcing

any lien or encumbrance against the Released Parties or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Released Parties or against their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Plan.

### 9.2.   Releases

   **9.2.1.   Releases by Debtors and Estates.**   Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date the Reorganized Debtors on their own behalf and as representatives of their respective estates, release unconditionally, and are hereby deemed to release unconditionally, each and all of (i) the Debtors' and their non-Debtor Affiliates' officers and directors who were serving in such capacity on or after the Petition Date, (ii) the attorneys, accountants, investment bankers, restructuring consultants and financial advisors of each of the Debtors, including Rothschild Inc. (together with its officers, directors and employees who served in such capacity during the term of its engagement by the Debtors) (iii) the holders of Noteholder Claims, the holders of Bank Claims, the Administrative Agent, and the Sureties, and their respective attorneys, accountants, investment bankers and advisers of and from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act, omission, transaction, event or other occurrence taking place before the Petition Date in connection with the Debtors or any of them, or their respective property.   The releases contained in this Section shall not apply to or otherwise affect the obligations of any of Debtors' officers or directors to repay loans or advances of money or other property owed to the Debtors or their Estates.

   **9.2.2.   Releases by Holders of Claims and Interests.**   Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date each holder of a Claim or Interest that has voted to accept the Plan, shall be deemed to have unconditionally released each and all of (i) the non-Debtor Affiliates, (ii) the Debtors' and their non-Debtor Affiliates' officers and directors who were serving in such capacity on or after the Petition Date, (iii) the attorneys, accountants, investment bankers, restructuring consultants and financial advisors of each of the Debtors (but specifically excluding (a) Rothschild Inc. and (b) Gilbert Randolph LLP; provided, however, that Gilbert Randolph LLP shall not be excluded from the scope of the releases in this Section 9.2.2 to the extent that any and all issues related to the contested matter involving that certain Motion to Disqualify Gilbert, Heintz & Randolph as Special Insurance Counsel to the Debtors (Docket No. 10123, filed July 24, 2006) are resolved in favor of Gilbert Randolph LLP pursuant to a Final Order) and (iv) the holders of Noteholder Claims, the holders of Bank Claims, the Administrative Agent, and the Sureties and their respective successors, attorneys, accountants, investment bankers and advisers of and from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act, omission, transaction, event or other occurrence taking place before the Petition Date in connection with

144

the Debtors or any of them, or their respective property; <u>provided,</u> <u>however,</u> that each holder of a Claim or Equity Interest that has voted on the Plan may elect, by checking the appropriate box on its Ballot, not to grant the releases set forth in this Section 9.2.2.

**9.3.** <u>*The Supplemental Injunction, The Third Party Injunction and The Asbestos Insurance Entity Injunction*</u>. In order to supplement the injunctive effect of the Discharge Injunction, and pursuant to Sections 524 and 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following injunctions to take effect as of the Effective Date.

**9.3.1.** *Supplemental Injunction*

(a) *Terms. In order to preserve and promote the settlements contemplated by and provided for in the Plan, and to supplement, where necessary, the injunctive effect of the discharge as provided in Sections 1141 and 524 of the Bankruptcy Code and as described in this Article, except as otherwise provided in the Plan, all Entities which have held or asserted, which hold or assert or which may hold or assert any claim, demand or cause of action (other than a Demand) against the Released Parties (or any of them) based upon, attributable to, or arising out of any Claim against or Equity Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the U.S., the U.K. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be permanently stayed, restrained and enjoined from taking any action against the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving payments or recovery with respect to any such claim, demand or cause of action arising prior to the Confirmation Date, including, but not limited to:*

(i) *commencing or continuing in any manner any action or other proceeding of any kind with respect to any such claim, demand or cause of action against any of the Released Parties, or against the property of any Released Party;*

(ii) *enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or against the property of any Released Party with respect to any such claim, demand or cause of action;*

(iii) *creating, perfecting or enforcing any Lien of any kind against any Released Party or the property of any Released Party with respect to any such claim, demand or cause of action;*

(iv) *except as otherwise provided in the Plan, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due any Released Party or against the property of any Released Party with respect to any such claim, demand or cause of action; and*

(v) *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or the Plan Documents relating to such claim, demand or cause of action.*

145

(b)    *Bankruptcy Rule 3016 Compliance. The Plan Proponents' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.*

### 9.3.2.    *Third Party Injunction*

(a)    *Terms. In order to preserve and promote the settlements contemplated by and provided for in the Plan and agreements previously or concurrently approved by the Bankruptcy Court, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under Section 524(g) of the Bankruptcy Code, all Entities which have held or asserted, which hold or assert or which may in the future hold or assert any claim, demand or cause of action (including, but not limited to, any Asbestos Personal Injury Claim or Demand, or any claim or demand for or respecting any Trust Expense) against the Protected Parties (or any of them) based upon, attributable to, or arising out of any Asbestos Personal Injury Claim or Demand, whenever and wherever arising or asserted, whether in the U.S., the U.K. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty (a "Third Party Claim"), shall be permanently stayed, restrained and enjoined, from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments or recovery with respect to any such Third Party Claim, including, but not limited to:*

(i)    *commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Third Party Claim against any Protected Party or against the property of any Protected Party with respect to any such Third Party Claim;*

(ii)    *enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any Protected Party or against the property of any Protected Party with respect to any such Third Party Claim;*

(iii)    *creating, perfecting or enforcing any Lien of any kind against any Protected Party or the property of any Protected Party on the basis of such Third Party Claim;*

(iv)    *commencing any action or other proceeding of any kind or enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order, with respect to a Third Party Claim against a Protected Party that pursuant to the Plan or after the Effective Date makes a loan to any of the Released Parties, or challenging, upsetting or impairing any Lien granted in connection with such loan by reason of any such Third Party Claim;*

(v)    *except as otherwise provided in the Plan, asserting, implementing or effectuating any setoff, right of subrogation or contribution or recoupment of any kind against any obligation due any Protected Party or against the property of any Protected Party with respect to any such Third Party Claim; and*

(vi)    *taking any act relating to such Third Party Claim in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Documents or the Trust Documents.*

(b)    *Reservations.  Notwithstanding anything to the contrary in Section 9.3.2(a) above, this Third Party Injunction shall not impair:*

(i)    *the rights of holders of Asbestos Personal Injury Claims to assert such Asbestos Personal Injury Claims or Trust Claims solely against the Trust or the Trust Assets in accordance with the Asbestos Personal Injury Trust Distribution Procedures;*

(ii)    *the rights of the Trust or the U.K. Asbestos Trustee on behalf of holders of Asbestos Personal Injury Claims to assert such Asbestos Personal Injury Claims solely against Hercules-Protected Entities in accordance with Article IV of the Plan;*

(iii)    *the rights of Entities to assert any Claim, debt, obligation or liability for payment of Trust Expenses solely against the Trust or the Trust Assets;*

(iv)    *the rights of the Trust or the Reorganized Debtors to prosecute any Asbestos Insurance Action or any similar claim, cause of action or right of Reorganized T&N against Curzon or of the Trust against the EL Insurers;*

(v)    *the rights of any Entity to assert an Asbestos Personal Injury Claim against a non-Debtor Affiliate where such Claim is based upon exposure to asbestos or asbestos-containing products resulting solely from the acts, conduct or omissions of such non-Debtor Affiliate;*

(vi)    *the rights of Entities to pursue or assert any claim, demand, or cause of action based upon, attributable to, or arising out of any Pneumo Asbestos Claims against any insurer under a Pneumo Asbestos Insurance Policy; or*

(vii)    *the rights of any of the Pneumo Parties to enforce the provisions of the Plan and the Plan Documents.*

(c)    *Bankruptcy Rule 3016 Compliance.  The Plan Proponents' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.*

(d)    *If a non-Settling Asbestos Insurance Company asserts that it has rights of contribution, indemnity, reimbursement, subrogation or other similar claims (collectively, "Contribution Claims") against a Settling Asbestos Insurance Company, (i) such Contribution Claims may be asserted as a defense or counterclaim against the Trust or the Reorganized Debtors (as applicable) in any Asbestos Insurance Action involving such non-Settling Asbestos Insurance Company, and the Trust or the Reorganized Debtors (as applicable) may assert the legal or equitable rights, if any, of the Settling Asbestos Insurance Company, and*

147

*(ii) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such non-Settling Asbestos Insurance Company to the Trust or the Reorganized Debtors (as applicable) shall be reduced by the amount of such Contribution Claims.*

### 9.3.3.    *Asbestos Insurance Entity Injunction*

(a)    *Purpose.  In order to protect the Trust and to preserve the Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under Section 105(a) of the Bankruptcy Code, the Asbestos Insurance Entity Injunction is issued pursuant to the Plan.*

(b)    *Terms.  Subject to the provisions of 9.3.3.(a) of this Plan, all Entities (excluding, however, the Trust, the Asbestos Insurance Companies and the Reorganized Debtors to the extent they are permitted or required to pursue claims relating to the Hercules Policy, any EL Policy, any Asbestos Insurance Actions and/or the Asbestos Insurance Action Recoveries) that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, demand or cause of action (including any Asbestos Personal Injury Claim or Demand or any claim or demand for or respecting any Trust Expense) against any Asbestos Insurance Company based upon, attributable to, arising out of, or in any way connected with any Asbestos Personal Injury Claim or Demand, whenever and wherever arising or asserted, whether in the U.S., the U.K. or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action including, without limitation:*

(i)    *commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Asbestos Insurance Company, or against the property of any Asbestos Insurance Company, with respect to any such claim, demand, or cause of action;*

(ii)    *enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Insurance Company, or against the property of any Asbestos Insurance Company, with respect to any such claim, demand, or cause of action;*

(iii)    *creating, perfecting, or enforcing in any manner, directly or indirectly, any encumbrance against any Asbestos Insurance Company, or the property of any Asbestos Insurance Company, with respect to any such claim, demand, or cause of action; and*

(iv)    *except as otherwise specifically provided in this Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Asbestos Insurance*

148

*Company, or against the property of any Asbestos Insurance Company, with respect to any such claim, demand or cause of action;*

*provided, however, that (a) the Asbestos Insurance Entity Injunction shall not impair in any way any actions brought by the Trust and/or the Reorganized Debtors against any Asbestos Insurance Company; (b) the Trust shall have the sole and exclusive authority at any time to file a motion, upon express notice to each affected Asbestos Insurance Company, asking the District Court to terminate, or reduce or limit the scope of, the Asbestos Insurance Entity Injunction with respect to any Asbestos Insurance Company (subject to the proviso that each affected Asbestos Insurance Company shall retain all rights and defenses with respect to Claims asserted against it as a result of any such termination, reduction, or limitation of the Asbestos Insurance Entity Injunction); and (c) the Asbestos Insurance Entity Injunction is not issued for the benefit of any Asbestos Insurance Company, and no Asbestos Insurance Company is a third-party beneficiary of the Asbestos Insurance Entity Injunction.*

(c)      *Reservations.  Notwithstanding anything to the contrary above, this Asbestos Insurance Entity Injunction shall not enjoin:*

(i)      *the rights of Entities to the treatment accorded them under this Plan, as applicable, including the rights of holders of Asbestos Personal Injury Claims to assert such Claims, as applicable, in accordance with the Asbestos Personal Injury Trust Distribution Procedures;*

(ii)      *the rights of Entities to assert any claim, debt, obligation, cause of action or liability for payment of Trust Expenses against the Trust;*

(iii)      *the rights of the Trust, and the Reorganized Debtors (to the extent permitted or required under this Plan) to prosecute any action based on or arising from the Asbestos Insurance Policies;*

(iv)      *the rights of the Trust, and the Reorganized Debtors to assert any claim, debt, obligation, cause of action or liability for payment against an Asbestos Insurance Company based on or arising from the Asbestos Insurance Policies;*

(v)      *the rights of any Asbestos Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Asbestos Insurance Company that is not a Settling Asbestos Insurance Company; and*

(vi)      *the rights of Entities to pursue or assert any claim, demand, or cause of action based upon, attributable to, or arising out of any Pneumo Asbestos Claims against any insurer under a Pneumo Asbestos Insurance Policy.*

9.4.      **Reservation Of Rights**.  Notwithstanding any other provision of the Plan to the contrary, the satisfaction, release and discharge and the Injunctions set forth in this Article IX, shall not be deemed or construed to satisfy, discharge, release or enjoin claims by the Trust, the Reorganized Debtors, or (subject to Article IV) any other Entity, as the case may be, against (a) the Trust for payment of Allowed Asbestos Personal Injury Claims or Trust Claims in accordance with the Asbestos Personal Injury Trust Distribution Procedures, (b) the Trust for the

149

payment of Trust Expenses, (c) any Asbestos Insurance Company that has not performed under an Asbestos Insurance Policy or an Asbestos Insurance Settlement Agreement, (d) Curzon under the Hercules Policy or any settlement agreement with Curzon relating to any Asbestos Personal Injury Claim, (e) the EL Insurers under any EL Asbestos Insurance or any settlement agreement with the EL Insurers relating to any Asbestos Personal Injury Claim, (f) any of the Reorganized Debtors on account of the Pneumo Excluded Claims, or (g) the issuer of a supersedeas bond or other assurance of payment with respect to an Allowed Bonded Asbestos Personal Injury Claim that has not performed thereunder. Nothing in this Section 9.4 is intended or shall be construed to limit the assertion, applicability, or effect of any Asbestos Insurance Coverage Defense.

**9.5.    Disallowed Claims And Disallowed Equity Interests.**  On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on a disallowed Claim or a disallowed Equity Interest, and any Order disallowing a Claim or an Equity Interest which is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such Order pursuant to Section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, shall constitute an Order: (a) in relation to each U.S. Debtor, disallowing all Claims (other than Asbestos Personal Injury Claims) and Equity Interests to the extent such Claims and Equity Interests are not allowable under any provision of Section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Equity Interests, and Claims for unmatured interest and (b) in relation to each U.S. Debtor, disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

**9.6.    Exculpation.**  None of the Debtors, the Reorganized Debtors, the members of the Unsecured Creditors Committee, the members of the Asbestos Claimants Committee, the Future Claimants Representative, the members of the Equity Committee, the Collateral Trustee, the holders of Noteholder Claims, the holders of Bank Claims, the Administrative Agent, and the Sureties, nor any of their respective successors, officers, directors, employees, members, agents, attorneys, accountants, investment bankers, financial advisors or restructuring professionals, including Rothschild Inc. (together with its officers, directors and employees who served in such capacity during the term of its engagement by the Debtors), nor any other professional Person employed by any of them, shall have or incur any liability to any Person or Entity for any act or omission in connection with, relating to, or arising out of the Reorganization Cases, the administration proceedings of the U.K. Debtors, the negotiation of the Plan or the CVAs, pursuit of Confirmation of the Plan or approval of the CVAs, the administration, consummation and implementation of the Plan and CVAs or the property to be distributed under the Plan or the CVAs, the Disclosure Statement, the Plan Documents, the releases and Injunctions, or the management or operation of the Debtors (except for any liability that results primarily from such Person's or Entity's gross negligence, bad faith or willful misconduct); provided, however, that (i) with respect to officers and directors of the Debtors, this exculpation provision shall apply only to officers or directors who were serving in such capacity on or after the Petition Date; (ii) this exculpation provision shall not apply to (a) Gilbert Randolph LLP (provided, however, that Gilbert Randolph LLP shall not be excluded from the scope of the exculpation provided in this Section 9.6 to the extent that any and all issues related to the contested matter involving that certain Motion to Disqualify Gilbert, Heintz & Randolph as Special Insurance Counsel to the

150

Debtors (Docket No. 10123, filed July 24, 2006) are resolved in favor of Gilbert Randolph LLP pursuant to a Final Order) and (b) Tersigni Consulting, pending the outcome of the review of Tersigni Consulting's professional fees and expenses in the Reorganization Cases by the United States Trustee and the Office of the United States Attorney for the District of Delaware); and (iii) this exculpation provision shall not apply to Asbestos Insurer Coverage Defenses. In all respects each and all of such Persons, firms and Entities shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Reorganization Cases, the Plan, the CVAs, the administration proceedings of the U.K. Debtors, and the administration of each of them.

## ARTICLE X
## MATTERS INCIDENT TO PLAN CONFIRMATION

**10.1.  No Liability For Tax Claims.**  Unless a taxing authority in the United States has asserted a Claim against the Debtors prior to the bar date established therefor, no Claim of such authority shall be Allowed against the Debtors or the Reorganized Debtors for taxes, penalties, interest, additions to tax or other charges arising out of the failure, if any, of the Debtors, or the non-Debtor Affiliates, or any other Entity to have paid tax or to have filed any tax return (including, but not limited to, any income tax return or franchise tax return) in or for any prior year or arising out of an audit of any return for a period before the Petition Date.

**10.2.  No Successor Liability.**  Except as otherwise expressly provided in the Plan and the CIP Agreement, the Commutation Agreement, and any other agreements between the Debtors and The Travelers Indemnity Company and Travelers Casualty and Surety Company, f/k/a The Aetna Casualty and Surety Company (*"Travelers"*) resolving issues relating to Asbestos Insurance Policies issued or subscribed by Travelers (collectively with the CIP Agreement and the Commutation Agreement, the *"Travelers Agreements"*), Reorganized Federal-Mogul and the other Reorganized Debtors do not, pursuant to the Plan or otherwise, assume, agree to perform, pay or indemnify any Entity, or otherwise have any responsibility for any liabilities or obligations of the Debtors relating to or arising out of the operations or assets of the Debtors, whether arising prior to, on or after the Effective Date. Except as provided in Article IV of the Plan, neither the Plan Proponents, Reorganized Federal-Mogul, the other Reorganized Debtors nor the Trust is, or shall be deemed to be, a successor to any of the Debtors by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character; provided, however, that Reorganized Federal-Mogul, the other Reorganized Debtors and the Trust shall assume and remain liable for their respective obligations specified in the Plan, the Travelers Agreements, and the Confirmation Order.

**10.3.  Asbestos Insurance Actions and Asbestos In-Place Insurance Coverage.**  Any Asbestos In-Place Insurance Coverage, Asbestos Insurance Action, or the claims and causes of action asserted or to be asserted therein, shall be preserved for the benefit of the Trust, for prosecution either by Reorganized Federal-Mogul, the other applicable Reorganized Debtors, or the Trustees (as mutually agreed by such parties) subsequent to Confirmation of the Plan and in accordance with the Trust Agreement. As of the date subsequent to the Effective Date on which the Trustees confirm in writing to the Reorganized Debtors that the Trust is in a position to assume such responsibility, the Asbestos In-Place Insurance Coverage and the Asbestos Insurance Actions, along with the rights and obligations of the Debtors and the Reorganized

Debtors with respect to Asbestos Insurance Policies and claims thereunder, to the extent that such Policies, Asbestos In-Place Insurance Coverage, and claims relate to Asbestos Personal Injury Claims but not as to any other claims covered thereby and subject to the assignability without prejudice of such claims and Policies, shall be assigned to and vested in the Trust as the representative of the Debtors' Estates, each being appointed by the Bankruptcy Court in accordance with Section 1123(b)(3) of the Bankruptcy Code without any further action by the Debtors or Reorganized Debtors, the Trust or the Bankruptcy Court. Such Asbestos In-Place Insurance Coverage and Asbestos Insurance Actions shall be so vested free and clear of all Liens, security interests and other Claims or causes of action, except for Asbestos Insurer Coverage Defenses as otherwise provided in the Plan. Until such time as the Asbestos In-Place Insurance Coverage and Asbestos Insurance Actions have become vested in the Trust, Reorganized Federal-Mogul and the other Reorganized Debtors, as the case may be, shall be entitled to compromise or settle any Asbestos Insurance Action or claims relating to any Asbestos In-Place Insurance Coverage; provided, however, that any such compromise or settlement shall require the consent of the Future Claimants Representative and the Asbestos Claimants Committee or the Trust Advisory Committee, as applicable, and the approval of the Bankruptcy Court. Upon vesting in the Trust, the prosecution of the Asbestos Insurance Actions shall be governed by the Trust Documents. Notwithstanding anything to the contrary contained herein, the Trust shall not compromise or resolve insurance coverage under any Asbestos Insurance Policy except with respect to Asbestos Personal Injury Claims. From the time that the Asbestos In-Place Insurance Coverage and Asbestos Insurance Actions are vested in the Trust, the Trust shall be entitled, in its sole and complete discretion, to move the District Court to extend the Supplemental Injunction, the Third Party Injunction, and/or the Asbestos Insurance Entity Injunction to any Asbestos Insurance Company that becomes a party to an Asbestos Insurance Settlement Agreement. Any extension of the Supplemental Injunction, the Third Party Injunction, and/or the Asbestos Insurance Entity Injunction shall be accomplished by amending and/or supplementing Exhibit 1.1.198 hereto to add the name of the Settling Asbestos Insurance Company and as required by the terms of the CIP Agreement, and by obtaining an order of the District Court.

**10.4.** **Insurance Neutrality**.

      **10.4.1.**    The provisions of this Section 10.4.1 shall apply to all Entities (including, without limitation, all Asbestos Insurance Companies); provided, however, that with respect to Certain Underwriters at Lloyd's, London and Certain London Market Companies (collectively, *"London Market Insurers"*) and any Asbestos Insurance Policies subscribed by London Market Insurers (or any Asbestos Insurance Settlement Agreements applicable to such Asbestos Insurance Policies), the provisions of this Section 10.4.1 shall not be applicable, and the provisions of Section 10.4.2 shall be applicable.

      **10.4.1.1.**    Nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan shall limit the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defense.

      **10.4.1.2.**    The Plan, the Plan Documents, the Confirmation Order, and the Bankruptcy Insurance Stipulation shall be binding on the Debtors, the Reorganized

Debtors, the Trust and the beneficiaries of the Trust. The obligations, if any, of the Trust to pay holders of Asbestos Personal Injury Claims and Demands shall be determined pursuant to the Plan and the Plan Documents. None of (I) the Bankruptcy Court's or District Court's approval of the Plan or the Plan Documents, (II) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (III) any estimation or valuation of Asbestos Personal Injury Claims, either individually or in the aggregate (including, without limitation, any agreement as to the valuation of Asbestos Personal Injury Claims) in the Reorganization Cases shall, with respect to any Asbestos Insurance Company, constitute a trial or hearing on the merits or an adjudication or judgment; or accelerate the obligations, if any, of any Asbestos Insurance Company under its Asbestos Insurance Policies; or be used as evidence in any forum to prove:

    (i)    that any of the Debtors, the Trust, or any Asbestos Insurance Company is liable for, or otherwise obligated to pay with respect to, any individual Asbestos Personal Injury Claim or Demand;

    (ii)    that the procedures established by the Plan, including the Asbestos Personal Injury Trust Distribution Procedures, for evaluating and paying Asbestos Personal Injury Claims and Demands are reasonable;

    (iii)    that the procedures established by the Plan, including the Asbestos Personal Injury Trust Distribution Procedures, for evaluating and paying Asbestos Personal Injury Claims and Demands are consistent with any procedures that were used to evaluate or settle Asbestos Personal Injury Claims against the Debtors before the Petition Date;

    (iv)    that the settlement of, or the value assigned to, any individual Asbestos Personal Injury Claim pursuant to the Asbestos Personal Injury Trust Distribution Procedures was reasonable and/or otherwise appropriate;

    (v)    that any of the Asbestos Insurance Companies participated in and/or consented to the negotiation of the Plan or any of the Plan Documents;

    (vi)    that any of the Debtors or the Trust has suffered an insured loss with respect to any Asbestos Personal Injury Claim or Demand; or

    (vii)    as to (A) the liability of the Debtors or the Trust for Asbestos Personal Injury Claims or Demands, whether such Claims or Demands are considered individually or on an aggregate basis; or (B) the value of such Asbestos Personal Injury Claims or Demands, individually or in the aggregate.

    **10.4.1.3.**    Nothing in the Plan or the Plan Documents shall affect or limit, or be construed as affecting or limiting, the protection afforded to any Settling Asbestos Insurance Company by the Supplemental Injunction, the Third Party Injunction, and/or the Asbestos Insurance Entity Injunction.

    **10.4.1.4.**    Nothing in this Section 10.4 is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Asbestos Insurance Company with respect to any issue that is actually

litigated by such Asbestos Insurance Company as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by such Asbestos Insurance Company in conjunction with or related to Confirmation of the Plan. Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated.

**10.4.1.5.**      Nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the Confirmation or consummation of the Plan shall limit the right, if any, of (i) any Asbestos Insurance Company, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense, including by presenting evidence and/or argument with respect to any of the matters specified in clauses (i) through (vii) of Section 10.4.1.2 of the Plan or (ii) any other party in any such Asbestos Insurance Action to assert any appropriate position. Except as provided in Section 10.4.1.4 above, none of the matters specified in clauses (i) through (vii) of Section 10.4.1.2 of the Plan shall have any res judicata or collateral estoppel effect against any Asbestos Insurance Company.

**10.4.2.      Insurance Neutrality Provisions Applicable Solely to London Market Insurers.** This Section 10.4.2 shall apply solely with respect to London Market Insurers and any Asbestos Insurance Policies subscribed by London Market Insurers (or Asbestos Insurance Settlement Agreements relating to such Asbestos Insurance Policies).

**10.4.2.1.**      Except as provided in Section 10.4.2.2, notwithstanding anything to the contrary in the Confirmation Order, the Plan or any of the Plan Documents, nothing in the Confirmation Order, the Plan or any of the Plan Documents (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing London Market Insurers' legal, equitable or contractual rights, if any, in any respect. The rights of London Market Insurers shall be determined under the Asbestos Insurance Policies or Asbestos Insurance Settlement Agreements.

**10.4.2.2.**      Nothing in the Plan or the Plan Documents shall affect or limit, or be construed as affecting or limiting, the protection afforded to any Settling Asbestos Insurance Company by the Supplemental Injunction, the Third Party Injunction, and/or the Asbestos Insurance Entity Injunction.

**10.4.2.3.**      Nothing in this Section 10.4.2 is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against London Market Insurers with respect to any issue that is actually litigated by London Market Insurers as part of their objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by London Market Insurers in conjunction with or related to Confirmation of the Plan. Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated. The Plan Proponents and London Market Insurers have agreed in a stipulation separate from this Plan (the ***"London Market Insurers Stipulation"***) that the only issue London Market Insurers will litigate in connection with Confirmation of the Plan is whether, under the Bankruptcy Code as a matter of law, the assignment of any Asbestos Insurance Policies or other rights and obligations with respect to, arising under, or related to Asbestos Insurance Policies subscribed by London Market Insurers, is valid and enforceable against London Market Insurers

notwithstanding (i) anti-assignment provisions in or incorporated in the Asbestos Insurance Policies subscribed by London Market Insurers and (ii) applicable state law.

**10.5.** **Supersedeas Bond Actions.**

**10.5.1.** **Preserved Actions.** All Supersedeas Bond Actions and the rights and claims asserted or to be asserted therein shall be preserved and shall be prosecuted or defended, as the case may be, by the Reorganized Debtors subsequent to Confirmation of the Plan.

**10.5.2.** **Assumption By The Trust.** As of the Effective Date, the Trust shall assume, and shall have exclusive liability for, any unsecured portion of Bonded Asbestos Personal Injury Claims remaining after crediting proceeds of any supersedeas bond or other payment assurances to which the holder of such Claim is determined by Final Order or agreement of the parties to be entitled. To the extent that the Reorganized Debtors successfully prosecute or defend against a Supersedeas Bond Action resulting in the discharge or release of the relevant supersedeas bond or other payment assurance provided in connection therewith, any such recoveries shall inure to the benefit of the Reorganized Debtors.

**10.5.3.** **Reservation of Rights of Issuers and Insurers of Payment Assurances.** Notwithstanding anything to the contrary contained herein, nothing in the Plan shall be deemed to impair, prejudice, compromise or otherwise affect any defense or counterclaim asserted by any issuer or insurer of payment assurances issued on behalf of the Debtors, or any other defendant in the Supersedeas Bond Actions, to any claim of the Debtors, including, but not limited to, any defense based upon an asserted right of setoff or recoupment, or other defense under applicable non-bankruptcy law. Any right of setoff or recoupment shall be satisfied out of the assets in the possession of the sureties and/or insurers relating to such payment assurances and any claims or liabilities including, but not limited to, claims for premiums for bonds provided by any such issuers or insurers.

**10.5.4.** **Compromising and Settling.** Reorganized Federal-Mogul and the other Reorganized Debtors shall be entitled to compromise or settle any Supersedeas Bond Actions; provided, however, that any such compromise or settlement shall require the consent of the Future Claimants Representative and the Asbestos Claimants Committee to the extent the compromise or settlement results in there being any unsecured portion of the Bonded Asbestos Personal Injury Claim after applying the proceeds of any supersedeas bond or other payment assurances.

**10.6.** **Institution And Maintenance Of Legal And Other Proceedings.** As of the date subsequent to the Effective Date on which the Trustees confirm in writing to the Reorganized Debtors that the Trust is in a position to assume the responsibility, the Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any asset, liability or responsibility of the Trust, including Asbestos Insurance Actions, Indirect Asbestos Personal Injury Claims, or other Trust Causes of Action. The Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of Federal-Mogul, any other Debtor or any Reorganized Debtor if deemed necessary or appropriate by the Trust. The Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the Effective Date

155

arising from or associated with any legal action or other proceeding which is the subject of this Section 10.6 and shall pay or reimburse all deductibles, retrospective premium adjustments or other charges (not constituting Indirect Asbestos Personal Injury Claims) which may arise from the receipt of any insurance proceeds by the Trust.

**10.7.** **Retention And Enforcement Of Trust Causes Of Action**. Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, including the Trust Documents, the Trust shall retain and have the exclusive right to enforce against any Entity any and all of the Trust Causes of Action, with the proceeds of the recoveries of any such actions to be deposited in the Trust; provided, however, that nothing herein shall alter, amend or modify the Injunctions, Releases, discharges or Supersedeas Bond Action provisions contained elsewhere in the Plan and Trust Documents.

**10.8.** **Sherrill Litigation**. Subject to the terms of any applicable settlement that may be approved by the Bankruptcy Court, nothing in the Plan limits, impairs, or creates any right, existing outside of bankruptcy, of Joseph Scott Sherrill or any class he may represent with respect to the matters set forth in Proof of Claim No. 7314 (the *"Sherrill Claim"*) to recover against any insurance coverage applicable to the Sherrill Claim.

## ARTICLE XI
## MISCELLANEOUS

**11.1.** **Jurisdiction**. Until the Reorganization Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out. Except as otherwise provided in the Plan or the Trust Documents, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Equity Interests in the Debtors, and to adjudicate and enforce the Asbestos Insurance Actions, the Supersedeas Bond Actions, and all other causes of action which may exist on behalf of the Debtors; provided, however, that nothing herein shall prevent the CVA Supervisors and/or the U.K. Court from admitting or adjudicating claims under the CVAs. Nothing contained herein shall prevent the Reorganized Debtors or the Trust from taking such action as may be necessary in the enforcement of any Asbestos Insurance Action, Supersedeas Bond Action or other cause of action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which actions or other causes of action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein. Nothing contained herein shall prejudice or affect the sole and exclusive jurisdiction and power of the U.K. Court in relation to the conduct of the administration of any U.K. Debtor under the laws of the relevant part of the United Kingdom and in relation to the CVAs. Nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (i) the Bankruptcy Court in fact has jurisdiction with respect to any Asbestos Insurance Action, (ii) that any such jurisdiction is exclusive with respect to any Asbestos Insurance Action, or (iii) that abstention or dismissal of any Asbestos Insurance Action pending in the Bankruptcy Court or the District Court as an adversary proceeding, so that another court can hear and determine such Asbestos Insurance Action(s), is or is not advisable or warranted. Any court other than the Bankruptcy Court that has jurisdiction over any Asbestos Insurance Action shall have the right to exercise such jurisdiction.

**11.2.    General Retention**.  Following Confirmation of the Plan, the administration of the Reorganization Cases will continue until the Reorganization Cases are closed by a Final Order of the Bankruptcy Court.  The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claims and the re-examination of Claims which have been Allowed for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claims. The failure by the Plan Proponents to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the rights of the Debtors, the Reorganized Debtors or the Trust, as the case may be, to object to or re-examine such Claim in whole or part.

