**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FEDERAL-MOGUL GLOBAL INC., T&N LIMITED, *et al.*,<br><br>———————<br><br>CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, *et al.*,<br><br>        Appellants<br><br>v.<br><br>FEDERAL-MOGUL GLOBAL INC., *et al.*,<br><br>        Appellees. | Chapter 11<br><br>Bankruptcy Case No. 01-10578<br><br><br>Civil Action Nos. 08-0229 and 08-230<br><br>Judge Joseph H. Rodriguez |

**REPLY OF APPELLANTS, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND CERTAIN LONDON MARKET COMPANIES, TO BRIEFS OF APPELLEES**

Eileen T. McCabe
MENDES & MOUNT LLP
750 Seventh Avenue
New York, New York 10019-6829
Telephone: (212) 261-8000

Russell W. Roten
Jeff D. Kahane
DUANE MORRIS LLP
633 W. 5th Street, Suite 4600
Los Angeles, CA 90071
Telephone: (213) 689-7400

Michael A. Shiner
TUCKER ARENSBERG, P.C.
1500 One PPG Place
Pittsburgh, PA 15222
Telephone: (412) 594-5586

Richard W. Riley (No. 4052)
DUANE MORRIS LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801-1246
Telephone: (302) 657-4928

*Counsel for Certain Underwriters at Lloyd's, London, and Certain London Market Companies*

## TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 3

I.  APPELLEES FAIL TO SHOW THAT *COMBUSTION ENGINEERING* IS BINDING PRECEDENT ON THIS APPEAL........................................................................... 3

II. APPELLEES FAIL TO SHOW THAT SECTION 1123(A)(5) PREEMPTS THE ASSIGNMENT RESTRICTIONS................................................................................ 6

    A.  Section 1123(a)(5) Must Be Interpreted In Light of the Surrounding Statutory Framework ........................................................................................ 6

    B.  The Statutory Framework Shows that §§ 363(l) and 1142(a) Govern the Assignment of the Insurance Rights ........................................................ 7

    C.  The Preemptive Scope of § 1123(a)(5)(B) Cannot Override §§ 363(l) and 1142(a) ........................................................................................................ 9

III. SECTION 1123(A)(5)'S PREEMPTIVE SCOPE DOES NOT EXTEND TO PREEMPTING THE ASSIGNMENT RESTRICTIONS.................................................. 9

    A.  Appellees Fail to Show that the Presumption Against Preemption Does Not Apply to § 1123(a)(5) ............................................................................. 9

    B.  The Preemptive Clauses of §§ 363(l) and 1142(a) Cannot be Overridden by § 1123(a)(5) ........................................................................ 11

    C.  Appellees Fail to Show that the Bankruptcy Court Properly Considered the Surrounding Statutory Framework ........................................................ 12

    D.  Appellees Fail to Show that § 1123(a)(5)(B) Preempts Contractual Provisions ... 13

    E.  Appellees Fail to Show that § 1123(a)(5) Is Not Limited to Laws "Relating to Financial Condition".......................................................................... 15

    F.  Appellees Fail to Show the Bankruptcy Code Allows Debtors to Restructure their Relationship with their Insureds ...................................... 19

IV. THERE IS NO WINDFALL IN ENFORCING THE TERMS OF THE POLICIES....... 19

CONCLUSION................................................................................................................. 20

# TABLE OF AUTHORITIES

**CASES**                                                                                **PAGE(S)**

*Anstett v. Eagle-Picher Indus.,*
    203 F.3d 501 (7th Cir. 2000) .........................................................................20

*In re The Babcock & Wilcox Co.,*
    2004 WL 4945985 (Bankr. E.D. La. Nov. 9, 2004),
    *vacated,* 2005 WL 4982364 (E.D. La. Dec. 28 2005.................................5, 14, 18

*Barber v. Bettendorf Bank, N.A. (In re Pearson Industries, Inc.),*
    152 B.R. 546 (Bankr. C.D. Ill. 1993).........................................................17

*BFP v. Resolution Trust Corp.,*
    511 U.S. 531 (1994).........................................................................11

*Bldg. & Constr. Trades Council v. Associated Builders & Contractors,*
    507 U.S. 218, 122 L. Ed. 2d 565, 113 S. Ct. 1190 (1993)............................10

*Buckley v. Am. Constitutional Law Found.,*
    525 U.S. 182 (1999)........................................................................18

*Cipollone v. Liggett Group, Inc.,*
    505 U.S. 504, 112 S. Ct. 2608 .............................................................14

*Cisneros v. Alpine Ridge Group,*
    508 U.S. 10 (1993)......................................................................11, 18

*In re Combustion Engineering,*
    391 F.3d 190 (3d Cir. 2004).......................................2-6, 11, 13-14, 17

*Commodity Futures Trading Com. v. Schor,*
    478 U.S. 833 (1986).........................................................................18

*Davis v. Michigan Dept. Treasury,*
    489 U.S. 803 (1989)...........................................................................7

*Dodson v. Old Republic Ins. Co.,*
    1999 U.S. Dist. LEXIS 8047 (E.D. La. May 24, 1999)...........................20

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,*
    541 U.S. 246 (2004).........................................................................11

*Egelhoff v. Egelhoff ex rel. Breiner,*
    532 U.S. 141 (2001).........................................................................11

## TABLE OF AUTHORITIES (Cont'd)

*In re Farmers Mkts., Inc.,*
792 F.2d 1400 (9th Cir. 1986) ..................................................................10

*In re FCX,*
853 F.2d 1149 (4th Cir. 1988) ........................................ 6-7, 11, 14, 18

*Florida Dept. of Revenue v. Piccadilly Cafeterias,*
Case No. 07-312, Slip Op. (U.S. June 16, 2008) ..........................7, 20

*Gregory v. Ashcroft,*
501 U.S. 452, 111 S. Ct. 2395 (1991) ....................................................10

*Granfinanciera v. Nordberg,*
492 U.S. 33 (1989)..................................................................................20

*Holywell Corp. v. Smith,*
503 U.S. 47 (1992)....................................................................................5

*I.N.S. v. Cardoza-Fonseca,*
480 U.S. 421 (1987)................................................................................15

*In re Kaiser Aluminum Corp.,*
343 B.R. 88 (D. Del. 2006) ................................4-6, 11, 13, 17-18

*Kawaauhau v. Geiger,*
523 U.S. 57 (1998)........................................................7, 12, 18

*Liberty Mut. Ins. Co. v. Greenwich Ins. Co.,*
417 F.3d 193 (1st Cir. 2005)..................................................................20

*Lorillard Tobacco Co. v. Reilly,*
533 U.S. 525 (2001)................................................................................12

*M & M Electric,*
241 A.D.2d 58, 60 (1998) .........................................................................3

*Maryland v. Louisiana,*
451 U.S. 725, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981)........................10

*Mazon v. Camden Fire Ins. Assoc.,*
389 S.E.2d 743 (W. Va. 1990)..................................................................3

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (U.S. 1996)..........................................................................6

*Michael v. Shiley, Inc.,*
46 F.3d 1316 (3d Cir. 1995)....................................................................11

## TABLE OF AUTHORITIES (Cont'd)

*Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assoc., Ltd.),*
   61 F.3d 197 (3d Cir. 1995)................................................................ 13-15

*Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.,*
   534 U.S. 327 (2002).........................................................................18

*New York v. FERC,*
   535 U.S. 1 (2002).............................................................................11

*Norfolk & W. Ry. Co. v. Train Dispatchers Ass'n,*
   499 U.S. 117 (1991).........................................................................14

*Pacific Gas & Elect. Co. v. State of California,*
   350 F.3d 932 (9th Cir. 2003), B.R. 795, (Bankr. N.D. Cal. 2002) ................................ 5, 16-18

*In re Public Service Co.,*
   108 B.R. 854 (Bankr. D.N.H. 1989) ..........................................................5

*SEC v. Nat'l Sec., Inc.,*
   393 U.S. 453 ..................................................................................10

*In re Stone & Webster, Inc.,*
   286 B.R. 532 (Bankr. D. Del. 2002) ........................................................6, 18

*Southwestern Engineering Co.,*
   196 Ct. Cl. 782, (1971) .......................................................................20

*Trojan Techs. v. Pennsylvania,*
   916 F.2d 903 (3d Cir. 1990)..................................................................19

*United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.,*
   484 U.S. 365 (1988)...........................................................................12

*United States v. Ron Pair Enters.,*
   489 U.S. 235 (1989)...........................................................................16

*Vujosevic v. Rafferty,*
   844 F.2d 1023 (3d Cir. 1988).................................................................18

*In re Western Asbestos Company,*
   313 B.R. 456 (Bankr. N.D. Cal. 2003) ..................................................... 5, 14, 17-18

*White Buffalo Ventures, LLC v. Univ. of Texas,*
   420 F.3d 366 (5th Cir. 2005) .................................................................10

## <u>TABLE OF AUTHORITIES (Cont'd)</u>

**STATUTES**                                                        **PAGE(S)**

11 U.S.C. §363.................................................................................. 2, 7, 9, 11-13, 19

11 U.S.C. §365(c)(3)......................................................................... 15-16

11 U.S.C. §523(a) ............................................................................... 7

11 U.S.C. §524(g) .......................................................................... 1-2, 5, 13, 20

11 U.S.C. §541 ................................................................................ 2, 13

11 U.S.C. §1123(a) ........................................................................... passim

11 U.S.C. §1123(b)(3) ....................................................................... 2

11 U.S.C. §1129 ............................................................................ 5, 6-7

11 U.S.C. §1142 ........................................................... 2, 7, 9, 12-13, 16-17, 19

11 U.S.C. §1144(a) ......................................................................... 11

49 U.S.C. §11344(b)(1) ...................................................................... 14

Certain Underwriters at Lloyd's, London, and Certain London Market Companies (collectively, "London Market Insurers" or "LMI") hereby reply to the briefs of appellees, and respectfully state as follows:

## INTRODUCTION

The captioned debtors (the "Debtors") claim coverage under certain insurance policies subscribed by LMI ("Policies"). The named insureds on the Policies were Studebaker-Worthington, Inc. ("SWI"), McGraw Edison Co., and Debtors Federal-Mogul Corp., and Felt Products Manufacturing Co. The latter two are Debtors. Another Debtor, Federal-Mogul Products ("FMP"), alleges that it is a successor to Wagner Electric Corp. which was a subsidiary of SWI and McGraw Edison Co. at the time that the Policies were subscribed, but that issue is currently subject to litigation. Whether FMP is even entitled to coverage under the Policies is a hotly contested issue. If FMP is not entitled to coverage (as LMI contend), then it has nothing to assign.

The Debtors are seeking to rewrite the consent-to-assignment provisions included or incorporated in the Policies ("Consent-to-Assignment Clauses"). The Fourth Amended Joint Plan of Reorganization (as modified) (the "Plan") permits the Debtors to assign rights under the Policies ("Insurance Rights") to a trust established under § 524(g)[1] (the "Trust") to pay asbestos-related claims. The Debtors have not sought LMI consent to the assignment and LMI have not so consented.

The legal issue on this appeal is whether the Debtors may use § 1123(a)(5)(B) to assign the Insurance Rights to the Trust notwithstanding the Consent-to-Assignment Clauses and state

---

[1]    Unless otherwise specified, all statutory references herein are to sections of Title 11 of the United States Code (the "Bankruptcy Code").

law enforcing such clauses (collectively, the "Assignment Restrictions"). As shown in the Brief of Appellants, Certain Underwriters at Lloyd's, London and Certain London Market Companies (the "Opening Brief"), nothing in the Bankruptcy Code allows such a non-consensual assignment. Contrary to the argument of the Appellee Official Committee of Asbestos Claimants (the "ACC"), the Third Circuit did not decide this legal issue in *In re Combustion Engineering*, 391 F.3d 190, 219 (3d Cir. 2004).

The Plan did not require the Debtors to contribute their securities to the Trust, contrary to the requirements of § 524(g). The Debtors instead assigned the Insurance Rights to the Trust. Opening Brief at 14-15. Neither § 1123(b)(3)(B), nor § 541 would preempt state law with respect to a transfer in a plan. Opening Brief at 16-19. Thus, the "Appellees" (the ACC, joined by the Debtors and the Legal Representative for Future Claimants) must show that § 1123(a)(5) preempts the Assignment Restrictions.

Section 1123(a)(5) must be read consistently with the surrounding statutory framework. The presumption against preemption requires a narrow interpretation of the preemptive effect § 1123(a)(5). Neither § 363(l) nor § 1142(a), which govern the transfer of the Insurance Rights and contain express preemptive clauses, would permit an assignment of the Insurance Rights in this case. Section 1123(a)(5) also contains a preemptive clause. However, nothing in § 1123(a)(5) permits § 1123(a)(5) to render the narrower preemptive clauses of §§ 363(l) and 1142(a) meaningless. The Court of Appeals for the Ninth Circuit, the only other Court of Appeals to consider the issue, held that Congress intended § 1123(a)(5)'s preemptive scope to be the same as that of § 1142(a). Finally, the plain language of § 1123(a)(5) does not preempt contractual provisions. Thus, § 1123(a)(5)'s preemptive scope, should be no broader than that of §§ 363(l) and 1142(a). The Court should not permit the assignment of the Insurance Rights.

**ARGUMENT**

I. **APPELLEES FAIL TO SHOW THAT *COMBUSTION ENGINEERING* IS BINDING PRECEDENT ON THIS APPEAL**

   A. **Footnote 27 Of *Combustion Engineering* Was Not A Determination That § 1123(A)(5) Preempts The Assignment Restrictions**

Appellees' *Combustion Engineering* argument avoids a point raised in the Opening Brief. The subject of the assignment in *Combustion Engineering*, according to the Court of Appeals and those sections of the opinion cited by Appellees, was the assignment of insurance *proceeds*. There are no proceeds from LMI and hence no proceeds are being assigned in this case. Instead, "Insurance Rights" are being assigned. As described on pp. 7-8 of the Opening Brief, Insurance Rights are far broader than mere proceeds and include the right to sue LMI for coverage for asbestos claims.

Appellees incorrectly state that there is no distinction between an assignment of a right to proceeds and the assignment of the right to sue LMI. Brief of Appellee Official Committee of Asbestos Claimants ("ACC Brief") at 7 n. 7. The proceeds of an indemnity or liability insurance policy are payments by an insurer to discharge its contractual liability for the insured's adjudicated liability to a third party. *See, e.g., Mazon v. Camden Fire Ins. Assoc.*, 389 S.E.2d 743, 745 (W. Va. 1990). Proceeds cannot exist until a court of competent jurisdiction has determined an insured's liability to a claimant, and whether such liability is covered by the insured's policies. *See id., M & M Electric*, 241 A.D.2d 58, 60 (1998). Once proceeds have been determined to exist, there is no increased risk to the insurer if the proceeds are assigned to another entity. For proceeds to exist, the insurer's liability under the relevant policies must already have been determined. No such determination has been made; no proceeds exist.

On the other hand, the assignment of the Insurance Rights can greatly affect the rights and obligations of LMI under the Policies. If the purported assignee is engaged in activities that

present more risk to LMI, LMI is affected. Not only would it be more likely that LMI would have to pay a loss that LMI did not contract to cover, but LMI would not have received an adequate premium to compensate for the added risk.

That is precisely the case here. LMI subscribed the Policies based on the activities and risks presented by the policyholders. Any claims would have ultimately been decided in the tort system, with juries determining the validity of claims and scrutinizing the testimony of claimants. The insureds had a strong incentive to challenge invalid claims because the payment of invalid claims would erode their insurance coverage. However, the risks of insuring the Trust are far different. The Trust was created solely to pay claims. The plaintiffs' lawyers who file the claims have some supervisory power over the Trustees. The Trust has no ongoing business for which it needs to conserve its coverage. There is no objective tribunal to determine fact and law, only a Trust applying one-sided, weak payment criteria. The risk to LMI is substantially increased if the purported Insurance Rights are assigned to the Trust.

*Combustion Engineering* did not address any of these issues because it dealt only with proceeds, and hence does not control the assignment of Insurance Rights.

Moreover, *Combustion Engineering* addressed the question of whether insurance proceeds from non-debtor third parties could be assigned to the estate. The Third Circuit ruled that such policies could *not* be assigned, *Combustion Engineering*, 391 F.3d at 219, so footnote 27 could hardly be cited for the proposition that they can be assigned in this case. In any event, the assignment of proceeds by non-debtors to the estate is not the issue here. Footnote 27 did not discuss whether Insurance Rights (which were not discussed at any point in the opinion) could be assigned from the estate to a third party (the Trust), and hence *Combustion Engineering* does not control that issue.

Appellees argue that LMI are incorrect in asserting that *In re Kaiser Aluminum Corp.*, 343 B.R. 88 (D. Del. 2006) addressed only the assignment of a right to proceeds because the Kaiser *plan* contemplated an assignment of the right to sue insurers.   ACC Brief at 7-8 n. 7. Regardless of what the Kaiser plan contemplated, the text of *Kaiser Aluminum* addressed the assignment of insurance proceeds:

> the Court must next determine whether the Bankruptcy Court erred in applying Section 1123(a)(5) to preempt the anti-assignment clauses in those contracts and allow *the proceeds* of those policies to be assigned to the Funding Vehicle Trust

*Id.* at 94 (emphasis added).

> In *Combustion Engineering*, the Third Circuit discussed the same issue raised here, *i.e.* whether a plan of reorganization can provide for the *assignment of insurance proceeds* to a Section 524(g) trust

*Id.* at 95 (emphasis added).   The *Kaiser Aluminum* court only addressed the assignment of insurance proceeds.[2]   The case says what it says.

---

[2]       The other cases cited by the Debtors as supporting their view of *Combustion Engineering* are equally unavailing:  *In re Pittsburgh Corning Corp.*, Case No. 00-22876, the "Memorandum Opinion", at 47, D.I. 5192 (Bankr. W.D. Pa. Dec. 21, 2006) is simply another example of the Bankruptcy Court's failure to properly interpret § 1123.  It has also been subject to a pending motion for reconsideration since late January 2006.  In *Holywell Corp. v. Smith*, 503 U.S. 47, 55 (1992), the preemptive effect of § 1123(a)(5) was not at issue.  In *In re Western Asbestos Company*, 313 B.R. 456, 462 (Bankr. N.D. Cal. 2003), *aff'd* 2004 WL 1944792 (N.D. Cal. April 16, 2004), the bankruptcy court found that causes of action could vest in a § 524(g) trust because such trust was a successor to a debtor. *Western Asbestos* was a bankruptcy court decision that was settled while on appeal and hence was never subject to appellate review.  It is plainly contrary to the Ninth Circuit's holding in *Pacific Gas & Elect. Co. v. State of California*, 350 F.3d 932, 943 (9th Cir. 2003), *cert. denied sub. nom.*, 543 U.S. 956, 125 S.Ct. 454, 160 L.Ed.2d 318 (2004), because it found that § 1123(a)(5)(B)'s preemptive scope was not limited by the preemptive scope of § 1142.  *See* Section III.E.3.d. of the Opening Brief.  Had it been appealed, it would undoubtedly have been reversed.  It is not persuasive authority.  In *In re Public Service Co.*, 108 B.R. 854 (Bankr. D.N.H. 1989), the Bankruptcy Court also looked to the surrounding statutory framework, and relied on the express statutory authorization of § 1129, to determine the preemptive scope of § 1123(a).  *See id.* at 887 (noting that the issue before it was more accurately framed "in terms of the question of preemptive effect involved as a result not only of § 1123 but also § 1129").  Similarly, *In re The Babcock & Wilcox Co.*, 2004 WL 4945985 (Bankr. E.D. La. Nov. 9, 2004), *vacated*, 2005 WL 4982364 (E.D. La. Dec. 28 2005 was vacated
(Continued...)

## II.    APPELLEES FAIL TO SHOW THAT SECTION 1123(A)(5) PREEMPTS THE ASSIGNMENT RESTRICTIONS

### A.    Section 1123(a)(5) Must Be Interpreted In Light of the Surrounding Statutory Framework

Appellees contend that § 1123 "expressly preempts nonbankruptcy rights that might otherwise interfere with the provisions of a Chapter 11 plan as described in that section." ACC Brief at 12. LMI do not contest that § 1123 preempts some nonbankruptcy rights. However, the Court must determine the scope of such preemption.[3] Even where preemption is express, the Court must "identify the domain expressly pre-empted by that language." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (U.S. 1996).

Appellees cite *In re FCX*, 853 F.2d 1149, 1155 (4th Cir. 1988) in their argument. *FCX* is inapplicable to the issue of § 1123(a)(5)(B)'s preemptive scope. The question in *FCX* was not whether Insurance Rights could be assigned under a plan, but whether a debtor could use § 1123(a)(5)(D) to implement the indubitable equivalent requirements of § 1129(b)(2)(A)(iii) by

---

(Continued...)

by the District Court. If the appeal had progressed, the approval of the assignment undoubtedly have been overturned, as it relied on Eighth Circuit precedent of dubious vitality. *See* Post-Trial Brief of Certain Insurers: The Court Cannot Approve the Assignment of the Insurance Rights as a Matter of Law under the Bankruptcy Code, filed August 21, 2007, D.I. 3182, Tab 9b-7 n. 5. In any event, Appellees cannot rely on an opinion that has been vacated.

[3]    Cases cited by Appellees support LMI' contention that the Court should perform this type of analysis. *In re Stone & Webster*, 286 B.R. 532 (Bankr. D. Del. 2002), is inapposite. In *Stone & Webster*, the District Court found that state law specifically subjected its state law merger requirements to those of the Bankruptcy Code. *Id.* at 543-44. Appellees have pointed to no such state law subjection here. *Kaiser Aluminum*, also cited by Appellees, did not perform this analysis, thus, the Court should not find it to be persuasive. Despite Appellees' contentions to the contrary, *Kaiser Aluminum* did not rely on *Integrated Solutions* for its preemption analysis but instead found it to be "consistent" with *Combustion Engineering*. *Id.* at 95. Whether or not *Kaiser Aluminum* relied on *Integrated Solutions* for its preemption analysis, the question of the scope of express preemption under § 1123(a)(5) was not before the Third Circuit in *Integrated Solutions*, and thus it is not determinative of the Court's ruling in this appeal.

distributing property to a creditor with a claim against that property. *Id.* at 1158. Section 1123(a)(5)(D) was used to restructure the debtor-creditor relationship, not the contractual insurer-insured relationship. *Id.* at 1155. The Fourth Circuit considered the statutory framework and interpreted § 1123(a)(5)(D) consistently with that framework. *Id.* at 1158. It did not use § 1123(a)(5)(D) to render terms of § 1129(b)(2)(A)(iii) meaningless. In this case, Appellees are trying to use § 1123(a)(5) so as to make provisions of § 363(l) and § 1142(a) meaningless.

**B.    The Statutory Framework Shows that §§ 363(l) and 1142(a) Govern the Assignment of the Insurance Rights**

The preemptive scope of § 1123(a)(5) must be narrower than what is advocated by Appellees because their interpretation would render portions of §§ 363(l) and 1142(a) meaningless. By its express terms, § 1123(a)(5) does not override other provisions of the Bankruptcy Code. § 1123(a) ("Notwithstanding any otherwise applicable *nonbankruptcy* law, a plan shall...."). It must be read consistently with such provisions. *Davis v. Michigan Dept. Treasury*, 489 U.S. 803, 809 (1989) (stating "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Any interpretation of § 1123(a)(5) that would render parts of §§ 363(l) and 1142(a) meaningless is to be avoided. *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) (refusing to adopt an interpretation of § 523(a)(6) which would render superfluous § 523(a)(9)). Appellees' interpretation is therefore incorrect.

As the Supreme Court recently pointed out in *Florida Dept. of Revenue v. Piccadilly Cafeterias*, Case No. 07-312, Slip Op. at 13 (U.S. June 16, 2008), the subchapter in which a bankruptcy statute is located guides its interpretation. Section 1123 is entitled "Contents of a plan." Section 1123(a)(5) is in Chapter 11 of the Code, subchapter II, and is entitled, "The Plan." Section 1123(a)(5) does not grant debtors the power to alienate property of the estate. Rather, it directs that a Chapter 11 plan "shall provide adequate means for the plan's

implementation" and sets forth a non-exclusive list of such means, "such as" a "transfer of all or any part of the property of the estate to one or more entities." § 1123(a)(5)(B). It preempts nonbankruptcy law that would prevent a plan from containing such provisions. § 1123(a)(5).

Section 363 of the Bankruptcy Code is the only statute which gives a debtor-in-possession the power to alienate property of the estate. § 363(b); *see also* Opening Brief at 21. Section 363 only preempts state laws or contractual provisions *relating to the insolvency or financial condition of a debtor. Id.* Its title and placement in the Bankruptcy Code demonstrates that § 363 is the pertinent enabling statute. It is located in Chapter 3, subchapter IV of the Code, which is entitled "Administrative Powers." Section 363 is entitled "Use, sale, or lease of property." Consistent with its title, it authorizes a debtor-in-possession to "use, sell or lease property." Appellees argue that the reference to "transfer" in § 1123(a)(5) is not a "use, sale or lease" of property governed by § 363. ACC Brief at 35. The assignment of the Insurance Rights is both a sale and a use. Therefore, § 363 would not allow for the assignment of the Insurance Rights because such assignment is not related to the insolvency or financial condition of the Debtors.

Section 1142(a) is entitled "Implementation of a Plan". It requires the Debtors to carry out the Plan. It preempts state law or contractual provisions *relating to financial condition* that would prevent a debtor from implementing a plan. *Id.* It is located in Subchapter III of Chapter 11, which is entitled "Postconfirmation Matters".

These three provisions appear to be inconsistent with each other unless the preemptive effect of § 1123(a)(5) is limited to provisions *concerning a debtor's financial condition.* Of the three provisions, only § 1142(a) applies to post-confirmation matters. Under the Plan, the

transfer of the purported Insurance Rights occurs post-confirmation.[4] *See* Plan, § 4.3 at 89. Section 1142(a) applies to the assignment of the Insurance Rights, and it would not permit the assignment.

### C.    The Preemptive Scope of § 1123(a)(5)(B) Cannot Override §§ 363(l) and 1142(a)

Appellees' argument would make portions of §§ 363(l) and 1142(a) useless. If § 1123(a)(5)(B) authorizes a debtor to transfer property of the estate pursuant to a plan, then the provisions of § 363(l) relating to a plan would have no purpose. Anything that could be done under § 363(l) with respect to a plan could also be done under § 1123(a)(5); however, things could be done under § 1123(a)(5) that could not be done under § 363. That is an illogical result.

The preemptive clause of § 1142(a) would also have no purpose. All of the words of § 1142(a) must be given effect. Section 1142(a) only supersedes state law provisions concerning the Debtors' financial condition. The Assignment Restrictions are not preempted, and hence § 1142(a) prohibits the implementation of the Plan. It makes no sense to put something into a plan that cannot be implemented.

The preemptive effect of § 1123(a)(5)(B), § 1142(a) and § 363(l) should be read consistently and logically.

## III.    SECTION 1123(A)(5)'S PREEMPTIVE SCOPE DOES NOT EXTEND TO PREEMPTING THE ASSIGNMENT RESTRICTIONS

### A.    Appellees Fail to Show that the Presumption Against Preemption Does Not Apply to § 1123(a)(5)

It is hornbook law that a presumption against preemption applies to federal legislation in areas in which the states have traditionally occupied. "The fact that Congress has expressly

---

[4]    On the "Effective Date", as that term is defined in the Plan.

preempted certain activity is plain, but the scope of that express preemption is not. The power to supplant state law is 'an extraordinary power in a federalist system.'" *White Buffalo Ventures, LLC v. Univ. of Texas,* 420 F.3d 366, 370 (5th Cir. 2005) (citing *Gregory v. Ashcroft,* 501 U.S. 452, 460, 115 L. Ed. 2d 410, 111 S. Ct. 2395 (1991)). "The Court has expressed this principle as a presumption against preemption of state law." *Id.* (citing *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517-18, 112 S. Ct. 2608; 120 L. Ed. 2d 407 (1992)); *Bldg. & Constr. Trades Council v. Associated Builders & Contractors,* 507 U.S. 218, 224, 122 L. Ed. 2d 565, 113 S. Ct. 1190 (1993) ("We are reluctant to infer preemption . . . ."); *Maryland v. Louisiana,* 451 U.S. 725, 746, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981) ("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law.").[5] As LMI have already shown, insurance is an area traditionally governed by state law.[6] Opening Brief at 25. Federal statutes impinging upon important state interests "cannot . . . be construed without regard to the implications of our dual system of government *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 544 (1994). Thus, to displace traditional state regulation the federal statutory purpose must be "clear and manifest". *Id.* Considering the ambiguity in §§ 363(l), 1123(a)(5) and 1142(a), any interpretation of the § 1123(a)(5) that would allow it to preempt the Assignment Restrictions would be contrary to the established principles underlying our federalist system.

---

[5]    *In re Farmers Mkts., Inc.,* 792 F.2d 1400 (9th Cir. 1986), which is quoted by Appellees, ACC Brief at 18, supports LMI' contention that the Policies remain subject to the Assignment Restrictions. In *Farmers Mkts.,* the Ninth Circuit reversed the holdings of the lower courts because, unlike the Bankruptcy Act which invalidated restrictions on assignment, the Bankruptcy Code only "invalidates restrictions on the transfer of property of the debtor, in order that all of the interests of the debtor in property will become the property of the estate." *Id.* at 1402.

[6]    In citing the McCarran-Ferguson Act in the Opening Brief, LMI provided one of several examples of how both the courts and Congress have recognized that insurance is traditionally governed by state law. *SEC v. Nat'l Sec., Inc.,* 393 U.S. 453, a case about reverse preemption, is inapplicable. LMI do not argue that McCarran-Ferguson reverse preempts § 1123(a)(5).

The cases cited by Appellees fail to support their contention that the presumption against preemption does not apply to interpreting § 1123(a)(5). ACC Brief at 18. All of the cases cited by Appellees applied the presumption against preemption to a determination of property rights.[7] Even if express preemption is present, this Court must give §1123(a)(5) "a fair but narrow reading which will give effect to Congress' purpose without undermining the strong presumption against pre-emption." *Michael v. Shiley, Inc.*, 46 F.3d 1316, 1322 (3d Cir. 1995)

**B.     The Preemptive Clauses of §§ 363(l) and 1142(a) Cannot be Overridden by § 1123(a)(5)**

Appellees incorrectly state that LMI contend that § 1123(a)(5) does not expand preemption beyond what is specifically authorized in the Bankruptcy Code. ACC Brief at 21. The preemptive language of § 1123(a)(5), which is limited to requiring a plan to provide for its own implementation, cannot override other provisions of the Bankruptcy Code providing for the

---

[7]     In *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001), the Supreme Court performed the analysis advocated by LMI. It found that the presumption against preemption could be overcome. *Id.* at 151. It did not find that the presumption against preemption did not apply. The Supreme Court also looked at the surrounding statutory framework of 29 U.S.C. § 1144(a) to find the limits of the phrase "relate to". *Id.* at 147. The Supreme Court held that the term "relate to" "cannot be taken to extend to the furthest stretch of its indeterminacy, or else for all practical purposes preemption would never run its course." *Id.* at 146. While *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) did state that the term "notwithstanding" overrides conflicting provisions of any other statutory section, § 1123(a)'s use of the term notwithstanding does not apply to bankruptcy provisions. Thus, *Cisneros* is inapplicable. In *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004), the Supreme Court looked to the use of the word "standard" in other provisions of Title II of the Clean Air Act to interpret its meaning. While the Supreme Court declined to apply the presumption against preemption, both the majority and dissenting opinions found that its application in that situation would not have made a difference in the end result. Here, it does. *New York v. FERC*, 535 U.S. 1 (2002) is similarly inapplicable, because the question presented there was whether FERC had acted within the scope of its congressionally delegated authority, not whether a federal statute conflicted with state law. The presumption against preemption does not apply to such questions. *Id.* at 18. As discussed above, *FCX* and *Pub. Serv. Co.* support the analysis advocated by LMI; *Pittsburgh Corning* is not persuasive, *see* note 2; the scope of § 1123(a)(5)'s preemption was not at issue in *Integrated Solutions*; and, *Kaiser Aluminum*, because it erred in finding *Combustion Engineering* to be controlling, never considered the issue.

sale of property pursuant to a plan and requiring a debtor to implement the plan. "[A]n express definition of the pre-emptive reach of a statute . . . supports a reasonable inference . . . that Congress did not intend to preempt other matters." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001). Section 1123(a)(5) cannot be used to override the more limited preemption provisions in §§ 363(l) and 1142(a). *See Kawaauhau*, 523 U.S. at 62.

Whether, as Appellees state, the merger or consolidation of a debtor, the amendment of a charter, and the issuance of securities, are not authorized elsewhere in the Bankruptcy Code is irrelevant. ACC Brief at 21-22. If such actions are not authorized elsewhere, then no interpretation of § 1123(a)(5) would render other Bankruptcy Code provisions meaningless.

**C.    Appellees Fail to Show that the Bankruptcy Court Properly Considered the Surrounding Statutory Framework**

The Bankruptcy Court erred when it failed to consider the surrounding statutory framework. Opening Brief at 27-29. Appellees contend that the Bankruptcy Court did not need to examine the statutory framework, and dismiss *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988) because "that case dealt with statutory interpretation where a provision was ambiguous." ACC Brief at 22. However, there is a patent ambiguity among the texts of §§ 363, 1123 and 1142 relating to the scope of preemption, and *Timbers of Inwood* is applicable.

Appellees contend that the Bankruptcy Court considered the surrounding statutory framework when it stated "the assignment of rights.... is valid and enforceable under §§ 524(g), 541(c)(1), 1123(a)(5)(B) and 1129(a)(1)" and by stating "section 524(g) of the Bankruptcy Code creates a new form of entity: a trust to which asbestos liabilities are channeled and which addresses and pays those liabilities." ACC Brief at 23. There was no analysis of the effect on

§ 363(l) and § 1142(a) of a broad reading of § 1123(a)(5). There was no analysis of how §§ 541(c)(1) or 1129(a)(1) require § 1123(a) to have a broad preemptive scope.

Appellees also state that "unless such transfer can be part of a plan, it is difficult to see how there could be a workable plan using a § 524(g) trust in any case in which there is potentially significant insurance coverage." ACC Brief at 24. In many of the § 524(g) cases, insurers voluntarily settle in exchange for the channeling injunction. Congress did not intend § 524(g) to be used to coerce insurers with valid rights and defenses to contribute to the Trust; if Congress had so intended, Congress would have included such a provision in the statute.

**D.      Appellees Fail to Show that § 1123(a)(5)(B) Preempts Contractual Provisions**

Appellees contend that the cases interpreting § 1123(a)(5)(B) all hold that it preempts contractual provisions. ACC Brief at 24-25. *Combustion Engineering* does not so hold. Nowhere did *Kaiser Aluminum* state that § 1123(a)(5) preempts contractual provisions.[8]

Appellees rely on *Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assoc., Ltd.)*, 61 F.3d 197, 209 (3d Cir. 1995) for the proposition that § 1123(a)(5) preempts contractual provisions. However, *Indian Palms* supports LMI' contention that § 1123(a)(5)(B) does not preempt contractual provisions. In *Indian Palms*, the Third Circuit relied on § 1123(a)(5)(H) to extend the contractual maturity date of a mortgage. *Indian Palms*, 61 F.3d at 209. Unlike § 1123(a)(5)(B), § 1123(a)(5)(H) contains a specific preemptive provision applicable to certain kinds of contracts. *Id.* ("Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—(5) provide adequate means for its implementation, such as—

---

[8]      The *Kaiser Aluminum* court held that § 541(c)(1) preempts contractual provisions. However, the *Kaiser Aluminum* court's application of § 541's preemptive effect to the transfer of property out of the estate was in error and contrary to controlling Third Circuit authority. *Integrated Solutions*, 124 F.3d at 492.

(H) extension of a maturity date or a change in an interest rate or other terms of outstanding securities;"). Section 1123(a)(5)(B), on the other hand, does not mention contracts.

*Norfolk & W. Ry. Co. v. Train Dispatchers Ass'n*, 499 U.S. 117 (1991), cited in *Cipollone* and by Appellees, is not to the contrary. In *Norfolk*, the Supreme Court considered a preemption provision applicable to "the antitrust law and all other laws." *Id.* at 120. At issue was whether 49 U.S.C. 11344(b)(1) preempted the mandatory bargaining requirement imposed on a collective bargaining agreement by the Railway Labor Act . *Id.* at 120-122. However, as Appellees point out, there is a logical distinction between (i) a requirement or prohibition that is self-imposed and not imposed by state law, and (ii) the liability for a breach of contract that would be imposed by state law. ACC Brief at 26, citing and quoting *Cipollone*, 505 U.S. at 515, 526 & n.24. In *Norfolk*, the Supreme Court considered whether a contractual requirement mandated by a preempted law was also preempted. That is not the question here. The Consent-to-Assignment Clauses are self-imposed, not imposed by state law. *Norfolk* is inapplicable. The other cases cited by Appellees are also inapplicable or flawed.[9]

Appellees argue that interpreting § 1123(a)(5) not to preempt contractual provisions is incorrect because it would render subsections (F), (G) and (H) of § 1123(a) meaningless. ACC Brief at 27. However, as discussed above in regard to the *Indian Palms* case, subsection (B) of § 1123(a)(5) does not preempt contractual rights because subsection (B) does not specifically reference contracts. Subsections (F) ("indenture or similar instrument"), (G) ("default", which can only happen under a contract) and (H) ("outstanding securities") do specifically refer to

---

[9]    *Combustion Engineering* did not examine whether § 1123(a)(5)(B) preempts contracts; *Pittsburgh Corning, Western Asbestos* and *Babcock & Wilcox* are not persuasive, *see* note 2, above; *FCX* is inapplicable because the Fourth Circuit did not consider whether contractual provisions were within the scope of subsection (B). It only considered whether subsection (D) would preempt state law.

contracts. Contrary to fundamental canons of statutory construction, by analogizing (B) to (F), (G) and (H), Appellees ask the Court to read a reference to contractual provisions into subsection (B) when none exists. The opposite is true, *i.e.*, Congress intended subsection (B) not to preempt contractual provisions. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987).