**11.3.    Specific Purposes**.  In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction for each of the following specific purposes after Confirmation of the Plan:

**11.3.1.**    to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

**11.3.2.**    to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Trust Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

**11.3.3.**    to assure the performance by the Disbursing Agent and the Trust of their respective obligations to make distributions under the Plan;

**11.3.4.**    to enforce and interpret the terms and conditions of the Plan, the Plan Documents, and the Trust Documents, and to enter such orders or judgments as are necessary to accomplish such purposes, including, but not limited to, injunctions (i) as are necessary to enforce the title, rights and powers of the Reorganized Debtors and the Trust, and (ii) as are necessary to enable holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise, including, but not limited to, court orders;

**11.3.5.**    to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters, including without limitation contested matters involving the deduction of interest accrued after the Petition Date on Noteholder Claims, with respect to the Debtors, the Reorganized Debtors or the Trust arising on or prior to the Effective Date, arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Reorganization Cases;

**11.3.6.**    to hear and determine all applications for compensation of professionals and reimbursement of expenses under Sections 330, 331 or 503(b) of the Bankruptcy Code;

**11.3.7.**    to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date, or in any way related to the Plan or the transactions contemplated hereby, against the Debtors, the Reorganized Debtors, the Plan Proponents, the Trust, the Trustees, the Official Committees or the Future Claimants

Representative and their respective officers, directors, stockholders, employees, members, attorneys, accountants, financial advisors, representatives and agents;

      **11.3.8.**    to determine any and all motions pending as of Confirmation for the rejection, assumption or assignment of executory contracts or unexpired leases and the allowance of any Claims resulting therefrom;

      **11.3.9.**    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

      **11.3.10.**    to determine the allowance and/or disallowance of any Claims against or Equity Interests in the Debtors or their Estates, including, without limitation, any objections to any such Claims and/or Equity Interests, and the compromise and settlement of any Claim against or Equity Interest in the Debtors or their Estates;

      **11.3.11.**    to determine all questions and disputes regarding title to the assets of the Debtors or their Estates or the Trust;

      **11.3.12.**    to construe, enforce and resolve all questions and disputes relating to collective bargaining or employment agreements existing or approved by the Bankruptcy Court at or before Confirmation;

      **11.3.13.**    to hear and determine the Asbestos Insurance Actions and the Supersedeas Bond Actions, to construe and take any action to enforce any Asbestos Insurance Settlement Agreement or any settlement of any Supersedeas Bond Action and the releases executed and exchanged in connection therewith, and to issue such orders as may be necessary for the execution, consummation and implementation of any Asbestos Insurance Settlement Agreement or settlement of any Supersedeas Bond Action, and to determine all questions and issues arising thereunder. Notwithstanding anything herein to the contrary, however, such retention of jurisdiction by the Bankruptcy Court in this Section 11.3.13 shall not be deemed to be a retention of exclusive jurisdiction with respect to any matter described in this Section 11.3.13; rather, any court other than the Bankruptcy Court that has jurisdiction over any matter described in this Section 11.3.13 shall have the right to exercise such jurisdiction;

      **11.3.14.**    to hear and determine any matters related to the Trust's indemnification obligations under Article IV of the Plan and the Trust Documents;

      **11.3.15.**    to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Reorganization Cases;

      **11.3.16.**    to enter in aid of implementation of the Plan such orders as are necessary, including but not limited to the implementation and enforcement of the releases contained in the Plan, the Injunctions and the other injunctions described herein; and

      **11.3.17.**    to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Trust or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, violative of, or insufficient to satisfy any of the

terms, conditions, or other duties associated with any Asbestos Insurance Policies; provided, however, that (i) such orders shall not impair the Asbestos Insurer Coverage Defenses or the rights, claims or defenses, if any, of any Asbestos Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, the Bankruptcy Insurance Stipulation, or any other orders entered in the Reorganization Cases, (ii) this provision does not, in and of itself, grant the Bankruptcy Court jurisdiction to hear and decide disputes arising out of or relating to the Asbestos Insurance Policies, and (iii) all interested parties, including any Asbestos Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

**11.4.    District Court Jurisdiction**. The District Court shall, without regard to the amount in controversy, retain exclusive jurisdiction after Confirmation to hear and determine (i) any motion pursuant to Section 8.19 of the Plan to extend the Third Party Injunction to an Asbestos Insurance Company and (ii) any motion pursuant to Section 9.3.3 to terminate, or reduce or limit the scope of the Asbestos Insurance Entity Injunction with respect to an Asbestos Insurance Company, and shall be deemed to have withdrawn the reference from the Bankruptcy Court for such purpose.

**11.5.    Reservation of Rights**. Except as otherwise agreed in the Bankruptcy Insurance Stipulation or the modifications of the Plan set forth in Exhibit A thereto, nothing contained in the Plan will (i) constitute a waiver of any claim, right or cause of action that a Debtor, a Reorganized Debtor, or the Trust, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement, except to the extent the insurer is a Settling Insurance Company; or (ii) limit the assertion, applicability, or effect of any Asbestos Insurer Coverage Defense.

**11.6.    Interpretation of Certain Terms**. When used in the Plan, the term "Claim" shall be broadly construed to include all manner and types of claim, whenever and wherever such claim may arise, anywhere in the world, and shall include, but not be limited to, Asbestos Personal Injury Claims. Likewise, when used in the Plan, the terms "Asbestos Personal Injury Claim" and "Asbestos Property Damage Claim" shall be broadly construed and shall include, but not be limited to, claims that may or may not presently constitute "claims" within the meaning of Section 101(5) of the Bankruptcy Code, and "demands" within the meaning of Section 524(g)(5) of the Bankruptcy Code.

**11.7.    The Official Committees and The Future Claimants Representative**. Except as set forth below, the Official Committees and the Future Claimants Representative shall continue in existence until the Effective Date. The Debtors shall pay the reasonable fees and expenses incurred by the Official Committees and the Future Claimants Representative through the Effective Date, in accordance with the fee and expense procedures promulgated during the Reorganization Cases (but only to the extent such fees and expenses are not Trust Expenses, in which case those portions of such fees and expenses shall be paid as Trust Expenses in accordance with the Trust Agreement, with the remainder to be paid by the Debtors). After the Effective Date, the rights, duties and responsibilities of the Future Claimants Representative shall be as set forth in the Trust Agreement. On the Effective Date, the Official Committees shall be dissolved (except that (a) the Unsecured Creditors Committee, the Asbestos Claimants Committee and the Future Claimants Representative shall continue in existence and have

159

standing and capacity to (i) prosecute their pre-Effective Date intervention in or commencement of any other adversary proceedings, (ii) object to any proposed modification of the Plan, (iii) object to or defend the Administrative Expense Claims of professionals employed by or on behalf of the Estates, (iv) participate in any appeals of the Confirmation Order or the Plan A Approval Order (if applicable), (v) participate as a party in interest in any proceeding involving Section 524(g) of the Bankruptcy Code, (vi) prepare and prosecute applications for the payment of fees and reimbursement of expenses, (vii) participate as a party in interest in any proceeding relating to the Trust, and (viii) commence or continue any adversary proceeding, claim objection or other proceeding as expressly provided for in the Plan; and (b) the Equity Committee shall continue in existence and have standing and capacity with respect to items (ii), (iii), (iv) and (vi) above) and the members thereof released and discharged of and from all further authority, duties, responsibilities, liabilities and obligations related to, or arising from, the Reorganization Cases. The Reorganized Debtors shall pay the reasonable fees and expenses incurred by the Unsecured Creditors Committee, the Asbestos Claimants Committee and the Future Claimants Representative relating to any post-Effective Date activities authorized hereunder. Nothing in this Section 11.7 shall purport to limit or otherwise affect the rights of the United States Trustee under Section 502 of the Bankruptcy Code or otherwise to object to Claims or requests for Allowance of Administrative Expenses.

**11.8.   Revocation Of Plan**.  The Plan Proponents reserve the right to revoke and withdraw the Plan as to any Debtor prior to entry of the Confirmation Order. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation of the Plan as to such Debtor or Debtors does not occur, then, with respect to such Debtor or Debtors, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against such Debtor or Debtors, or any other Entity (including the Plan Proponents), or to prejudice in any manner the rights of such Debtor or Debtors, or such Entity (including the Plan Proponents) in any further proceedings involving such Debtor or Debtors.

**11.9.   Modification Of Plan**.

**11.9.1.**    The Plan Proponents may propose amendments to or modifications of the Plan under Section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date. After Confirmation, the Plan Proponents (or, as the case may be, the Reorganized Debtors after the Effective Date) may remedy any defects or omissions or reconcile any inconsistencies in the Plan, or the Confirmation Order or any other order entered for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan, so long as the interests of the holders of Allowed Claims are not materially and adversely affected thereby. Anything in the Plan or in any Plan Document to the contrary notwithstanding, following Confirmation but prior to the Effective Date, no Plan Document shall be modified, supplemented, changed or amended in any material respect except with the consent of all Plan Proponents or, in the absence of such consent, with the approval of the Bankruptcy Court on notice to all Plan Proponents and such other Entities as the Bankruptcy Court may require and a hearing. In the event of a conflict between the terms or provisions of the Plan and the Trust Documents, the terms of the Plan shall control the Trust Documents.

**11.9.2.**    Notwithstanding the provisions of Sections 6.7.3 and/or 11.9.1 of the Plan, no modification, supplement, change or amendment to the Plan that would adversely affect

160

any of the rights of the Pneumo Parties under the Plan B Settlement Agreement shall be made without the consent of the Plan Proponents and Cooper LLC and Cooper Industries, Ltd. and, to the extent directly related to Pneumo Abex or PCT's rights or obligations under the Plan B Settlement and directly related to Pneumo Abex or PCT, Pneumo Abex and PCT (such approval of Pneumo Abex and PCT not to be unreasonably withheld).

**11.10.  Certain Provisions Regarding Thornwood**.  Thornwood or its affiliated designee shall have the same rights and powers that the Plan Proponents are provided under the Plan or Plan Documents, including, but not limited to, with respect to any modifications or amendments to the Plan or the Plan Documents, any waiver of conditions to Confirmation or consummation of the Plan, the classification and/or treatment of any creditor or equity class in the U.S. and/or U.K. proceedings and any rights regarding the U.K. Debtors (including, but not limited to, as to the CVAs), the cramdown of the Plan, the Plan's tax consequences, the corporate governance of Reorganized Federal-Mogul, the Exit Facilities and any and all other rights reserved for, or afforded to, the Plan Proponents under the Plan and Plan Documents (including as set forth in Section 6.7.3 of the Plan).

**11.11.  Modification Of Payment Terms**.  The Reorganized Debtors reserve the right to modify the treatment of any Allowed Claim, as provided in Section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date upon the consent of the holder of such Allowed Claim.

**11.12.  Entire Agreement**.  The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings and documents.  No Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

**11.13.  Headings**.  Headings are utilized in the Plan for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

**11.14.  Administrative Claims Bar Date**.  Unless otherwise ordered by the Bankruptcy Court, except for Administrative Claims for amounts incurred by the U.S. Debtors in the ordinary course of business during these Reorganization Cases, the Confirmation Order shall operate to set a bar date for Administrative Claims against the U.S. Debtors (the "*Administrative Claims Bar Date*"), which bar date shall be the first Business Day that is at least 120 days after the Effective Date.  Claimants holding Administrative Claims against the Debtors not paid prior to the Administrative Claims Bar Date may submit a Request for Payment of Administrative Expense on or before such bar date.  The notice of Confirmation to be served and delivered pursuant to Bankruptcy Rules 2002 and 3020(c) will set forth such date and constitute notice of the Administrative Claims Bar Date.  The Reorganized Debtors and any other party in interest will have ninety days after the Administrative Claims Bar Date to review and object to such Claims before a hearing for determination of such Administrative Claims is held by the Bankruptcy Court, provided that such ninety-day period of review may be extended by the Bankruptcy Court upon the request of any of the Plan Proponents.

**11.15. <u>Governing Law</u>.** Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or where the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

**11.16. <u>No Interest</u>.** Except with respect to unimpaired Allowed Claims, or as expressly stated in the Plan or otherwise Allowed by Final Order of the Bankruptcy Court, no interest, penalty or late charge arising after the Petition Date shall be Allowed on any Claim or Equity Interest.

**11.17. <u>Limitation On Allowance</u>.** No attorneys' fees, punitive damages, penalties, exemplary damages, or interest shall be paid with respect to any Claim or Equity Interest except as specified herein or as Allowed by a Final Order of the Bankruptcy Court.

**11.18. <u>Estimated Claims</u>.** To the extent any Claim is estimated for any purpose other than for voting, then in no event shall such Claim be Allowed in an amount greater than the estimated amount.

**11.19. <u>Consent To Jurisdiction</u>.** Upon default under the Plan, the Reorganized Debtors, the Trust and the Trustees, the Future Claimants Representative, and the Trust Advisory Committee, respectively, consent to the jurisdiction of the Bankruptcy Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to any such default, except for matters pertaining solely to the CVAs, in which respect all such parties consent to the jurisdiction of the U.K. Court.

**11.20. <u>Successors And Assigns</u>.** The rights, duties and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.

**11.21. <u>Non-Debtor Waiver of Rights</u>.** Non-Debtor parties shall have the right to voluntarily waive any rights, benefits or protections that are afforded to them under the provisions of the Plan or any order issued in furtherance of the Plan, and such waiver shall supersede such rights, benefits or protections. Any such waiver shall only be effective if such party expressly and specifically waives in writing one or more of such rights, benefits or protections. Any such Entity which waives its rights under the Plan shall nonetheless remain subject to and bound by all other provisions of the Plan, including, but not limited to the discharge, the releases, the Injunctions and all other injunctions thereunder.

**11.22. <u>Consistent United States Federal Tax Reporting</u>.** The Trust, the Reorganized Hercules-Protected Entities, and the other Reorganized Debtors agree to report the transactions described in Article IV of the Plan on their respective United States Federal and State tax returns, to the extent required to be filed, in a manner consistent with how Reorganized Federal-Mogul reports such transactions for U.S. tax purposes, which shall be provided by Federal-Mogul to the Trust, the Hercules-Protected Entities, and the other Debtors prior to the Effective Date. In addition, Reorganized Federal-Mogul shall agree to cause each of its Affiliates that are not U.S.

Debtors to report the transactions described in Article IV of the Plan on their respective U.S. Federal and State tax returns, to the extent required to be filed, pursuant to this Section 11.22.

**11.23. Duty to Cooperate.** Nothing in the Plan, the Plan Documents or the Confirmation Order shall relieve (by way of injunction or otherwise) any entity (including the Trust, any Reorganized Debtor, and any non-Debtor Affiliate) that is or claims to be entitled to indemnity under an Asbestos Insurance Policy from any duty to cooperate that may be required by any such insurance policy or under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Asbestos Insurance Policy. To the extent that any entity incurs costs in satisfying such duty to cooperate with respect to Asbestos Personal Injury Claims, the Trust shall reimburse such entity for all such reasonable out-of-pocket expenses.

**11.24. Notices.** All notices, requests and demands required or permitted to be provided to the Debtors, Reorganized Debtors or the Plan Proponents under the Plan, in order to be effective, shall be in writing, and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, to the addresses set forth below:

**THE DEBTORS:**

FEDERAL-MOGUL CORPORATION
Attention: General Counsel
26555 Northwestern Highway
Southfield, MI 48034
Telephone: (248) 354-7055
Facsimile: (248) 354-8103

**COUNSEL FOR THE DEBTORS:**

| | | |
|---|---|---|
| SIDLEY AUSTIN LLP | SIDLEY AUSTIN LLP | PACHULSKI STANG |
| James F. Conlan, Esq. | Richard T. Peters, Esq. | ZIEHL & JONES LLP |
| Larry J. Nyhan, Esq. | Kevin T. Lantry, Esq. | Laura Davis Jones, Esq. |
| Kenneth P. Kansa, Esq. | 555 West Fifth Street, Suite 4000 | James E. O'Neill, Esq. |
| One South Dearborn Street | Los Angeles, CA 90013 | 919 North Market Street |
| Chicago, IL 60603 | Telephone: (213) 896-6000 | 17th Floor |
| Telephone: (312) 853-7000 | Facsimile: (213) 896-6600 | Wilmington, DE 19801 |
| Facsimile: (312) 853-7036 | | Telephone: (302) 652-4100 |
| | | Facsimile: (302) 652-4400 |

**COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:**

| | | |
|---|---|---|
| SONNENSCHEIN NATH & | SONNENSCHEIN NATH & | THE BAYARD FIRM |
| ROSENTHAL LLP | ROSENTHAL LLP | Charlene D. Davis, Esq. |
| Peter D. Wolfson, Esq. | Robert B. Millner, Esq. | Eric Sutty, Esq. |
| John A. Bicks, Esq. | Thomas A. Labuda, Jr., Esq. | 222 Delaware Avenue, Suite 900 |
| Jo Christine Reed, Esq. | 8000 Sears Tower | Wilmington, DE 19801 |
| 1221 Avenue of the Americas | Chicago, IL 60606 | Telephone: (302) 655-5000 |

App. 207

New York, NY 10020-1089        Telephone: (312) 876-8000        Facsimile: (302) 658-6395
Telephone: (212) 768-6700       Facsimile: (312) 876-7934
Facsimile: (212) 768-6800

## COUNSEL FOR THE ASBESTOS CLAIMANTS COMMITTEE:

CAPLIN & DRYSDALE,           CAPLIN & DRYSDALE,           CAMPBELL & LEVINE, LLC
  CHARTERED                      CHARTERED                    Marla Eskin, Esq.
Elihu Inselbuch, Esq.             Peter Van N. Lockwood, Esq.      Chase Manhattan Centre, 15th Fl.
375 Park Avenue, 35th Floor       One Thomas Circle, N.W.          1201 N. Market Street
New York, NY 10152               Washington, D.C. 20005           Wilmington, DE 19801
Telephone: (212) 319-7125         Telephone: (202) 862-5000        Telephone: (302) 426-1900
Facsimile: (212) 644-6755         Facsimile: (202) 429-3301        Facsimile: (302) 426-9947

## COUNSEL TO JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT

SIMPSON THACHER &            RICHARDS, LAYTON &
  BARTLETT LLP                   FINGER, P.A.
Steven M. Fuhrman, Esq.           Mark D. Collins, Esq.
425 Lexington Avenue             One Rodney Square
New York, NY 10017               P.O. Box 551
Telephone: (212) 455-2000         Wilmington, DE 19899
Facsimile: (212) 455-2502         Telephone: (302) 651-7700
                                Facsimile: (302) 658-6548

## COUNSEL FOR THE FUTURE CLAIMANTS REPRESENTATIVE:

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr., Esq.
Edwin J. Harron, Esq.
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

## COUNSEL FOR THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS:

BELL, BOYD & LLOYD LLP        BIFFERATO GENTILOTTI LLC
Robert V. Shannon, Esq.           Ian Connor Bifferato, Esq.
Adam R. Schaeffer, Esq.           800 N. King Street
70 West Madison Street            Wilmington, DE 19801
Three First National Plaza        Telephone: (302) 429-1900
Suite 3300                       Facsimile: (302) 429-8600
Chicago, IL 60602
Telephone: (312) 807-4315
Facsimile: (312) 827-8010

Dated: November 5, 2007

FEDERAL-MOGUL CORPORATION (for itself and on behalf of the Affiliated Debtors, as Debtors and Debtors in Possession)

By:   /s/ Robert L. Katz

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By:   /s/ Thomas A. Labuda

OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS

By:   /s/ Peter Van N. Lockwood

JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT

By:   /s/ Steven M. Fuhrman

ERIC D. GREEN, as THE FUTURE CLAIMANTS REPRESENTATIVE

By:   /s/ Edwin J. Harron

OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

By:   /s/ David F. Heroy

## COUNSEL FOR THE PLAN PROPONENTS

**COUNSEL FOR THE DEBTORS:**

| SIDLEY AUSTIN LLP | SIDLEY AUSTIN LLP | PACHULSKI STANG |
|---|---|---|
| James F. Conlan, Esq. | Richard T. Peters, Esq. | ZIEHL & JONES LLP |
| Larry J. Nyhan, Esq. | Kevin T. Lantry, Esq. | Laura Davis Jones, Esq. |
| Kenneth P. Kansa, Esq. | 555 West Fifth Street, Suite 4000 | James E. O'Neill, Esq. |
| One South Dearborn Street | Los Angeles, CA 90013 | 919 North Market Street |
| Chicago, IL 60603 | Telephone: (213) 896-6000 | 17th Floor |
| Telephone: (312) 853-7000 | Facsimile: (213) 896-6600 | Wilmington, DE 19801 |
| Facsimile: (312) 853-7036 | | Telephone: (302) 652-4100 |
| | | Facsimile: (302) 652-4400 |

**COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:**

| SONNENSCHEIN NATH & | SONNENSCHEIN NATH & | THE BAYARD FIRM |
|---|---|---|
| ROSENTHAL LLP | ROSENTHAL LLP | Charlene D. Davis, Esq. |
| Peter D. Wolfson, Esq. | Robert B. Millner, Esq. | Eric Sutty, Esq. |
| John A. Bicks, Esq. | Thomas A. Labuda, Jr., Esq. | 222 Delaware Avenue, Suite 900 |
| Jo Christine Reed, Esq. | 8000 Sears Tower | Wilmington, DE 19801 |
| 1221 Avenue of the Americas | Chicago, IL 60606 | Telephone: (302) 655-5000 |
| New York, NY 10020-1089 | Telephone: (312) 876-8000 | Facsimile: (302) 658-6395 |
| Telephone: (212) 768-6700 | Facsimile: (312) 876-7934 | |
| Facsimile: (212) 768-6800 | | |

**COUNSEL FOR THE ASBESTOS CLAIMANTS COMMITTEE:**

| CAPLIN & DRYSDALE, | CAPLIN & DRYSDALE, | CAMPBELL & LEVINE, LLC |
|---|---|---|
| CHARTERED | CHARTERED | Marla Eskin, Esq. |
| Elihu Inselbuch, Esq. | Peter Van N. Lockwood, Esq. | Chase Manhattan Centre, 15th Fl. |
| 375 Park Avenue, 35th Floor | One Thomas Circle, N.W. | 1201 N. Market Street |
| New York, NY 10152 | Washington, D.C. 20005 | Wilmington, DE 19801 |
| Telephone: (212) 319-7125 | Telephone: (202) 862-5000 | Telephone: (302) 426-1900 |
| Facsimile: (212) 644-6755 | Facsimile: (202) 429-3301 | Facsimile: (302) 426-9947 |

**COUNSEL TO JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT**

| SIMPSON THACHER & | RICHARDS, LAYTON & |
|---|---|
| BARTLETT LLP | FINGER, P.A. |
| Steven M. Fuhrman, Esq. | Mark D. Collins, Esq. |
| 425 Lexington Avenue | One Rodney Square |
| New York, NY 10017 | P.O. Box 551 |
| Telephone: (212) 455-2000 | Wilmington, DE 19899 |
| Facsimile: (212) 455-2502 | Telephone: (302) 651-7700 |
| | Facsimile: (302) 658-6548 |

**COUNSEL FOR THE FUTURE CLAIMANTS REPRESENTATIVE:**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr., Esq.
Edwin J. Harron, Esq.
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

**COUNSEL FOR THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS:**

BELL, BOYD & LLOYD LLP
Robert V. Shannon, Esq.
Adam R. Schaeffer, Esq.
70 West Madison Street
Three First National Plaza
Suite 3300
Chicago, IL 60602
Telephone: (312) 807-4315
Facsimile: (312) 827-8010

BIFFERATO GENTILOTTI LLC
Ian Connor Bifferato, Esq.
Buckner Building
1308 Delaware Avenue
Wilmington, DE  19806
Telephone: (302) 429-1900
Facsimile: (302) 429-8600

## EXHIBITS TO THE PLAN

| | |
|---|---|
| 1.1.4 | Addendum to Joint Plan of Reorganization (Pneumo Abex "Plan A" Settlement) |
| 1.1.9 | Schedule of Affiliates |
| 1.1.11 | Schedule of Affiliated Subsidiaries |
| 1.1.14 | Ancillary CVAs |
| 1.1.50 | Asset Values for U.K. Debtors |
| 1.1.70 | Dan=Loc Deed of Special Indemnity and Dan=Loc Deed of Guarantee |
| 1.1.95 | Schedule of Known On-Site Environmental Claims |
| 1.1.173 | Principal CVAs |
| 1.1.191 | Principal Terms and Conditions of the Reorganized Federal-Mogul Junior Secured PIK Notes |
| 1.1.192 | Principal Terms and Conditions of the Reorganized Federal-Mogul Secured Term Loan Agreement |
| 1.1.198 | Settling Asbestos Insurance Companies |
| 1.1.217 | Form of Asbestos Personal Injury Trust Agreement and Asbestos Personal Injury Trust Distribution Procedures |
| 1.1.240 | Warrant Agreement |
| 3.1.12 | Schedule of Affiliate Claims Treatment |
| 3.20 | Classification and Treatment of Claims Against and Equity Interests in all Remaining U.S. Debtors and U.K. Debtors |
| 4.5.11 | Power of Attorney |
| 5.1.2 | Schedule of Rejected Contracts |
| 8.3.6(a) | Stock Option Agreement relating to Thornwood Call Option |
| 8.3.6(b) | September 25, 2005 Letter Agreement Relating to Call Option |
| 8.3.6(c) | Form of Loan Agreement for $100,000,000 Term Loan |
| 8.3.9 | Form of Registration Rights Agreement |
| 8.3.11 | Form of Lockup Agreement |
| 8.3.12(1) | Proposed Certificate of Incorporation of Reorganized Federal-Mogul Corporation |
| 8.3.12(2) | Proposed Bylaws of Reorganized Federal-Mogul Corporation |
| 8.3.13 | Initial Board of Directors of Reorganized Federal-Mogul Corporation |
| 8.3.15 | Form of Stock Option Agreement |
| 8.4 | Initial Boards of Directors for the Affiliated Debtors of Reorganized Federal-Mogul Corporation |
| 8.15.2.2 | Stock Election Form |
| 8.15.2.2A | List of Record Holders of Certain Unsecured Claims |
| 8.22 | Plan B Settlement Agreement |
| 8.24 | Plan Support Agreement |
| 8.26 | Settlement Agreement with Certain Holders of Asbestos Property Damage Claims |

The exhibits to the Plan are as previously filed with the Court on June 5, 2007 (D.I. 12620, 12621, 12622), as such exhibits may have been modified through the Modifications (as defined in the Order Confirming Fourth Amended Joint Plan of Reorganization, a form of which was filed with the Bankruptcy Court on November 6, 2007 (Docket No. 582593609)).

# Tab D

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| | |
| FEDERAL-MOGUL GLOBAL, INC., | Case No. 01-10578 (JKF) |
| T&N LIMITED, et al.,[1] | Jointly Administered |
| | RE: 12620, 12621, 12622, 12836, |
| Debtors. | 582593567, 13142, 13374, 13375, |
| | 13436, 13499, 13551, 582593611, 13651 |

## STIPULATION TO PRESERVE APPEALS ON THE ASBESTOS INSURANCE ASSIGNMENT AND PREEMPTION ISSUE

WHEREAS the Plan Proponents[2] have proposed a Fourth Amended Joint Plan Of

Reorganization, dated February 7, 2007, as modified on or about June 5, 2007, July 31, 2007,

---

[1] The U.S. Debtors (collectively, the "U.S. Debtors") are Carter Automotive Company, Inc., Federal-Mogul Corporation, Federal-Mogul Dutch Holdings Inc., Federal-Mogul FX, Inc., Federal-Mogul Global Inc., Federal-Mogul Global Properties, Inc., Federal-Mogul Ignition Company, Federal-Mogul Machine Tool, Inc., Federal-Mogul Mystic, Inc., Federal-Mogul Piston Rings, Inc., Federal-Mogul Powertrain, Inc., Federal-Mogul Products, Inc., Federal-Mogul Puerto Rico, Inc., Federal-Mogul U.K. Holdings, Inc., Federal-Mogul Venture Corporation, Federal-Mogul World Wide, Inc., Felt Products Manufacturing Co., FM International LLC, Ferodo America, Inc., Gasket Holdings Inc., J.W.J. Holdings, Inc., McCord Sealing, Inc., and T&N Industries Inc.

Those Debtors that are incorporated under the laws of England and Wales or Scotland and are subjects of this Stipulation (collectively, the "U.K. Debtors") are AE Piston Products Limited, Aeroplane & Motor Aluminium Castings Limited, Ashburton Road Services Limited, Brake Linings Limited, Duron Limited, Edmunds, Walker & Co. Limited, Federal-Mogul Aftermarket UK Limited, Federal-Mogul Bradford Limited, Federal-Mogul Bridgwater Limited, Federal-Mogul Camshaft Castings Limited, Federal-Mogul Camshafts Limited, Federal-Mogul Engineering Limited, Federal-Mogul Eurofriction Limited, Federal-Mogul Friction Products Limited, Federal-Mogul Global Growth Limited, Federal-Mogul Ignition (U.K.) Limited, Federal-Mogul Powertrain Systems International Limited, Federal-Mogul Sealing Systems (Cardiff) Limited, Federal-Mogul Sealing Systems (Rochdale) Limited, Federal-Mogul Sealing Systems (Slough) Limited, Federal-Mogul Sealing Systems Limited, Federal-Mogul Shoreham Limited, Federal Mogul Sintered Products Limited, Federal-Mogul Systems Protection Group Limited, Federal-Mogul Technology Limited, Ferodo Caernarfon Limited, Ferodo Limited, Fleetside Investments Limited, F-M UK Holding Limited, Friction Materials Limited, Greet Limited, Halls Gaskets Limited, Hepworth & Grandage Limited, J.W. Roberts Limited, Lanoth Limited, Newalls Insulation Company Limited, TAF International Limited, T&N Holdings Limited, T&N International Limited, T&N Investments Limited, T&N Limited, T&N Materials Research Limited, T&N Piston Products Group Limited, T&N Properties Limited, T&N Shelf Eighteen Limited, T&N Shelf Nineteen Limited, T&N Shelf One Limited, T&N Shelf Seven Limited, T&N Shelf Three Limited, T&N Shelf Twenty Limited, T&N Shelf Twenty-One Limited, T&N Shelf Twenty-Six Limited, TBA Belting Limited, TBA Industrial Products Limited, Telford Technology Supplies Limited, The Washington Chemical Company Limited, Turner & Newall Limited, Turner Brothers Asbestos Company Limited, and Wellworthy Limited. Certain additional U.K. affiliates of the U.S. Debtors and U.K. Debtors have commenced chapter 11 cases but are not subjects of this Stipulation.

[2] The "Plan Proponents" are: (a) the debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Debtors"); (b) the Official Committee of Unsecured Creditors (the "Unsecured Creditors' Committee"); (c) the Official Committee of Asbestos Claimants (the "ACC"); (d) the legal representative for future asbestos claimants (the "FCR"), (e) the administrative agent for the prepetition lenders (the "Administrative Agent") and (f) the Official Committee of Equity Security Holders of Federal-Mogul Corporation (the "Equity Committee").

September 26, 2007, September 27, 2007, October 30, 2007 and November 5, 2007, and as it

may be further modified hereafter in accordance with the terms thereof, (the "Plan");[3] and

WHEREAS the Plan provides for, among other things, the assignment of rights in certain

insurance policies to the Trust; and

WHEREAS the Plan Proponents anticipate that the Bankruptcy Court will enter that

certain Order Confirming Fourth Amended Joint Plan of Reorganization For Debtors and

Debtors-in-Possession (As Modified) (the "Confirmation Order") prior to or concurrently with

the entry of the Preemption Order (as defined below); and

WHEREAS the Objecting Insurers[4] have objected to confirmation of the Plan, in, among

other submissions, the briefs appended under Tabs 9a and 9b to the Joint Submission of Plan

Objectors' Post-Trial Briefs In Opposition To Confirmation Of Fourth Amended Joint Plan Of

---

[3]   Unless otherwise specified, capitalized terms used herein shall have the meanings ascribed to them in the Plan.

[4]   For purposes of this Stipulation, the "Objecting Insurers" are the following entities: Ace Property & Casualty Insurance Company; Century Indemnity Company, as successor to CCI Insurance Company (successor to Insurance Company of North America) and CIGNA Specialty Insurance Company f/k/a California Union Insurance Company; Central National Insurance Company of Omaha (for certain policies issued through Cravens Dargan & Company, Pacific Coast, as Managing General Agent); Pacific Employers Insurance Company; Insurance Company of North America; St. Paul Mercury Insurance Company and United States Fire Insurance Company (collectively, "ACE"); AIG Casualty Company; AIU Insurance Company; American Home Assurance Company; Granite State Insurance Company; Insurance Company of the State of Pennsylvania; Lexington Insurance Company; National Union Fire Insurance Company of Pittsburgh, Pa; New Hampshire Insurance Company (collectively, "AIG Member Companies"); Allianz Global Corporate & Specialty AG (as successor-by-partial-merger to Allianz Versicherungs AG as to Policy No. H 0 001 456); Allianz Global Risks U.S. Insurance Company (f/k/a Allianz Insurance Company); and Allianz Underwriters Insurance Company (f/k/a Allianz Underwriters, Inc.) (collectively, "Allianz"); Columbia Casualty Company, Continental Casualty Company, and The Continental Insurance Company, Both In Its Individual Capacity and As Successor To Certain Interests Of Harbor Insurance Company (collectively, "CNA Entities"); Fireman's Fund Insurance Company and National Surety Company (collectively, "Fireman's Fund"); Globe Indemnity Company ("Globe"); Hartford Accident and Indemnity Company, First State Insurance Company, and New England Insurance Company (collectively, "Hartford"); Certain Underwriters at Lloyds, London and Certain London Market Companies (collectively, "London"); OneBeacon America Insurance Company ("OneBeacon"); Royal Indemnity Company ("Royal"); Seaton Insurance Company ("Seaton"); Stonewall Insurance Company ("Stonewall"); Employers Insurance Company of Wausau ("Wausau").