Appellees cite to cases interpreting § 365(c)(3) as an example of a statutory provision that does not expressly mention contracts but preempts state law governing contracts. ACC Brief at 27 n.33. In doing so, however, Appellees only partially quote § 365(c)(3): "terminated under applicable nonbankruptcy law prior to the order for relief." *Id.* A full reading of § 365(c)(3) shows that it supports LMI' arguments: It specifically mentions contracts *five* times:

> The trustee may not assume or assign any *executory contract* or *unexpired lease* of the debtor, whether or not such *contract* or *lease* prohibits or restricts assignment of rights or delegation of duties, if—such *lease* is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief.

When Congress intends to preempt contractual provisions, it specifically mentions contracts in the language of the statute. Section 365(c)(3) mentions contracts no fewer than five times. Section 1123(a)(5)(B) does not mention contacts even once when setting forth the scope of the preemption.

### E.    Appellees Fail to Show that § 1123(a)(5) Is Not Limited to Laws "Relating to Financial Condition"

Appellees contend that interpreting § 1123(a)(5) to override the provisions of §§ 363(l) and 1142(a) is supported by the "plain meaning" canon of statutory interpretation. ACC Brief at 29. However, the plain meaning rule does not apply when "the literal interpretation of a statute

will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989). Contrary to Appellees' contentions, *see* ACC Brief at 29, the Ninth Circuit did not just import the words "relating to financial condition" into § 1123(a)(5). As discussed in Section IV.C, there is a patent ambiguity in the preemptive clauses of §§ 363(l), 1123(a)(5) and 1142(a). To interpret § 1123(a)(5) as having a broad preemptive scope would render portions of §§ 363(l) and 1142(a) meaningless—a result to be avoided in statutory interpretation.

The Ninth Circuit found that Congress intended for §§ 1123(a)(5) and 1142(a) to be read together. *PG&E Co. v. Cal. ex rel. Cal. Dept of Toxic Substances Control*, 350 F.3d 932, 942 (9th Cir. 2003) *cert. denied sub nom., Pacific Gas and Electric Company, v. California Public Utilities Commission*, 543 U.S. 956; 125 S. Ct. 454; 160 L. Ed. 2d 318.

> Sections 1123(a) and 1142(a) were enacted at the same time, as part of the 1978 Bankruptcy Code. Both sections are directly concerned with the contents and implementation of a reorganization plan under Chapter 11. Section 1123(a) specifies what a confirmable plan must do. Among other things, under § 1123(a)(5) it must "provide for adequate means for the plan's implementation." Section 1142(a) in turn describes the duty of an entity charged with implementing a confirmed plan.

*Id.* at 947. In determining how to read the statutes together, the Ninth Circuit found that the legislative history was consistent with interpreting § 1123(a)(5)'s preemptive scope to be the same as that of § 1142(a). *Id.* at 948.

Appellees also argue that a narrow interpretation would render § 1123(a)'s "notwithstanding" clause meaningless with respect to subsections (a)(5)(I), (a)(5)(H) and (a)(6), because those statutory provisions do not relate to financial condition. ACC Brief at 31. Such contention, however, makes no sense. Whether a provision of the Bankruptcy Code preempts nonbankruptcy law relating to financial condition has nothing to do with whether the Bankruptcy

16

Code provision at issue relates to financial condition. The only question is whether the nonbankruptcy law relates to financial condition.

Appellees' argument fails on its own terms. Various nonbankruptcy laws related to financial condition apply to each of the actions specified in those provisions, and could be preempted even if contractual provisions were not. For example, § 1123(a)(5)(H) would allow for "...a change in an... other term of outstanding securities." The term "security" includes shares of stock. § 101(49)(A)(ii). A share of stock usually entitles its holder to dividends. State laws, however, may limit the payment of dividends to shareholders if a company fails certain solvency requirements. *See, e.g., Barber v. Bettendorf Bank, N.A. (In re Pearson Industries, Inc.)*, 152 B.R. 546, 557 (Bankr. C.D. Ill. 1993). Section 1123(a)(5) would preempt such a law relating to financial condition.[10]

Appellees contend that there is nothing in § 1123(a)(5) that makes it subject to the administrative provisions of Chapter 3. ACC Brief at 35. Regardless, binding case law requires § 1123(a)(5) to be interpreted so that other provisions of the Bankruptcy Code, including §§ 363 and 1142, are not rendered meaningless. *Kawaauhau*, 523 U.S. at 62.

---

[10]    The cases cited by Appellees in support of their position either do not support their position, *e.g., Combustion Engineering*, or are otherwise not persuasive, *Kaiser Aluminum, Western Asbestos* and *Pittsburgh Corning*. As discussed in Section II.A. and in the Opening Brief, *Combustion Engineering* did not rule on the issue of preemption. Opening Brief at 33-36. *Kaiser Aluminum* is inapplicable because it (i) did not find that § 1123(a)(5) preempted provisions barring assignment, and (ii) was only presented with the issue of whether a right to proceeds was assignable. *See id.* 95. *FCX* supports the analysis advocated by LMI. *Stone & Webster*, is inapposite, see note 3. As discussed in note 2, *Pittsburgh Corning, Western Asbestos* and *Babcock & Wilcox* are all of dubious vitality and are not persuasive. *Cisneros* did not interpret the preemptive scope of § 1123(a)(5); it involved contract interpretation. *Vujosevic v. Rafferty*, 844 F.2d 1023 (3d Cir. 1988) is inapplicable. There is no controlling precedent involved here.

Appellees also complain about the examples in the Opening Brief of how, if Appellees'
contentions about the scope of § 1123(a)(5) are correct, § 1123(a)(5) could be used to allow a
debtor to act contrary to nonbankruptcy law. ACC Brief at 32-34. These examples, however,
are not LMI' examples. They are examples from the opinion of the only bankruptcy court to
interpret the preemptive scope of § 1123(a)(5) properly. *See In re Pacific Gas & Elect. Co.*, 273
B.R. 795, 806 (Bankr. N.D. Cal. 2002), *aff'd in part & rev'd in part sub nom.*, *Pacific Gas &
Elect. Co. v. State of California*, 350 F.3d 932 (9th Cir. 2003), *cert. denied sub. nom.*, 543 U.S.
956, 125 S.Ct. 454, 160 L.Ed.2d 318 (2004).

The cases cited by Appellees in support of this argument are not relevant to or persuasive
on any particular point at issue.[11] These citations reveal that Appellees' contentions rely on the
proposition that § 1123(a)(5)'s preemptive effect is without limit. However, § 1123(a)(5)
"cannot be taken to extend to the furthest stretch of its indeterminacy, or else for all practical
purposes preemption would never run its course." *Egelhoff,* 532 U.S. at 146. Even the
Bankruptcy Court would not go so far. *See In re Kaiser Aluminum Corp.*, Case No. 02-10429,
Transcript of Record, at 88:18-89:18, D.I. 8135 (Bankr. D. Del. Jan. 9, 2006). This Court should
interpret § 1123(a)(5) consistently with the other applicable provisions of the Bankruptcy Code,
§§ 363(l) and 1142(a).

---

[11]    *See Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327 (2002) (a case
about the scope of the FCC's power to regulate phone companies); *Buckley v. Am. Constitutional
Law Found.*, 525 U.S. 182 (1999) (a case about Colorado's requirements for the gatherers of
petitions to put initiatives on the ballot); *Commodity Futures Trading Com. v. Schor*, 478 U.S.
833 (1986) (a case about the scope of the Commodity Futures Trading Commission's authority);
*Trojan Techs. v. Pennsylvania*, 916 F.2d 903 (3d Cir. 1990) (a case about whether the
Pennsylvania Steel Products Procurement Act was unconstitutional).

**F.    Appellees Fail to Show the Bankruptcy Code Allows Debtors to Restructure their Relationship with their Insureds**

Appellees contend that they can modify the Consent-to-Assignment Clauses because "there are numerous provisions in the Bankruptcy Code that allow debtors to restructure their obligations under non-executory contracts." ACC Brief at 36 (citing §§ 510, 544, 364(d), 552(a), 502(b)(7) and 506(b)). However, none of those provisions applies to the Consent-to-Assignment Clauses. Without some specific statute allowing a debtor to restructure its insurance relationship, it may not do so. As LMI showed in the Opening Brief, the insurance policies are non-executory contracts. The default rule is that non-executory contracts may not be modified in bankruptcy. Opening Brief at 38-39.

Appellees cannot cite to statutes allowing them to modify the Consent-to-Assignment Clauses because the Bankruptcy Code does not allow a debtor to restructure its insurance relationship. "The restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights." *Granfinanciera v. Nordberg*, 492 U.S. 33, 56 (1989). The Bankruptcy Code "strikes a balance between a debtor's interest in reorganizing and restructuring its debts and creditors' interest in maximizing the value of the bankruptcy estate." *Florida Dept. of Revenue*, Slip Op. at 33.

**IV.    THERE IS NO WINDFALL IN ENFORCING THE TERMS OF THE POLICIES**

Appellees mistakenly claim that Appellants "seek a windfall, because they seek to use the bankruptcy to eliminate their coverage obligations." ACC Brief at 38. LMI did not instigate this case, the Debtors did. If the Debtors were not attempting to rewrite the Policies, LMI would not be in the case. However, the Debtors formulated a plan that provided for the transfer of the purported Insurance Rights contrary to the Assignment Restrictions. LMI filed this appeal to protect their contractual rights. If the Debtors were not attempting to assign their purported

Insurance Rights in violation of the Assignment Restrictions, LMI would not have filed this appeal.

Enforcing bargained-for contractual rights does not give rise to a windfall. *See Anstett v. Eagle-Picher Indus.*, 203 F.3d 501, 506 (7th Cir. 2000); *Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*, 417 F.3d 193, 201 (1st Cir. 2005); *Dodson v. Old Republic Ins. Co.*, 1999 U.S. Dist. LEXIS 8047 at *18 (E.D. La. May 24, 1999); *Southwestern Engineering Co.*, 196 Ct. Cl. 782, 799 (1971). LMI dispute whether FMP has any rights under the Policies. However, it would create a windfall for the Debtors if they were allowed to assign the Insurance Rights in contravention of the freely contracted Consent-to-Assignment Clauses and thereby transfer all of their asbestos liability to their insurers, while failing to comply with the provisions of § 524(g)

## CONCLUSION

Accordingly, LMI respectfully request that this Court reverse the Preemption Order. The parties will return to state court to litigate whether the Assignment is valid under state law, an issue that was expressly reserved and not litigated during confirmation.

Wilmington, Delaware

Respectfully submitted,

/s/Richard W. Riley
DUANE MORRIS LLP
Richard W. Riley (No. 4052)
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Telephone: (302) 657-4928
Fax: (302) 657-4901

MENDES & MOUNT LLP
Eileen T. McCabe
750 Seventh Avenue
New York, New York 10019-6829
Telephone: (212) 261-8000
Fax: (212) 261-8750

DUANE MORRIS LLP
Russell W. Roten (CA SBN 170571)
Jeff D. Kahane (CA SBN 223329)
633 W. 5th Street, Suite 4600
Los Angeles, CA 90071
Telephone: (213) 689-7400
Facsimile:  (213) 689-7401

TUCKER ARENSBERG, P.C.
Michael A. Shiner (PA ID 78088)
mshiner@tuckerlaw.com
1500 One PPG Place
Pittsburgh, PA 15222
Telephone: (412) 594-5586
Facsimile: (412) 594-5619

*Counsel for Certain Underwriters at Lloyd's,
London, and Certain London Market Companies*

Dated:  July 3, 2008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FEDERAL-MOGUL GLOBAL INC., T&N LIMITED, *et al.*,<br><br>---<br><br>CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, *et al.*,<br><br>                        Appellants<br><br>               v.<br><br>FEDERAL-MOGUL GLOBAL INC., *et al.*,<br><br>                       Appellees. | Chapter 11<br><br>Bankruptcy Case No. 01-10578<br><br><br>Civil Action Nos. 08-0229 and 08-230<br><br>Judge Joseph H. Rodriguez |

## CERTIFICATE OF SERVICE

I, Richard W. Riley, certify that I am not less than 18 years of age, and that service of a copy of the Reply Of Appellants, Certain Underwriters At Lloyd's, London And Certain London Market Companies, To Briefs Of Appellees was made on June 3, 2008 upon the individuals identified on the attached Service List by the manner of delivery indicated on the Service List.

Under penalty of perjury, I declare the foregoing is true and correct.

Dated: July 3, 2008

Wilmington, Delaware

                                      /s/Richard W. Riley
                                     Richard W. Riley (DE 4052)
                                     Duane Morris LLP
                                     1100 North Market Street, Suite 1200
                                     Wilmington, DE 19801-1246
                                     Telephone:    (302) 657-4928
                                     Facsimile:    (302) 657-4901
                                     E-mail:       rwriley@duanemorris.com

<u>**SERVICE LIST**</u>

**VIA FIRST CLASS MAIL**
James F. Conlan
Larry J. Nyhan
Jeffrey C. Steen
Kevin T. Lantry
Kenneth P. Kansa
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603

**VIA HAND DELIVERY**
Laura Davis Jones
James E. O'Neill
Pachulski Stang Ziehl & Jones LLP
919 Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705

**VIA HAND DELIVERY**
Marla R. Eskin
Kathleen Campbell Davis
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, Delaware 19801

**VIA FIRST CLASS MAIL**
Elihu Inselbuch
Caplin & Drysdale Chartered
375 Park Avenue, 35th Floor
New York, NY 10152-3500

**VIA FIRST CLASS MAIL**
Peter Van N. Lockwood
Caplin & Drysdale Chartered
One Thomas Circle, NW
Washington DC 20005

**VIA HAND DELIVERY**
Richard L. Schepacarter
Trial Attorney
Office of U.S. Trustee
J. Caleb Boggs Federal Buiding
844 North King Street
Room 2207, Lockbox 35
Wilmington, Delaware 19801

**VIA HAND DELIVERY**
James S. Yoder
White and Williams LLP
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709

**VIA HAND DELIVERY**
James L. Patton, Jr.
Edwin J. Harron
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391

**VIA FIRST CLASS MAIL**
Eileen T. McCabe
Mendes & Mount LLP
750 Seventh Avenue
New York, New York 10019-6829

**VIA FIRST CLASS MAIL**
Russell W. Roten
Duane Morris LLP
633 W. 5th Street, Suite 4600
Los Angeles, CA 90071

**VIA FIRST CLASS MAIL**
Steven M. Crane
Berks Crane Robinson & Seal LLP
515 South Figueroa Street, Suite 1500
Los Angeles, California 90071

**VIA FIRST CLASS MAIL**
Michael A. Shiner
Tucker Arensberg, P.C.
1500 One PPG Place
Pittsburgh, PA 15222

**VIA HAND DELIVERY**
Sean J. Bellew
Cozen O'Connor
1201 N. Market Street
Suite 1400
Wilmington, DE 19801

**VIA FIRST CLASS MAIL**
Michael S. Davis
Jantra Van Roy
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, New York 10022

**VIA HAND DELIVERY**
Bruce E. Jameson
Prickett, Jones & Elliott, P.A.
1310 King Street
Wilmington, Delaware 19899

**VIA FIRST CLASS MAIL**
Elit R. Felix, II
Margolis Edelstein
The Curtis Center, 4th Floor
601 Walnut Street
Philadelphia, PA 19106-3304

**VIA HAND DELIVERY**
John D. Demmy
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801

**VIA FIRST CLASS MAIL**
Leonard P. Goldberger
Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA 19103

**VIA HAND DELIVERY**
Michael W. Yurkewicz
Klehr, Harrison, Harvey Branzburg and Ellers LLP
919 Market Street, Suite 1000
Wilmington, Delaware 19801

**VIA FIRST CLASS MAIL**
David C. Christian II
William J. Factor
Seyfarth Shaw LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603

**VIA FIRST CLASS MAIL**
Craig Goldblatt
Nancy L. Manzer
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., NW
Washington, D.C. 20006

**VIA FIRST CLASS MAIL**
William J. Bowman
James P. Ruggeri
Edward B. Parks, II
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

# UNREPORTED DECISIONS

# PART 1 OF 3

(Slip Opinion)    OCTOBER TERM, 2007    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FLORIDA DEPARTMENT OF REVENUE *v.* PICCA-DILLY CAFETERIAS, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 07–312.   Argued March 26, 2008—Decided June 16, 2008

After respondent (Piccadilly) declared bankruptcy under Chapter 11, but before its plan was submitted to the Bankruptcy Court, that court authorized Piccadilly to sell its assets, approved its settlement agreement with creditors, and granted it an exemption under 11 U. S. C. §1146(a), which provides a tax-stamp exemption for any asset transfer "under a plan confirmed under section 1129." After the sale, Piccadilly filed its Chapter 11 plan, but before the plan could be confirmed, petitioner Florida Department of Revenue (Florida) objected, arguing that the stamp taxes it had assessed on certain of the transferred assets fell outside §1146(a)'s exemption because the transfer had not been under a confirmed plan. The court granted Piccadilly summary judgment. The Eleventh Circuit affirmed, holding that §1146(a)'s exemption applies to preconfirmation transfers necessary to the consummation of a confirmed Chapter 11 plan, provided there is some nexus between such transfers and the plan; that §1146(a)'s text was ambiguous and should be interpreted consistent with the principle that a remedial statute should be construed liberally; and that this interpretation better accounted for the practicalities of Chapter 11 cases because a debtor may need to transfer assets to induce relevant parties to endorse a proposed plan's confirmation.

*Held:* Because §1146(a) affords a stamp-tax exemption only to transfers made pursuant to a Chapter 11 plan that has been confirmed, Piccadilly may not rely on that provision to avoid Florida's stamp taxes. The most natural reading of §1146(a)'s text, the provision's placement within the Bankruptcy Code, and applicable canons of statutory construction lead to this conclusion. Pp. 4–19.

(a) Florida's reading of §1146(a) is the most natural.  Contending

2      FLORIDA DEPT. OF REVENUE *v.* PICCADILLY
CAFETERIAS, INC.

Syllabus

that the text unambiguously limits stamp-tax exemptions to postconfirmation transfers made under the authority of a confirmed plan, Florida argues that "plan confirmed" denotes a plan confirmed in the past, and that "under" should be read to mean "with the authorization of" or "inferior or subordinate" to its referent, here the confirmed plan, see *Ardestani* v. *INS*, 502 U. S. 129, 135. Piccadilly counters that the provision does not unambiguously impose a temporal requirement, contending that had Congress intended "plan confirmed" to mean "confirmed plan," it would have used that language, and that "under" is as easily read to mean "in accordance with." While both sides present credible interpretations, Florida's is the better one. Congress could have used more precise language and thus removed all ambiguity, but the two readings are not equally plausible. Piccadilly's interpretation places greater strain on the statutory text than Florida's simpler construction. And Piccadilly's emphasis on the distinction between "plan confirmed" and "confirmed plan" is unavailing because §1146(a) specifies not only that a transfer be "under a plan," but also that the plan be confirmed pursuant to §1129. Ultimately this Court need not decide whether §1146(a) is unambiguous on its face, for, based on the parties' other arguments, any ambiguity must be resolved in Florida's favor. Pp. 4–7.

  (b) Even on the assumption that §1146(a)'s text is ambiguous, reading it in context with other relevant Code provisions reveals nothing justifying Piccadilly's claims that had Congress intended §1146(a) to apply exclusively to postconfirmation transfers, it would have made its intent plain with an express temporal limitation, and that "under" should be construed broadly to mean in "in accordance with." If statutory context suggests anything, it is that §1146(a) is inapplicable to preconfirmation transfers. The provision's placement in a subchapter entitled "POSTCONFIRMATION MATTERS" undermines Piccadilly's view that it extends to preconfirmation transfers. Piccadilly's textual and contextual arguments, even if fully accepted, would establish at most that the statutory language is ambiguous, not that the purported ambiguity should be resolved in Piccadilly's favor. Pp. 7–13.

  (c) The federalism canon articulated in *California State Bd. of Equalization* v. *Sierra Summit, Inc.*, 490 U. S. 844, 851–852—that courts should "proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly expressed"—obliges the Court to construe §1146(a)'s exemption narrowly. Piccadilly's interpretation would require the Court to do exactly what the canon counsels against: recognize an exemption that Congress has not clearly expressed, namely, an exemption for preconfirmation transfers. The various substantive canons on which Piccadilly relies

Cite as: 554 U. S. ____ (2008)      3

Syllabus

for its interpretation—most notably, that a remedial statute should be construed liberally—are inapposite in this case.  Pp. 13–19.

484 F. 3d 1299, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, SOUTER, GINSBURG, and ALITO, JJ., joined. BREYER, J., filed a dissenting opinion, in which STEVENS, J., joined.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 07–312

---

## FLORIDA DEPARTMENT OF REVENUE, PETITIONER
## *v.* PICCADILLY CAFETERIAS, INC.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 16, 2008]

JUSTICE THOMAS delivered the opinion of the Court.

The Bankruptcy Code provides a stamp-tax exemption for any asset transfer "under a plan confirmed under [Chapter 11]" of the Code. 11 U. S. C. §1146(a) (2000 ed., Supp. V). Respondent Piccadilly Cafeterias, Inc., was granted an exemption for assets transferred after it had filed for bankruptcy but before its Chapter 11 plan was submitted to, and confirmed by, the Bankruptcy Court. Petitioner, the Florida Department of Revenue, seeks reversal of the decision of the Court of Appeals upholding the exemption for Piccadilly's asset transfer. Because we hold that §1146(a)'s stamp-tax exemption does not apply to transfers made before a plan is confirmed under Chapter 11, we reverse the judgment below.

I

Piccadilly was founded in 1944 and was one of the Nation's most successful cafeteria chains until it began experiencing financial difficulties in the last decade. On October 29, 2003, Piccadilly declared bankruptcy under Chapter 11 of the Bankruptcy Code, §1101 *et seq.* (2000 ed. and Supp. V), and requested court authorization to sell

substantially all its assets outside the ordinary course of business pursuant to §363(b)(1) (2000 ed., Supp. V). Piccadilly prepared to sell its assets as a going concern and sought an exemption from any stamp taxes on the eventual transfer under §1146(a) of the Code.[1]  The Bankruptcy Court conducted an auction in which the winning bidder agreed to purchase Piccadilly's assets for $80 million.

On January 26, 2004, as a precondition to the sale, Piccadilly entered into a global settlement agreement with committees of senior secured noteholders and unsecured creditors.  The settlement agreement dictated the priority of distribution of the sale proceeds among Piccadilly's creditors.  On February 13, 2004, the Bankruptcy Court approved the proposed sale and settlement agreement. The court also ruled that the transfer of assets was exempt from stamp taxes under §1146(a).  The sale closed on March 16, 2004.

Piccadilly filed its initial Chapter 11 plan in the Bankruptcy Court on March 26, 2004, and filed an amended plan on July 31, 2004.[2]  The plan provided for distribution

---

[1] When litigation commenced in the lower courts, the stamp-tax exemption was contained in §1146(c) (2000 ed.).  In 2005, Congress repealed subsections (a) and (b), and the stamp-tax exemption was recodified as §1146(a).  See Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, §719(b)(3), 119 Stat. 133.  For simplicity, we will cite the provision as it is currently codified.

[2] Chapter 11 bankruptcy proceedings ordinarily culminate in the confirmation of a reorganization plan.  But in some cases, as here, a debtor sells all or substantially all its assets under §363(b)(1) (2000 ed., Supp. V) before seeking or receiving plan confirmation.  In this scenario, the debtor typically submits for confirmation a plan of liquidation (rather than a traditional plan of reorganization) providing for the distribution of the proceeds resulting from the sale.  Here, Piccadilly filed a Chapter 11 liquidation plan after selling substantially all its assets as a going concern.  Although the central purpose of Chapter 11 is to facilitate reorganizations rather than liquidations (covered generally by Chapter 7), Chapter 11 expressly contemplates liquidations.

Opinion of the Court

of the sale proceeds in a manner consistent with the settlement agreement. Before the Bankruptcy Court confirmed the plan, Florida filed an objection, seeking a declaration that the $39,200 in stamp taxes it had assessed on certain of Piccadilly's transferred assets fell outside §1146(a)'s exemption because the transfer had not been "under a plan confirmed" under Chapter 11. On October 21, 2004, the bankruptcy court confirmed the plan. On cross-motions for summary judgment on the stamp-tax issue, the Bankruptcy Court granted summary judgment in favor of Piccadilly, reasoning that the sale of substantially all Piccadilly's assets was a transfer "'under'" its confirmed plan because the sale was necessary to consummate the plan. App. D to Pet. for Cert. 40a–41a. The District Court upheld the decision on the ground that §1146(a), in certain circumstances, affords a stamp-tax exemption even when a transfer occurs prior to confirmation. *In re Piccadilly Cafeterias, Inc.*, 379 B. R. 215, 226 (SD Fla. 2006).

The Court of Appeals for the Eleventh Circuit affirmed, holding that "§1146[(a)]'s tax exemption may apply to *those* pre-confirmation transfers that are necessary to the consummation of a confirmed plan of reorganization, which, at the very least, requires that there be some nexus between the pre-confirmation transfer and the confirmed plan." *In re Piccadilly Cafeterias, Inc.*, 484 F. 3d 1299, 1304 (2007) (*per curiam*). Finding the statutory text ambiguous, the Court of Appeals concluded that §1146(a) should be interpreted consistent with "the principle that a remedial statute such as the Bankruptcy Code should be liberally construed." *Ibid.* The court further noted that its

---

See §1129(a)(11) (2000 ed.) ("Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan").

interpretation of §1146(a) better accounted for "the practical realities of Chapter 11 reorganization cases" because a debtor may need to transfer assets to induce relevant parties to endorse the proposed confirmation of a plan. *Ibid.* The Court of Appeals acknowledged that its holding conflicted with the approach taken by the Courts of Appeals for the Third and Fourth Circuits, *id.*, at 1302, which have held that §1146(a) "does not apply to . . . transactions that occur prior to the confirmation of a plan under Chapter 11 of the Bankruptcy Code." *In re Hechinger Inv. Co. of Del.*, 335 F. 3d 243, 246 (CA3 2003); see also *In re NVR, LP*, 189 F. 3d 442, 458 (CA4 1999) (holding that §1146(a) "appl[ies] only to transfers under the Plan occurring after the date of confirmation").

We granted certiorari, 552 U. S. ___ (2007), to resolve the conflict among the Courts of Appeals as to whether §1146(a) applies to preconfirmation transfers.

## II

Section 1146(a), entitled "Special tax provisions," provides: "The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer *under a plan confirmed under section 1129 of this title*, may not be taxed under any law imposing a stamp tax or similar tax." (Emphasis added.) Florida asserts that §1146(a) applies only to postconfirmation sales; Piccadilly contends that it extends to preconfirmation transfers as long as they are made in accordance with a plan that is eventually confirmed. Florida and Piccadilly base their competing readings of §1146(a) on the provision's text, on inferences drawn from other Code provisions, and on substantive canons of statutory construction. We consider each of their arguments in turn.

## A

Florida contends that §1146(a)'s text unambiguously

Opinion of the Court

limits stamp-tax exemptions to postconfirmation transfers made under the authority of a confirmed plan. It observes that the word "confirmed" modifies the word "plan" and is a past participle, *i.e.*, "[a] verb form indicating past or completed action or time that is used as a verbal adjective in phrases such as *baked beans* and *finished work.*" American Heritage Dictionary 1287 (4th ed. 2000). Florida maintains that a past participle indicates past or completed action even when it is placed after the noun it modifies, as in "beans baked in the oven," or "work finished after midnight." Thus, it argues, the phrase "plan confirmed" denotes a "confirmed plan"—meaning one that has been confirmed in the past.

Florida further contends that the word "under" in "under a plan confirmed" should be read to mean "with the authorization of" or "inferior or subordinate" to its referent, here the confirmed plan. See *Ardestani* v. *INS*, 502 U. S. 129, 135 (1991) (noting that a thing that is "'under'" a statute is most naturally read as being "'subject to'" or "'governed by'" the statute). Florida points out that, in the other two appearances of "under" in §1146(a), it clearly means "subject to." Invoking the textual canon that "'identical words used in different parts of the same act are intended to have the same meaning,'" *Commissioner* v. *Keystone Consol. Industries, Inc.*, 508 U. S. 152, 159 (1993), Florida asserts the term must also have its core meaning of "subject to" in the phrase "under a plan confirmed." Florida thus reasons that to be eligible for §1146(a)'s exemption, a transfer must be subject to a plan that has been confirmed subject to §1129 (2000 ed. and Supp. V). Echoing the Fourth Circuit's reasoning in *NVR, supra*, at 457, Florida concludes that a transfer made prior to the date of plan confirmation cannot be subject to, or under the authority of, something that did not exist at the time of the transfer—a confirmed plan.

Piccadilly counters that the statutory language does not

unambiguously impose a temporal requirement.  It contends that "plan confirmed" is not necessarily the equivalent of "confirmed plan," and that had Congress intended the latter, it would have used that language, as it did in a related Code provision.  See §1142(b) (referring to "any instrument required to effect a transfer of property dealt with by a confirmed plan").  Piccadilly also argues that "under" is just as easily read to mean "in accordance with." It observes that the variability of the term "under" is well-documented, noting that the American Heritage Dictionary 1395 (1976) provides 15 definitions, including "[i]n view of," "because of," "by virtue of," as well as "[s]ubject to the restraint . . . of."  See also *Ardestani, supra,* at 135 (recognizing that "[t]he word 'under' has many dictionary definitions and must draw its meaning from its context"). Although "under" appears several times in §1146(a), Piccadilly maintains there is no reason why a term of such common usage and variable meaning must have the same meaning each time it is used, even in the same sentence. As an illustration, it points to §302(a) of the Bankruptcy Code, which states, "The commencement of a joint case under a chapter of this title constitutes an order for relief under such chapter."  Piccadilly contends that this provision is best read as: "The commencement of a joint case *subject to the provisions of* a chapter of this title constitutes an order for relief *in* such chapter."  Piccadilly thus concludes that the statutory text—standing alone—is susceptible of more than one interpretation.  See *Hechinger, supra,* at 253 ("[W]e cannot say that the language of [§1146(a)] rules out the possibility that 'under a plan confirmed' means 'in agreement with a plan confirmed'").

While both sides present credible interpretations of §1146(a), Florida has the better one.  To be sure, Congress could have used more precise language—*i.e.,* "under a plan *that has been* confirmed"—and thus removed all ambiguity.  But the two readings of the language that Congress

Opinion of the Court

chose are not equally plausible: Of the two, Florida's is clearly the more natural. The interpretation advanced by Piccadilly and adopted by the Eleventh Circuit—that there must be "some nexus between the pre-confirmation transfer and the confirmed plan" for §1146(a) to apply, 484 F. 3d, at 1304—places greater strain on the statutory text than the simpler construction advanced by Florida and adopted by the Third and Fourth Circuits.

Furthermore, Piccadilly's emphasis on the distinction between "plan confirmed" and "confirmed plan" is unavailing because §1146(a) specifies not only that a tax-exempt transfer be "under a plan," but also that the plan in question be confirmed pursuant to §1129. Congress' placement of "plan confirmed" before "under section 1129" avoids the ambiguity that would have arisen had it used the term "confirmed plan," which could easily be read to mean that the transfer must be "under section 1129" rather than under a plan that was itself confirmed under §1129.

Although we agree with Florida that the more natural reading of §1146(a) is that the exemption applies only to postconfirmation transfers, ultimately we need not decide whether the statute is unambiguous on its face. Even assuming, *arguendo*, that the language of §1146(a) is facially ambiguous, the ambiguity must be resolved in Florida's favor. We reach this conclusion after considering the parties' other arguments, to which we now turn.

### B

Piccadilly insists that, whatever the degree of ambiguity on its face, §1146(a) becomes even more ambiguous when read in context with other Bankruptcy Code provisions. Piccadilly asserts that if Congress had intended §1146(a) to apply exclusively to transfers occurring after confirmation, it would have made its intent plain with an express temporal limitation similar to those appearing elsewhere in the Code. For example, §1127 governs modifications to

a Chapter 11 plan, providing that the proponent of a plan
may modify the plan "at any time before confirmation," or,
subject to certain restrictions, "at any time after confirma-
tion of such plan." §§1127(a)–(b). Similar examples
abound. See, *e.g.,* §1104(a) ("[a]t any time after the com-
mencement of the case but before confirmation of a plan
. . ."); §1104(c) ("[a]t any time before the confirmation of a
plan . . ."). Piccadilly emphasizes that, "where Congress
includes particular language in one section of a statute but
omits it in another section of the same Act, it is generally
presumed that Congress acts intentionally and purposely
in the disparate inclusion or exclusion." *Russello* v. *United
States,* 464 U. S. 16, 23 (1983) (internal quotation marks
omitted). Because Congress did not impose a clear and
commonly used temporal limitation in §1146(a), Piccadilly
concludes that Congress did not intend one to exist. Pic-
cadilly buttresses its conclusion by pointing out that
§1146(b)—the subsection immediately following
§1146(a)—includes an express temporal limitation. See
§1146(b) (2000 ed., Supp. V) (providing that a bankruptcy
court may declare certain tax consequences after the date
a government unit responds to a plan proponent's request
or "270 days after such request," whichever is earlier).
But Congress included no such limitation in subsection
(a).

Piccadilly also relies on other Code provisions to bolster
its argument that the term "under" preceding "a plan
confirmed" in §1146(a) should be read broadly—to mean
"in accordance with" rather than the narrower "authorized
by." Apart from §302, discussed above, Piccadilly adverts
to §111, which states that an agency providing credit
counseling to debtors is required to meet "the standards
set forth under this section." §111(b)(4)(A) (2000 ed.,
Supp. V). Piccadilly argues that this language requires
the agency to meet "the standards set forth *in* this sec-
tion," because reading the quoted language to mean "the

Opinion of the Court

standards set forth *authorized by* this section" would render the words "set forth" nonsensical. Piccadilly additionally refers to §303(a), which provides that "[a]n involuntary case may be commenced only under chapter 7 or 11 of this title." Again, Piccadilly asserts that this language means "an involuntary case may be commenced only *in* chapter 7 or 11 of this title." It reasons that "under" in §303(a) cannot mean "authorized by" because §303(a) itself authorizes involuntary cases, and the provisions of Chapters 7 and 11 do not. Piccadilly makes a similar argument with respect to §343, which provides that "[t]he debtor shall appear and submit to examination under oath at the meeting of creditors." Reading "under" to mean "authorized by" would make little sense here. On the basis of these examples, Piccadilly concludes that the term "under" is ambiguous.

Finally, Piccadilly maintains that "under" in §1146(a) should be construed broadly in light of §365(g)(1) of the Bankruptcy Code, which provides that rejection of an executory contract or unexpired lease constitutes the equivalent of a prebankruptcy breach "if such contract or lease has not been assumed under this section or under a plan confirmed under chapter . . . 11." In *Hechinger*, the Third Circuit concluded that substituting "authorized by" for "under" in §1146(a) would be consistent with the use of the parallel language in §365(g)(1). 335 F. 3d, at 254. Piccadilly attempts to refute *Hechinger*'s reading of §365(g)(1), asserting that, because authorization for the assumption of a lease under a plan is described in §1123(b)(2), which "circles back to section 365," such authorization cannot be "subject to" or "authorized by" Chapter 11. Brief for Respondent 39 (emphasis deleted); see 11 U. S. C. §1123(b)(2) (providing that "a plan may . . . subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under

such section"). The phrase "under a plan confirmed" in
§365(g)(1), contends Piccadilly, is thus best read to mean
*"in accordance with* a plan confirmed" because a plan may
provide for the assumption of an executory contract or
unexpired lease but not—unlike §365—be the ultimate
authority for that assumption. As a result, Piccadilly
concludes that the identical language of §1146(a) should
have the same meaning.

Piccadilly supports this point with its assertion that,
unlike sales, postconfirmation assumptions or rejections
are not permitted under the Bankruptcy Code. See *NLRB*
v. *Bildisco & Bildisco,* 465 U. S. 513, 529 (1984) (stating
that in "a Chapter 11 reorganization, a debtor-in-
possession has until a reorganization plan is confirmed to
decide whether to accept or reject an executory contract").
Because, as Piccadilly contends, the phrase "under a plan
confirmed under chapter . . . 11" in §365(g)(1) cannot refer
to assumptions or rejections occurring after confirmation,
it would be anomalous to read the identical phrase in
§1146(a) to cover *only* postconfirmation transfers.

For its part, Florida argues that the statutory context of
§1146(a) supports its position that the stamp-tax exemp-
tion applies exclusively to postconfirmation transfers. It
observes that the subchapter in which §1146(a) appears is
entitled, "POSTCONFIRMATION MATTERS." Florida
contends that, while not dispositive, the placement of a
provision in a particular subchapter suggests that its
terms should be interpreted consistent with that subchap-
ter. See *Davis* v. *Michigan Dept. of Treasury,* 489 U. S.
803, 809 (1989) ("It is a fundamental canon of statutory
construction that the words of a statute must be read in
their context and with a view to their place in the overall
statutory scheme"). In addition, Florida dismisses Picca-
dilly's references to the temporal limitations in other Code
provisions on the ground that it would have been super-
fluous for Congress to add any further limitations to

Opinion of the Court

§1146(a)'s already unambiguous temporal element.

Even on the assumption that the text of §1146(a) is ambiguous, we are not persuaded by Piccadilly's contextual arguments. As noted above, Congress could have used language that made §1146(a)'s temporal element clear beyond question. Unlike §1146(a), however, the temporal language examples quoted by Piccadilly are indispensable to the operative meaning of the provisions in which they appear. Piccadilly's reliance on §1127, for example, is misplaced because that section explicitly differentiates between preconfirmation modifications, see §1127(a), and postconfirmation modifications, which are permissible "only if circumstances warrant" them, §1127(b). It was unnecessary for Congress to include in §1146(a) a phrase such as "at any time after confirmation of such plan" because the phrase "under a plan confirmed" is most naturally read to require that there be a confirmed plan at the time of the transfer.

Even if we were to adopt Piccadilly's broad definition of "under," its interpretation of the statute faces other obstacles. The asset transfer here can hardly be said to have been consummated "in accordance with" any confirmed plan because, as of the closing date, Piccadilly had not even submitted its plan to the Bankruptcy Court for confirmation. Piccadilly's asset sale was thus not conducted "in accordance with" any plan confirmed under Chapter 11. Rather, it was conducted "in accordance with" the procedures set forth in Chapter 3—specifically, §363(b)(1). To read the statute as Piccadilly proposes would make §1146(a)'s exemption turn on whether a debtor-in-possession's actions are consistent with a legal instrument that does not exist—and indeed may not even be conceived of—at the time of the sale. Reading §1146(a) in context with other relevant Code provisions, we find nothing justifying such a curious interpretation of what is a straightforward exemption.