- 2 -

Reorganization (dated August 21, 2007) (collectively, the "Plan Assignment Objections"), and in

prior submissions referred to therein, on the grounds therein, including that the assignment of the

policy rights to the Trust is prohibited by the applicable insurance policies and state law; and

WHEREAS certain of the Objecting Insurers are parties to a Stipulation and Agreed

Order (D.I. 10113, the "Insurance Stipulation"), which was subsequently approved by an order

of this Court dated September 19, 2006 (D.I. 10606), by which such Objecting Insurers narrowed

the scope of their objections to the Plan, in relevant part, to the following legal issue: "(i)

Whether, under the Bankruptcy Code as a matter of law, the Assignment is valid and enforceable

against the Insurers notwithstanding anti-assignment provisions in or incorporated in the Policies

and applicable state law;..." *Insurance Stipulation, § 3(a)(i).* The Insurance Stipulation further

provided that the parties thereto would "request that the Bankruptcy Court determine such

objections only under the Bankruptcy Code as a matter of law" and "[e]ach Party retains all

appellate rights with respect to any adjudication by the Bankruptcy Court or any higher court of

the issues identified in Section 3(a) above, and may appeal any such adjudication." *Insurance*

*Stipulation, § 4(a), (f).*

WHEREAS this Court has indicated its intention to overrule the Plan Assignment

Objections, to the extent not withdrawn or otherwise resolved, on the ground that Sections

524(g), 541(c)(1) and/or 1123(a)(5)(B) of the Bankruptcy Code preempt any anti-assignment

provisions and any state law defenses to the assignment that may be provided under the

insurance policies and applicable state law (the "Assignment and Preemption Issue"), for

substantially the reasons set forth in, among other authorities, the decisions in *In re Kaiser*

- 3 -

*Aluminum Corp.*, 343 B.R. 88 (D. Del. 2006); *In re Western Asbestos Co.*, 313 B.R. 456 (Bankr. N.D. Cal. 2004); *In re Pittsburgh Corning Corp.*, No. 00-22876 (Memorandum Opinion at 47-48 D.I. 5192 (Bankr. W.D. Pa. Dec. 21, 2006)); and *In re North American Refractories Co.*, No. 02-20198, *In re Global Industrial Technologies, Inc.* No. 02-21626 (Memorandum Opinion at 2-7 (Bankr. W.D. Pa. Sept. 21, 2007)); and

WHEREAS the Plan Proponents and the undersigned Objecting Insurers (together with any Objecting Insurers that subsequently join this Stipulation, collectively, the "Stipulating Insurers") have filed that certain Joint Motion Seeking Determination of Asbestos Insurance Assignment and Preemption Issues Pursuant to Plan (the "Motion"), in which the Movants jointly request the Bankruptcy Court to approve this Stipulation, and in which the Plan Proponents further move the Bankruptcy Court to (i) overrule the Plan Assignment Objections, (ii) approve the transfer of certain Asbestos Insurance Actions,  Asbestos Insurance Action Recoveries and Asbestos In-Place Insurance Coverage by the Debtors to the Trust pursuant to the Plan, including, without limitation, Section 4.3 thereof, and (iii) determine that the Bankruptcy Code preempts any anti-assignment provisions under any Insurance Policy or applicable state law pursuant to Sections 524(g), 541(c)(1) and/or 1123(a)(5)(B) thereof.

WHEREAS the Stipulating Insurers desire to permit the Effective Date of the Plan to occur on or before December 31, 2007, without seeking to stay, appeal, reconsider, or otherwise seek review of the Confirmation Order, notwithstanding their potential pursuit of an appeal of an order, in the form attached to the Motion as Exhibit B thereto, granting the relief requested by the movants in the Motion with respect to the Assignment and Preemption Issue (the

- 4 -

"Preemption Order") (while preserving all rights and objections, including without limitation the right to seek a stay, if necessary, with respect to the Plan A Settlement); and

WHEREAS the Plan Proponents have agreed that, in the event any of the Stipulating Insurers pursue an appeal of the Preemption Order, they will not oppose or seek to dismiss such appeal on the basis of the substantial consummation of the Plan; and

WHEREAS, each of the parties hereto has agreed to the terms and conditions of this Stipulation to Preserve Appeals on the Asbestos Insurance Assignment and Preemption Issue (the "Stipulation"),

IT IS HEREBY STIPULATED AND AGREED THAT:

1.      The Stipulating Insurers shall not oppose, and the other parties hereto shall support, entry by the Bankruptcy Court of the Preemption Order, provided, however, that the Stipulating Insurers preserve all rights to appeal the Preemption Order.

2.      The Plan Proponents shall request that the Court include in the Confirmation Order a provision providing that such Confirmation Order does not constitute or contain a ruling on Plan Assignment Objections or the Assignment and Preemption Issue.

3.      The Stipulating Insurers shall not move, in this Court or in any other, to stay, appeal, seek reconsideration, or otherwise seek review of the Confirmation Order on account of the Court's ruling on the Motion, the Preemption Order or this Stipulation.

4.      The Plan Proponents shall not contend that any appeal by the Stipulating Insurers of the Preemption Order, in which such Stipulating Insurers seek reversal of this Court's ruling on the Assignment and Preemption Issue, is equitably moot or otherwise barred, under the

- 5 -

doctrine of equitable mootness or otherwise, by virtue of the substantial consummation or effectiveness of the Plan or the Plan B Settlement. The Stipulating Insurers shall not contend in any appeal of the Preemption Order that the fact that the determinations set forth in the Preemption Order were set forth therein, rather than in the Confirmation Order, constitutes a basis for or otherwise supports reversal of the Preemption Order.

     5.     This Court's ruling on the Assignment and Preemption Issue pursuant to the Motion shall extend only to the determinations set forth in the Preemption Order that, insofar as state law would enforce an insurance policy's anti-assignment provisions, such state law is preempted by Sections 524(g), 541(c)(1) and/or 1123(a)(5)(B) of the Bankruptcy Code. In overruling the Plan Assignment Objections as sought in the Motion and set forth in the Preemption Order, this Court is not adjudicating whether, in light of the terms of any particular insurance policy, the law of any particular state would or would not permit the enforcement of any assignment contemplated by the Plan, which is a matter that shall be left to insurance coverage litigation (per Paragraph 6 hereof) in the event that the Preemption Order is reversed on appeal pursuant to a Final Order.

     6.     In the event that this Court's Preemption Order is reversed on appeal pursuant to a Final Order, the Stipulating Insurers would be permitted to assert any and all rights under any applicable anti-assignment provisions in any insurance coverage proceeding in which a Stipulating Insurer or the Trust seeks to construe or enforce any of the applicable insurance policies between or among the parties.

- 6 -

7.      The parties hereto agree that there is no just cause for delay, and the Stipulation

shall become final and binding upon each of the parties hereto immediately upon entry by the

Bankruptcy Court of this Order approving the Stipulation, notwithstanding anything to the

contrary in Fed. R. Bankr. P. 7062(a).

8.      This Court shall retain jurisdiction to interpret, implement and enforce the terms

and provisions of the Stipulation and this Order in all respects; provided, however, that nothing

in this paragraph, the Motion or the Preemption Order shall expand, or be construed as

constituting any party's consent to the exercise of, this Court's jurisdiction over any state-law

insurance coverage dispute, or to limit or in any way affect, modify or amend the terms of the

Insurance Stipulation.

SO ORDERED:

*Judith K. Fitzgerald*

United States Bankruptcy Judge

Dated: November 8, 2007

- 7 -

**AGREED TO BY:**

> SIDLEY AUSTIN LLP
> James F. Conlan
> Larry J. Nyhan
> Jeffrey C. Steen
> Kevin T. Lantry
> Kenneth P. Kansa
> One South Dearborn Street
> Chicago, Illinois 60603
> (312) 853-7000
>
> and
>
> **PACHULSKI STANG ZIEHL & JONES LLP**
>
>  /s/ James E. O'Neill
> Laura Davis Jones (Bar No. 2436)
> James E. O'Neill (Bar No. 4042)
> 919 North Market Street, 17th Floor
> P.O. Box 8705
> Wilmington, Delaware 19899-8705
> Telephone:  (302) 652-4100
> Facsimile:   (302) 652-4400
>
> Co-Counsel to the Debtors and Debtors in Possession

/s/ Charlene D. Davis
**THE BAYARD FIRM**
Charlene D. Davis (2336)
Eric M. Sutty
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395

Attorneys for the Official Committee of
Unsecured Creditors

CAMPBELL & LEVINE, LLC
Marla R. Eskin (No. 2989)
Kathleen Campbell Davis (No. 4229)
800 N. King Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 426-1900

-and-

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, New York 10052-3500
Telephone: (212) 319-7125

-and-

/s/ Peter Van N. Lockwood
CAPLIN & DRYSDALE, CHARTERED
Peter Van N. Lockwood
One Thomas Circle, N.W.
Washington, DC 20005
Telephone: (202) 862-5000

Counsel to the Official Committee
of Asbestos Claimants

/s/ Garvan F. McDaniel
Ian Connor Bifferato
Garvan F. McDaniel
**BIFFERATO GENTILOTTI**
800 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 429-1900
Facsimile: (302) 429-8600

-and-

David Heroy
Bruce E. Lithgow
**BAKER & McKENZIE LLP**
One Prudential Plaza
130 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-8000
Facsimile: (312) 861-2899

Counsel to the Official Committee of Equity
Security Holders

/s/ Elisha Graff
**SIMPSON THACHER & BARTLETT LLP**
Steven M. Fuhrman
Elisha Graff
425 Lexington Avenue
New York, New York 10017
Telephone:  (212) 455-2000
Facsimile:  (212) 455-2502


-and-


**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Facsimile:  (302) 658-6548

Attorneys for JPMorgan Chase Bank, as
Administrative Agent

YOUNG CONAWAY STARGATT & TAYLOR LLP

By: /s/ Edwin J. Harron
    James L. Patton, Jr. (No. 2202)
    Edwin J. Harron (No. 3396)
    Maribeth L. Minella (No. 4185)
    The Brandywine Building
    1000 West Street, 17th Floor
    P.O. Box 391
    Wilmington, Delaware 19899-0391
    Telephone: (302) 571-6600

    Counsel to Eric D. Green,
    Futures Representative

Brian L. Kasprzak  (No. 3846)
Michael J. Joyce  (No. 4563)
**MARKS, O'NEILL, O'BRIEN AND**
 **COURTNEY, P.C.**
913 North Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: 302-658-6538
Facsimile: 302-658-6537

- and –

/s/ Mark D. Plevin
Mark D. Plevin
Leslie A. Epley
Kelly R. Cusick
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone: 202-624-2500
Facsimile:  202-628-5116

*Attorneys for ACE, OneBeacon, Seaton and*
*Stonewall*

/s/ Sean J. Bellew
Sean J. Bellew (DE 4072)
**COZEN O'CONNOR**
1201 N. Market Street
Suite 1400
Wilmington, DE 19801
Telephone: 302-295-2026
Facsimile: 302-295-2013

-and-

Michael S. Davis (pro hac vice)
Jantra Van Roy (pro hac vice)
**ZEICHNER ELLMAN & KRAUSE LLP**
575 Lexington Avenue
New York, New York 10022
Telephone: 212-223-0400
Facsimile: 212-753-0396

-and-

Ngoc H. Lam (pro hac vice)
**JACKSON & CAMPBELL, P.C.**
1120 Twentieth Street, N.W.
South Tower
Washington, DC 20036-3437
Telephone: 202-457-1600
Facsimile: 202-457-1678

*Attorneys for AIG Member Companies*

/s/ James S. Yoder
James S. Yoder, Esquire
**WHITE AND WILLIAMS LLP**
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709
Telephone: 302-467-4524
Facsimile: 302-467-4554
yoderj@whiteandwilliams.com

- and -

Elit R. Felix, II, Esquire
**MARGOLIS EDELSTEIN**
The Curtis Center, 4th Floor
601 Walnut Street
Philadelphia, PA 19106-3304
Telephone: 215-931-5870
Facsimile: 215-922-1772
EFelix@MargolisEdelstein.com

*Attorneys for Allianz*

Bruce E. Jameson (Del. Bar No. 2931)
**PRICKETT, JONES & ELLIOTT, P.A.**
1310 King Street
Wilmington, Delaware 19899
Telephone: 302-888-6500
Facsimile: 302-658-8111

-and-

/s/ William J. Factor
David C. Christian II
William J. Factor
**SEYFARTH SHAW LLP**
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603
Telephone: 312-460-5000
Facsimile: 312-460-7000

- and –

Clinton E. Cameron
**ROSS, DIXON & BELL, LLP**
55 West Monroe Street, Suite 3000
Chicago, IL 60603-5758
Telephone: 312-759-1920
Facsimile: 312-759-1939

*Attorneys for CNA Entities*

/s/ John D. Demmy
John D. Demmy (No. 2802)
**STEVENS & LEE, P.C.**
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: 302-425-3308
Facsimile: 610-371-8515
jdd@stevenslee.com

-and-

Leonard P. Goldberger
**STEVENS & LEE, P.C.**
1818 Market Street, 29th Floor
Philadelphia, PA 19103
Telephone: 215-864-7000
Facsimile: 215-864-7123
lpg@stevenslee.com

*Attorneys for Fireman's Fund*

/s/ Karen V. Sullivan
Karen V. Sullivan (No. 3872)
**OBERLY, JENNINGS & RHODUNDA, P.A.**
800 Delaware Avenue, Suite 901
PO Box 2054
Wilmington DE 19899
Telephone: 302-576-2000
Facsimile: 302-576-2004

-and-

Carl J. Pernicone
**WILSON, ELSER, MOSKOWITZ, EDELMAN
& DICKER, LLP**
150 East 42nd Street
New York NY 10017-5639
Telephone: 212-490-3000
Facsimile: 212-490-3038

*Attorneys for Globe and Royal*

/s/ Michael W. Yurkewicz
Michael W. Yurkewicz (I.D. # 4165)
**KLEHR, HARRISON, HARVEY
BRANZBURG AND ELLERS LLP**
919 Market St., Suite 1000
Wilmington, DE 19801
Telephone: 302-426-1189
Facsimile: 302-426-9193

– and –

Craig Goldblatt
Nancy L. Manzer
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: 202-663-6000
Facsimile: 202-663-6363

– and –

William J. Bowman
James P. Ruggeri
Edward B. Parks, II
**HOGAN & HARTSON L.L.P.**
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: 202-637-5600
Facsimile: 202-637-5910

*Attorneys for Hartford*

/s/ Christopher P. Simon
Christopher P. Simon (No. 3697)
**CROSS & SIMON, LLC**
913 North Market Street, 11th Floor
P.O. Box 1380
Wilmington, DE 19899-1380
Telephone: 302-777-4200
Facsimile: 302-383-4224

-and-

John J. Dillon, Esquire
Anthony S. Fernandez, Esquire
Mary-Lee Payne, Esquire
Ami Specktor, Esquire
**MILTON ALTMAN CANALE
& DILLON, LLC**
4600 East-West Highway, Suite 201
Bethesda, MD 20814
Telephone: 301-652-7332

*Attorneys for Wausau*

CH1 4061142v.1

# Tab E

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FEDERAL-MOGUL GLOBAL INC., | ) | Case No. 01-10578 (JKF) |
| T&N LIMITED, et al.,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | *AE: 12620, 12621, 12622* |
| | ) | *582593567, 13375, 13435, 13553,* |
| | | *13620, 582593609* |

**ORDER CONFIRMING FOURTH AMENDED JOINT PLAN OF REORGANIZATION
FOR DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED)**

---

[1]    The U.S. Debtors (collectively, the "U.S. Debtors") are Carter Automotive Company, Inc., Federal-Mogul Dutch Holdings Inc., Federal-Mogul FX, Inc., Federal-Mogul Global Inc., Federal-Mogul Global Properties, Inc., Federal-Mogul Ignition Company, Federal-Mogul Machine Tool, Inc., Federal-Mogul Mystic, Inc., Federal-Mogul Piston Rings, Inc., Federal-Mogul Powertrain, Inc., Federal-Mogul Products, Inc., Federal-Mogul Puerto Rico, Inc., Federal-Mogul U.K. Holdings, Inc., Federal-Mogul Venture Corporation, Federal-Mogul World Wide, Inc., Felt Products Manufacturing Co., FM International LLC, Ferodo America, Inc., Gasket Holdings Inc., J.W.J. Holdings, Inc., McCord Sealing, Inc., and T&N Industries Inc.

The U.K. Debtors to which this Confirmation Order applies (collectively, the "U.K. Debtors") are AE Piston Products Limited, Aeroplane & Motor Aluminium Castings Limited, Ashburton Road Services Limited, Brake Linings Limited, Duron Limited, Edmunds, Walker & Co. Limited, Federal-Mogul Aftermarket UK Limited, Federal-Mogul Bradford Limited, Federal-Mogul Bridgwater Limited, Federal-Mogul Camshaft Castings Limited, Federal-Mogul Camshafts Limited, Federal-Mogul Engineering Limited, Federal-Mogul Eurofriction Limited, Federal-Mogul Friction Products Limited, Federal-Mogul Global Growth Limited, Federal-Mogul Ignition (U.K.) Limited, Federal-Mogul Powertrain Systems International Limited, Federal-Mogul Sealing Systems (Cardiff) Limited, Federal-Mogul Sealing Systems (Rochdale) Limited, Federal-Mogul Sealing Systems (Slough) Limited, Federal-Mogul Sealing Systems Limited, Federal-Mogul Shoreham Limited, Federal Mogul Sintered Products Limited, Federal-Mogul Systems Protection Group Limited, Federal-Mogul Technology Limited, Federal Mogul U.K. Limited, Ferodo Caernarfon Limited, Ferodo Limited, Fleetside Investments Limited, F-M UK Holding Limited, Friction Materials Limited, Greet Limited, Halls Gaskets Limited, Hepworth & Grandage Limited, J.W. Roberts Limited, Lanoth Limited, Newalls Insulation Company Limited, TAF International Limited, T&N Holdings Limited, T&N International Limited, T&N Investments Limited, T&N Limited, T&N Materials Research Limited, T&N Piston Products Group Limited, T&N Properties Limited, T&N Shelf Eighteen Limited, T&N Shelf Nineteen Limited, T&N Shelf One Limited, T&N Shelf Seven Limited, T&N Shelf Three Limited, T&N Shelf Twenty Limited, T&N Shelf Twenty-One Limited, T&N Shelf Twenty-Six Limited, TBA Belting Limited, TBA Industrial Products Limited, Telford Technology Supplies Limited, The Washington Chemical Company Limited, Turner & Newall Limited, Turner Brothers Asbestos Company Limited, and Wellworthy Limited. Unlike all the other U.K. Debtors, T&N Investments Limited is a Scottish rather than English company and commenced administration in Scotland in April 2002. Certain additional U.K. affiliates of the U.S. Debtors and U.K. Debtors have commenced chapter 11 cases but are not subjects of this Confirmation Order.

## TABLE OF CONTENTS

INTRODUCTION .............................................................................................................1

I.    GENERAL PROVISIONS REGARDING CONFIRMATION OF THE PLAN AND
      APPROVAL OF PLAN-RELATED DOCUMENTS ............................................2

      A. CONFIRMATION OF THE PLAN...............................................................2

      B. MODIFICATIONS TO THE PLAN .............................................................2

      C. CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN..3

      D. EFFECTS OF CONFIRMATION ...............................................................3

      E. APPROVAL, MODIFICATION AND EXECUTION OF PLAN DOCUMENTS .....4

II.   CLAIMS BAR DATES AND OTHER CLAIMS MATTERS ............................4

      A. GENERAL BAR DATE PROVISIONS FOR ADMINISTRATIVE CLAIMS ..........4

      B. BAR DATE FOR PROFESSIONAL FEE CLAIMS ....................................5

      C. BAR DATE FOR REJECTION DAMAGES CLAIMS..................................6

III.  APPROVAL OF EXECUTORY CONTRACT AND UNEXPIRED LEASE
      PROVISIONS AND RELATED PROCEDURES. ..............................................7

      A. ASSUMED CONTRACTS AND LEASES AND RELATED PROCEDURES ..........7

      B. REJECTED CONTRACTS AND LEASES ...................................................8

IV.   MATTERS RELATING TO IMPLEMENTATION OF THE PLAN .................8

      A. ACTIONS IN FURTHERANCE OF THE PLAN...........................................8

      B. DIRECTORS AND OFFICERS OF REORGANIZED DEBTORS ...........................10

      C. COMPENSATION AND BENEFIT PROGRAMS ......................................10

      D. APPROVAL OF EXIT FACILITIES ........................................................11

      E. CREATION OF TRUST:.........................................................................12

      F. TRANSFERS OF PROPERTY TO AND ASSUMPTION OF CERTAIN
         LIABILITIES BY THE TRUST...............................................................12

         1. Funding of the Trust.......................................................................12

2.  Transfer and Assignment of the Asbestos Insurance Action Recoveries, Asbestos Insurance Actions, and Asbestos In-Place Insurance Coverage.......13

3.  Assumption of Liability for Asbestos Personal Injury Claims by the Trust....13

4.  Appointment of Trustees.................................................................14

5.  Appointment of TAC Members. ..........................................................14

6.  Appointment of Future Claimants Representative............................................14

7.  Indemnity Obligations of the Trust............................................................14

G.  EXEMPTIONS FROM TAXATION. .....................................................14

H.  EXEMPTIONS FROM SECURITIES LAWS.........................................15

I.  DISTRIBUTION RECORD DATE.........................................................15

J.  SECURITY FOR OBLIGATIONS UNDER REORGANIZED FEDERAL-MOGUL SECURED TERM LOAN AGREEMENT AND REORGANIZED FEDERAL-MOGUL JUNIOR SECURED PIK NOTES. ............................................16

K.  DELIVERY OF DOCUMENTS.............................................................17

L.  TRANSACTIONS IMPLEMENTED BY THE PLAN................................17

1.  Exercise of Purchase Options for Assets of Certain Debtors. ..........17

2.  Implementation of Certain Settlement Agreements.........................18

3.  Implementation of the Plan B Settlement. ...................................18

M.  ISSUANCE OF NEW INSTRUMENTS...................................................20

V.  RELEASES AND EXCULPATION PROVISIONS........................................20

VI.  DISCHARGE, INJUNCTIONS AND RELATED MATTERS. ...........................20

A.  DISCHARGE OF CLAIMS. .................................................................20

B.  DISCHARGE INJUNCTION.................................................................22

C.  SUPPLEMENTAL INJUNCTION, THIRD PARTY INJUNCTION, AND ASBESTOS INSURANCE ENTITY INJUNCTION .................................24

1.  Supplemental Injunction ..............................................................24

2.  Third Party Injunction.................................................................25

3. Asbestos Insurance Entity Injunction .............................................................28

VII. ISSUES RELATED TO PLAN AND OBJECTIONS TO CONFIRMATION..................30

A. RESOLUTION OF CERTAIN OBJECTIONS TO CONFIRMATION.....................30

1. PepsiAmericas, Inc. ...................................................................................30

2. Owens-Illinois, Inc...................................................................................31

3. Rothschild Inc. .........................................................................................31

4. Objecting Insurers Regarding Assignment and Preemption Issue..................31

VIII. RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT AND THE DISTRICT COURT...........................................................................................................32

IX. NOTICE OF ENTRY OF CONFIRMATION ORDER. .......................................................32

X. EFFECT OF REVERSAL. ...................................................................................................33

XI. REPORT AND RECOMMENDATION TO THE DISTRICT COURT. ...........................34

XII. NO JUST CAUSE FOR DELAY. ........................................................................................34

## TABLE OF EXHIBITS

I.    FOURTH AMENDED JOINT PLAN OF REORGANIZATION FOR DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED)……………………………………...Exhibit A

II.   CONFIRMATION NOTICE………………………………………………………...Exhibit B

III.  CONFIRMATION NOTICE — PUBLICATION VERSION…………………...Exhibit C

## INTRODUCTION

The debtors and debtors-in-possession identified in footnote 1 of this Order (collectively, the "Debtors" and, as reorganized entities after emergence, the "Reorganized Debtors"), together with the Official Committee of Unsecured Creditors (the "Unsecured Creditors Committee"), the Official Committee of Asbestos Claimants (the "Asbestos Claimants Committee"), the Legal Representative for Future Asbestos Claimants (the "Future Claimants Representative"), the Official Committee of Equity Security Holders (the "Equity Committee"), and JPMorgan Chase Bank, N.A., as Administrative Agent under the Bank Credit Agreement (the "Administrative Agent" and, collectively, with the Debtors, the Unsecured Creditors Committee, the Asbestos Claimants Committee, the Future Claimants Representative and the Equity Committee, the "Plan Proponents") have proposed the Fourth Amended Joint Plan of Reorganization, dated February 7, 2007 (as modified by the Modifications (defined below) and as it may be further modified hereafter in accordance with the terms thereof, the "Plan");[2] As a result of the proposal of the Plan, and a hearing to consider Confirmation of the Plan having been held on June 18-21, July 9-10 and October 1-2, 2007, at which all objections to Confirmation of the Plan were considered, and the Bankruptcy Court having entered certain Findings of Fact and Conclusions of Law (the "Findings of Fact and Conclusions of Law") respecting Confirmation of the Plan, THE BANKRUPTCY COURT HEREBY ORDERS, ADJUDGES AND DECREES THAT:

---

[2] Capitalized terms and phrases used but not otherwise defined herein have the meanings given to them in the Plan.

1

**I.    GENERAL PROVISIONS REGARDING CONFIRMATION OF THE PLAN AND APPROVAL OF PLAN-RELATED DOCUMENTS**

**A.    CONFIRMATION OF THE PLAN**

The Plan, a copy of which is attached hereto as Exhibit A, and each of its provisions (whether or not specifically approved herein, subject to Section IV.F.2 below) and all exhibits and schedules thereto (with the exception of the Plan A Settlement and the Addendum, which shall be the subject of a separate order (the "Plan A Order") and separate findings of fact and conclusions of law (the "Plan A Settlement Findings and Conclusions"), are CONFIRMED in each and every respect, pursuant to section 1129 of the Bankruptcy Code. If there is any direct conflict between the terms of the Plan or any exhibit thereto and the terms of this Confirmation Order, the terms of this Confirmation Order shall control. This Confirmation Order shall supersede any prior orders of the Bankruptcy Court that may be inconsistent herewith.

**B.    MODIFICATIONS TO THE PLAN**

The modifications contained in the Plan and the Plan Documents filed by the Plan Proponents on or about June 5, 2007 (D.I. 12620, 12621, and 12622), July 31, 2007 (D.I. 582593567), September 26, 2007 (D.I. 13374), September 27, 2007 (D.I. 13391), October 30, 2007 (D.I. 13614), and November 5, 2007 (D.I. 13649) and such further modifications to the Plan and the Plan Documents as were identified to the Court at the Confirmation Hearing or otherwise identified to the Bankruptcy Court prior to entry of this Confirmation Order (the "Modifications"), are deemed to be either technical changes or clarifications that do not materially and adversely change the treatment of the Claim of any creditor or the Equity Interest of any interest holder of the Debtors or have been consented to by the entities affected thereby,

2

and are approved in all respects. The Plan, as modified by the Modifications, shall be deemed accepted by all holders of Claims and Equity Interests who previously accepted the Plan.

### C.   CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN

Nothing in this Confirmation Order or in the Findings of Fact and Conclusions of Law shall in any way affect the provisions of Sections 7.1 and 7.2 of the Plan, which include provisions regarding (1) the conditions precedent to the Confirmation of the Plan, (2) the conditions precedent to the Effective Date of the Plan and (3) the waiver of any such conditions.

### D.   EFFECTS OF CONFIRMATION

In accordance with section 1141(a) of the Bankruptcy Code and Section 7.1 of the Plan, subject to Section I.C of this Confirmation Order and notwithstanding any otherwise applicable law, immediately upon the entry of this Confirmation Order, the terms of the Plan and this Confirmation Order shall be binding upon all Entities, including each of the Debtors, the Reorganized Debtors, any and all holders of Claims, Demands or Equity Interests (irrespective of whether such Claims or Equity Interests are impaired under the Plan or whether the holders of such Claims or Equity Interests accepted, rejected or are deemed to have accepted or rejected the Plan), any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, and any and all Entities who are parties to or are subject to the settlements, compromises, releases, waivers, discharges and injunctions described herein, or in the Findings of Fact and Conclusions of Law or in the Plan, and each of the respective heirs, executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, guardians, successors or assigns, if any, of any of the foregoing.

3

E.    **APPROVAL, MODIFICATION AND EXECUTION**
       **OF PLAN DOCUMENTS**

1.    The Plan and all exhibits and schedules thereto, substantially in the form as they exist at the time of the entry of this Confirmation Order (subject to Section IV.F.2 below), including, without limitation, the documents relating to the Trust, and each of the other Plan Documents (with the exception of the Plan A Settlement and the Addendum, which shall be the subject of the Plan A Order and the Plan A Settlement Findings and Conclusions), are ratified and approved in all respects. All relevant parties are authorized, without further action by the Bankruptcy Court, to enter into, effectuate, and perform any and all obligations under the Plan Documents, notwithstanding that the efficacy of such documents may be subject to the occurrence of the Effective Date or some other date thereafter.

2.    The Plan Proponents are hereby authorized to amend or modify the Plan at any time prior to the substantial consummation of the Plan, but only in accordance with section 1127 of the Bankruptcy Code, Section 11.9 of the Plan and the Plan Support Agreement.

3.    The Plan Support Agreement shall not be deemed to have been modified in any respect by this Confirmation Order.

II.   **CLAIMS BAR DATES AND OTHER CLAIMS MATTERS**

A.    **GENERAL BAR DATE PROVISIONS FOR ADMINISTRATIVE CLAIMS**

1.    All requests for payment of an Administrative Claim (other than as set forth in Section 11.14 of the Plan and Sections II.A.2 and II.B below) against any of the U.S. Debtors shall be filed with the Bankruptcy Court and served on the United States Trustee and counsel for the Debtors at the addresses set forth in Section 11.24 of the Plan not later than the first business day that is at least one hundred and twenty (120) days after the Effective Date (the

4

"Administrative Claims Bar Date"). The Reorganized Debtors and any other party in interest may object to an Administrative Claim within ninety (90) days after the Administrative Claims Bar Date, provided that such 90-day period of review may be extended by the Bankruptcy Court upon the request of any of the Plan Proponents. If an Entity does not submit a request for payment of an Administrative Expense on or before the Administrative Claims Bar Date, such Entity shall be forever barred from seeking payment of such Administrative Expense from any Reorganized Debtor, or any of its successors or assigns, or out of the property of any of them.

      2.    Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable by a U.S. Debtor in the ordinary course of business.

### B.    BAR DATE FOR PROFESSIONAL FEE CLAIMS

      1.    All final requests for compensation or reimbursement of the fees of any professional employed in the Reorganization Cases pursuant to Sections 327 or 1103 of the Bankruptcy Code or otherwise, including the professionals seeking compensation or reimbursement of costs and expenses relating to services performed after the Petition Date and prior to and including the Effective Date in connection with the Reorganization Cases, pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered to the Debtors, the Official Committees, or the Future Claimants Representative (each a "Professional"), and Claims for making a substantial contribution under sections 503(b)(3)(D) and/or 503(b)(4) of the Bankruptcy Code, including any requests (i) by the Ad Hoc Committee of Certain Unsecured Creditors in accordance with Section 8.15.3 of the Plan or (ii) pursuant to Section 2.5 of the Addendum ("Substantial Contribution Claims"), shall be filed and served on

5

the Reorganized Debtors and their counsel not later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court (the "Professional Fee Bar Date").

      2.     The procedures for processing final requests for compensation or reimbursement of the fees of any Professional set forth in Section 2.5 of the Plan are approved.

      3.     If a Professional or other entity does not submit a request for payment of an Administrative Expense on account of services rendered to the Estates on or before the Professional Fee Bar Date, such Entity shall be forever barred from seeking payment of such Administrative Expense from any Reorganized Debtor, or any of its successors or assigns, or out of the property of any of them.

      4.     Section 8.14.6 of the Plan shall apply to the fees, if any, of the Collateral Trustee.

### C.    BAR DATE FOR REJECTION DAMAGES CLAIMS

      1.     If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed with the Bankruptcy Court within thirty (30) calendar days following the Confirmation Date, or as otherwise ordered by the Bankruptcy Court as set forth in Section 5.5 of the Plan.

      2.     The Plan constitutes due and proper notice to Entities that may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the bar date for filing a Proof of Claim in connection therewith.