Nor does anything in §365(g)(1) recommend Piccadilly's
reading of §1146(a). Section 365(g) generally allows a
trustee to reject "an executory contract or unexpired lease
of the debtor," *i.e.*, to reject a contract that is unfavorable
to the estate, subject to court approval. As the text makes
clear, such approval may occur either under "this section,"
§365(g)—*i.e.*, "at any time before the confirmation of a
plan," §365(d)(2)—or "under a plan confirmed under chap-
ter 9, 11, 12, or 13," §365(g)(1). Piccadilly relies heavily on
*Bildisco, supra,* in which this Court held that §365
permits a debtor-in-possession to reject a collective-
bargaining agreement like any other executory contract,
and that doing so is not an unfair labor practice under the
National Labor Relations Act. In reaching this conclusion,
the Court observed that "a debtor-in-possession has until a
reorganization plan is confirmed *to decide* whether to
accept or reject an executory contract." 465 U. S., at 529
(emphasis added).

We agree with *Bildisco*'s commonsense observation that
the *decision* whether to reject a contract or lease must be
made before confirmation. But that in no way undermines
the fact that the rejection takes *effect* upon or after con-
firmation of the Chapter 11 plan (or before confirmation if
pursuant to §365(d)(2)). In the context of §1146(a), the
decision whether to transfer a given asset "under a plan
confirmed" must be made prior to submitting the Chapter
11 plan to the bankruptcy court, but the transfer itself
cannot be "under a plan confirmed" until the court con-
firms the plan in question. Only at that point does the
transfer become eligible for the stamp-tax exemption.[8]

---

[8] Also meritless is Piccadilly's argument that "under" in the phrase
"under a plan confirmed under chapter . . . 11" in §365(g)(1) cannot be
read to mean "subject to" because §1123(b)(2), in Piccadilly's words,
"circles back to section 365." Brief for Respondent 39. Section
1123(b)(2) authorizes a plan to provide for the assumption, rejection, or
assignment of an executory contract or unexpired lease, but requires

Opinion of the Court

If the statutory context suggests anything, it is that §1146(a) is inapplicable to preconfirmation transfers. We find it informative that Congress placed §1146(a) in a subchapter entitled, "POSTCONFIRMATION MATTERS." To be sure, a subchapter heading cannot substitute for the operative text of the statute. See, *e.g.*, *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 212 (1998) ("'[T]he title of a statute . . . cannot limit the plain meaning of the text'"). Nonetheless, statutory titles and section headings "'are tools available for the resolution of a doubt about the meaning of a statute.'" *Porter* v. *Nussle*, 534 U. S. 516, 528 (2002). The placement of §1146(a) within a subchapter expressly limited to postconfirmation matters undermines Piccadilly's view that §1146(a) covers preconfirmation transfers.

But even if we were fully to accept Piccadilly's textual and contextual arguments, they would establish at most that the statutory language is ambiguous. They do not— and largely are not intended to—demonstrate that §1146(a)'s purported ambiguity should be resolved in Piccadilly's favor. Florida argues that various nontextual canons of construction require us to resolve any ambiguity in its favor. Piccadilly responds with substantive canons of its own. It is to these dueling canons of construction that we now turn.

C

Florida contends that even if the statutory text is deemed ambiguous, applicable substantive canons compel its interpretation of §1146(a). Florida first invokes the canon that "Congress is presumed to be aware of an ad-

---

that the plan do so in a manner consistent with the various requirements set forth throughout §365. By contrast, the phrase "under this section" in §365(g)(1) serves as a reference to §365(d)(2), which permits preconfirmation assumptions and rejections pursuant to a court order (and not, as in §1123(b)(2), pursuant to a confirmed plan).

ministrative or judicial interpretation of a statute and to
adopt that interpretation when it reenacts a statute with-
out change." *Lorillard* v. *Pons*, 434 U. S. 575, 580–581
(1978). Florida observes that the relevant language of
§1146(a) relating to "under a plan confirmed" has re-
mained unchanged since 1978 despite several revisions of
the Bankruptcy Code. The most recent revision in 2005
occurred after the Fourth Circuit's decision in *NVR* and
the Third Circuit's decision in *Hechinger* but before the
Eleventh Circuit's decision below. Florida asserts that
Congress ratified this longstanding interpretation when,
in its most recent amendments to the Code, it "readopted"
the stamp-tax provision verbatim as §1146(a). Brief for
Petitioner 26.

Florida also invokes the substantive canon—on which
the Third Circuit relied in *Hechinger*—that courts should
"'proceed carefully when asked to recognize an exemption
from state taxation that Congress has not clearly ex-
pressed.'" 335 F. 3d, at 254 (quoting *California State Bd.
of Equalization* v. *Sierra Summit, Inc.*, 490 U. S. 844, 851–
852 (1989)). In light of this directive, Florida contends
that §1146(a)'s language must be construed strictly in
favor of the States to prevent unwarranted displacement
of their tax laws. See *National Private Truck Council, Inc.*
v. *Oklahoma Tax Comm'n*, 515 U. S. 582, 590 (1995) (dis-
cussing principles of comity in taxation and the "federal
reluctance to interfere with state taxation" given the
"strong background presumption against interference").

Furthermore, Florida notes that the canon also discour-
ages federal interference with the administration of a
State's taxation scheme. See *id.*, at 586, 590. Florida
contends that the Court of Appeals' extension of §1146(a)
to preconfirmation transfers directly interferes with the
administration of the State's stamp tax, which is imposed
"prior to recordation" of the instrument of transfer. Fla.
Stat. §§201.01, 201.02(1) (2006). Extending the exemption

to transfers that occurred months or years before a confirmable plan even existed, Florida explains, may require the States to "'unravel'" stamp taxes already collected. Brief for Petitioner 31. Alternatively, should a court grant an exemption under §1146(a) before confirmation, States would be saddled with the task of monitoring whether the plan is ever eventually confirmed.

In response, Piccadilly contends that the federalism principle articulated in *Sierra Summit, supra,* at 852, does not apply where there is a "clear expression of an exemption from state taxation" overriding a State's authority to tax. In Piccadilly's view, that is precisely the case with regard to §1146(a), which proscribes the imposition of stamp taxes and demonstrates Congress' intent to exempt a category of state taxation.

Piccadilly further maintains that Florida's stamp tax is nothing more than a postpetition claim, specifically an administrative expense, which is paid as a priority claim ahead of the prepetition claims of most creditors. Equating Florida's receipt of tax revenue with a preference in favor of a particular claimant, Piccadilly argues that §1146(a)'s ambiguous exemption should not be construed to diminish other claimants' recoveries. See *Howard Delivery Service, Inc.* v. *Zurich American Ins. Co.,* 547 U. S. 651, 667 (2006) (emphasizing that "provisions allowing preferences must be tightly construed"). Reading the stamp-tax exemption too narrowly, Piccadilly maintains, "'is not only inconsistent with the policy of equality of distribution'" but also "'dilutes the value of the priority for those creditors Congress intended to prefer'"—those with prepetition claims. Brief for Respondent 54 (quoting *Howard Delivery Serv., supra,* at 667).

Above all, Piccadilly urges us to adopt the Court of Appeals' maxim that "a remedial statute such as the Bankruptcy Code should be liberally construed." 484 F. 3d, at 1304; *cf. Isbrandtsen Co.* v. *Johnson,* 343 U. S. 779,

782 (1952). In Piccadilly's view, any ambiguity in the statutory text is overshadowed by §1146(a)'s obvious purpose: to facilitate the Chapter 11 process "through giving tax relief." *In re Jacoby-Bender, Inc.*, 758 F. 2d 840, 841 (CA2 1985). Piccadilly characterizes the tax on asset transfers at issue here as tantamount to a levy on the bankruptcy process itself. A stamp tax like Florida's makes the sale of a debtor's property more expensive and reduces the total proceeds available to satisfy the creditors' claims, contrary to Congress' clear intent in enacting §1146(a).

What is unclear, Piccadilly argues, is why "Congress would have intended the anomaly that a transfer essential to a plan that occurs two minutes before confirmation may be taxed, but the same transfer occurring two seconds after may not." Brief for Respondent 43. After all, interpreting §1146(a) in the manner Florida proposes would lead precisely to that result. And that, Piccadilly asserts, is "absurd" in light of §1146(a)'s policy aim—evidenced by the provision's text and legislative history—of reducing the cost of asset transfers. In that vein, Piccadilly contends that interpreting §1146(a) to apply solely to postconfirmation transfers would undermine Chapter 11's twin objectives of "preserving going concerns and maximizing property available to satisfy creditors." *Bank of America Nat. Trust and Sav. Assn.* v. *203 North LaSalle Street Partnership*, 526 U. S. 434, 453 (1999). In order to obtain the maximum value for its assets—especially assets rapidly declining in value—Piccadilly claims that a debtor often must close the sale before formal confirmation of the Chapter 11 plan.

We agree with Florida that the federalism canon articulated in *Sierra Summit* and elsewhere obliges us to construe §1146(a)'s exemption narrowly. Piccadilly's effort to evade the canon falls well short of the mark because reading §1146(a) in the manner Piccadilly proposes would

Opinion of the Court

require us to do exactly what the canon counsels against. If we recognized an exemption for preconfirmation transfers, we would in effect be "'recogniz[ing] an exemption from state taxation that *Congress has not clearly expressed*'"—namely, an exemption for preconfirmation transfers. *Sierra Summit*, 490 U. S., at 851–852 (emphasis added); see also *Swarts* v. *Hammer*, 194 U. S. 441, 444 (1904) (reasoning that if Congress endeavored to exempt a debtor from state and local taxation, "the intention would be clearly expressed, not left to be collected or inferred from disputable considerations of convenience in administering the estate of the bankrupt"). Indeed, Piccadilly proves precisely this point by resting its entire case on the premise that Congress has expressed its stamp-tax exemption in ambiguous language. Therefore, far from being inapposite, the canon is decisive in this case.

The canons on which Piccadilly relies are inapposite. While we agree with Piccadilly that "provisions allowing preferences must be tightly construed," *Howard Delivery Serv., supra*, at 667, §1146(a) is not a preference-granting provision. The statutory text makes no mention of preferences.

Nor are we persuaded that in this case we should construe §1146(a) "liberally" to serve its ostensibly "remedial" purpose. Based on the Eleventh Circuit's declaration that the Bankruptcy Code is a "remedial statute," Piccadilly would stretch the disallowance well beyond what the statutory text can naturally bear. Apart from the opinion below, however, the only authority Piccadilly offers is a 1952 decision of this Court interpreting the Shipping Commissioners Act of 1872. See Brief for Respondent 54 (citing *Isbrandtsen, supra*, at 782). But unlike the statutory scheme in *Isbrandtsen*, which was "'designed to secure the comfort and health of seamen aboard ship, hospitalization at home and care abroad,'" 343 U. S., at 784 (quoting *Aguilar* v. *Standard Oil Co. of N. J.*, 318 U. S.

724, 728 (1943)), the Bankruptcy Code—and Chapter 11 in
particular—is not a remedial statute in that sense. To the
contrary, this Court has rejected the notion that "Congress
had a single purpose in enacting Chapter 11." *Toibb* v.
*Radloff,* 501 U. S. 157, 163 (1991). Rather, Chapter 11
strikes a balance between a debtor's interest in reorganiz-
ing and restructuring its debts and the creditors' interest
in maximizing the value of the bankruptcy estate. *Ibid.*
The Code also accommodates the interests of the States in
regulating property transfers by "'generally [leaving] the
determination of property rights in the assets of a bank-
rupt's estate to state law.'" *Travelers Casualty & Surety
Co. of America* v. *Pacific Gas & Elec. Co.,* 549 U. S. ___,
___ (2007) (slip op., at 7 ). Such interests often do not
coincide, and in this case, they clearly do not. We there-
fore decline to construe the exemption granted by §1146(a)
to the detriment of the State.

As for Piccadilly's assertion that reading §1146(a) to
allow preconfirmation transfers to be taxed while exempt-
ing others moments later would amount to an "absurd"
policy, we reiterate that "'it is not for us to substitute our
view of . . . policy for the legislation which has been passed
by Congress.'" *Hechinger,* 335 F. 3d, at 256. That said,
we see no absurdity in reading §1146(a) as setting forth a
simple, bright-line rule instead of the complex, after-the-
fact inquiry Piccadilly envisions. At bottom, we agree with
the Fourth Circuit's summation of §1146(a):

> "Congress struck a most reasonable balance. If a
> debtor is able to develop a Chapter 11 reorganization
> and obtain confirmation, then the debtor is to be af-
> forded relief from certain taxation to facilitate the im-
> plementation of the reorganization plan. Before a
> debtor reaches this point, however, the state and local
> tax systems may not be subjected to federal interfer-
> ence." *NVR,* 189 F. 3d, at 458.

Opinion of the Court

Lastly, to the extent the "practical realities" of Chapter 11 reorganizations are increasingly rendering postconfirmation transfers a thing of the past, see 484 F. 3d, at 1304, it is incumbent upon the Legislature, and not the Judiciary, to determine whether §1146(a) is in need of revision. See, *e.g.*, *Ali* v. *Federal Bureau of Prisons*, 552 U. S. ____, ____ (2008) (slip op., at 14 ) ("We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable").

### III

The most natural reading of §1146(a)'s text, the provision's placement within the Code, and applicable substantive canons all lead to the same conclusion: Section 1146(a) affords a stamp-tax exemption only to transfers made pursuant to a Chapter 11 plan that has been confirmed. Because Piccadilly transferred its assets before its Chapter 11 plan was confirmed by the Bankruptcy Court, it may not rely on §1146(a) to avoid Florida's stamp taxes. Accordingly, we reverse the judgment below and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*



Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 4982364 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 4982364 (E.D.La.))**

**H**
In re Babcock & Wilcox Co.
E.D.La.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. Louisiana.
In re: THE BABCOCK & WILCOX CO., Diamond
Power International, Inc. Babcock & Wilcox Con-
struction Co., Inc., Americon, Inc., Debtor(s)
No. Civ.A. 05-232.

Dec. 28, 2005.

*EX PARTE ORDER VACATING BANKRUPTCY
COURT ORDER RECOMMENDING CONFIRMA-
TION OF PLAN OF REORGANIZATION AND
DISMISSING APPEALS AND 9033 OBJECTIONS,
WITHOUT PREJUDICE*

VANCE, J.
*1 Considering the Ex Parte Joint Motion for Order
Vacating Bankruptcy Court Order Recommending
Confirmation of Plan of Reorganization and Dis-
missing Appeals and 9033 Objections, Without Pre-
judice, filed hereby by the Debtors, the Asbestos
Claimants' Committee (the "ACC"), the Future
Claimants' Representative for Asbestos-Related
Claims (the "FCR"), and McDermott Incorporated
("McDermott") (all hereinafter referred to as "the
Proponents"), American Nuclear Insurers ("ANI"),
St. Paul Mercury Insurance Company ("St.Paul"),
The ACE Companies FN1 ("ACE") and Certain
Law Firms ("Appellees"), which came be heard on
December 22, 2005;

> FN1. ACE Companies shall mean Century
> Indemnity Company (as successor to CCI
> Insurance Company, as successor to Insur-
> ance Company of North America and as
> successor to CIGNA Specialty Insurance
> Company (formerly California Union In-
> surance Company)); Westchester Fire In-
> surance Company (with respect to certain
> policies issued by U.S. Fire Insurance

Company, the obligations and rights of
which have been transferred to
Westchester Fire Insurance company);
Central National Insurance Company of
Omaha, through Cravens Dargan & Com-
pany, its managing general agent; Insur-
ance Company of North America; Pacific
Employers Insurance Company; ACE In-
surance Company of Texas, f/k/a Cigna In-
surance Company of Texas, f/k/a INA of
Texas, f/k/a Pacific Employers Indemnity
Company; Atlantic Employers Insurance
Company; ACE Insurance Company of
Illinois, f/k/a Cigna Insurance Company of
Illinois, f/k/a INA Insurance Company of
Illinois; ACE American Insurance Com-
pany, f/k/a Cigna Insurance company;
CIGNA Property and Casualty Insurance
Company; Bankers Standard Company; In-
demnity Insurance Company of North
America; ACE Insurance Company of
Ohio, f/k/a Cigna Insurance Company of
Ohio, f/k/a INA Insurance Company of
Ohio; INA of Illinois; P.T. ACE Insurance;
ACE Seguros S.A.; ACE Insurance Lim-
ited; and ACE Insurance S.A.-N.V.. Refer-
ence to the ACE Companies in this Motion
shall mean one or more of the ACE Com-
panies, as the case may be.

IT IS HEREBY ORDERED that the Bankruptcy
Court's Order of November 9, 2004 recommending
confirmation of the Third Amended Plan of Reor-
ganization is vacated;

IT IS FURTHER HEREBY ORDERED that the ap-
peals and 9033 objections filed by American Nucle-
ar Insurers, St. Paul Mercury Insurance Company,
ACE Companies, the Proponents and Certain Law
Firms are dismissed, without prejudice.

New Orleans, Louisiana this 27th day of December,
2005.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 4982364 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 4982364 (E.D.La.))**

E.D.La.,2005.
In re Babcock & Wilcox Co.
Not Reported in F.Supp.2d, 2005 WL 4982364
(E.D.La.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 07–312

## FLORIDA DEPARTMENT OF REVENUE, PETITIONER *v.* PICCADILLY CAFETERIAS, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 16, 2008]

JUSTICE BREYER, with whom JUSTICE STEVENS joins, dissenting.

The Bankruptcy Code provides that the "transfer" of an asset *"under a plan confirmed under section 1129 of this title,* may not be taxed under any law imposing a stamp tax or similar tax." 11 U. S. C. §1146(a) (2000 ed., Supp V) (previously §1146(c)) (emphasis added). In this case, the debtor's reorganization "plan" provides for the "transfer" of assets. But the "plan" itself was not "confirmed under section 1129 of this title" (*i.e.,* the Bankruptcy Judge did not formally approve the plan) until *after* the "transfer" of assets took place. See §1129 (2000 ed. and Supp. V) (detailing the requirements for bankruptcy court approval of a Chapter 11 plan).

Hence we must ask whether the time of transfer matters. Do the statutory words "under a plan confirmed under section 1129 of this title" apply only where a transfer takes place "under a plan" that at the time of the transfer *already has been* "confirmed under section 1129 of this title"? Or, do they also apply where a transfer takes place "under a plan" that *subsequently is* "confirmed under section 1129 of this title"? The Court concludes that the statutory phrase applies only where a transfer takes place "under a plan" that at the time of transfer *already has been* "confirmed under section 1129 of this title." In my

view, however, the statutory phrase applies "under a plan"
that at the time of transfer either *already has been* or
*subsequently is* "confirmed." In a word, the majority be-
lieves that the time (pre- or post-transfer) at which the
bankruptcy judge confirms the reorganization plan mat-
ters. I believe that it does not. (And construing the provi-
sion to refer to a plan that simply "is" confirmed would
require us to read fewer words into the statute than the
Court's construction, which reads the provision to refer
only to a plan "that has been" confirmed, *ante*, at 19.)

The statutory language itself is perfectly ambiguous on
the point. Linguistically speaking, it is no more difficult to
apply the words "plan confirmed" to instances in which the
"plan" *subsequently is* "confirmed" than to restrict their
application to instances in which the "plan" *already has
been* "confirmed." See *In re Piccadilly Cafeterias, Inc.*, 484
F. 3d 1299, 1304 (CA11 2007) *(per curiam)* ("[T]he statute
can plausibly be read either as describing eligible trans-
fers to include transfers 'under a plan confirmed' regard-
less of *when* the plan is confirmed, *or* . . . imposing a tem-
poral restriction on when the confirmation of the plan
must occur" (emphasis in original)). Cf. *In re Hechinger
Inv. Co. of Del.*, 335 F. 3d 243, 252–253 (CA3 2003) (major-
ity opinion of Alito, J.) (noting more than one "plausible
interpretation"); *In re NVR, LP*, 189 F. 3d 442, 458 (CA4
1999) (Wilkinson, J., concurring in part and concurring in
judgment) ("equally possible that the provision requires
only that the transfer occur 'under'—i.e., that it be inferior
or subordinate to—'a plan' that is ultimately 'confirmed'").
But cf. *ante*, at 7 (majority believes its reading is "clearly
the more natural").

Nor can I find any text-based argument that points
clearly in one direction rather than the other. Indeed, the
majority, after methodically combing the textualist
beaches, finds that a comparison with other somewhat
similar phrases in the Bankruptcy Code sheds little light.

BREYER, J., dissenting

For example, on the one hand, if Congress thought the time of confirmation mattered, why did it not say so expressly as it has done elsewhere in the Code? See, *e.g.*, 11 U. S. C. §1127(b) (plan proponent may modify it "at any time *after* confirmation" (emphasis added)); §1104(a) ("[a]t any time after the commencement of the case but *before* confirmation" (emphasis added)); §1104(c) ("at any time *before* the confirmation of a plan" (emphasis added)); §1114(e)(2) ("*before* a plan confirmed under section 1129 of this title is effective" (emphasis added)).  On the other hand, if Congress thought the time of confirmation did *not* matter, why did it place this provision in a subchapter entitled "POSTCONFIRMATION MATTERS"?  See 11 U. S. C., ch. 11, subch. III.  (And yet one could also argue that the tax exemption provision appears under the "postconfirmation matters" title because the trigger for the exemption is plan confirmation.  Thus, the exemption is a "postconfirmation matter," regardless of when the transfer occurs.)

The canons of interpretation offer little help.  And the majority, for the most part, seems to agree.  It ultimately rests its interpretive conclusion upon this Court's statement that courts "must proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly expressed." *California State Bd. of Equalization* v. *Sierra Summit, Inc.*, 490 U. S. 844, 851–852 (1989) (internal quotation marks omitted).  See *ante*, at 17.  But when, as here, we interpret a provision the *express point of which* is to exempt some category of state taxation, how can the statement in *Sierra Summit* prove determinative?  See §1146(a) ("The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, *may not be taxed* under any law imposing a stamp tax or similar tax" (emphasis added)).

Neither does Florida's related claim, protesting federal

interference in the *administration* of a State's taxation
scheme seem plausible.  See Brief for Petitioner 32–33
(noting the "additional difficulties and complexities that
will proliferate" under the lower court's decision).  *If* Flor-
ida now requires transferees to file a *pre-existing* con-
firmed plan in order to avoid payment of the stamp tax,
then why could Florida not require a transferee under a
not-yet-confirmed plan to pay the stamp tax and then file
the plan after its confirmation in order to obtain a refund?
(If there is some other, less curable, practical problem,
Florida has not explained what it is.)  Given these difficul-
ties, I suspect that the majority's reliance upon *Sierra
Summit*'s "canon," *ante*, at 14, reflects no more than an
effort to find the proverbial "any port" in this interpretive
storm.

The absence of a clear answer in text or canons, how-
ever, should not lead us to judicial despair.  Consistent
with Court precedent, we can and should ask a further
question: *Why* would Congress have insisted upon tempo-
ral limits?  What reasonable *purpose* might such limits
serve?  See, *e.g., Dolan* v. *Postal Service*, 546 U. S. 481,
486 (2006) ("Interpretation of a word or phrase depends
upon reading the whole statutory text, *considering the
purpose* and context of the statute, and consulting any
precedents or authorities that inform the analysis" (em-
phasis added)); *Robinson* v. *Shell Oil Co.*, 519 U. S. 337,
346 (1997) (the Court's construction of a statute's meaning
based in part on its consideration of the statute's *"primary
purpose"* (emphasis added)).  In fact, the majority's read-
ing of temporal limits in §1146(a) serves *no reasonable
congressional purpose at all.*

The statute's purpose is apparent on its face.  It seeks to
further Chapter 11's basic objectives: (1) "preserving going
concerns" and (2) "maximizing property available to sat-
isfy creditors." *Bank of America Nat. Trust and Sav. Assn.*
v. *203 North LaSalle Street Partnership*, 526 U. S. 434,

BREYER, J., dissenting

453 (1999). See also *Toibb* v. *Radloff,* 501 U. S. 157, 163 (1991) (Chapter 11 "embodies the general [Bankruptcy] Code policy of maximizing the value of the bankruptcy estate"). As an important bankruptcy treatise notes, "[i]n addition to tax relief, the purpose of the exemption of [§1146(a)] is to encourage and facilitate bankruptcy asset sales." 8 Collier on Bankruptcy ¶1146.02, p. 1146–3 (15th ed. rev. 2005). It furthers these objectives where, *e.g.,* asset transfers are at issue, by turning over to the estate (for the use of creditors or to facilitate reorganization) funds that otherwise would go to pay state stamp taxes on plan-related transferred assets. The requirement that the transfers take place pursuant to a reorganization "plan" that is "confirmed" provides the bankruptcy judge's assurance that the transfer meets with creditor approval and the requirements laid out in §1129.

How would the majority's temporal limitation further these statutory objectives? It would not do so in any way. From the perspective of these purposes, it makes no difference whether a transfer takes place before or after the plan is confirmed. In both instances the exemption puts in the hands of the creditors or the estate money that would otherwise go to the State in the form of a stamp tax. In both instances the confirmation of the related plan assures the legitimacy (from bankruptcy law's perspective) of the plan that provides for the assets transfer.

Moreover, one major reason why a transfer may take place *before* rather than *after* a plan is confirmed is that the preconfirmation bankruptcy process takes time. As the Administrative Office of the United States Courts recently reported, "[a] Chapter 11 case may continue for many years." Bankruptcy Basics (Apr. 2006), online at http://www.uscourts.gov/bankruptcycourts/bankruptcybasics/chapter11.html (as visited June 13, 2008, and available in Clerk of Court's case file). Accord, *In re Hechinger Inv. Co. of Del.,* 254 B. R. 306, 320 (Bkrtcy. Ct. Del. 2000) (noting it

may run "a year or two"). And a firm (or its assets) may
have more value (say, as a going concern) where sale takes
place quickly. As the District Court in this case acknowl-
edged, "there are times when it is more advantageous for
the debtor to begin to sell as many assets as quickly as
possible in order to insure that the assets do not lose
value." *In re Piccadilly Cafeterias, Inc.,* 379 B. R. 215, 224
(SD Fla. 2006) (internal quotations marks and alteration
omitted). See, *e.g., In re Webster Classic Auctions, Inc.,*
318 B. R. 216, 219 (Bkrtcy. Ct. MD Fla. 2004) (recognizing
"the inestimable benefit to a Chapter 11 estate to sell a
piece of property at the most opportune time—whether
pre- or postconfirmation—as opposed to requiring all
concerned to wait for a postconfirmation sale in order to
receive the tax relief Congress obviously intended"); *In re
Medical Software Solutions,* 286 B. R. 431, 441 (Bkrtcy.
Ct. Utah 2002) (approving preconfirmation sale of debtor's
assets recognizing that the assets' "value is reducing
rapidly" and there was only a narrow window for a viable
sale of the assets). Thus, an immediate sale can often
make more revenue available to creditors or for reorgani-
zation of the remaining assets. Stamp taxes on related
transfers simply reduce the funds available for any such
legitimate purposes. And insofar as the Court's interpre-
tation of the statute reduces the funds made available,
that interpretation inhibits the statute's efforts to achieve
its basic objectives.

Worse than that, if the potential loss of stamp tax reve-
nue threatens delay in implementing any such decision to
sell, then creditors (or the remaining reorganized enter-
prise) could suffer far more serious harm. They could lose
the extra revenues that a speedy sale might otherwise
produce. See, *e.g., In re Met-L-Wood Corp.,* 861 F. 2d
1012, 1017 (CA7 1988) (as suppliers and customers "shy
away," it can make sense quickly to sell business to other
owners so that it "can continue" to operate "free of the

stigma and uncertainty of bankruptcy"). In the present case, for example, Piccadilly, by selling assets quickly after strategic negotiation, realized $80 million, considerably more than the $54 million originally offered before Piccadilly filed for bankruptcy. That fact, along with the Bankruptcy Court's finding of "sound business reasons" for the prompt sale of Piccadilly's assets and that the expeditious sale was "in the best interests of creditors of [Piccadilly] and other parties in interest," App. 32a, suggest that considerably less would have been available for creditors had Piccadilly waited until after the plan's confirmation to execute the sale plan.

What conceivable reason could Congress have had for silently writing into the statute's language a temporal distinction with such consequences? The majority can find none. It simply says that the result is not "'absurd'" and notes the advantages of a "bright-line rule." *Ante*, at 18. I agree that the majority's interpretation is not absurd and do not dispute the advantages of a clear rule. But I think the statute supplies a clear enough rule—transfers are exempt when there is confirmation and are not exempt when there is no confirmation. And I see no reason to adopt the majority's preferred construction (that only transfers completed after plan confirmation are exempt), where it conflicts with the statute's purpose.

Of course, we should not substitute "'"*our view* of . . . policy"'" for the statute that Congress enacted. *Ante*, at 18 (emphasis added). But we certainly should consider *Congress'* view of the policy for the statute it created, and that view inheres in the statute's purpose. "Statutory interpretation is not a game of blind man's bluff. Judges are free to consider statutory language in light of a statute's basic purposes." *Dole Food Co.* v. *Patrickson*, 538 U. S. 468, 484 (2003) (BREYER, J., concurring in part and dissenting in part). It is the majority's failure to work with this important tool of statutory interpretation that

8          FLORIDA DEPT. OF REVENUE *v.* PICCADILLY
                      CAFETERIAS, INC.
                    BREYER, J., dissenting

has led it to construe the present statute in a way that, in my view, runs contrary to what Congress would have hoped for and expected.

For these reasons, I respectfully dissent.

# UNREPORTED DECISIONS
# PART 2 OF 3

LEXSEE 1999 U.S. DIST. LEXIS 8047



Positive
As of: Jul 03, 2008

## RICHARD DODSON, JR. v. OLD REPUBLIC INSURANCE COMPANY

### CIVIL ACTION NO. 98-3041 SECTION "N"

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

### *1999 U.S. Dist. LEXIS 8047*

### May 20, 1999, Decided
### May 21, 1999, Filed; May 24, 1999, Entered

**DISPOSITION:** [*1] Dodson's Motion for Summary Judgment GRANTED, LWCC's Complaint in Intervention dismissed. LWCC's Cross-Motion for Summary Judgment DENIED. Old Republic's Motion for Summary Judgment and for Partial Summary Judgment GRANTED. Dodson's motion for sanctions DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff injured employee moved for summary judgment, defendant underinsured motorist insurer moved for summary judgment and partial summary judgment, and intervenor plaintiff workers' compensation insurer cross-moved for summary judgment in plaintiff's action to recover for personal injuries.

**OVERVIEW:** Plaintiff injured employee sued defendant underinsured motorist insurer for injuries arising from an automobile accident that occurred during the course and scope of plaintiff's employment. Plaintiff moved for summary judgment and sanctions. Defendant moved for summary judgment and partial summary judgment. Intervenor plaintiff workers' compensation insurer cross-moved for summary judgment on the issue of the recognition of a lien and entitlement to the statutory dollar for dollar credit. The court granted plaintiff's summary judgment motion, holding that intervenor plaintiff was not entitled to reimbursement due to the exclusion clause in the policy. Intervenor plaintiff was not entitled to dollar for dollar credit because the employer waived the right to a credit for future obligations in exchange for a less expensive policy. The court granted defendant's summary judgment and partial summary judgment motions because defendant was entitled to a credit in the amount of intervenor plaintiff's payments in order to comply with the principles of solidary liability. The court denied plaintiff's motion for sanctions because plaintiff intervenor raised nonfrivolous defenses.

**OUTCOME:** The court granted plaintiff injured employee's summary judgment motion because intervenor plaintiff workers' compensation carrier was not entitled to reimbursement or dollar for dollar credit. The court granted defendant underinsured motorist insurer's summary judgment and partial summary judgment motions because defendant was entitled to a credit. The court denied plaintiff's motion for sanctions.

**LexisNexis(R) Headnotes**

*Insurance Law > Motor Vehicle Insurance > Coverage*

> *Uninsured Motorists > Liens & Setoffs*
*Insurance Law > Motor Vehicle Insurance > Coverage*
*> Uninsured Motorists > Subrogation*
*Labor & Employment Law > Employer Liability > Third*
*Party Insurers*
[HN1] Under Louisiana's workers' compensation scheme, the award of compensation to an injured employee shall not affect the claim or right of action of the said employee against third persons legally liable to pay damages to the employee. *La. Rev. Stat. Ann. § 23:1101(A).* The Louisiana Supreme Court has interpreted the term "third persons" as encompassing uninsured/underinsured insurers.

*Insurance Law > Motor Vehicle Insurance > Coverage*
*> Underinsured Motorists > Liens & Setoffs*
*Insurance Law > Motor Vehicle Insurance > Coverage*
*> Uninsured Motorists > Liens & Setoffs*
*Insurance Law > Motor Vehicle Insurance >*
*Exclusions > Public Policy*
[HN2] No statute prohibits an employer from contracting with its uninsured/underinsured insurer to exclude compensation reimbursement to a workers compensation insurer.

*Insurance Law > Motor Vehicle Insurance > Coverage*
*> Underinsured Motorists > General Overview*
*Insurance Law > Motor Vehicle Insurance > Coverage*
*> Uninsured Motorists > General Overview*
*Insurance Law > Motor Vehicle Insurance >*
*Exclusions > General Overview*
[HN3] A valid exclusion in an uninsured/underinsured motorist policy applies equally whether the compensation insurer files suit directly against the uninsured/underinsured motorist insurer, or whether the compensation insurer intervenes in the employee's suit against the uninsured/underinsured motorist insurer. Moreover, where the exclusion prohibits any direct or indirect benefit to the compensation insurer, it applies to compensation already paid as well as to future compensation to be made by the compensation insurer.

*Labor & Employment Law > Employer Liability > Third*
*Party Insurers*
*Workers' Compensation & SSDI > Benefit*
*Determinations > Dependents*
*Workers' Compensation & SSDI > Third Party Actions*
*> Subrogation*

[HN4] A Louisiana compensation insurer's right of recoupment is statutory subrogation dependent entirely upon the rights granted in La. Rev. Stat. Ann. § 23:1101-1103. The statutory scheme subrogates the compensation insurer to the employer's rights, not the employee's rights. *La. Rev. Stat. Ann. § 23:1162(D).* Payment of compensation under the scheme shall not affect the claim or right of action of the injured employee against third persons. *La. Rev. Stat. Ann. § 23:1101(A).*

*Torts > Procedure > Multiple Defendants > Joint &*
*Several Liability*
[HN5] In determining whether obligors are solidarily liable to an obligee, the sources of the obligors' debts are irrelevant so long as they are both obligated to the same thing, that is, to repair the same damage. In other words, differing sources of liability do not preclude an in solido obligation to the extent that each is liable for certain damages sustained by plaintiff. Where elements of damages recoverable from an employer and from a tort-feasor are co-extensive, the Louisiana Supreme Court has held that the employer and tortfeasor are solidarily liable.

*Torts > Procedure > Multiple Defendants > Joint &*
*Several Liability*
*Workers' Compensation & SSDI > Administrative*
*Proceedings > Evidence > Medical Evidence*
*Workers' Compensation & SSDI > Benefit*
*Determinations > Medical Benefits > General Overview*
[HN6] Payment by one solidary obligor exonerates the other obligor as to the creditor.

**COUNSEL:** For RICHARD R DODSON, JR, plaintiff: Gregory Pius DiLeo, Gregory P. DiLeo, Attorney at Law, New Orleans, LA.

For LOUISIANA WORKERS' COMPENSATION CORPORATION, intervenor: Musa Rahman, Egan, Johnson & Stiltner, Baton Rouge, LA.

For OLD REPUBLIC INSURANCE COMPANY, defendant: Stephen W. Glusman, Glusman, Moore, et al, Baton Rouge, LA.

**JUDGES:** EDITH BROWN CLEMENT, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** EDITH BROWN CLEMENT

1999 U.S. Dist. LEXIS 8047, *1

**OPINION**

ORDER AND REASONS

Before the Court are: (1) Plaintiff Richard Dodson, Jr.'s Motion for Summary Judgment; (2) Intervenor Plaintiff Louisiana Workers' Compensation Corporation's Cross-Motion for Summary Judgment on the Issue of Recognition of Lien and/or on Cross-Movant's Entitlement to the Statutory Dollar for Dollar Credit; (3) Defendant Old Republic Insurance Company's Motion for Summary Judgment and for Partial Summary Judgment; and (4) Plaintiff Richard Dodson's Motion for Sanctions. The Court resolves these motions as follows.

A. BACKGROUND

The following facts are undisputed. On December 5, 1996, Plaintiff Richard Dodson, Jr. ("Dodson") sustained injuries in an automobile accident during the course and scope of his employment with Ameritek Heat Treating Services, Inc. ("Ameritek"). At all relevant times, Ameritek had an insurance [*2] policy with Old Republic Insurance Company. The policy included coverage for uninsured/underinsured motorist liability ("UM liability") subject to the following exclusion: "This insurance does not apply to ... the direct or indirect benefit of any insurer or self-insurer under any workers' compensation disability benefits or similar law." At all relevant times, Ameritek also had a policy of workers' compensation insurance with Louisiana Workers' Compensation Corporation ("LWCC"). As a result of the injuries sustained by Dodson, LWCC has paid workers' compensation benefits and medical expenses.

On September 24, 1998, Dodson brought this action against Old Republic in Louisiana state court. Dodson alleges that the December 5, 1996 accident resulted from the negligence of Lennix Madere, Jr. ("Madere"), the driver of the other vehicle involved. Madere allegedly had an insurance policy limit of $ 10,000.00, an inadequate amount to compensate Dodson for his injuries. Dodson seeks to enforce Old Republic's UM coverage. On October 16, 1998, Old Republic removed this action to this Court on the basis of diversity jurisdiction. On February 1, 1999, LWCC filed a Complaint in Intervention seeking [*3] reimbursement for amounts paid on Dodson's behalf. Alternatively, LWCC seeks a dollar for dollar credit against any future obligations to pay weekly indemnity or medical benefits.