III.    **APPROVAL OF EXECUTORY CONTRACT AND UNEXPIRED LEASE PROVISIONS AND RELATED PROCEDURES.**

A.    **ASSUMED CONTRACTS AND LEASES AND RELATED PROCEDURES**

1.    Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, all unexpired leases and executory contracts that (a) have not been expressly rejected by the U.S. Debtors with the approval of the Bankruptcy Court on or prior to the Effective Date or (b) are not rejected pursuant to Section 5.1.2 or Section 5.2 of the Plan shall, as of the Effective Date, be assumed by the relevant U.S. Debtor(s).

2.    Each Reorganized U.S. Debtor that is assuming a contract or lease pursuant to the Plan has provided "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed.

3.    The Debtors have filed with the Bankruptcy Court an exhibit setting forth those unexpired leases and executory contracts which are being assumed by the U.S. Debtors as of the Effective Date and as to which the U.S. Debtors believe that cure amounts are owing, together with the respective cure amounts due for each such assumed lease or executory contract (the "Cure Exhibit"); provided, however, that unexpired leases or executory contracts which are being assumed by the U.S. Debtors as of the Effective Date and as to which no cure amount is owing are not set forth on the Cure Exhibit. The cure amounts associated with each executory contract and unexpired lease to be assumed pursuant to the Plan, as set forth on the Cure Exhibit, shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, at the option of the Debtors: (x) by payment of the cure amounts in Cash on the Effective Date (or as soon thereafter as is reasonably practicable) or (y) on such other terms as are agreed to by the parties to such executory contract or unexpired lease.

7

4.     If there is a dispute regarding the nature or amount of any cure amount by the counterparty to any unexpired lease or executory contract, then, subject to the deadlines specified in Section 5.1.1 of the Plan, the counterparty to such unexpired lease or executory contract may file an appropriate objection with the Bankruptcy Court. Payment of the cure amount will occur following the entry of a Final Order of the Bankruptcy Court resolving such objection and approving the assumption.

### B.     REJECTED CONTRACTS AND LEASES

On the Effective Date, each executory contract and unexpired lease that is listed on Exhibit 5.1.2 to the Plan, and each executory contract and unexpired lease of the type specified in Section 5.2 of the Plan, shall be rejected pursuant to section 365 of the Bankruptcy Code. Any Claims for damages relating to the rejection of any executory contracts or unexpired leases under the Plan shall be subject to the provisions of Section II.C of this Confirmation Order and Section 5.5 of the Plan.

## IV.     MATTERS RELATING TO IMPLEMENTATION OF THE PLAN

### A.     ACTIONS IN FURTHERANCE OF THE PLAN

1.     Pursuant to sections 1123 and 1142 of the Bankruptcy Code, section 303 of the Delaware General Corporation Law and any comparable provisions of the business corporation law of any other state (collectively, the "Reorganization Effectuation Statutes"), without further action by the Bankruptcy Court or the stockholders, members, managers or board of directors of any Debtor or Reorganized Debtor, each of the Debtors and the Reorganized Debtors, as well as the each of the Chief Executive Officer, President or any Vice President of any Debtor or Reorganized Debtor (collectively, the "Responsible Officers"), is hereby authorized to execute, deliver, file or record such contracts, instruments, releases and other

8

agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, the Plan Documents, this Confirmation Order and the transactions contemplated thereby or hereby.

        2.      To the extent that, under applicable non-bankruptcy law, any of the foregoing actions would otherwise require the consent or approval of the stockholders, members, managers, or directors of any of the Debtors or Reorganized Debtors, this Confirmation Order shall, pursuant to sections 1123(a)(5) and 1142 of the Bankruptcy Code and the Reorganization Effectuation Statutes, constitute such consent or approval, and such actions are deemed to have been taken by unanimous action of the stockholders, members, managers or directors, as the case may be, of the appropriate Debtor or Reorganized Debtor.

        3.      The approvals and authorizations specifically set forth in this Confirmation Order are non-exclusive and are not intended to limit the authority of any Debtor or Reorganized Debtor or any officer thereof to take any and all actions necessary or appropriate to implement, effectuate and consummate the Plan, this Confirmation Order, the Plan Documents or the transactions contemplated thereby or hereby. In addition to the authority to execute and deliver, adopt or amend, as the case may be, the contracts, instruments, releases and other agreements, including, without limitation, the Plan Documents, specifically granted in this Confirmation Order, each of the Debtors and the Reorganized Debtors is authorized and directed, without further action by the Bankruptcy Court or further action or consent by its directors, managers, trustees, members or stockholders, to take any and all such actions as any of its Responsible Officers may determine are necessary or appropriate to implement, effectuate and consummate the Plan, this Confirmation Order, the Plan Documents or the transactions contemplated thereby or hereby.

9

4.    To the extent any approval of the Bankruptcy Court is required for any of the Plan Proponents to enter into any of the Plan Documents, or to take any actions thereunder or to consummate any of the transactions contemplated thereby, such approvals are hereby granted.

## B.    DIRECTORS AND OFFICERS OF REORGANIZED DEBTORS

1.    The appointment of the initial members of the Reorganized Federal-Mogul Board of Directors, as set forth in Section 8.3.13 of the Plan, as of and immediately following the Effective Date, is hereby approved.  The initial board of directors of Reorganized Federal-Mogul shall consist of the nine (9) persons identified on Exhibit 8.3.13 to the Plan.

2.    The appointment of the initial members of the Boards of Directors for the Debtors other than Federal-Mogul, as set forth in Section 8.4 of the Plan, and which members are set forth on Exhibit 8.4 to the Plan, is hereby approved.

## C.    COMPENSATION AND BENEFIT PROGRAMS

1.    Except and to the extent rejected, modified, and/or terminated by an order of the Bankruptcy Court on or before the Effective Date, the Reorganized U.S. Debtors shall continue, automatically and without further act, deed or court order, the Employee Benefit Plans maintained by such U.S. Debtors immediately prior to the Effective Date.  Absent the termination of any retiree benefit plans to which Section 1114 of the Bankruptcy Code is applicable in accordance with Section 1114 of the Bankruptcy Code, and subject to the provisions of Section 5.4.2 of the Plan and Section IV.C.2 of this Confirmation Order, payment of all retiree benefits under retiree benefit plans to which Section 1114 of the Bankruptcy Code is applicable shall be continued after the Effective Date in accordance with Section 1129(a)(13) of the Bankruptcy Code.

10

2.    Nothing in Section IV.C.1 of this Confirmation Order or Section 5.4.1 of the Plan shall alter or modify (i) the treatment of Excluded Non-Qualified Pension Claims as Unsecured Claims under the Plan, or (ii) the treatment of any claims relating to the FM Ignition Pension Plan and/or the T&N Pension Plan under the CVAs (as such treatment is incorporated into the Plan), in accordance with Section 5.4.2 of the Plan.

**D.    APPROVAL OF EXIT FACILITIES**

1.    Without further action by the Bankruptcy Court or the directors, managers, trustees, partners, members and stockholders of any Reorganized Debtor or further notice to any entities, each applicable Reorganized Debtor is authorized, as of the Effective Date, to (i) execute, deliver, file, record and implement (x) that certain Credit Agreement, to be entered into by and among (i) Reorganized Federal-Mogul, as Borrower, (ii) Citicorp USA, Inc., as Administrative Agent, (iii) JPMorgan Chase Bank, N.A., as Syndication Agent, and (iv) the Lenders from time to time party thereto (the "Exit Facility Credit Agreement"), and (y) such other contracts, instruments, agreements, guaranties or other documents executed or delivered in connection with the Exit Facility Credit Agreement (the "Other Exit Facility Documents"), (ii) perform all of its obligations under the Exit Facility Credit Agreement and the Other Exit Facility Documents, and (iii) take all such other actions as any of the Responsible Officers of such Reorganized Debtor may determine are necessary, appropriate or desirable in connection with the consummation of the transactions contemplated by the Exit Facility Credit Agreement and the Other Exit Facility Documents.

2.    In addition to the foregoing, each applicable Reorganized Debtor is authorized, as of the Effective Date, to grant such liens and security interests as necessary to

11

provide security for the Exit Facilities in accordance with the Exit Facility Credit Agreement and the Other Exit Facility Documents.

### E.    CREATION OF TRUST

1.    On the Effective Date, the Trust shall be created in accordance with the terms and conditions of the Plan and the Trust Agreement. The Trust and the Trustees thereof are authorized and empowered to receive the property to be transferred to the Trust pursuant to Section 4.3 of the Plan.

2.    Pursuant to the Reorganization Effectuation Statutes, as applicable, and other appropriate provisions of applicable state laws governing corporations or other legal entities and section 1142(b) of the Bankruptcy Code, without further action by the Bankruptcy Court or the directors, managers, partners, members or stockholders of any Reorganized Debtor or further notice to any entities, the Reorganized Debtors are authorized and directed to execute, deliver and perform their obligations under the Trust Agreement and to execute, deliver, file, record and implement all such other contracts, instruments, agreements or documents and take all such other actions as any of the Responsible Officers of the Reorganized Debtors may determine are necessary, appropriate or desirable in connection therewith. The Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures, as in effect on the Effective Date, shall be substantially in the forms attached to the Plan at Exhibit 1.1.217 thereto.

### F.    TRANSFERS OF PROPERTY TO AND ASSUMPTION OF CERTAIN LIABILITIES BY THE TRUST

#### 1.    Funding of the Trust.

The Reorganized Debtors shall fund the Trust in accordance with Section 4.3 of the Plan.

12

2.    **Transfer and Assignment of the Asbestos Insurance Action Recoveries, Asbestos Insurance Actions, and Asbestos In-Place Insurance Coverage.**

The validity and enforceability of the transfer of the Asbestos Insurance Action Recoveries, Asbestos Insurance Actions, and the Asbestos In-Place Insurance Coverage by the Debtors to the Trust pursuant to Section 4.3 of the Plan with respect to the rights and obligations of the Asbestos Insurance Companies, the preemption of any anti-assignment provisions of the Asbestos Insurance Policies pursuant to sections 524(g), 541(c)(1), 1123(a)(5)(B) and 1129(a)(1) of the Bankruptcy Code, and the adjudication of the objections of certain Asbestos Insurance Companies to such assignment and preemption, are and shall be exclusively the subject of the Order Granting Joint Motion Seeking Determination of Asbestos Insurance Assignment and Preemption Issues Pursuant to Plan (the "Preemption Order"), which has been entered by this Court or may be entered hereafter. The terms and conditions of this Confirmation Order are separate and independent from, and are mutually independent of, the terms and conditions of the Preemption Order. Notwithstanding the foregoing determinations, the Effective Date of the Plan may occur regardless of whether the Preemption Order shall have become a Final Order.

3.    **Assumption of Liability for Asbestos Personal Injury Claims by the Trust.**

Subject to the terms and conditions of Article IV of the Plan, and as set forth in Article IV of the Plan, on the Effective Date, upon creation of the Trust, the Trust, in consideration of the property transferred to the Trust, and in furtherance of the purposes of the Trust and the Plan, shall assume any and all Asbestos Personal Injury Claims, and each of the Debtors, the Reorganized Debtors, and the Released Parties shall have no further financial or other obligation, responsibility or liability therefor whatsoever.

13

### 4.    Appointment of Trustees.

The appointment of Edward D. Robertson, Jr., Stephen M. Snyder and Kirk Watson as the initial Trustees of the Trust is approved. Effective on the Effective Date, the initial Trustees shall serve as Trustees of the Trust in accordance with the terms of the Trust Agreement. Each of the Trustees is deemed to be a "party in interest" in the Debtors' Reorganization Cases within the meaning of Section 1109(b) of the Bankruptcy Code.

### 5.    Appointment of TAC Members.

The appointment of Russell W. Budd, Steven Kazan, Joseph F. Rice and Perry Weitz as the initial members of the TAC be, and hereby is, approved. Effective on the Effective Date, the initial members of the TAC shall serve as members of the TAC in accordance with the terms of the Trust Agreement.

### 6.    Appointment of Future Claimants Representative.

The appointment of Eric D. Green as the initial Future Claimants Representative under the Trust Agreement is approved. Effective on the Effective Date, Eric D. Green shall serve as the Future Claimants Representative in accordance with the terms of the Trust Agreement.

### 7.    Indemnity Obligations of the Trust.

The Trust shall be bound by the indemnity obligations set forth in the Plan and the Trust Documents, including, without limitation, those indemnity obligations set forth in Section 4.14 of the Plan.

### G.    EXEMPTIONS FROM TAXATION.

Pursuant to section 1146 of the Bankruptcy Code, (i) any transfers in the United States from a Debtor to a Reorganized Debtor or any other Person or entity pursuant to or in

14

connection with the Plan or any of the Plan Documents, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, franchise tax or other similar tax or governmental assessment, and (ii) the appropriate state or local governmental officials or agents are hereby directed to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**H.    EXEMPTIONS FROM SECURITIES LAWS.**

The issuance and distribution of any and all of (i) the Reorganized Federal-Mogul Common Stock, (ii) the Warrants, (iii) the Reorganized Federal-Mogul Junior Secured PIK Notes, and (iv) any other stock, options, warrants, conversion rights, rights of first refusal or other related rights, contractual, equitable or otherwise, issued, authorized or reserved under or in connection with the Plan, shall be, and shall be deemed to be, exempt from registration under any applicable federal or state securities law to the fullest extent permissible under applicable non-bankruptcy law and under bankruptcy law, including, without limitation, section 1145 of the Bankruptcy Code.

**I.    DISTRIBUTION RECORD DATE.**

The Record Date for purposes of determining the holders of Allowed Claims and Equity Interests that are entitled to distributions that are required to be made under the Plan on the Effective Date or as otherwise provided under the Plan shall be the date this Confirmation Order is entered on the docket in the Reorganization Cases by the clerk of the Bankruptcy Court. Except as and to the extent otherwise required by customary procedures of the Depository Trust Company with respect to debt security claims or Equity Interests, as of the close of business on

15

the Record Date, the various transfer and claims registers for each of the classes of Claims or Equity Interests as maintained by the Debtors, their agents or the Indenture Trustees shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Equity Interests. The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring after the close of business on the Record Date. Each of the Debtors, Reorganized Debtors and the Indenture Trustees shall be entitled to recognize and deal under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Record Date, to the extent applicable. Notwithstanding anything to the contrary set forth in the Plan or in this Confirmation Order, the Debtors, the Reorganized Debtors and/or the Disbursing Agent may take such other and additional steps as they may deem appropriate to effectuate distributions to holders of Class 1F Claims.

## J.    SECURITY FOR OBLIGATIONS UNDER REORGANIZED FEDERAL-MOGUL SECURED TERM LOAN AGREEMENT AND REORGANIZED FEDERAL-MOGUL JUNIOR SECURED PIK NOTES.

The applicable Reorganized Debtors are authorized to grant all liens and security interests necessary to secure (i) the obligations under the Reorganized Federal-Mogul Secured Term Loan Agreement, and (ii) the Reorganized Federal-Mogul Junior Secured PIK Notes, in accordance with the terms of the Reorganized Federal-Mogul Secured Term Loan Agreement, the Indenture for the Reorganized Federal-Mogul Junior Secured PIK Notes, and any applicable documents ancillary thereto (it being understood that the liens and security interests granted to secure the obligations under each of (i) the Reorganized Federal-Mogul Secured Term Loan Agreement, (ii) the Reorganized Federal-Mogul Junior Secured PIK Notes, and (iii) the Exit Facilities, shall be separate and distinct from one another).

16

K.    **DELIVERY OF DOCUMENTS.**

Pursuant to Section 1142 of the Bankruptcy Code, all entities holding Claims against or Equity Interests in the Debtors or collateral pledged as security for any Claims against the Debtors that are treated under the Plan shall be, and they hereby are, directed to execute, deliver, file or record any document, and to take any action necessary, including, without limitation, cancelling, releasing, and discharging any liens arising under the Security Documents (as defined in the Bank Credit Agreement) to implement, consummate and otherwise effect the Plan and the Plan Documents in accordance with their respective terms, and all such entities shall be bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan and the Plan Documents. The Security Documents shall be deemed cancelled in connection with the treatment of the underlying Claims in accordance with the Plan.

L.    **TRANSACTIONS IMPLEMENTED BY THE PLAN**

1.    **Exercise of Purchase Options for Assets of Certain Debtors**

a.    In accordance with Section 8.16.1 of the Plan, as part of the implementation of the Plan, Federal-Mogul Goryzce, S.A. ("Goryzce"), a non-Debtor Affiliate, shall, and is authorized to, exercise that certain purchase option for certain assets of Federal-Mogul Bradford Limited ("Bradford"), which purchase option is set forth in the Purchase Agreement dated as of December 17, 2003 by and between, inter alia, Gorzyce and Bradford. Pursuant to Section 524(g)(3)(A)(ii) of the Bankruptcy Code, Gorzyce shall have no liability with respect to any Asbestos Personal Injury Claim or Demand that may be made against it by reason of its status as the transferee of and/or successor to the assets of Bradford.

b.    In accordance with Section 8.16.2 of the Plan, as part of the implementation of the Plan, Federal-Mogul Sealing Systems (Pty) Limited ("FMSS-South

17

Africa"), a non-Debtor Affiliate, shall, and is authorized to, exercise that certain purchase option for certain assets of Federal-Mogul Sealing Systems (Rochdale) Limited ("Rochdale"), which purchase option is set forth in the Purchase Agreement dated as of August 4, 2006 by and between, inter alia, FMSS-South Africa and Rochdale. Pursuant to Section 524(g)(3)(A)(ii) of the Bankruptcy Code, FMSS-South Africa shall have no liability with respect to any Asbestos Personal Injury Claim or Demand that may be made against it by reason of its status as the transferee of and/or successor to the assets of FMSS-South Africa.

### 2.    Implementation of Certain Settlement Agreements

The Debtors and other relevant parties in interest are hereby authorized to implement, on the terms and conditions set forth in the Plan and in the relevant settlement agreements and related documents, certain settlement agreements, including, without limitation, (i) the Environmental Settlement Agreements (as set forth in Section 8.21 of the Plan), (ii) the Owens-Illinois Settlement (as set forth in Section 8.25 of the Plan), (iii) that Settlement with certain holders of Asbestos Property Damage Claims (as set forth in Section 8.26 of the Plan), (iv) that Settlement Agreement by and between, inter alia, Federal-Mogul, FMP, MagneTek, Inc., the Asbestos Claimants Committee, and the Future Claimants Representative (as set forth in Section 8.27 of the Plan), and (v) the CIP Agreement (as set forth in Section 8.29 of the Plan).

### 3.    Implementation of the Plan B Settlement

a.    The Plan B Settlement, the Plan B Settlement Agreement, and the compromise and settlement evidenced thereby, including the releases set forth in Article III of the Plan B Settlement Agreement, are authorized and approved, subject to, and in accordance with, the terms and conditions thereof, pursuant to Fed. R. Bankr. P. 9019, and all parties to the Plan B Settlement Agreement are bound by the terms thereof, including Section 4.08. The

18

Debtors and any other applicable parties are hereby authorized and directed to take any and all actions necessary or appropriate to implement, effectuate and consummate the Plan B Settlement and the transactions contemplated thereby, including, without limitation, each of the transactions and agreements contemplated by or referenced in the Plan B Settlement Agreement, without further notice, application or order of the Bankruptcy Court, subject in each case to the terms and conditions of the Plan and the Plan B Settlement Agreement.

        b.    Without limiting the foregoing, the Trust or Reorganized Federal-Mogul, in accordance with the provisions of Section 8.22.4 of the Plan, are each authorized to and shall, subject to, and in accordance with, the terms and conditions of Section 8.22.4 of the Plan and Sections 4.08, 4.09 and 4.10 of the Plan B Settlement Agreement, pay the Plan B Settlement Amount or create and fund the Cooper/Pneumo Escrow Account with $140 million in Cash or Cash equivalents, as applicable; provided, however, that notwithstanding anything to the contrary contained in the Plan, the Plan Documents, or this Confirmation Order, in accordance with, and subject to the terms and conditions of, the Plan B Settlement Agreement, Articles II and III of the Plan B Settlement Agreement (including, without limitation, the releases set forth in Article III thereof) and the parties' respective obligations thereunder shall only become effective in accordance with Section 5.01 of the Plan B Settlement Agreement (and shall thereafter remain effective unless the Plan B Settlement Agreement is terminated in accordance with Article VII thereof).

        c.    The Plan B Settlement is and shall be deemed to be a separate, independent, distinct and alternative settlement from, and is and shall be deemed to be mutually exclusive of, the Plan A Settlement set forth in the Addendum. Without limiting the foregoing determination, if Articles II and III of the Plan B Settlement Agreement become effective

19

pursuant to Section 5.01 of the Plan B Settlement Agreement, then the Plan B Settlement shall be effectuated in accordance with the terms and conditions of the Plan B Settlement Agreement regardless of whether (i) the Plan A Settlement has been or may be approved by this Court, the District Court or any other court of competent jurisdiction, or (ii) either the Plan A Effective Date or the Interim Plan A Effective Date has occurred.  In the event that the Plan A Approval Order is entered by this Court, such order shall be issued in connection with the Confirmation Order under Section 524(g)(1)(A) of the Bankruptcy Code.

     **M.**     **ISSUANCE OF NEW INSTRUMENTS**

     All instruments to be issued under the Plan (including, without limitation, the Reorganized Federal-Mogul Common Stock, the Warrants, and the Reorganized Federal-Mogul Junior Secured PIK Notes) shall upon issuance be duly authorized and validly issued, fully paid, and non-assessable, and any conditions precedent to issuance shall be deemed satisfied.

**V.**     **RELEASES AND EXCULPATION PROVISIONS.**

     Each of the release and exculpation provisions set forth in the Plan (including, without limitation, Sections 9.2, and 9.6 of the Plan) is hereby approved in all respects, is incorporated herein in its entirety, is so ordered and shall be immediately effective on the Effective Date of the Plan without further action or notice by the Bankruptcy Court, any of the parties to such releases or any other party.

**VI.**     **DISCHARGE, INJUNCTIONS AND RELATED MATTERS.**

     **A.**     **DISCHARGE OF CLAIMS.**

     1.     As of the Effective Date, except as provided in the Plan (including, without limitation, Article IV of the Plan) or in this Confirmation Order, the distributions and rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan

20

shall be in exchange for, and in complete discharge of, all Claims and satisfaction and termination of all Equity Interests, including any interest accrued on Claims from and after the Petition Date. Accordingly, except as otherwise provided in the Plan (including, without limitation, Article IV of the Plan) or in this Confirmation Order, Confirmation of the Plan shall, as of the Effective Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in Sections 502(g) or 502(i) of the Bankruptcy Code, whether or not (x) a proof of claim based on such debt is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code, (y) a Claim based on such debt is Allowed pursuant to Section 502 of the Bankruptcy Code (or is otherwise resolved), or (z) the holder of a Claim based on such debt has accepted the Plan; and (ii) satisfy, terminate or cancel all Equity Interests and other rights of equity security holders in the Debtors except as otherwise provided in the Plan.

2.    In addition to the foregoing provisions of this Section VI.A of this Confirmation Order, except as provided in the Plan (including, without limitation, the exceptions provided in (i) Section 4.5 of the Plan and (ii) Section 9.3.2(b)(v) of the Plan concerning Non-Debtor Affiliates), the transfer to, vesting in and assumption by the Trust of the Trust Assets as contemplated by the Plan shall, as of the Effective Date, discharge all obligations and liabilities of and bar recovery or any action against the Released Parties and their respective estates, Affiliates and subsidiaries, for or in respect of all Asbestos Personal Injury Claims and Demands, including, but not limited to, all Indirect Asbestos Personal Injury Claims and Demands against the Debtors, the Reorganized Debtors, and their respective Estates, Affiliates and subsidiaries. Except as provided in Sections 8.22.3.2 and 4.5 of the Plan, the Trust shall as of the Effective Date assume sole and exclusive responsibility and liability for all Asbestos Personal Injury

21

Claims, including, but not limited to, Indirect Asbestos Personal Injury Claims, against the Debtors, the Reorganized Debtors, and their respective Estates, Affiliates and subsidiaries and, also except as provided in Section 4.5 of the Plan, such Claims shall be paid by the Trust from the Trust Assets or as otherwise directed in the Trust Documents. The Trust shall indemnify and hold the Reorganized Debtors and their non-Debtor Affiliates harmless from and against any and all Asbestos Personal Injury Claims, as well as all associated costs and expenses, to the extent set forth in Section 4.14 of the Plan. Additionally, notwithstanding the foregoing and anything to the contrary in the Plan or the Trust Documents, each Reorganized Hercules-Protected Entity shall also be conclusively deemed to have suffered a loss (y) in the amount of any and all unreimbursed fees, costs and expenses incurred by such Reorganized Hercules-Protected Entity on and after the Effective Date in defending against Asbestos Personal Injury Claims and (z) in the amount of any unreimbursed fees, costs, expenses, indemnity payments, reimbursement amounts, additional premiums or other amounts paid by such Hercules-Protected Entity on and after the Effective Date related to the Hercules Policy or the EL Asbestos Insurance. The Trust shall indemnify the applicable indemnitee(s) in respect of any such losses in full (without regard to any limitation in Section 4.14 of the Plan).

**B.    DISCHARGE INJUNCTION**

1.    Except as provided in the Plan or in this Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim, Demand or other debt or liability that is discharged, or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Equity Interests or rights: (i) commencing or continuing any action or other proceeding against the Debtors, the Reorganized Debtors, the Trust or their respective property;

22

(ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Debtors, the Reorganized Debtors, the Trust or their respective property; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtors, the Reorganized Debtors, the Trust or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Debtors, the Reorganized Debtors, the Trust or their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Plan.

2.    Except as provided in the Plan or this Confirmation Order, as of the Effective Date all Persons that hold, have held, or may hold a Claim, Demand, or other debt, right, cause of action or liability that is released pursuant to the provisions of the Plan are permanently enjoined from taking any of the following actions on account of or based upon such released Claims, Demands, debts, rights, causes of action or liabilities: (i) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (iii) creating, perfecting or enforcing any lien or encumbrance against the Released Parties or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Released Parties or against their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that such injunction shall not apply to any Person that elected not to grant a release in favor of the Released Parties by checking the appropriate box on their ballot for voting on the Plan.

23

C.   **SUPPLEMENTAL INJUNCTION, THIRD PARTY INJUNCTION, AND ASBESTOS INSURANCE ENTITY INJUNCTION**

In addition to conduct otherwise enjoined under the Bankruptcy Code, and in order to supplement the injunctive effect of the Discharge Injunction contained in the Plan, the Plan provides for the following injunctions, as set forth in Sections 9.3.1, 9.3.2, and 9.3.3 of the Plan, which are hereby approved and authorized in all respects and which shall take effect as of the Effective Date:

1.   Supplemental Injunction

a.   *Terms.  In order to preserve and promote the settlements contemplated by and provided for in the Plan, and to supplement, where necessary, the injunctive effect of the discharge as provided in Sections 1141 and 524 of the Bankruptcy Code and as described in Article IX of the Plan, except as otherwise provided in the Plan, all Entities which have held or asserted, which hold or assert or which may hold or assert any claim, demand or cause of action (other than a Demand) against the Released Parties (or any of them) based upon, attributable to, or arising out of any Claim against or Equity Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the U.S., the U.K. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be permanently stayed, restrained and enjoined from taking any action against the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving payments or recovery with respect to any such claim, demand or cause of action arising prior to the Confirmation Date, including, but not limited to:*

*(i)      commencing or continuing in any manner any action or other proceeding of any kind with respect to any such claim, demand or cause of action against any of the Released Parties, or against the property of any Released Party;*

*(ii)      enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or against the property of any Released Party with respect to any such claim, demand or cause of action;*

*(iii)      creating, perfecting or enforcing any Lien of any kind against any Released Party or the property of any Released Party with respect to any such claim, demand or cause of action;*

*(iv)      except as otherwise provided in the Plan, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due any Released Party or*

24

*against the property of any Released Party with respect to any such claim, demand or cause of action; and*

     *(v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or the Plan Documents relating to such claim, demand or cause of action.*

    *b.    Bankruptcy Rule 3016 Compliance. The Plan Proponents' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.*

    2.    Third Party Injunction

    *a.    Terms. In order to preserve and promote the settlements contemplated by and provided for in the Plan and agreements previously or concurrently approved by the Bankruptcy Court, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under Section 524(g) of the Bankruptcy Code, all Entities which have held or asserted, which hold or assert or which may in the future hold or assert any claim, demand or cause of action (including, but not limited to, any Asbestos Personal Injury Claim or Demand, or any claim or demand for or respecting any Trust Expense) against the Protected Parties (or any of them) based upon, attributable to, or arising out of any Asbestos Personal Injury Claim or Demand, whenever and wherever arising or asserted, whether in the U.S., the U.K. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty (a "Third Party Claim"), shall be permanently stayed, restrained and enjoined, from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments or recovery with respect to any such Third Party Claim, including, but not limited to:*

     *(i)    commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Third Party Claim against any Protected Party or against the property of any Protected Party with respect to any such Third Party Claim;*

     *(ii)    enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any Protected Party or against the property of any Protected Party with respect to any such Third Party Claim;*

     *(iii)   creating, perfecting or enforcing any Lien of any kind against any Protected Party or the property of any Protected Party on the basis of such Third Party Claim;*

     *(iv)    commencing any action or other proceeding of any kind or enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order, with respect to a Third Party Claim against a Protected Party that pursuant to the Plan or after the Effective Date makes a loan to any of the Released Parties, or challenging, upsetting or impairing any*

25

*Lien granted in connection with such loan by reason of any such Third Party Claim;*

*(v)    except as otherwise provided in the Plan, asserting, implementing or effectuating any setoff, right of subrogation or contribution or recoupment of any kind against any obligation due any Protected Party or against the property of any Protected Party with respect to any such Third Party Claim; and*

*(vi)    taking any act relating to such Third Party Claim in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Documents or the Trust Documents.*

*b.    Reservations.  Notwithstanding anything to the contrary in the foregoing provisions of this paragraph VI.C.2 or in Section 9.3.2(a) of the Plan, the Third Party Injunction shall not impair*

*(i)    the rights of holders of Asbestos Personal Injury Claims to assert such Asbestos Personal Injury Claims or Trust Claims solely against the Trust or the Trust Assets in accordance with the Asbestos Personal Injury Trust Distribution Procedures;*

*(ii)    the rights of the Trust or the U.K. Asbestos Trustee on behalf of holders of Asbestos Personal Injury Claims to assert such Asbestos Personal Injury Claims solely against Hercules-Protected Entities in accordance with Article IV of the Plan;*

*(iii)    the rights of Entities to assert any Claim, debt, obligation or liability for payment of Trust Expenses solely against the Trust or the Trust Assets;*

*(iv)    the rights of the Trust or the Reorganized Debtors to prosecute any Asbestos Insurance Action or any similar claim, cause of action or right of Reorganized T&N against Curzon or of the Trust against the EL Insurers;*

*(v)    the rights of any Entity to assert an Asbestos Personal Injury Claim against a non-Debtor Affiliate where such Claim is based upon exposure to asbestos or asbestos-containing products resulting solely from the acts, conduct or omissions of such non-Debtor Affiliate;*

*(vi)    the rights of Entities to pursue or assert any claim, demand, or cause of action based upon, attributable to, or arising out of any Pneumo Protected Asbestos Claims against any insurer under a Pneumo Asbestos Insurance Policy; or*

*(vii)    the rights of any of the Pneumo Parties to enforce the provisions of the Plan and the Plan Documents.*

26

c.    *If a non-Settling Asbestos Insurance Company asserts that it has rights of contribution, indemnity, reimbursement, subrogation or other similar claims (collectively, "Contribution Claims") against a Settling Asbestos Insurance Company, (i) such Contribution Claims may be asserted as a defense or counterclaim against the Trust or the Reorganized Debtors (as applicable) in any Asbestos Insurance Action involving such non-Settling Asbestos Insurance Company, and the Trust or the Reorganized Debtors (as applicable) may assert the legal or equitable rights, if any, of the Settling Asbestos Insurance Company, and (ii) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such non-Settling Asbestos Insurance Company to the Trust or the Reorganized Debtors (as applicable) shall be reduced by the amount of such Contribution Claims.*

d.    *Protected Parties. For purposes of the Third Party Injunction, the Protected Parties shall consist of all of the following:*

i.    *the Debtors, their non-Debtor Affiliates (excluding, however, any person or Entity that may qualify as an Affiliate, but that is not commonly owned or controlled by the Debtors), the Affiliated Subsidiaries, Reorganized Federal-Mogul and the other Reorganized Debtors and all of their respective past and present officers, directors and employees;*

ii.    *the Noteholders, the holders of Bank Claims, and the Sureties, together with their respective successors, past and present officers, directors and employees, in each case limited to such party's capacity set forth in this subsection;*

iii.    *any Entity which, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of the Debtors, Reorganized Federal-Mogul or the Trust, but only to the extent that a claim or liability is asserted against such Entity on account of its status as such transferee or successor;*

iv.    *any Entity that, pursuant to the Plan or after the Effective Date, makes a loan to the Debtors, Reorganized Federal-Mogul, or the Trust, or to a successor to, or transferee of, any assets of the Debtors, Reorganized Federal-Mogul, or the Trust, but only to the extent that liability is asserted to exist by reason of such lending relationship or to the extent any Lien created in connection with such a loan is sought to be challenged or impaired;*

v.    *each Settling Asbestos Insurance Company and each contributor of funds, proceeds or other consideration to the Trust; provided, however, that in the event a Settling Asbestos Insurance Company enters into any Asbestos Insurance Settlement Agreement(s) that cover less than all Asbestos Insurance Policies applicable to such Settling Asbestos Insurance Company, such Settling Asbestos Insurance Company shall be a Protected Party only with respect to those Asbestos Insurance*

27

*Policies as to which it has entered into an Asbestos Insurance Settlement Agreement or Agreements; and*

*vi.      the Dan=Loc Group and their respective successors, including, but not limited to, The Flexitallic Group, Inc. and its subsidiaries and affiliates and respective successors.*

3.      Asbestos Insurance Entity Injunction

*a.      Purpose. In order to protect the Trust and to preserve the Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under Section 105(a) of the Bankruptcy Code, the Asbestos Insurance Entity Injunction is issued pursuant to the Plan.*

*b.      Terms. Subject to the provisions of 9.3.3.(a) of the Plan, all Entities (excluding, however, the Trust, the Asbestos Insurance Companies and the Reorganized Debtors to the extent they are permitted or required to pursue claims relating to the Hercules Policy, any EL Policy, any Asbestos Insurance Actions and/or the Asbestos Insurance Action Recoveries) that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, demand or cause of action (including any Asbestos Personal Injury Claim or Demand or any claim or demand for or respecting any Trust Expense) against any Asbestos Insurance Company based upon, attributable to, arising out of, or in any way connected with any Asbestos Personal Injury Claim or Demand, whenever and wherever arising or asserted, whether in the U.S., the U.K. or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action including, without limitation:*

*(i)      commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Asbestos Insurance Company, or against the property of any Asbestos Insurance Company, with respect to any such claim, demand, or cause of action;*

*(ii)      enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Insurance Company, or against the property of any Asbestos Insurance Company, with respect to any such claim, demand, or cause of action;*

*(iii)      creating, perfecting, or enforcing in any manner, directly or indirectly, any encumbrance against any Asbestos Insurance Company, or the property of any Asbestos Insurance Company, with respect to any such claim, demand, or cause of action; and*

28

(iv)    except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Asbestos Insurance Company, or against the property of any Asbestos Insurance Company, with respect to any such claim, demand or cause of action;

provided, however, that (a) the Asbestos Insurance Entity Injunction shall not impair in any way any actions brought by the Trust and/or the Reorganized Debtors against any Asbestos Insurance Company; (b) the Trust shall have the sole and exclusive authority at any time to file a motion, upon express notice to each affected Asbestos Insurance Company, asking the District Court to terminate, or reduce or limit the scope of, the Asbestos Insurance Entity Injunction with respect to any Asbestos Insurance Company (subject to the proviso that each affected Asbestos Insurance Company shall retain all rights and defenses with respect to Claims asserted against it as a result of any such termination, reduction, or limitation of the Asbestos Insurance Entity Injunction); and (c) the Asbestos Insurance Entity Injunction is not issued for the benefit of any Asbestos Insurance Company, and no Asbestos Insurance Company is a third-party beneficiary of the Asbestos Insurance Entity Injunction.

c.    Reservations.  Notwithstanding anything to the contrary in the foregoing provisions of this paragraph VI.C.3, this Asbestos Insurance Entity Injunction shall not enjoin:

(i)    the rights of Entities to the treatment accorded them under the Plan, as applicable, including the rights of holders of Asbestos Personal Injury Claims to assert such Claims, as applicable, in accordance with the Asbestos Personal Injury Trust Distribution Procedures;

(ii)    the rights of Entities to assert any claim, debt, obligation, cause of action or liability for payment of Trust Expenses against the Trust;

(iii)    the rights of the Trust, and the Reorganized Debtors (to the extent permitted or required under the Plan) to prosecute any action based on or arising from the Asbestos Insurance Policies;

(iv)    the rights of the Trust, and the Reorganized Debtors to assert any claim, debt, obligation, cause of action or liability for payment against an Asbestos Insurance Company based on or arising from the Asbestos Insurance Policies;

(v)    the rights of any Asbestos Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Asbestos Insurance Company that is not a Settling Asbestos Insurance Company; and

(vi)    the rights of Entities to pursue or assert any claim, demand, or cause of action based upon, attributable to, or arising out of any Pneumo Asbestos Claims against any insurer under a Pneumo Asbestos Insurance Policy.