On March 12, 1999, Dodson filed a motion for summary judgment against LWCC. Owing to the exclusion clause in the insurance policy between Ameritek and Old Republic, Dodson argues that LWCC has no right to reimbursement or for a dollar for dollar credit against future obligations. Dodson seeks dismissal of LWCC's Complaint in Intervention. Dodson also moves for sanctions against LWCC under *Federal Rule of Civil Procedure 11*.

On March 26, 1999, LWCC filed a cross-motion for summary judgment. LWCC argues that it should be subrogated to Dodson's rights against Old Republic, thereby entitling it to reimbursement and avoiding double recovery by Dodson. Alternatively, LWCC contends that is should receive a credit against future obligations, because the right to a credit is separate and distinct from the right to reimbursement. [1]

> 1    Additionally, LWCC objects to the introduction of Exhibit A in Dodson's motion for summary judgment. Exhibit A contains multiple documents including the UM insurance policy at issue, an accident report, a damage assessment, and a recorded statement. Dodson correctly indicates in his memorandum in opposition to LWCC's cross-motion for summary judgment that only the insurance policy need be considered. This Court hereby strikes all documents from Dodson's Exhibit A except the relevant insurance policy.

[*4] On March 31, 1999, Old Republic filed a motion for partial summary judgment. Old Republic seeks dismissal of LWCC's claims for the same reasons urged by Dodson. Additionally, Old Republic moves for partial summary judgment against Dodson, thereby granting Old Republic a credit in the amount of payments made by LWCC.

B. ANALYSIS

[HN1] Under Louisiana's workers' compensation scheme, the award of compensation to an injured employee "shall not affect the claim or right of action of the said employee ? against [third persons legally liable to pay damages to the employee]." LSA-R.S. 23:1101(A). The compensation insurer [in this case LWCC] is subrogated to the rights of the employer [in this case Ameritek], *see* LSA-R.S. 23:1162(D), and has a statutory right of reimbursement against legally liable third

persons. LSA-R.S. 23:1101(B). The Louisiana Supreme Court has interpreted the term "third persons" as encompassing UM insurers [in this case Old Republic]. *Travelers Insurance Company v. Joseph, 656 So. 2d 1000, 1003 (La. 1995).*

The Louisiana Supreme Court in *Travelers* addressed "whether an employer's UM policy exclusion may prevent a workers compensation insurer from [*5] recovering compensation benefits paid to the UM policyholder's employee injured by an uninsured/underinsured motorist." *Id.* Despite the statutorily granted reimbursement claim for compensation insurers, the *Travelers* Court concluded that [HN2] "no statute prohibits an employer from contracting with its UM insurer to exclude compensation reimbursement." *Id. at 1004.* In reaching this conclusion, the *Travelers* Court relied on an individual's freedom to contract and the strong public policy considerations supporting UM legislation and full recovery for innocent accident victims. *Id.*

Since *Travelers*, several Louisiana appellate courts have extended the Louisiana Supreme Court's holding. These courts have found that [HN3] a valid exclusion in a UM policy "applies equally whether the compensation insurer files suit directly against the UM insurer, as in *Travelers*, or whether the compensation insurer intervenes in the employee's suit against the UM insurer." *LeJeune v. Brewster, 722 So. 2d 74, 76 (La.App. 1 Cir. 1998)* (citing *Cleaning Specialists, Inc. v. Johnson, 695 So. 2d 562, 565 (La.App. 4 Cir. 1997)).* Moreover, "where the exclusion prohibits any 'direct or indirect' [*6] benefit to the compensation insurer, it applies to compensation already paid as well as to future compensation to be made by the compensation insurer." *Id.* (citing *Cleaning Specialists, Inc., 695 So. 2d at 565).* *See also Watson v. Funderburk, 720 So. 2d 808, 809-10 (La.App. 3 Cir. 1998).*

## 1. WHETHER LWCC IS ENTITLED TO REIMBURSEMENT

The exclusion clause in the UM insurance policy at issue is identical to the clause examined by the Louisiana Supreme Court in *Travelers*. Both clauses provide that "this insurance does not apply to ... the direct or indirect benefit of any insurer or self-insurer under any workers' compensation disability benefits or similar law." Despite the identical language in the two clauses, LWCC argues that *Travelers* is inapplicable. LWCC contends that

*Travelers* applies only when the compensation insurer claims rights through the employer. LWCC argues that it should be subrogated to the rights of the employee, Dodson, who is not a party to the contract between Ameritek and Old Republic. LWCC emphasizes that, because of the collateral source rule, Dodson may receive duplicate compensation for the same items of damage unless the Court permits [*7] LWCC to claim a portion of Dodson's damages.

The Louisiana Court of Appeal, Third Circuit, has acknowledged but not resolved an argument similar to LWCC's. *See Watson, 720 So. 2d at 810.* The *Watson* Court observed that the rights of a compensation insurer may hinge on whether the UM insurer should "step into the shoes of the tortfeasors" or, alternatively, "should wear the same shoes as health insurers who contract with plaintiffs or employers to provide medical benefits, though they may result from the negligent or intentional acts of third parties." *Id.* In the latter instance, the *Watson* Court noted that the "workers' compensation carrier is not entitled to a credit or reimbursement from the benefits paid by these insurers." *Id.* (citing *Bryant v. New Orleans Public Service, Inc., 414 So. 2d 322 (La. 1982); Woolsey v. Cotton Bros. Bakery, 535 So. 2d 1119 (La. App. 2 Cir. 1988)).* Because no party raised the argument, the *Watson* Court did not decide "exactly what pair of shoes" fit the compensation insurer. *Id.*

This Court concludes that LWCC's argument runs afoul of the statutory language in the Louisiana workers compensation scheme. [HN4] "[A] Louisiana [*8] compensation insurer's right of recoupment is statutory subrogation dependent entirely upon the rights granted in Section 23:1101-1103." *Fidelity & Casualty Co. of New York, 345 F.2d 45, 49 (5th Cir. 1965).* The statutory scheme subrogates the compensation insurer to the employer's rights, not the employee's rights. *See* LSA-R.S. 23:1162(D). Payment of compensation under the scheme "shall not affect the claim or right of action of the [injured] employee [against third persons]." LSA-R.S. 23:1101(A). LWCC cites no authority for the proposition that a compensation insurer can subrogate to the rights of the employee. If in fact a compensation insurer could by-pass the terms of the Louisiana Workers Compensation Act by subrogation to the rights of the employee, the Louisiana Supreme Court's holding in *Travelers* would make little sense.

LWCC raises a valid concern regarding double

recovery. "The injured person should not receive more in reparation than that required to make him legally whole." *Johnson v. Fireman's Fund Ins. Co., 425 So. 2d 224, 227 (La. 1983)*. Nonetheless, LWCC's double recovery argument fails for two reasons. First, the Travelers Court rejected the [*9] compensation insurer's double recovery argument. *Travelers, 656 So. 2d at 1003-04*. So did the Louisiana Court of Appeal, Fourth Circuit. *Cleaning Specialists, 695 So. 2d at 565*. Second and even more importantly, denying reimbursement to LWCC will not result in double recovery for Dodson. As discussed below in the context of Old Republic's motion for summary judgment, denying reimbursement to LWCC merely results in a reallocation of payments between Old Republic and LWCC. Accordingly, this Court find LWCC's argument against double recovery to be without merit and concludes that LWCC is not entitled to reimbursement. [2]

> [2] The Court notes that LWCC might avoid this result in the future through careful drafting of its contracts with employers like Ameritek.

## 2. WHETHER LWCC IS ENTITLED TO A FUTURE CREDIT

Even if it is not entitled to reimbursement, LWCC argues that it should receive a dollar for dollar credit against any future obligations to pay weekly indemnity or medical benefits. That is, LWCC contends [*10] that it has no obligation to pay compensation in the future until Dodson has exhausted the proceeds on any recovery from Old Republic. *See LSA-R.S. 23:1103; Minor v. Frank's Door & Bldg. Supply Co., 657 So. 2d 737, 740 (La.App. 1 Cir. 1995)*. Because a credit for future compensation payments is allegedly irrelevant to Old Republic, LWCC argues that "it is illogical, unreasonable and absurd to assume [Ameritek] intended to make a promise to [Old Republic] regarding disposition of the credit." [3]

> [3] LWCC's Cross-Motion for Summary Judgment, p. 13.

Two Louisiana appellate courts have rejected LWCC's argument. *See Watson, 720 So. 2d at 809-10; Cleaning Specialists, 695 So. 2d at 565*. These courts dealt with exclusionary clauses which – like the one at issue – prohibited any "direct or indirect benefit" to the compensation insurer. *Watson, 720 So. 2d at 810; Cleaning Specialists, 695 So. 2d at 565*. These courts observed that "[a] credit against future obligations would

certainly be an [*11] indirect benefit, if not a direct one." *Cleaning Specialists, 695 So. 2d at 565*. As a result, these courts both concluded that the employer contracted away the compensation insurer's right under LSA-R.S. 23:1103 to a credit against future obligations to the employee. *Watson, 720 So. 2d at 811; Cleaning Specialists, 695 So. 2d at 565*.

Upon review of Watson and Cleaning Specialists, this Court agrees that LWCC's right to a future credit falls within the clear terms of the exclusion clause contained in the insurance policy between Ameritek and Old Republic. The issue remains, however, whether it would be "illogical, unreasonable and absurd" to assume Ameritek intended to enter into an agreement with Old Republic regarding disposition of credit for future obligations. Stated another way, did cause exist for Ameritek to bargain away its right to a future credit? *See LSA-C.C. arts. 1966, 1967.* As demonstrated in the following section, cause did exist. Since Old Republic is solidarily liable with LWCC, Old Republic's obligations are closely tied to those of LWCC. Ameritek presumably waived the right to a credit for future obligations in exchange for a less expensive [*12] policy. Accordingly, LWCC is not entitled to a dollar for dollar credit against any future obligations to pay weekly indemnity or medical benefits.

## 3. WHETHER OLD REPUBLIC IS ENTITLED TO A CREDIT

Old Republic's motion for partial summary judgment is twofold. First, Old Republic urges this Court to dismiss LWCC's Complaint in Intervention – a motion already resolved in the previous sections of this Order and Reasons. Second, Old Republic moves the Court for credit in the amount of LWCC's payments. Old Republic argues that it and LWCC are solidarily liable. Because performance rendered by one solidary obligor relieves the other solidary obligors of such liability, *see LSA-C.C. art. 1794*, Old Republic argues that it should not be held liable to Dodson for damage amounts paid by LWCC. Alternatively, if the collateral source rule applies, Dodson will receive a windfall of double recovery from LWCC and Old Republic.

[HN5] In determining whether obligors are solidarily liable to an obligee, "the sources of the obligors' debts are irrelevant so long as they are both obligated to the same thing, that is, to repair the same damage." *Williams v. Sewerage & Water Bd. of New Orleans, 611 [*13] So. 2d*

*1383, 1388 (La. 1993)* (citations omitted). In other words, differing sources of liability "[do] not preclude an in solido obligation *to the extent that each is liable for certain damages* sustained by plaintiff." Id. (citation omitted). Where elements of damages recoverable from an employer and from a tort-feasor are co-extensive, the Louisiana Supreme Court has held that the employer and tort-feasor are solidarily liable. *Id. at 1384.* Applying the reasoning of Williams, the Louisiana Court of Appeal, Fourth Circuit, has held that "[the plaintiff's UM insurer] and the plaintiff's workers' compensation carrier are solidarily liable as both are required by law to repair the damages caused by the accident." *Molony v. United Services Auto Ass'n, 683 So. 2d 891, 894 (La.App. 4 Cir. 1996).* This Court finds that Old Republic and LWCC are solidarily liable to the extent that each is liable for certain damages sustained by Dodson.

Next, this Court must consider whether Old Republic's status as a solidary obligor gives Old Republic a right to a credit against payments made by LWCC. Old Republic urges this Court to follow the Louisiana Supreme Court's decision in [*14] *Fertitta v. Allstate Ins. Co., 462 So. 2d 159 (La. 1985).* In Fertitta, the UM insurer paid $ 32,000 and waived any right to subrogation or other reimbursement in order to settle plaintiff's claims. *Id. at 161.* Subsequently, plaintiff obtained a judgment against the tortfeasor and the tortfeasor's liability insurer for $ 48,701.11, representing plaintiff's total damages. Id. The Fertitta Court first determined that the UM insurer, the tortfeasor, and the tortfeasor's liability insurer were solidary obligors. *Id. at 162-63.* Next, the Fertitta Court emphasized that "the Civil Code expressly provides that payment by one solidary obligor exonerates the other toward the creditor to the extent of that payment." *Id. at 164.* Because the UM insurer had contractually waived subrogation and reimbursement, the Fertitta Court recognized that "either plaintiff will recover more than her judicially determined damages or the tortfeasor will reap the benefits of the uninsured motorists carrier's having paid a substantial portion of the plaintiff's damages." Id. The Fertitta Court also acknowledged that "as the plaintiff paid premiums for her underinsured motorist [*15] coverage, arguably she should receive any 'windfall' in preference to the tortfeasor." Id. Nonetheless, relying on the principles of solidarity, the Fertitta Court held that the UM insurer's payment of $ 32,000 must be imputed to the debt owed by the other solidary obligors. Id.

Old Republic also directs this Court's attention to *Molony v. United Services Auto Ass'n, 683 So. 2d 891, 894 (La.App. 4 Cir. 1996).* In Molony, an employer's compensation insurer paid most of an injured employee's medical expenses. *Id. at 892.* When the employee filed suit against the tortfeasor, the tortfeasor's insurer, and the employee's UM carrier, the UM insurer moved to exclude from trial evidence of medical expenses already paid by the compensation insurer. Id. The Molony Court first concluded that the UM insurer and the compensation insurer were solidarily liable. *Id. at 893.* The Molony Court found that [HN6] "payment by one solidary obligor (in this case, plaintiff's workers' compensation carrier) exonerates the other obligor [the UM insurer] as to the creditor (plaintiff)." *Id. at 894.* Therefore, the Molony Court excluded evidence of medical expenses as irrelevant [*16] and unduly prejudicial. Id.

Both Fertitta and Molony expressly rejected arguments for application of the collateral source rule. *Fertitta, 462 So. 2d at 164, n. 7; Molony, 683 So. 2d at 893-94.* Under the collateral source rule, "an injured plaintiff's recovery is not diminished because of insurance benefits received by plaintiff from sources independent of the tortfeasor's procuration or contribution." *Molony, 683 So. 2d at 893* (citations omitted). Both Fertitta and Molony hinged their analysis on the existence of solidary liability. Fertitta distinguished "the case of medical payments or collision coverage, [where] because only the contract (and not the law) imposes the obligation on the insurer to repair some of the damages caused by the tortfeasor, there arguably is no solidary liability." *Fertitta, 462 So. 2d at 164, n. 7.* "Therefore, while the collateral source rule perhaps would apply to payments under medical payments or collision coverage (in the absence of a subrogation agreement), the rule does not apply to payments under uninsured motorist coverage." Id. In applying the reasoning of Fertitta, the Molony Court noted that [*17] the compensation insurer "is required under the Workers' Compensation Act to reimburse the plaintiff for lost wages and medical expenses incurred as a result of the accident." *Molony, 683 So. 2d at 894.* As already discussed above, the Molony Court concluded that, owing to principles of solidary liability, payment by the compensation insurer exonerated the UM insurer. Id.

In light of Fertitta and Molony, this Court finds that Old Republic is entitled to a credit in the amount of LWCC's payments. This result is necessary in order to

comply with the principles of solidary liability. Moreover, this result is consistent with the "strong public policy favoring full recovery by UM insureds," *see Travelers, 656 So. 2d at 1004,* and by tort victims. *See Fertitta, 462 So. 2d at 163.* While "[a] UM insurer may not reduce its liability by compensation benefits paid to an insured when the credit reduces the UM amount available to the insured," *see Travelers, 656 So. 2d at 1004,* this Court's ruling does not relieve Old Republic of liability for amounts left unpaid by LWCC, at least to the extent of the policy limits. This Court's decision also prevents Dodson [*18] from receiving double compensation. *See Fertitta, 462 So. 2d at 163.* Rather than granting Old Republic a windfall, this Court's decision enforces the contractual rights negotiated between Old Republic and Ameritek. Accordingly, this Court must grant Old Republic's motion for summary judgment and for partial summary judgment.

### 4. WHETHER TO IMPOSE *RULE 11* SANCTIONS ON LWCC

Dodson moves for *Rule 11* sanctions against LWCC because of LWCC's failure to withdraw its intervention upon request. This Court finds that LWCC has raised nonfrivolous defenses, particularly with respect to LWCC's argument for a credit against future obligations. Therefore, this Court must deny Dodson's motion for sanctions.

For the reasons set forth above,

IT IS ORDERED that Dodson's Motion for Summary Judgment is GRANTED, thereby dismissing LWCC's Complaint in Intervention.

IT IS FURTHER ORDERED that LWCC's Cross-Motion for Summary Judgment is DENIED.

IT IS FURTHER ORDERED that Old Republic's Motion for Summary Judgment and for Partial Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that Dodson's motion for sanctions is DENIED.

New Orleans, Louisiana, this 20 day of May, 1999.

EDITH BROWN [*19] CLEMENT

UNITED STATES DISTRICT JUDGE

127GSW

********** Print Completed **********

Time of Request: Thursday, July 03, 2008  14:46:05 EST

Print Number:    1862:101494540
Number of Lines: 309
Number of Pages: 7

Send To:   KAHANE, JEFF
           DUANE MORRIS LLP
           333 S HOPE ST STE 2300
           LOS ANGELES, CA 90071-1496

Westlaw.

Not Reported in B.R.                                                                                    Page 1
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

► 

In re Babcock & Wilcox Co.
Bkrtcy.E.D.La.,2004.
Only the Westlaw citation is currently available.
　　United States Bankruptcy Court,E.D. Louisiana.
In re: THE BABCOCK & WILCOX COMPANY, Debt-
or
Diamond Power International, Inc. Babcock & Wilcox
Construction Co ., Inc. Americon, Inc.
**No. 00-10992, 00-10993, 00-10994, 00-10995.**

　　　　Nov. 9, 2004.

AMENDED FINDINGS OF FACT AND CONCLU-
SIONS OF LAW REGARDING CORE MATTERS
AND PROPOSED FINDINGS OF FACT, CONCLU-
SIONS OF LAW AND RECOMMENDATIONS TO
THE DISTRICT COURT WITH RESPECT TO NON-
CORE MATTERS

BROWN, Bankruptcy J.

Outline

| | |
|---|---|
| I. | Introduction |
| II. | Background |
| | A. The Debtors |
| | B. Description of the Plan |
| III. | The Court has Jurisdiction to Enter Certain Insurance Related Findings |
| IV. | The Joint Plan Meets the Requirements of § 1129 |
| | A. The Plan complies with the applicable provisions of title 11, including the classification of claims under § 1122 and the contents of the Plan under § 1123 |
| | 1. Classification and Treatment |
| | 2. Adequate Means for Implementation |
| | B. The Plan meets the requirements of § 1129(a)(2), (4), and (5) |
| | C. The Plan meets the requirements of § 1129(a)(7)-(10) |
| | D. The Plan satisfies the requirements of § 1129(a)(11) |
| | E. Cram Down Requirements of § 1129(b) have been satisfied |
| | 1. Unfair Discrimination |
| | 2. Fair and Equitable |
| V. | The Plan has Been Filed in Good Faith, and not by Means Forbidden by Law |
| | A. The Plan is a result of extensive negotiations and |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                    Page 2
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

is not a collusive agreement between the Debtors, McDermott and plaintiff's lawyers

B. The Insurer's Contractual Rights

1. Anti-Assignment Clauses

2. Anti-Assignment, Management of Claims, Co-operation and Consent Clauses Preemption Under Section 1123(a)(5).

C. Payment of Valid Claims

VI.  The Plan's Discharge and Injunctive Provisions Satisfy the Requirements of the Bankruptcy Code

A. Uncontested Matters

B. Contested Matters

C. Section 105 Injunction

1. Identity of Interest

2. Substantial Contribution

3. Essential to Reorganization

4. Acceptance of the Plan by Impacted Class

5. Substantially Full Payment to Impacted Class

6. Full Payment of Nonsettling Claimants

VII.  Executory Contracts

A. Insurance Policies

B. Coverage in Place Agreements

VIII.  Apollo Parks Issues

A. Background Facts

B. The Plan, as it relates to Apollo/Parks, is Proposed in Good Faith

C. The Plan does not violate the Price Anderson Act

D. The Court's jurisdiction to determine insurance related findings

E. Proposed Findings of Fact and Conclusions of Law that ANI has Forfeited Rights under the Policies, such as the Management of Claims, No Action, and Consent to Settlement Provisions

1. Breach of Duty to Settle

2. Breach of Duty to Defend

3. Denial of Coverage

F. Reasonable Settlement

IX.  Other Objections

A. Lack of Notice

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                          Page 3
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

X.

I. *INTRODUCTION.*

*1 This matter came before the court as a hearing on confirmation of the third amended joint plan of reorganization as of June 25, 2003 with technical modifications as of October 1, 2004 proposed by the Debtors,[FN1] the Asbestos Claimants' Committee, the Future Claimants' Representative, and McDermott Incorporated ("Plan"). Objections to the Plan were filed by various entities,[FN2] and a hearing on confirmation of the Plan was held on September 22 through 26, 2003, October 20 through 24, 2003, December 16 through 18, 2003 and January 5 through 9, 2004. Also heard was the Plan Proponents'[FN3] motion to resolve Executory Contract Assumption Motion in conjunction with other insurance-related plan issues. The Plan Proponents assert that certain asbestos insurance settlement agreements are not executory contracts, and that the Debtors need not assume or reject them, or in the alternative, if they are determined to be executory, that the agreements can be assumed by the Debtors. The matter was heard in conjunction with other insurance-related matters at the hearing on confirmation. Since the hearings on confirmation, various settlements have been entered resolving certain objections and issues.[FN4]

FN1. See title for the names of the four debtors.

FN2. Objections were filed by a Certain Group of Law Firms; PMAC Ltd; Pulp & Paper of America, LLC; Babcock Wilcox Espanola, S.A.; American Nuclear Insurers and Mutual Atomic Energy Liability Underwriters ("ANI"); TIG and United States Fire Ins. Co.; Travelers Indemnity Co. and Travelers Casualty and Surety ("Travelers"); Maryland Ins. Co.; Ace Companies; Westchester Fire Ins. Co.; Certain Underwriters at Lloyds; as well as joinders in objections filed by Royal Indemnity Company, Maryland Ins. Company, and St. Paul Mercury Ins. Co.

B. Objections Specific to Ace Companies

Conclusion

FN3. Plan Proponents are The Babcock & Wilcox Company, Diamond Power International, Inc., Americon, Inc., and Babcock & Wilcox Construction Company, Inc. (collectively ("Debtors"), McDermott Incorporated ("MI"), the Asbestos Claimants' Committee (the "ACC"), and the Future Asbestos-Related Claimants' Representative (the "FCR"). As to A/P Township matters, the Plan Proponents also include the A/P Claimants, the A/P FCR, ARCO, BWXT Services and McDermott International, Inc. ("MII"). A chart showing the corporate structure of MII, the parent of MI and related companies including the debtors appears as Exhibit 32.

FN4. During the confirmation process, various settlements were concluded with CNA/ Continental Insurance, p. 5417; and Affiliated/ Appalachian, p. 5415. After the confirmation hearings, various settlements were approved with First State, p. 5804; AIG Member Cos., p. 5802; Associated International, p. 5803; Northwestern, p. 5824; Travelers Property Insurance Co., The Travelers Indemnity Co., The Travelers Insurance Co, The Travelers Indemnity Co.of Rhode Island and Travelers Casualty and Surety Co., p. 6065; Royal Indemnity Co, p. 6057; Arkwright, p. 6059; Mount McKinley Ins. Co, p. 6061; Prudential Assurance Co., Ltd. and Pearl Assurance plc., p. 6068; Riverstone and The Riverstone Insurers, p. 6063. No ruling, proceeding or other matter in connection with the Plan or the Chapter 11 Reorganization Cases will impair, affect or modify any of the Plan Proponents' or Settling Asbestos Insurance Entities' rights or obligations under any Asbestos PI Insurance Settlement Agreements.

This case is rapidly approaching the fifth anniversary of its filing date, February 22, 2000. The asbestos claimants, who for at least three years were strident adversaries of the debtors, are now in agreement on the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.    Page 4
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

joint plan before the court for confirmation. A number of the insurers, most of which are not creditors, continue to object. Other insurers have settled their differences and withdrawn, or are willing to withdraw, their objections if their pending motions for compromise are granted.[FN5] The Plan Proponents have been urging the court not to enter an opinion at this time, but instead to grant additional time for them to negotiate settlements with some of the remaining objecting insurers. Their plea for further delay falls on deaf ears because the court has the distinct feeling that:

FN5. See footnotes 2, 4.

1. This case has already lasted too long;

2. The professional fees and expenses have already been far too costly-$85,666,633 at last count, which only included charges through October 2003.[FN6] Such fees and expenses will probably exceed one hundred million dollars before this case is over-a far too expensive cost of reorganization.

FN6. See Exhibit 2013, which also contains a future estimate of $7,085,000, but that only forecasted future invoices through March 2004.

3. The parties have only reached settlements, filed a joint plan or taken affirmative and constructive action among themselves when the court has insisted upon firm deadlines. The clearest example is that Travelers and the Plan Proponents had advised the court as early as February 2004 that they had a "settlement in principle", but only filed settlement papers on September 21, 2004, because the court had set that date as a strict deadline.
The time has come to move this case forward.

This opinion constitutes the court's findings of fact and conclusions of law regarding core matters and proposed findings of fact and conclusions of law and recommendations to the district court regarding non-core matters arising in connection with the Plan confirmation. In the alternative, to the extent that certain insurance-related issues are determined to be non-core, they are tendered as proposed findings of fact and conclusions of law. The

court recommends that the Plan be confirmed.

## II. BACKGROUND

*2 A. *The Debtors and other parties.* The Babcock & Wilcox Company ("B & W") was initially formed in 1877, as the manufacturer and marketer of water tube steam boilers. In 1978, J. Ray McDermott & Co., Inc. (now McDermott Incorporated) acquired B & W.[FN7] B & W and its subsidiaries design, engineer, manufacture, and service industrial boiler systems.[FN8] The boilers contain or are alleged to contain asbestos liners.

FN7. Debtors Diamond Power International Inc. and Americon, Inc. are subsidiaries of B & W. Americon is a holding company for Babcock & Wilcox Construction Company, Inc., the other debtor. Joint Pre-Trial Order, 2-5.

FN8. Joint Pretrial Order, 1-2.

In the late 1970's, asbestos-related personal injury claims were asserted against B & W.[FN9] By 1999, the number of claims filed against B & W had reached over 400,000.[FN10] The Debtors filed for relief under Chapter 11 of the Bankruptcy Code on February 22, 2000.

FN9. Id. at 7.

FN10. Id. at 9.

Following the filing, the official Asbestos Claimants' Committee was formed by the United States Trustee, and the court authorized the appointment of Eric D. Green, Esq. as the legal representative for the future asbestos-related claimants. For well over two years, the ACC and the FCR were for the most part allied but in opposition to the Debtors as to the handling of present and future asbestos claims.

In February, 2001 the court granted the Debtors' request that a mediator be appointed. Mr. Francis McGovern was appointed to mediate with the Debtors, the Debtors' owners or affiliates, the ACC and the FCR regarding the general financial terms of a plan of reorganization. On February 22, 2001, at the court's insistence, the Debtors

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                    Page 5
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

filed their Disclosure Statement and Plan, which set forth the Debtor's proposal for a consensual plan of reorganization. Both the ACC and FCR initially did not agree to the Debtors' Plan, and it was not set for hearing. The plan was amended at least twice, in May and July, 2002.[FN11] In May, 2002, this court terminated the Debtors' exclusive period to file a plan of reorganization. Thereafter, in July, 2002, the ACC and the FCR filed their own Disclosure Statement and Plan.[FN12]

FN11. Pl. 3148, 3316.

FN12. Pl. 3320, 3321.

After much negotiation, the ACC, FCR and Debtors were able to resolve many of their differences and agree upon a form of plan. On December 19, 2002, the Debtors, MI, ACC and FCR filed a Substantially Complete Form of Joint Disclosure Statement. On June 25, 2003, the Plan Proponents filed the Third Amended Joint Disclosure Statement and the Third Amended Joint Plan of Reorganization. On August 28, 2003, the Plan Proponents filed the Plan Supplement. Following approval of the Disclosure Statement, on July 10, 2003, the court entered an order approving the confirmation hearing notice and solicitation package and the manner of mailing these, as well as the procedures for voting and tabulation and procedures for allowing claims for voting purposes.

On August 15, 2003 Mr. Uddo was appointed the Apollo FCR, representing the interests of the Apollo/ Parks ("A/P") future interest holders.[FN13] After his appointment, further negotiations with the settling parties took place, which resulted in the filing of technical amendments to the Plan and a revised A/P Settlement Agreement.[FN14] On November 12, 2003 and January 12, 2004, this Court approved the First and Second Sets of Technical Modifications to the Plan. Among other things, the modifications provide for: (1) the elimination of the Asbestos PD Trust and payment of Asbestos PD Claims and Indirect Asbestos PD Claims by the Reorganized Debtors based on the same payment percentage as previously contemplated to be paid on the claims by the trust; and (2) amendments to the Plan and Apollo/Parks related plan documents to reflect the agreement reached regarding the Apollo/Parks Township Claims. A Third Set of Technical Modifications to the Plan was approved on June 21, 2004, and a Fourth Set of Technical Modifications was approved on October 6, 2004.

FN13. Exhibit 3240.

FN14. The term sheet for the revised settlement was filed on December 16, 2003. Exhibit 3221.

**\*3** B. *Description of the Plan.* A brief summary of the Plan is necessary to adequately discuss classification and other issues that arose in connection with confirmation. The Plan generally provides for eleven classes of claims, as follows:

| Classification | Description | Voting Status | Vote |
|---|---|---|---|
| Class 1 | Priority | Unimpaired | |
| Class 2 | Non-Priority Secured | Unimpaired | |
| Class 3 | Workers' Compensation | Unimpaired | |
| Class 4 | Unsecured Trade | Unimpaired | |
| Class 5 | General Unsecured | Impaired | Reject |
| Class 6 | Asbestos PI Trust | Impaired | Accept |
| Class 7 | Asbestos PD and Indirect Asbestos PD | Impaired | Accept |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                          Page 6
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

| Class 8A | Apollo/Parks Township | Impaired | Accept |
|---|---|---|---|
| Class 8B | ARCO's Apollo/Parks | Impaired | Accept |
| Class 8C | ARCO's Environmental Remediation | Unimpaired | |
| Class 8D | Governmental Unit Environmental Remediation | Unimpaired | |
| Class 9 | Intercompany Claims | Unimpaired | |
| Class 10 | Affiliate Intercompany Claims | Unimpaired | |
| Class 11A | Equity Interests in B & W | Impaired | Accept |
| Class 11B | Equity Interests in Diamond | Unimpaired | |
| Class 11C | Equity Interests in B & W Const. | Unimpaired | |
| Class 11D | Equity Interests in Americon | Unimpaired | |

The Plan calls for the creation of the Asbestos Personal Injury Trust. All current and future asbestos personal-injury claims will be channeled to the Asbestos PI Trust, which will process the claims and pay all allowed claims pursuant to the Asbestos PI Trust Distribution Procedures ("TDP's"). The Asbestos PI Trust will be funded primarily by the transfer of (a) all the capital stock of B & W (valued at between $400 and $500 million); (b) insurance rights valued at as much as $1.15 billion; (c) 4.75 million shares of the common stock of MII or a related share price guaranty; (d) $92 million in promissory notes from MI; and (e) certain tax benefits. In exchange, the Debtors and certain of their non-debtor affiliates will be granted the benefit of the Asbestos PI Channeling Injunction, under which they will be forever released from liability on account of Asbestos PI Trust Claims.

Following mediation, the claimants in litigation involving the Apollo and Parks Township Facilities,[FN15] B & W and Arco entered into the Apollo/Parks Township Settlement Agreement ("Settlement"). The Settlement is incorporated into the Plan, which provides for the Apollo/Parks Township Claims to be channeled to the Apollo/Parks Township Trust ("A/P Trust"), and the A/P Trust to process and pay allowed claims. The Settlement and Plan contemplates the following: (a) the claims of the *Hall* claimants will be allowed in the B & W bankruptcy case at $110 million; (b) Arco will make a cash payment to the *Hall* claimants of $27.5 million upon the receipt of releases from the *Hall* claimants, as well as other conditions as set forth in the Settlement; (c) B & W will make a $2.8 million cash payment to the A/P Trust; (d) B & W will assign to the A/P Trust its claims against ANI for reimbursement of prior defense costs incurred and paid by B & W arising from the *Hall* litigation in the amount of $1.44 million; (e) The Apollo/Parks Township Insurance Contributors and the Arco entities will make the Apollo/Parks Township Insurance Rights Assignment to the A/P Trust; (f) The A/P Trust will process and pay the *Hall* claimants claims, and process, adjudicate, settle or pay A/P future demands and the unliquidated A/P present claims pursuant to the Settlement, the A/P Trust Agreement and the A/P Trust Distribution Procedures; and (g) a set aside of $75 million (with a cap of $100 million) will be made for A/P Future Demand Holders.

FN15. Known as the *Hall* claimants, for the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                        Page 7
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

lead plaintiff in the case against B & W, B & W Nuclear Environmental Services, Inc. and Arco pending in the United States District Court for the Western District of Pennsylvania, Civil Action No. 94-0951.Exhibit 3017.

### III. *THE COURT HAS JURISDICTION TO ENTER CERTAIN INSURANCE RELATED FINDINGS.*

**\*4** The Plan, at § 7.14.1, provides that the Court shall make several insurance-related findings of fact and/or conclusions of law in connection with, and as a condition to, confirmation of the Plan.[FN16] Several insurers object that the court lacks jurisdiction to enter a final judgment adjudicating the rights of the parties under the policies. They argue that questions regarding the coverage-in-place ("CIP") agreements and the insurance policies are already before the district court in various coverage actions, and that the insurers have requested jury trials in district court on their demands,[FN17] and by numerous and continuing objections in this court have attempted to reserve and protect their rights to jury trials.[FN18]

> FN16. These findings include the following:
>
> "(p) The terms of this Plan and the Asbestos Insurance Rights Assignment Agreement do not violate any obligation of the Debtors or any Insurance contributor under any consent-to-assignment of any Subject Asbestos Insurance Policy or Subject Asbestos Insurance Settlement Agreement;
>
> (q) The terms of this Plan and the Asbestos Insurance Rights Assignment Agreement do not violate any obligation of the Debtors or any Insurance Contributor under any consent-to-settlement, cooperation, management-of-claims, or no-action provision of any Subject Asbestos Insurance Policy or Subject Asbestos Insurance Settlement Agreement;
>
> (r) The Asbestos PI Insurance Rights Assignment and the Asbestos PD Insurance Rights

Assignment do not materially increase any insurers risk of providing coverage for asbestos-related liabilities under the relevant insurance policies as compared to the risk that was otherwise being borne by the insurers prior to the Effective Date;

> \* \* \*

> (v) The Asbestos Insurance Entity Injunction, the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, and the Apollo/Parks Township Channeling Injunction are essential to this Plan and the Debtors' reorganization efforts;

> \* \* \*

> (z) The duties and obligations of the Asbestos Insurance Entities under the Subject Asbestos Insurance Policies and Subject Asbestos Insurance Settlement Agreements are not diminished, reduced or eliminated by (1) the discharge, release, and extinguishment of all the obligations and liabilities of the Asbestos Protected Parties (other than the Reorganized Debtors respecting Class 7 Claims) for and in respect of all Asbestos PI Trust Claims and Class 7 Claims; (2) the assumption of responsibility and liability for all Asbestos PI Trust Claims and Class 7 Claims; or (3) the assignment of the Asbestos Insurance Rights pursuant to this Plan and the Asbestos Insurance Rights Assignment Agreement;

> \* \* \*

> (bb) The Asbestos PI Trust shall have the exclusive authority as of the Effective Date to defend all Asbestos PI Trust Claims involving Asbestos PI Insurance Rights; provided, however, that the Asbestos PI Trust may, in its sole discretion, afford any Entity, including any Asbestos Insurance Entity, the opportunity to participate in the resolution of any Asbestos PI Trust Claim;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)

(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

* * *

(ee) All of the Debtors' insurers who are affording insurance coverage that is the subject of the asbestos PI Insurance Rights Assignment and the Asbestos PD Insurance Rights Assignment, and the Apollo/Parks Township Insurers have been given notice and an opportunity to be heard."

FN17.Certain Underwriters at Lloyd's, London and Certain London Market Companies v. McDermott International, Inc., Case No. 03-2203;Certain Underwriters at Lloyd's, London and Certain London Market Companies v. The Babcock & Wilcox Co., Case No. 03-1192 (the "Declaratory Judgment Actions").

FN18. As to those insurers who filed proofs of claim, and consented to jurisdiction in the bankruptcy court, see page 15 *infra.*

The bankruptcy jurisdiction of the district court is found in 28 U.S.C. § 1334(b), which gives the district courts and adjunct bankruptcy courts jurisdiction of proceedings arising under title 11, arising in a case under title 11, or related to a case under title 11. To determine whether such jurisdiction exists, " 'it is necessary only to determine whether a matter is at least "related to" the bankruptcy." ' [FN19] Where bankruptcy jurisdiction is challenged, the result will turn on how broad or narrow "related to" jurisdiction is construed.

FN19.*In re Walker,* 51 F.3d 562, 569 (5th Cir.1995)(*quoting In re Wood,* 825 F.2d 90, 93 (5th Cir.1987).

A proceeding is "related to" a bankruptcy proceeding if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." [FN20] Stated another way, " 'an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and ... in any way impacts upon the handling and administration of the bankruptcy estate.' " [FN21] Therefore, in order for bankruptcy jurisdic-

tion to attach, the anticipated outcome of the action must (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect upon the administration of the estate.

FN20.*Id.*

FN21.*In re Bass,* 171 F.3d 1016, 1022 (5th Cir.1999).