29

## VII.    ISSUES RELATED TO PLAN AND OBJECTIONS TO CONFIRMATION.

### A.    RESOLUTION OF CERTAIN OBJECTIONS TO CONFIRMATION

Based upon the record of these Reorganization Cases, the Bankruptcy Court hereby determines that all of the objections to Confirmation, whether informal or filed (the "Objections"), to the extent not satisfied by the Modifications or by separate agreement, have been consensually resolved or otherwise voluntarily withdrawn, provided, however, that as set forth in Sections IV.F.2 and VII.A.4 hereof, the objections of certain Asbestos Insurance Companies with respect to the transfer of the Asbestos Insurance Action Recoveries, Asbestos Insurance Actions, and the Asbestos In-Place Insurance Coverage to the Trust pursuant to the Plan and the preemption of any anti-assignment provisions of the Asbestos Insurance Policies and any other applicable non-bankruptcy law pursuant to the Bankruptcy Code are and shall be exclusively the subject of the separate and independent Preemption Order. The compromises and settlements contemplated by each such resolution to an Objection are fair, equitable and reasonable, are in the best interests of the Debtors and their respective Estates and creditors and are hereby expressly approved pursuant to Bankruptcy Rule 9019. The consensual resolution of certain of the foregoing objections is on the terms and subject to the conditions set forth below.

### 1.    PepsiAmericas, Inc.

For the reasons set forth in, and subject to the terms of, that certain Order Approving Stipulation By and Among (I) Plan Proponents, (II) Cooper Parties, (III) PCT/Pneumo Parties, (IV) PepsiAmericas, Inc., and (V) Stipulating Pneumo Abex Insurers and Clarifying Effect of Plan B Settlement Agreement and Withdrawal of Objections Thereto (the "Pepsi Stipulation Approval Order"), which was entered by the Court on October 11, 2007 (D.I. 582593568), PepsiAmericas, Inc. has withdrawn with prejudice, and shall be deemed to have withdrawn with prejudice, its objections to Confirmation of the Plan and/or approval of the Plan

30

B Settlement (without prejudice to its pending objection to the Addendum and the Plan A Settlement), subject only to the entry of the Pepsi Stipulation Approval Order by this Court.

### 2.    Owens-Illinois, Inc.

For the reasons set forth in, and subject to the terms of, that certain Order Approving Stipulation By and Among Plan Proponents and Owens-Illinois, Inc., which was entered by the Court on October 25, 2007 (D.I. 13560), Owens-Illinois, Inc. has withdrawn with prejudice, and shall be deemed to have withdrawn with prejudice, its objections to Confirmation of the Plan.

### 3.    Rothschild Inc.

For the reasons set forth in, and subject to the terms of, that certain Order Approving Stipulation By and Among Plan Proponents and Rothschild Inc., which was entered by the Court on October 12, 2007 (D.I. 13486), and based on the understanding of the parties thereto as set forth in the October 30, 2007 Modifications to the Plan, Rothschild Inc. has withdrawn with prejudice, and shall be deemed to have withdrawn with prejudice, its objections to Confirmation of the Plan and/or approval of the Plan B Settlement.

### 4.    Objecting Insurers Regarding Assignment and Preemption Issue

Consistent with the terms of the Preemption Order, and as set forth in Section IV.F.2 above, this Confirmation Order does not constitute or contain a ruling on the Plan Assignment Objections or the Assignment and Preemption Issue (as each such term is defined in the Preemption Order). Without limiting the foregoing, and based upon that certain Stipulation and Order Regarding Remaining London Market Objections to the Plan by and among the London Market Insurers and the Plan Proponents (the "LMI Stipulation"), the Bankruptcy Court hereby determines that (i) this Confirmation Order is not approving the assignment of Insurance

31

Rights (as defined in the <u>LMI Stipulation</u>) set forth in the Plan or determining the Preemption

Issues (as defined in the LMI Stipulation), (ii) the Preemption Order has been, or will be, entered

separately from this Confirmation Order, and (iii) the Preemption Order will be a final and

appealable order with respect to the Preemption Issues (as defined in the LMI Stipulation).

## VIII. RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT AND THE DISTRICT COURT.

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and

notwithstanding entry of this Confirmation Order and occurrence of the Effective Date, the

District Court, together with the Bankruptcy Court to the extent of any reference made to it by

the District Court, shall, and shall be deemed to, retain exclusive jurisdiction, to the fullest extent

permissible, over any and all matters arising out of, under or related to, the Reorganization

Cases, this Confirmation Order or the Plan, including any and all of the matters specified in

Section 11.3 of the Plan. The resolution of Asbestos Personal Injury Claims and the forum in

which such resolution will be determined shall be governed exclusively by and in accordance

with the Asbestos Personal Injury Trust Distribution Procedures and the Trust Agreement.

## IX. NOTICE OF ENTRY OF CONFIRMATION ORDER.

A.    Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), the Reorganized

Debtors are authorized and directed to serve, within 10 days after the occurrence of the Effective

Date, a notice of the entry of this Confirmation Order, which shall include notice of the bar dates

established by the Plan and this Confirmation Order, notice of the issuance of the Supplemental

Injunction, the Third Party Injunction, and the Asbestos Insurance Entity Injunction, and notice

of the Effective Date, substantially in the form of <u>Exhibit B</u> attached hereto and incorporated

herein by reference (the "<u>Confirmation Notice</u>"), on all parties that received notice of the

32

Confirmation Hearing, including, without limitation, the various counsel to holders of Asbestos Personal Injury Claims; provided, however, that the Reorganized Debtors are authorized and directed to serve the Confirmation Notice directly on those holders of Asbestos Personal Injury Claims that received Solicitation Packages directly from the Debtors pursuant to the terms of the Solicitation Procedures Order and/or the Supplemental Solicitation Procedures Order.

B.     As soon as practicable after the entry of this Confirmation Order, the Debtors shall make copies of this Confirmation Order and the Confirmation Notice available on the Federal-Mogul Corporation website and the Debtors' reorganization website (http://www.fmoplan.com).

C.     No later than 20 Business Days after the Effective Date, the Reorganized Debtors are directed to publish the version of the Confirmation Notice attached hereto as Exhibit C once in the national editions of *The Wall Street Journal, The New York Times, USA Today, The Detroit Free Press* and the *Daily Telegraph* of London. The Debtors are authorized to pay all fees associated with the publication program described in this paragraph to The Garden City Group, Inc., as the Debtors' noticing agent, which will coordinate publication of the Confirmation Notice for the Reorganized Debtors.

## X.     EFFECT OF REVERSAL.

If any or all provisions of this Confirmation Order are reversed, modified, or vacated by subsequent order, such act shall not affect the validity of acts or obligations taken or incurred under the Plan, Plan Documents or this Confirmation Order prior to provision to the Plan Proponents of notice of such reversal, modification, or vacation.

**XI.    REPORT AND RECOMMENDATION TO THE DISTRICT COURT.**

To the extent required under 28 U.S.C. § 157(d), this Court hereby reports to the

District Court and recommends that the District Court enter an order issuing and affirming this

Confirmation Order, including, without limitation, the Third Party Injunction set forth in the Plan

and section VI.B.2 of this Confirmation Order pursuant to section 524(g)(3) of the Bankruptcy

Code.

**XII.    NO JUST CAUSE FOR DELAY.**

This Court determines that there is no just cause for delay, and that this

Confirmation Order shall take effect immediately upon entry, notwithstanding anything to the

contrary in Federal Rules of Bankruptcy Procedure 3020(e) or 7062(a).

> THIS ORDER IS HEREBY DECLARED TO BE IN
> RECORDABLE FORM AND SHALL BE ACCEPTED BY ANY
> RECORDING OFFICER FOR FILING AND RECORDING
> PURPOSES WITHOUT FURTHER OR ADDITIONAL
> ORDERS, CERTIFICATIONS OR OTHER SUPPORTING
> DOCUMENTS.

Dated: November 8 2007

_Judith K. Fitzgerald_
_____
The Honorable Judith K. Fitzgerald

34

App. 273

# Tab F

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FEDERAL-MOGUL GLOBAL | ) | Case No. 01-10578 (JKF) |
| INC., T&N LIMITED, et al., | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | Related Docket Nos. 13182, 582593566, |
|  | ) | 13499, 13660, 13671, 13672, and 13674.. |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## ORDER

**AND NOW**, this <u>19th</u> day of March, 2008, for the reasons stated in the foregoing Memorandum Opinion, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the assignment of rights in certain insurance policies to the asbestos trust, as provided in part by Section 4.3 of the Fourth Amended Joint Plan of Reorganization For Debtors and Debtors-In-Possession (As Modified), Doc. No. 13360, is valid and enforceable pursuant to §§524(g), 541(c)(1), 1123(a)(5)(B) and §1129(a)(1) of the Bankruptcy Code notwithstanding anti-assignment provisions in or incorporated in the policies and applicable state law. The Objections of the Objecting Insurers and of Certain Underwriters at Lloyds, London and London Market Companies, all as defined in the Memorandum Opinion, are **OVERRULED**.

It is **FURTHER ORDERED** that counsel for Debtors shall immediately serve a copy of this Memorandum Opinion and Order on all parties on the current Service List and any other parties in interest and shall file proof of service forthwith.

*Judith K. Fitzgerald*                    **jmd**

Judith K. Fitzgerald
United States Bankruptcy Judge

1

**App. 274**

cc:

James F. Conlan
Kevin T. Lantry
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Laura Davis Jones
James E. O'Neil
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705

OFFICE OF THE UNITED STATES TRUSTEE
844 North King Street
Room 2207, Lockbox 35
Wilmington, Delaware 19801

Charlene D. Davis
Eric M. Sutty
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801

Marla R. Eskin
Kathleen Campbell Davis
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, Delaware 19801

Elihu Inselbuch
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, New York 10052-3500

Peter Van N. Lockwood
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W.
Washington, DC 20005
Telephone: (202) 862-5000

2

Ian Connor Bifferato
BIFFERATO GENTILOTTI
800 N. King Street
Wilmington, Delaware 19801

David Heroy
Bruce E. Lithgow
BAKER & McKENZIE LLP
One Prudential Plaza
130 East Randolph Drive
Chicago, Illinois 60601

Steven M. Fuhrman
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017

Mark D. Collins
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899

Edwin J. Harron
James L. Patton, Jr.
Maribeth L. Minella
YOUNG CONAWAY STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

Brian L. Kasprzak
MARKS, O'NEILL, O'BRIEN AND
COURTNEY, P.C.
913 North Market Street, Suite 800
Wilmington, Delaware 19801

Mark D. Plevin
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595

Sean J. Bellew

COZEN O'CONNOR
1201 N. Market Street
Suite 1400
Wilmington, DE 19801


Michael S. Davis
Jantra Van Roy
ZEICHNER ELLMAN & KRUSE LLP
575 Lexington Avenue
New York, New York 10022

Ngoc H. Lam
JACKSON & CAMPBELL, P.C.
1120 Twentieth Street, N.W.
South Tower
Washington, DC 20036-3437

James S. Yoder
WHITE AND WILLIAMS LLP
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709

Elit R. Felix, II
MARGOLIS EDELSTEIN
The Curtis Center, 4th Floor
601 Walnut Street
Philadelphia, PAl 9 1 06- 3304

Michael W. Yurkewicz
KLEHR, HARRISON, HARVEY
BRANZBURG AND ELLERS LLP
919 Market St., Suite 1000
Wilmington, DE 19801

Craig Goldblatt
Nancy L. Manzer
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

William J. Bowman

4

James P. Ruggeri
Edward B. Parks, II
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004


Neal J. Levitsky
Seth A. Niederman
FOX ROTHSCHILD LLP
Citizen's Bank Center
919 North Market Street, Suite 1300
Wilmington, DE 19899

Stuart D. Rosen
G. Eric Brunstad, Jr.
BINGHAM McCUTCHEN LLP
One State Street
Hartford, Connecticut 06103-3178

Rheba Rutkowski
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110

Christopher P. Simon
913 North Market Street, 11th Floor
P.O. Box 1380
Wilmington, Delaware 19899-1380

John J. Dillon
Anthony S. Fernandez
HAMILTON ALTMAN CANALE
& DILLON, LLC
4600 East-West Highway, Suite 201
Bethesda, Maryland 20814

John D. Demmy
STEVENS & LEE, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801


Leonard P. Goldberger

5

1818 Market Street, 29th Floor
Philadelphia, PA 19103

Richard W. Riley
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246

Russell W. Roten
DUANE MORRIS LLP
633 W. 5th Street, Suite 4600
Los Angeles, CA 90071

Eileen T. McCabe
MENDES & MOUNT LLP
750 Seventh Avenue
New York, New York 10019-6829

Michael A. Shiner
TUCKER ARENSBERG, P.C.
1500 One PPG Place
Pittsburgh, PA 15222

6

# Tab G

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
|  | ) | Case No. 01-10578 (JKF) |
| FEDERAL-MOGUL GLOBAL | ) | (Jointly Administered) |
| INC., T&N LIMITED, et al., | ) |  |
|  | ) | Related Docket Nos. 13182, 582593566, |
|  | ) | 13499, 13660, 13671, 13672, and 13674. |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

**MEMORANDUM OPINION REGARDING ASSIGNMENT AND PREEMPTION ISSUE[1]**

Before the court is an issue related to but bifurcated from the plan confirmation process.

The court's jurisdiction is not disputed.  As stated by the parties, the issue is:  "Whether, under

the Bankruptcy Code as a matter of law, the [assignment of Asbestos Insurance Policies to a

§524(g) trust] is valid and enforceable against the Insurers notwithstanding anti-assignment

provisions in or incorporated in the Policies and applicable state law."[2]

---

[1]  This Memorandum Opinion constitutes our findings of fact and conclusions of law.

[2] Certain of the Objecting Insurers are parties to a Stipulation and Agreed Order (Doc. No. 10113 at Exhibit A, the "Insurance Stipulation"), which was approved by an order of this court dated September 19, 2006 (Doc. No. 10606), by which such Objecting Insurers narrowed the scope of their objections related to confirmation of the Plan, in relevant part, to the following legal issue: "Whether, under the Bankruptcy Code as a matter of law, the Assignment is valid and enforceable against the Insurers notwithstanding anti-assignment provisions in or incorporated in the Policies and applicable state law." Doc. No. 10606 at Exh. A, Insurance Stipulation at §3(a)(i).  The Insurance Stipulation further provided that the parties thereto would "request that the Bankruptcy Court determine such objections under the Bankruptcy Code as a matter of law" and "[e]ach Party retains all appellate rights with respect to any adjudication by the Bankruptcy Court or any higher court of the issues identified in Section 3(a) above, and may
(continued...)

1

A hearing to consider confirmation of the Plan was held on June 18-21, July 9-10, 2007, and October 1-2, 2007, at which all objections to confirmation were considered. Thereafter, after devoting a considerable amount of time and effort, the Debtors, Plan Proponents,[3]

---

[2](...continued)

appeal any such adjudications." *Id.* at §4(a), (f). Certain Underwriters at Lloyds, London and Certain London Market Companies (collectively "LMI") and Plan Proponents entered into a stipulation on July 10, 2007 (Doc. No. 13062, Exh. 1, the "LMI Insurance Stipulation"), in which they agreed that the only issue to be contested in the Plan confirmation between LMI and the Plan Proponents was "whether under the Bankruptcy Code, as a matter of law, the assignment of any Asbestos Insurance Policies subscribed by LMI, is valid and enforceable against LMI notwithstanding (i) anti-assignment/consent to assignment provisions in or incorporated in the Asbestos Insurance Policies subscribed by LMI and (ii) applicable state law." LMI Insurance Stipulation, ¶ 2 at 1.

[3] The Plan Proponents are as follows: Debtors, the Official Committee of Unsecured Creditors, the Official Committee of Asbestos Claimants, the Legal Representatives for Future Asbestos Claims, the Official Committee of Equity Security Holders, and JPMorgan Chase Bank, N.A, as Administrative Agent under the Bank Credit Agreement.

Objecting Insurers,[4] and other interested parties were able to resolve all remaining objections to confirmation except those related to the Assignment and Preemption Issue.[5]

---

[4]    The "Objecting Insurers" are:  Ace Property & Casualty Insurance Company; Century Indemnity Company, as successor to CCI Insurance Company (successor to Insurance Company of North America) and CIGNA Specialty Insurance Company f/k/a California Union Insurance Company; Central National Insurance Company of Omaha (for certain policies issue through Cravens Dargan & Company, Pacific Coast, as Managing General Agent); Pacific Employers Insurance Company; Insurance Company of North America; St. Paul Mercury Insurance Company and United States Fire Insurance Company (collectively, "ACE"); AIG Casualty Company; AIU Insurance Company; American Home Assurance Company; Granite State Insurance Company; Insurance Company of the State of Pennsylvania; Lexington Insurance Company; National Union Fire Insurance Company of Pittsburgh, Pa; New Hampshire Insurance Company (collectively, "AIG Member Companies"); Allianz Global Corporate & Specialty AG (as successor-by-partial-merger to Allianz Versicherungs AG as to Policy No. H 0 001 456); Allianz Global Risks U.S. Insurance Company (f/k/a Allianz Underwriters, Inc.) (Collectively, "Allianz"); Columbia Casualty Company, Continental Casualty Company, The Continental Insurance Company, Both In Its Individual Capacity and As Successor To Certain Interests Of Harbor Insurance Company (collectively, "CNA Entities"); Fireman's Fund Insurance Company and National Surety Company (collectively, "Fireman's Fund"); Globe Indemnity Company ("Globe"); Hartford Accident and Indemnity Company, First State Insurance Company, and New England Insurance Company (collectively, "Hartford"); Certain Underwriters at Lloyds, London and Certain London Market Companies (collectively, "London"); OneBeacon America Insurance Company ("OneBeacon"); Royal Indemnity Company ("Royal"); Seaton Insurance Company ("Seaton"); Stonewall Insurance Company ("Stonewall"); TIG Insurance Company (solely as successor to International Insurance Company) ("TIG"); The Travelers Indemnity Company and certain affiliates and Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety Company (collectively, "Travelers"); Employers Insurance Company of Wausau ("Wausau").

[5]    Order of October 11, 2007, Approving Stipulation By and Among (I) Plan Proponents, (II) Cooper Parties, (III) PCT/Pneumo Parties, (IV) PepsiAmericas, Inc., and (V) Stipulating Pneumo Abex Insurers and Clarifying Effect of Plan B Settlement Agreement and Withdrawal of Objections Thereto, Doc. No. 582593568;  Order of November 8, 2007, Authorizing and Approving Settlement with Stonewall Insurance Company, Doc. No. 13662;  Order of November 8, 2007, Authorizing and Approving Settlement with Seaton Insurance Company, Doc. No. 13663;  Order of November 8, 2007, Authorizing and Approving Settlement with OneBeacon American Insurance Company, Doc. No. 13664;  Order of November 8, 2007, Authorizing and Approving Settlement with TIG Insurance Company, Doc. No. 13665;  Order of November 8, 2007, Authorizing and Approving Settlement with ACE USA Companies, Doc. No. 13666;  Order of November 8, 2007, Granting Motion for An Order Approving Proposed Settlement

(continued...)

3

On October 17, 2007, the Plan Proponents and the certain Objecting Insurers filed a Joint Motion Seeking Determination of Asbestos Insurance Assignment and Preemption Issues Pursuant to the Plan[6] and seeking court approval of the Stipulation to Preserve Appeals on the Asbestos Insurance Assignment and Preemption Issue.[7] This stipulation was entered into by and among the Plan Proponents and certain Objecting Insurers. A separate stipulation was entered into by and among the Plan Proponents and Certain Underwriters at Lloyd's, London and Certain London Market Companies (collectively, "LMI"), ("LMI" Stipulation).[8] The LMI Stipulation was subsequently added to the October 17, 2007, Joint Motion.[9] The certain Objecting Insurers' stipulation and the LMI Stipulation shall be collectively referred to herein as the "Stipulations." A hearing was held on October 25, 2007, and the court entered the Stipulation Orders on November 8, 2007.[10]

---

[5](...continued)

Agreement By, Between and Among Federal-Mogul Corporation, Federal-Mogul Products Inc., Cooper Industries, LLC, Magnetek, Inc., and Travelers, Doc. No. 13667; Order of November 8, 2007, Approving Stipulation By and Among the Debtors, the Official Committee of Asbestos Claimants, the Legal Representative for Future Asbestos Claimants, and the CNA Entities, Doc. No. 13668; Order of November 8, 2007, (I) Approving Compromise and Settlement with Certain Insurers Pursuant to Asbestos Bodily Injury Coverage in Place Agreement and Related Commutation Agreement, (II) Authorizing Sale of Estate Property Free and Clear of Liens and Other Interests, And (III) Partially Allowing Travelers Claim No. 10163 as Class 1E Claim, Doc. No. 13669.

[6] Doc. No. 13499.

[7] Doc. No. 13499, Exhibit A.

[8] Doc. No. 582593612.

[9] Doc. No. 13499.

[10] Doc. Nos. 13670 and 13671.

4

On November 8, 2007, this court entered an order (the "Confirmation Order")[11]

confirming the Fourth Amended Joint Plan of Reorganization For Debtors and Debtors-In-

Possession (As Modified) (the "Plan")[12] of Federal-Mogul Global Inc., T&N LIMITED, et al.,[13]

---

[11]  Doc. No. 13674.

[12]  Doc. No. 13360.  ("This is the Plan as filed on June 5, 2007, at Doc. Nos. 1260, 12621 and 12622 updated to incorporate the Plan Modifications filed on July 31, 2007 (Doc. No. 582593567), September 26, 2007 (Doc. No. 13374), September 27, 2007 (Doc. No. 13391), October 30, 2007 (Doc. No. 13614), and November 5, 2007 (Doc. No. 13649)").

[13]  The U.S. Debtors (collectively, the "U.S. Debtors") are Carter Automotive Company, Inc., Federal-Mogul Corporation, Federal-Mogul Dutch Holdings Inc., Federal-Mogul FX, Inc., Federal-Mogul Global Inc., Federal-Mogul Global Properties, Inc., Federal-Mogul Ignition Company, Federal-Mogul Machine Tool, Inc., Federal-Mogul Mystic, Inc., Federal-Mogul Piston Rings, Inc., Federal-Mogul Powertrain, Inc., Federal-Mogul Products, Inc., Federal-Mogul Puerto Rico, Inc., Federal-Mogul U.K. Holdings, Inc., Federal-Mogul Venture Corporation, Federal-Mogul World Wide, Inc., Felt Products Manufacturing Co., FM International LLC, Ferodo America, Inc., Gasket Holdings Inc., J.W.J. Holdings, Inc., McCord Sealing, Inc., and T&N Industries Inc.

Those Debtors that are incorporated under the laws of England and Wales or Scotland and are subjects of the Plan (collectively, the "U.K. Debtors") are AE Piston Products Limited, Aeroplane & Motor Aluminum Castings Limited, Ashburton Road Services Limited, Brake Linings Limited, Duron Limited, Edmunds, Walker & Co. Limited, Federal-Mogul Aftermarket U.K. Limited, Federal-Mogul Bradford Limited, Federal-Mogul Bridgewater Limited, Federal-Mogul Camshaft Castings Limited, Federal-Mogul Camshafts Limited, Federal-Mogul Engineering Limited, Federal-Mogul Eurofriction Limited, Federal-Mogul Friction Products Limited, Federal-Mogul Global Growth Limited, Federal-Mogul Ignition (U.K.) Limited, Federal-Mogul Powertrain Systems International Limited, Federal-Mogul Sealing Systems (Cardiff) Limited, Federal-Mogul Sealing Systems (Rochdale) Limited, Federal-Mogul Sealing Systems (Slough) Limited, Federal-Mogul Sealing Systems Limited, Federal-Mogul Shoreham Limited, Federal Mogul Sintered Products Limited, Federal-Mogul Systems Protection Group Limited, Federal-Mogul Technology Limited, Ferodo Caernarfon Limited, Ferodo Limited, Fleetside Investments Limited, F-M U.K. Holding Limited, Friction Materials Limited, Greet Limited, Halls Gaskets Limited, Hepworth & Grandage Limited, J.W. Roberts Limited, Lanoth Limited, Newalls Insulation Company Limited, TAF International Limited, T&N Holdings Limited, T&N International Limited, T&N Investments Limited, T&N Limited, T&N Materials Research Limited, T&N Piston Products Group Limited, T&N Properties Limited, T&N Shelf Eighteen Limited, T&N Shelf Nineteen Limited, T&N Shelf One Limited, T&N Shelf Seven Limited, T&N Shelf Three Limited, T&N Shelf Twenty Limited, T&N Shelf Twenty-One Limited, T&N Shelf Twenty-Six Limited, TBA Belting Limited, TBA Industrial Products

(continued...)

5

("Debtors") and also entered Findings of Fact and Conclusions of Law Regarding Confirmation

of the Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-in-Possession (As

Modified) (the "Findings of Fact and Conclusions of Law").[14]  On November 13, 2007, the

United States District Court  for the District of Delaware entered an order (the "Affirmance

Order")[15] affirming the Confirmation Order and adopting the Findings of Fact and Conclusions

of Law.  Consistent with the terms of the Order and Stipulation to Preserve Appeals on the

Asbestos Insurance Assignment and Preemption Issue[16] and the Order and Stipulation Regarding

Remaining London Market Objections to the Plan[17] (collectively, the "Stipulation Orders"), the

Confirmation Order did not constitute or contain a ruling on the objections[18] of the Objecting

---

[13](...continued)
Limited, Telford Technology Supplies Limited, The Washington Chemical Company Limited, Turner & Newall Limited, Turner Brothers Asbestos Company Limited, and Wellworthy Limited.  Certain additional U.K. affiliates of the U.S. Debtors and U.K. Debtors have commenced chapter 11 cases but are not subjects of the Plan.

[14]  Doc. No. 13672.

[15]  Doc. No. 13698.  The Affirmance Order was signed on November 13, 2007, entered on the Bankruptcy Court docket on November 14, 2007, and entered on the District Court docket on November 16, 2007 (Case No. 07-00198 (JHR), D.I. 3).  The plan became effective on December 27, 2007.  *See* Notice of (A) Entry of Order Confirming Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-In-Possession (As Modified); (B) Effective Date of the Plan; (C) Substantial Consumption of the Plan; And (D) Bar Dates for Certain Administrative Claims and Professional Claims, Doc. No. 13940.

[16]  Doc. No. 13671.

[17]  Doc. No. 13670.

[18]  The Objecting Insurers' objections regarding the Assignment and Preemption Issue were articulated in the briefs appended under Tabs 9a and 9b to the Joint Submission of Plan Objectors' Post-Trial Briefs In Opposition To Confirmation Of Fourth Amended Joint Plan Of Reorganization, Doc. No. 13182, and in prior submissions referred to therein.  The Plan Proponents' responses to these objections were set forth in the Post-Trial Brief, Doc. No.

(continued...)

6

Insurers to the confirmation of the Plan on the ground that assignment of the Insurance Rights to

the Trust is not permitted, as a matter of law, under the Bankruptcy Code ("Assignment and

Preemption Issue"). The Stipulation Orders provided that this court would address the

Assignment and Preemption Issue separately from the confirmation of the Plan.[19] The question

before this court, regarding the Assignment and Preemption Issue, is whether under the

Bankruptcy Code, as a matter of law, the assignment of the Asbestos Insurance Policies to a

§524(g) trust is valid and enforceable, notwithstanding any anti-assignment or consent to

assignment provisions incorporated in the Asbestos Insurance Policies and applicable state law.

There is a dispute among the parties as to whether any anti-assignment provision of the policies

is violated under state law at all, given the insurance neutrality provisions[20] in the Plan, which

preserve the insurers' right to argue state law in state courts. However, this court is not

addressing whether the provisions of the policies and applicable state law are violated, only

whether or not, in this case, they are preempted by the Bankruptcy Code.

---

[18](...continued)
582593566, and Reply Brief of Plan Supporters in Support of Confirmation of Fourth Amended
Joint Plan of Reorganization (As Modified), Doc. No. 13249, and in prior submissions referred
to therein. Argument was held as part of the Confirmation Hearing.