Matters involving the confirmation of a plan arise under Title 11, and the court has jurisdiction to decide confirmation issues. Even if this confirmation proceeding necessarily involved a coverage issue, as asserted by insurers, suits involving insurance coverage are at least minimally related to a case under Chapter 11, because coverage will increase the estate. [FN22] At a minimum, the confirmation findings concerning the Debtors' insurance are at least "related to" bankruptcy proceedings, and this court has jurisdiction to hear the matter.

FN22.*Travelers Indemnity Co. v. Babcock and Wilcox, Co.,* Civ. Action 01-3387 (E.D.La.2002).

The bankruptcy court's authority to enter final orders in matters before it is found in 28 U.S.C. § 157, which permits the bankruptcy judge to hear and determine "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11."Section 157(c)(1) permits a bankruptcy judge to hear a noncore proceeding that is related to a case under title 11, but specifies that the judge shall submit proposed findings of fact and conclusions of law to the district court, and the district judge, after de novo review and after considering the proposed findings and conclusions, shall enter any final order or judgment regarding the matter. On core matters, the bankruptcy court may enter final orders.

*5 A matter is core if it involves a right created by federal bankruptcy law, or is one which would only arise in bankruptcy. [FN23] Matters that arise under the Bankruptcy Code are also considered core. [FN24] A matter is non-core if it does not invoke substantive rights created by federal bankruptcy law and is one that could exist

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                      Page 9
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

outside of bankruptcy.[FN25]

FN23.*In re Wood*, 825 F.2d 90 (5th Cir.1987)

FN24.*Liljeberg Enters. Inc. v. Lifemark Hosps. of La.*, 2000 WL 63307, at 3 (E.D.La. Jan. 21, 2000).

FN25.*Wood*, 825 F.2d at 97.

The Debtors argue that the Plan does not require a determination of the scope of insurance coverage, and that coverage issues will likely be decided in another forum. They argue that the findings are necessary to ensure that confirmation itself does not act to annul the Debtors' policies. In other words, the Debtors argue that sustaining the insurers' objection would make mere compliance with the Code requirements for confirmation a violation of the insurance contracts and relieve the insurers of obligations under the policies.

Other courts have noted, in a similar context, that "because of the significance insurance coverage issues often have in a bankruptcy proceeding, it is proper under certain circumstances for a bankruptcy court to adjudicate such matters."[FN26] In *Prudential*, a trustee charged with the liquidation of asbestos-related claims under a confirmed plan filed an adversary proceeding seeking a declaratory judgment to determine the trustee's rights under protection and indemnity policies. The district court held that a declaratory judgment proceeding to resolve issues concerning coverage and indemnification under insurance policies was a "core" proceeding.[FN27] Although the determination involved state law issues, that factor was not determinative given § 157(b)(3)'s wording that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." Instead, because the policies were property of the debtor's estate in a Chapter 11 proceeding with over 7,000 asbestos claims potentially covered by the policies filed against the estate, the determination of policy provisions was "essential and inextricably tied to the administration of the estate."[FN28]

FN26.*In re Prudential Lines, Inc.*, 170 B.R.

222, 231 (S.D.N.Y.1994).

FN27.*Id.* at 229.

FN28.*Id.; see also Asbestosis Claimants v. American Steamship Owners Mutual Protection and Indem. Assoc.*, 197 F.3d 632, 638 (2d Cir.1999)("resolving disputes relating to major insurance contracts are bound to have a significant impact on the administration of the estate" and are core).

The court is not asked to determine a separate suit or adversary proceeding seeking a declaration that coverage is or is not available. Instead, the inquiry concerns whether the Plan is capable of confirmation, a matter at the heart of the Chapter 11 provisions of the Bankruptcy Code. In connection with the Plan, the Debtors seek a declaration that confirmation of the Plan will not impair the ability of the § 524(g) trusts to access insurance rights transferred to the trusts. Section 157(b)(2)(L) specifies that core matters include "confirmation of plans." To the extent that a determination need be made of whether the Plan is capable of confirmation, or whether it is incapable of confirmation because its provisions run afoul of certain contractual rights of insurers, that determination is at the very heart of the function of the bankruptcy court, that is to determine whether the Plan is confirmable under the Bankruptcy Code. To the extent that the confirmation involves issues regarding the workings of a § 524(g) injunction, that too is a core matter. Similarly, § 365 expressly provides for the assumption or rejection of executory contracts, and a determination of whether an agreement is executory is a core bankruptcy function, as it arises under the Bankruptcy Code. Section 1123 governing the contents of a plan, provides that a plan must provide adequate means for its implementation, including but not limited to, curing or waiving of any defaults.[FN29] In order to determine confirmation, a core matter, the court must necessarily make determinations of whether insurance rights may be transferred to a trust to be established under § 524(g), whether the Plan meets the requirements of § 524, whether the Bankruptcy Code preempts certain contract provisions and whether the Plan provides adequate means for its implementation under § 1123(a)(5).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                      Page 10
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

FN29.11 USC 1123(a)(5)(G).

*6 Various insurers who have objected to confirmation have filed proofs of claim in this bankruptcy proceeding.[FN30] Generally, the filing of a proof of claim constitutes consent to the jurisdiction of the Bankruptcy Court.[FN31] Additionally, the filing of a claim invokes the core jurisdiction of the court under § 157(b)(2)(B), (C). As to insurers who have filed claims in the bankruptcy proceeding, core jurisdiction exists on issues relating to the insurers claims and objections to the Plan.

> FN30. These insurers include: Continental Company (P. 4491); TIG Insurance (P. 4499); American Home Ins. (P. 4516); Century Indemnity Ins. (P.4518); Westchester Fire Ins. Co. (P. 4519); and Ace USA Companies (P. 4520).

> FN31.*In re Baudoin*, 981 F.2d 736 (5th Cir.1993); *see Katchen v. Landy*, 382 U.S. 323 (1966); *Pan American World Airways, Inc. v. Evergreen Int'l Airlines, Inc.*, 132 B.R. 4 (SDNY 1991).

This is not a trial on coverage, and the court is not determining whether coverage exists under any particular policy. It is a trial on the confirmation of the Plan, and whether the Plan can be confirmed and the Debtors can proceed under the Plan. What the insurers argue is that the Plan may not implicate the insurers or policies of insurance, the largest single asset of the estate, without violating terms of the insurance contracts, thereby raising a coverage issue, which this court cannot finally determine. The insurers argue that confirmation of any plan funded by insurance will vitiate the policies and relieve the insurers of any obligation to make payments under the policies. The Debtors are put in a position that they cannot go forward on confirmation, as required by the Bankruptcy Code and Rules, because the act of formulating a plan involving insurance will breach obligations due under the policies. Likewise, they cannot simply wait for the coverage determinations to be made by the district court.[FN32] The act of going forward with confirmation of the plan cannot, of itself, be restrained by allegations that confirmation involves insurance is-

sues, that cannot be determined in this proceeding. The court finds that it has core jurisdiction to make insurance-related findings. To the extent that the district court may determine that certain issues are non-core, then the findings are made as proposed findings of fact and conclusions of law.

> FN32. The coverage actions were filed in 2003, three years after the filing of the Debtors' Chapter 11. The Bankruptcy Code requires that a plan be filed within 120 days of the petition date in order to maintain the exclusive period. This court has not only terminated exclusivity, but ordered that confirmation proceedings be commenced in September 2004. The Debtors thus lacked the option of simply waiting for the coverage matters to be decided by the district court prior to confirmation.

IV. *THE JOINT PLAN MEETS THE REQUIREMENTS OF § 1129.*

The court finds that the Plan meets the requirements of confirmation under 11 U.S.C. § 1129. On all core matters, the court finds that confirmation is appropriate. On non-core matters, the court recommends that the district court enter an order confirming the plan.

A. *The Plan complies with the applicable provisions of title 11, including the classification of claims under § 1122 and the contents of the plan under § 1123.*

The court finds that the Plan adequately designates classes of claims and interests, adequately specifies the classes of claims or interests that are not impaired under the Plan, and specifies the treatment of claims or interests that are impaired under the Plan.

1. *Classification and Treatment.*Certain law firms [FN33] object to the classification of claims made by the Plan under § 1122. They object that their clients settled asbestos-related personal injury tort or wrongful death claims and thus should not be included in Class 6, which also includes disallowed settled claims and unliquidated or contingent claims for personal injury tort and wrongful death claims. The objectors argue that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

allowed, settled claims are substantially similar to other non-tort claims in Classes 4 or 5 of the Plan, which will receive payment in full, yet are classified with unliquidated claims in Class 6, which will receive only a partial payment. They make three arguments: (1) settled claims are treated differently from unliquidated claims in the same class, in violation of §§ 1123(a)(4) and 1129(a)(1); (2) settled claims are not "substantially similar" to other Class 6 claims, and they cannot be classified together; (3) the current Class 6 classification is meant to disenfranchise and discriminate against settled claims, and constitutes improper gerrymandering.

> FN33. The law firms consist of Levy, Phillips & Konigsberg, LLP; Greitzer & Locks, and The Law Offices of Peter G. Angelos, P.C., and represent approximately 1,177 claimants who settled claims for asbestos-related personal injury tort or wrongful death claims with the Debtor prior to the filing of the Debtors' Chapter 11 petition.

*7 The classification objection made by Certain Law Firms is not new. The arguments regarding separate classification and gerrymandering were raised previously as objections to the Disclosure Statement, and rejected by the court.[FN34] Instead, the court found previously, and finds now, that the claims in Class 6 are substantially similar claims. Both the settled claims and the unliquidated personal injury and wrongful death claims are unsecured claims with common priority and rights against the estate, both are based on injuries or death claims stemming from alleged asbestos exposure, both will be paid from the pool of insurance rights.

> FN34. *See* Reasons for Order dated April 4, 2003, Pl. 4101.

The *Greystone* case [FN35] does not mandate separate classification as Certain Law Firms argue. Instead, the case prohibits separate classification of similar claims where a valid business purpose is lacking, or where the separate classification is meant to disenfranchise a dissenting class of creditors.

> FN35. *In re Greystone III Joint Venture*, 995

F.2d 1274, 1279 (5th Cir.1991), *cert. denied,* 506 U.S. 821 (1992).

In this case, the Plan placed unsecured trade claims in Class 4, and unsecured general claims in Class 5. Mr. David Keller, President and COO of B & W, testified at trial regarding the Plan's classification of claims, and testified as to the importance to the company of the ability to pay trade claims. He testified that the Debtors' reputation and future business success depends on the Debtors following through with representations made in this proceeding that the trade claims would be paid in full. Given the small amount of the trade claims, which are approximately $3.5 million, and the large size of the Debtors' contracts, the loss of future contracts would result in a revenue reduction greatly in excess of the amount needed to pay trade claims in full. As such, the court finds that a legitimate business justification exists for paying trade claims in full, and separate classification of Class 4 unsecured trade claims is appropriate.

The court also rejects the contention that settled claims in Class 6 are treated differently than other claims in the class. The Plan provides that all unsecured claims for personal injury caused by alleged exposure to asbestos in Class 6 will be paid in accordance with the provisions of the TDP. Similar claims will receive similar treatment under the TDPs. The claims will not be paid in full; however, the unrebutted testimony at trial was that as to the Debtors and their customers and suppliers, no business reason exists to pay asbestos personal injury claims in full.[FN36]

> FN36. Tr. David Keller, September 24, 2003.

Other objectors have argued that Class 3 claims for workers compensation, as well as Class 4 and Class 5 claims, should not be separately classified. Class 3 consists of workers compensation claims. Mr. Keller testified at trial that these unsecured claims are paid in the ordinary course through the state workers' compensation system. Additionally, business reasons exist for the Debtors to pay its injured employees, justifying separate classification of the workers compensation claims, and payment in full. The court finds that the unsecured workers compensation claims are dissimilar to trade or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

other unsecured claims,[FN37] and separate classification of Class 3 claims is appropriate.

> FN37.*In re U.S. Truck Co., Inc.,* 42 B.R. 790, 794 (Bankr.E.D.Mich.1984).

**\*8** Class 5 consists of general unsecured claims. Mr. Keller testified that this class included a disputed unsecured claim of the IRS, disputed miscellaneous legal claims, and the disputed claims of excess insurance carriers for recoupment of amounts previously paid to B & W. The claims are all disputed by the Debtors, are speculative in nature, and the Debtors estimate that the amount needed to pay these claims will not exceed $1 million. The Class 5 claims will receive a percentage payment on the allowed claims, similar to the treatment of Classes 6 and 7. The court finds that the separate classification of Class 5 unsecured claims is appropriate.

2. *Adequate Means for Implementation.*Section 1123(a)(5) requires that a plan provide adequate means for its implementation. As discussed above, the Plan provides for creation of the Asbestos PI Trust and the A/P Trust. Both trusts will be funded by, among other things, assignment of rights to the proceeds of B & W's insurance coverage. This insurance coverage is substantial, and is valued as high as $1.15 billion for the Asbestos PI Trust, and for the insurance rights assignment to the A/P Trust. The Plan provides for the creation of Trust Distribution Procedures governing the payment of trust claims. The other implementation procedures described in detail in the Plan are more than adequate to satisfy the requirements of § 1123(a)(5).

B. *The Plan meets the requirements of §§ 1129(a)(2), (4), and (5).*

No objections have been received that the Plan violates the provisions of §§ 1129(a)(2), (4) and (5). The court finds that the Plan Proponents have complied with the Code provisions. The Plan describes both impaired and unimpaired classes, and adequately describes their treatment. The Court, on July 10, 2003, approved the confirmation hearing notice, and provided procedures for the mailing of the solicitation packages and approval of the voting agent. Adequate notice was provided to creditors and parties in interest by the notice and procedures requirements approved by this Court. The court further finds that payments made under the Plan are reasonable, and the Plan complies with 1129(a)(4).

The Plan Proponents have made disclosures required by 1129(a)(5). The Plan Proponents have identified the officers and directors who will serve the reorganized Debtors, and the appointment of the officers and directors is consistent with the interests of the creditors, equity security holders and public policy. The Plan Proponents have also identified the individuals who will serve as Trustees of the Asbestos PI Trust, as well as their affiliations. Various objectors have questioned whether the Trustees are fair and impartial, citing alleged ties of some of the proposed trustees to the asbestos plaintiffs bar. The court finds that the Trustees have been adequately disclosed, and that appointment of the Trustees is consistent with the requirements of § 1129(a)(5). Insiders who will be employed or retained by the Debtors, as well as their compensation, have been disclosed, as required by § 1129(a)(5)(B).

**\*9** Although strong objections to the Plan Proponents refusal to name at this time the trustees of the A/P Trust-even though they had named the trustees of the Asbestos Trust-were raised by certain insurers, the court does not consider that as a bar to confirmation. The court does not read § 1129(a)(5) as requiring the names and identity of those individuals and finds nothing in the trust provisions of § 524(g)(1)(B) that requires the information.

Section 1129(a)(6) regarding regulatory commissions and rate changes is not applicable to these Debtors.

C. *The Plan meets the requirements of §§ 1129(a)(7)-(10).*

Subsection 1129(a)(7) requires that each holder of an impaired claim or interest either has accepted the Plan, or will receive an amount equal or greater than in a Chapter 7 liquidation. Section 1129(a)(8) provides for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                      Page 13
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

each class to accept the Plan or that the class not be impaired under the Plan. All impaired classes have voted on the Plan. All impaired classes, except Class 5, have voted to accept the Plan, by casting votes in favor of the Plan exceeding two-thirds of the amount of voting claims and one-half the number of voting claims in each class required for acceptance under 11 USC 1126(c). Class 11 equity shareholders have approved the Plan by vote exceeding two-thirds of the amount of shares who voted for the Plan, as required by 11 USC 1126(d). The Plan accordingly meets the requirements of § 1129(a)(10), that an impaired non-insider class vote to accept the Plan.

The non-accepting class, Class 5, will receive under the Plan an amount equal to or greater than what would be received in a Chapter 7 liquidation. At the confirmation hearing, the Plan Proponents presented the testimony of Pamela Zilly, an investment banker with the Blackstone Group, L.P. Her testimony was that the total assets available under the Plan for payment of claims are between $1.46 billion and $2.25 billion. After adjustment for allocations for cash or liquidation uses, between $1.2 billion and $1.97 billion in net assets is available for distribution under the Plan. In contrast, the Chapter 7 liquidation value of the Debtors assets was placed at between $584 million and $1 billion.[FN38] A greater return to creditors under the Plan is possible because of the contributions of various McDermott entities, including the promissory note of $92 million, and 4.75 million shares of McDermott International Inc. stock. The Court finds that under the Plan, each impaired class will receive or retain a claim or interest in property of value that is not less than the amount they would have received or retained in a Chapter 7 liquidation of the Debtors. Instead, it is clear that they will receive more under the Plan than from a liquidation, so the requirements of § 1129(a)(7) have been satisfied.

> FN38. Exhibit 17.

No dispute exists that the Plan meets the requirements of § 1129(a)(9).

*D. The Plan satisfies the requirements of § 1129(a)(11).*

Section 1129(a)(11) requires that confirmation of a plan is not likely to be followed by the liquidation, or further financial reorganization, of the debtor, unless such is proposed in the plan. In other words, for a plan to be confirmed, it must be "feasible."[FN39] The debtor must prove a plan's feasibility by a preponderance of the evidence.[FN40] A plan is feasible where it offers " 'a reasonable probability of success,"[FN41] and where "the debtor can realistically carry out its plan."[FN42]

> FN39. *T-H New Orleans Ltd. Partnership,* 116 F.3d 790, 801 (5th Cir.1997).

> FN40. *Id.*

> FN41. *Id, citing In re Landing Assoc., Ltd,* 157 B.R. 791, 820 (Bankr.W.D.Tex.1993).

> FN42. *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506 (Bankr.S.D.Tex.1989).

*10 In proving a reasonable probability of success, the bankruptcy court "need not require a guarantee of success ...., [o]nly a reasonable assurance of commercial viability is required."[FN43] In *T-H New Orleans Limited Partnership,* feasibility was shown where the debtor demonstrated that it was able to service the debt with an infusion of capital, and presented evidence regarding the past and present earning power of the debtor, the ability of management and the economic picture for similar businesses in the area.[FN44] Projections of future revenue are appropriate "where the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive."[FN45]

> FN43. *T-H New Orleans,* 116 F.3d at 801 (citations omitted).

> FN44. *Id.*

> FN45. *Id., citing In re Lakeside Global II. Ltd.,* 116 B.R. 499, 508 n. 20 (Bankr.S.D.Tex.1989).

Mr. Keller testified at confirmation regarding the Debtors' business prospects. Mr. Keller testified that the Debtors have excellent prospects for exit financing with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Citibank and Fleet, who have provided term sheets for exit financing. In addition, the ACC has negotiated with other banks for financing. In the post-confirmation period, the Debtors prospects for getting and performing contracts are good. He testified that in the post-petition period, the Debtors' income had increased by 33%, and the Debtors have become financially stronger in comparison to their competitors. He also testified that the Debtors have made tentative offers of post-confirmation employment to himself and to Richard Rimels, the current head of B & W Canada, and that he has confidence in the future management of Debtors. The Plan also makes provisions for the transition of B & W to a stand-alone company, and contemplates a transition period whereby McDermott will continue to provide critical services pursuant to a transition agreement. Mr. Keller's opinion was that the transition period was adequate, and B & W would be able to function as a stand-alone company at the end of the transition period.

The court finds that B & W has sustained its burden of proving feasibility under § 1129(a)(11). Additionally, the Plan satisfies the requirements of § 1129(a)(12), in that it provides for all fees payable under 28 USC § 1930 to be paid, and all retiree benefits to be satisfied. No objection has been received under §§ 1129(a)(12) and (13), and the court finds that these sections have been satisfied.

*E. Cram Down Requirements of § 1129(b) have been satisfied.*

Only Class 5, consisting of general unsecured claims, and an impaired class, has voted against the Plan. The Plan may nonetheless be confirmed if it meets the requirements of § 1129(b), that is, that all requirements other than § 1129(b)(8) that each impaired class has accepted the plan or is not impaired by the plan, where "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."[FN46] If these requirements are met, the Plan may be confirmed despite the rejection of an impaired class. Class 5 consists of general unsecured claims, including a disputed tax claim, insurer's disputed claims for in-

demnity, and certain disputed claims for damages. Each claim contained in Class 5 has been objected to, and certain of the insurer's claims have been estimated for voting purposes at $1.00 each.

FN46.11 U.S.C. 1129(b)(1).

1. *Unfair Discrimination.*

*11 Unfair discrimination has been found where similar claims are treated differently without a reasonable basis for the disparate treatment, or if a class of claims receives consideration of a value that is greater than the amount of its allowed claim.[FN47] A plan that unfairly singles out a claim for nonuniform treatment violates § 1129(b). One court, after making an exhaustive analysis of unfair discrimination, stated a four-part test to determine whether discrimination is fair: (1) whether the discrimination is supported by a reasonable basis; (2) the extent of good faith behind the proposal, (3) the degree to which the debtor can confirm a plan without such discrimination, (4) the treatment of the classes discriminated against.[FN48]

> FN47.*In re Kennedy,* 158 B.R. 589, 599 (Bankr.D. N.J.1993); *In re Johns-Manville Corp.,* 68 B.R. at 636.

> FN48.*In re Aztec Co.,* 107 B.R. 585, 590 (Bankr.M.D.Tenn.1989); *see In re Rochem, Ltd.,* 58 B.R. 641 (Bankr.D.N.J.1985).

Various objections have been made that the Plan unfairly discriminates against Class 5, which will receive a pro rata distribution, and Class 4 (trade creditors), which will receive payment in full. At the confirmation hearing, testimony was heard from Mr. Keller about the importance of paying trade creditors. Not only had the representation been made to the creditors from the inception of the case that they would be paid in full, the vendors are suppliers to the business, ones with claims that are not disputed or suspect. Additionally, the failure to pay trade claims in full may cause the loss of future contracts, contracts in size that could easily eclipse the $3.5 million to be paid trade creditors. By contrast, Class 5 consists of disputed and unliquidated claims of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                          Page 15
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

various creditors, including the insurers claims to recover sums paid under excess insurance policies under an indemnity theory, which have been valued at $1.00 for voting purposes, disputed ongoing lawsuits and a contested tax claim which the Debtors believe has been paid by the McDermott consolidated tax group. These claims have all been the subject of objections, and in the business judgment of B & W, have been determined to be lacking in merit. No business justification exists to pay the highly disputed claims in full. A business justification does exist, however, to pay trade claims, i.e., the relationships are important to the continued operation of the business and its reputation.[FN49] The court finds that a reasonable basis exists for payment in full of trade claims, that the debtors have satisfied the requirements of § 1129(b), and the Plan does not unfairly discriminate.

FN49.*In re Rochem, Ltd.,* 58 B.R. 641, 643 (Bankr.D.N.J.1985)(payment of trade claims in full and only partial payment of disputed tort claims not discriminatory, as reasonable basis existed for the treatment).

2. *Fair and Equitable.*

"The 'fair and equitable' requirement provides for an absolute rule of priority among creditors and stockholders in reorganization plans, placing secured creditors' rights first, those of unsecured next, and subordinating the interests of stockholders."[FN50] The Code defines treatment that is fair and equitable to various classes of claims. For unsecured creditors, such as the objecting Class 5 creditors, fair and equitable means:

FN50.*In re Lakeside Global II. Ltd.,* 116 B.R. 499, 511 (Bankr.S.D.Tex.1989).

(B) with respect to a class of unsecured claims-

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

*12 (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain

under the plan on account of such junior claim or interest any property.[FN51]

FN51.11 U.S.C. 1129(b)(2)(B).

In other words, in order to confirm a plan over a dissenting class of unsecured creditors, the plan must pay the dissenting unsecured creditors the allowed amount of the claims or leave nothing to junior claimants or interest holders. The Plan does not provide that Class 5 allowed claims be paid in full, therefore, the inquiry becomes whether junior claimants or interest holders will receive or retain any property.

Various class 5 claimants have objected that the plan is not fair and equitable because it does not propose to pay Class 5 claims in full but equity holders in class 11 B - D retain their stock holdings. These objections lack merit. The Plan provides that all of B & W's equity interests will be transferred to the Asbestos PI trust. Notably, Section 7.2.3 provides that on the Plan's effective date, BWICO will cause the Asbestos PI Trust to become the holder of record of all the outstanding shares of the Capital Stock of B & W. B & W will retain its stock in subsidiary corporations, however, the stock will really belong to the Asbestos PI Trust by way of the BWICO transfer. The value of the stock of B & W and its subsidiaries will be used to pay Class 5, 6 and 7 claims. The Court finds that the absolute priority objection is not well taken, because the retention by B & W of its subsidiary's stock is a means to facilitate the ultimate transfer of the value of the stock to the trust, for the benefit of creditors. This is not an instance where B & W's owners, or in this case, it's parent corporation, is retaining anything of value. To the contrary, they are giving up not only the stock in B & W (which includes the stock of the B & W subsidiaries), but also a $92 million note, some stock of MII and/or a stock price guaranty and certain tax benefits.

V. *THE PLAN HAS BEEN FILED IN GOOD FAITH, AND NOT BY MEANS FORBIDDEN BY LAW.*

Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                 Page 16
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

Various insurance companies have filed objections to the Plan, ranging from frivolous objections that the trust to resolve radiation claims "will accomplish nothing less than insurance fraud",[FN52] and that the plan proponents have "made collusive efforts to defraud [insurers]"[FN53] to the more palatable but serious charge that the Plan provisions are in violation of the rights of insurers under their contracts and settlements with the Debtors, that the Debtors have settled meritless claims, and that the management of the Asbestos Trust is predicated on a conflict of interests.

FN52. Objection of American Nuclear Insurer, Pl. 4716.

FN53. Objection of Travelers, Pl. 4722.

The good faith requirement is "viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."[FN54] "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied."[FN55] The debtor bears the burden of proving that the plan was filed in good faith by a preponderance of the evidence.[FN56] The good faith requirement is satisfied even where "the plan may not be one which the creditors would themselves design and indeed may not be confirmable."[FN57]

FN54. *T-H New Orleans Ltd Partnership*, 116 F.3d at 802.

FN55. *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir.1985).

FN56. *In re Briscoe Enter., Ltd., II*, 994 F.2d 1160, 1165 (5th Cir.1993).

FN57. *Id.* at 1167.

*13 The court finds that the Debtors have sustained their burden of proof that the Plan is filed in good faith, and that the Plan was proposed with a legitimate and honest purpose to reorganize and has a reasonable hope

of success. Various insurers arguments to the contrary will be addressed in turn.

*A. The Plan is a result of extensive negotiations and is not a collusive agreement between the Debtors, McDermott and plaintiff's lawyers.*

Various of the Debtors' insurers have objected that the Plan is not filed in good faith because, in essence, it is merely a collusive agreement with plaintiff's attorneys designed to pay meritless claims. The Plan Proponents predictably respond that the Plan is the result of extensive arms-length negotiations and the system of paying claims is actually stricter than the system that existed pre-petition.

The Debtors' bankruptcy case was filed on February 22, 2000. Mr. Nesser, general counsel of B & W and MII, testified that a dual track was followed post-petition, that of settling with various constituencies, while also pursuing the "Litigation Protocol" to contest asbestos personal injury claims. Mr. Nesser testified that in the spring of 2000, the Debtors had settlement discussions with plaintiffs' lawyers. Throughout 2000, the Debtors also pursued discussions with London. In 2001, an adversary proceeding was initiated seeking a declaratory judgment regarding $600 million in assets that had been transferred from B & W to its parent corporations during a 1998 corporate restructuring.[FN58] About the same time, various insurers, including London, brought insurance-coverage litigation before the district court.[FN59]

FN58. Adv. No. 01-1155.

FN59. "London" includes Certain Underwriters at Lloyd's, London and Certain London Market Companies. Various suits are pending before the United States District Court for the Eastern District of Louisiana by London Market Insurers and Traveler's Insurance Co. including *(i) Traveler's Ins. Co. et. al. v. McDermott Inc., McDermott Int'l, Babcock & Wilcox Co., Diamond Power Int'l, Inc., Babcock & Wilcox Constr. Co., and American, Inc.*, Nos. 01-3218 c/w 01-3387, United States District Court,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Eastern District of Louisiana, (ii) *Certain Underwriters at Lloyd's v. McDermott Int'l, Inc.,* Case No. 01-0912 and *(iii) Certain Underwriters at Lloyd's London, et al. v. Babcock & Wilcox Co.,* et al., Case No. 01-1187.*See also* footnote 17.

Mr. Nesser testified that negotiations with constituencies began soon after the Debtors' filing, and continued during the course of the transfers litigation and litigation with insurers. In 2001, the Debtors asked that a mediator be appointed, in part because they felt that negotiations were not fruitful. Eventually, Professor Francis McGovern was appointed as mediator.[FN60]

FN60. Pl. 1682.

In early 2002, several events occurred that helped in the Debtors' negotiation strategy. In January 2002, Judge Vance rendered a decision in favor of B & W in the London declaratory judgment action. The next month, in February 2002, this court entered a decision denying the transfer complaint.[FN61] In May, 2002, this court also entered an order terminating the Debtors' exclusive period to file a plan of reorganization.

FN61.*In re Babcock & Wilcox Co.,* 274 B.R. 230 (Bankr.E.D.La.2002).

In May, 2002, B & W filed a draft plan, but continued to negotiate with constituencies, including London. Following the termination of exclusivity, the ACC and the FCR filed their own Disclosure Statement and Plan. By August, 2002, the Debtors announced that an agreement in principle had been reached regarding the terms of the ultimate plan. Professor Green testified that concessions made by the FCR and ACC to the amount of the contribution to be made by MII to the Asbestos PI Trust enabled a resolution in principle to be achieved and an amended plan was filed by the Debtors in December 2002. Finally, in June, 2003, the Joint Plan was filed by various constituencies, including the ACC, FCR and McDermott, Inc.[FN62] Each of the Debtors' plans contained different treatment of asbestos claims, reflecting the negotiations underway at the time of filing. Various insurers object because the Joint Plan contains provi-

sions more generous to claimants than the original plan, and argue that such indicates a lack of good faith.

FN62. Pl. No. 1694, 3148, 3320.

**\*14** Rather than indicate that good faith is lacking, the case history indicates that negotiations with constituencies was protracted, extensive and hard fought. A great deal of negotiation and litigation took place before an agreement in principle could be reached with any constituency. Ultimately, the Debtors were able to craft a plan agreeable to the ACC and FCR, which represent the major creditors in the case. Rather than indicate a lack of good faith, the Debtors' actions indicate a dogged determination to settle with its major constituencies on the best terms possible, and under a plan capable of confirmation.

The court finds it significant that prior plans submitted to the court never came on for confirmation. Instead, the plans were modified, amended and/or withdrawn prior to any confirmation hearing. Bankruptcy Code § 1127(a) expressly provides for modification of a plan prior to confirmation, so long as it meets the requirements of §§ 1122-1123. Plans are frequently modified during the confirmation process, including situations where settlements are incorporated into the plan and objections withdrawn. While the Litigation Protocol may have originally formed the Debtors' strategy in the initial phases of the bankruptcy proceedings, it is not binding on the Debtors for the duration of the case. Instead, the debtor is free to negotiate, and the Code promotes, settlements with creditor bodies. The modifications and amendments to the Plan, and the abandonment by the Debtors of the Litigation Protocol, do not indicate a lack of good faith. Instead, they are the result of the usual negotiations leading to confirmation of a plan in many, if not most, Chapter 11s. In this case, these were hard-fought negotiations with the ACC and FCR, two bodies that vigorously objected to the original plan and the Litigation Protocol.

Insurers also object that the Plan is not filed in good faith because they were deliberately and collusively excluded from the negotiations and formation of the Plan and other agreements. Mr. Nesser testified that negoti-

Not Reported in B.R.                                                                                  Page 18
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

ations were underway with London from the outset of the case, and continued even after the agreement in principle was announced with the ACC and FCR. There was much argument but no evidence to the contrary.

B. *The Insurer's Contractual Rights*

Various insurers object that the Plan may not rewrite the contracts of insurance, without the consent of the parties. They argue that the Plan may not change provisions of the policies, including the claims management function, the anti-assignment clause, reporting requirements, the requirement to pay only meritorious claims, to pay claims only as they come due, and to assist in the defense, investigation and settlement of claims. Stated another way, they object that the Plan Proponents colluded against insurers to formulate a plan designed to force insurers to pay non-meritorious claims, without the insurer's participation and control over defense and settlement of the claims.

1. *Anti-Assignment Clauses.*

*15 Insurers argue that the Plan, among other things, may not require the assignment of insurance rights because the insurance policies and/or settlement agreements with Debtors specify that any assignment must be consented to in writing by the insurer. They also argue that insurance rights are only assignable without the insurer's consent where vested and the amount of loss has been fixed by a settlement of the claim or an adverse judgment which has been paid by the Debtors. The Plan Proponents respond (i) the Plan only assigns insurance rights, and does not implicate any anti-policy-assignment clause; (ii) a substantial portion of the remaining insurance coverage is subject to settlement agreements that do not contain restrictions on assignment; and (iii) the assignment does not increase the insurers' risk.

The Plan does not purport to assign the insurance policies. Only insurance rights, including rights, interests, claims, demands or entitlements to a policy's proceeds and the right to pursue the proceeds are transferred to the trusts. As a general rule, contracts are freely assignable. An exception exists where the parties provide an express prohibition on an assignment. A general stipulation in a policy prohibiting assignment except with the insurer's consent is valid only as to assignments that occur prior to a loss.[FN63] The prohibition of an assignment without the consent of the insurer is not effective as to an assignment of a policy or right under a policy after the event has occurred by which liability under the policy is fastened upon the insurer.[FN64]

> FN63. *Geddes & Moss Undertaking & Embalming Co. v. Metropolitan Life Ins. Co.,* 167 So.2d 209, 210 (La.Ct.App.1936)(distinction is made between assignment of policy before and after loss, assignment after loss is permitted); *International Rediscount Corp. v Hartford Acc. and Indemnity Co.,* 425 F.Supp. 669, 673 (D.Del.1977)(assignment of policy prohibited only assignment of insurance contract before loss); *see also* 3 Couch on Insurance, 35:7 (3rd ed.1995); 44 Am. Jr.2d Insurance 787.

> FN64. *Time Fin. Corp. v. Johnson Trucking Co.,* 458 P.2d 873 (Utah 1969).

The anti-assignment clause in the various B & W policies states: "Assignment of interest under this Contract shall not bind the Underwriters until their consent is entered hereon."[FN65] In construing a nearly identical provision, one court has held that the provision prohibits only the assignment of the insurance contract before loss.[FN66] The court reasoned that the purpose of a general anti-assignment clause is to protect the insurer against the possibility of increased risks attached to a change in the identity of the insured if the policy were assigned before the insured-against loss had occurred.[FN67] That rationale is lacking where the assignment only applies to a right to proceed against the insurer after loss. After loss, the assignee simply stands in the shoes of the assignor, subject to valid defenses against the original insured.[FN68]

> FN65. Exhibits 34.001 through 34.240. For example, see Exhibit 34.232, Policy No. A & PH-11611, paragraph O, pg. 24.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                    Page 19
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

FN66.*International Rediscount Corp. v. Hart-ford Acc. and Ind. Co.,* 425 F.Supp. 669, 673 (D.Del.1977).

FN67.*Id.* at 672.

FN68.*Id.* at 673,citing *Georgia Co-Operative Fire Ass'n v. Borchardt & Co.,* 51 S.E. 429, 430 (Ga.1905). Withholding consent in order to defeat the claim of an assignee on an assignment made after loss "would be a mere act of caprice or bad faith."

Objectors assert that a "loss" does not occur under the policies, and the right to payment for loss may not be assigned, until the happening of the occurrence and a determination of pecuniary injury resulting from the occurrence has fixed the amount of the loss. The weight of authority is otherwise. In *Ocean Acc. & Guarantee Corp. v. Southwestern Bell Tele. Co.,*[FN69] relied upon by London, the court held that after a loss occurs, a policy is assignable despite the presence of an anti-assignment clause. In a contract for indemnity against liability, the liability of the insurer arose immediately upon the happening of an accident. In such case, the liability, loss and cause of action arise simultaneously when the accident occurs, and not when judgment is rendered.[FN70] Rather than supporting London's argument, the case provides that assignment may occur after loss, the loss occurring at the time of the insured-against accident, and not judgment fixing liability.

FN69.100 F.2d 441 (8th Cir.1939).

FN70.*Id.* at 447.

*16 In the case of *Continental Cas. Co. v. Diversified Industries, Inc.,*[FN71] the court similarly construed a general prohibition against assignment without consent under Pennsylvania law as applying to assignments before loss only.[FN72] In *Continental,* the insurance policy contained an anti-assignment clause nearly identical to the one contained in the B & W policies. The court held that because the injury that would potentially place liability upon the insurer, in this case environmental damage from the storage of contaminants, occurred prior to

the assignment, the assignment occurred after loss and was valid.[FN73] The assignment did not increase the amount of risk -the insurer would face, but merely changed the name of the party to whom any payment could be made. Rather than measure loss from the time of judgment or other determination of damages for injury, the court looked at whether the assignment occurred after the injury occurred.

FN71.884 F.Supp. 937 (E.D.Pa.1995).

FN72.*Continental,* 884 F.Supp. at 947 (noting that "great weight of authority" holds a general provision prohibiting assignment without consent applies to assignments before loss only.); *see A C and S,* 2004 WL 1354283 (Bankr.D.Del. Jan. 26, 2004)(commercial general liability policies could be assigned in their entirety to asbestos trust under Pennsylvania law, notwithstanding anti-assignment provision, because loss that gave rise to liability had already occurred).

FN73.*Id.* at 948.

As opposed to the policies, nothing contained in the CIPs or settlement agreements with the insurers prohibits an assignment of insurance rights. Most of the settlement agreements contain similar language.[FN74] Nothing contained within the settlement agreements acts to restrict transfer. Instead, the settlement language that they were made binding upon the parties "and their respective successors and assigns" appears to contemplate assignment.[FN75] Additionally, B & W utilized an agent, Worldwide, to handle and fulfill its claims management duties prior to filing of the petitions. Delegation of B & W's duties to an agent would also indicate that assignment was contemplated under the agreements.

FN74. Exhibits 36.001 to 36.022.