[19] The Order and Stipulation Regarding Remaining London Market Objections to the
Plan, Doc. No.13670, at 4, states: ". . . section 7.1 of the Plan sets forth the conditions to
confirmation of the Plan, and there is no condition to confirmation stated in the Plan that the
Bankruptcy Court or the District Court must approve the assignment of Insurance Rights or
determine that the Bankruptcy Code, as a matter of law, preempts state law and contractual
provisions prohibiting assignment absent the consent of the insurers. Hence, Plan confirmation
does not depend on the entry of an Order determining the Preemption Issues (the "Preemption
Order") in favor of the Plan Proponents. Thus, regardless of who prevails on the Preemption
Issues, the Plan may be confirmed. Hence, the Bankruptcy Court's consideration of the
Preemption Issues is a separate determination from the Court's consideration of whether to
confirm the Plan."

[20] *See* Insurance Neutrality Provision, Section 10.4 of Plan, Doc. No. 13660.

For the reasons explained in detail below, the Objecting Insurers' objections regarding the assignment and preemption issue will be overruled.  The assignment of rights in certain insurance policies to the asbestos trust, as provided in part by Section 4.3 of the Plan, is valid and enforceable under §§524(g), 541(c)(1), 1123(a)(5)(B) and 1129(a)(1) of the Bankruptcy Code.  The anti-assignment provisions in the policies and applicable state law are preempted.  Among other authorities, we rely upon the decisions in *Global Industrial Technologies, Inc.*, Case No. 02-21626, Memorandum Order at 2-7, Doc No. 7703 (Bankr. W.D. Pa., Sept. 21, modified Sept. 24, 2007), *In re Kaiser Aluminum Corporation,* 343 B.R. 88 (D.Del. 2006), and *In re Western Asbestos Co.,* 313 B.R. 456 (Bankr.N.D.Cal. 2004), *aff'd* 2004 WL 1944792 (N.D.Cal. April 16, 2004).


## DISCUSSION

Section 541 of the Bankruptcy Code defines property of the estate broadly to include "all legal or equitable interests of the debtor in property as of the commencement of the case," "[p]roceeds . . . from the property of the estate," and "[a]ny interest in property that the estate acquires after commencement of the case."  11 U.S.C. §541(a)(1), (6), and (7) respectively.  The Court of Appeals for the Third Circuit has expressly concluded that an insurance policy is property of the estate within the meaning of §541, even if the policy has not matured, has no cash value, or is otherwise contingent.  *Estate of Lellock v. Prudential Insurance. Co. of Am.*, 811 F.2d 186, 189 (3d Cir. 1987).[21]

---

[21]  The Court of Appeals for the Third Circuit's conclusion is consistent with those reached by the majority of other courts of appeals.  *See e.g., Homsy v. Floyd (In re Vitek, Inc.),*

(continued...)

8

Section 1123(a) provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . (5) provide adequate means for the plan's implementation, such as . . . (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan." 11 U.S.C. §1123(a)(5)(B). Courts that have delved into the reach of §1123 have found that it expressly preempts nonbankruptcy rights that might otherwise interfere with the implementation of a Chapter 11 plan. *See, e.g., In re FCX, Inc.*, 853 F.2d 1149, 1155 (4th Cir. 1988)(to the extent that any nonbankruptcy law or contract prohibits debtor from adequately implementing terms of a plan, "the plan may propose such actions notwithstanding nonbankruptcy law or agreements"), *cert. denied sub nom. Universal Cooperatives, Inc. v. FCX, Inc.*, 489 U.S. 1011 (1989); *In re Stone & Webster, Inc.*, 286 B.R. 532, 543 (Bankr. D. Del. 2002)("[§] 1123(a) can be effected without regard to otherwise applicable nonbankruptcy law . . ."). Section 1123(a)(5) "is an empowering statute" that "enhanc[es] the ability of the trustee or debtor in possession to deal with property of the estate." *In re FCX, Inc.*, 853 F.2d at 1155.

It is established in this circuit that under §1123(a)(5) assignment of policy proceeds to a §524(g) trust is not prohibited by anti-assignment provisions in insurance policies. *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004). The Court of Appeals for the Third

---

[21](...continued)
51 F.3d 530, 535 (5th Cir. 1995)(insurance policies covering debtors' liability vis-a-vis third parties are estate property, as are the proceeds of those policies); *Health Ctr. v. Insurance. Co. of N. Am. (In re St. Clare's Hosp. & Health Ctr.)*, 934 F.2d 15, 18 (2d Cir. 1991)("the debtors' [sic] rights under its insurance policies are property of a debtor's estate under §541(a)); *In re Titan Energy, Inc.*, 837 F.2d 325, 329 (8th Cir. 1988)(products liability policies in a debtor's name are estate property under §541); *Tringali v. Hathaway Mach. Co.*, 796 F.2d 553, 560 (1st Cir. 1986)(products liability policies are estate property).

9

Circuit explained that "[p]ut simply, §541 prohibits restrictions on the interests of the debtor, which includes the insurance policies held by [the debtor]," id. at 219, and, with respect to property of the estate, §1123(a)(5)(B) expressly contemplates that the debtor's interests in the policies may be assigned to a trust or other entity. *Id.* at n.27.

Furthermore, once an event occurs that gives rise to the insurer's liability under the policy, the policy itself can be assigned. *See generally* 3 Couch on Insurance §35.7 (3d ed. 1999). *See also In re Western Asbestos Company,* 313 B.R. 456, 462 (Bankr. N.D. Cal. 2003), *aff'd* 2004 WL 1944792 (N.D.Cal. April 16, 2004) (policies or rights transferable under 11 U.S.C. §1123(a)(5) notwithstanding contrary state law); *Viola v. Fireman's Fund Insurance Co.,* 965 F.Supp. 654, 658 (E.D. Pa. 1997)("[u]nder Pennsylvania law, an insurer may not limit an insured's ability to assign . . . rights under a policy after the occurrence of the event which gives rise to the insurer's liability"). The court in *Viola* also noted as follows:

> [a]fter a loss has occurred, the right of the insured or his successor in interest to the indemnity provided in the policy becomes a fixed and vested right; it is an obligation or debt due from the insurer to the insured, subject only to such claims, demands, or defenses as the insurer would have been entitled to make against the original insured.

965 F.Supp. at 658 (citation omitted). To the same effect see *National Memorial Services v. Metropolitan Life Insurance Co.*, 49 A.2d 382 (Pa. 1946)(anti-assignment clause does not preclude beneficiaries of life insurance policy from assigning proceeds of policy after the event giving rise to liability; it applies only to assignments before liability). For federal cases to the same effect see *OneBeacon America Insurance Co. v. A.P.I., Inc.* 2006 WL 1473004 at *2-*3 (D.Minn. May 25, 2006)(anti-assignment clauses are to protect insurer from increase in the risk it agreed to insure but assignment of loss does not expand risk to insurer, simply allows change

10

in identity to "reconnect the policy's coverage to the insured loss;" most courts follow the

risk/loss distinction to allow insured to assign loss); *R.L. Vallee, Inc. v. American Intern.*

*Specialty Lines Insurance Co.*, 431 F.Supp.2d 428, 435 (D.Vt. 2006)(assignments after loss are

permitted as there is no additional risk to insurer; anti-assignment clauses operate after loss

occurs to limit the free assignability of claims, which is not favored by the law).

 In this case, to the extent that the events giving rise to liability have already occurred,

there will be no additional risk to the insurance companies by virtue of the assignments.

Coverage issues, including, *inter alia*, proof that an event giving rise to liability occurred within

the covered period before a specific policy can be accessed for coverage, are all preserved.[22]

---

[22] *See* Plan Section 10.4 Insurance Neutrality, Doc. No. 13660, at 152-55.
 **"10.4.1.** The provisions of this Section 10.4.1 shall apply to all Entities (including, without limitation, all Asbestos Insurance Companies); provided, however, that with respect to Certain Underwriters at Lloyd's, London and Certain London Market Companies (collectively, "London Market Insurers and any Asbestos Insurance Policies subscribed by London Market Insurers (or any Asbestos Insurance Settlement Agreements applicable to such Asbestos Insurance Policies), the provisions of this Section 10.4.1 shall not be applicable, and the provisions of Section 10.4.2 shall be applicable.
 **10.4.1.1.** Nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan shall limit the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defense.
 **10.4.1.2.** The Plan, the Plan Documents, the Confirmation Order, and the Bankruptcy Insurance Stipulation shall be binding on the Debtors, the Reorganized Debtors, the Trust and the beneficiaries of the Trust. The obligations, if any, of the Trust to pay holders of Asbestos Personal Injury Claims and Demands shall be determined pursuant to the Plan and the Plan Documents. None of (I) the Bankruptcy Court's or District Court's approval of the Plan or the Plan Documents, (II) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (III) any estimation or valuation of Asbestos Personal Injury Claims, either individually or in the aggregate (including, without limitation, any agreement as to the valuation of Asbestos Personal Injury Claims) in the Reorganization Cases shall, with respect to any Asbestos Insurance Company, constitute a trial or hearing on the merits or an adjudication or judgment; or accelerate the obligations, if any, of any Asbestos Insurance Company under its Asbestos Insurance Policies; or be used as evidence in any form to prove:
 (i) that any of the Debtors, the Trust, or any Asbestos Insurance Company is
(continued...)

11

---

[22](...continued)
liable for, or otherwise obligated to pay with respect to, any individual Asbestos Personal
Injury Claim or Demand;

(ii) that the procedures established by the Plan, including the Asbestos Personal
Injury Trust Distribution Procedures, for evaluating and paying Asbestos Personal Injury
Claims and Demands are reasonable;

(iii) that the procedures established by the Plan, including the Asbestos Personal
Injury Trust Distribution Procedures, for evaluating and paying Asbestos Personal Injury
Claims and Demands are consistent with any procedures that were used to evaluate or
settle Asbestos Personal Injury Claims against the Debtors before the Petition Date;

(iv) that the settlement of, or the value assigned to, any individual Asbestos
Personal Injury Claim pursuant to the Asbestos Personal Injury Trust Distribution
Procedures was reasonable and/or otherwise appropriate;

(v) that any of the Asbestos Insurance Companies participated in and/or
consented to the negotiation of the Plan or any of the Plan Documents;

(vI) that any of the Debtors or the Trust has suffered an insured loss with respect
to any Asbestos Personal Injury Claim or Demand; or

(vii) as to (A) the liability of the Debtors or the Trust for Asbestos Personal Injury
Claims or Demands, whether such Claims or Demands are considered individually or on
an aggregate basis; or (B) the value of such Asbestos Personal Injury Claims or
Demands, individually or in the aggregate.

**10.4.1.3.** Nothing in the Plan or the Plan Documents shall affect or limit, or be construed
as affecting or limiting, the protection afforded to any Settling Asbestos Insurance Company by
the Supplemental Injunction, the Third Party Injunction, and/or the Asbestos Insurance Entity
Injunction.

**10.4.1.4.** Nothing in this Section 10.4 is intended or shall be construed to preclude
otherwise applicable principles of res judicata or collateral estoppel from being applied against
any Asbestos Insurance Company with respect to any issue that is actually litigated by such
Asbestos Insurance Company as part of its objections, if any, to Confirmation of the Plan or as
part of any contested matter or adversary proceeding filed by such Asbestos Insurance Company
in conjunction with or related to Confirmation of the Plan. Plan objections that are withdrawn
prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually
litigated.

**10.4.1.5.** Nothing in the Plan, the Plan Documents, the Confirmation Order, or any
finding of fact and/or conclusion of law with respect to the Confirmation or consummation of the
Plan shall limit the right, if any, of (i) any Asbestos Insurance Company, in any Asbestos
Insurance Action, to assert any Asbestos Insurer Coverage Defense, including by presenting
evidence and/or argument with respect to any of the matters specified in clauses (i) through (vii)
of Section 10.4.1.2 of the Plan or (ii) any other party in any such Asbestos Insurance Action to
assert any appropriate position. Except as provided in Section 10.4.1.4 above, none of the

(continued...)

12

The principle enunciated in *National Memorial Services, supra,* that an anti-assignment clause is unenforceable after the loss has occurred, was reiterated in *Egger v. Gulf Insurance Co.,* 903 A.2d 1219 (Pa. 2006). The Pennsylvania Supreme Court in *Egger* noted that *National*

---

[22](...continued)

matters specified in clauses (i) through (vii) of Section 10.4.1.2 of the Plan shall have any res judicata or collateral estoppel effect against any Asbestos Insurance Company.

**10.4.2. Insurance Neutrality Provisions Applicable Solely to London Market Insurers.** This Section 10.4.2 shall apply solely with respect to London Market Insurers and any Asbestos Insurance Policies subscribed by London Market Insurers (or Asbestos Insurance Settlement Agreements relating to such Asbestos Insurance Policies).

**10.4.2.1.** Except as provided in Section 10.4.2.2, notwithstanding anything to the contrary in the Confirmation Order, the Plan or any of the Plan Documents, nothing in the Confirmation Order, the Plan or any of the Plan Documents (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing London Market Insurers' legal, equitable or contractual rights, if any, in any respect. The rights of London Market Insurers shall be determined under the Asbestos Insurance Policies or Asbestos Insurance Settlement Agreements.

**10.4.2.2.** Nothing in the Plan or the Plan Documents shall affect or limit, or be construed as affecting or limiting, the protection afforded to any Settling Asbestos Insurance Company by the Supplemental Injunction, the Third Party Injunction, and/or the Asbestos Insurance Entity Injunction.

**10.4.2.3.** Nothing in this Section 10.4.2 is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against London Market Insurers with respect to any issue that is actually litigated by London Market Insurers as part of their objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by London Market Insurers in conjunction with or related to Confirmation of the Plan. Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated. The Plan Proponents and London Market Insurers have agreed in a stipulation separate from this Plan (the "London Market Insurers Stipulation" that the only issue London Market Insurers will litigate in connection with Confirmation of the Plan is whether, under the Bankruptcy Code as a matter of law, the assignment of any Asbestos Insurance Policies or other rights and obligations with respect to, arising under, or related to Asbestos Insurance Policies subscribed by London Market Insurers, is valid and enforceable against London Market Insurers notwithstanding (i) anti-assignment provisions in or incorporated in the Asbestos Insurance Policies subscribed by London Market Insurers and (ii) applicable state law."

13

*Memorial Services* involved a life insurance policy but applied the rule to the facts before it involving personal injury and an excess insurance policy. The court in *Egger* said:

> The logic behind the general rule is that post-loss assignments do not invalidate the policy, thereby changing the risks the insurer undertook to insure; rather, they assign the right to a money claim. *See* G. Couch, CYCLOPEDIA OF INSURANCE LAW § 35.7 (3d ed. 1995) ("The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.").

> While *Nat'l Mem'l* involved life insurance policies and the matter concerns an excess insurance policy, this distinction does not warrant a different outcome or analysis. The triggering event for coverage in *Nat'l Mem'l* was the death of the insured. Accordingly, we found that there was no "sound reason for the insurance company to forbid or limit an assignment by a beneficiary of the amount due him or her after the death of the insured." *Id.* at 382-83.

> However, with the Gulf excess insurance policy, there was no death of an insured; rather, Foulke purchased coverage to protect itself against an award of damages exceeding the limits of its primary liability policy with respect to its activities at the PECO plant. Foulke provided plant protection and security services pursuant to its contracts with PECO. Gulf insured these activities of Foulke through its issuance of an excess insurance policy, "which provides coverage for any sum the insured is obligated to pay for bodily injury arising out of an 'occurrence.'" Trial Court Opinion at 2. It is an "Occurrence" that triggers the obligation of Foulke. . . .

> Consequently, in parsing the terms of the policy, the triggering event for coverage was bodily injury occasioned by Foulke, which arose out of an Occurrence during the period of the policy. . . .

> In attempting to circumvent the principle that we articulated in *Nat'l Mem'l* that a restriction against a post-loss assignment is void, Gulf asserts that its loss did not arise until the jury reached its verdict and awarded damages in an amount exceeding the underlying $ 1,000,000.00 of primary insurance coverage . . .

14

> This argument lacks merit. First, as Appellee correctly notes, the term "by reason of liability imposed by law" could mean, for example: (1) only after a judgment has been entered; (2) only after all appeals are exhausted and the verdict stands; (3) only after efforts to execute judgment have begun; (4) the occurrence upon which the liability is based (i.e., the death of Egger); or (5) only after the tender of primary coverage. . . . This demonstrates the ambiguity of the clause that Gulf cites as support for its argument that this term means the jury verdict.
>
> We have stated that where ambiguity exists in the interpretation of policy language, the ambiguity must be construed in favor of coverage.

*Egger v. Gulf Insurance. Co.*, 903 A.2d at 1224-26 (citations omitted) (emphasis omitted).

In *In re Western Asbestos Company*, 313 B.R. 832, 858 (Bankr.N.D.Cal. 2003), the bankruptcy court concluded that under 11 U.S.C. §1123(a)(5), policies or rights thereunder may be transferred to an asbestos personal injury trust, whether or not state law would permit assignment.

In a subsequent opinion in the same case, *In re Western Asbestos Co.*, 313 B.R. 456, 459 (Bankr.N.D.Cal. 2004), *aff'd* 2004 WL 1944792 (N.D.Cal. April 16, 2004), the court held that, with respect to causes of action that were transferred to the trust pursuant to the plan of reorganization, the trust was designated as a successor to the debtors and a representative of the chapter 11 estates. The court noted that the trust was authorized as a matter of law to appear in and act for debtors in pending actions and to pursue causes of action for the benefit of holders of asbestos related claims. The court found that under §1123(b)(3)(B), on the effective date of the plan,

> the Trust shall be vested with and have the right to enforce against any Entity any and all of such causes of action, with the proceeds of the recovery of any such actions related to insurance for

15

> Asbestos Related Claims (including, without limitation, the
> Coverage Litigation) to be paid to the respective Debtor . . . .

313 B.R. at 459. The court concluded that the debtors' insurance policies, rights under, and

proceeds of those polices could be vested in the trust under §1123(a)(5)(B), notwithstanding

state law or contractual provisions to the contrary. *Id.* at 462. The court further ruled that the

vesting of insurance rights in the trust "shall neither diminish nor impair the enforceability of

any of the Asbestos Insurance Policies against a party that is not a Released Party." *Id.*

Likewise, it would not expand rights. *Id.* We agree with this analysis and, inasmuch as the plan

provisions at issue here accord the same result, adopt it in this case.

In *In re Kaiser Aluminum Corp.*, 343 B.R. 88 (D.Del. 2006), in affirming this court, the

District Court for the District of Delaware permitted the debtor to assign insurance proceeds to a

personal injury trust pursuant to 11 U.S.C. §541(c)(1) and 11 U.S.C. §1123(a) "which expressly

provides for the preemption of nonbankruptcy law." *Id.* at 95. In *Kaiser* the nonbankruptcy law

addressed was that purporting to limit or restrict a debtor's rights to assign interests in insurance

policies. The District Court relied upon *Combustion Engineering*, 391 F.3d at 218-19, n.27, in

determining that §541(c)(1) and §1123(a) preempt anti-assignment clauses in insurance policies.

*Kaiser, supra*, 343 B.R. at 95 ("Section 541(c)(1) and Section 1123(a)(5)(B) of the Bankrutpcy

Code expressly permits [sic] the assignment of a debtor's interest in insurance policies to a trust

or other entity, even if the subject insurance policies contain a prohibition of assignment.")

*Global Industrial Technologies, Inc.*, Case No. 02-21626, Memorandum Order at 7, Doc No.

7703, ("The anti-assignment clauses in the insurance policies are preempted by the Bankruptcy

Code").

16

Thus, the insurance policies are property of these estates by virtue of §541 and their

transfer to the §524(g) trust is permitted notwithstanding anti-assignment clauses in or

incorporated in the policies or applicable state law by virtue of §1123(a)(5) and §541(c)(1), as

applicable.

Objecting Insurers raised a number of additional issues, which we address below:

### 1. Objecting Insurers contend that there is a "strong presumption against preemption"[23] and that 1123(a)(5) cannot be interpreted to extend beyond "the limited preemption afforded by §§363(l) and 1142(a)."[24]

Objecting Insurers argue that in determining the scope of preemption under §1123(a)(5)

there is a strong "presumption against preemption" as articulated in *Medtronic, Inc. v. Lohr*, 518

U.S. 470, 485 (1996).  However, this premise does not change the primacy of the language of

§1123(a)(5).  The court in *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001),

explained that the presumption against preemption "can be overcome where . . . Congress has

made clear its desire for pre-emption."[25]  In *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18

(1993), the Supreme Court noted that it is well-recognized that the term "notwithstanding" as

found in §1123(a) expresses a clear statement of intent "to supercede all other laws."  Despite the

_____

[23] Joint Submission of Plan Objectors' Post-Trial Briefs In Opposition To Confirmation Of Fourth Amended Joint Plan Of Reorganization, Doc. No. 13182, at Tab 9b-5.

[24] Objections of Certain Underwriters at Lloyd's, London and Certain London Market Companies to Fourth Amended Joint Plan of Reorganization, Doc. No. 12576, at 16.  *See also* Joint Submission of Plan Objectors' Post-Trial Briefs In Opposition To Confirmation Of Fourth Amended Joint Plan Of Reorganization, Doc. No. 13182, at Tab 9b-8.

[25] *See also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996)("As a result, any understanding of the scope of a pre-emption statute must rest primarily on 'a fair understanding of congressional purpose' . . . . Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it").

17

plain meaning of §1123(a)(5), which this court is bound to consider first and foremost, [26] objecting Insurers ask the court to look past the plain meaning of §1123(a)(5) and examine the other provisions of the Bankruptcy Code as a reference for a statutory framework. Specifically, they ask the court to look to §1142 and §363(l) of the Bankruptcy Code to limit the scope of preemption under §1123(a)(5).

The Objecting Insurers rely on *Pacific Gas and Electric Company v. California Dept. of Toxic Substances Control*, 350 F.3d 932 (9th Cir. 2003), to argue that §1123(a)(5) preempts applicable nonbankruptcy law only insofar as such law relates to a debtor's financial condition. *Pacific Gas* imports the words "relating to financial condition" from §1142(a) into §1123(a)(5). The holding in *Pacific Gas* squarely conflicts with the rationale of the Court of Appeals for the Third Circuit and other courts which have considered the issue. *See Combustion Engineering*, 391 F.3d at 219 n. 27 (interpreting §1123(a)(5) without limiting applicable nonbankruptcy law to laws relating to financial condition); *Kaiser Aluminum*, 343 B.R. at 93 (same). This court, of course, is bound by pronouncements of the Court of Appeals for the Third Circuit, not the Ninth, and, therefore, follows *Combustion Engineering*.[27]

----

[26] *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

[27] We note that the language of each of §363(l), §1142(a) and §1123(a)(5) varies. Section 363(l) speaks to "insolvency or financial condition." Section 1142(a) speaks only of "financial condition." Section 1123(a)(5) mentions neither insolvency nor financial condition. Inasmuch as the provisions address different time periods in the life cycle of a bankrutpcy (§363(l) in Chapter 3 Subchapter IV Administrative Powers; §1123(a) in Chapter 11, Subchapter II - The Plan; §1142(a) in Chapter 11, Subchapter III - Post Confirmation Matters), we think it likely that Congress intended this difference in statutory language. Mindful of *Lamie v. United States Trustee*, 540 U.S. 526 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms'")(citations omitted), we will rely upon

(continued...)

Objecting insurers argue that §363(l) is "the governing statute" and directly applicable to the assignment of contractual rights arising under non-executory contracts pursuant to a plan. However, this argument, far from presenting a statutory framework, takes the Bankruptcy Code out of its logical sequence. As explained above, §541 defines what is property of the estate, §1123 delineates what a plan can provide, and §1129 lays out the requirements for plan confirmation. Section 363 is an administrative provision which gives the trustee authority to deal with property of the estate notwithstanding certain *ex post facto* clauses based upon the insolvency or financial condition of the debtor. Not all anti-assignment provisions are based upon a debtor's insolvency or financial condition. Thus, to do as we are asked would re-write the statute and modify the meaning of §1123 in such a way that it becomes superfluous. This, we may not do. *TRW, Inc. V. Andrews*, 534 U.S. 19, 31 (2001)("It is a cardinal principle of statutory construction that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'") (citation omitted). *Accord Duncan v. Walker*, 533 U.S. 167, 174 (2001).

Moreover, Objecting Insurers provide no authority for their contention that §363(l) should be fashioned to limit the use made by this plan of §1123(a)(5). However, a number of

---

[27](...continued)
§1123(a)(5) –a clearly written provision– as written without the need to incorporate words from other sections that Congress chose not to use in this one. We further note that §363(l) parrots §541(c)(1)(B), which nullifies most restrictions on the debtor's interests in property by, *inter alia*, agreement or applicable non-bankruptcy law conditioned upon the insolvency or financial condition of the debtor. Congress, therefore, made use of different words in different statutory sections. A fundamental premise of statutory construction is that when Congress uses particular language in one section of a statute but omits it in another, its actions are purposeful and intentional. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994); *Russello v. U.S.*, 464 U.S. 16, 23 (1983).

19

cases demonstrate the appropriate statutory framework (i.e., under §§524(g), 541, 1123, and 1129) for the assignment of insurance proceeds to a §524(g) trust, pursuant to a plan. *See, e.g., In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004) (finding that assignment of insurance proceeds to §524(g) trust notwithstanding any anti-assignment provisions in subject insurance policies is valid and enforceable pursuant to §541 and §1123(a)(5)). *Accord In re Kaiser Aluminum Corp.*, 343 B.R. 88 (D.Del. 2006); *In re Western Asbestos Company*, 313 B.R. 832, 857-8 (Bankr.N.D.Cal. 2003). This plan is in accord with that precedent.

In arguing for limiting the scope of preemption under §1123(a), the Objecting Insurers suggest that "[u]nder the Proponents' theory of section 1123(a)(5)(B), a bankrupt debtor with no use for a particular insurance policy because it has no liabilities could sell its policy to any third party, including a party with liabilities but no insurance."[28] The argument ignores the context of the contested assignment. Section 524(g) of the Bankruptcy Code creates a new form of entity: a trust to which asbestos liabilities are channeled and which addresses and pays those liabilities. A §524(g) trust is not a state law trust and likewise is not a creation of private agreement. Rather, a §524(g) trust is one whose existence is authorized and whose contours are delineated by the Bankruptcy Code. Such a trust is the successor to the debtor's asbestos liabilities that are channeled to that trust, and those liabilities may include insured asbestos liabilities, inasmuch as

---

[28] Plan Objectors' Post Trial Brief, Doc. No. 13182, Tab 9a, at 5; *see also* Plan Objectors' Post Trial Brief, Doc. No. 13182, Tab 9b, at 10 (arguing that the Plan Supporters' proposed interpretation of §1123(a)(5)(B) could be used "to amend a corporation's charter, contrary to state law, to provide that its purpose is to engage in the sale of illegal narcotics"). This argument ignores the premise that §1123(a)(5)(B) will not be used to permit an entity to engage in a criminal enterprise. *Cf.* §1129(a)(3)(plan shall be confirmed only if, *inter alia*, it has been proposed "in good faith and not by any means forbidden by law."

§524(g) clearly contemplates the transfer of insured liabilities to the trust.[29]  Insurance policies covering asbestos liabilities are assets held by a debtor.  Just as insured asbestos liabilities may be transferred to the trust, so may the corresponding assets, the insurance policies, proceeds, or policy rights, as applicable in any given Plan, that stand to cover those liabilities.[30]  In this context, the logic of the Bankruptcy Code, in §1123(a)(5)(B), which permits transfers of property of the estate (here, insurance policies or rights to proceeds thereunder) from a debtor to the successor vehicle to the debtor (the §524(g) trust), is unassailable.

### 2.  *Objecting Insurers contend that §1123(a)(5) does not preempt private contracts.*

Objecting Insurers also argue that because the language of §1123(a)(5) does not specifically refer to contracts, and other provisions of the Bankruptcy Code do, §1123(a)(5)

---

[29]  Section 524(g)(2)(B) provides in relevant part:  "The requirements of this subparagraph are that--
(i) the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization--
    (I) is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;
    (II) is to be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends; . . .
    (IV) is to use its assets or income to pay claims and demands . . .".
11 U.S.C. §524(g)(2)(B).

[30]  Section 524(g)(2)(B)(i)(IV) requires the debtor to "use its assets or income to pay claims and demands."

21

cannot preempt private contact rights. However, both the express language of §541(c)(1) and

courts construing that text have held that §541(c)(1) prohibits a contractual restriction on the

rights of a debtor to transfer or assign its interests in bankruptcy and §1123(a)(5) permits the

transfer of the property to a §524(g) trust. Thus, §1123(a)(5) provides for the adequate

implementation of the plan. *See In re Combustion Engineering*, 391 F.3d 190, 219 n. 27 (3d Cir.

2004) (insurance contracts); *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 95 (D.Del. 2006)

(insurance policies); *In re FCX, Inc.*, 853 F.2d 1149, 1154-55 (4th Cir. 1988) (bylaws of

cooperative), *cert. denied sub nom. Universal Cooperatives, Inc. v. FCX, Inc.*, 489 U.S. 1011

(1989). The objection, therefore, is not well founded.[31]


### 3. Objecting Insurers contend that the Asbestos Insurance Policies are Executory Contracts and therefore subject to §365.

The Objecting Insurers argue that the Asbestos Insurance Policies are executory, and

therefore fall under the restrictions on assignment contained in §365 of the Bankruptcy Code.

However, "[c]ourts have consistently held that insurance policies where the policy coverage

period has expired prior to the insured's bankruptcy are not executory contracts despite ongoing

obligations of the debtor." *Beloit Liquidating Trust v. United Insurance. Co.*, 287 B.R. 904, 906

(N.D. Ill. 2002). *See also In re CVA General Contractors, Inc.*, 267 B.R. 773, 778 (Bankr. W.D.

Tex. 2001) (holding that the insurance policy was not a proper subject for §365 analysis because

it had expired as of the petition date). The court in *Columbia Cas. Co. v. Federal Press Co.*, 104

---

[31] The court notes that the Supreme Court has ruled in another context that Congress has "reshaped debtor and creditor rights in marked departure from state law." *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 964 (1997).

B.R. 56, 66 (Bankr. N.D. Ind. 1989), explained that even though the terms and conditions of the policies may still be in effect for the periods covered by the policies, the executory period for the contract ends when the last effective date of the policies has passed.  All the policy periods under the Asbestos Insurance Policies in this case have expired.  In the case at bench, the last known policy period of any of the Asbestos Insurance Policies ended in 1991, long before the petition date.

Additionally, all premiums under such policies were paid prior to the petition date.  The Court of Appeals for the Third Circuit has adopted the Countryman definition of executory contracts, which defines an executory contract as "a contract under which the obligation of both the bankrupt and the other party to the contact are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir. 1989) (*quoting* Countryman, *Executory Contracts in Bankruptcy, Part 1*, 57 Minn. L. Rev. 439, 460 (1973);  *In re Exide Technologies*, 340 B.R. 222, 229 (Bankr. D. Del. 2006).  Under the Countryman definition courts have recognized that where one of the parties to the insurance policy has fulfilled the central agreement to such contract, such as the obligation of the insured to pay the premium in exchange for the insurer's defense and payment of indemnity claims against the insured, the contract is no longer executory.  *See In re Surfside Resort and Suites, Inc.*, 344 B.R. 179, 187 (Bankr. M.D. Fla. 2006) (finding that where the premium had been paid in full prepetition, the insurance policy was not executory under the Countryman definition);  *In re CVA General Contractors, Inc.*, 267 B.R. 773, 779 (Bankr. W.D. Tex. 2001) (stating that when the "sole basis" for finding an insurance policy to be an executory contract, the continuing

23

obligation to make premium payments, had been fulfilled, the insurance policy is not executory);

*In re Firearms Import and Export Corp.*, 131 B.R. 1009, 1013 (Bankr. S.D. Fla. 1991) (holding

that the insurance policy was not an executory contract because the debtor had already paid the

premiums in full). The payment of policy premiums prior to the petition date constitutes

substantial compliance with the policy and renders the contracts non-executory in nature.

 The Objecting Insurers argue that, even though the premiums have been paid, the

Debtors' ongoing obligations of cooperation, retrospective premiums, deductibles and notice

make the policies executory. To the contrary, courts have found that such ministerial obligations

do not transform an otherwise non-executory insurance policy into an executory contract. *See In*

*re Grace Indus. Inc.*, 341 B.R. 399, 402-03 (Bankr. E.D.N.Y. 2006) (stating that an insurance

policy was not an executory contract despite the debtor's duties to pay retrospective premiums

and deductibles/self-insurance); *In re Vanderveer Estates Holding, LLC*, 328 B.R. 18, 25-26

(Bankr. E.D.N.Y. 2005) (stating that an insurance policy was not an executory contract despite

the debtor's duty to pay a deductible); *In re Wisconsin Barge Line, Inc.*, 76 B.R. 695, 697

(Bankr. E.D. Mo. 1987) (holding that the contract was not executory despite the debtor's duties

to pay retroactive premiums).