FN75.*Certain Underwriters at Lloyds v. Mc-Dermott Int'l, Inc.,* 2002 WL 22023 (E.D.La.2002).

Accordingly, the court finds that the Plan assigns to the trusts the Insurance Rights, including the right to re-

Not Reported in B.R.                                                                                        Page 20
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

ceive insurance proceeds under various insurance policies and settlement agreements, and not the policies themselves. The Plan does not violate obligations of the Debtors or Insurance Contributor under any consent-to-assignment clause of any Subject Insurance Policy, A/P policy, Subject Asbestos Insurance Settlement Agreement or A/P Township Settlement Agreement. The assignment of the right to collect on B & W's coverage obligations does not materially increase the insurers' risk because the asbestos-related exposures and injuries relevant to asbestos claims have taken place years prior to the assignment.

2. *Anti-Assignment, Management of Claims, Cooperation and Consent Clauses.*

a) *Preemption under Section 1123(a)(5).* Plan Proponents argue that (i) § 1123(a)(5) expressly provides for adequate means for a plan's implementation "notwithstanding any otherwise applicable nonbankruptcy law" and preempts nonbankruptcy law to the contrary, such as the anti-assignment clause and other contractual provisions including management of claims, cooperation and consent to settlement provisions, (ii) the interpretation of contract rights the insurers promote would impliedly thwart the purpose of the channeling injunction found in 524(g); and (iii) both bankruptcy and insurance law prohibit the insurers from reaping a windfall if their coverage obligations were lessened by the Plan's implementation of 524(g).

*17 Section 524(g) provides for an injunction to supplement a discharge in asbestos cases where certain requirements are met. Those requirements include that a trust be established and assigned substantial assets for the benefit of asbestos claimants and provide for matrices so that similar present and future claims are treated substantially the same. Plan Proponents argue that the Plan merely complies with the requirements of § 524(g). They also argue that the insurers' allegation that the Plan breaches the policies and they no longer have obligations under the policies would permit the insurers to escape payment in any asbestos case where § 524(g) is implemented and insurance is a major asset of the estate. In short, they argue that acceptance of the in-

surers' argument would render § 524(g) meaningless.

Plan Proponents cite various cases for the proposition that § 1123(a)(5) preempts any nonbankruptcy laws that impair the implementation of a plan. Unlike other provisions in the Code which have been interpreted as merely enabling statutes, the language of § 1123(a)(5) that "notwithstanding any otherwise applicable nonbankruptcy law" constitutes an explicit express Congressional intent to supercede state law restrictions on the transfer of estate property.[FN76] As the Fourth Circuit has said,

> FN76.*In re FCX, Inc.,* 853 F.2d 1149, 1154 (4th Cir.1988); *cf. Integrated Solutions v. Service Support,* 124 F.3d 487, 493 (3rd Cir.1997).

"...§ 1123(a)(5) is an empowering statute. As stated by Collier: 'The alternatives set forth in § 1123(a)(5) are self executing. That is, the plan may propose such actions notwithstanding nonbankruptcy law or agreements.'Section 1123(a)(5)(D) then does not simply provide a means to exercise the debtor's prebankruptcy rights; it enlarges the scope of those rights, thus enhancing the ability of a trustee or debtor in possession to deal with property of the estate."[FN77]

> FN77.*FCX,* 853 F.2d at 1155.

Insurers argue that the scope of the preemption found in § 1123(a)(5) is limited only to "otherwise applicable non-bankruptcy laws 'relating to financial condition" ' as stated in § 1142(a), as the recent case of *Pacific Gas & Elec. Co. v. Cal. ex. rel. Cal. Dept. Of Toxic Substances Control,*[FN78] has so held. The *PG & E* case acknowledges that § 1123(a)(5) provides for express preemption of nonbankruptcy laws, but held that the preemption is narrow in scope, applying only to nonbankruptcy laws relating to financial condition.[FN79] In so holding, the court noted that § 1123 is derived from a similar provision found in § 1142 which authorizes the implementation of a plan "notwithstanding any otherwise applicable nonbankruptcy law, rule or regulation relating to financial condition."[FN80] As noted by one author, it is unclear what, if any, nonbankruptcy laws

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                      Page 21
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

would be preempted under the narrow ruling of the Ninth Circuit.[FN81]

   FN78.350 F.3d 932 (9th Cir.2003)

   FN79.*Id.* at 937.

   FN80.*Id.* at 942.

   FN81.23 Am. Bankr.Inst. J. 32, 33 (2004).

This court holds that *PG & E* is distinguishable. *PG & E* involved the transfer of a large public utility under a plan that obviated the need for approval or compliance with the applicable state public utility regulation provisions. The B & W case does not involve the public regulation of a utility, instead it concerns implementation of §§ 524(g) and 105(a) injunctions in a case involving asbestos and radiation injury claims. Public health and safety issues are not implicated by the preemption, and a presumption against preemption is not present because state police powers are not implicated.[FN82] Instead, only contractual provisions restricting, among other things, the assignment of insurance, management of claims and consent to settlement are implicated.

   FN82.*In re Pacific Gas & Elec. Co.,* 283 B.R. 41, 47 (N.D.Cal.2002), *rev'd,*350 F.3d 932 (9th Cir.2004)(noting that preemption issues are particularly acute in public utility cases because no other debtor is subject to as much regulation).

**\*18** Additionally, the weight of authority is in accord that § 1123(a)(5) preempts contrary state law or contract provisions if such provisions are necessary to the implementation of a plan.[FN83] Cases that have considered the issue have uniformly held that § 1123(a)(5) expressly preempts nonbankruptcy laws, and *PG & E* is the only case to read the preemption narrowly, to apply only to nonbankruptcy laws relating to financial condition. *PG & E* is in the minority, and reads into § 1123(a)(5) a requirement not found in the text of the provision.

   FN83.*In re FCX, Inc.,* 853 F.2d 1149 (4th Cir.1988)(1123(a)(5) authorized the release of

collateral securing a claim in satisfaction of the claim despite bylaw provision requiring board approval); *In re Entz-White Lumber & Supply Co.,* 850 F.2d 1338 (9th Cir.1988)(1123(a)(5) permitted cure of default without paying contract default interest); *In re Public Service Co.,* 108 B.R. 854 (D.N. H.1989)(1123(a)(5) permitted transfer of electric utility despite lack of state regulatory approval); *In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 61 (Bankr.S.D.N.Y.1990)( "Court finds that its jurisdiction and power over the debtor's estate takes precedence over the authority vested in the OTS under Title 12.")

This court also disagrees with the Ninth Circuit in *PG & E* in adding the words "relating to financial condition" to § 1123(a)(5). The Ninth Circuit's reading into the § 1123(a)(5) the words "relating to financial condition" ignored the rules of statutory interpretation found in other cases that where a statute's language is plain, the function of the court is to enforce it in accordance with its terms [FN84] and that a statute should be read to give effect to the whole, and not render superfluous any other portion of the same law.[FN85] The "notwithstanding" language appears in the introductory portion of § 1123(a) and under any fair reading applies to all subsections thereunder. Adding the "relating to financial condition" language creates real doubt and confusion as to its limitation applying to subsection (a)(5)(C), (I), (J), and (a)(6)-(7) and would in many instances render these subsections meaningless.

   FN84.*United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 103 L.Ed.2d 290 (1989)("... where ... the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' ").

   FN85.*Kawaauhau v. Geiger,* 118 S.Ct. 974, 523 U.S. 57, 140 L.ed.2d 90 (1998)(Court is "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law."), *quoting Mackey v. Lanier Collection Agency & Service Inc.,* 486 U.S. 825, 83, 108 S.Ct. 2182,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                    Page 22
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

2189, 100 L.Ed.2d 836 (1988).

The structure of the Plan contemplates that, among other things, insurance rights will be assigned to the various trusts, that matrices will be established providing for the payment of allowed claims, and an injunction issued. The implementation of section 524(g) provides support for the argument that Congress intended to permit the transfers contemplated by the Plan in asbestos cases. This conclusion is buttressed by the provision in each policy of insurance, mandated by state law, that the bankruptcy or insolvency of the Assureds shall not relieve the insurer of the obligation to pay claims under the policy.

A contrary conclusion would allow insurers an absolute veto of a plan of any reorganization that involved an insured with asbestosis liability because of the anti-assignment clauses found in policies. Such an interpretation would allow insurers to gut the reorganization and channeling injunction provisions specifically provided for in § 524(g). No law has been cited by the insurers to support such a proposition. Authority does exist, however, to support the proposition that § 524(g) was adopted to foster reorganization.[FN86] This conclusion is also in accord with the asbestos insurers' practice in this proceeding, as discussed in more detail in the next section, of permitting B & W to oversee the claims management process.

> FN86. The House Report states that section 524(g) was added to establish a procedure for dealing with reorganizations involving future personal injury claims against the debtor based on exposure to asbestos-containing products. The section is modeled on the trust/injunction in the Johns-Manville bankruptcy case and the UNR bankruptcy proceeding. HR Rep. 103-834, 103rd Cong., 2nd Sess 8-12 (Oct. 4, 1994); 140 Cong. Rec. H10765 (Oct. 4, 1994).

### C. Payment of Valid Claims.

London and other insurers object that the Plan is not filed in good faith because it proposes to pay meritless claims, not within the coverage of the insurers policies.

Plan Proponents respond that the insurers must act reasonably with respect to a policyholder's settlement of asbestos-related liabilities, that the TDP's criteria for payment of claims are similar to or more stringent than the pre-petition settlement criteria used to settle over 300,000 claims against B & W from late 1970 to February 2000.

**\*19** The history of the claims management process is significant and bears describing in detail. Initially, B & W looked to Travelers, its insurer with primary general liability coverage, for defense and indemnity. In the 1970's, B & W began receiving asbestos injury claims, which it tendered to Travelers. In the early 1980's, Travelers and B & W developed a "bulk settlement" strategy to settle the asbestos injury claims asserted against B & W. Mr. McKnight testified that, while he was employed by Travelers, this primary insurer played a key role in developing the strategy and supported the strategy.[FN87] Under the settlement strategy, protocols were developed to settle claims for a low per-claim amount where the asbestos injury claimant could demonstrate: (a) exposure to asbestos allegedly associated with a B & W boiler and (b) an asbestos-related medical condition. Mr. McKnight testified that if the claimant could provide information sufficient to survive a summary judgment motion, allowing the claim to go to a jury, the claim could be settled under the protocols developed. Claims were settled under the protocols until 1989, when Traveler's informed B & W that the products bodily injury aggregate limits under its post-1937 primary insurance policies were approaching exhaustion.

> FN87. Testimony, September 22, 2003.

After 1989, B & W through Worldwide, assumed principal claims-handling responsibility for asbestos injury claims. Mr. McKnight joined Worldwide, a third-party claims administrator, and continued to apply the settlement methodology developed by Travelers to B & W claims until the petition date.

After 1989, B & W looked to its excess insurers to provide coverage in place to fund the asbestos injury claims. On or about April 25, 1990, B & W and London

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Market Insurers agreed to the London Settlement Agreement ("LSA"),[FN88] which set forth the manner in which the excess insurers' policies would provide coverage-in-place for B & W's asbestos products bodily injury claims. The LSA was the first B & W CIP agreement with excess insurers, and many other CIP's were executed with other excess insurers by B & W in the following years. All the CIP's contained similar provisions. The CIP's agreed to a "trigger of coverage," for allocation of coverage, for the management of claims and other provisions.

FN88. Exhibit 37.

Under the management of claims provision, B & W was given the responsibility for the defense and management of asbestos claims. B & W, through its agent Worldwide, settled the asbestos claims, and then allocated settlement payments and administrative costs to the excess insurers using the agreed upon allocation method. B & W and Worldwide continued the same settlement strategy that was initiated with Travelers.

Mr. McKnight testified that, while at Worldwide, he employed the same exposure and medical criteria as used while he was at Travelers. He testified that items that a claimant needed to present for a claim to be settled were:

(1) Evidence that the claimant worked in a facility containing a B & W boiler. Exposure documentation included an affidavit from the claimant or a letter from his attorney listing the claimant's places of employment;

*20 (2) Medical documentation of an alleged asbestos-related disease or condition. Generally, a doctor's report stating that the claimant had symptoms "consistent with" an asbestos-related disease or condition was satisfactory. B & W accepted an ILO reading of "1/0" to establish a claim of asbestosis.

The evidence shows that the settlement strategy was communicated to London.[FN89] Mr. Quinn, the New York attorney for London, stated that London supported the strategy.[FN90]

FN89. Exhibit 96.

FN90. Testimony, September 24, 2003.

Worldwide would keep excess insurers apprised of the claims handling procedures and criteria by, among other things, providing memos to London's counsel notifying them of new or revised settlement protocols,[FN91] and providing Quarterly Reports notifying the excess insurers of settlements reached.[FN92] The excess insurers also performed periodic audits of Worldwide's claims handling procedures.[FN93] The results of the audits were acceptable, as Worldwide continued to process claims using the settlement strategy.[FN94] In 1997, Worldwide paid $200 million in claims, in 1998 it paid $220 million and in 1999 it paid $270 million in claims, none of which were rejected by insurers.

FN91. Exhibits 123, 124, 135, 143.

FN92. Exhibits 165.27-165.40.

FN93. Exhibits 40, 94, 221.

FN94. Exhibit 47.

Under the Plan, certain TDPs have been developed by the FCR, the ACC, and the Debtors. Mr. Green, the Asbestos FCR, testified that the TDPs are consistent with, or stricter, than the pre-petition claims settlement criteria employed by Worldwide, and agreed to by their insurers. The court finds it significant that Mr. Green has critically examined the TDPs, because his interest is in assuring the payment of future claimants, and the Plan has only limited resources for paying both present and future claims. In addition, Dr. Florence testified that his analysis of the TDPs shows them to be more stringent than B & W's pre-petition settlement strategy.[FN95] Also, the testimony at trial shows that the TDPs are consistent with or more stringent than criteria used in other asbestos cases to evaluate claims, including the Celotex Trust, Manville Trust, Eagle Picher Trust and UNR Trust.[FN96] Dr. Peterson testified that under the TDPs, the Debtors would pay less than they would had they remained in the tort system.[FN97]

FN95. Exhibit 169c.

Not Reported in B.R.                                                                      Page 24
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

FN96. Exhibit 169, App. B, 1-12.

FN97. Exhibit 166, Table 18.

London and other insurers argue that the TDPs provide for payment of invalid claims because (i) the Debtor has stated such claims were invalid in earlier pleadings, which have now been withdrawn or abandoned by the Debtors, (ii) the TDPs do not follow the American Thoracic Society ("ATS") or ABA Guidelines for criteria in the diagnosis of asbestosis and provide for payment of claims despite the lack of an "asbestos marker."

The Litigation Protocol proposed by the Debtor early in this bankruptcy proceeding was a departure from the Debtors' insurer-approved, prior procedure for handling asbestos injury claims, that of settlement upon meeting certain somewhat loose criteria. The Litigation Protocol represented an aggressive response to asbestos injury claims-one which the Debtors have since abandoned in favor of the negotiated Plan.[FN98] It is not unusual for Debtors to change litigation strategy in connection with a Chapter 11 proceeding. Likewise, if the court were to hold every party to aggressive assertions made in pleadings in advance of litigation, there could never be a settlement of the litigation. Accordingly, the court finds that the Debtors' abandonment of their initial strategy to contest claims does not indicate a lack of good faith.

FN98. The Litigation Protocol was a proposal for disposing without jury trials of more than 200,000 asbestos personal injury claims in the district court by obtaining summary judgments in certain prototype cases and applying those rulings (supposedly in Debtors' favor) to all of the claims. The court should note that Debtors' counsel did not freely and willingly abandon this litigation strategy. Instead, after a couple of years this court indicated it was not willing to allow the reorganization to remain pending during the long period of time necessary to carry out the litigation strategy in the district court. See background on page 6-7 supra as to this court's insistence that at least an outline or tentative plan be filed in 2001, and the termination of the exclusivity period which ultimately

resulted in the filing of a joint plan in July, 2003.

**\*21** The TDP's are not as stringent as the insurers would like. They are, however, more stringent than the standards employed by the Debtors, and approved by the insurers, prior to bankruptcy. They are also consistent with standards employed by various other courts in the handling of asbestos injury claims under trust procedures.[FN99] The insurers have not made a showing that the criteria which they want have been accepted by any other bankruptcy court dealing with an asbestos trust. Rather than providing for the payment of "invalid claims," the Plan is the result of a negotiated settlement proposing to pay claimants in a fashion consistent with past practices approved by insurers, and consistent with practices found reasonable by other courts considering the asbestos liabilities of Debtors. The court finds that the Plan and associated documents satisfy the requirements of § 1129(a)(3).

FN99. These include the Celotex Trust, Manville Trust, Eagle Pitcher Trust and UNR Trust. Exhibit 169, App. B, 1-12.

## VI. *THE PLAN'S DISCHARGE AND INJUNCTIVE PROVISIONS SATISFY THE REQUIREMENTS OF THE BANKRUPTCY CODE.*

The Plan provides for the Asbestos PI Channeling Injunction and the Asbestos Insurance Entity Injunction to be issued in connection with its Trusts, under § 524 and the Asbestos PI Channeling Injunction and Asbestos Insurance Entity Injunction under § 105(a). These injunctions, and the related Plan discharge provisions, satisfy the requirements of the Bankruptcy Code.

Section 524 generally provides for the effects of discharge, and 524(g) provides for an injunction to supplement the injunctive effect of a discharge. The Plan has met all requirements of § 524(g).

### A. *Uncontested matters.*

The parties do not contest that the Plan meets the requirements of several sections, including §§

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

524(g)(2)(B)(i)(I)–(IV),[FN100] 524(g)(2)(B)(ii)(II),[FN101] (IV)(aa),[FN102] and 524(g)(2)(B)(ii)(V).[FN103] Other provisions of § 524(g) are not disputed, although uncontested facts were not entered in connection with these sections. These include 524(g)(2)(B)(ii)(I), that the debtors will be subject to substantial future demands for payment arising from their asbestos-related activities and (III), that the pursuit of the Asbestos PI Trust Claims outside the Plan will threaten the Plan's purpose to deal equitably with asbestos claims and future demands.

> FN100. Pretrial Order, Uncontested Facts 31, 32, 34, 35.

> FN101. Pretrial Order, Uncontested Fact 39.

> FN102. Pretrial Order, Uncontested Facts 39, 40.

> FN103. Pretrial Order, Uncontested Facts, 13, 38.

Dr. Peterson and Dr. Florence, experts retained by the ACC and FCR, were recognized by the court as experts in valuation. Dr. Peterson estimated the Debtors' present and future claims. His methodology assumed that, absent evidence to the contrary, future claims would broadly follow historical patterns with respect to: (1) claims against B & W relative to the continuing incidence of asbestos-related cancers in the general population; (2) the ratio of non-malignant to malignant claims, and (3) amounts paid to settle claims for different diseases.[FN104] His methodology also factored in foreseeable changes in factors affected by non-epidemiological influences, including (1) changes in the propensity to file against B & W, (2) the ratio of non-malignant to malignant disease claims, and (3) the amounts paid to settle cases.

> FN104. Peterson testimony, October 22, 2003; Exhibit 166.

*22 Dr. Peterson testified that if B & W had remained in the tort system, its total present and future asbestos-related liability would range between $7.099 billion and $9.043 billion.[FN105] Dr. Peterson also estimated the

number and value of future claims that would be filed against the Asbestos PI Trust. Under the Plan TDPs, he testified that B & W's asbestos-related liabilities would be between $5.2 billion and $7.8 billion.[FN106]

> FN105. Exhibit 166, at Table 15.

> FN106.Id., Table 18.

Dr. Florence testified that utilizing several scenarios, based upon B & W's historical experience, B & W and its insurers would have faced significant asbestos-related personal injury claims had B & W not filed for bankruptcy: (1) $491 million in 2000; (2) between $793 million and $1.44 billion in 2001; (3) between $1.091 billion and $2 .259 billion in 2002, and (4) between $1.39 billion and $3.041 billion in 2003.[FN107]

> FN107. Exhibit 169b.

The expert testimony of John C. Butler was also offered by the ACC as to when B & W's coverage for its remaining products liability policies would have been exhausted had B & W not filed for bankruptcy. Using the liability scenarios offered by Dr. Petersen and Dr. Florence, Mr. Butler testified that B & W's nearly $1.2 billion in remaining products coverage would have been completely exhausted by the end of the year 2004 if B & W had not filed for bankruptcy.[FN108]

> FN108. Exhibit 188.

The court finds that the experts are credible,[FN109] and that Plan Proponents have demonstrated that the Debtors would be subject to substantial future demands for asbestos related claims. The Plan Proponents have also demonstrated to the court's satisfaction that the pursuit of such demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with claims and future demands. The Plan provides a mechanism to channel claims to the trust, have each claim rated in accordance with the TDPs and for claims to be paid in accordance with a proposed schedule. Absent such a mechanism, claims would be paid on a first come, first serve basis, with the likelihood that insurance coverages would be exhausted within a short time, leaving little or nothing to pay later filed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                 Page 26
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

claims. Additionally, the Court finds that the Plan meets the requirements of the Code on all uncontested matters relating to the § 524(g) injunction.

> FN109. The insurers argue that the testimony of Dr. Peterson and Dr. Florence should not be accepted because this court rejected their testimony in the avoidance action by holding that B & W was not insolvent at the time. *See In re Babcock & Wilcox Co.,* 274 B.R. 230, 254 (Bankr.E.D.La.2002). This argument has no validity because:
>
>> 1) the evaluations were as of a different time and for a different purpose;
>>
>> 2) only the figures and not the import of their testimony has changed. That is, they felt B & W was insolvent in 1998 because of future claims. Now they testify the enormity of the claims is greater and presumably B & W is even more insolvent.

**B. *Contested matters.***

Certain Insurers have objected that § 524(g)(2)(B)(i)(II) requires funding by the contribution of securities and future payments, which the Plan does not clearly do.FN110The Plan provides for the funding of the Asbestos PI Trust by the transfer of, among other things, all of the capital stock of B & W, which will be accomplished by a transfer from BWICO. It follows that if the Trust is the holder of all of the shares of B & W it will receive all dividends paid by B & W and its subsidiaries. Thus, claims allowed by the Trust will be paid from the earnings or the proceeds from any sale of those shares .FN111 The court finds that the Plan satisfies the requirements of § 524(g)(2)(B)(i)(II).

> FN110. "Certain Insurers" includes a large group of insurers, including TIG, Mt. McKinley Insurance Company and Federal Insurance Company. B & W contends that this section is uncontested, and that uncontested fact no. 32 covers this provision.
>
> FN111. It is not at all unlikely that B & W will,

in the future, be a profitable company as it is now profitable if asbestos and nuclear claims no longer burden the company.

*23 Certain Insurers also object that the 75% majority voting requirements of § 524(g)(2)(B)(ii)(IV)(bb) have not been satisfied. Class 6, consisting of the holders of Asbestos PI Trust Claims, voted in favor of the Plan by amounts and numbers sufficient to satisfy the requirements of this section.FN112

> FN112. Class 6 voted in favor of the Plan 89.4% by number and 88.4% by dollar amount.

Certain Insurers also object that the requirements of § 524(g)(2)(B)(ii)(V) are not met because examination of the Trust Documents "[m]ake it impossible to determine whether the Trusts will ever be able to operate through the 'mechanisms' as required" by the section. Additionally, London insurers objects that the Plan violates the provision that present and future claims be treated in substantially the same manner because it proposes to pay meritless claims of present claimants, leaving little for future claimants, and because the Plan will vitiate insurance coverage through its illegal treatment of the insurers' contracts.

The Plan provides, at Section 3.2.6.2 and 5.4 for the Asbestos PI Trust to process and allow or disallow claims in accordance with the provisions of the Asbestos PI Trust Distribution Procedures. A mechanism exists for the trust to process claims and determine the amount, if any, that will be paid. The Asbestos PI Trust will be funded from several sources as discussed, including an assignment of rights to insurance coverage, all of the equity of B & W and additional contributions from McDermott. This funding will provide up to $1.152 billion in insurance rights, and capital stock and other assets worth between $680-$780 million.FN113 As discussed elsewhere in this opinion, the Plan and TDP's are more stringent than the settlement strategy previously employed by Worldwide in processing asbestos claims, and are consistent with the provisions approved in other bankruptcy cases. The FCR who is charged with the obligation of protecting the interest of the future claimants, has analyzed the Plan and TDPs, is a joint

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proponent of the Plan, and testified quite strongly in favor of the Plan. The court will not presume-as the insurers ask the court to do without any evidence-that the FCR has not performed, or will not perform in the future, his fiduciary obligations.

FN113. Exhibit 17.

The court finds that the Plan provides sufficient funding to the Asbestos PI Trust, and that the Asbestos PI Trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner. Thus, it satisfies the requirements of § 524(g)(2)(B)(ii)(V). The Asbestos PI Trust will operate through mechanisms, such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and value of Asbestos PI Trust Claims, or other comparable mechanisms that provide reasonable assurance that it will value and pay similar claims in substantially the same manner.

In addition to other requirements, § 524(g)(4)(B) requires that the court appoint a legal representative to protect the rights of future claim holders and that the court determine that the injunction with respect to future claims is fair and equitable to the future claim holders. As already mentioned, the court has appointed Eric D. Green, Esq. as the legal representative for the future asbestos-related claims holders. Mr. Green is well experienced in these kinds of matters.[FN114] Mr. Green has engaged in numerous discussions with the Debtors regarding the treatment of future claimants in the Plan, and taken actions needed to protect the rights of future claimants. Among other things, Mr. Green has retained Dr. Thomas Florence and other advisors to examine the availability of insurance to pay claims, to provide claims projection and trust distribution analysis, to examine the Debtors' asbestos-related liabilities and other issues relating to the future claims. All of this expert knowledge supports Mr. Green's informed and experienced opinion to support the Plan as a plan proponent. The court finds that the requirements of § 524(g)(4)(B) have been satisfied.

FN114. Mr. Green testified that he has served

as special master in both federal and state asbestos cases in Massachusetts, as well as in federal asbestos suits in Connecticut. He has also served as consultant to the post-confirmation trustees in the Johns Manville bankruptcy proceeding. He has served as futures representative in several asbestos bankruptcies, including the Fuller Austin case in Delaware, the Federal Mogul case in New Jersey and the Halliburton/Dresser bankruptcy proceedings.

C. *Section 105 Injunction.*

**\*24** The Plan provides for the Apollo/Parks Township Channeling Injunction, which will enjoin Apollo/Parks claimants from pursuing claims against the Debtors, certain of their affiliates and subsidiaries, the MII Indemnified Parties and ARCO.[FN115] The Plan Proponents base this provision upon § 1123(b)(6), which permits any "appropriate provision" that is not inconsistent with other provisions of the Code, and § 105 of the Bankruptcy Code, which permits the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Also, § 524(g)(1)(A) specifically provides for "an injunction ... to supplement the injunctive effect of a discharge...."

FN115. Plan, sections 1.1.9, 1.1.25, 7.10.

The Plan Proponents seek issuance of the Asbestos PI Channeling Injunction and Asbestos Insurance Entity Injunction under § 105, as well as § 524(g). A discussion of the evidence supporting § 524(g) appears above, and will not be repeated in this section. To the extent applicable, it is incorporated herein.

Case law has provided several factors for consideration prior to issuance of a third-party injunction, including:

"(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# UNREPORTED DECISIONS

# PART 3 OF 3

Not Reported in B.R.                                                                                    Page 28
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

junction is essential to reorganization, namely, the re-organization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions."[FN116]

> FN116.*In re Dow Corning Corp.,* 280 F.3d 648, 658 (6th Cir.2002), *citing In re A.H. Robins Co.,* 880 F.2d 694, 701-702 (4th Cir.1989); *In re Johns-Manville,* 837 F.2d 89, 92-94 (2nd Cir.1988); *In re Continental Airlines,* 203 F.3d at 214.

Each factor will be discussed in turn.

*1. Identity of Interest.*

A. *Asbestos.*Plan Proponents seek issuance of the Asbestos PI Channeling Injunction, Asbestos PD Channeling Injunction and Asbestos Insurance Entity Injunction against Debtors and other third parties that are Asbestos Protected Parties. The court finds that an identity of interest exists between Debtors and the Asbestos Protected Parties. The Asbestos Protected Parties include MII, the ultimate parent, MI the parent of B & W, non-debtor subsidiaries of the Debtors and affiliate corporations of the Debtors. Under numerous policies, B & W and all "wholly owned, or financially controlled or affiliated companies" are the named assured.[FN117]Lawsuits filed also name MII as a party, with claims derivative of B & W's alleged asbestos liability. MI and MII are making substantial contributions to the Plan, and their willingness to do so is dependant upon a final resolution of liability for the derivative asbestos liability claims.

> FN117. For example, see Exhibits 34.072-34.080.

*25 B. *Apollo/Parks.*The court finds that an identity of interests exists between the Debtors and third parties, including ARCO, MII and the non-debtor affiliates and subsidiaries to support issuance of the Apollo/Parks Township Channeling Injunction. Mr. Nesser testified that B & W purchased Nuclear Materials and Equipment Corporation ("NUMEC") from ARCO in 1971.[FN118]NUMEC had operated the Apollo and the Parks facilities from approximately 1957 to 1967,[FN119] and NUMEC's assets were eventually transferred to a wholly owned subsidiary of ARCO, also named NUMEC. Among other things, ARCO is contractually bound under an assumption of liability and agreement to indemnify B & W which exists in the Stock Purchase and Assumption Agreements related to the transaction.[FN120]

> FN118. A/P Uncontested Facts, No. 6. Pl. 5356.

> FN119. A/P Uncontested Facts, No. 2-4.Pl. 5356.

> FN120. Exhibit 3015. Agreement between Atlantic Richfield Co. as owner of capital stock of Nuclear Materials and Equipment Corporation and the purchaser, The Babcock & Wilcox Company. A/P Uncontested Facts, No. 7, Pl. 5356.

Additionally, ARCO and B & W are both named insureds under the A/P Policies.[FN121] Because these entities share a pool of insurance related to the A/P claims, their interests are aligned, and an identity of interests exists between the entities. Likewise, the B & W affiliates and subsidiaries, including MII, share an identity of interest. Each may share liability for nuclear hazard risks at the Apollo and Parks facilities, and their interests are aligned. The court finds that an identity of interests exists among the Debtors, the Asbestos Protected Parties, and the Apollo/Parks Township Protected Parties such that a claim asserted against any of the Asbestos Protected Parties or the Apollo/Parks Township Protected Parties gives rise to a claim against the Debtors, including by the operation of the law of indemnity and/or contribution.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                          Page 29
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

FN121. A/P Uncontested Facts, No. 68

*2. Substantial Contribution.*

A. *Asbestos.*Section 7.2 of the Plan provides for funding of the Asbestos PI Trust, with: (i) BWICO (an indirect wholly owned- subsidiary of MII), which now owns the stock of B & W, will cause the trust to become the holder of all outstanding Capital Stock of B & W; (ii) additional McDermott contributions including 4.75 million shares of common stock of MII (the ultimate parent of B & W) and a $92 million promissory note by MI; (iii) assignment of the asbestos insurance rights; and (v) transfer of certain of tax benefits of the Debtors. MI and MII's contributions to the trusts are substantial, and consist of both shares and promissory notes. According to the Blackstone Liquidation Analysis, the various McDermott contributions are in the range of $680 or 780 million. MII and certain of its subsidiaries are also assigning their Asbestos PI Insurance Rights, plus intellectual property rights to the Asbestos PI Trust. The court finds that the contributions of $400-500 million in B & W stock, $123.1 million for the MII stock, McDermott guarantee and promissory notes and $160 million for the tax benefits are substantial contributions to the Plan and the reorganization.[FN122]

FN122. Ms. Zilly expert report, Exhibit 17.

B. *Apollo/Parks.*The Plan, at § 7.6.5, provides for the funding of the A/P Township Trust. Contributions are made on the Effective Date to the Trust, as follows: (i) Insurance Contributors shall make the A/P Township Insurance Rights Assignment; (ii) the Debtors shall make the A/P Township Payment of $2.8 million and assign $1.4 million of rights to reimbursement of defense costs; and (iii) ARCO shall make a $27.5 million cash contribution and an assignment of insurance rights. Mr. Nesser testified, in connection with the formation of the Plan and settlement, that ARCO's contribution was to be substantial. It will be paid directly to the A/P Claimants with the A/P Trust receiving a setoff of the cash payment amount, and forms an integral part of the settlement of the A/P Claims. The Court finds that ARCO's contribution to the Plan, in the form of cash contributions and insurance rights assigned, are substan-

tial assets of the Plan and the reorganization, and will serve to reduce the amount that the A/P Claimants will eventually be paid through the A/P Trust. The contribution of the Debtors' Apollo/Parks Township Payment and the Debtors' Apollo/Park Township Insurance Rights Assignment are substantial contributions to the reorganization.

*3. Essential to Reorganization.*

*26 A. *Asbestos.*The testimony at confirmation was that B & W was subject to voluminous personal-injury claims alleging exposure to asbestos from B & W boilers. During the 1980's and 1990's, B & W carried out a settlement strategy in which it consensually resolved all claims by claimants who made minimal showing of alleged exposure and injury. A total of more than $1.5 billion was paid to claimants by B & W's insurers, resolving more than 300,000 pre-petition claims. By late 1999, however, there was an increase in both the number and the cost of asbestos claims. By 1999, the number of claims filed against B & W had reached over 400,000.[FN123]By the claims bar date, approximately 222,000 primary asbestos-related personal injury and 60,000 secondary exposure proofs of claim were filed in this case.[FN124]The Debtors are likely to be subject to substantial future demands arising out of the same or similar conduct or events that gave rise to the asbestos personal injury trust claims and asbestos property damage claims, addressed by the various asbestos channeling injunctions. Pursuit of these demands outside of the reorganization and procedures set forth in the Plan will threaten the Plan's purpose to deal equitably with asbestos personal injury and property damage claims. The court finds that the Asbestos Insurance Entity Injunction, the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction are essential to the Plan and the reorganization.

FN123. Joint Pre-Trial Order, Uncontested Facts No. 9.

FN124.*Id.* at No. 14.

B. *Apollo/Parks.*As will be discussed in more detail in

connection with the discussion of the nature of the A/P Claims, the defendants' claims in the *Hall* litigation pending in Pennsylvania present a substantial litigation risk. A "test trial" in the *Hall* litigation involving only eight of the 500 claimants resulted in an adverse jury verdict of $36.7 million.[FN125] Although the trial court eventually granted a new trial, a substantial risk remains on retrial that a similar result may be found. Resolution of the *Hall* claims and future claims by channeling them to the A/P Trust will result in a resolution of all the claims, and payment of the claims from the A/P Trust, and will permit the Debtor to emerge from bankruptcy free from past and potential future claims relating to the Apollo and Parks facilities, and also free from significant litigation expenses related to the *Hall* claims.[FN126] Absent the injunction found in the Plan, after more than a decade of litigation the A/P Claims will remain unresolved, with the Debtor facing significant future litigation and its attendant expense. Moreover, a condition to incurrence of the Effective Date of the Plan, and to ARCO's contribution of cash and the insurance rights assignment, is that the A/P Channeling Injunction is in effect. The court finds that the injunction is essential to the Plan and the Debtors' reorganization.

> FN125. A/P Uncontested Facts, No. 96, 97.Pl. 5356.

> FN126. As of November 1, 2003, ANI, through its counsel reported that the total transaction costs expended in the defense of the *Hall* action are $24.02 million. A/P Uncontested Fact No. 120. Defense costs erode the limits of the Facility Form Policies. A/P Uncontested Fact No. 66. That is, for every dollar spent on defense there is one dollar less available for claimants from the applicable insurance.

*4. Acceptance of the Plan by Impacted Class.*

A. *Asbestos.*The Plan provides for payment of the asbestos personal injury claims as Class 6 claims, and for payment of asbestos property damage and indirect asbestos property damage claims as Class 7 claims. These classes have voted in favor of the Plan. The holders of

Class 6 claims voted in favor of the Plan 89.4% by number and 88.4% by dollar value.[FN127] The holders of Class 7 claims voted 100% in favor of the Plan.[FN128] The court finds that the requirement of acceptance by the impacted class has been met.

> FN127. Exhibit 2006.

> FN128. Exhibit 16.

*27 B. *Apollo/Parks.*The Plan provides for payment of the A/P Claims as Class 8A Claims. Class 8A has voted overwhelmingly in favor of the Plan, with affirmative votes received by over 99% of the class members.[FN129] Moreover, the Apollo Future Claims Representative supports the Apollo/Parks Settlement Agreement. The court finds that the requirement of acceptance of the Plan by the impacted class has been met.

> FN129. Tabulation of Votes and Affidavit of Michelle Dalsin Zeller.

*5. Substantially Full Payment to Impacted Classes.*

A. *Asbestos.*The Plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction. Contributions to the asbestos personal injury trust is discussed above. Like the A/P Trust, trust distribution procedures have been promulgated to govern the trust's operations. Under the Plan, claims will be channeled to the trust, each claim rated in accordance with established TDPs, and paid in accordance with a proposed schedule.

B. *Apollo/Parks.*The Plan provides for payment of the A/P Claimants and Future Claimants as Class 8A Claims, and for adoption of Trust Distribution Procedures to govern the workings of the A/P Trust. The A/P Settlement will settle the *Hall* claims, which comprise the bulk of the A/P present claims, in the amount of $110 million. Both ARCO and the Insurance Contributors will make the Apollo/Parks Township Insurance Rights Assignment. The parties have stipulated to the face amounts and limits of various insurance policies applicable to both the Apollo and Parks facilities over time, and these limits are sufficient to cover the *Hall*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

settlement amount.[FN130]

> FN130. A/P Uncontested Facts, Nos. 62, 63.Pl. 5356.

In addition, ARCO will make a cash payment to the *Hall* claimants of $27.5 million upon the receipt of releases from the *Hall* claimants, as well as other conditions as set forth in the Settlement. B & W will make a $2.8 million cash payment to the A/P Trust and assign to the A/P Trust its claims against ANI for reimbursement of prior defense costs incurred and paid by B & W arising from the *Hall* litigation in the amount of $1.44 million.