 At the confirmation hearing, Objecting Insurers devoted a significant portion of their

arguments in favor of designating the Asbestos Insurance Policies as executory contracts to

concerns over the obligations of cooperation and notice. These concerns mirrored those in *In re*

*Sudbury, Inc.*, 153 B.R. 776, 779-80 (Bankr. N.D. Ohio 1993), where the court held that the

insurance policy was not an executory contract despite the debtor's duties with respect to

retroactive premiums and the cooperation clause, including notice obligations, providing

24

information demanded by the insurer, cooperating in the defense of claims, consent to settlements and preservation of the insurers' right to subrogation, because such duties were ministerial. Failure of cooperation with respect to a claim establishes only that an insurer may have a defense to payment of that claim and would not affect an insurer's obligation regarding other claims. Further, the court held that denying executory status to the policies in issue would not impact the rights or remedies of the insurer.

This court finds that, because the premiums are paid, the policy coverage periods have expired, and the remaining obligations of the insureds are ministerial, the Asbestos Insurance Policies are non-executory contracts and therefore, do not fall under §365 of the Bankruptcy Code.[32]

**CONCLUSION**

For the reasons discussed, the court will overrule the objections of the Objecting Insurers and the Certain Underwriters at Lloyds, London and London Market Companies regarding assignment and preemption on the ground that the assignment of rights in certain insurance policies to the Asbestos Trust, as provided in part by Section 4.3 of the Plan, is valid and enforceable under §524(g), §541(c)(1), §1123(a)(5)(B) and §1129(a)(1) of the Bankruptcy Code, and that the Bankruptcy Code preempts any anti-assignment contractual provisions and applicable state law.

An appropriate order will be entered.

---

[32] Debtors have acknowledged their remaining ministerial obligations under the policies and have agreed to perform them. If they fail, all coverage defenses are preserved pursuant to the insurance neutrality provisions described, *infra*.

25

DATE:   March  19  , 2008

_Judith K. Fitzgerald_
Judith K. Fitzgerald                    **jmd**
United States Bankruptcy Judge

cc:

James F. Conlan
Kevin T. Lantry
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Laura Davis Jones
James E. O'Neil
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705

OFFICE OF THE UNITED STATES TRUSTEE
844 North King Street
Room 2207, Lockbox 35
Wilmington, Delaware 19801

Charlene D. Davis
Eric M. Sutty
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801

26

Marla R. Eskin
Kathleen Campbell Davis
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, Delaware 19801

Elihu Inselbuch
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, New York 10052-3500

Peter Van N. Lockwood
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W.
Washington, DC 20005
Telephone: (202) 862-5000

Ian Connor Bifferato
BIFFERATO GENTILOTTI
800 N. King Street
Wilmington, Delaware 19801

David Heroy
Bruce E. Lithgow
BAKER & McKENZIE LLP
One Prudential Plaza
130 East Randolph Drive
Chicago, Illinois 60601

Steven M. Fuhrman
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017

Mark D. Collins
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899

27

Edwin J. Harron
James L. Patton, Jr.
Maribeth L. Minella
YOUNG CONAWAY STARGATT & TAYLOR LLP
 The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

Brian L. Kasprzak
MARKS, O'NEILL, O'BRIEN AND
COURTNEY, P.C.
913 North Market Street, Suite 800
Wilmington, Delaware 19801

Mark D. Plevin
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595

Sean J. Bellew
COZEN O'CONNOR
1201 N. Market Street
Suite 1400
Wilmington, DE 19801

Michael S. Davis
Jantra Van Roy
ZEICHNER ELLMAN & KRUSE LLP
575 Lexington Avenue
New York, New York 10022

Ngoc H. Lam
JACKSON & CAMPBELL, P.C.
1120 Twentieth Street, N.W.
South Tower
Washington, DC 20036-3437

James S. Yoder
WHITE AND WILLIAMS LLP
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709

Elit R. Felix, II
MARGOLIS EDELSTEIN
The Curtis Center, 4th Floor
601 Walnut Street
Philadelphia, PA1 9 1 06- 3304

Michael W. Yurkewicz
KLEHR, HARRISON, HARVEY
BRANZBURG AND ELLERS LLP
919 Market St., Suite 1000
Wilmington, DE 19801

Craig Goldblatt
Nancy L. Manzer
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

William J. Bowman
James P. Ruggeri
Edward B. Parks, II
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004

Neal J. Levitsky
Seth A. Niederman
FOX ROTHSCHILD LLP
Citizen's Bank Center
919 North Market Street, Suite 1300
Wilmington, DE 19899

Stuart D. Rosen
G. Eric Brunstad, Jr.
BINGHAM McCUTCHEN LLP
One State Street
Hartford, Connecticut 06103-3178

Rheba Rutkowski
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110

29

Christopher P. Simon
913 North Market Street, 11th Floor
P.O. Box 1380
Wilmington, Delaware 19899-1380

John J. Dillon
Anthony S. Fernandez
HAMILTON ALTMAN CANALE
& DILLON, LLC
4600 East-West Highway, Suite 201
Bethesda, Maryland 20814

John D. Demmy
STEVENS & LEE, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801

Leonard P. Goldberger
1818 Market Street, 29th Floor
Philadelphia, PA 19103

Richard W. Riley
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246

Russell W. Roten
DUANE MORRIS LLP
633 W. 5th Street, Suite 4600
Los Angeles, CA 90071

Eileen T. McCabe
MENDES & MOUNT LLP
750 Seventh Avenue
New York, New York 10019-6829

Michael A. Shiner
TUCKER ARENSBERG, P.C.
1500 One PPG Place
Pittsburgh, PA 15222

30

# Tab H

# Exhibit 1.1.217

# FEDERAL-MOGUL

## FORM OF

## ASBESTOS PERSONAL INJURY TRUST AGREEMENT

# FEDERAL-MOGUL

## ASBESTOS PERSONAL INJURY SETTLEMENT TRUST AGREEMENT

### TABLE OF CONTENTS

SECTION 1 — Agreement of Trust .......................................................... 7

    1.1    Creation and Name .......................................................... 7
    1.2    Purpose .......................................................... 7
    1.3    Transfer of Assets .......................................................... 8
    1.4    Acceptance of Assets and Assumption of Liabilities ...................... 8

SECTION 2 — Powers and Trust Administration ................................. 9

    2.1    Powers .......................................................... 9
    2.2    General Administration ....................................... 14
    2.3    Claims Administration ....................................... 19

SECTION 3 — Accounts, Investments, and Payments .......................... 20

    3.1    Subfunds and Accounts ...................................... 20
    3.2    Investments .......................................................... 20
    3.3    Source of Payments .......................................... 22

SECTION 4 — Trustees; Delaware Trustees .......................................... 23

    4.1    Number .......................................................... 23
    4.2    Term of Service .......................................................... 23
    4.3    Appointment of Successor Trustees ................................ 24
    4.4    Liability of Trustees, Officers and Employees ................... 25
    4.5    Compensation and Expenses of Trustees ......................... 25
    4.6    Indemnification of Trustees and Additional Indemnitees ................ 26
    4.7    Trustees' Lien .......................................................... 28
    4.8    Trustees' Employment of Experts; Delaware Trustee's
           Employment of Counsel .................................... 28
    4.9    Trustees' Independence ...................................... 28
    4.10   Bond .......................................................... 29
    4.11   Delaware Trustee .......................................................... 29

DB01:2170915.12
059066.1001

SECTION 5 — Trust Advisory Committee ................................................................ 31

    5.1     Members .................................................................................. 31
    5.2     Duties ..................................................................................... 31
    5.3     Term of Office ....................................................................... 31
    5.4     Appointment of Successor .................................................... 32
    5.5     TAC's Employment of Professionals ................................... 33
    5.6     Compensation and Expenses of TAC ................................... 34
    5.7     Procedures for Consultation with and Obtaining the
            Consent of the TAC .............................................................. 34

          (a)    Consultation Process ................................................ 34
          (b)    Consent Process ....................................................... 35

SECTION 6 — The Future Claimants Representative ............................................. 36

    6.1     Duties ..................................................................................... 36
    6.2     Term of Office ....................................................................... 37
    6.3     Appointment of Successor .................................................... 37
    6.4     Future Claimants Representative's Employment of Professionals ... 38
    6.5     Compensation and Expenses of the Future Claimants
            Representative ........................................................................ 39
    6.6     Procedures for Consultation with and Obtaining the
            Consent of the Future Claimants Representative ................. 40

          (a)    Consultation Process ................................................ 40
          (b)    Consent Process ....................................................... 40

SECTION 7 — General Provisions ........................................................................ 42

    7.1     Irrevocability ......................................................................... 42
    7.2     Termination ........................................................................... 42
    7.3     Amendments .......................................................................... 43
    7.4     Meetings ................................................................................ 44
    7.5     Severability ........................................................................... 45
    7.6     Notices .................................................................................. 45
    7.7     Successors and Assigns ......................................................... 46
    7.8     Limitation on Claim Interests for Securities Laws Purposes ............ 47
    7.9     Entire Agreement; No Waiver .............................................. 47
    7.10   Headings ................................................................................ 47
    7.11   Governing Law ...................................................................... 47
    7.12   Federal-Mogul's Representations and Cooperation ........................ 48
    7.13   Dispute Resolution ................................................................ 48
    7.14   Enforcement and Administration .......................................... 48
    7.15   Effectiveness ......................................................................... 49
    7.16   Counterpart Signatures ......................................................... 49

059066.1001

**App. 313**

# FEDERAL-MOGUL

## **ASBESTOS TRUST AGREEMENT**

This Federal-Mogul U.S. Asbestos Personal Injury Trust Agreement, as may be amended pursuant to the Pneumo Abex Addendum to the U.S. Asbestos Personal Injury Trust Agreement attached hereto as Exhibit A, (the "U.S. Asbestos Trust Agreement"), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into by Federal-Mogul Corporation ("Federal-Mogul"), the Debtor and debtor-in-possession in jointly-administered cases docketed under Case No. 01-10578 RTL in the United States Bankruptcy Court for the District of Delaware, on behalf of itself and the other Protected Parties; the Future Claimants Representative; the Official Committee of Asbestos Claimants (the "Committee"); the Trustees (the "Trustees"), [Wilmington Trust Company] (the "Delaware Trustee") and the members of the Trust Advisory Committee (the "TAC"), who are further identified on the signature pages hereof and appointed at Confirmation pursuant to the Federal-Mogul Fourth Amended Joint Plan of Reorganization, as such Plan may be amended, modified or supplemented from time to time (the "Plan"). All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or defined in the Plan, but defined in the Bankruptcy Code or Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Rules, and such definitions are incorporated herein by reference.

WHEREAS, at the time of the entry of the order for relief in the Chapter 11 case, Federal-Mogul and the other Protected Parties were named as defendants in actions involving Asbestos Personal Injury Claims; and

WHEREAS, the Plan has been confirmed by the Bankruptcy Court; and

WHEREAS, the CVAs have been approved by an English Court; and

WHEREAS, the Plan provides, *inter alia*, for the creation of the Federal-Mogul U.S. Asbestos Personal Injury Trust (the "U.S. Asbestos Trust"); and

WHEREAS, pursuant to the Plan, Federal-Mogul will make certain contributions to the U.S. Asbestos Trust; and

WHEREAS, pursuant to the Plan, the U.S. Asbestos Trust will use the Trust Assets to pay all Asbestos Personal Injury Claims, caused by exposure to asbestos-containing products for which Federal-Mogul and/or its wholly owned direct or indirect subsidiaries Turner & Newell ("T&N") and its direct or indirect subsidiaries, Gasket Holdings Inc. ("Flexitallic") and Ferodo America Inc. ("Ferodo") (collectively, the "T&N Entities"); Federal-Mogul Products Inc. ("FMP"); Felt Products Mfg. Co. ("Fel-Pro"); and Federal-Mogul's former division Vellumoid ("Vellumoid"); and their successors, and assigns (each a "Federal-Mogul Entity," and collectively, the "Federal-Mogul Entities") have legal responsibility under applicable tort law, as provided in and by the Plan and the U.S. Asbestos Trust Agreement; and

WHEREAS, it is the intent of the Debtors, the Trustees, the TAC, and the Future Claimants' Representative that the U.S. Asbestos Trust be administered, maintained, and operated at all times through mechanisms that provide reasonable assurance that the U.S. Asbestos Trust will satisfy Asbestos Personal Injury Claims pursuant to the Asbestos Personal Injury Trust Distribution Procedures (the "U.S. TDP") that are attached to the Plan in a

059066.1001

substantially similar manner, and in strict compliance with the terms of this U.S. Asbestos Trust

Agreement; and

WHEREAS, pursuant to the Plan, the U.S. Asbestos Trust shall establish four separate

Subfunds (the "Subfunds"), which shall include the T&N Subfund, which shall process, liquidate

and make payments pursuant to the U.S. TDP to holders of Asbestos Personal Injury Claims for

which the T&N Entities have legal liability as provided in the Plan, the FMP Subfund, the Fel-

Pro Subfund and the Vellumoid Subfund, which shall pay claims from proceeds of insurance

available to the corresponding Federal-Mogul Entity; and

WHEREAS, pursuant to the Plan, the U.S. Asbestos Trust is intended to qualify as a

"qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury

Regulations promulgated under Section 468B of the Internal Revenue Code (the "IRC"); and

WHEREAS, the Bankruptcy Court has determined that the U.S. Asbestos Trust and the

Plan satisfy all the prerequisites for the issuance of an injunction pursuant to Section 524(g) of

the Bankruptcy Code, and such injunction has been entered in connection with the Confirmation

Order.

NOW, THEREFORE, it is hereby agreed as follows:

## SECTION 1

## AGREEMENT OF TRUST

1.1    **Creation and Name.** Federal-Mogul hereby creates a trust known as the

"Federal-Mogul Asbestos Personal Injury Trust," which is the Trust provided for and referred to

6

in the Plan. The Trustees of the U.S. Asbestos Trust may transact the business and affairs of the U.S. Asbestos Trust in the name of the U.S. Asbestos Trust. It is the intention of the parties hereto that the trust created hereby constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 *et seq.* (the "Act") and that this document, together with the bylaws described in Section 2.2, constitute the governing instruments of the U.S. Asbestos Trust. The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit A.

    **1.2**    **Purpose.** The purpose of the U.S. Asbestos Trust is to assume the liabilities of the Debtors and the other Protected Parties, for and with respect to all Asbestos Personal Injury Claims, and to use the assets contributed to the U.S. Asbestos Trust pursuant to the Plan and any other assets that may be contributed to or acquired by the U.S. Asbestos Trust from time to time and the proceeds and income from such assets to pay the holders of all Asbestos Personal Injury Claims in accordance with this U.S. Asbestos Trust Agreement and the U.S. TDP in such a way that such holders of Asbestos Personal Injury Claims are treated fairly, equitably and reasonably in light of the limited assets available to satisfy such claims, and to otherwise comply in all respects with the requirements of a trust set forth in Section 524(g)(2)(B) of the Bankruptcy Code.

    **1.3**    **Transfer of Assets**. Pursuant to the Plan, the Trust Assets will be transferred and assigned to the U.S. Asbestos Trust to settle and discharge all Asbestos Personal Injury Claims and to permit the U.S. Asbestos Trust to satisfy the obligations of the Trust under Section 8.22 of the Plan. Pursuant to the Plan, Federal-Mogul and the other Protected Parties, from and after the

7

Effective Date, and others may also transfer and assign additional assets to the U.S. Asbestos

Trust from time to time to be added to the Trust Assets described above. Except as otherwise

provided in the Plan or the Plan Documents, any and all assets transferred to the U.S. Asbestos

Trust shall be free and clear of any liens or other claims by any Protected Party, any creditor, or

other entity. Federal-Mogul, Reorganized Federal-Mogul, and any other transferors shall also

execute and deliver such documents to the U.S. Asbestos Trust as the Trustees reasonably

request to transfer and assign the Trust Assets to the U.S. Asbestos Trust.

### 1.4    Acceptance of Assets and Assumption of Liabilities

(a)    In furtherance of the purposes of the U.S. Asbestos Trust, the Trustees, on

behalf of the U.S. Asbestos Trust, hereby expressly accept the transfer and assignment to the

U.S. Asbestos Trust of the Trust Assets in the time and manner contemplated in the Plan.

(b)    In furtherance of the purposes of the U.S. Asbestos Trust, the Trustees, on

behalf of the U.S. Asbestos Trust, expressly assume all liability for all Asbestos Personal Injury

Claims. Subject to and as otherwise provided in the Plan and exhibits thereto, the U.S. Asbestos

Trust also shall have all defenses available to any Protected Party and all Trust Causes of Action.

Regardless of the foregoing, however, a claimant must meet otherwise applicable federal, state

and foreign statutes of limitations and repose, except as otherwise provided in Section 5.1(a)(2)

of the U.S. TDP.

(c)    No provision herein or in the U.S. TDP shall be construed to mandate

distributions on any claims or other actions that would contravene the Trust's compliance with

the requirements of a qualified settlement fund within the meaning of section 1.468B-1 *et seq.* of

the Treasury Regulations promulgated under section 468B of the IRC.

8

(d)    The U.S. Asbestos Trust shall indemnify the Protected Parties to the extent set forth in the Plan.

(e)    Nothing in this U.S. Asbestos Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Section 524(g) injunction issued in connection with the Plan or the U.S. Asbestos Trust's assumption of all liability for Asbestos Personal Injury Claims.

**1.5**    **Certain Obligations to the Pneumo Parties.**    The U.S. Asbestos Trust expressly acknowledges (a) its obligations under the Plan with respect to the Plan B Settlement Amount in the event that the Plan B Date occurs after the Effective Date but prior to the Date of Finality and (b) its obligations under the Unwind Agreement dated as of the date hereof among the U.S. Asbestos Trust and the Pneumo Parties to preserve and return, as provided therein, the assets funded by the Pneumo Parties upon the occurrence of the Plan A Date in the event that the Plan B Date occurs after the Plan A Date but prior to the Date of Finality. The U.S. Asbestos Trust further agrees to cause the funds held pursuant to the Cooper/Pneumo Escrow Agreement to be released from the Cooper/Pneumo Escrow Account and paid over to Cooper LLC and PCT, as applicable, in satisfaction of the obligation to pay the Plan B Settlement Amount pursuant to the Plan and the Plan B Settlement Agreement if the Plan B Date occurs prior to the Date of Finality.

**SECTION 2**

9

## POWERS AND TRUST ADMINISTRATION

### 2.1    Powers.

(a)    The Trustees are and shall act as the fiduciaries to the U.S. Asbestos Trust in accordance with the provisions of this U.S. Asbestos Trust Agreement and the Plan and shall have the power, on behalf of the Trust, to exercise all rights and fulfill all obligations of the Trust under the Plan and the Plan Documents.  The Trustees shall, at all times, administer the U.S. Asbestos Trust and the Trust Assets in accordance with the purposes set forth in Section 1.2 above.  Subject to the limitations set forth in this U.S. Asbestos Trust Agreement, the Trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or proper to fulfill the purposes of the U.S. Asbestos Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or otherwise specified herein, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    In addition to the powers set forth in Section 7.3 below, and without limiting the generality of Section 2.1(a) above, and except as limited below, the Trustees shall have the power to:

(i)    receive and hold the Trust Assets, vote the Reorganized Federal-Mogul common stock, and exercise all rights with respect to, and sell, any securities issued by

10

Reorganized Federal-Mogul that are included in the Trust Assets, subject to any restrictions set forth in the Restated Certificate of Reorganized Federal-Mogul;

        (ii)     allocate all Trust Assets, including insurance proceeds, received as of the Effective Date and thereafter, to the various Trust Subfunds that are liable for the Asbestos Personal Injury Claims payable from those assets in accordance with the Plan and U.S. TDP;

        (iii)    invest the monies held from time to time by the U.S. Asbestos Trust;

        (iv)    sell, transfer, or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustees may consider proper, consistent with the other terms of this U.S. Asbestos Trust Agreement;

        (v)     enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the U.S. Asbestos Trust to operate;

        (vi)    subject to provisions of the Plan, pay liabilities and expenses of the U.S. Asbestos Trust, including, but not limited to, Trust Expenses;

        (vii)   establish the T&N Subfund, the FMP Subfund, the Fel-Pro Subfund and the Vellumoid Subfund and such other funds, reserves and accounts with the Trust Assets, as deemed by the Trustees to be useful in carrying out the purposes of the U.S. Asbestos Trust;

        (viii)  sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

11

(ix)    establish, supervise and administer the U.S. Asbestos Trust in accordance with the U.S. TDP and the terms thereof;

(x)    appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing and forecasting, and other consultants and agents as the business of the U.S. Asbestos Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of the U.S. Asbestos Trust;

(xi)    pay employees, legal, financial, accounting, investment, auditing, and forecasting, and other consultants, advisors, and agents, including those engaged by the U.S. Asbestos Trust in connection with its alternative dispute resolution activities, reasonable compensation;

(xii)    compensate the Trustees, the TAC members, and the Future Claimants Representative as provided below, and their employees, legal, financial, accounting, investment and other advisors, consultants, independent contractors, and agents, and reimburse the Trustees, the TAC members and the Future Claimants Representative all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xiii)    execute and deliver such instruments as the Trustees consider proper in administering the U.S. Asbestos Trust;

12

(xiv)    enter into such other arrangements with third parties as are deemed by the Trustees to be useful in carrying out the purposes of the U.S. Asbestos Trust, provided such arrangements do not conflict with any other provision of this U.S. Asbestos Trust Agreement;

(xv)    in accordance with Section 4.6 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) (A) the Trustees and (B) the TAC, the Future Claimants Representative, the officers and employees of the U.S. Asbestos Trust, and any agents, advisors and consultants of the U.S. Asbestos Trust, the TAC or the Future Claimants Representative (the "Additional Indemnitees"), to the fullest extent that a corporation or trust organized under the law of the U.S. Asbestos Trust's situs is from time to time entitled to indemnify and/or insure its directors, trustees, officers, employees, agents, advisors and representatives;

(xvi)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 below;

(xvii)    consult with Reorganized Federal-Mogul, the TAC and the Future Claimants Representative at such times and with respect to such issues relating to the conduct of the U.S. Asbestos Trust as the Trustees consider desirable; and

(xviii)    make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the U.S. Asbestos Trust or in the name of the appropriate Reorganized

13

Debtor any claim, right, action, or cause of action included in the Trust Assets including, but not limited to, insurance recoveries, before any court of competent jurisdiction; provided that settlement of actions before the Bankruptcy Court require the approval of the Bankruptcy Court after notice to Reorganized Federal-Mogul as the case may be.

        (d)      The Trustees shall not have the power to cause the U.S. Asbestos Trust to guarantee any debt of other persons.

        (e)      The Trustees shall give the TAC and the Future Claimants Representative prompt notice of any act performed or taken pursuant to Sections 2.1(c)(i), (iv), or (xvi) above, and any act proposed to be performed or taken pursuant to Section 2.2(f) and 7.3 below.

        (f)      The Trustees shall have the power to seek or sue for insurance coverage proceeds in connection with and to the extent of the rights transferred to the U.S. Asbestos Trust pursuant to the Plan.

        (g)      Subject to any restrictions set forth in the Plan, the Trustees, in consultation with the TAC and Future Claimants Representative, shall have the power to allocate the administrative expenses of the U.S. Asbestos Trust among the various Subfunds on a reasonable basis that takes into account the relative assets and liabilities of each such Subfund. The Trustees may also, subject to the provisions of the Plan, advance funds from one Subfund to another Subfund to pay the latter Subfund's administrative expenses, including the costs of insurance litigation; provided, however, that the Subfund that received the advance shall reimburse the Subfund that made the advance as soon as the monies are available for such reimbursement.

14

                                        059066.1001

## 2.2     General Administration.

(a)     The Trustees shall adopt and act in accordance with the U.S. Asbestos Trust Bylaws. To the extent not inconsistent with the terms of this U.S. Asbestos Trust Agreement, the U.S. Asbestos Trust Bylaws shall govern the affairs of the U.S. Asbestos Trust. In the event of an inconsistency between the U.S. Asbestos Trust Bylaws and this U.S. Asbestos Trust Agreement, the U.S. Asbestos Trust Agreement shall govern.

(b)     The Trustees shall (i) timely file such income tax and other returns and statements and shall timely pay all taxes required to be paid, (ii) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (iii) meet without limitation all requirements necessary to qualify and maintain qualification of the U.S. Asbestos Trust as a qualified settlement fund within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the IRC, and (iv) take no action that could cause the U.S. Asbestos Trust to fail to qualify as a qualified settlement fund within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the IRC.

(c)     The Trustees shall timely account to the Bankruptcy Court as follows:

(i)     The Trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report containing *inter alia* financial statements of the U.S. Asbestos Trust (including, without limitation, a balance sheet of the U.S. Asbestos Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustees and

15

accompanied by an opinion of such firm as to the fairness of the financial statements'

presentation of the cash and investments available for the payment of claims and as to the

conformity of the financial statements with generally accepted accounting principles. The

Trustees shall provide a copy of such report to the TAC, the Future Claimants Representative,

and Reorganized Federal-Mogul when such reports are filed with the Bankruptcy Court.

      (ii)     Simultaneously with delivery of each set of financial statements

referred to in Article 2.2(c)(i) above, the Trustees shall cause to be prepared and filed with the

Bankruptcy Court a report containing a summary regarding the number and type of claims

disposed of during the period covered by the financial statements. The Trustees shall provide a

copy of such report to the TAC, the Future Claimants Representatives, and Reorganized Federal-

Mogul when such report is filed.

      (iii)    All materials required to be filed with the Bankruptcy Court by this

Section 2.2(c) shall be available for inspection by the public in accordance with procedures

established by the Bankruptcy Court and shall be filed with the Office of the United States

Trustee for the District of Delaware.

      (d)    The Trustees shall cause to be prepared as soon as practicable prior to the

commencement of each fiscal year a budget and cash flow projections covering such fiscal year

and the succeeding four fiscal years. The budget and cash flow projections shall include

determining the Maximum Annual Payment pursuant to Section 2.4 of the U.S. TDP, and the

Claims Payment Ratio pursuant to Section 2.5 of the U.S. TDP. The Trustees shall provide a

copy of the budget and cash flow projections to the TAC and the Future Claimants

Representative.

DB01:2170915.12      059066.1001

(e)    The Trustees shall consult with the TAC and the Future Claimants Representative (i) on the general implementation and administration of the U.S. Asbestos Trust; (ii) on the general implementation and administration of the U.S. TDP; and (iii) on such other matters as may be required under this U.S. Asbestos Trust Agreement and the U.S. TDP.

(f)    The Trustees shall be required to obtain the consent of the TAC and the Future Claimants Representative pursuant to the Consent Process set forth in Section 5.7(b) and 6.6(b) below, in addition to any other instances elsewhere enumerated, including as set forth in Section 7.3 below, in order:

(i)    to change the Claims Payment Ratio described in Section 2.5 of the U.S. TDP in the event that the requirements for such a change as set forth in said provision have been met;

(ii)    to change the Disease Levels, Medical/Exposure Criteria set forth in Section 5.3(a)(1)(C) of the U.S. TDP, and/or the Scheduled, Average and/or Maximum Values set forth in Sections 5.3(a)(3) of the U.S. TDP;

(iii)    to change the Payment Percentage described in Section 4.2 of the U.S. TDP;

(iv)    to establish and/or to change the Proof of Claim Forms and other claims materials to be provided holders of Asbestos Personal Injury Claims under Section 6.1 of the U.S. TDP;

(v)    to require that claimants provide additional kinds of medical or exposure evidence pursuant to Section 5.7 of the U.S. TDP;

17

(vi)    to change the form of release to be provided pursuant to Section 7.8 of the U.S. TDP, provided that the release must be consistent with the requirements of the Plan;

(vii)    to establish a separate valuation matrix for any Foreign Claims at such time as the U.S. Asbestos Trust has sufficient historical settlement, verdict and other valuation data for claims from a particular foreign jurisdiction pursuant to Section 5.3(a)(2)(B) of the U.S. TDP;

(viii)    to develop methods for auditing the reliability of medical evidence, including additional reading of X-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to asbestos-containing products manufactured or distributed by pursuant to Section 5.8 of the U.S. TDP;

(ix)    to terminate the U.S. Asbestos Trust pursuant to Section 7.2 below;

(x)    to settle the liability of any insurer under any insurance policy or legal action related thereto;

(xi)    to change the compensation of the members of the TAC, the Future Claimants Representative or Trustees, other than to reflect cost-of-living increases or changes approved by the Bankruptcy Court as otherwise provided herein;

(xii)    to take structural or other actions to minimize any tax on the Trust Assets;

18

(xiii)   to amend the U.S. Asbestos Trust Bylaws in accordance with the terms thereof;

(xiv)   to amend any provision of the U.S. Asbestos Trust Agreement or the U.S. TDP in accordance with the terms thereof;

(xv)   subject to such restrictions as may exist in the Plan Documents, to vote the shares of Reorganized Federal-Mogul Common Stock held by the U.S. Asbestos Trust for purposes of electing members of the Board of Directors of Reorganized Federal-Mogul and such other matters as may be submitted to shareholders; and

(xvi)   to merge any asbestos claims resolution organization formed by the U.S. Asbestos Trust with another asbestos claims resolution organization, or to contract with another asbestos claims resolution organization or other entity, or permit any other party to join in any asbestos claims resolution organization that is formed by the U.S. Asbestos Trust; provided that such merger, contract or joinder shall not (a) subject Reorganized Federal-Mogul or the other Protected Parties or any successors in interest thereto, to any risk of having any U.S. Asbestos Trust Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of the Section 524(g) injunction; and provided further that the terms of such merger or contract will require the surviving organization or other asbestos claims resolution organization to make decisions about the allowability and value of claims in accordance with Section 2.1 of the U.S. TDP which requires that such decisions be based on the provisions of the U.S. TDP.

DB01:2170915.12

059066.1001

(g)     The Trustees shall meet with the TAC and the Future Claimants Representative no less often than quarterly.  The Trustees shall meet in the interim with the TAC and the Future Claimants Representative when so requested by either.

(h)     The Trustees, upon notice from either the TAC or the Future Claimants Representative, if practicable in view of pending business, shall at their next meeting with the TAC or the Future Claimants Representative consider issues submitted by the TAC or the Future Claimants Representative.

(i)     Periodically, but not less often than once a year, the Trustees shall make available to claimants and other interested parties the number of claims by disease levels that have been resolved both by individual review and by arbitration, as well as by trial, indicating the amounts of the awards and the averages of the awards by jurisdiction pursuant to Section 7.10 of the U.S. TDP.

**2.3     Claims Administration.**

The Trustees shall promptly proceed to implement the U.S. TDP.

## SECTION 3

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**3.1     Subfunds and Accounts.**  The Trustees shall create the T&N Subfund, the FMP Subfund, the Fel-Pro Subfund and the Vellumoid Subfund as provided above, and may, from time to time, create such other funds, accounts and reserves within the U.S. Asbestos Trust estate as they may deem necessary, prudent, or useful in order to provide for the payment of expenses

20

and payment of Asbestos Personal Injury Claims, and may, with respect to any such fund, account or reserve, restrict the use of monies therein. The assets of each such Subfund shall be held by the Trustees as a separate, segregated account, shall not be co-mingled with the assets of any other Subfund, and, except as provided herein and in the Plan, shall not be used for any purpose other than paying claims asserted against such Subfund, as well as expenses incurred by the U.S. Asbestos Trust in the administration of the Subfund.

**3.2    Investments.** Investment of monies held in the U.S. Asbestos Trust shall be administered in the manner in which individuals of ordinary prudence, discretion, and judgment would act in the management of their own affairs, subject to the following limitations and provisions:

(a)    The U.S. Asbestos Trust shall not acquire, directly or indirectly, equity in any entity (other than Reorganized Federal-Mogul or any successor to Reorganized Federal-Mogul) or business enterprise if, immediately following such acquisition, the U.S. Asbestos Trust would hold more than 5% of the equity in such entity or business enterprise. The U.S. Asbestos Trust shall not hold, directly or indirectly, more than 10% of the equity in any entity (other than Reorganized Federal-Mogul or any successor to Reorganized Federal-Mogul) or business enterprise.

(b)    Except as expressly contemplated by or provided for in the Plan, the U.S. Asbestos Trust shall not acquire or hold any long-term debt securities unless (i) such securities are included in the Trust Assets under the Plan, (ii) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's ("S&P's"), or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency, or (iii) have

21

been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(c)     The U.S. Asbestos Trust shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "Prime-1" or higher by Moody's or "A-1" or higher by S&P's or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)     Excluding any securities of the Debtor or Reorganized Federal-Mogul, the U.S. Asbestos Trust shall not acquire or hold any common or preferred stock or convertible securities unless such stock or securities are rated "A" or higher by Moody's or "A" or higher by S&P's or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency.