The Plan also provides for a set aside of $75 million (with a cap of $100 million) for the A/P Future Demand Holders. Mr. Basil Uddo, the A/P FCR, has exercised extensive due diligence review in the case. For example, he testified that, among other things, he reviewed the Plan and Disclosure Statement, the case record, the record in the *Hall* litigation and studies related to radiation exposure issues, as well as consulted with experts and others before concluding that the set aside was sufficient to satisfy A/P future claims. Although the A/P Trust Distribution Procedures remain to be negotiated between the parties and approved by the Court, based on the provisions of the Plan as amended on October 1, 2004, they will provide for the treatment of Apollo/ Parks Township future demands in substantially similar fashion to A/P Present Claims.

### 6. Full Payment of Nonsettling Claimants.

**\*28** A. *Asbestos.*No evidence was put forth as to claimants who have not agreed to settle asbestos-related claims, or the payment to be made to these claimants. The Plan proposes to resolve all asbestos-related claims, and to pay those claims in accordance with procedures established under the TDPs. The Settlement Agreement between Debtors, MII, MI, the ACC and FCR proposes to settle disputes concerning the contents of the Plan, set up the asbestos trusts for the benefit of asbestos personal injury claimants and provide a mechanism for payment of the claims. To the extent claims are al-

lowed, they will be paid in accordance with the trust in full.

B. *Apollo/Parks.*Mr. Nesser testified at the confirmation hearing that the *Hall* Claimants have agreed to settle their claims, and that other non-*Hall* claimants have claims estimated at $3 million or less. To the extent that the non-*Hall* claims are allowed, they will be paid under the A/P Trust in full.

In conclusion, the court finds that the requirements for issuance of the Apollo/Parks Township Channeling Injunction have been met. The Asbestos PI Channeling Injunction, the Apollo/Parks Channeling Injunction, the Asbestos PD Channeling Injunction and the Asbestos Insurance Entity Injunction are to be implemented in connection with this Plan, and the various trusts.[FN131]Upon confirmation and substantial consummation of the Plan, the Non-Debtor Affiliate Settlement Agreement and the Non-Debtor Affiliate Release shall be in full force and effect.

> FN131. The Settling Asbestos Insurance entities, designated on the Plan Proponents' Schedule of Settling Asbestos Insurance Entities (and subject to the Plan Proponents' amendment until the Confirmation Date), are entitled to all of the benefits of the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, and the Asbestos Insurance Entity Injunction. Accordingly, the Asbestos PI Channeling Injunction applies in full to the Settling Asbestos Insurance Entities with respect to Asbestos PI Trust Claims and the Asbestos PD Channeling Injunction applies in full to the Settling Asbestos Insurance Entities with respect to Class 7 Claims.
>
> Consistent with Sections 7.3 and 7.4 of the Plan, the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, and the Asbestos Insurance Entity Injunction apply to (i) the B & W/AIG Insurer Misconduct Actions (as defined in the Settlement Agreement and Release between the Babcock Parties the ACC, the FCR and Certain AIG

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                      Page 32
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

Member Companies, which was approved by this Court on June 16, 2004) subject to this Court's approval of the Settlement Agreement and Release between the B & W/ McDermott Parties, the ACC, the FCR and Travelers (the "Travelers Settlement Agreement"), which was filed for approval in the Court and which this Court is scheduled to consider on October 20, 2004, the B & W/ Travelers Insurer Misconduct Actions (as defined in the Travelers Settlement Agreement).

Consistent with Sections 7.3 and 7.4 of the Plan, none of the Babcock Parties, with B & W/McDermott Parties, the ACC, the FCR and the Asbestos PI Trust (each as defined in the Asbestos PI Insurance Settlement Agreements) may seek to terminate, reduce, or limit the scope of the Asbestos PI Channeling Injunction with respect to any Settling Asbestos Insurance Entity after the Confirmation Order becomes a Final Order.

## VII. EXECUTORY CONTRACTS

### A. Insurance Policies

1. *Asbestos.* Section 7.2.6 of the Plan calls for the transfer of the Asbestos PI Insurance Rights to the Asbestos PI Trust. Section 8.1 of the Plan calls for assumption of all executory contracts and unexpired leases, not previously rejected. The parties apparently agree that the insurance policies are not executory contracts.[FN132] At issue is whether the settlement agreements with insurers, including the coverage in place agreement with London ("LSA") are executory contracts capable of assumption. Insurers contend that the settlements are executory contracts that cannot be assumed or assigned, because the settlements incorporate the terms of the policies, including anti-assignment provisions, and other provisions with which the Plan does not comply. The Plan Proponents contend that the settlements are like the policies-not executory.

FN132. See Plan Proponents Post-Hearing

Brief, at pg.25; Certain Underwriters Response Brief Regarding the Plan Proponents' Motion to Resolve Executory Contract Assumption Motion, at pg. 20 (LMI concur with the Plan Proponents that the overwhelming weight of authority establishes the non-executory nature of the Policies.")

Prior to filing, the Debtors had numerous insurance policies with various insurers, many of which were the subject of coverage-in-place agreements.[FN133] Prior to filing, the Debtor was current in its premiums on all policies covering asbestos-related liabilities. On many policies, the coverage period had already expired.[FN134] The Debtors' material obligation regarding the policies, i.e. the payment of premiums, had been satisfied for the policy period covered. Other duties, such as assistance and cooperation, are ancillary, and not material obligations. The only material obligation of insurers remains the indemnity of the Debtors on the policies. As such, the asbestos policies are not executory contracts which can be assumed or rejected in the bankruptcy proceedings.[FN135]

FN133. The insurance policies are found at Exhibits 34.001 through 34.240. The settlement agreements are found at Exhibits 0035, 0036, 36.001 through 36.022, and 0037.

FN134. All applicable coverage periods for the London policies expired on or about April 1, 1987. Objection to Plan, P. 4726 at pg. 17.

FN135. *In re Firearms Import and Export Corp.,* 131 B.R. 1009, 1013-14 (Bankr.S.D.Fla.1991)(insurance policy was not executory where debtor had paid all premiums in full prepetition on coverage periods that had expired); *In re Placid Oil Co.,* 72 B.R. 135, 137-38 (Bankr.N.D.Tex.1987)(premium agreement not executory because no performance is required by debtor, other than payment of money); *see also Ames Dept. Stores, Inc.,* 1995 WL 311764 at 3 (S .D.N.Y. May 18, 1995)("Courts considering insurance policies in which the policy periods have expired and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the initial premiums have been paid routinely find that they are not executory contracts despite continuing obligations on the part of the insured.")(collecting cases).

*29 *2. Apollo/Parks.*ANI asserts that its policies governing coverage for nuclear energy hazards, unlike the asbestos related policies, are executory contracts. ANI asserts that the policies are executory because B & W has the continuing obligation to pay premiums and ANI has the continuing obligation to defend claims tendered under the Plan.

Unexpired insurance policies are generally considered executory.[FN136]Where a debtor has the continuing obligation to pay premiums, and the insurer has the continuing obligation to provide coverage, a policy is considered to be executory.[FN137]Premium payments are considered to be bargained for consideration in an insurance policy.[FN138]Policies where the debtor has paid premiums for coverage periods that have expired are considered to be nonexecutory.[FN139]

FN136.*In re Gamma Fishing Co.*, 70 B.R. 950, 951 (Bankr.S.D.Cal.1987).

FN137.*Id.;Counties Contracting and Const. Corp.*, 855 F.2d 1054, 1060 (3rd Cir.1988).

FN138.*In re Sudbury*, 153 B.R. 776, 779 (Bankr.N.D.Ohio 1993).

FN139.*See* footnote 132.

The parties have stipulated that a total of four policies were issued on the Apollo and Parks Township facilities, and that each policy was effective from the date of its issuance to the present.[FN140]Although the original policies were issued at various times from March 1958 to March 1975, yearly endorsements to the policies were issued, specifying the effective period for the endorsement.[FN141]Member companies participating in an ANI syndicate agree to pay a specified portion of insured losses, and receive the commensurate portion of the premiums.[FN142]ANI provided for each calendar year a premium endorsement specifying the advance, standard and reserve premium for the calendar year that

the endorsement is effective, and an endorsement specifying changes in proportionate liability for subscribing companies in each calendar year.[FN143]The parties have stipulated that all premiums required to be paid under the policies have been paid.[FN144]The secondary financial protection master policy ANI administers is a retrospective premium program.[FN145]

FN140. Joint Pretrial Order on Issues Related to Apollo/Parks Township Matters, P. 5356, nos. 52-65.

FN141. Exhibits 3108-3111.

FN142. Exhibit 3127; section 2.3.2, page lxxiv.

FN143. For example, *see* Exhibit 3108, pg. 600.

FN144.*Id.* at 67.

FN145. Exhibit 3127, 2.3.3.3, page lxxix.

The Plan Proponents assert that the ANI policies are not executory because all premiums have already been paid for the insurance, citing four cases for that proposition. The court notes, however, that three of the cases involved policies that expired prior to the bankruptcy filing.[FN146]Where the coverage period has expired prepetition, there remains no existing contract to assume or reject. The remaining case relied on by Plan Proponents involved a retrospective insurance policy, where debtor had paid the minium premium for the policy year, but on the filing date, had failed to pay retrospective premiums assessed after the policy year.FN147The court determined that the existence of a retrospective premium did not render the policy executory. The court does not find persuasive the cases where the policy at issue expired prepetition, or which considered retrospective insurance policies where the retrospective premium was unpaid on the petition date. Instead, an unexpired retrospective insurance policy is executory.[FN148]In this case, the coverage period of the ANI policies extends post-petition, and Debtors still owe an obligation to pay standard premiums for the policies.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN146. *In re CVA General Contractors, Inc.,* 267 B.R. 773, 778 (W . D. Tex.2001)(when an insurance contract has been terminated prior to the date of the filing of the petition, there remains no existing contract, executory or otherwise, for the trustee either assume or reject); *In re Firearms Import and Export Corp,* 131 B.R. 1009, 1013 (Bankr.S.D.Fla.1991)(where liability coverages were for prepetition periods, on the filing of the petition, no existing contract is present for the debtor to assume and 365 was not applicable); *In re Sudbury,* 153 B.R. 776, 777 (Bankr.N.D.Ohio 1993)(each policy had expired or was terminated prior to the filing of the case; presence of Bankruptcy Clause in policy constituted agreement that indemnity obligation was not conditioned upon payment of retrospective premium, where deposit premium was paid in full).

FN147. *Wisconsin Barge Line, Inc.,* 76 B.R. 695 (Bankr.E.D.Mo.1987)(considering retrospective insurance policy).

FN148. *Wheeling-Pittsburgh Steel Corp.,* 54 B.R. 772, 779 (Bankr.W.D.Pa.1985), *aff'd* 67 B.R. 620 (W.D.Pa.1986).

*30 Generally, the mere obligation to pay money by one party to the contract is not enough to render that contract executory, absent some corresponding material obligation that is still owed by the other party.[FN149] Here, the Debtors owe the continuing obligation to pay premiums, and ANI owes a continuing obligation to provide coverage and to keep the policy in effect, which would render the policy executory.[FN150] The failure of the Debtors to pay premiums would permit ANI the right to cancel the policies.[FN151] The court finds that the ANI policies are executory contracts which the Debtors may assume under the Plan. The policies are continuing, and coverage periods have not expired, which would render the policies executory.[FN152]

FN149. *Lubrizol Enters., Inc., v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1046 (4th Cir.1985).

FN150. *Counties Contracting and Const. Corp.,* 855 F.2d 1054, 1060 (3rd Cir.1988); see also M. Ledwin, The Treatment of Retrospectively Rated Insurance Policies in Bankruptcy, 16 Bankr.Dev. J. 11, 29 (1999).

FN151. Exhibit 3110, pg. 6 ("in the event of nonpayment of premium ... this policy may be cancelled by the companies ... )

FN152. Exhibit 3110, Item 2 (Policy Period: Beginning at 12:01 on the 7th day of March, 1975 and continuing through the effective date of the cancellation or termination of this policy).

ANI further objects that the policies may only be assumed in their entirety, and the Plan Proponents may not assume the benefits of the policies without also assuming provisions regarding consent to settlement and control of the defense of claims. For reasons put forth in more detail in the following sections dealing with the Apollo/Parks Township issues, this objection is overruled. Debtors may make a reasonable settlement in the Plan of the A/P claims.

**B. Coverage in Place Agreements**

The insurers object that various settlement agreements are executory contracts which the Debtors may not assume. At issue are settlement agreements entered into by B & W after the primary policies governing asbestos-related liabilities with Travelers were nearing expiration.

In 1989, Travelers informed B & W that certain limits on primary insurance policies were nearing exhaustion, and that it would no longer handle claims for B & W. B & W then assumed the principal claims-handling responsibility for its asbestos claims, using a newly formed third-party claims administrator, Worldwide. B & W then looked to its excess insurance carriers to provide coverage in place to fund asbestos claims.FN153 B & W entered into agreements with excess insurers regarding the manner that the excess insurers' policies would provide coverage-in-place for B

Not Reported in B.R.

Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)

**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

Page 35

& W's asbestos products bodily injury claims.

FN153. Testimony Mr. McKnight, September 22, 2003; Mr. Quinn, September 24, 2003.

One of the chief CIP documents is the LSA, agreed to on April 25, 1990.[FN154] London, and other insurers, argue that the settlement agreement is executory because the major undertaking for Debtors under the agreement is the management of claims and for London is to indemnify pursuant to special criteria established by the CIP, and these obligations are so substantial that a breach of either would defeat the purpose of the transaction. In addition, they argue that Judge Vance, in a January 4, 2002 opinion, treated the CIP as an executory contract,[FN155] and that her decision constitutes the law of the case.

FN154. Exhibit 36.003.

FN155.*Certain Underwriters at Lloyd's, London, et al v. Babcock & Wilcox Co, et al,* C.A. No. 01-1187, 2002 WL 22023 at 8 (E.D.La. Jan. 4, 2002).

Initially, the court notes that Judge Vance's decision of January 4, 2002 does not establish that the CIP is an executory contract. Instead, she was asked to decide whether the Debtors had anticipatorily repudiated the CIP by proposing to assign the management of claims to a claims-handling trust under the Plan. She held that "the provisions of the Plan do not express defendants' unequivocal intent to cease performance of the LSA."[FN156]Without an analysis of the executory or nonexecutory nature of the CIP, Judge Vance reasoned that the Code does not prohibit assignment of executory contracts and unexpired leases, and that the LSA "does not prohibit its assignment and appears to contemplate assignment."[FN157]In other words, a hypothetical scenario existed that would permit assignment. Because the Plan at that time did not provide unequivocally for assignment of the LSA to a trust, or which would exclude the Underwriters from claims management, she found that the defendants had not committed an anticipatory repudiation of the LSA that would absolve the insurers of obligations under the agreement. In short, Judge

Vance was not asked to decide whether the LSA was an executory contract under 11 USC § 365. Instead, she decided only that the Debtors did not commit an anticipatory breach of the LSA.

FN156.*Id.* at 7.

FN157.*Id.*

**\*31** The Bankruptcy Code, at § 365, provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."In determining whether a contract is executory, the relevant inquiry is whether "if at the time of bankruptcy filing the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party."[FN158]Only the existence of a material obligation that would excuse the performance of the other party, and not merely ancillary, ministerial or other continuing duties, would render a contract executory.[FN159]A contract fully performed on one side prior to bankruptcy is not executory.[FN160]If either side has "substantially performed" its side of the bargain, such that the party's failure to perform further would not excuse performance by the other party, then the contract is not executory.[FN161]

FN158.*In re Murexco Petroleum, Inc.,* 15 F.3d 60, 62-63 (5th Cir.1994).

FN159.*In re Sudbury, Inc.,* 153 B.R. 776, 779 (Bankr.N.D.Ohio 1993).

FN160. Resnick, *Bankruptcy Law Manual,* 8:41 (5th ed.).

FN161.*In re Texscan Corp.,* 976 F.2d 1269 (9th Cir.1992).

Generally, a material breach is one so substantial as to defeat the purpose of making the contract.[FN162]The breach must go to "the root of the agreement" for a party to terminate its obligations under the contract. FN163

FN162.*Sinco, Inc. v. Metro-North Commuter*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Railroad Co.,* 133 F.Supp.2d 308, 311 (S.D.N.Y.2001). The LSA provides that it is governed by New York law. Other CIPs either do not contain a choice of law stipulation, or provide that laws of other states shall govern. For example, the CIP with Commercial Union specifies that it shall be governed by the law of Massachusetts. Exhibit 36.006 at pg.13.

FN163.*Id.*

No decision could be located specifically discussing the executory nature of CIP agreements. Courts generally construe continuing obligations in nonexecutory insurance policies where the coverage period has expired, such as notification and cooperation clauses, as ancillary obligations that are still in effect but which failure to perform would not be material and would not excuse the insurer from liability under the policy.[FN164]

FN164.*Firearms,* 131 B.R. 1009, 1013-1014 (citing *In re Federal Press Co., Inc.,* 104 B.R. 56, 66 (Bankr.N.D.Ind.1989)); *In re Sudbury, Inc.,* 153 B.R. 776, 779 (Bankr.N.D.Ohio 1993)(debtor's duties under cooperation clause is ministerial).

Under the settlement agreements, B & W is made responsible for the management of claims.[FN165]The insurer parties agreed to the establishment of a coverage block and to indemnify B & W for claims and defense costs. Plan Proponents argue that the management of claims provision in the CIP is not material, that it was never specifically discussed, and was merely added with other standard provisions in an early draft, and remained in the CIP thereafter. Additionally, they argue that the management of claims provision in the CIP is analogous to assistance and cooperation clauses found in policies, and are not material obligations. This court agrees.

FN165. Exhibit 36.003, pg.3. Other settlements contain similar provisions.

The CIPs were designed to state the manner by which the settling insurers' excess policies would provide coverage-in-place for B & W's asbestos products bodily injury claims. The insurers agreed to pay asbestos claims as they were asserted under a methodology that was to be agreed upon. Eldon Bolton, who acted as lead negotiator for McDermott in the negotiation of the LSA, testified that the negotiations leading up to the LSA centered on the "trigger of coverage", that is, which policies would be used for injuries arising based upon an agreed upon "trigger" of liability. The Debtors objective was to obtain a "triple trigger" and to increase access to coverage. He testified that once the trigger was achieved, he had no objections or comments to the management of claims provision of the agreement.[FN166]Letters between Mr. Bolton and Mr. Quinn, a New York attorney and London's chief negotiator, discussing the LSA do not contain any mention of this provision.[FN167]In short, Bolton's testimony was that the trigger of coverage was extensively negotiated; however, the management of claims provision in the settlement was merely inserted without discussion.

FN166. Deposition Eldon Bolton, pg. 48-49.

FN167. Exhibits 97-100, 102, 104-106, 108.

**\*32** Additionally, the course of conduct of the parties indicates that the management of claims provision is not a material provision, such that its breach would excuse the Underwriters' performance. The LSA specifies that "B & W/McDermott shall be responsible for the management of the Claims."[FN168]The testimony established that Worldwide undertook the management of claims for the Debtors. Worldwide employed among others, David McKnight a former employee of Travelers, who had handled B & W asbestos claims while at Travelers. The testimony was that Worldwide was given near complete discretion in handling claims,[FN169] and that settlement in excess of given dollar amounts would not constitute a breach.[FN170]

FN168. Exhibit 36.0003, pg. 3.

FN169. Exhibit 121; Thomas Quinn testimony Sept. 24, 2003; Louis Burkart testimony Sept. 23, 2003.

FN170. Thomas Quinn testimony, Sept. 24, 2003; *see also Certain Underwriters*, 2002 WL 22023 at 7 (failure of B & W to notify underwriters of settlements in excess of $100,000 would not breach the LSA).

The conduct of the parties indicates that they never considered the management of claims clause to be central to their agreement, such that a breach would be material. Moreover, the management of claims provision in the CIPs merely provides for the parties to agree in the future to procedures for, among other things, the negotiation of new settlement agreements with plaintiffs' counsel and other claims handling matters. That the LSA does not set out those procedures was confirmed by Mr. Quinn's testimony.[FN171] Therefore, it cannot be said that the management of claims constituted the "root of the agreement" such that Underwriters may terminate the agreement if the clause were breached. Other than claims management, which is more in the nature of an incidental continuing obligation, and which was performed by Worldwide pre-petition, no material obligations are due by Debtors under the CIPs that would constitute a material breach if not performed. Accordingly, the CIPs are not executory contracts that must be assumed or rejected by the Debtors.

FN171. Thomas Quinn testimony, Sept. 24, 2003.

## VIII. *APOLLO/PARKS ISSUES*

### A. *Background Facts.*

The Apollo Facility and the Parks Township Facility are nuclear power facilities located in Pennsylvania. In 1971, B & W purchased from ARCO all of the shares of the companies owning the facilities. Under the purchase agreement with B & W, ARCO agreed to indemnify B & W for certain liabilities, including claims arising out of "all liabilities, obligations and debts" of the predecessor company that predated the sale. The Apollo Facility produced high-enriched uranium ("HEU") from 1957 to 1978, and low-enriched uranium ("LEU") from 1964 to 1983. The Parks Township Facility produced specialty metal products,[FN172] plutonium-238, plutoni-

um based fuel plates and other products using radioactive materials at various times from 1961 to the mid-1970's. Additionally, from the mid-1960's, the Parks Township Facility stored or disposed of radioactive waste materials and buried solid radioactive wastes in a forty acre area known as the Shallow Landfill Disposal Area.

FN172. These products included hafnium, beryllium, titanium, and zirconium. Uncontested Facts, No. 35.P. 5356.

ANI[FN173] has provided coverage to B & W and ARCO as insureds for nuclear energy hazards at the Apollo Facility since March, 1958 and at the Parks Township Facility since June 1960, under four policies issued to cover the facilities. As of February 15, 1979, aggregate limits available under its policies at both facilities totaled $320 million. The parties have stipulated that defense costs erode the limits of the ANI policies, and that all required premiums have been paid on the policies.[FN174]

FN173. Formerly known as Nuclear Energy Liability Insurance Association and Mutual Atomic Energy Liability Underwriters.

FN174. Uncontested Facts Nos. 66, 67.Pl. 5356.

*33 The buildings at the Apollo Facility have been demolished, and the Nuclear Regulatory Commissions ("NRC") released the facility for unrestricted use in the mid-1990's. The buildings at the Parks Township Facility were demolished between the mid-1990's and 2000. The Army Corps of Engineers continues site assessment activity at the Parks Facility, and remediation has not yet been determined.

### The Hall Litigation.

On June 7, 1994, five individuals and three putative class representatives filed a complaint against B & W and ARCO in the United States District Court for the Western District of Pennsylvania ("*Hall* action").FN175 The plaintiffs in the action assert bodily

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                    Page 38
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

injury and property damage claims as a result of radio-active, hazardous and toxic emissions from both facilit-ies.[FN176] The bodily injury claims include a variety of cancer claims, including leukemia, throat cancer, breast cancer, and other cancers, which have led to the death of certain claimants.[FN177]

> FN175.*Hall v. Babcock & Wilcox Co.,* Civ. Action No. 94-0951, United States District Court, Western District of Pennsylvania. The complaint has been amended, and now includes 500 plaintiffs with 383 claims.

> FN176. Exhibit 3017.

> FN177. All but 19 of the 235 wrongful death and personal injury claims involve some form of cancer.

B & W and ARCO tendered the *Hall* action to ANI in June, 1994.[FN178] ANI accepted the tender with a reservation of rights to deny coverage with respect to, among other things, any punitive damages and liability as a result of injunctive relief for medical monitoring damages.FN179In June, 1994, ANI appointed the law firm of Pepper Hamilton to represent both B & W and ARCO in the *Hall* action.

> FN178. Uncontested Facts 81, 82. Pl. 5356.

> FN179. Exhibits 3021, 3168.

In August 1998, the federal district court in Pennsylvania held a trial of eight representative "test case" plaintiffs in the *Hall* action. On September 17, the jury in the *Hall* action rendered a verdict in favor of the eight test plaintiffs of compensatory damages in the amount of $33.7 million jointly against B & W and ARCO and $2.8 million solely against B & W.[FN180] Trial on the punitive damages phase was continued, and B & W entered into an agreement with Baron & Budd, plaintiffs' lawyers, to settle the punitive damage claims of all claimants in the *Hall* action for $8 million.[FN181] ANI has not paid any part of the punitive damages settlement.

> FN180. Exhibit 3040.

> FN181. Exhibit 3186.

The defendants filed a motion for Judgment NOV, which was denied on June 29, 1999.[FN182]The court, however, did grant a motion for new trial, based primarily upon the plaintiffs' failure to disclose to defendants two exhibits prior to trial.[FN183]

> FN182. Exhibit 3072.

> FN183.*Id.*

After the jury verdict, multiple suits were filed both by B & W and ANI regarding the *Hall* action. In November 1998, ANI filed a declaratory judgment action against B & W and ARCO in the New York state court, seeking a determination of available policy limits and arguing an "emission" trigger of coverage, one that required identification of the moment when exposure to radioactive material resulted in bodily injury.[FN184]The New York suit was dismissed on *forum non conveniens* grounds. In the fall of 1999, both B & W and ANI filed coverage actions in the Pennsylvania state court, which were consolidated.[FN185]In April 2001, the Pennsylvania state court rendered an opinion in the coverage actions that the date of manifestation, and not emission, is the applicable trigger on the ANI policies, and that ANI had the duty to pay for independent defense counsel to represent and defend the separate interests of B & W and ARCO in the *Hall* action.[FN186]To date, ANI has not paid the costs of B & W's independent counsel.

> FN184. Exhibit 3055.

> FN185.*B & W v. ANI,* No. 99-11498, Court of Common Pleas of Allegheny County, PA and *ANI v. B & W and ARCO,* No. 99-16227, Court of Common Pleas of Allegheny County, PA..

> FN186. Uncontested Facts, Nos. 127-129.Pl. 5356; Exhibit 3094.

B. *The Plan, as it relates to Apollo/Parks, is Proposed in Good Faith*

*34 ANI objects that the Plan represents a collusive

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                    Page 39
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

agreement by Debtors and the attorneys for the Apollo/ Parks claimants to defraud ANI and guarantee payment of meritless claims. ANI objects that no Apollo/Parks claimant has ever obtained either a judgment or settlement of compensatory damages, after nearly ten years of litigation. They argue that despite the lack of any adverse judgment against ANI's insureds, the Plan provides for payment of over $110 million in policy proceeds, without permitting ANI to control the defense of claims.

Much of the discussion regarding the good faith of the Debtors is made above, and will not be repeated here. Mr. Nesser testified that after the petition was filed, B & W, ARCO and the *Hall* Claimants agreed in March of 2003 to involve a mediator to assist in reaching an agreement on the *Hall* claims, and Mr. McGovern, the court-appointed mediator was engaged. In March 2003, a mediation session was conducted in Washington, D.C., attended by *Hall* claimants counsel, an ANI representative and counsel, and B & W. ANI's counsel included both its bankruptcy counsel, and its attorney from the Pepper Hamilton law firm, who participated in the *Hall* action.[FN187] The Pepper Hamilton attorney provided an updated valuation analysis of the *Hall* claims, which reflected a value in the range of $76 to $90 million.[FN188] After negotiation, the *Hall* claimants, B & W and ARCO reached an agreement, memorialized by the Apollo/Parks Township Settlement Agreement, and incorporated into the Plan.

FN187. Exhibit 3100.

FN188. Exhibit 3102.

On August 15, 2003 Mr. Uddo was appointed the Apollo FCR, representing the interests of the Apollo/ Parks future interest holders.[FN189] After his appointment, further negotiations with the settling parties took place, which resulted in the filing of technical amendments to the Plan and a revised A/P Settlement Agreement.[FN190] Mr. Uddo retained experts, including epidemiologists and biostatisticians, as well as other professionals to assist in evaluating the claims of A/P future demand holders, the Debtors' assets and the Plan. As a result, the A/P settlement has been revised to permit Mr. Uddo to participate in the development of the A/P TDPs and to set aside $75 million, with a cap of $100 million, for the A/P future demand holders. Under the settlement, the A/P Claims are liquidated and allowed. The eight test claims in the *Hall* action were allowed in the total amount of $13.5 million, an amount less than the jury verdict.[FN191] The remaining *Hall* claims were placed into four categories, which were rated based upon certain criteria, including the strength of the evidence regarding the cancer and nuclear exposure, the length and duration of exposure, the claimants' age, special damage characteristics, and whether the claim was within the applicable limitations period. The Plan provides for a total of up to $210 million to be paid under the A/P Settlement to A/P claimants.

FN189. Exhibit 3240.

FN190. The term sheet for the revised settlement was filed on December 16, 2003. Exhibit 3221.

FN191. Exhibit 3186.

ANI has not produced any credible evidence of collusion. While ANI complains that the Plan Proponents negotiated the Plan among themselves to the exclusion of ANI, it is undisputed that ANI and its counsel attended at least one mediation session during the bankruptcy proceedings regarding the *Hall* claims. While ANI ultimately did not settle with the Plan Proponents, and opposes the Plan, that alone is insufficient to deny confirmation on the basis of lack of good faith.

**\*35** The court finds that the Plan is proposed with the legitimate and honest purpose to reorganize, has a reasonable chance of success, and is made in good faith. It is not surprising that ANI desires to continue litigating the A/P claims-the litigation costs erode the coverage limits. The *Hall* action alone has cost over $24 million in attorneys' fees without resulting in resolution of any of the plaintiffs' claims.[FN192] Litigation of each claim of the over 500 *Hall* claimants may cost many times the $24 million in attorneys' fees already spent. Although the jury verdict in the *Hall* action was ultimately vacated, and a new trial granted, the jury verdict was in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                      Page 40
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

excess of $36 million in compensatory damages alone for only eight test cases. It seems reasonable that many times that amount of damages may ultimately be awarded by a jury if all or most of the 500 claimants ultimately go to trial.

FN192. Exhibit 3064; Uncontested Fact, 120, Pl. 5356.

Rather than a collusive arrangement, the Plan represents a negotiated solution to the expensive and protracted litigation that has been filed against the Debtors. Other than ANI, the A/P portion of the Plan is supported by all major A/P constituencies. The Plan and the A/P settlement were the result of extensive arms-length negotiations. ANI participated in settlement negotiations, however, did not agree to the settlement. The A/P FCR-who has an interest in ensuring that valid claims be paid to preserve limited resources for his claimants, who are at present unknown-has conducted due diligence and negotiated a satisfactory resolution of the futures claims with the settling parties. The Plan and the A/P settlement are filed in good faith, are not the result of collusion, and are sufficient to satisfy the requirements of § 1129(a)(3).

C. *The Plan does not violate the Price Anderson Act.*

ANI objects to confirmation of the Plan because it asserts that the Plan violates provisions of the Price Anderson Act, 42 U.S.C. § 2210, *et. seq.* ANI asserts that, under the Act, the exclusive jurisdiction and venue over public liability claims is in the district where the nuclear incident is alleged to have occurred, i.e ., the Western District of Pennsylvania. It also asserts that payment of claims under the Plan would undermine the purpose of the Act to provide and preserve financial protection for valid claims.

The Price Anderson Act ("Act") is found at 42 U.S.C. § 2210, et. seq. The Act was enacted to meet two basic objectives:

"(1) Remove the deterrent to private sector participation in atomic energy presented by the threat of potentially enormous liability claims in the event of a catastrophic nuclear accident.

(2) Ensure that adequate funds are available to the public to satisfy liability claims if such an accident were to occur."FN193

FN193. Exhibit 3127, Part 1, xii.

The Act effectively channels the obligation to pay compensation for damages so that a claimant need not sue each party involved as owner, designer or engineer of the facility, but can bring the claim against the reactor licensee.FN194    The Act provides that with respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident took place shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy.FN195Section 2210(n)(2) also permits actions pending in state court to be removed to the appropriate federal court venue. It is this section that ANI asserts provides authority that jurisdiction and venue over all nuclear related claims must be in the U.S. district court where the reactor is located, and therefore, the Trust structure as contained in the Plan is proposed by a means forbidden by law and cannot be confirmed. ANI objects that the Plan provides that the *Hall* action is to be dismissed in favor of resolution of the claims by the Trust, and that the Trust will likely settle and pay claims through use of the TDPs, rather than litigate the claims through the *Hall* action pending in the Western District of Pennsylvania. It argues that the settlement strategy will violate the policy of the Act to provide and preserve financial protection for valid claims.

FN194.*Id.* at xiii.

FN195.42 U.S.C. 2210(n)(2).

**\*36** The Act is construed as creating an exclusive federal cause of action for torts arising out of nuclear incidents.FN196    The consequence is that "no state cause of action based upon public liability exists."FN197However, although jurisdiction and venue over public liability actions is now vested in the federal courts, nothing in the Act prohibits confirmation of a

Not Reported in B.R.                                                                                            Page 41
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

Plan under the Bankruptcy Code which provides for the settlement of claims based upon public liability. Likewise, nothing in the Act indicates that Congress intended to preempt bankruptcy law in cases involving claims based upon public liability. The Act provides for consolidation of public injury cases arising from a nuclear incident in a single federal district court located where the incident occurred. Congress sought, by this provision, to "effect uniformity, equity, and efficiency in the disposition of public liability claims .... [and] ensured that all claims resulting from a given nuclear incident would be governed by the same law, provided for the coordination of all phases of litigation and the orderly distribution of funds, and assured the preservation of sufficient funds for victims whose injuries may not become manifest until long after the incident."[FN198] The purpose of the venue and jurisdiction provisions is to provide uniformity, and to promote efficiency and not, as ANI claims, to preclude the settlement of claims or to ensure that litigation of claims take place in the district where the incident occurred.

FN196. *Acuna v. Brown & Root, Inc.,* 200 F.3d 335 (5th Cir.2000), *cert. denied* 522 U.S. 1229.

FN197. *In re TMI Litigation Cases Consolidated, II,* 940 F.2d 832, 854 (3d Cir.1991).

FN198. *Id.* at 856, citing H.R.Rep. No. 104, 100th Cong., 1st Sess., pt. 3, at 18 (1987).

The court notes that the ANI policies explicitly recognize that settlement, rather than litigation, of a claim may occur. For instance, section I of the policies permits payments on behalf of the insured and provides that the "companies may make such investigation, negotiation and settlement of any claim or suit as they deem expedient."[FN199] Nothing in the Act mandates that a Plan involving public liability claims specify that the claims will be litigated subject to the venue provisions of the Act, to the exclusion of the bankruptcy court. ANI's argument that the Plan cannot be confirmed because it violates the "public policy" of the Act is not well taken.

FN199. Exhibit 3110, pg. 3, section I. The

Conditions to the policies provides for a limit of liability where "payments in settlement of claims and in satisfaction of judgements" against the insureds for losses meets certain amounts. Exhibit 3110, pg. 4.

Likewise, nothing in the Act provides that the Plan cannot be confirmed because it "abrogates the applicable federal law regarding *how* the claims must be adjudicated."[FN200] ANI asserts that the Act required that Third Circuit precedent concerning the elements and standard of proof of a public liability claim be applied, which the Plan fails to do. ANI fails, however, to specifically demonstrate how the Plan does not meet the standard of proof for claims, other than to assert that the Trust, and not the Debtor or ANI, will ultimately handle claims. Other than broad assertions that the Trust mechanism will violate the public policy behind the "compensation scheme" found in the Act, ANI has failed to articulate any specific provision of the Act that has been violated by the Plan. As such, the Court finds that the Plan does not violate the Price Anderson Act.

FN200. Post Trial Brief of ANI, p. 13.

D. *The Court's jurisdiction to determine the insurance related findings.*

*37 ANI objects that the bankruptcy court lacks the jurisdiction to make insurance-related findings requested by the Plan Proponents.[FN201] For the reasons expressed in the previous discussion of jurisdiction relating to the asbestos-related findings of fact, and except as stated otherwise, this court finds that it has jurisdiction to determine and enter findings and conclusions regarding confirmation of the Plan, including transfers of insurance rights to the trust established pursuant to § 105 for radiation related claims, the function of the Apollo/ Parks Township Trusts and related injunctions, and whether policies are executory contracts which may be assumed by the Debtors.

FN201. ANI asserts that the insurance related findings are found at Plan section 7.14.1, and include:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                        Page 42
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

(s) The terms of this Plan, the Apollo/Parks Township Settlement Agreement, and the Apollo/Parks Township Insurance Rights Assignment Agreement do not violate any obligation of the Insurance Contributors or ARCO under any consent-to-assignment provision of any Apollo/Parks Township Insurance Policy;

(t) The Apollo/Parks Township Insurance Rights Assignment does not materially increase the risk of the Apollo/Parks Township Insurers of providing coverage for liabilities under the Apollo/Parks Township Insurance Policies as compared to the risk that was otherwise being borne by the Apollo/Parks Township Insurers prior to the Effective Date.

(u) The terms of this Plan, the Apollo/Parks Township Settlement Agreement, and the Apollo/Parks Township Insurance Rights Assignment Agreement do not violate any obligation of the Insurance Contributors or ARCO under any consent-to-settlement, co-operation, management-of-claims, or no-action provision of any Apollo/Parks Township Insurance Policy.