(e)     Except as expressly contemplated by or provided for in the Plan, the U.S. Asbestos Trust shall not acquire any debt securities or other instruments issued by any entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) if, following such acquisition, the aggregate market value of all debt securities and instruments issued by such entity held by the U.S. Asbestos Trust would exceed 2% of the aggregate value of the Trust Assets. Except as expressly contemplated by or provided for in the Plan, the U.S. Asbestos Trust shall not hold any debt securities or other instruments issued by any entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof and other than debt securities or other instruments of Reorganized Federal-Mogul or any successor to Reorganized Federal-

22

Mogul) to the extent that the aggregate market value of all securities and instruments issued by such entity held by the U.S. Asbestos Trust would exceed 5% of the aggregate value of the Trust Assets.

(f)     The U.S. Asbestos Trust shall not acquire or hold any certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 3.2(b) above.

(g)     The U.S. Asbestos Trust may acquire and hold any securities or instruments issued by Reorganized Federal-Mogul or any successor to Reorganized Federal-Mogul, or obtained as proceeds of litigation or otherwise to resolve disputes, without regard to the limitations set forth in Subsections (a)-(f) above.

(h)     The U.S. Asbestos Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustees, they are adequately collateralized.

(i)     The U.S. Asbestos Trust shall not acquire or hold any options.

**3.3     Source of Payments.**  All U.S. Asbestos Trust expenses and all liabilities with respect to Asbestos Personal Injury Claims shall be payable solely by the Trustees out of the Trust Assets.  None of the Debtors, Reorganized Debtors, or other Protected Parties, nor the Trustees, the TAC or Future Claimants Representative, or any of their officers, agents, advisors, or employees shall be liable for the payment of any U.S. Asbestos Trust expense or any other liability of the U.S. Asbestos Trust.

**SECTION 4**

23

## TRUSTEES; DELAWARE TRUSTEES

**4.1**    **Number.**  In addition to the Delaware Trustee appointed pursuant to Section 4.11 below, there shall be three (3) Trustees.  The initial Trustees shall be those persons named on the signature page hereof.  At their first meeting, the initial Trustees shall designate one of their number to serve as the Managing Trustee of the U.S. Asbestos Trust, with such administrative duties as the Trustees may determine.  The Trustees may change the designation of the individual to serve as Managing Trustee from time to time as circumstances warrant.

**4.2**    **Term of Service.**

(a)    The initial Trustees named pursuant to Article 4.1 above shall serve the staggered terms of three (3), four (4) and five (5) years as shown on the signature page hereof. Thereafter each term of service shall be five (5) years.  The initial Trustees shall serve from the Effective Date until the earlier of (i) the end of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section 4.2(b) below, (iv) his or her removal pursuant to Section 4.2(c) below, or (v) the termination of the U.S. Asbestos Trust pursuant to Section 7.2 below.

(b)    A Trustee may resign at any time by written notice to the remaining Trustees, the TAC and the Future Claimants Representative.  Such notice shall specify a date when such resignation shall take place, which shall not be less than 90 days after the date such notice is given, where practicable.

(c)    A Trustee may be removed by unanimous vote of the remaining Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident or physical or mental deterioration, or for other good cause.  Good cause shall be

24

App. 334

deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustees hereunder, or repeated non-attendance at scheduled meetings. Such removal shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

### 4.3    Appointment of Successor Trustees.

(a)    In the event of a vacancy in the position of a Trustee, whether by death, term expiration, resignation or removal, the remaining Trustees shall consult with the TAC and the Future Claimants Representative concerning appointment of a successor Trustee (a "Successor Trustee"). The vacancy shall be filled by the unanimous vote of the remaining Trustees unless a majority of the TAC or the Future Claimants Representative vetoes the appointment. In the event that the remaining Trustees cannot agree on a Successor Trustee, or a majority of the TAC or the Future Claimants Representative vetoes the appointment of the proposed successor Trustee, the Bankruptcy Court shall make the appointment. Nothing shall prevent the reappointment of a Trustee for an additional term or terms.

(b)    Immediately upon the appointment of any Successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the Successor Trustee without any further act. No Successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustees.

(c)    Each Successor Trustee shall serve until the earlier of (i) the end of a full term of five (5) years if the predecessor Trustee completed his or her term, (ii) the end of the remainder of the term of the Trustee whom he or she is replacing if said predecessor Trustee did

25

not complete said term, (iii) his or her death, (iv) his or her resignation pursuant to Section 4.2(b) above, (v) his or her removal pursuant to Section 4.2(c) above, or (vi) the termination of the U.S. Asbestos Trust pursuant to Section 7.2 below.

**4.4**    **Liability of Trustees, Officers and Employees.**  The Trustees and the individuals identified as Additional Indemnitees in Section 2.1(c)(xv) above shall not be liable to the U.S. Asbestos Trust, to any individual holding an asbestos claim, or to any other person, except for such individual's own breach of trust committed in bad faith or willful misappropriation.  In addition, the Trustees and the Additional Indemnitees shall not be liable for any act or omission of any other Trustee or Additional Indemnitee unless such person acted with bad faith in the selection or retention of such other Trustee or Additional Indemnitee.

**4.5**    **Compensation and Expenses of Trustees.**

(a)    The Trustees shall receive compensation from the U.S. Asbestos Trust for their services as Trustees in the amount of $75,000 per annum for the Managing Trustee and $60,000 per annum for the other Trustees, plus a per diem allowance for meetings or other U.S. Asbestos Trust business performed in the amount of $1,500.  For purposes of the per diem allowance, U.S. Asbestos Trust business includes, but is not limited to, attendance at meetings of Reorganized Federal-Mogul's Board of Directors.  For purposes of Section 7.4 below, the Trustees shall determine the scope and duration of activities that constitute a meeting and, if the Trustees elect to provide for payment for activities of less than a full day's duration, may provide for partial payment of per diem amounts on a proportional basis for activities of less than a full day's duration.  The per annum and per diem compensation payable to the Trustees hereunder shall be reviewed every three (3) years and appropriately adjusted for changes in the cost of

26

living. Any other changes in compensation of the Trustees shall be made subject to the approval of the Bankruptcy Court. The Delaware Trustee shall be paid from the U.S. Asbestos Trust an initial fee of [$      ] upon entry into this U.S. Asbestos Trust Agreement and an annual fee of [$      ], the first payment for which shall be due on [        ].

(b)    The U.S. Asbestos Trust will promptly reimburse the Trustees and the Delaware Trustees for all reasonable out-of-pocket costs and expenses incurred by the Trustees or the Delaware Trustee in connection with the performance of their duties hereunder.

(c)    The U.S. Asbestos Trust shall include a description of the amounts paid under this Section 4.5 in the accounts to be filed with the Bankruptcy Court and provided to the TAC, the Future Claimants Representative, and Reorganized Federal-Mogul pursuant to Section 2.2(c)(i).

**4.6    Indemnification of Trustees and Additional Indemnitees.**

(a)    The U.S. Asbestos Trust shall indemnify and defend each Trustee, the Delaware Trustee and each Additional Indemnitee in the performance of its, his or her duties hereunder to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend such Person (as defined in the Act) against any and all liabilities, expenses, claims, damages or losses incurred by or on behalf of it, him or her in the performance of its, his or her duties. Notwithstanding the foregoing, no Trustee, Delaware Trustee or Additional Indemnitee shall be indemnified or defended in any way for any liability, expense, claim, damage or loss for which it, he or she is ultimately liable under Section 4.4 above.

27

059066.1001

(b)    Any fees and expenses reasonably incurred by or on behalf of a Trustee, the Delaware Trustee or an Additional Indemnitee in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which it, he or she is indemnified by the U.S. Asbestos Trust pursuant to Section 4.6(a) above, including without limitation out-of-pocket fees and expenses and attorneys' fees and expenses, shall be paid by the U.S. Asbestos Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee, Delaware Trustee or Additional Indemnitee, as the case may be, to repay such amount in the event that it shall be determined by a Final Order that such Trustee, Delaware Trustee or Additional Indemnitee is not entitled to be indemnified by the U.S. Asbestos Trust.

(c)    The Trustees may purchase and maintain reasonable amounts and types of insurance on behalf of an individual who is or was a Trustee, and, if requested, shall purchase insurance on behalf of the TAC, the Future Asbestos Claimants Representative, and such officers or employees of the TAC, and Future Asbestos Claimants Representative who are typically insured under standard policy forms (the "Insured Individuals"), including for liability asserted against or incurred by such individual in that capacity or arising from his or her status with regard to the U.S. Asbestos Trust. If so requested, the Trustees shall keep the Insured Individuals continuously insured, to the fullest extent available for errors and omissions, in such total amounts and with such terms as the Trustees, TAC and Future Asbestos Claimants Representative may reasonably agree upon from time to time.

4.7    **Trustees' Lien.**  The Trustees, the Delaware Trustee and the Additional Indemnities shall have a first priority lien upon the Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 above.

28

**4.8**     **Trustees' Employment of Experts; Delaware Trustee's Employment of Counsel.**

(a)     The Trustees may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors and forecasters, and other parties deemed by the Trustees to be qualified as experts on the matters submitted to them, and the written opinion of or information provided by any such parties on any matters submitted to them by the Trustees shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustees hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

(b)     The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

**4.9**     **Trustees' Independence.**  The Trustees shall not, during the term of their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Reorganized Federal-Mogul.  Notwithstanding the foregoing, any Trustee may serve, without any additional compensation other than the per diem compensation to be paid by the  U.S. Asbestos Trust pursuant to Section 4.5(a) above, as a director of Reorganized Federal-Mogul. No Trustee shall act as an attorney for any person who holds an asbestos claim.  For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.10**     **Bond.**  The Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

29

**4.11    Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity.  If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.11(c) below.  For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustees set forth herein. The Delaware Trustee shall be one of the trustees of the U.S. Asbestos Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the U.S. Asbestos Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.

(c)    The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is

30

**App. 340**

appointed by the Trustees in accordance with the terms of Section 4.11(d) below. The Delaware

Trustee may resign at any time upon the giving of at least 60 days' advance written notice to the

Trustees; provided, that such resignation shall not become effective unless and until a successor

Delaware Trustee shall have been appointed by the Trustees in accordance with Section 4.11(d)

below. If the Trustees do not act within such 60-day period, the Delaware Trustee may apply to

the Court of Chancery of the State of Delaware for the appointment of a successor Delaware

Trustee.

        (d)      Upon the resignation or removal of the Delaware Trustee, the Trustees

shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing

Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section

3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a

successor Delaware Trustee shall not become effective until a written acceptance of appointment

is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the

Trustees and any fees and expenses due to the outgoing Delaware Trustee are paid. Following

compliance with the preceding sentence, the successor Delaware Trustee shall become fully

vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee

under this U.S. Asbestos Trust Agreement, with like effect as if originally named as Delaware

Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations

under this  U.S. Asbestos Trust Agreement.

DB01:2170915.12                                                  059066.1001

## SECTION 5

## TRUST ADVISORY COMMITTEE

**5.1**    **Members.**  The TAC shall consist of four (4) members, who shall initially be the persons named on the signature page hereof.

**5.2**    **Duties.**  The members of the TAC shall serve in a fiduciary capacity representing all holders of present Asbestos Personal Injury Claims.  The Trustees must consult with the TAC on matters identified in Section 2.2(e) above and in other provisions herein, and must obtain the consent of the TAC on matters identified in Section 2.2(f) above.  Where provided in the U.S. TDP, certain other actions by the Trustees are also subject to the consent of the TAC.

**5.3**    **Term of Office.**

(a)    A member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) below, (iii) his or her removal pursuant to Section 5.3(c) below, or (iv) termination of the U.S. Asbestos Trust pursuant to Section 7.2 below.

(b)    A member of the TAC may resign at any time by written notice to the other members of the TAC, the Trustees and the Future Claimants Representative.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration,

32

mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or other good cause. Such removal shall be made at the recommendation of the remaining members of the TAC with the approval of the Bankruptcy Court.

**5.4    Appointment of Successor.**

(a)        In the event of a vacancy caused by the resignation or death of a TAC member, his or her successor shall be pre-selected by the resigning or deceased TAC member, or by his or her law firm in the event that such member has not pre-selected a successor. If neither the member nor the law firm exercises the right to make such a selection, the successor shall be chosen by a majority vote of the remaining TAC members. If a majority of the remaining members cannot agree, the Bankruptcy Court shall appoint the successor. In the event of a vacancy caused by the removal of a TAC member, the remaining members of the TAC by majority vote shall name the successor. If the majority of the remaining members of the TAC cannot reach agreement, the Bankruptcy Court shall appoint the successor.

(b)    Each successor TAC member shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) above, (iii) his or her removal pursuant to Section 5.3(c) above, or (iv) the termination of the U.S. Asbestos Trust pursuant to Section 7.2 below.

**5.5    TAC's Employment of Professionals.**

(a)    The TAC may but is not required to retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and

DB01:2170915.12                                059066.1001

such other parties deemed by the TAC to be qualified as experts on matters submitted to the

TAC (the "Professionals"). The TAC and its Professionals shall at all times have complete

access to the U.S. Asbestos Trust's officers, employees and agents, as well as to the

Professionals retained by the U.S. Asbestos Trust, and shall also have complete access to all

information generated by them or otherwise available to the U.S. Asbestos Trust or the Trustees.

In the absence of gross negligence, the written opinion of or information provided by any

Professional deemed by the TAC to be qualified as an expert on the particular matter submitted

to the TAC shall be full and complete authorization and protection in support of any action taken

or not taken by the TAC in good faith and in accordance with the written opinion of or

information provided by the Professional.

   (b)  The U.S. Asbestos Trust shall promptly reimburse, or pay directly if so

instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of

legal counsel pursuant to this provision in connection with the TAC's performance of its duties

hereunder. The U.S. Asbestos Trust shall also promptly reimburse, or pay directly if so

instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of

any other Professional pursuant to this provision in connection with the TAC's performance of

its duties hereunder; provided, however, that (i) the TAC has first submitted to the U.S. Asbestos

Trust a written request for such reimbursement setting forth the reasons (A) why the TAC desires

to employ such Professional, and (B) why the TAC cannot rely on Professionals retained by the

U.S. Asbestos Trust to meet the need of the TAC for such expertise or advice, and (ii) the U.S.

Asbestos Trust has approved the TAC's request for reimbursement in writing. If the U.S.

Asbestos Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as an

U.S. Asbestos Trust Expense. If the U.S. Asbestos Trust declines to pay for the TAC

34

Professional, it must set forth its reasons in writing. If the TAC still desires to employ such Professional at the U.S. Asbestos Trust's expense, the TAC and the Trustees shall resolve their dispute pursuant to Section 7.13 below.

### 5.6 Compensation and Expenses of TAC.

The members of the TAC shall receive compensation from the U.S. Asbestos Trust for their services as TAC members in the form of a reasonable hourly rate set by the Trustees for attendance at meetings or other conduct of U.S. Asbestos Trust business. The members of the TAC shall also be reimbursed promptly for all reasonable out-of-pocket costs and expenses incurred by the TAC members in connection with the performance of their duties hereunder. Such reimbursement or direct payment shall be deemed an U.S. Asbestos Trust expense. The U.S. Asbestos Trust shall include a description of the amounts paid under this Section 5.6 in the accounts to be filed with the Bankruptcy Court and provided to the Trustees, the Future Claimants Representative, and Reorganized Federal-Mogul pursuant to Section 2.2(c)(i).

### 5.7 Procedures for Consultation with and Obtaining the Consent of the TAC.

#### (a) Consultation Process.

(i) In the event the Trustees are required to consult with the TAC pursuant to Section 2.2(e) above or on other matters as provided herein, the Trustees shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustees shall also provide the TAC with such reasonable access to Professionals and other

35

experts retained by the U.S. Asbestos Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustees are considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

(ii)    The Trustees shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter.

**(b)    Consent Process.**

(i)    In the event the Trustees are required to obtain the consent of the TAC pursuant to Section 2.2(f) above, the Trustees shall provide the TAC with a written notice stating that their consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take, and explaining in detail the reasons why the Trustees desire to take such action. The Trustees shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustees shall also provide the TAC with such reasonable access to Professionals and other experts retained by the U.S. Asbestos Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustees are considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

(ii)    The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustees, and must in any event advise the Trustees in writing of its consent or its objection to the proposed action within 30 days of receiving the original request for

36

consent from the Trustees.  The TAC may not withhold its consent unreasonably.  If the TAC

decides to withhold its consent, it must explain in detail its objections to the proposed action.  If

the TAC does not advise the Trustees in writing of its consent or its objections to the action

within 30 days of receiving notice regarding such request, the TAC's consent to the proposed

actions shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 5.7(b),

the TAC continues to object to the proposed action and to withhold its consent to the proposed

action, the Trustees and/or the TAC shall resolve their dispute pursuant to Section 7.13.

However, the burden of proof with respect to the validity of the TAC's objection and

withholding of its consent shall be on the TAC.

## SECTION 6

## THE FUTURE CLAIMANTS REPRESENTATIVE

**6.1    Duties.**  The Future Claimants Representative shall be the individual identified on

the signature pages hereto.  He or she shall serve in a fiduciary capacity, representing the

interests of the holders of future Asbestos Personal Injury Claims for the purpose of protecting

the rights of such persons.  The Trustees must consult with the Future Claimants Representative

on matters identified in Section 2.2(e) above and on certain other matters provided herein, and

must obtain the consent of the Future Claimants Representative on matters identified in Section

2.2(f) above.  Where provided in the U.S. TDP, certain other actions by the Trustees are also

subject to the consent of the Future Claimants Representative.

**6.2    Term of Office.**

37

(a)     The Future Claimants Representative shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) below, (iii) his or her removal pursuant to Section 6.2(c) below, or (iv) the termination of the U.S. Asbestos Trust pursuant to Section 7.2 below.

(b)     The Future Claimants Representative may resign at any time by written notice to the Trustees.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Future Claimants Representative may be removed by the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties hereunder, such as repeated non-attendance at scheduled meetings.

**6.3     Appointment of Successor.** A vacancy caused by death or resignation shall be filled with an individual nominated prior to the effective date of the resignation or the death by the resigning or deceased Future Claimants Representative, and a vacancy caused by removal of the Future Claimants Representative shall be filled with an individual nominated by the Trustees in consultation with the TAC, subject to the approval of the Bankruptcy Court.. In the event a majority of the Trustees cannot agree, or a nominee has not been pre-selected, the successor shall be chosen by the Bankruptcy Court.

**6.4     Future Claimants Representative's Employment of Professionals.**

38

(a)     The Future Claimants Representative may but is not required to retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the Future Claimants Representative to be qualified as experts on matters submitted to the Future Claimants Representative (the "Professionals"). The Future Claimants Representative and his or her experts shall at all times have complete access to the U.S. Asbestos Trust's officers, employees and agents, as well as to the Professionals retained by the U.S. Asbestos Trust, and shall also have complete access to all information generated by them or otherwise available to the U.S. Asbestos Trust or the Trustees. In the absence of gross negligence, the written opinion of or information provided by any Professional deemed by the Future Claimants Representative to be qualified as an expert on the particular matter submitted to the Future Claimants Representative shall be full and complete authorization and protection in support of any action taken or not taken by the Future Claimants Representative in good faith and in accordance with the written opinion of or information provided by the Professional.

(b)     The U.S. Asbestos Trust shall promptly reimburse, or pay directly if so instructed, the Future Claimants Representative for all reasonable fees and costs associated with the Future Claimants Representative's employment of legal counsel pursuant to this provision in connection with the Future Claimants Representative's performance of his or her duties hereunder. The U.S. Asbestos Trust shall also promptly reimburse, or pay directly if so instructed, the Future Claimants Representative for all reasonable fees and costs associated with the Future Claimants Representative's employment of any other Professionals pursuant to this provision in connection with the Future Claimants Representative's performance of his or her duties hereunder; provided, however, that (i) the Future Claimants Representative has first

submitted to the U.S. Asbestos Trust a written request for such reimbursement setting forth the reasons (A) why the Future Claimants Representative desires to employ the Professional, and (B) why the Future Claimants Representative cannot rely on Professionals retained by the U.S. Asbestos Trust to meet the need of the Future Claimants Representative for such expertise or advice, and (ii) the U.S. Asbestos Trust has approved the Future Claimants Representative's request for reimbursement in writing. If the U.S. Asbestos Trust agrees to pay for the Future Claimants Representative's Professional, such reimbursement shall be treated as an U.S. Asbestos Trust Expense. If the U.S. Asbestos Trust declines to pay for the Future Claimants Representative's Professional, it must set forth its reasons in writing. If the Future Claimants Representative still desires to employ the Professional at U.S. Asbestos Trust expense, the Future Claimants Representative and the Trustees shall resolve their dispute pursuant to Section 7.13 below.

### 6.5    <u>Compensation and Expenses of the Future Claimants Representative.</u>

(a)     The Future Claimants Representative shall receive compensation from the U.S. Asbestos Trust in the form of the Future Claimants Representative's normal hourly rate for services performed. The U.S. Asbestos Trust will promptly reimburse the Future Claimants Representative for all reasonable out-of-pocket costs and expenses incurred by the Future Claimants Representative in connection with the performance of his or her duties hereunder. Such reimbursement or direct payment shall be deemed an U.S. Asbestos Trust expense. The U.S. Asbestos Trust shall include a description of the amounts paid under this Section 6.5 in the accounts to be filed with the Bankruptcy Court and provided to the Trustees, the Future Claimants Representative, and Reorganized Federal-Mogul pursuant to Section 2.2(c)(i).

DB01:2170915.12                    059066.1001

### 6.6    Procedures for Consultation with and Obtaining the Consent of the Future Claimants Representative.

#### (a)    Consultation Process.

(i)    In the event the Trustees are required to consult with the Future Claimants Representative pursuant to Section 2.2(e) above or on any other matters specified herein, the Trustees shall provide the Future Claimants Representative with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustees shall also provide the Future Claimants Representative with such reasonable access to Professionals and other experts retained by the U.S. Asbestos Trust and its staff (if any) as the Future Claimants Representative may reasonably request during the time that the Trustees are considering such matter, and shall also provide the Future Claimants Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

(ii)    The Trustees shall take into consideration the time required for the Future Claimants Representative, if he or she so wishes, to engage and consult with his or her own independent financial or investment advisors as to such matter.

#### (b)    Consent Process.

(i)    In the event the Trustees are required to obtain the consent of the Future Claimants Representative pursuant to Section 2.2(f) above, the Trustees shall provide the Future Claimants Representative with a written notice stating that his or her consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take, and explaining in detail the reasons why the Trustees desire to take

41

such action. The Trustees shall provide the Future Claimants Representative as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustees shall also provide the Future Claimants Representative with such reasonable access to Professionals and other experts retained by the U.S. Asbestos Trust and its staff (if any) as the Future Claimants Representative may reasonably request during the time that the Trustees are considering such action, and shall also provide the Future Claimants Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

(ii)    The Future Claimants Representative must consider in good faith and in a timely fashion any request for his or her consent by the Trustees, and must in any event advise the Trustees in writing of his or her consent or objection to the proposed action within 30 days of receiving the original request for consent from the Trustees. The Future Claimants Representative may not withhold his or her consent unreasonably. If the Future Claimants Representative decides to withhold consent, he or she must explain in detail his or her objections to the proposed action. If the Future Claimants Representative does not advise the Trustees in writing of his or her consent or objections to the proposed action within 30 days of receiving the notice from the Trustees regarding such consent, the Future Claimants Representative's consent shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 5.7(b), the Future Claimants Representative continues to object to the proposed action and to withhold its consent to the proposed action, the Trustees and/or the Future Claimants Representative shall resolve their dispute pursuant to Section 7.13. However, the burden of proof with respect to the

42

validity of the Future Claimants Representative's objection and withholding of his or her consent shall be on the Future Claimants Representative.

## SECTION 7

## GENERAL PROVISIONS

**7.1** **Irrevocability.** The U.S. Asbestos Trust is irrevocable.

**7.2** **Termination.**

(a)     The U.S. Asbestos Trust shall automatically terminate on the date ninety (90) days after the first to occur of the following events (the "Termination Date"):

(i)     the Trustees decide to terminate the U.S. Asbestos Trust because (A) they deem it unlikely that new Asbestos Personal Injury Claims will be filed against the U.S. Asbestos Trust, (B) all Asbestos Personal Injury Claims duly filed with the U.S. Asbestos Trust have been liquidated and paid to the extent provided in this U.S. Asbestos Trust Agreement and the U.S. TDP or disallowed by a final, non-appealable order, to the extent possible based upon the funds available through the Plan, and (C) twelve (12) consecutive months have elapsed during which no new Asbestos Personal Injury Claim has been filed with the U.S. Asbestos Trust; or

(ii)     if the Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the U.S. Asbestos Trust in a manner consistent with this U.S. Asbestos Trust

43

Agreement and the U.S. TDP, the date on which the Bankruptcy Court enters an order approving

such insurance and other arrangements and such order becomes a Final Order; or

    (iii)  to the extent that any rule against perpetuities shall be deemed

applicable to the U.S. Asbestos Trust, twenty-one (21) years less ninety-one (91) days pass after

the death of the last survivor of all of the descendants of Joseph P. Kennedy, Sr., of

Massachusetts, father of the late President John F. Kennedy, living on the date hereof.

    (b)  On the Termination Date, after payment of all the U.S. Asbestos Trust's

liabilities have been provided for, all monies remaining in the U.S. Asbestos Trust estate shall be

given to such organization(s) exempt from federal income tax under Section 501(c)(3) of the

Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustees using

their reasonable discretion; provided, however, that (i) if practicable, the activities of the selected

tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of

suffering of individuals suffering from asbestos related lung disorders, and (ii) the tax-exempt

organization(s) shall not bear any relationship to Reorganized Federal-Mogul within the meaning

of Section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of

the Plan and related documents, this Section 7.2(b) cannot be modified or amended.

   **7.3**  **Amendments.** The Trustees, after consultation with the TAC and the Future

Claimants Representative, and subject to the consent of the TAC and the Future Claimants

Representative, may modify or amend this U.S. Asbestos Trust Agreement. The Trustees, after

consultation with the TAC and the Future Claimants Representative, and subject to the consent

of the TAC and the Future Claimants Representative, may also modify or amend the U.S. TDP,

provided, however, that no amendment to the U.S. TDP shall be inconsistent with the limitations

44

DB01:2170915.12                  059066.1001

**App. 354**

on amendments provided therein, and, in particular, the provisions limiting amendment of the

Claims Payment Ratio set forth in Section 2.5 of the U.S. TDP and of the Payment Percentage

set forth in Section 4.2 of the U.S. TDP.  Any modification or amendment made pursuant to this

Article must be done in writing, and must be described in the annual report to be filed by the

U.S. Asbestos Trust with the Bankruptcy Court pursuant to Section 2.2(c)(i).  Notwithstanding

anything contained in this U.S. Asbestos Trust Agreement to the contrary, neither this U.S.

Asbestos Trust Agreement, the U.S. Asbestos Trust Bylaws, the U.S. TDP, nor any document

annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair,

or modify the applicability of Section 524(g) of the Bankruptcy Code, the efficacy or

enforceability of the injunction entered thereunder, or the U.S. Asbestos Trust's qualified

settlement fund status under Section 468B of the Internal Revenue Code, or any of the indemnity

obligations of the Trust provided under the Plan.

      **7.4**    **Meetings.**  The Trustees, the TAC, and the Future Claimants Representative, shall

be deemed to have attended a meeting in the event such person spends at least four hours of the

day conferring, in person or by telephone conference call, on U.S. Asbestos Trust matters with

the TAC, the Future Claimants Representative, or Trustees, as applicable.  A Trustee shall also

be deemed to have attended a meeting in the event he or she spends at least four hours of the day

engaging in activities related to Reorganized Federal-Mogul, including attendance at its Board of

Directors meetings.  The Trustees, the TAC and the Future Claimants Representative shall have

discretion to determine whether a meeting, as described herein, occurred for purposes of Sections

4.5, 5.6, and 6.5 above.

      **7.5**    **Severability.**  Should any provision in this U.S. Asbestos Trust Agreement be

determined to be unenforceable, such determination shall in no way limit or affect the

45

enforceability and operative effect of any and all other provisions of this U.S. Asbestos Trust Agreement.

   **7.6**    **Notices.**  Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's Future Claimants Representative, in each case as provided on such person's claim form submitted to the U.S. Asbestos Trust with respect to his or her U.S. Asbestos Trust Claim.

          (a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by telex, telecopy or facsimile pursuant to the instructions listed below, or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the U.S. Asbestos Trust through the Trustees:

To the Delaware Trustee:

To Reorganized Federal-Mogul:

To the TAC:

To the Future Claimants Representative:

       (b)     All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

       **7.7**     **Successors and Assigns.**  The provisions of this U.S. Asbestos Trust Agreement shall be binding upon and inure to the benefit of Federal-Mogul, the other Protected Parties, the U.S. Asbestos Trust, the Trustees, except that neither any of the Protected Parties, the U.S. Asbestos Trust and the Trustees nor Reorganized Federal-Mogul may assign or otherwise transfer any of its, or their, rights or obligations under this U.S. Asbestos Trust Agreement except, in the case of the U.S. Asbestos Trust and the Trustees, as contemplated by Section 2.1 above.

       **7.8**     **Limitation on Claim Interests for Securities Laws Purposes.** Asbestos Personal Injury Claims, and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 7.8 shall not apply to the holder of a claim that is subrogated to a U.S. Asbestos Trust Claim as a result of its satisfaction of such U.S. Asbestos Trust Claim.

47

          059066.1001

**7.9    Entire Agreement; No Waiver.** The entire agreement of the parties relating to the subject matter of this U.S. Asbestos Trust Agreement is contained herein and in the documents referred to herein, and this U.S. Asbestos Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**7.10    Headings.** The headings used in this U.S. Asbestos Trust Agreement are inserted for convenience only and do not constitute a portion of this U.S. Asbestos Trust Agreement, nor in any manner affect the construction of the provisions of this U.S. Asbestos Trust Agreement.

**7.11    Governing Law.** This U.S. Asbestos Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to Delaware conflict of law principles.

**7.12    Federal-Mogul's Representations and Cooperation.** Federal-Mogul, on behalf of itself and its subsidiaries, is hereby authorized to take any action required of a beneficial owner, as defined in the Act, in connection with the Trust Agreement. The Debtors and Reorganized Debtors agree to cooperate in implementing the goals and objectives of this U.S. Asbestos Trust.

**7.13    Dispute Resolution.** Any disputes that arise under this U.S. Asbestos Trust Agreement or under the U.S. TDP shall be resolved by submission of the matter to an alternative dispute resolution ("ADR") process mutually agreeable to the parties involved except that this

48

ADR procedure shall not apply to any disputes between the Trust and any Pneumo Protected

Party.  Should any party to the ADR process be dissatisfied with the decision of the arbitrator(s),

that party may apply to the Bankruptcy Court for a judicial determination of the matter.  In either

case, if the dispute arose pursuant to the consent provision set forth in Section 5.7(b) (in the case

of the TAC) or Section 6.6(b) (in the case of the Future Claimants Representative), the burden of

proof shall be on the party or parties who withheld consent to show that the objection was valid.

Should the dispute not be resolved by ADR process within thirty (30) days after submission, the

parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy

Court.  Notwithstanding anything else herein contained, to the extent any provision of this U.S.

Asbestos Trust Agreement is inconsistent with any provision of the Plan or the U.S. TDP, the

Plan or the U.S. TDP shall control.

     **7.14**    **Enforcement and Administration.**  The provisions of this U.S. Asbestos Trust

Agreement and the U.S. TDP attached hereto shall be enforced by the Bankruptcy Court

pursuant to the Plan.  The parties hereby further acknowledge and agree that the Bankruptcy

Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustees and

over any disputes hereunder not resolved by alternative dispute resolution in accordance with

Section 7.13 above.

     **7.15**    **Effectiveness.**  This U.S. Asbestos Trust Agreement shall not become effective

until it has been executed and delivered by all the parties hereto.

     **7.16**    **Counterpart Signatures.**  This U.S. Asbestos Trust Agreement may be executed

in any number of counterparts, each of which shall constitute an original, but such counterparts

shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this U.S. Asbestos Trust

Agreement this _____ day of _____, _____.

Federal-Mogul

By:_____

Name and Title:_____

DELAWARE TRUSTEE

_____

TRUSTEES

_____

_____

_____

ASBESTOS CREDITORS COMMITTEE

By:_____

TRUST ADVISORY COMMITTEE

50

_____

Russell W. Budd


_____

Steven Kazan


_____

Joseph F. Rice


_____

Perry Weitz


FUTURE CLAIMANTS REPRESENTATIVE


_____

Eric D. Green

51

## EXHIBIT A

**Pneumo Abex Addendum to the U.S. Asbestos
Personal Injury Trust Agreement**

DB01:2170915.12                                                                 059066.1001