(v) The Asbestos Insurance Entity Injunction, the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, and the Apollo/Parks Township Channeling Injunction are essential to this Plan and the Debtors' reorganization efforts;

(w) An identity of interests exists among the Debtors, the Asbestos Protected Parties, and the Apollo/Parks Township Protected Parties such that a claim asserted against any of the Asbestos Protected Parties or the Apollo/Parks Township Protected Parties gives rise to a claim against the Debtors, including by the operation of the law of indemnity and/or contribution;

(y) The duties and obligations of the Apollo/Parks Township Insurers under the Apollo/Parks Township Insurance Policies are not diminished, reduced or eliminated by (1) the discharge, release, and extinguishment of all obligations and liabilities of the Debtors, the Reorganized Debtors, and ARCO for and in respect of all Apollo/Parks Township Claims; (2) the assumption of responsibility and liability for all Apollo/Parks Township Claims by the Apollo/Parks Township Trust; or (3) the assignment of the Apollo/Parks Township Settlement Agreement, and the Apollo/Parks Township Insurance Rights Assignment Agreement;

(aa) The contribution of the Debtors' Apollo/Parks Township Payment and the Debtors' Apollo/Parks Township Insurance Rights Assignment, and the contribution of ARCO's Apollo/Parks Township Rights Assignment and the ARCO Release Payment are substantial assets of this Plan and the reorganization;

(dd) The Apollo/Parks Township Trust, as of the Effective Date, will irrevocably assume the liabilities, obligations, and responsibilities of the Debtors and all other Apollo/Parks Township Protected Parties with respect to the Apollo/Parks Township Claims;

(ee) All of the Debtors' insurers who are affording insurance coverage that is the subject of the Asbestos PI Insurance Rights Assignment and the Asbestos PD Insurance Rights Assignment, and the Apollo/Parks Township Insurers have been given notice and an opportunity to be heard;

(ff) Upon confirmation and consummation of the Plan, the Apollo/Parks Township Trust shall have substantially the same rights to indemnity and other rights related to the Apollo/Parks Township Claims and Debtors' Apollo/Parks Township Insurance Rights subject to the Debtors' Apollo/Parks Town-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                    Page 43
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

ship Insurance Carveout, as those afforded to the Debtors immediately prior to the Effective Date, and shall have substantially the same rights to indemnity and other rights related to ARCO's Apollo/Parks Township Insurance Rights subject to the ARCO Carveout, as those afforded the ARCO Entities immediately prior to the Effective Date, and such rights shall be deemed to be transferred to the Apollo/Parks Township Trust and deemed vested in the Apollo/Parks Township Trust upon the occurrence of the Apollo/Parks Township Insurance Rights Assignment. With respect to the rights that are transferred to the Apollo/Parks Township Trust, such rights shall be so vested free and clear of all liens, security interests, and other Claims, or cause of action, except as otherwise provided for in this Plan;

At issue also at confirmation was the question of whether the Plan Proponents could enter into a settlement of radiation claims due to the breaches of the policy by ANI in the conduct of the *Hall* and other litigation. Breach of contract actions are based upon state law. A determination that the insurer has breached obligations due under a policy to the insured is at heart a state law breach of contract issue. It is not an issue that invokes substantive rights created by federal bankruptcy law. Instead, the issue is one that invokes state law, and could exist outside of bankruptcy. It is thus a non-core matter in which this court may enter proposed findings of fact and conclusions of law. Accordingly, the following section dealing with the propriety of the settlement of radiation claims are made as proposed findings of fact and conclusions of law.

E. *Proposed Findings of Fact and Conclusions of Law That ANI has Forfeited Rights under the Policies, such as the Management of Claims. No Action or Consent to Settlement Provisions.*

B & W contends that because ANI has breached its duty to settle and to defend and has disclaimed coverage for the A/P claims, that B & W may enter into a reasonable

settlement of the A/P claims despite language in the policies that would give ANI the right to control the defense and settlement of the claims. Each contention will be discussed.

1. *Breach of Duty to Settle.*Plan Proponents contend that ANI has the duty of good faith and fair dealing under the insurance contracts, accordingly ANI has the affirmative duty to both negotiate and accept reasonable settlement offers. They contend that notwithstanding the $36.7 million adverse test trial verdict, ANI has never initiated settlement discussions, has rejected all settlement offers, has refused to negotiate with claimants and refused to authorize any counterproposal in response to settlement demands.

ANI responds that, under Pennsylvania law, the insurer has no absolute duty to settle a case within policy limits. Instead, because ANI conducted an extensive evaluation of the claims and determined the claims had no scientific or legal merit, it was reasonable for ANI to defend the case rather than settle. Therefore, it is argued that ANI did not act in bad faith in determining to defend, rather than settle, the *Hall* action.

*38 Generally, insurance law recognizes that the covenant of good faith and fair dealing implied in the insurance contract provides the insurer with a duty to settle within policy limits on objectively reasonable terms.FN202The duty stems from the insurer's exclusive control over settlement negotiations, "plus the inevitable conflict between the insurer's interest to pay as little as possible and the insured's interest not to suffer an excess judgment."FN203 A strong case against an insured on the issue of damages and liability tends to show the insurer's rejection of an offer to settle was negligent or in bad faith.FN204 Similarly, the insurer's rejection of advice of investigators, adjusters, or legal counsel of an opportunity to settle a claim within the policy limits may constitute evidence of negligence or bad faith in failing to compromise.FN205 The effect of the insurer's good faith refusal to settle is that the liability of the insurer remains measured by the terms of the policy, and the insured is not relieved of compliance with policy provisions.FN206 However, the wrongful refusal by the insurer to settle operates to release the in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sured from all provisions of the policy that otherwise give the control of the matter to the insurer.[FN207]

> FN202. 14 Couch on Insurance, section 203.12, 14 (3d ed.1999).

> FN203.*Id.* at 203.13.

> FN204.*Id.* at 203.29;*see also Cowden v. Aetna Cas. & Sur. Co.,* 134 A.2d 223 (Pa.Super.1957)(where little possibility of verdict or settlement within policy limits, decision not to settle must be based on insurer's bona fide belief predicated upon all circumstances of case, that it has good possibility of winning suit).

> FN205. 14 Couch on Insurance, section 203.31 (3d ed.1999).

> FN206.*Id.* at 203.34.

> FN207.*Id.* at 203.38.

Pennsylvania law provides that, under an insurance contract, the insurer undertakes three obligations: (1) to indemnify against liability covered under the policy; (2) to defend all claims that potentially come within coverage of the policy; and (3) a fiduciary responsibility towards the insured and an obligation to act in good faith and with due care in representing the interests of its insured when handling third party claims brought against the insured.[FN208] The duty to act in good faith in representing the interests of its insured compels the insurer to accord the insured's interests "the same faithful consideration it gives its own interests."[FN209] A decision not to settle involves an objective consideration of all factors bearing on the advisability of a settlement, including consideration of anticipated range of an adverse verdict, strengths and weaknesses of evidence, history of similar cases in the area, the relative appearance of persuasiveness, and the appeal of claimant, witnesses and the insured at trial.[FN210] The insurer does not have an absolute duty to settle a claim merely because a judgment against the insured may exceed the policy limits.[FN211] By the same token, where there is little possibility of a verdict within policy limits, the decision

to litigate must be based on a reasonable assessment of the circumstances of the case and a real and substantial chance of a verdict in favor of the insured.[FN212] Therefore, the "insurer's right under the policy to litigate or settle a claim against the insured is not a right to risk the insured's financial well-being unless there is both a real and a substantial chance of a finding of nonliability."[FN213]

> FN208.*The Birth Center v. St. Paul Cos., Inc.,* 727 A.2d 1144, 1155 (Pa.Super.Ct.1999)(and cases cited therein).

> FN209.*Id.* at 1155.

> FN210.*Id.* (citing *Shearer v. Reed,* 428 A.2d 635, 638 (Pa.Super.1981).

> FN211.*Id.* at 1156 (citing *Cowden v. Aetna Cas. & Sur. Co.,* 134 A.2d 223, 229 (Pa.Super.Ct.1957).

> FN212.*Id.*

> FN213.*Id.* at 1156.

**\*39** Through the course of the *Hall* action, B & W and ARCO have made numerous requests that ANI settle the matter. The parties have stipulated here that after the jury's verdict in the *Hall* matter, both B & W and ARCO requested that ANI settle the matter.[FN214] The testimony and evidence in this proceeding indicates that B & W and ARCO requested, before the jury verdict, during jury deliberations and after the verdict, that ANI settle the matter for amounts within the policy coverage that plaintiffs had offered as settlement.[FN215] ANI did not respond to the settlement demands made during jury deliberations and did not settle the *Hall* action. Indeed, McDermott's general counsel informed ANI that "ANI's refusal to negotiate is unreasonable and in bad faith in view of, among other things, the nature of plaintiffs' claims, ANI's control of the defense of B & W, and the damages to which B & W is exposed."[FN216]

> FN214. Joint Pretrial Order, Pl. 5356, Nos. 102, 107, 108, 113.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                          Page 45
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

FN215. Exhibits 3035, 3036, 3037, 3038, 3043, 3049, 3050, 3051, 3053, 3073, 3082

FN216. Exhibit 3037.

On September 17, 1998, the jury in the *Hall* action rendered a verdict in the amount of $36.7 million for the initial eight test cases. Mr. Nesser testified that, at that time, B & W was concerned that it would be exposed to uninsured losses over the policy limits should all the then remaining 100 claims be tried. Additionally, after the jury verdict, ANI informed the Debtors that its position was that the limits of liability remaining in the A/P policies was insufficient to pay the jury award or any future liability.[FN217] B & W learned for the first time that ANI took the position that the A/P policy limits were at the lowest limits of liability. Indeed, on November 22, 1998, ANI wrote that the costs of litigation incurred by ANI and assessed against the policies "ha[d] already exhausted the limits available at both facilities for bodily injury and property damage caused by the nuclear energy hazard prior to July 12, 1968."[FN218] Given ANI's position, B & W reasonably could assume that it would be exposed to payment of all claims in the *Hall* action.

FN217. Exhibit 3046.

FN218. Exhibit 3064.

On November 4, 1998, B & W, ARCO, ANI and the *Hall* claimants' counsel attended a mediation session held before a Judge Gibbons, a retired judge of the federal Third Circuit in an attempt to resolve the *Hall* claims.[FN219] ANI did not agree to settle the *Hall* claims, and on November 19, 1998, sent correspondence indicating that it would withdraw from any further mediation before Judge Gibbons because the policy holders would not negotiate the policy limits applicable to the *Hall* claims.[FN220]

FN219. Pretrial Order, P. 5356, Uncontested Facts Nos.103, 105, 106.

FN220. Exhibit 3055.

Both the testimony and the evidence reflect that ANI's

stated reason for refusal to settle was because settlement in this case would provide incentive for plaintiffs to bring other actions against ANI's insureds.[FN221] Case law provides that a refusal to settle based upon a self-serving agenda permits an inference that the insurer has failed to consider all facts and circumstances in considering a settlement proposal.[FN222] ANI contends that its refusal to consider settlement is based upon its understanding that the claims lack scientific merit and that Third Circuit precedent requires evidence of exposure to radiation at least in excess of background levels. Although a new trial was granted in the *Hall* action, it is uncontested that a jury rendered a verdict in favor of the initial test claimants. It is also undisputed that B & W and ARCO made repeated demands of its insurer to settle the claims for amounts within the policy limits, all of which were either not responded to by ANI, or which ANI refused to consider. At the same time, ANI's initial reaction to the jury verdict was to assert that policy limits had been exhausted and that B & W was exposed to uninsured liability on the claims. Since that initial assertion, and after litigation, the Pennsylvania court has determined that ANI's theory of coverage is not valid. To date, any progress in the case, including a determination of the trigger of coverage and whether B & W is entitled to separate counsel, comes only after litigation.

FN221. Exhibits 3043, 3049.

FN222.*Birth Center,* 727 A.2d at 1156 (Insurers stated reason in not settling that it tries all bad baby cases "indicates an agenda on the part of the insurer that is self-serving").

**\*40** The facts and circumstances of the *Hall* action indicate that ANI's duty to settle has been triggered. The plaintiffs have made settlement offers within the limits of the policies, and the defendants in the *Hall* action have repeatedly requested that settlement offers be considered, and a settlement be entered in the matter. The *Hall* case involves significant litigation risks. The record indicates that claimants include those who have died of cancer. The initial test trial resulted in a jury verdict of $36.7 million in favor of only eight of the over 100 claimants. Although a new trial has been granted in the action, it remains true that the test trial resul-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                 Page 46
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

ted in a substantial jury verdict in favor of the plaintiffs. If the verdict amounts were extrapolated over 100 claims, a significant risk exists that B & W will be exposed to liability in excess of policy limits, especially when attorney's fees and other transaction costs that reduce the policy limits is considered, and that these fees, at the end of 1998, exceeded $12 million, and currently exceed $24 million.[FN223] Even after a jury verdict, ANI has not considered any settlement proposals, choosing instead to litigate.

> FN223. Exhibit 3064. The total transaction cost expended in defense of the *Hall* action as of November 1, 2003 is $24.02 million. Joint Pretrial Order, Uncontested Fact No. 120, Pl. 5356.

ANI also has taken the position after the test trial that policy limits are exhausted, exposing B & W to significant uninsured liability. This position ultimately proved to be unavailing; however, B & W has had to expend significant sums in litigating the coverage matter. ANI argues that no basis exists in Pennsylvania law to strip an insurer of the right to defend claims because it refuses to settle. Instead, it argues that Pa. Cons.Stat. § 8371 provides the exclusive remedy for bad faith conduct by an insurer is damages, and no remedy is found in the statute of the forfeiture of the right to defend. Section 8371 was promulgated by the Pennsylvania legislature in 1990, and created a new cause of action under state law for "bad faith."[FN224] The statute provides that if an insurer has acted in bad faith toward the insured, the court may award interest on the claim, award punitive damages and assess court costs and attorneys' fees.[FN225] The courts have consistently held that § 8371 creates a separate and independent cause of action.[FN226] A "claim brought under § 8371 is a cause of action which is separate and distinct from the underlying contract claim."[FN227] Because § 8371 was "promulgated to provide additional relief to insureds and to discourage bad faith practices of insurance companies, we would be reluctant to impose any limitations of claims brought under § 8371 which do not appear in the plain language of the statute."[FN228] The Pennsylvania Supreme Court has interpreted § 8371 as

an additional remedy that does not preempt common law rights.[FN229] The statute was not intended to alter prior law, and nothing in the statute prevents the court from granting remedies not mentioned in the statute that it previously had the power to award.[FN230] Instead, "[t]he statute does not reference the common law, does not explicitly reject it, and the application of the statute is not inconsistent with the common law. Accordingly, the [common law] remedy survives."[FN231] ANI's argument that § 8371 provides an exclusive remedy is not well taken, and is overruled.

> FN224. *March v. Paradise Mut. Ins. Co.,* 646 A.2d 1254, 1256 (Pa.Super.Ct.1994).

> FN225. 42 Pa.C.S. 8371.

> FN226. *March,* 646 A.2d at 1256 (and cases cited therein).

> FN227. *Id.*

> FN228. *Id.*

> FN229. *Birth Center,* 787 A.2d at 402-403.

> FN230. *Id.* at 404.

> FN231. *Id.* at 407.

**\*41** In conclusion, this court recommends that the district court find that sufficient evidence has been produced to support the Plan Proponents' allegation that ANI has breached its duty to settle. It further recommends a finding that the settlement of the *Hall* claims contained in the Plan does not violate the ANI policies.

2. *Breach of Duty to Defend.* Plan Proponents contend that ANI has breached its duty to insureds to defend by failing to appoint separate counsel for ARCO and B & W even after it was evident that serious conflicts of interest existed between the two. ANI asserts that the appointment of Pepper Hamilton as joint defense counsel for B & W and ARCO was not in bad faith, that ANI accepted the tender of the defense under a reservation of rights, and that no support exists for the proposition that an insurer that accepts the tender of claims and appoints

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                      Page 47
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

defense counsel has forfeited its right to defend claims.

Generally, policies will contain a provision by which the insurer obligates itself to defend the insured against all actions covered under the policy. The insurer's un-justified refusal to defend exposes it to a finding that it has breached its duty to defend, and that it has breached the insurance contract. The result is that the insurer may be estopped from disputing coverage, may incur liabil-ity and lose its rights under the policy such as to prohib-it settlement by the insured, to control the defense and to require the insureds compliance with other policy provisions.[FN232] Even then, however, a settlement reached by the insured, after the insurer's unjustified re-fusal to defend, must be reasonable and entered in good faith.[FN233]

> FN232.14 Couch on Insurance, 202.4 (4th ed.1999).

> FN233.*Id.* at 202.9

Plan Proponents rely on the case of *Apalucci v. Agora Syndicate, Inc.,*[FN234] as support for the proposition that the insurer's failure to defend results in loss of rights under the policy to protect it from claims of its insured or third parties injured by the insured. In *Ap-alucci,* the Third Circuit court held that an insurer's re-fusal to defend constituted a breach of contract, and the insured lost its right to enforce a "no action clause" in the policy despite the lack of an actual trial. In that case, an injured minor who was served alcoholic beverages at a club, sued the club for negligence. By the time the suit was filed, the club had ceased business and its owner could not be found. A default judgment was eventually entered against the club, and the injured minor made a demand against the club's insurer for payment. The club owner had notified the insurer of the claim, but the in-surer was unable to locate the owner and denied cover-age based upon the owner's failure to assist and cooper-ate in the defense of claims, as required by the policy. The insurer responded to the claimant's suit to collect the judgment by denying any obligation and asserted that the claimant lacked standing to sue for bad faith breach of the duty to provide coverage and defense to the club, and the club's breach of the policy by failing to

cooperate.

> FN234.145 F.3d 630 (3d Cir.1998).

*42 The Third Circuit held that, despite the provision in the policy requiring an "actual trial" prior to bringing suit against the insurer under the policy, the essence of the clause did not require a trial, but "whether the in-sured suffered a bona fide and fixed money judgment."[FN235] Instead, the "actual trial" provision depended upon the insurer defending the insured in good faith, and the insurer had failed to do so in this case. The refusal to defend, "cut at the very root of the mutual obligation, [it] put an end to its right to demand further compliance with the ... term of the contract."[FN236] Instead, "when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure."[FN237] Be-cause the insurer permitted a default to be entered against the insured, it could not complain that the de-fault was not a "trial" so that the "no action" clause would apply, and a third party beneficiary may sue the insurer directly to collect and enforce the default.

> FN235.*Id.* at 633.

> FN236.*Id.* (quoting *St. Louis Dressed Beef & Provision Co. v. Maryland Cas. Co.,* 201 U.S. 173, 181 (1906).

> FN237.*Id.* at 634.

In this case, Plan Proponents argue that while ANI ap-pointed counsel in the *Hall* action, it nonetheless effect-ively failed to defend B & W by appointing a joint de-fense counsel with a conflict of interest, and by arguing an "emission" theory of coverage that would effectively nullify coverage. ANI originally appointed the Pepper Hamilton law firm to defend both B & W and ARCO in the *Hall* action. Both B & W and ARCO expressed a de-sire to retain separate counsel, notified ANI that the re-servation of rights raised a conflict of interest,[FN238] and expressed concern regarding the firm's relationship with ANI. Nevertheless, the litigation proceeded with a single joint defense counsel which, as it developed, was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                    Page 48
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

unable to make certain arguments because of conflicts. For example, the joint defense counsel was unable to pursue a cross claim that B & W wished to file against ARCO for indemnity for discharges occurring while ARCO's subsidiary was the licensee of the facilities, because of the conflict that it would pose.[FN239] It also became clear during the course of the trial that Pepper Hamilton could not advise ANI regarding settlement demands because of the "claims asserted inter se by the insurer and the insured."[FN240] ANI filed suit seeking, among other things, to enjoin B & W from retaining independent counsel in the *Hall* action .[FN241] In fact, the Pennsylvania federal court, in coverage litigation between ANI and B & W, found that ANI must provide separate counsel to each insured in the defense of the *Hall* action.[FN242]

FN238. Exhibit 3025, 3026, 3030.

FN239. Exhibit 3043.

FN240. Exhibit 3076.

FN241. Exhibit 3088 ("on their tenth cause of action, enjoining B & W from continuing to retain K & L as counsel in the defense of the *Hall* action.")

FN242. Exhibit 3096, at pg. 38 ("Furthermore, as long as the plaintiffs are raising claims against both B & W and ARCO and the trial court may be using verdict forms which require the jury to make separate findings as to the responsibilities of B & W and ARCO for the plaintiffs' injuries, it is not possible for a single law firm to represent B & W and ARCO."). This decision was affirmed on appeal in November 2002, and the Pennsylvania Supreme Court denied further review. Pretrial Order, Uncontested Facts Nos. 128, 129.

Nonetheless, ANI has refused in the past, and continues to refuse, to pay for the independent counsel which B & W retained in the litigation.[FN243] Instead, ANI has expressed to Pepper Hamilton a desire to restore common counsel.[FN244]

FN243. Exhibits 3086, 3087.

FN244. Exhibit 3114.

Pennsylvania law provides that the duty to defend includes the duty to provide independent counsel when a potential conflict of interest exists between co-defendants.[FN245] An insurer's denial of the obligation to defend or indemnify the insured constitutes a breach of the insurer's duty to act in good faith and a repudiation of the insurance contract, permitting the insured to negotiate a settlement, so long as it is fair and reasonable.[FN246]

FN245. *Bituminous Ins. Cos. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 427 F.Supp. 539, 555 (E.D.Pa.1976).

FN246. *Alfiero v. Berks Mut. Leasing Co.*, 500 A.2d 169, 172 (Pa.1985).

**\*43** In conclusion, this court recommends that the district court find that sufficient evidence has been produced to support the Plan Proponents allegation that ANI has breached the duty to defend.

3. *Denial of Coverage.* Plan Proponents assert that ANI breached its insurance policy by filing declaratory judgment actions in Pennsylvania and New York, following the adverse jury verdict against insureds in the *Hall* action, seeking a declaration that the policies carried the lowest limit of liability based upon its "emission" trigger of coverage. They assert that the legal maneuver effectively denied coverage for losses under the policies, because ANI asserted that defense costs had eroded the entire value of the coverage.[FN247] ANI contends that it did not deny coverage, but instead merely exercised its legal right to adjudicate a legitimate coverage dispute in court. It contends that the dispute over the trigger of coverage was one of first impression under nuclear energy liability policies.

FN247. Exhibit 3046, 3054, 3064.

At the time that ANI put forth its "emission" trigger theory, applicable Pennsylvania law provided that "manifestation" was an applicable trigger of coverage.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In the case of *J.H. France Refractories Co. v. Allstate Ins. Co.*,[FN248] the Pennsylvania Supreme court held that policy limits in effect when the manifestation of injury occurred were applicable.

> FN248. 626 A.2d 502 (Pa.1993).

Despite knowledge of the *J.H. France* decision,[FN249] ANI initiated two coverage actions, one in New York and the other in Pennsylvania. In the Pennsylvania action, filed in October 1999, ANI requested a declaration that "plaintiffs ANI and MAELU are relieved from all liability to B & W under the Facility Form Policies and/or the S & T Form Policies with respect to the *Hall* action,"[FN250] by reason of B & W's alleged breach of good faith by refusing to authorize joint defense counsel to file a motion to certify an appeal, and by instructing the firm of Kirkpatrick and Lockhart to act on its behalf in the *Hall* action. The Pennsylvania court ultimately held that B & W was entitled to independent counsel, and that, because the CGL policy in the *J.H. France* case was almost identical to the language in the ANI policies, *J.H. France's* interpretation of the policies would govern interpretation of the ANI policies, making the more expansive manifestation trigger applicable to the *Hall* action.[FN251]

> FN249. Exhibit 3049. In a letter to ANI dated Nov. 2, 1998, ARCO writes: "In *J.H. France Refractories Co. v. Van Brunt Co.*, 534 Pa. 29, 626 A.2d 502 (1993), the Pennsylvania Supreme Court decided that bodily injury of this sort triggered all policies in effect during any stage of the pathogenesis, including exposure, progression or manifestation of the disease."

> FN250. Exhibit 3088.

> FN251. Exhibit 3094, pgs. 17-20.

Generally, once an insurer denies coverage, the insured is released from policy provisions governing cooperation and settlement, as well as other provisions.[FN252] Case law also recognizes that a prolonged silence, or refusal to answer an insured's request for coverage or a coverage position may constitute the equivalent of a denial of coverage.[FN253] It seems equally clear to this court that an action for a declaration that there is no coverage has the same effect.

> FN252. 1 Insurance Claims and Disputes 4th section 3:10 (Sept.2003).

> FN253. *Id.* (citing *Sarnafil, Inc. v. Peerless Ins. Co.*, 636 N.E.2d 247, 253-53 (Mass.1994); *Best Place v. Penn Am. Ins. Co.*, 920 P.2d 334, 352-53 (Haw.1996)).

This court recommends that the district court make a finding that ANI effectively denied coverage to its insured, thereby releasing the insured from policy provisions that ANI argues prohibits the settlement contained in the Plan.

*F. Reasonable Settlement.*

*44 Under Pennsylvania law, once the insurer breaches its contract, an insured may negotiate a reasonable settlement with the injured party "so long as it was done in good faith and the settlement was fair and reasonable."[FN254] The good faith of the Plan Proponents is discussed elsewhere in this opinion, and will not be repeated. The Settlement Agreement provides for settlement of A/P claims for the amount of $110 million, with up to a $100 million set aside for future claimants. The court finds the settlement is fair and reasonable. The settlement is in an amount within the policies' coverage. Pepper Hamilton, joint defense counsel in the *Hall* action, has prepared a range of settlement values, and the settlement is not out of line with these figures.[FN255] Mr. Baron, one of the leading attorneys representing plaintiffs in this type of case, testified that his estimate of the potential value in the tort system of all the radiation cases, considering the number of claims and the jury verdict in the test case, would approach $1 billion.[FN256] The settlement amount uses figures for the test claimants that: (i) are significantly lower than the jury verdicts in the test cases, (ii) are in amounts close to the pre-bankruptcy settlement offers made by plaintiffs counsel, and (iii) are in line with the *Hall* counsel's settlement figures, which are signific-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                      Page 50
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))

antly lower than plaintiffs' counsels estimate of the potential value of the cases.

FN254.*Alflero,* 500 A.2d at 172.

FN255. Exhibit 3076. In July, 1999, counsel recommended a settlement value of between $38 to $63 million on the personal injury claims, based upon certain assumptions, plus a small amount for the 178 property damage claims and medical monitoring claims. Mr. Nesser testified that this value was subsequently determined, in March 2003, to a range of $70 to $90 million. Exhibit 3102.

FN256. Baron testimony, January 5, 2004.

At trial, the Plan Proponents provided a detailed explanation for the settlement value and the amounts paid to claimants. The values for the eight cases where jury verdicts were initially rendered, were settled for 32% to 42% of the jury verdict. The remaining claims were placed in four categories, based upon five criteria, including:

1. The strength of the evidence regarding the relationship of the type of cancer asserted to the nuclear exposure;

2. The location where each person was exposed, the duration of the exposure, and the years of exposure;

3. The age of the individual, with the claims of younger cancer victims accorded more value than those of relatively older claimants;

4. Special characteristics in the damage claims, such as plaintiffs who had sustained significant medical expenses or plaintiffs with large families;

5. Whether the particular claim was within the statute of limitations period, and if not, the strength of the claimants' arguments regarding tolling.

The court finds that the settlement values are reasonable, based upon fair assumptions for the reasonable value of claims considering a number of various criter-

ia, and comport with state law regarding fair and reasonable settlement.

ANI is not prejudiced by the settlement. The settlement will liquidate and allow the *Hall* claims; however, the Plan Proponents argue that ANI's rights regarding coverage are not prejudiced by the settlement.[FN257] Instead, the Plan provides that insurance rights will be transferred to the A/P Trust, and claimants state that the Trust will take those rights for what they are. If it is ultimately determined that no coverage exists, then the Trust will not recover. Because ANI retains its right to contest coverage, it is not prejudiced by the settlement.

FN257. Trial Brief of the Apollo/Parks Township Releasors, pg. 37. Pl. 5358.

**\*45** The settlement also comports with bankruptcy standards regarding settlement, and will be approved. Under Bankruptcy Rule 9019 and applicable law, in order for a settlement to be approved by a bankruptcy court, it must be "fair and equitable and in the best interest of the estate."[FN258] The factors a court considers in evaluating whether a settlement is fair and equitable include:

FN258.*Matter of Cajun Elec. Power Coop., Inc.,* 119 F.3d 349, 355 (5th Cir.1997).

1. The probability of success in the litigation, with due consideration for the uncertainty in fact and law;

2. The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay;

3. The best interests of the creditors with proper deference to their reasonable views;

4. The extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion;

5. All other factors bearing on the wisdom of the compromise.[FN259]

FN259.*Id.* at 356.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                Page 51
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

1. *Probability of Success.*Under the settlement, the *Hall* action will be dismissed, and the *Hall* claimants will be paid in accordance with a matrix established under the trust. The *Hall* action has been pending since 1994. In that time, defense costs have exceeded $24 million. In 1998, a jury in a test trial of eight claims in the *Hall* action rendered a verdict against B & W and ARCO in the amount of $36.7 million. Although a new trial was ultimately granted, as pointed out by Plan Proponents, a significant risk still exists in the case of an adverse judgment. At the test trial, the *Hall* plaintiffs were permitted to have their experts testify that the plaintiffs' injuries were caused by emissions from the A/P facilities. While defendants sought to have this testimony excluded, the court has stated that sufficient admissible evidence of causation has been presented, and would likely permit the experts' testimony on retrial. ANI asserts that it has a strong case on retrial, that it has retained highly qualified experts who can rebut allegations that claimants' injuries were caused by emissions from the facilities, and that the dose of radiation that plaintiffs' experts estimate the plaintiffs had received is insufficient to increase the risk of disease.[FN260]Consideration of a settlement does not require the court to conduct a mini-trial to determine the probable outcome of claims compromised.[FN261]Instead, the court considers relevant facts and law to enable it to make an informed and intelligent decision.[FN262]Given that a test trial has already resulted in jury verdicts in favor of the test plaintiffs, and that on retrial the trial court may permit plaintiffs' experts to testify regarding whether the plaintiffs' injuries were caused by emissions from the A/P facilities, the court finds that this factor weighs in favor of approval of the settlement. In short, there is a substantial probability that the plaintiffs will again be successful in the *Hall* action.

FN260. ANI Post Trial Brief, pgs. 29-30.

FN261.*Cajun*, 119 F.3d at 356.

FN262.*Id.*

2. *Complexity, Expense and Likely Duration of Litigation.*As recited above, the *Hall* action has been pending for ten years, and not a single claim has been resolved.

In that time, the defense costs have exceeded $24 million. There are now over 500 claimants involved in the litigation, and the defense costs are likely to increase exponentially if the litigation continues. The defense costs reduce the policy limits, and if permitted to escalate, will ultimately reduce any recovery in the case.

*46 The likely duration of the litigation is uncertain; however, given the time spent already in the case, it is likely to last for several more years. Any appeal of the *Hall* verdict would add at least a year, and probably more, to the expected duration of the case.

Both parties acknowledge the complexity of the case. It involves issues regarding radiation exposure including highly complex medical and scientific evidence and the effect of the Price Anderson Act. The case involves 500 plaintiffs, personal injury and property damage claims. A trial is likely to be complex, expensive and time consuming. Given the complexity, expense and likely duration of the litigation, settlement is advisable.

3. *The Best Interests of the Creditors.*In considering whether a settlement is fair and equitable, the court must consider the reasonable views of a majority of the creditors.[FN263]The settlement is supported by all creditors and by the A/P Futures Representative. Over 99% of the present A/P claimants voted in favor of the Plan. ANI is the only party that has objected to the A/P settlement, and ANI is not a creditor of the estate. The A/P Futures Representative, as well as retained experts and professionals, have conducted due diligence into the reasonableness of the settlement as it affects future claimants, and concluded that the settlement is in the best interests of the future claimants. This factor also favors approval of the settlement.

FN263.*In re Foster Mortgage Corp.*, 68 F.3d 914, 917 (5th Cir.1995).

4. *Arms-Length Bargaining.*The settlement is the result of extensive negotiations, commencing in November, 1998, with the parties involved in the *Hall* action. In March 2003, after the filing of Debtors' bankruptcy petitions, mediation was again commenced between the *Hall* claimants, B & W and ANI to attempt to resolve

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the *Hall* claims. Mr. Francis McGovern, the court-appointed mediator, participated in the mediation.FN264ANI was represented by its bankruptcy counsel, as well as by an attorney from Pepper Hamilton, the firm which conducted the joint defense of the *Hall* action. Mr. Nesser testified that, at this time, Pepper Hamilton provided an updated analysis of the settlement value of the *Hall* action, reflecting values between $70 and $90 million.FN265 Mr. Baron testified that thousands of hours were spent in negotiations, resulting in the settlement agreement.

> FN264. Exhibit 3099.

> FN265. Testimony John Nesser, Jan. 7, 2004; Exhibit 3102.

Thereafter, the A/P Futures Representative was appointed, and was given an opportunity to examine the agreement and the fairness of the settlement and the Plan to future claimants. Due diligence was conducted by the A/P Futures Representative, and further negotiations occurred. These negotiations resulted in the filing of an Amended Settlement Agreement, incorporating revisions requested by the Futures Representative. These revisions include granting the FCR the right to participate in the drafting of the A/P Trust Distribution Procedures, and to provide a set aside of $75 million (with a cap of $100 million) for the future claimants.

*47 The court finds that the A/P settlement is not the result of fraud or collusion, but is the result of arms-length bargaining. As such, it will approve the settlement.

## IX. *OTHER OBJECTIONS*

### A. *Lack of Notice.*

Maryland Ins. Co. and Federal Insurance Co. object that they were not provided notice in time for filing objections to the Plan and Disclosure Statement. Plan Proponents assert, and the record reflects, that sufficient notice of the bankruptcy filing was provided to each insurer. Maryland was informed through its designated agent of the initial petition filed in 2000,FN266 had no-

tice of, and actually participated in, discovery prior to the confirmation hearing, and filed an objection to the Plan.FN267 The record reflects that Maryland had notice of, and participated in objections to the confirmation of the Plan. As such, its objection of lack of notice is not well taken and is overruled.

> FN266. Exhibit 15.

> FN267. Exhibit 4735.

Similarly, Federal Insurance objects that it lacked notice of the Plan. The record reflects a different story. It shows that Federal, in January 2003, filed two proofs of claim in the bankruptcy proceedings.FN268 Federal knew of the bankruptcy proceedings at least by January 2003. It certainly knew of the bankruptcy proceedings and plan confirmation when B & W sent it notice of the Plan filing in May, 2003.FN269 Federal's objection of lack of notice is similarly overruled.

> FN268. Proofs of Claim 0350968 and 0350945.

> FN269. Exhibit 15, BW 10020012-41. BW 10020036 indicates that on May 22, 2003, B & W notified "Jeff Golden, Federal Insurance Company, c/o Chubb Ins. Group, 2000 W. Loop South, Suite 1800, Houston, TX 77027" of the filing of the Plan.

### B. *Objections Specific to Ace Companies*

Ace contends that its insurance policies are unique, i.e., that its policies are backed by various forms of security and a third party guarantee under a High Deductible Program and/or Captive Program. Ace provided primary general liability, workers' compensation and automobile liability insurance to B & W, MII and their affiliates, backed by forms of security and a third party guaranty by MII, as well as excess policies where no security was required. Additionally, some general liability policies are fronting policies reinsured largely by a wholly owned captive of MII, i.e., by Creole Insurance Co., Ltd. ("Creole"). Ace objects that the Plan cannot eliminate, alter or impair Ace's rights to the collateral, security, reinsurance and guarantee, and that the Plan does so because it: (1) impairs Ace's recourse against the Cap-

tive reinsurers and MII to access reinsurance and the third party collateral; (2) provides for the Captive Program to be dismantled and restructured, divides the Third Party Collateral held by Ace and releases the MII guaranty; (3) reassigns fronting policies secured by Creole[FN270] collateral and channels asbestos claims to the asbestos trust, and enjoins Ace from recourse against the Creole Reinsurance and Creole collateral.

> FN270. Creole is a captive insurance subsidiary of MII.

Plan Proponents agree that the collateral posted to the High Deductible Program or to the Captive Program is not property of the estate, but assert that the channeling injunction may protect property of affiliated third parties who make substantial contributions to the trust.

**\*48** Section 524(g)(1)(A) specifically permits the court to issue an injunction "to supplement the injunctive effect of a discharge under this section."Under § 524(g)(4)(A)(i), the injunction is valid and enforceable against all entities that it addresses. Moreover, notwithstanding the provisions of § 524(e), which prohibits a discharge from affecting the liability of a third party or third party property, the channeling injunction "may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor ..." that arise by its ownership of a financial interest in the debtor, the third party's management of the debtor, the third party's provision of insurance to the debtor or a related party, or the third party's financial transaction or corporate restructuring of the debtor or a related party.

Notwithstanding the general prohibition of a third party's release contained in § 524(e) of the Bankruptcy Code, § 524(g)(4)(A)(i) relating to asbestos channeling injunctions specifically permits a third party to be the beneficiary of an injunction, so long as the conditions and requirements of the section are met. The Plan provides for the Debtors and the MII Indemnified Parties to be subject to the protections of the channeling injunction.

Plan Proponents agree that certain of Ace's claims, including claims for indemnity against MII Indemnified Parties and Creole Insurance Co. will be channeled to the Asbestos PI Trust, but assert that this is permitted by § 524(g). This court agrees. While it is premature at this point to determine the effect of implementation of the channeling injunction, the relief sought by the Plan is likely within the protection found in § 524(g). The Plan provides that the Asbestos PI Channeling Injunction will enjoin Ace from proceeding against MII or the collateral pledged by MII under its agreements with Ace. This is permitted by the terms of § 524(g)(4)(A)(ii), which permits the channeling injunction to bar actions against an identifiable third party directly or indirectly liable for claims against the debtor.FN271MII is such a party as an owner or ultimate parent of the Debtors. Similarly, Creole as the captive insurer of B & W, is a third party that provided insurance to the Debtor or a related party under the section.

> FN271.*In re Combustion,* 295 B.R. 459, 482 (Bankr.D.Del.2003)("To the extent that [nondebtors] are sued as a result of their prior affiliation with Debtor or other relationship with Debtor as provided in 524(g)(4), the channeling injunction is properly applied to them.").

X. *CONCLUSION*

For the reasons expressed in the foregoing opinion, the Court recommends that the Plan be confirmed. The Plan requires that numerous findings of fact be made in connection with confirmation. To the extent that findings are required for confirmation, they are adopted.

As to non-core maters and in accordance with Bankruptcy Rule 9033:

> Within 10 days after being served with a copy of the proposed findings of fact and conclusions of law a party may serve and file with the clerk written objections which identify the specific proposed findings or conclusions objected to and state the grounds for such objection. A party may respond to another party's ob-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                              Page 54
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)
**(Cite as: Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.))**

jections within 10 days after being served with a copy thereof. A party objecting to the bankruptcy judge's proposed findings or conclusions shall arrange promptly for the transcription of the record, or such portions of it as all parties may agree upon or the bankruptcy judge deems sufficient, unless the district judge orders otherwise.

Bkrtcy.E.D.La.,2004.
In re Babcock & Wilcox Co.
Not Reported in B.R., 2004 WL 4945985 (Bkrtcy.E.D.La.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.